# EXHIBIT B

Not Reported in A.2d
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)

Page 2



UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Edith CITRON, Samuel Pill, William Steiner, Sidney M. Cohn and Ruth Cohn,
tenants by the entirety, and Lillian Jackson, Plaintiffs,
v.
STEEGO CORPORATION, Industrial Equity (Pacific) Limited, IEP Acquisition Corp.,
Alfred Boyer and Robert Sutherland, Defendants.
CIV. A. No. 10171.

Submitted: Sept. 8, 1988.
Decided: Sept. 9, 1988.

\*\*637 Joseph A. Rosenthal, Norman M. Monhait, and Kevin Gross, Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and Jonathan M. Plasse, Goodkind, Wechsler, Labaton & Rudoff, New York City, for plaintiffs.

E. Norman Veasey, Allen M. Terrell, Jr., Kevin G. Abrams, and James C. Strum, Richards, Layton & Finger, Wilmington, and Neal, Gerber, Eisenberg & Lurie, Chicago, Ill., for defendant Steego Corporation.

Lawrence A. Hamermesh, Morris, Nichols, Arsht & Tunnell, Wilmington, and Alan R. Friedman, Robert M. Heller, and Mark J. Headley, Kramer, Levin, Nessen, Kamin & Frankel, for defendants Industrial Equity (Pacific) Limited, IEP Acquisition Corp., Alfred Boyer and Robert Sutherland.

MEMORANDUM OPINION

ALLEN, Chancellor.

\*1 On August 12, 1988, without prior negotiation or discussion with the board of directors of Steego Corporation, IEP Acquisition Corp. commenced a public tender offer for all of the outstanding shares of Steego at $6 per share cash. Two months earlier, the offeror's parent, Industrial Equity (Pacific) Limited ("IEP"), had purchased all of the Steego stock held by Steego's chairman, J. Russell Duncan (approximately 7.4% of the outstanding shares), and by Milastar, a corporation controlled by Mr. Duncan and his wife. (Milastar held 10.1% of Steego's stock). Together with IEP's prior holdings, and some open market purchases made prior to the commencement of the tender offer, IEP held 48.8% of Steego's common stock by the time it announced its offer.

Federal law requires the board of directors of a target corporation, in circumstances such as these, to consider the merits of such \*\*638 an offer and to inform shareholders of its conclusion. See 17 C.F.R. § 240.140-9. The Steego board met on August 18, 1988 to consider that question. It there decided to recommend acceptance of the offer.

The pending litigation was commenced on August 12, 1988--the day the tender offer was announced. An amended complaint was filed on August 25. The following day, plaintiffs sought and were granted the right to proceed on an expedited schedule. The matter was scheduled for a preliminary injunction application for September 8. A second amended complaint has now been prepared, although the court has not yet acted on any proposal that it be filed. It names the directors of Steego as defendants. The offer may close no sooner than midnight September 9.

Plaintiffs allege themselves to be shareholders to whom this offer is extended. They seek to have consummation of the offer enjoined, claiming it is, by its nature, coercive and, in the circumstances, actionably so. That is, they contend that IEP's 48.8% shareholding constitutes control over Steego that gives rise to fiduciary responsibilities. Those fiduciary duties are said to be breached here in a number of respects. First, it is claimed that the $6 cash price is substantially less than a fair price. Second, it is said that IEP has failed to disclose material information including the market value of certain assets of the Company; it is claimed that that information has been kept from the public but has been made available to IEP.

Another theory apparently advanced by plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                       Page 3
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)

principally involves Mr. Duncan and attempts to extend to IEP consequences of the wrongs it posits. Under that theory, Mr. Duncan has furnished nonpublic information to IEP and has manipulated the Steego board in order to foster IEP's interest in buying Steego at a bargain price. Duncan has been "paid" for this action by a consultation agreement and a $1.7 million investment by an IEP affiliate in Milastar. Accordingly, it is said that Duncan has breached his duty of loyalty and that IEP is jointly liable with him for the consequences.

*2 An additional theory said to justify the relief sought is that the Steego board acted without due care in recommending acceptance of the IEP offer. It did not seek to negotiate with IEP or to consider other alternatives. It did not seek the advice of an investment banker and was unaware of the true asset value of the Company. It is said to have acted hastily and without pertinent financial information that Duncan had made available to others who might have been interested in buying his stock. This theory, as an independent ground for relief, does not posit that the board has acted out of any interest that conflicts with the interests of shareholders, but seeks to enjoin a third **639 party tender offer (for purposes of this theory, the offer of an innocent third party) because the board itself has failed to satisfy its duty to the shareholders. If factually well founded, this theory raises the interesting legal question alluded to in *Jedwab v. MGM Grand Hotels, Inc.*, Del.Ch., 509 A.2d 584, 600 n. 12 (1986).

Plaintiffs seek an order enjoining consummation of the tender offer until (1) a supplement to the offer is distributed that discloses all material information, (2) the board withdraws its recommendation and makes full disclosure of any later position it takes, and (3) an opportunity to withdraw tendered shares is provided to tendering shareholders.

The legal test for the entry of a preliminary injunction is well settled and need not be repeated

*Shell Oil Co.*, Del.Ch., 482 A.2d 335 (1984)), but has done so rarely, since to do so "inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium[. Such a step] requires not only a special conviction about the strengths of the legal claim asserted, but also a strong sense that the risk in granting the preliminary relief of an untoward financial result from the stockholders' point of view is small." *Solash v. Telex Corp.*, Del.Ch., No. 9518, Allen, C. (January 19, 1988) at p. 33. *Accord Yanow v. Scientific Leasing, Inc.*, Del.Ch., C.A. No. 9536, Jacobs, V.C. (February 5, 1988); *Hecco Ventures v. Sea-Land Corp.*, Del.Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986); *Rosman v. Shoe-Town*, Del.Ch., C.A. No. 9483, Hartnett, V.C. (January 8, 1988); *Freedman v. Restaurant Assoc.*, Del.Ch., C.A. No. 9212, Allen, C. (October 16, 1987).

An offer extended by a 48.8% shareholder is, of course, less likely to be withdrawn as the result of an injunction of the kind sought than would be an offer extended by one who has not already invested substantial sums in the target corporation. Nevertheless, the granting of the remedy here would involve risks to the shareholders that (aside from the rights of the offeror) require substantial justification to impose. I cannot find that justification in the facts of this case as they now appear.

*3 **640 Those facts are not well developed and appear to be warmly contested. The statement of facts that follows represents a preliminary assessment of the probable results of a trial of this case predicated upon the record developed to date.

I.

Steego Corporation is a Delaware corporation with its principal offices in West Palm Beach, Florida. Its business is comprised of the distribution of automotive replacement parts, agri-equipment replacement parts, metal working machinery and industrial supplies. It also manufactures automotive

Not Reported in A.2d
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)

Page 4

been a negative $1.1 million. The Company discontinued paying dividends two years ago.

There are approximately 10,395,847 shares of Steego stock now outstanding. The market price of the stock in the past 18 months has ranged from a low of $2.50 in the second quarter of fiscal 1988, to prices in the $5 range immediately prior to the announcement of IEP's tender offer.

Steego's board includes a banker, the chief executive officer of an industrial company, and several present and former officers of Steego. A majority of the Steego board members appear to be independent directors in the sense that they are not current officers of the Company, nor do they appear to derive substantial income from regular transaction of business with the firm. The chairman and chief executive officer of Steego is Mr. J. Russell Duncan, who, together with his wife, owns 682,438 shares of Steego directly and holds an option controlling an additional 120,000 shares. In addition, the Milastar Corporation, of which Mr. Duncan is a 56% stockholder, owns 1,041,053 shares of Steego. The shares owned directly and indirectly by Mr. Duncan are now subject to a stock purchase agreement with IEP.

*IEP's involvement with Steego*

The tender offeror is a wholly owned subsidiary of Industrial Equity (Pacific) Limited, a Hong Kong corporation engaged in the **641 investment business. IEP first began acquiring Steego stock in January of 1986. Its Schedule 13D disclosure filing, reporting holdings of 574,250 shares (5.9% of Steego) was made October 29, 1986.

Over the past two years, IEP has gradually increased its overall position in Steego shares. Following its initial accumulation of Steego stock during the spring of 1988, IEP concluded that it was advisable to liquidate its Steego investment. It began seeking a buyer for the stock in March. It offered to sell its block to another large holder, Mr. Fen Arton, who held a 7% block of Steego. Mr. Arton declined to purchase the IEP shares and declared his intention to sell his own shares. IEP concluded that, given the thin market for Steego shares, it would be easier to sell a large block of Steego than IEP then held, and therefore expressed a willingness to purchase Mr. Arton's shares. On March 30, 1988, this transaction was accomplished at a price of $4.48 per share. This brought IEP's interest in Steego to 19.9%.

*4 At about the same time, Mr. Duncan attempted to sell his Steego shares. He was approached by two prospective buyers, General Electric Credit Corporation ("GECC") and Mr. Dolliver Frederick of the Frederick Capital Corporation. Mr. Duncan provided GECC and Mr. Frederick with specially prepared financial projections of Steego, subject to a confidentiality agreement. GECC eventually offered to pay Mr. Duncan $6 a share for his stock, and Mr. Frederick offered $5 a share. Apparently, both parties were considering subsequent tender offers for the remainder of Steego's stock. Mr. Duncan rejected both offers.

IEP apparently continued to search for opportunities to dispose of its Steego shares throughout the spring of 1988. Discussions were held during April between Mr. Boyer, the president and a director of IEP, and Mr. Duncan to consider the prospect of cooperation in selling their combined Steego holdings. Mr. Duncan evinced no interest in such a transaction.

Sometime after its discussions with Mr. Duncan, frustrated in its efforts to find a buyer, IEP began to consider the possibility of keeping its Steego shares, acquiring control of the Company, and attempting to turn the Company around by selling some of the Company's less profitable assets and some of the divisions which had consistently lost money. In furtherance of this objective, it began negotiating with Mr. Duncan for the sale of his Steego holdings to IEP. These discussions eventually bore fruit in June of 1988, in the form of a stock purchase agreement for all of Mr. Duncan's stock, **642 including the shares covered by the option agreement and the shares held by Milastar.

As part of the negotiation of this sale--or at least contemporaneously-- affiliates of IEP entered into long-term (five year) consulting agreements with Mr. Duncan which will pay him $300,000 per year while in effect. In addition, IEP agreed to make a $1.7 million investment in a new class of preferred stock of Milastar. Both of these agreements--which Duncan and IEP claim are separate from the consideration for the sale of Steego stock--are subject to a closing condition that the stock purchase has occurred.

The consulting agreements with IEP are said by

Not Reported in A.2d
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)

Page 5

defendants to ensure that Mr. Duncan's services would remain available to IEP in the event of the termination of his employment with Steego. The preferred stock investment in Milastar is said to provide IEP with an opportunity to invest in companies too small for its normal operation. The parties also agreed that IEP would supply additional capital and advice about operations to Milastar. The employment agreement which Mr. Duncan entered into with IEP contained a clause to the effect that his employment agreements with Steego and Milastar were to take precedence over the agreement with IEP.

*IEP's offer for Steego and the board's reaction.*

On August 12, 1988, IEP commenced its all cash tender offer for any and all shares of Steego at $6 a share. It did not consult either Mr. Duncan or the board of directors prior to the commencement of its offer, nor had the board discussed the possibility of such an offer being made.

*5 The special meeting of the Steego board to consider IEP's offer was set for August 18. During the week of August 12-18, there were telephone conversations among some of the directors regarding the adequacy of the $6 offering price and the possibility of Steego's retaining the services of an investment banker. On August 16, Mr. Curtas, the Company's chief financial officer, sent a package of materials to each board member concerning the offer. *See* Curtas Aff., Exh. G. The only Company-provided financial data (some was contained in the Offer to Purchase itself which was included) was a single typed sheet that showed, for five years: per share earnings, dividends, cash flow and cash flow from operations, and showed for that same period, three ratios: offering price to book value, offering price to average market value, and net earnings to net worth. No written information on any other indicia of value or on future prospects or projections were furnished.

**643 The board met on August 18 to consider the proposal. Mr. Duncan introduced the subject of the IEP offer and gave the board a summary of the background of the offer, but Mr. Duncan and his son, Lance Duncan, also a board member, refrained from consideration of the offer. Although they remained present throughout the meeting, they did not participate in the board's vote on the matter. Apart from Mr. Schuler and the Duncans, the remaining directors present appear to be independent outside directors. Mr. Cutas, the secretary of the board and the Company's chief financial officer, played the leading role in the board's consideration of the offer. He presented the board with an overview of Steego's present financial condition, including his belief that prospects for "dramatic" improvement in Steego's operating results were remote. While some improvements might be anticipated, Mr. Curtas felt that "in light of Steego's history of operating losses, any improvement would be dramatic." *See* Curtas Aff., p. 12.

Mr. Curtas also reviewed with the board the value of Steego's real estate holdings in Canada and Arizona, including his opinion regarding the net amounts realizable from the sale of such assets. Although the board reviewed a package of financial information which contained a comparison of budgeted and actual figures for sales and incomes, no review of financial projections was conducted. Financial projections were not routinely prepared by the Company, but projections appropriate to the kind of evaluation being performed had been prepared by Mr. Curtas and Mr. Duncan in connection with Mr. Duncan's efforts to sell his shares earlier in the year, and the Company's efforts to refinance its debt. In fact, these projections had been given to Steego's bankers and to Mr. Duncan's prospective buyers, GECC and Mr. Frederick. Mr. Curtas was aware of the projections and what they contained.

The board also discussed the possibility of hiring an investment banker to evaluate the Company, but concluded that it was unnecessary to do so. It was the board's belief that an investment advisor's opinion would not bring to light any new facts about the Company beyond those already being considered by the board. There was no discussion of establishing a special committee to consider the offer, due to the fact that a majority of the directors voting on the matter were independent directors in the first instance.

*6 Based on their knowledge of Steego and on facts contained in Mr. Curtas' August 18 presentation, the board determined that IEP's $6 a share offer represented a premium over Steego's trading value, **644 absent the offer, of roughly $3 a share. The board voted to recommend that stockholders tender their shares.

II.
Plaintiffs' principal theory is that IEP, by reason of

Not Reported in A.2d                                                                                                   Page 6
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)

its ownership of 48.8% of Steego's outstanding common stock, bears a fiduciary duty to the class which requires it to disclose all material information in its possession to the Steego shareholders fully, and to offer a price that is intrinsically fair. Such a duty is said to be breached here in both its aspects.

Delaware law is well developed on this point. Fiduciary duties of the type asserted arise from control. *Ivanhoe Partners v. Newmont Mining Co.*, Del.Supr., 535 A.2d 1334 (1987). While a position less than a majority stockholding might, as a factual matter, give rise to control which, in turn, gives rise to a fiduciary duty, *In Re Sea-Land Corp. Stockholders Litigation*, Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987), it is the actual exercise of such control, not the simple potential for control, that creates the special duty. *Gilbert v The El Paso Company, et al*, Del.Ch., 490 A.2d 1050 (1984). See also *Aronson v Lewis*, Del.Supr., 473 A.2d 805 (1984); *Kaplan v Centex*, Del.Ch., 284 A.2d 119 (1971); *Puma v. Marriott*, Del.Ch., 283 A.2d 693 (1971); *Harriman v. E.I. duPont de Nemours & Co.*, 411 F.Supp. 133 (D.Del.1975); *Mayer v. Adams*, Del.Ch., 167 A.2d 729 (1961), aff'd, 174 A.2d 313 (1961).

Here, plaintiffs point to three factors that they

entitled and, in the absence of which the entire fairness test seeks to act as a surrogate.

*7 Accordingly, I conclude that plaintiffs' principal argument--that IEP owes and has breached fiduciary duties--is not well founded legally, or at least it now so appears.

Plaintiffs offer a fallback argument with respect to their claim directed to disclosure by IEP. They urge that the offering statement constitutes an attempted deceit actionable as fraud. It is asserted that, even though IEP may not be a fiduciary, it has, as a third party offeror, an obligation to disclose all material information in its possession--even where that information arises from its own investigation of public sources. (It is conceded that IEP's information concerning certain appraisals of Steego real estate in Arizona came from publicly available sources). This concept appears to be without precedent. An action for fraud, of course, requires, minimally, a false statement made with an intention to deceive. *See Harmon v. Masoneilan*, Del.Supr., 442 A.2d 487 (1982); Prosser and Keeton, Law of Torts at 728 (5th ed.). It obviously is not fraud to fail to disclose material information that one's own investigation from public sources provides. With respect to the other principal "nondisclosure" points in the offering

Not Reported in A.2d                                                                                                    Page 7
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
**(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)**

this very moment? Another factor is the rationale--to provide IEP with an opportunity to invest in enterprises to be run by Duncan, even though Mr. Duncan has managed Steego to the point at which IEP sees value in it as a "turn around situation." It is, of course, noteworthy that the Milastar investment is itself conditioned on the stock sale, and thus the transactions are, by their own terms, linked. Finally, it may be significant that Mr. Duncan apparently turned down a GECC offer at $6 per share; but the record provides no basis to evaluate that action, except to note that the GECC alternative was not all cash.

Assuming that the other consideration received by Mr. Duncan, directly and indirectly, as a result of his stock sales agreement is, in fact, consideration for the sale of his stock, that fact might have federal law implications in light of the later tender offer, but what significance does it have under Delaware corporation law? Alone, it seems to me at this time to have none. Other facts supporting another inference are necessary for the corporation law to find such a step actionable. Those other facts would have to establish (or permit a trier of fact to conclude) that the premium was, in fact, a payment for a breach of duty.

*8 To explain briefly. Our law does not regard a control premium as a corporate asset that must be shared among all shareholders. *Polk v Good,* Del.Supr., 507 A.2d 531, 537 (1986); *In Re Sea-Land Corporation Shareholders Litigation,* Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987), at p 12; *Manacher v. Reynolds,* Del.Ch., 165 A.2d 741, 751-54 (1960). *A fortiori* a shareholder without control, even if he is a director, and thus owes a duty of loyalty to the corporation and its shareholders, may *qua* shareholder negotiate the sale of his stock on whatever terms he is able to arrange. *Wellman v. Dickinson,* 682 F.2d 355 (2d Cir.1982), cert. denied, 460 U.S. 1069 (1983); *Treadway Co., Inc. v. Care Corp.,* 638 F.2d 357 (2d Cir.1980) If, however, a director-shareholder uses his corporate office to advantage himself in a way denied to other shareholders, he has misused his office. Therefore, if, in securing a better deal for himself alone, an officer uses confidential corporate information, any premium he secures may be claimed by the corporation. *Brophy v Cities Services Co ,* Del.Ch., 70 A.2d 5, 7 (1949). Similarly, if he secures more advantageous treatment by a promise, express or implied, that he will promote the buyer's interest within the corporation, it is obviously the case that the premium is the fruit of a breach of duty and may be impressed with a constructive trust.

**647 These principles may have pertinence here. If one were to conclude that the consideration paid for the consulting agreements and Milastar investment was actually paid for the stock, and if one assumes or finds that IEP was unwilling to pay other shareholders more than $6, then in that event, one must ask what the additional consideration paid to Duncan was paid for.

The record is far too sketchy and too earnestly contested to permit any view that plaintiffs have established a reasonable likelihood of prevailing on this theory. Aside from innuendo, there is no adequate basis here to support an inference that, even if IEP paid more for Duncan stock than it offered to others, it did so in exchange for a breach of duty-- most particularly, a promise or, even a reasonable expectation, that Duncan would thereafter smooth the way for its later offer. For present purposes, the record is undisputed that the possibility of a later public offer by IEP was not discussed. More importantly, there is no sufficient record to support any preliminary conclusion that Mr. Duncan did anything to advise IEP with respect to its tender offer, or to promote its approval by the board of Steego. He apparently declined to participate in the board's consideration of the matter, after giving the board the background of the offer and a summary of its terms. The most troubling aspect of the board's consideration was its failure in that connection to consider certain projections prepared in February by Mr. Duncan and others, and provided to GECC and others. (*See* pp 25-26, *infra* ). But the board's consideration of that aspect of the matter was under the charge of Mr. Curtas, the chief financial officer of the Company. There is no reason to suppose, at this point, that Mr. Duncan was responsible for the board's not having those figures before it at that time.

*9 Nor does the "additional" payment appear otherwise linked to a breach of duty. It is true that Duncan apparently developed the projections based upon Company confidential information, and used them in attempting to promote the sale of his own stock. But there is no basis in the record to believe that such confidential information was supplied to IEP, or that the tender offer is predicated upon it.

Accordingly, even if the Milastar investment and the consulting agreements are regarded as a disguised

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01268-***-MPT   Document 38-3   Filed 03/02/2005   Page 8 of 10

Not Reported in A.2d                                                                                           Page 8
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)

consideration for Duncan's stock, as plaintiffs contend and defendants deny, the present record does not contain enough to permit the conclusion that it was also a wrong.

Finally, on this point I address disclosure under state law of this aspect of the matter. The facts surrounding the negotiation and **648 the terms of these agreements are fully and fairly stated in the Offer to Purchase at pages 2 and 3. Assuming that one might conclude that the consideration for the Milastar investment was, in part at least, the sale of Mr. Duncan's stock, I cannot conclude that, in order to avoid the charge of fraud, one would be required to say more than was said. The facts, insofar as they now appear, are fully set forth. As indicated above, common law fraud is the test that must be applied to a nonfiduciary's arm's-length offering document--at least where there is no basis to test him with one conspiring with a fiduciary.

Accordingly, I can find in Mr. Duncan's behavior, as it now appears, no basis to issue an injunction against IEP's consummation of its current offer.

IV.

I turn next to the actions of the Steego board of directors in responding to IEP's unnegotiated offer, in order to determine whether the acts of the board, as they now appear, offer grounds for a conclusion that a reasonable probability exists that this offer may ultimately be found to violate rights of the shareholders. This topic raises issues of two distinct types. First are issues of fact and law relating to the on a motion of this kind, or following final hearing--on the question of director attention, is highly specific. There is no ritual in these matters with which thoughtless compliance will assure later judicial approval or from which thoughtful deviation will risk automatic judicial censure. Thus, for example, whether the advice of an investment **649 banker would be helpful or not in making a business decision of importance is itself a question demanding business judgment. In some instances--where, for example, the projected market value of a proposed financial instrument forms an important part of the consideration offered to a corporation or its shareholders--one would assume that expertise of a kind found in investment banking houses (and elsewhere) would be invaluable and perhaps essential. Where, however, the transaction offered is all cash and the essential question is the present and future value of the firm, directors with long and intimate contact with the firm may reasonably feel less need for the guidance that investment houses may offer. *See Smith v. Van Gorkom, supra* at 881.

*10 The point this example makes is simply that a determination of director due care is highly particularized and generalizations are of little help in that task. I turn then to the particulars here, mindful of the fact that the matter has had little discovery and the preliminary view here expressed cannot be expressed with confidence.

The most salient facts facing the board on August 12 with the public announcement were very obvious. I take them to be the following:

Not Reported in A.2d                                                                 Page 9
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
**(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)**

meeting).

3. The price offered was cash and was substantially in excess of the unaffected market price of the stock. Prior to the purchase by IEP of Mr. Arton's 7% holding for $4.50 in March, the price of the stock had, for the prior two years, ranged between 2 1/2 and 4 3/4. (Offer to Purchase, at 13). Mr. Arton was a substantial holder who had negotiated with IEP. Mr.

It apparently budgets one year at a time and attempts to plan for only that period. In all events, while the board is regularly provided with financial reports showing current performance and budgeted targets, it appears that it did not have specific longer-range projections in mind when it acted on August 18. There is no indication that the board was aware that certain projections had been prepared, in connection with Mr. Duncan's efforts to sell his shares, when it

prospects than anyone else. He had sold the 1.7 **650 million shares he controlled for $6 per share, albeit at the same time he entered into other contracts that, if viewed entirely as disguised consideration for his stock, were worth between $1 and $2 a share.

Knowing these things, and having the familiarity with the Company's business and prospects they had, the board met once for a period of 90 minutes to consider the question whether it should recommend

the materiality of these projections by saying (1) that the Company has regularly failed to meet its one year budgeted targets and any projections could not **651 be deemed to be reliable, and (2) the projections could not be thought to have indicated that the decision reached on August 18 was not sound in any event, as those who did have the projections were not induced by them to offer Mr. Duncan more than $6 per share for his stock or, in the case of the banks, to refinance the Company's debt on terms that would

Not Reported in A.2d                                                                      Page 10
1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634
**(Cite as: 1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634)**

shareholders, who arguably claim a right to the considered view of the board with respect to the offer.

*12 The notion of enjoining an innocent party, in the exercise of legal rights, strikes one as curious, but not altogether without precedent. A court, however, would require persuasive authority for such a step. Such authority has not been offered here and, therefore, did I conclude differently with respect to the prospects of the ultimate **652 result of the claim of board negligence, I would still decline to preliminarily enjoin IEP's consummation of its offer in this instance.

For the foregoing reasons, the application for preliminary injunction against consummation of IEP's tender offer is denied. It is so ordered.

>    FN1. Four of the seven directors attending were present by telephone.

1988 WL 94738 (Del.Ch.), 14 Del. J. Corp. L. 634

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.