# EXHIBIT C

LEXSEE 2000 U.S. DIST. LEXIS 1303

In re: COLOR TILE, INC., et al., Debtor, OFFICIAL COMMITTEE OF THE UNSECURED CREDITORS OF COLOR TILE, INC., et al., Plaintiff, v. BLACKSTONE FAMILY INVESTMENT PARTNERSHIP, L.P., et al., Defendants.

Case Nos. 96-76 (HSB), 96-77 (HSB), 96-78 (HSB), 96-79 (HSB), 96-80 (HSB) Jointly Administered Civ. A. No. 98-358-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2000 U.S. Dist. LEXIS 1303

February 9, 2000, Decided

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**SUBSEQUENT HISTORY:** Summary judgment granted by Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Pilgrim High Yield Trust (In re Color Tile, Inc.), 278 B.R. 366, 2002 U.S. Dist. LEXIS 8123 (D. Del., 2002)

**PRIOR HISTORY:** Adv. Proc. No. A-98-90, Chapter 11.

**DISPOSITION:** Defendants' motions to dismiss denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Ian Connor Bifferato, Esquire, Bifferato, Bifferato & Gentilotti, Wilmington, Delaware, for Plaintiff.

David F. Heroy, Esquire, Brian E. Martin, Esquire, Bruce E. Lithgow, Esquire, Of Counsel, Bell, Boyd & Lloyd, Chicago, Illinois, for Plaintiff.

Kevin Gross, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, for Blackstone Defendants and Saloman Smith Barney.

David I. Blejwas, Esquire, Of counsel, Hahn & Hessen LLP, New York, New York, for Blackstone Defendants and Saloman Smith Barney.

Joseph Grey, Esquire, Stevens & Lee, Wilmington, Delaware, for Bankers Trust Company.

Louis J. Sinatra, Esquire, Ronald L. Daugherty, Esquire, and James C. Shah, Esquire, Of counsel, Pelino & Lentz, P.C., Philadelphia, Pennsylvania, for Bankers Trust Company.

Richard K. Herrmann, Esquire and Mary B. Matterer, Esquire, Blank, Rome, Comisky & McCauley LLP, Wilmington, Delaware, for Northeast Investors Trust, Northern Trust Company, Morgan Guaranty Trust Company.

Richard F. Lubarsky, Esquire, Of counsel, Levi & Lubarsky, New York, [*2] New York, for Northeast Investors Trust, Northern Trust Company, Morgan Guaranty Trust Company.

John D. Demmy, Esquire and Eric D. Schwartz, Esquire, Morris, James, Hitchens & Williams, Wilmington, Delaware, for Reliance Insurance Company.

Charlene D. Davis, Esquire, John H. Newcomer, Jr., Esquire, and Michael L. Vild, Esquire, The Bayard Firm, Wilmington, Delaware, for Northstar High Yield Bond Fund.

Christopher D. Loizides, Esquire and Magdalen Braden, Esquire, Of counsel, Dechert Price & Rhoads, Philadelphia, Pennsylvania, for Northstar High Yield Bond Fund.

Laurie Selber Silverstein, Esquire and William A. Hazeltine, Esquire, Potter, Anderson & Corroon LLP,

Wilmington, Delaware, for BTC U.S. High Yield Fund.

Michael P. O'Neill, Esquire, Of counsel, Freeborn & Peters, Chicago, Illinois, for BTC U.S. High Yield Fund.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

MEMORANDUM OPINION

Dated: February 9, 2000
Wilmington, Delaware

Sue L. Robinson
District Judge

## I. INTRODUCTION

Currently before the court are motions to dismiss the instant adversary proceeding. The motions have been filed by the Blackstone defendants and a [*3] variety of other alleged recipients of preferred stock dividends issued by the debtor, Color Tile, Inc. ("Color Tile"). n1 Plaintiff, the Official Committee of Unsecured Creditors of Color Tile, is the fiduciary appointed to represent the interests of bondholders and trade and other unsecured creditors who hold more than $ 300 million in unpaid claims against the bankruptcy estates of Color Tile and its affiliates.

> n1 Defendants include insurance companies, high-yield mutual funds, business trusts, investment companies and partnerships, securities firms and two high net worth individuals. Unless otherwise specified, the court shall refer to defendants collectively as the Blackstone defendants. According to plaintiff, all defendants are wealthy, sophisticated "accredited investors" and "qualified institutional buyers."

The court has jurisdiction pursuant to 28 U.S.C. § 1334. For the following reasons, the court shall deny the motions to dismiss.

## II. BACKGROUND

The court gleans [*4] the following facts from plaintiff's complaint and the attached documents. For purposes of this motion, the court accepts as true the facts asserted therein.

Plaintiff seeks restoration to the estate of approximately $ 10,077,500 in dividends that Color Tile paid to holders of its Class B, Series A, Senior Increasing Rate Preferred Stock ("preferred shares"). n2 In 1992, Color Tile issued 2,200,000 shares of the preferred stock, the proceeds of which it used to retire approximately $ 47,700,000 in debt associated with Color Tile's Senior Notes. The terms governing the preferred shares were outlined in a June 24, 1992 Private Placement Memorandum and in an August 7, 1992 supplement thereto. The sale of the preferred shares replaced the existing debt on Color Tile's Senior Notes with a new obligation redeemable after ten years, at an amount equal to the purchase price of the preferred shares plus any unpaid and accrued dividends. The preferred shares carried a lower stated dividend than the interest carried on the Senior Notes. The dividend payments began on or about January 1, 1994.

> n2 Due in part to the financial sophistication of the defendants, the preferred stock was exempt from the registration and prospectus delivery requirements of the Securities and Exchange Act of 1933. See D.I. B27, Ex. C, at 1.

[*5]

On January 24, 1996, Color Tile filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On January 15, 1998, plaintiff commenced this action against the Blackstone defendants and the other recipients of the dividends. The complaint asserts claims under the Delaware Fraudulent Transfer Act, 6 Del. C. § 1301 et seq. (the "DFTA"), and 11 U.S.C § § 544(b) and 548(a)(2). In essence, the complaint alleges that the preferred stock dividends were fraudulent transfers under the DFTA because they left Color Tile with unreasonably small capital and caused it to incur debts beyond its ability to pay. Plaintiff seeks to avoid these transfers under 11 U.S.C. § 544. The complaint also seeks recovery under 11 U.S.C. § 548(a)(2) for transfers that occurred within one year prior to the petition date. With respect to these payments, the complaint alleges that Color Tile received less than reasonably equivalent value in exchange for these dividends and that it was insolvent on the date of the dividend payments or became insolvent because of such payments.

Defendants seek dismissal of the complaint on several [*6] grounds. First, they allege that the DFTA is inapplicable to plaintiff's claims because "its application would improperly nullify the Delaware General Corporation Law ["DGCL"] remedial statutory scheme,

which specifically addresses the recovery of unlawful dividends from shareholders." (D.I. B26 at 2) Second, defendants argue that the court must dismiss the DFTA claim because plaintiff fails to allege that defendants knew the dividend payments were unlawful. Third, even if the DFTA claim were viable, defendants contend that plaintiff cannot establish that the payments constituted fraudulent transfers because defendants provided Color Tile with reasonably equivalent value for the dividends and because the dividends were payments in satisfaction of antecedent debt.

In addition to these arguments, defendants BTC US High Yield Fund, Brinson Trust Company, and Northstar High Yield Bond Fund move to dismiss the complaint as time barred. (D.I. B77, D37) The court shall address each of these arguments in turn.

## III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in favor of the plaintiff, accepting as true [*7] all material allegations of the complaint. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. A court may dismiss claims pursuant to Rule 12(b)(6) only if the plaintiff cannot demonstrate any set of facts that would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV. DISCUSSION

### A. Plaintiff May Proceed Under the DFTA

Defendants argue that § 174 of the DGCL trumps the DFTA and that, therefore, plaintiff's sole remedy is to proceed under the DGCL and recover the dividend payments from the directors of Color Tile rather than from the preferred shareholders. Defendants do not cite a single case supporting this proposition. [*8] Instead, defendants rely on general principles of statutory construction. Specifically, they argue that when two acts touch upon the same subject, the general statute (here the DFTA) should not prevail over the more specific statute (allegedly the dividend recovery provisions of the DGCL). Otherwise, defendants argue, the DFTA would nullify the DGCL.

Upon closer inspection, however, the two statutes serve distinct purposes and provide different remedies. Section 1305(a) n3 of DFTA provides, in pertinent part, that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

6 Del. C. § 1305(a). Once a transfer is found to be fraudulent, § 1307 of the DFTA enables a creditor to avoid the transfer to the extent necessary to satisfy the creditor's claim. The DFTA thus focuses on ensuring that creditors recover [*9] fraudulent transfers to third parties. Section 174 of the DGCL, on the other hand, imposes liability on corporate directors for approving unlawful dividend payments. Unlike the DFTA's avoidance provision, the DGCL provides for damages against corporate directors. Because it makes directors (rather than the recipients of the dividends) primarily liable, § 174 is designed to discourage directors from depleting a corporation's ability to repay its debts. Section 174 focuses on deterrence rather than on returning fraudulent payments to creditors. Thus, contrary to defendants' assertion, the DGCL and the DFTA serve different purposes.

---

n3 Plaintiff asserts under both §§ 1304(a)(2) and 1305(a) of the DFTA. Section 1304 applies to present and future creditors whereas § 1305 applies only to present creditors. The language in both sections, however, is substantially the same.

---

The DFTA's focus on ensuring the equitable distribution of assets to a debtor's rightful creditors also makes it the more appropriate statute in [*10] the context of a bankruptcy proceeding. Indeed, the DFTA looks to the economic effects of the transfer on a debtor's creditors rather than to the debtor's mere compliance with corporate governance rules. See China Resource Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc., 788 F. Supp. 815, 818 (D. Del. 1992) (noting that Delaware's fraudulent transfer act "judges a transaction by its effect on the debtor's

unsecured creditors"). Moreover, statutes like § 170 of the DGCL lack the DFTA's "equity-oriented, purposive concept of capital, which is much more relevant to the question of risk actually posed to creditors." See Robert Charles Clark, The Duties of the Corporate Debtor to its Creditors, 90 Harv. L. Rev. 505, 556 (1977); see also 1 R. Franklin Balotti et al., The Delaware Law of Corporations & Business Organizations § 5.22, at 5-48 n.309 (3d ed. 1999).

For instance, the DFTA requires proof only of inequivalent value in exchange for the payment and the debtor's resulting or contemporaneous insolvency. On the other hand, to state a cause of action under § 174, a creditor first must prove that the corporation depleted its surplus in paying [*11] the dividend. See 8 Del. C. § 170(a)(1). The directors, however, have almost unfettered discretion in defining the extent of the corporation's surplus. The Delaware Code defines surplus as the value of net assets over the par value of the stock. See 8 Del. C. § 154; 1 David A. Drexler et al., Delaware Corporation Law and Practice § 20.03[2], at 20-9 -11 (1999). In determining the value of net assets, the directors are not tied to any formal financial appraisal of their assets. They need only "evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present 'values.'" Morris v. Standard Gas & Elec. Co., 31 Del. Ch. 20, 63 A.2d 577, 582 (Del. Ch. 1949); see also Klang v. Smith's Food & Drug Centers, Inc., 702 A.2d 150, 152 (Del. 1997). By manipulating the value of net assets, directors can skew the calculation of surplus and thereby render "lawful" (in a strictly formalistic sense) dividend payments that otherwise would qualify as fraudulent transfers under the DFTA. The easy manipulation of a corporation's surplus has prompted one commentator to note that statutes prohibiting [*12] payments of dividends out of surplus are "virtually meaningless." See Clark, supra, at 556. This conclusion is buttressed by the fact that directors can easily insulate themselves from liability under § 170 of the DGCL by demonstrating that they relied on the reports of employees, committees of the board, or experts "selected with reasonable care by or on behalf of the corporation" as to the availability of surplus. See 8 Del. C. § 172.

For these reasons, plaintiff may proceed under the DFTA against defendants. Plaintiff is not required to proceed against Color Tile's directors under the DGCL simply because the allegedly fraudulent transfers took the form of dividend payments. See Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.), 513 F.2d 807, 814 (6th Cir. 1975) (explaining that the Delaware legislature, in providing a specific remedy against corporate directors, "in no way intended to relieve shareholders of liability").

### B. The DFTA Does Not Require Knowledge of the Allegedly Fraudulent Dividends

Quoting the DGCL, defendants also argue that plaintiff's DFTA claim is invalid because the complaint does not allege that defendants received [*13] the dividends with knowledge that they were unlawful. See D.I. B26 at 12 (quoting 8 Del. C. § 174(c)). The DGCL has no bearing on the pleading requirements under the DFTA. The DFTA requires only that a plaintiff plead and prove (1) a transfer, (2) made without receiving reasonably equivalent value in exchange, and (3) resulting or contemporaneous insolvency. See 6 Del. C. § § 1304(a), 1305(a); Corporate Property Assocs. 8, L.P. v. Amersig Graphics, Inc., 1994 Del. Ch. LEXIS 45, Civ. A. No. 13241, 1994 WL 148269, at *2 (Del. Ch. Mar. 31, 1994) (construing the Delaware Fraudulent Conveyances Act, 6 Del. C. § 1304). Knowledge of the fraudulent transfer on the part of the recipient is not an element of a DFTA claim.

### C. The Dividends Were Not Payments in Satisfaction of Antecedent Debt

Defendants next argue that the purchase of the preferred shares was tantamount to a $ 52 million loan to Color Tile and that the dividends were payments in satisfaction of this antecedent debt. Construed as such, the dividend payments could not have been fraudulent transfers. See 6 Del. C. § 1303(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, [*14] . . . an antecedent debt is secured or satisfied . . . ."). At issue, then, is whether the purchasers of the preferred shares held equity or debt in Color Tile.

Whether a security constitutes equity or debt depends on the interpretation of the contract between the corporation and the security holders. See Wolfensohn v. Madison Fund, Inc., 253 A.2d 72, 75 (Del. 1969); accord Drexler, supra, at 17-5 n.8. In interpreting the contract, courts consider numerous factors, including: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. See Slappey Drive Indus. Park v. United States, 561 F.2d 572, 581-82 (5th Cir. 1977); Moore v. American Fin. & Secs. Co., 31 Del. Ch. 335, 73 A.2d 47, 48 (Del. Ch. 1950); Drexler, supra, at 17-5 n.8.

In light of these standards, there is little doubt that the [*15] preferred shares and their accompanying

Case 1:04-cv-01268-***-MPT    Document 38-4    Filed 03/02/2005    Page 6 of 7

Page 5
2000 U.S. Dist. LEXIS 1303, *

Private Placement Memorandum (the "Memorandum") contemplated an equity interest in Color Tile. The instrument, itself, is denoted as "Series A Senior Increasing Rate Preferred Stock." (See D.I. B27 at 1) Although the dividend and redemption dates were projected, the very first page of the Memorandum warns purchasers that, "the Company's ability to pay dividends on the Shares and to redeem or repurchase the Shares is subject to the satisfaction of certain covenants and restrictions under the Company's credit facilities, the Company's Certificate of Incorporation and the Delaware General Corporation Law." (D.I. B27 at 1) This caveat is repeated elsewhere in the Memorandum. For instance, the terms of the Memorandum limit the payment of dividends to "funds legally available therefor." (D.I. B27 at 7) The Memorandum also states that, "pursuant to the terms of its Senior Credit Agreement, its Certificate of Incorporation and the DGCL under certain circumstances the Company will be restricted from repurchasing the Shares." (D.I. B27 at 9) More tellingly, the "Investment Considerations" section of the Memorandum warns that Color Tile is "substantially [*16] leveraged" and that, due to

> the degree to which the Company is leveraged, the need to apply a substantial portion of the Company's cash flow from operations to pay principal of and interest on indebtedness, and the operating and financial restrictions contained in the agreements governing the Company's credit facilities could have important consequences to holders of the Shares, including the following: (1) the Company's ability to pay dividends, including dividends on the [Preferred] Shares, may be restricted . . . .

(D.I. B27 at 12) Thus, the Memorandum explicitly distinguishes between Color Tile's "credit facilities," which enjoy priority, and its preferred shareholders, whose interests are junior to such secured creditors.

If there were any doubt as to the true nature of the preferred shareholders' interest, it is dispelled by the Memorandum's description of the liquidation preference: "Holders of the [Preferred] Shares will be entitled to be paid out of the assets of the Company **available to its stockholders** an amount in cash equal to $ 25.00 for each Share outstanding." (D.I. B27 at 8 (emphasis added)) In other words, the preferred shareholders enjoy [*17] priority only with respect to the funds available to stockholders, whose interests as a class are junior to the corporation's secured creditors in the context of liquidation. Thus, there is no certainty of payment of accrued dividends or of redemption of the shares upon liquidation. Where such certainty of payment is missing, the security is equity, not debt. See Moore, 73 A.2d at 48.

The fact that the preferred shareholders held equity is further evidenced by the fact that the Memorandum accorded shareholders voting rights if Color Tile failed to pay dividends for six consecutive quarters or if it failed to redeem the shares in 2003. (See D.I. B27 at 8) In discussing the tax ramifications of the security, the Memorandum also states that, "the Company believes that the [Preferred] Shares will constitute equity for Federal income tax purposes and that distributions on the Shares . . . will constitute dividends." (D.I. B27 at 59)

Despite defendants' vehement protestations to the contrary, the preferred shares constituted equity, not debt. Therefore, their attempt to characterize the dividend payments as payments in satisfaction of antecedent debt is unavailing. [*18] Equally unavailing is defendants' attempt to characterize the declaration of the dividend as creating a debt, the payment of which constitutes "fair consideration" under the DFTA. Under Delaware law, a declaration of a dividend gives rise to a debt only if the dividends are lawfully declared. See Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1175 (Del. 1988) (noting that "upon a **valid** declaration of a dividend the corporation becomes indebted to the stockholder") (emphasis added). Construed broadly, the complaint alleges that Color Tile lacked legally available funds at the time of the dividend declaration. For purposes of this motion only, the court shall presume that the dividends were not validly declared and that, therefore, they did not constitute payment of an antecedent debt.

### D. Count II of the Complaint

Count II of the complaint asserts a claim under § 548(a)(2) of the Bankruptcy Code and seeks to avoid dividend payments made within one year of the petition date (i.e., January 24, 1996). Defendants claim that the last dividend payment was made no later than January 17, 1995. See D.I. B26 at 20) The timing of the dividend [*19] payments, however, is a question of fact and inappropriate for resolution at this stage of the proceedings. Accordingly, for all these reasons, the court shall deny the Blackstone defendants' motion to dismiss.

### E. The Motion to Dismiss of BTC US High Yield Fund, Brinson Trust Company, and Northstar High Yield Bond Fund

Defendants BTC US High Yield Fund ("BTC"), Brinson Trust Company ("Brinson"), and Northstar High

Case 1:04-cv-01268-***-MPT  Document 38-4  Filed 03/02/2005  Page 7 of 7

Page 6
2000 U.S. Dist. LEXIS 1303, *

Yield Bond Fund ("Northstar") contend that plaintiff's amended complaint is time barred. Plaintiff's initial complaint, filed on January 15, 1998, listed Cede & Co ("Cede") as a defendant. n4 Plaintiff soon learned that Cede served as the nominee of, and conduit for, the dividend payments made to Northstar, BTC, and Brinson. Plaintiff then stipulated to a dismissal of Cede and, on September 18, 1998, amended its complaint to include Northstar, BTC, and Brinson as defendants. Plaintiff filed the amended complaint more than two years after Color Tile's bankruptcy filing. Consequently, the amended complaint against BTC, Brinson, and Northstar falls outside the two year statute of limitations period imposed by 11 U.S.C. § 108(a)(2). Unless the [*20] amended complaint relates back to the filing date of the original complaint, plaintiff's action against BTC, Brinson, and Northstar must be dismissed. The court finds that the amended complaint does relate back to the filing date of the original complaint.

> n4 Cede is the partnership nominee of the Depository Trust Company ("DTC"), a securities depository and clearing agency registered with the Securities and Exchange Commission.

For an amended complaint to relate back to the filing date of the original complaint, the claim must have arisen out of the same transaction or occurrence set forth in the original pleading and,

> within the period provided by Rule 4(m) for service of the summons and complaint [i.e., 120 days after filing of the complaint], the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity [*21] of the proper party, the action would have been brought against the party.

Fed. R. Civ. P. 15(c). Courts have interpreted the notice requirement under Rule 15(c) broadly to include actual, constructive, or imputed notice through formal and informal channels. See Resource Ventures, Inc. v. Resources Management Int'l, Inc., 42 F. Supp. 2d 423, 429 (D. Del. 1999).

Except for the substitution of the aforementioned defendants for Cede, the amended complaint is identical to the original complaint. It is not disputed that the amended complaint arises out of the same transaction or occurrence as the initial complaint. At issue is (1) whether BTC, Brinson, and Northstar received actual or constructive notice of plaintiff's suit within 120 days following the filing of plaintiff's complaint and (2) whether these defendants knew, or should have known, that but for plaintiff's mistake, they would have been named instead of Cede.

BTC, Brinson, and Northstar do not dispute that Cede served as the conduit for the dividend payments from Color Tile. Furthermore, they do not dispute that Cede received timely notice of plaintiff's suit. Cede's operating rules require it to notify [*22] its participants of "documents received . . . with respect to a Participant's Deposited Securities." See D.I. 42, Ex. A) In light of this delivery rule, defendants received constructive notice of plaintiff's suit when plaintiff served Cede. As sophisticated investors who chose to use Cede as an intermediary, BTC, Brinson, and Northstar assumed the risk that suits arising out of their ownership of Color Tile preferred shares would name only Cede. These defendants also assumed the risk that service upon Cede would enable a later complaint to relate back. For these same reasons, these defendants knew, or should have known, that the original complaint mistakenly named Cede and that they were the real parties in interest. Accordingly, the court shall deny the motions to dismiss of BTC, Brinson, and Northstar.

## V. CONCLUSION

For the aforementioned reasons, the court shall deny defendants' motions to dismiss. An appropriate order shall issue.