# EXHIBIT I

Not Reported in A.2d
2002 WL 537692 (Del.Ch.)
(Cite as: 2002 WL 537692 (Del.Ch.))

Page 18



Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
In re THE LIMITED, INC. SHAREHOLDERS LITIGATION
No. CIV.A. 17148-NC.

Submitted: March 28, 2001.
Decided: March 27, 2002.

Common stockholders brought shareholder derivative suit against corporation and members of corporation's board of directors, alleging that directors committed corporate waste and breached their fiduciary duties by rescinding contingent stock redemption agreement and funding, in part with monies made available as the result of the rescission, a self-tender offer. Corporation and directors filed motion to dismiss. The Court of Chancery, John W. Noble, Vice Chancellor, held that: (1) stockholders' allegations were sufficient to raise a reasonable doubt as to disinterestedness of two board members, for purposes of determining demand futility; (2) stockholders' allegations were sufficient to raise a reasonable doubt as to independence of four board members, for purposes of determining demand futility; (3) directors' approval of self-tender offer and rescission of stock redemption agreement gave rise to cause of action for breach of duty of loyalty; (4) directors' approval of the transactions, when considered by themselves or together, did not give rise to claim for corporate waste; and (5) directors' approval of the transactions did not give rise to claim for breach of duty of care.

Motion granted in part and denied in part.

West Headnotes

[1] Corporations 320(5)
101k320(5) Most Cited Cases
Common stockholders' allegations that corporation's board of directors approved challenged transactions in order to enable chief executive officer (CEO) to negotiate a rescission of a contingent stock redemption agreement, which affected trust which CEO controlled for benefit of his children, were sufficient to raise a reasonable doubt as to the disinterestedness of CEO and his wife, who was also a director, in connection with the rescission, for purposes of determining pre-suit demand futility in derivative action. Chancery Court Rule 23.1.

[2] Corporations 206(4)
101k206(4) Most Cited Cases
Allegations as to one's position as a director of corporation and the receipt of director's fees, without more, are not enough to raise reasonable doubt as to director's independence, for purposes of pleading demand futility in derivative action. Chancery Court Rule 23.1.

[3] Corporations 320(5)
101k320(5) Most Cited Cases
Neither director's compensation from his role as director of corporation, nor his receipt of director's fees from subsidiary which was dependent upon the corporation for significant revenues, demonstrated a reasonable doubt as to the director's independence with respect to challenged transactions approved by board of directors, for purposes of determining pre-suit demand futility in derivative action. Chancery Court Rule 23.1.

[4] Corporations 320(5)
101k320(5) Most Cited Cases
Allegation of director's role as principal of audio equipment company supplying in-store music for corporation's stores, from which the company received $400,000 annually in revenue, did not create a reasonable doubt as to the director's independence with respect to challenged transactions approved by the corporation's board, for purposes of determining pre-suit demand

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

futility in derivative action, where there was no indication that the $400,000 in annual revenue was material to the audio equipment company's business, and there was no allegation how director may have benefitted from any portion of that revenue. Chancery Court Rule 23.1.

[5] Corporations 320(5)
101k320(5) Most Cited Cases
Allegations that principal employment of two directors of corporation was as executive officers of either the corporation or its wholly-owned subsidiary, and that each of directors had average annual compensation of approximately $1.8 million, were sufficient to raise a reasonable doubt as to the directors' independence from the control of corporation's chief executive officer (CEO), for purposes of determining pre-suit demand futility in derivative action challenging directors' approval of transactions that benefitted CEO. Chancery Court Rule 23.1.

[6] Corporations 320(5)
101k320(5) Most Cited Cases
Allegations that corporate director, whose principal occupation was as a senior university official, provided consulting services to corporation and one of its wholly-owned subsidiaries, and that he received average annual consulting fees of $150,000, were sufficient to raise a reasonable doubt as to the director's independence from control of corporation's chief executive officer (CEO), for purposes of determining pre-suit demand futility in derivative action challenging directors' approval of transactions that benefitted CEO. Chancery Court Rule 23.1.

[7] Corporations 320(5)
101k320(5) Most Cited Cases
Allegations that corporation's director had previously served as president of university that was chief executive officer's (CEO's) alma mater, and that director had successfully solicited from CEO a $25 million grant to establish arts center at the university, were sufficient to raise a reasonable doubt as to the director's independence from CEO's control, for purposes of determining pre-suit demand futility in derivative action challenging directors' approval of transactions that benefitted CEO, although director had since become president of another university. Chancery Court Rule 23.1.

[8] Corporations 206(4)
101k206(4) Most Cited Cases
Where the challenged actions in a derivative action are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making pre-suit demand on the board by showing that half of the board was either interested or not independent. Chancery Court Rule 23.1.

[9] Corporations 314(1)
101k314(1) Most Cited Cases
Actions of corporation's board of 12 directors in unanimously approving rescission of contingent stock redemption agreement and a self-tender offer, which allegedly benefitted corporation's chief executive officer (CEO) without a corresponding benefit to corporation, gave rise to cause of action by stockholders for breach of duty of loyalty, where six of directors were either interested or subject to disqualifying doubts about their independence.

[10] Corporations 310(1)
101k310(1) Most Cited Cases
Actions of corporation's directors in approving rescission of contingent stock redemption agreement, under which trust controlled by corporation's chief executive officer (CEO) had option of redeeming the trust's stock at specified price and corporation had call option to redeem shares held by trust at specified price, did not give rise to claim for corporate waste; rescinding agreement freed up $350 million in cash reserves that corporation was required to maintain in order to satisfy its obligations, agreement exposed corporation to risk of having to pay trust a per share price in excess of the shares' trading price, and any future benefit corporation might have enjoyed under agreement was speculative.

[11] Corporations 310(1)
101k310(1) Most Cited Cases
Actions of corporation's directors in approving self-tender offer, authorizing the repurchase of up to 15 million shares of corporation's outstanding common stock in order to utilize corporation's excess cash, did not give rise to claim for corporate waste, although stockholders later

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

identified alternative methods of using the excess cash; self-tender offer was a well-accepted option for corporate boards wanting to manage mounting cash reserves.

[12] Corporations 🗝 310(1)
101k310(1) Most Cited Cases
Corporate directors' approval of self-tender offer, in conjunction with their approval of rescission of contingent stock redemption agreement, did not give rise to claim for corporate waste, despite stockholders' claim that the two transactions taken together served no business purpose other than to benefit corporation's chief executive officer (CEO); CEO promised not to participate in the self-tender, rescinding the redemption agreement freed up $350 million in cash reserves and protected corporation from potentially costly liability that would have occurred if shares declined in value, and transactions gave shareholders an opportunity to sell their shares at 15% premium.

[13] Corporations 🗝 310(2)
101k310(2) Most Cited Cases
Corporate directors' approval of self-tender offer, in conjunction with their approval of rescission of contingent stock redemption agreement, did not give rise to claim by stockholders for breach of duty of care, absent allegation of gross negligence or insufficiency of information upon which board of directors based its decision.

Norman M. Monhait, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington.

Allen M. Terrell, Jr., Esquire, Richards, Layton & Finger, P.A., Wilmington.

A. Gilchrist Sparks, III, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington.

NOBLE, Vice Chancellor.

*1 Dear Counsel:

Pending is a motion to dismiss the First Amended Consolidated Derivative Complaint ("Complaint") in a shareholder derivative suit brought on behalf of The Limited, Inc. ("The Limited" or the "Company"). The defendants are The Limited, the nominal defendant, and each of the twelve members of the Company's Board of Directors (the "Board"). The plaintiffs allege that the Company's directors committed corporate waste and breached their fiduciary duties of loyalty and due care by rescinding a Contingent Stock Redemption Agreement (the "Redemption Agreement") and funding in part with monies made available as the result of the rescission of the Redemption Agreement a self-tender offer that they also assert resulted in no consideration to the Company.

Defendants have moved to dismiss the Complaint on the basis that plaintiffs failed to meet the pre-suit demand requirements of Court of Chancery Rule 23.1. They also seek dismissal of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state an actionable claim for corporate waste or breach of fiduciary duty.

I. BACKGROUND [FN1]

> FN1. "As a general rule, the Court of Chancery must confine its consideration on a motion to dismiss to the face of the complaint." *White v. Panic*, 783 A.2d 543, 547 n. 5 (Del.2001).

A. The Parties

Common stockholder plaintiffs Rochelle Phillips, Miriam Shapiro and Peter Sullivan [FN2] bring this derivative action on behalf of The Limited, against the Company and each of its directors. The plaintiffs' allegations stem from The Limited's authorization of a self-tender offer for up to 15 million shares of its stock and the rescission of an agreement that included a call option to purchase 18.75 million shares of common stock from a trust set up for the benefit of Leslie H. Wexner's ("Mr.Wexner") children. Mr. Wexner is The Limited's founder as well as its President, Chief Executive Officer, and Chairman.

> FN2. Sullivan asserts his claim as custodian for Mollie R. Sullivan.

The Limited, a Delaware corporation based in Columbus, Ohio, is a specialty retailer operating more than 3,000 stores nationwide. [FN3] In addition to being the Company's top executive, Mr. Wexner, one of the individual defendant-directors, is also its largest shareholder, owning or controlling approximately twenty-five percent of The Limited's outstanding stock at the time of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenged transactions. [FN4] Also named as a defendant in the Complaint is Abigail S. Wexner ("Mrs.Wexner"), Mr. Wexner's wife, who has served on the Board since 1997.

> FN3. Compl. ¶ 21. The Company operates under the names: "Lerner New York," "Express," "Lane Bryant," "The Limited," "The Limited Too," "Henri Bendel," "Structure," and "Galyan's Trading Co." The Company also owns approximately 84% of Intimate Brands, Inc., which operates "Victoria's Secret" and "Bath & Body Works" stores. *Id.*

> FN4. Mr. Wexner owned or controlled more than 58 million shares of The Limited. *Id.* ¶ 7.

The remaining ten members of The Limited's Board named as defendants are Raymond Zimmerman ("Zimmerman"), Allan R. Tessler ("Tessler"), Claudine B. Malone ("Malone"), Eugene M. Freedman ("Freedman"), Martin Trust ("Trust"), Kenneth B. Gilman ("Gilman"), David T. Kollat ("Kollat"), E. Gordon Gee ("Gee"), Donald B. Shackelford ("Shackelford"), and Leonard A. Schlesinger ("Schlesinger").

B. The Self-Tender

On May 3, 1999, The Limited announced that the Board had authorized the repurchase of up to 15 million shares of the Company's outstanding common stock [FN5] through a Dutch auction tender offer. [FN6] Under the terms of the tender offer, the Company agreed to repurchase those shares at a premium over their pre-announcement closing price. [FN7] Mr. Wexner agreed that neither he nor any of his affiliates would participate in the tender.

> FN5. *Id.* ¶ 30. These shares represented approximately six percent of The Limited's 228,165,712 shares then outstanding. *Id.*

> FN6. "A Dutch auction is a form of tender offer in which the selling stockholders, rather than the buyer, determine the price to be paid for the shares purchased. The corporation establishes a price range within which individual stockholders may designate the price at which they are willing to sell their shares. The corporation then determines the lowest price at which it can purchase the number of shares it needs, and buys at that price. Any shares tendered above that price are excluded." *Frank v. Arnelle*, Del.Supr., No. 424, 1998 (Jan. 22, 1999) (ORDER) (quoting *Cottle v. Standard Brands Paint Co.*, Del. Ch., C.A. No. 9342, mem. op. at 3, Berger, V.C. (Mar. 22, 1990)).

> FN7. The self-tender price was between $50 and $55 per share. Compl. ¶ 2. This, plaintiffs indicate, represented a significant premium over the $43.75 pre-announcement closing price. *Id.*

*2 This decision, according to the Company, was based in large part on the purportedly large amount of excess cash and cash equivalents generated by the Company's operations, an amount more than $660 million. The Board concluded that the stock repurchase was the most attractive method for utilizing the Company's excess cash and would demonstrate to the stockholders how much confidence it had in The Limited's business. Shortly after the expiration of the self-tender, The Limited announced that it had acquired 15,000,000 shares at a total cost to the Company of $750 million, $90 million more than the $660 million of cash and cash equivalents it had on hand.

C. The Contingent Stock Redemption Agreement

When it made public its decision to conduct a self-tender offer, The Limited also announced that it had agreed to rescind the Redemption Agreement, an agreement it had entered into in 1996 with Mr. Wexner in both his individual capacity and as trustee of The Wexner Children's Trust (the "Children's Trust"). [FN8]

> FN8. The Redemption Agreement was entered into on January 26, 1996 and was subsequently amended in July 1996.

Under the Redemption Agreement, the Children's Trust acquired the right, through January 30, 2006, to require the Company to redeem all or a portion of the 18.75 million shares of common stock it held at $18.75 per share, a put option. [FN9] The Redemption Agreement also provided

the Company with a six-month window, commencing on July 31, 2006, to redeem all or part of the remaining shares still held by the Children's Trust at $25.07 per share, a call option. [FN10]

> FN9. Compl. ¶ 23.
>
> FN10. *Id.*

During the term of the Redemption Agreement, The Limited was required to retain $350 million in a restricted cash account in order to satisfy its obligations under the agreement should either of the options be triggered. [FN11] In other words, the $350 million was to remain in this restricted account until the year 2006 to cover The Limited's potential obligations under the Redemption Agreement.

> FN11. *Id.* ¶ 25.

## II. CONTENTIONS

The Complaint asserts claims of corporate waste and breaches of the fiduciary duties of loyalty and due care in connection with the challenged transactions described above.

Plaintiffs' due care and corporate waste claims rest on the relationship between the rescission of the Redemption Agreement and the self-tender. Plaintiffs allege that the only reason for structuring the transactions in this manner was to enable Mr. Wexner to avoid the terms of the Redemption Agreement which, they assert, had become particularly unfavorable to him. [FN12] Plaintiffs' argue that these transactions lacked any legitimate business purpose other than to benefit Mr. Wexner at the Company's expense and came without a corresponding benefit to the Company. Plaintiffs also allege a breach of the fiduciary duty of loyalty on the basis that at least half of the Board had a disqualifying self-interest in the transactions or lacked independence in approving the challenged transactions due to their personal or professional relationships with Mr. Wexner.

> FN12. By May 1999, the month in which The Limited announced the two challenged transactions, the price of the Company's stock was trading at more than $40 per share, significantly higher than the call price that the Company could have paid during the six-month window to exercise its option in 2006. Had the Company been empowered in May 1999 to force the Trust to sell it its shares, the Company could have purchased the Trust's 18.75 million shares for approximately $25 per share, thus realizing a savings of more than $15 per share from its then over $40 trading price. This equates to roughly $280,000,000.

Plaintiffs claim that the absence of impartiality on the part of a majority of the Board rendered any demand futile. Specifically, plaintiffs maintain they have pled particularized facts raising a reasonable doubt that a majority of the twelve-member Board was disinterested and independent at the time that their initial complaint was filed. In this respect, plaintiffs argue that they have alleged particularized facts demonstrating that a majority of the twelve-member Board stood to gain from the now challenged transactions or were economically beholden to Mr. Wexner (who, they allege, had a disqualifying self-interest). Additionally, the plaintiffs assert that they have alleged particularized facts raising a reasonable doubt as to whether the challenged transactions resulted from the exercise of sound business judgment.

*3 Defendants respond by asserting that this action should be dismissed for two reasons. First, defendants argue that plaintiffs have failed to meet the pre-suit demand requirements of Court of Chancery Rule 23.1. Specifically, they contend that plaintiffs have failed to plead particularized facts as to why demand on the Board should be excused. Second, defendants argue that plaintiffs have not sufficiently alleged an actionable corporate waste claim or a breach of fiduciary duty claim and that the Complaint should be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim for which this Court can grant relief.

## III. ANALYSIS
### A. Demand Futility

Court of Chancery Rule 23.1 provides that where a plaintiff initiates a shareholder derivative action without first making a demand on the company's board, the complaint must allege with particularity the reasons justifying the plaintiff's failure to do so. [FN13]

Not Reported in A.2d
2002 WL 537692 (Del.Ch.)
(Cite as: 2002 WL 537692 (Del.Ch.))

Page 23

FN13. Ct. Ch. R. 23.1 ("The complaint shall ... allege with particularity the efforts, if any, ... to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort."). At this stage, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." Brehm v. Eisner, 746 A.2d 244, 255 (Del.2000).

In most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation. This authority is subject to the limited exception, defined in Chancery Rule 23.1, permitting stockholders to initiate a derivative suit to enforce unasserted rights of the corporation without the board's approval where they can show either that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or, if no demand was made, that such a demand would be a futile gesture and is therefore excused. [FN14]

FN14. White v. Panic, 783 A.2d at 550 (footnotes omitted).

The "heavy burden" of pleading demand futility is a substantive component of a plaintiff's case and, as such, the failure to meet either of the two showings prescribed by our Supreme Court in Aronson v. Lewis [FN15] ends a court's inquiry before it can even address the merits of the challenged transaction. [FN16] "Under Aronson v. Lewis, demand is considered futile and, therefore, excused only if the particularized facts alleged in the complaint create a reasonable doubt that: 1) the directors are disinterested and independent; or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN17] In this case, plaintiffs assert that their failure to make a demand should be excused because their Complaint raises a reasonable doubt as to both of the Aronson factors. Thus, I turn to consideration of the first prong of Aronson.

FN15. 473 A.2d 805 (Del.1984).

FN16. Id. at 814.

FN17. In re Walt Disney Co. Deriv. Litig., 731 A.2d 342, 353-54 (Del.Ch.1998), aff'd in part and rev'd in part sub nom. Brehm v. Eisner, 746 A.2d 244 (Del.2000) (quoting Aronson v. Lewis, 473 A.2d at 814).

The plaintiffs argue that they have sufficiently alleged with particularity facts raising a reasonable doubt as to whether a majority of the directors on The Limited's Board were disinterested and independent.

> To meet the first prong of the Aronson test and adequately show the futility of a pre-suit demand, a plaintiff must plead particularized facts sufficiently demonstrating that the defendant directors had a financial interest in the challenged transaction, that they were motivated by a desire to retain their positions on the board or within the company (an entrenchment motive), or that they were dominated or controlled by a person interested in the transaction. [FN18]

FN18. Kahn v. Roberts, Del. Ch., C.A. No. 12324, mem. op. at 12, Hartnett, V.C. (Feb. 28, 1994), aff'd, Kahn v. Roberts, 679 A.2d 460 (Del.1996); see also Aronson v. Lewis, 473 A.2d at 812-16.

*4 In conducting this analysis, Aronson and its progeny limit the scope of my inquiry under Rule 23.1 to the allegations of the Complaint. [FN19] For the reasons discussed below, I find that the plaintiffs have alleged sufficient particularized facts to raise a reasonable doubt as to the disinterestedness or independence of at least six of The Limited's twelve directors.

FN19. Aronson v. Lewis, 473 A.2d at 808; see also supra note 1.

1. Director Disinterestedness

[1] The Complaint alleges that the challenged transactions were approved by the Board for the sole or primary reason of enabling Mr. Wexner to negotiate a rescission of the Redemption Agreement affecting the Trust which he controlled. [FN20] "Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenged transaction which is not equally shared by the stockholders." [FN21] Because Mr. Wexner, in his individual capacity and as trustee for the Trust, negotiated the Redemption Agreement at its creation, an agreement that was for the benefit of his children, the Complaint has alleged sufficiently particularized facts creating a reasonable doubt as to his disinterestedness in connection with the Company's rescission of that agreement. Mrs. Wexner similarly stood to benefit from the rescission of the Redemption Agreement, thereby creating a reasonable doubt as to her disinterestedness as a director in the approval of the rescission. [FN22]

> FN20. Compl. ¶ 4.
>
> FN21. *Pogostin v. Rice*, 480 A.2d 619, 624 (Del.1984), *overruled on other grounds Brehm v. Eisner*, 746 A.2d 244 (Del.2000).
>
> FN22. I understand that Mr. Wexner, for himself and Mrs. Wexner, disclaimed any right to participate in the self-tender. That begs the question of whether they can be deemed interested in the self-tender. The answer, at least at this stage of these proceedings, is that the Redemption Agreement and the self-tender appear so interdependent that, for these purposes, they cannot be segregated.

With respect to the remaining ten directors, however, the Complaint is devoid of any allegations suggesting the presence of any financial interest in the challenged transactions that would suffice for purposes of the first prong of *Aronson*. [FN23] At issue with these directors are the plaintiffs' allegations challenging their independence (*i.e.*, whether they were so beholden to Mr. Wexner as to create a reasonable doubt about their independence). The independence of these directors will be discussed next.

> FN23. These directors received no material benefit (nor risked any material detriment) that was not available to the shareholders generally. *See Orman v. Cullman*, Del. Ch., C.A. No. 18039, mem. op. at 19-21, Chandler, C. (Mar. 1, 2002).

2. Director Independence

Independence, the *Aronson* Court held, means that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influences. To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized. [FN24]

> FN24. *In re Western Nat'l Corp. S'holders Litig.*, Del. Ch., C.A. No. 15927, mem. op. at 28, Chandler, C. (May 22, 2000) (citations omitted); *see also In re Paxson Communication Corp., S'holders Litig.*, Del. Ch., C.A. No. 17568, mem. op. at 23, Chandler, C. (July 10, 2001) ("Even where the *potential* for domination or control by a controlling shareholder exists, the complaint must allege particularized allegations that would support an inference of domination or control.") (emphasis in original).

The Court in ascertaining the sufficiency of a complaint challenging a director's loyalty does not apply an objective "reasonable director standard"; instead, the Court must apply a "subjective 'actual person' test to determine whether a *particular* director[ ] ... lacks independence because he is controlled by another." [FN25]

> FN25. *Orman v. Cullman*, mem. op. at 21 (emphasis in original) (footnote omitted).

[2] The plaintiffs do not seriously contest the independence of four of The Limited's directors. The only allegations in the Complaint with respect to Zimmerman, Tessler, Malone, and Freedman are that each had been a director of The Limited for a number of years predating the challenged transactions. [FN26] Allegations as to one's position as a director and the receipt of director's fees, without more, however, are not enough for purposes of pleading demand futility. [FN27] As such, I find that the plaintiffs have not met their burden of raising, through allegations of particularized facts, a reasonable doubt as to the independence of Zimmerman, Tessler, Malone, or Freedman.

> FN26. The Complaint alleges that Zimmerman had been a director of The Limited since 1984, Tessler a director

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

since 1987, Malone a director since 1982, and Freedman a director since 1995. *See* Compl. ¶¶ 11, 13-14, 16.

FN27. *See Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds Brehm v. Eisner,* 746 A.2d 244 (Del.2000) (stating that "such allegations, without more, do not establish any financial interest"); *Orman v. Cullman,* mem. op. at 24-26, 29 n. 62 (observing that "[the] Court's view of the disqualifying effect of [director's] fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee").

*5 [3] The Complaint states that Shackelford, a director of The Limited since 1975, was also a director of Intimate Brands, Inc., The Limited's 84% owned subsidiary, which is allegedly dependent upon The Limited for significant revenues. Shackelford's compensation from his role as a director of The Limited, alone, does not create a reasonable doubt as to that director's independence. [FN28] Similarly, the receipt of director's fees from a subsidiary does not, in the absence of other facts suggesting a lack of independence, demonstrate a reasonable doubt as to that director's loyalty. [FN29] Accordingly, I find that plaintiffs have failed to rebut the presumption as to Shackelford's independence as well.

FN28. *See Orman v. Cullman,* mem. op. at 24-26, 29.

FN29. *See In re Walt Disney Co. Deriv. Litig.,* 731 A.2d at 357.

[4] The Complaint alleges that Kollat, a director of The Limited since 1976, is a principal of Audio Environments ("Audio"), a company supplying in-store music to The Limited's stores, from which Audio receives $400,000 annually in revenue. This Court has previously considered the potential impact on a director's independence from a business relationship between the director's employer (in which the director may have an interest) and the company on whose board the directors sits. "Although it has been held that a director whose small law firm received $1,000,000 in legal fees from the corporation was potentially beholden to the CEO, [a] plaintiff [who has failed to] allege[ ] particular facts indicating that [the money] allegedly paid to [the director] or his firm was so material as to taint [the director's] judgment .... [fails] to create a reasonable doubt about his independence." [FN30] The Complaint is devoid of any allegations asserting (or from which an inference can reasonably be drawn, for that matter) that the $400,000 annual revenue that Audio receives from its dealings with The Limited and its affiliates was material to Audio's business. Moreover, the Complaint does not allege how Kollat, as "a principal," may have benefited from any portion of those revenues. Accordingly, the plaintiffs have also failed to plead particularized facts raising a reasonable doubt as to Kollat's independence.

FN30. *White v. Panic,* Del. Ch., C.A. No. 16800, mem. op. at 18, Lamb, V.C. (Jan. 19, 2000), *aff'd,* 783 A.2d 543 (Del.2001) (citing *Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, mem. op. at 24-25, Allen C. (July 18, 1995)).

[5] Gilman has served as a director since 1990. Since 1997, his principal employment has been as vice chairman and chief administrative officer of The Limited for which, during the years 1996-1998, he averaged $1.8 million in salary and bonuses. It is reasonable to infer that compensation of this magnitude is material to him. [FN31] Moreover, as a general matter, compensation from one's principal employment is "typically of great consequence" to the employee. [FN32] Because of Mr. Wexner's holdings of The Limited and his position, as chairman, chief executive officer, and director, [FN33] these allegations of particularized facts raise a reasonable doubt as to Gilman's independence from Mr. Wexner's will.

FN31. *See Orman v. Cullman,* mem. op at 20 n. 44, 32.

FN32. *In re The Student Loan Corp. Deriv. Litig.,* Del. Ch., let. op. at 9 n. 3, Strine, V.C. (Jan. 8, 2002).

FN33. *See Friedman v. Beningson,* Del. Ch., C.A. No. 12232, mem. op. at 10, Allen, C. (Dec. 4, 1995) (stating that the defendant-director's position as the company's chairman, coupled with his

ownership of 36% of the company's stock "[f]rom a practical perspective, ... [is] quite consistent with control of the board").

Trust's status is similar to that of Gilman. Trust is a long-time (since 1978) director of the The Limited. His principal employment is as president and chief executive officer of a wholly-owned subsidiary of The Limited. His average compensation from that position, which can reasonably be inferred to be material to him, over the four-year period preceding the filing of the Complaint, was approximately $1.8 million. Again, these particularized facts generate a reasonable doubt as to whether Trust is able to make decisions about Mr. Wexner's interests that are independent from his control.

*6 [6] Schlesinger became a director of The Limited in 1996. He provided consulting services to The Limited and one of its wholly-owned subsidiaries for which, during the years 1996-1998, he received average annual compensation of $150,000. His principal occupation was as a senior administrative officer of Brown University. Thus, I must determine whether, on these particularized facts, it is appropriate to conclude that average annual consulting fees of $150,000 would be material to Schlesinger and that he was "beholden" to Mr. Wexner because of a desire to continue with those consulting services. [FN34] I am satisfied that it is reasonable to infer from these allegations that continued annual compensation in excess of $150,000 would be material to Schlesinger, a senior university official, and that Schlesinger was beholden to Wexner for the continuation of the consulting services. [FN35] Accordingly, plaintiffs have met their pleading burden for raising a reasonable doubt as to Schlesinger's independence. [FN36]

> FN34. *Orman v. Cullman*, mem. op. at 32.
>
> FN35. *See Friedman v. Beningson*, mem. op. at 10, 12.
>
> FN36. *Orman v. Cullman*, mem. op. at 32 (noting that "it is reasonable to infer that $75,000 [annually] would be material to [the director at issue]"); *cf. White v. Panic*, 783 A.2d at 551 n. 24. Plaintiffs note that Schlesinger took a full-time position with The Limited after the filing of this action. Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss at 17-18. I must, however, confine my consideration of whether demand would have been futile to the allegations of the Complaint. *See supra* note 1.

[7] Gee, who has been a director since 1991, was president of The Ohio State University, Mr. Wexner's alma mater, from 1990 to 1997. He subsequently became president of Brown University, a position he left before the Complaint was filed. Gee, as the result of nominations by Mr. Wexner, serves on the boards of both The Limited and a subsidiary of The Limited. These facts, whether viewed singly or cumulatively, do not support any inference questioning Gee's independence. Gee, however, while president of Ohio State, successfully solicited from Wexner a $25 million grant to establish The Wexner Center for the Arts. Furthermore, Gee, while president of Brown, is alleged to have continued to solicit Mr. Wexner for donations.

Thus, the question as to Gee becomes: if a director is the head of a charitable or educational institution, under what circumstances may his independence be called into question by the charitable giving of the allegedly dominating person, in this instance, Mr. Wexner?

This Court has considered this question previously. In *Lewis v. Fuqua*, [FN37] the independence of Govornor Terry Sanford was evaluated. He served with J.B. Fuqua, the allegedly controlling person, on both the board of Fuqua Industries, Inc. and the Board of Trustees of Duke University of which Governor Sanford was then the president. Governor Sanford and Fuqua had a lengthy history of political, social and business relationships. Fuqua was a generous benefactor to Duke. [FN38] The Court concluded that all of these facts, taken together, supported the conclusion that there was reasonable doubt of Governor Sanford's independence from the domination of Fuqua.

> FN37. 502 A.2d 962 (Del.Ch.1985).
>
> FN38. He had donated $10 million to Duke University. *Id.* at 967.

This conclusion may be contrasted with the determination in *Disney* that the independence of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2002 WL 537692 (Del.Ch.)
(Cite as: 2002 WL 537692 (Del.Ch.))

Father O'Donovan had not been sufficiently called into question. Father O'Donovan was the president of Georgetown University and served as a director of The Walt Disney Company. The allegedly dominating person, Mr. Eisner, the chairman of Disney, had given $1 million to Georgetown University, which was the alma mater of one of his children. The Court in *Disney* focused on two critical distinctions from the analysis in *Lewis v. Fuqua*: (i) Governor Sanford had "numerous political and financial dealings" with Fuqua; no such relationship was alleged between Father O'Donovan and Mr. Eisner; and (ii) both Fuqua and Governor Sanford served together as directors (or trustees) of both Duke and Fuqua Industries. Mr. Eisner, in comparison, had no formal relationship with Georgetown University. [FN39]

> FN39. *In re Walt Disney Co. Deriv. Litig.,* 731 A.2d at 359.

*7 Thus, unlike the relationship between Governor Sanford and Fuqua, Gee and Mr. Wexner are not alleged to have had lengthy political and financial dealings and they do not serve together on multiple boards. Furthermore, while Gee, as president of Brown University, may have solicited Mr. Wexner for donations, the Complaint does not allege that he was successful. Moreover, Gee left his position at Brown and the Complaint does not suggest any continuing need or desire to solicit Mr. Wexner for charitable donations.

However, the determination of whether a particular director is "beholden" to an allegedly controlling person is not limited to the power to affect the director in the future. One may feel "beholden" to someone for past acts as well. [FN40] It may reasonably be inferred that Mr. Wexner's gift of $25 million to Ohio State was, even for a school of that size, a significant gift. While the gift was not to Gee personally, it was a positive reflection on him and his fundraising efforts as university president to have successfully solicited such a gift. In this context, even though there can be no "bright line" test, a gift of that magnitude can reasonably be considered as instilling in Gee a sense of "owingness" to Mr. Wexner. For that reason, I conclude that the plaintiffs have successfully alleged a reasonable doubt as to Gee's independence from Mr. Wexner's domination. [FN41]

> FN40. *See In re Ply Gem Indus., Inc. S'holders Litig.,* Del. Ch., C.A. No. 15779, let. op. at 4, Noble, V.C. (Sept. 28, 2001).

> FN41. I recognize that charitable giving to educational institutions, particularly one's alma mater, is to be encouraged. That, however, is not the issue here. The issue is whether such an extraordinary gift makes it reasonable to question Gee's independence. I conclude that it does.

[8] Thus, six of the twelve directors of The Limited are either interested (Mr. Wexner and Mrs. Wexner) in the challenged transactions or subject to a reasonable doubt about their independence (Gilman, Trust, Schlesinger and Gee) from Mr. Wexner's domination. Although that, of course, is not a majority of the directors, where the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent. [FN42] Accordingly, defendants' motion under Court of Chancery Rule 23.1 is denied.

> FN42. *Beneville v. York,* 769 A.2d 80, 85-87 (Del.Ch.2000); *In re The Student Loan Corp. Deriv. Litig.,* let. op. at 9 n. 4.

B. Duty of Loyalty

With the determination that demand is excused, I now turn to consideration of defendants' application under Court of Chancery Rule 12(b)(6)'s more lenient pleading standards.

[9] For the reasons set forth above, I am satisfied that the Complaint states a claim for breach of the duty of loyalty. The challenged transactions were approved by a unanimous board of twelve; six of those directors were either interested or subject to disqualifying doubts about their independence. [FN43] As set forth below, the challenged transactions, while perhaps not constituting corporate waste, appear unfair to the stockholders. [FN44] Thus, because the challenged transactions were not approved by a majority of independent and disinterested directors, the Complaint states a loyalty claim that survives a challenge under Court of Chancery Rule 12(b)(6).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN45]

> FN43. The Board's composition is not alleged to have changed from the date of its approval of the challenged transactions until the filing of this action, a short time thereafter.
>
> FN44. *See Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, mem. op. at 14, Allen, C. (July 18, 1995).
>
> FN45. *See In re The Student Loan Corp. Deriv. Litig.,* let. op. at 9 n. 4. Thus, I need not consider whether my conclusion as to Kollat's independence would change under the less stringent pleading requirements of Court of Chancery Rule 12(b)(6).

C. Corporate Waste

Although the challenged transactions may be questioned because of doubts about the loyalty of the directors approving them, it does not necessarily follow that they constitute corporate waste.

*8 For plaintiffs' waste claim to survive, the Complaint, under the liberal pleading standards of Court of Chancery Rule 12(b)(6), must show that the transactions were "effected on terms 'that no person of ordinary, sound business judgment could conclude represent a fair exchange." ' [FN46] Plaintiffs' burden has also been described as requiring a showing that "the [transactions] in question either served no corporate purpose or [were] so completely bereft of consideration that [they] effectively constituted a gift." [FN47]

> FN46. *Id.* at 10 (quoting *Steiner v. Meyerson,* mem. op. at 2); *see also Harbor Finance Partners v. Huizenga,* 751 A.2d 879, 892 (Del.Ch.1999).
>
> FN47. *Ash v. McCall,* Del. Ch., C.A. No. 17132, mem. op. at 19-20, Chandler, C. (Sept. 15, 2000), quoting *Benerofe v. Cha,* Del. Ch., C.A. No. 14614, mem. op. at 19, Chandler, V.C. (Sept. 12, 1996), quoting *Grobow v. Perot,* 539 A.2d at 189.

I will first analyze the corporate waste claim for the two transactions separately, followed by a consideration of the two transactions taken together.

1. Rescission of the Redemption Agreement

[10] By its terms, the Redemption Agreement required The Limited to maintain, untouched, a cash account of $350 million until 2006 to cover its potential obligations under the agreement. Because the price of the stock had risen appreciably since the creation of the Redemption Agreement, the plaintiffs allege that the rescission "destroyed a valuable option worth hundreds of millions of dollars to the Company.... without a corresponding benefit to the Company, ... the only benefit accruing to [Mr.] Wexner and the [Children's] Trust, which no longer faced the prospect of being forced to sell shares below market value." [FN48]

> FN48. Compl. ¶ 37.

It is true that had the terms of the Redemption Agreement empowered the Company to trigger its call on May 3, 1999, the date of the Company's announcement, then Mr. Wexner, as trustee, would have been obligated to sell the Trust's 18,750,000 shares at approximately $15 below the shares' trading price at that time. The Company's call option, however, could not have been exercised until 2006, almost seven years after the date of The Limited's announcement. By that time, it is anyone's guess as to whether The Limited's stock would have continued to climb in value, whether it would have fallen below its May 1999 trading levels, or whether it would have fallen below either the put option price or the call option price. Any future benefit that the Company might have enjoyed had rescission not been effectuated, therefore, is speculation and conjecture.

The Company argues that rescinding the Redemption Agreement freed up $350 million in cash reserves that it was required to maintain. Freeing up such a substantial amount of otherwise stagnant and untouchable capital, in light of the stock market's volatility and unpredictability, it argues, is well within the realm of reason. That the plaintiffs assess the intrinsic value of the Redemption Agreement to have been between $350 and $550 million based on the Black-Scholes model is not dispositive. [FN49] If the stock price had fallen below $18.75 at any time prior to 2006,

the Company would have been open to the risk that Mr. Wexner would exercise the Children's Trust's put rights (which he would have arguably been under a duty to do), thereby requiring the Company to expend substantial monies from its reserve to purchase the stock at a premium to market. It is well-settled that " '[c]ourts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk." ' [FN50] Thus, the plaintiffs have failed to allege facts supporting a claim that rescission of the Redemption Agreement "served no corporate purpose or was so completely bereft of consideration that it effectively constituted a gift." [FN51]

> FN49. *See In re 3Com Corp. S'holders Litig.*, Del. Ch., C.A. No. 16721, mem. op. at 12 n. 17, Steele, V.C. (Oct. 25, 1999). For a more detailed discussion of the Black-Scholes valuation model, see *Lewis v. Vogelstein*, 699 A.2d 327, 331-33 (Del.Ch.1997).
>
> FN50. *Brehm v. Eisner*, 746 A.2d at 263 (quoting *Lewis v. Vogelstein*, 699 A.2d at 336).
>
> FN51. *Ash v. McCall*, mem. op. at 19-20.

2. The Self-Tender Offer

*9 [11] The Board's purported justification for the self-tender was that " 'a significant share repurchase would be the most desirable use for [the Company's] excess cash' and 'it would demonstrate to the Company stockholders the Company's confidence in its business." ' [FN52] Plaintiffs assert that the Board's stated goals for this transaction could have been achieved by alternative means less costly to the Company. Specifically, the Complaint alleges that the Company could have avoided paying a premium of more than 15% for its shares by effectuating "an open market purchase at the prevailing market price given the large daily volume of trading in the Company's stock." [FN53] This, plaintiffs aver, "would have saved the Company well over $90 million." [FN54] The Limited could also have used its "significant excess cash to pay a dividend to shareholders.... [meaning that] the Company could have shared the benefits of its excess cash with all of its shareholders.... [as opposed to only a relatively small number of individuals benefiting from] a self tender." [FN55]

> FN52. Compl. ¶ 32 (quoting The Limited's May 4, 1999 Offer of Purchase) (alteration in original).
>
> FN53. *Id.* ¶ 33.
>
> FN54. *Id.*
>
> FN55. *Id.*

"Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." [FN56] That the Complaint identifies viable alternatives to the Board's decision here is not enough--it is precisely this kind of judicial after-the-fact evaluation that the business judgment rule seeks to prevent. [FN57] Even the plaintiffs cannot dispute that the vehicle of a self-tender offer is a well-accepted option for corporate boards wanting to manage mounting cash reserves. [FN58] Thus, because "reasonable, informed minds might disagree on the question, ... a reviewing court will not attempt to itself evaluate the wisdom of the bargain or the adequacy of the consideration." [FN59] Accordingly, I find that the plaintiffs have failed to allege that the Self-Tender is the basis for a viable corporate waste claim.

> FN56. *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del.Ch.1993).
>
> FN57. For example, the plaintiffs' identification of a dividend distribution as an alternative means for managing The Limited's excess cash arguably ignores the preferential tax consequences for the capital gains that would result from the tender.
>
> FN58. *See Weiss v. Samsonite Corp.*, 741 A.2d 366, 371 (Del.Ch.1999), aff'd, 746 A.2d 277 (Del.1999).
>
> FN59. *Glazer v. Zapata Corp.*, 658 A.2d at 183.

3. The Rescission and the Self-Tender Offer

Together

**[12]** It is the plaintiffs' position that "the two transactions *taken together* served no business purpose other than to benefit [Mr.] Wexner." [FN60] At the time that these two transactions were announced, The Limited had more than $660 million in cash and cash equivalents on hand. [FN61] The Complaint alleges that "[t]he only reason for a $750 million--as opposed to $500 million or $600 million--Self Tender, was to create an artificial 'need' to rescind the Redemption Agreement, and, thereby, allow [Mr.] Wexner to escape from the Redemption Agreement at the Company's expense." [FN62]

> FN60. Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss at 9 (emphasis in original).
>
> FN61. Compl. ¶ 35.
>
> FN62. *Id.* ¶ 38.

The plaintiffs have failed to demonstrate that the Company received no benefit in exchange from these two transactions or that these transactions, taken together, served no corporate purpose. For one, Mr. Wexner promised not to participate in the Company's self-tender. Having done this, Mr. Wexner forfeited his ability to partake in the more than 15% premium offered by the Company for its shares. Moreover, rescinding the Redemption Agreement allowed the Company to manage the otherwise untouchable $350 million that would have been locked up by the terms of that agreement for another six to seven years. While the plaintiffs point out that The Limited only needed an additional $90 million in cash to cover its self-tender offer, nothing changes the fact that $260 million in liquid funds is a valuable asset for any company. As discussed in more detail above, the rescission of the Redemption Agreement protected the Company from a potentially costly liability that might have befallen it had the shares declined in value in the future. Considering that these transactions conferred upon all of The Limited's shareholders, excluding Mr. Wexner and his affiliates, an opportunity to reap the benefits of a more than 15% premium for their shares, while at the same time demonstrating to the market and those individuals declining to tender their shares the Board's confidence in the Company's stock, I am unwilling to find that the two transactions, viewed together, "served no corporate purpose." [FN63] As such, even after accepting all of the plaintiffs' well-pled factual allegations and according them the benefit of all reasonable inferences, I find that the Complaint does not state a claim for corporate waste.

> FN63. *Ash v. McCall,* mem. op. at 19-20.

**D. Duty of Care**

*10 **[13]** Plaintiffs, without much enthusiasm, also allege that the challenged transactions are the product of the directors' breach of their duty of care. The Complaint does not allege gross negligence or the insufficiency of the information upon which the Board based its decision. [FN64] Thus, the duty of care claim will be dismissed. [FN65]

> FN64. "[I]n making business decisions, directors must consider all material information reasonably available, and the directors' process is actionable only if grossly negligent." *Brehm v. Eisner,* 746 A.2d at 259. The only allegation in the Complaint speaking to the directors' alleged breaches of care states that:
> A Special Committee was apparently formed the very day the transaction was approved, solely to "rubber stamp" the transaction, without adequate deliberation, without adequate advice from independent legal counsel and independent financial advisors, without adequate consideration of the cost to the Company, and without any genuine exploration of alternative means through which the Company's excess cash could be used to benefit shareholders (without causing forfeiture of the valuable right). The Special Committee [also failed to] negotiate the transaction with [Mr.] Wexner. Compl. ¶ 46. Such general and conclusory allegations, however, fail to support the inference that the Board breached its duty of care. Moreover, these allegations involve only the Special Committee, upon which, as of yet, Defendants have not relied.
>
> FN65. Defendants (other than Mr. Wexner and Mrs. Wexner) have also sought to invoke the exculpatory charter

Not Reported in A.2d
2002 WL 537692 (Del.Ch.)
(Cite as: 2002 WL 537692 (Del.Ch.))

Page 31

provision adopted under the authority of 8 *Del. C.* § 102(b)(7). To the extent that a duty of loyalty claim is implicated, that provision, of course, is inapplicable. *Malpiede v. Townson,* 780 A.2d 1075, 1094-95 (Del.2001). In addition, as to those defendants about whom there is no question as to their disinterestedness and independence, I am reluctant to evaluate the § 102(b)(7) defense at this stage. First, this defense has not been asserted by the defendants on a director-by-director basis. Second, whether an independent director can obtain dismissal of the claims against him at this stage of the proceedings is an open question. *See In re The Student Loan Corp. Deriv. Litig.,* let. op. at 11 n. 8. In any event, this has not been addressed by the parties.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss under Chancery Court Rule 23.1 is denied; defendants' motion under Chancery Court Rule 12(b)(6) to dismiss plaintiffs' duty of care claim and corporate waste claim is granted. [FN66] Otherwise, defendants' motion to dismiss is denied.

> FN66. Because Court of Chancery Rule 15(aaa) was not in effect when plaintiffs filed their answering brief in opposition to the motion to dismiss, this dismissal is without prejudice.

IT IS SO ORDERED.

2002 WL 537692 (Del.Ch.)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works