**Unpublished Opinions Cited in Plaintiff's Memorandum in Opposition to Defendants' Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Westlaw.

2005 WL 613387                                                                Page 1

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

▷

United States Bankruptcy Court,
D. New Jersey.
In re LGI, INC., Debtor.
David Michaels, Distribution Trustee for LGI, Inc.,
Plaintiff,
v.
World Color Press, Inc., Grady W. Jones Company
and Unarco Material Handling,
Inc., Defendants.
**Bankruptcy No. 99-39325 (RG).**
**Adversary No. 01-3642 MS.**

March 15, 2005.

**Background:** Distribution trustee brought postconfirmation proceeding to recover on prepetition negligence and contract claims specifically excluded from being among property transferred to purchaser of Chapter 11 debtor's assets.

**Holding:** On motion to dismiss on jurisdictional grounds, the Bankruptcy Court, Morris Stern, J., held that proceeding had a sufficiently close nexus with debtor's confirmed plan that bankruptcy court could exercise continuing postconfirmation jurisdiction over proceeding.
Motion denied.

**[1] Bankruptcy** ☞3570

51k3570 Most Cited Cases
Post-confirmation proceeding that was brought by distribution trustee to recover on prepetition negligence and contract claims specifically excluded from being among property transferred to purchaser of Chapter 11 debtor's assets had a sufficiently close nexus with debtor's confirmed plan that bankruptcy court could exercise continuing post-confirmation jurisdiction over proceeding, notwithstanding any distinction between bankruptcy estate and distribution trustee

or that proceeding involved purely state law claims, where plan and supporting documents sufficiently identified these claims and assigned them to post-confirmation trust for benefit of certain creditors. 28 U.S.C.A. § 1334(b).

**[2] Bankruptcy** ☞2043(3)

51k2043(3) Most Cited Cases
Test for whether bankruptcy court may exercise "related to" jurisdiction over proceeding is whether outcome of proceeding could "conceivably" have any effect on estate being administered in bankruptcy; certainty, or even likelihood, of such an effect is not required. 28 U.S.C.A. § 1334(b).

**[3] Bankruptcy** ☞3570

51k3570 Most Cited Cases
Determination as to whether bankruptcy court may exercise subject matter jurisdiction over proceeding after Chapter 11 plan has been confirmed requires special scrutiny.

**[4] Bankruptcy** ☞3570

51k3570 Most Cited Cases
Although section of the Bankruptcy Code which authorizes court to enter orders necessary for implementation of confirmed Chapter 11 plan provides for post-confirmation jurisdiction to adjudicate certain disputes, source of court's post-confirmation jurisdiction remains general jurisdictional statute. Bankr.Code, 11 U.S.C.A. § 1142(b); 28 U.S.C.A. § 1334(a, b).

**[5] Bankruptcy** ☞3570

51k3570 Most Cited Cases
Test for whether bankruptcy court may exercise continuing post-confirmation jurisdiction over proceeding is whether there is sufficiently close nexus between proceeding and plan, a nexus which will generally be found when proceeding affects interpretation, implementation, consummation, execution or administration of confirmed plan. Bankr.Code, 11 U.S.C.A. § 1142(b); 28 U.S.C.A. §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

1334(a, b).

**[6] Bankruptcy ☞3570**
51k3570 Most Cited Cases
Mere fact that, as result of settlement of another post-confirmation proceeding brought by distribution trustee to recover from Chapter 11 debtor's insurer, insurer acquired a percentage interest in proceeds of negligence and contract claims which were likewise assigned to post-confirmation trust for benefit of certain creditors did not cause bankruptcy court's continuing post-confirmation jurisdiction over these assigned negligence and contract claims to suddenly evaporate, on theory that claims lacked requisite nexus with plan, where post-confirmation trust remained party with ultimate interest in any recovery to extent of approximately 25 percent. 28 U.S.C.A. § 1334(b).

**[7] Bankruptcy ☞3570**
51k3570 Most Cited Cases
Passage of time since debtor's Chapter 11 plan was confirmed nearly five years earlier did not deprive bankruptcy court of post-confirmation jurisdiction over post-confirmation proceeding that was brought by distribution trustee to recover on prepetition negligence and contract claims specifically excluded from being among property transferred to purchaser of Chapter 11 debtor's assets and assigned to post-confirmation trust, where long delay occurred after proceeding had been initiated, pending resolution of related insurance coverage dispute; such delay, after proceeding was initiated, was irrelevant to whether bankruptcy court could exercise subject matter jurisdiction over proceeding. 28 U.S.C.A. § 1334(b).
Cozen O'Connor, Jerrold N. Poslusny, Jr., Cherry Hill, NJ, for Plaintiff.

Booker, Rabinowitz, Trenk, Lubetkin, Tully, DiPasquale & Webster, P.C., Sam Della Fera, Jr., West Orange, NJ, for Defendants World Color Press, Inc. (n/k/a Quebecor World (USA), Inc.), Grady W. Jones Company and Unarco Material Handling, Inc.

Ravin Greenberg, PC, Howard S. Greenberg,

Roseland, NJ, for the Official Committee of Unsecured Creditors.

### *OPINION*

MORRIS STERN, Bankruptcy Judge.

**\*1** Plaintiff David Michaels is the Distribution Trustee pursuant to a Distribution Trust Agreement entered into post-confirmation with certain reorganized Chapter 11 debtors. The affiliated debtors are collectively denominated "LGI, Inc.," (hereinafter the "debtor"). On October 7, 1998 the debtor sustained a casualty loss at a printing facility owned and operated by defendant World Color in Covington, Tennessee. The debtor had a contract with World Color to produce mail-order catalogs for shipment to the debtor's customers. Those catalogs were stored on racks in the World Color facility. When the racks collapsed, some three million catalogs were destroyed, decimating debtor's sales during the winter holidays.

On August 19, 1999 (the "Petition Date"), the debtor filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The cases, jointly administered, resulted in a Joint Plan of Reorganization (the "Plan"), [FN1] which was confirmed on May 25, 2000. The Plan incorporated by reference a certain Asset Purchase Agreement and an implementing order (the "Brightline Stipulation and Order"). Certain assets *not* included in the asset sale nor passed through to the reorganized debtor (the "Excluded Assets") were assigned to the Distribution Trust for the ultimate benefit of certain creditors. Designated among the Excluded Assets were any proceeds received from the World Color casualty loss, including proceeds of a pending insurance claim. Asset Purchase Agreement ¶ 1.4(f). [FN2] As a corollary, and without contest from any party in interest, also included in the Trust corpus as Excluded Assets were claims against third parties (the defendants [FN3]) said to be responsible for the loss. [FN4] The Plan specifically provided that the Excluded Assets be transferred to the Distribution Trust and granted the plaintiff authority to liquidate the Excluded Assets for the benefit of certain creditors.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

Page 3

*See* Plan §§ 1.61, 7.07. The confirmation order provided that the Bankruptcy Court retain jurisdiction to "determine any and all pending adversary proceedings ... pending on, filed or commenced after, the Confirmation Date...." Order of Confirmation, ¶ 26(c).

Insurance coverage issues arose during the pendency of the Chapter 11 case; post-confirmation and as part of his charge as Distribution Trustee, the plaintiff filed an adversary proceeding in this Court on October 10, 2000. That litigation was captioned *David Michaels, Distribution Trustee for LGI, Inc. v. New Hampshire Ins. Co.* ("New Hampshire"), Adversary Proceeding Number 00-3674 (the "coverage action"). The coverage action sought to compel New Hampshire to pay the plaintiff's loss in the Tennessee accident. New Hampshire defended on the bases that the plaintiff was late in submitting its loss claim and that the plaintiff demanded excessive and unsubstantiated damages.

While the coverage action was pending, on October 5, 2001 the plaintiff filed this adversary proceeding. The plaintiff's complaint alleged negligence and theories of contract liability against the defendants and demanded damages of $2,851,357. On December 14, 2001 the defendants filed, in lieu of an answer, the instant motion to dismiss for lack of subject matter jurisdiction. This proceeding then became inactive, pending resolution of the coverage action.

**\*2** After extensive motion practice, discovery, and arbitration pursuant to the insurance contract, the plaintiff and New Hampshire settled the coverage action. On November 1, 2004 the Court entered an Order approving the settlement. It provided that New Hampshire pay the plaintiff $100,000 and that the World Color action continue, with the plaintiff and the insurer participating in any net recovery. In effect the plaintiff retains approximately a twenty-fivepercent interest in any such recovery, with the balance belonging to the insurer by way of its subrogation rights.

Following the long-delayed litigation/settlement process which concluded the coverage action (and

helped define the damages in the World Color action), this Court rescheduled the defendants' motion to dismiss and required both parties to supplement their submissions, particularly in light of the intervening decision in *In re Resorts Int'l, Inc.,* 372 F.3d 154 (3d Cir.2004).

The immediate motion requires the Court to determine whether it has subject matter jurisdiction post-confirmation. Can this Article I Court entertain an adversary proceeding that the Distribution Trustee commenced post-confirmation on a prepetition cause of action, which the plan of reorganization preserved for the benefit of creditors? If so, does the recent settlement of the related insurance coverage dispute, which provided for the continuation of the adversary proceeding in the name of the Distribution Trustee, but now for the benefit of both the Trust and the insurer, as subrogee, affect this Court's subject matter jurisdiction?

### DISCUSSION
### *In re Resorts Int'l, Inc.*

[1] 28 U.S.C. § 1334 establishes the jurisdiction of the district court over bankruptcy cases and proceedings. 28 U.S.C. § 1334(a) grants the district court "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(b) grants the district court "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Since, under 28 U.S.C. § 157(a) a district court may refer all such matters to the bankruptcy court, [FN5] *Resorts* capsules that court's jurisdiction as follows:

Bankruptcy court jurisdiction potentially extends to four types of title 11 matters, pending referral from the district court: " '(1) cases under title 11, (2) proceeding [sic] arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11.' " *In re Guild & Gallery Plus,* 72 F.3d at 1175 (quoting *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 264 (3d Cir.1991)). Cases under title 11 , proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as "core" proceedings; whereas

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

Page 4

proceedings "related to" a case under title 11 are referred to as "non-core" proceedings. *See* 1 *Collier on Bankruptcy,* P.3.02[2], at 3-35 (15th ed. rev.2003).
**\*3** 372 F.3d at 162.

It is not necessary for the bankruptcy court to decide whether a matter is core or noncore under 28 U.S.C. § 157(b) in order to determine that it has jurisdiction over that matter under 28 U.S.C. § 1334(a) or (b). *Resorts,* 372 F.3d at 163, citing *Marcus Hook,* 943 F.2d at 266 ("[w]hether a particular proceeding is core represents a question wholly separate from that of subject-matter jurisdiction"). The immediate issue for this Court then is only whether it has at least "related to" jurisdiction over the matter before it. *Resorts,* 372 F.3d at 163, citing *Donaldson v. Bernstein,* 104 F.3d 547, 552 (3d Cir.1997).

[2] In the Third Circuit the seminal test for determining "related to" jurisdiction remains that set forth in *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (as acknowledged in *Resorts,* 372 F.3d at 164). Under *Pacor,* the bankruptcy court has "related to" jurisdiction pursuant to 28 U.S.C. § 1334(b) to hear a matter if "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*" *Pacor,* 743 F.2d at 994 (emphasis in original). [FN6] *Pacor* continued:
[T]he proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom or action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.
*Pacor,* 743 F.2d at 994. "A key word in this test is 'conceivable.' Certainty, or even likelihood, is not a requirement." *Marcus Hook,* 943 F.2d at 264.

[3][4] The breadth of the *Pacor* test notwithstanding, the search for subject matter jurisdiction post-confirmation requires special scrutiny. *Resorts* observed:
At the most literal level, it is impossible for the

bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred.
*Resorts,* 372 F.3d at 165. Courts typically do not apply the *Pacor* analysis so literally to post-confirmation proceedings as to exclude them entirely from the jurisdiction of the bankruptcy court. *Resorts,* 372 F.3d at 165. And, although 11 U.S.C. § 1142(b) provides for post-confirmation jurisdiction to adjudicate certain disputes, the source for post-confirmation jurisdiction remains 28 U.S.C. § 1334(a) and (b). *Resorts,* 372 F.3d at 165, citing *In re United States Brass Corp.,* 301 F.3d 296, 306 (5th Cir.2002).

*Resorts* acknowledged cases finding, generally, post-confirmation jurisdiction in the bankruptcy court, [FN7] and more specific precedent for post-confirmation jurisdiction in the context of continuing trusts and other entities established by plans of reorganization. [FN8] *Resorts,* 372 F.3d at 165.

[5] After reviewing these cases, *Resorts* summed up the essence of the post-confirmation inquiry into subject matter jurisdiction as follows:
**\*4** Though courts have varied the standard they apply post-confirmation, the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter.... Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus. [FN9]
372 F.3d at 166-67. Thus, while continuing trusts by their nature maintain a connection to the case post-confirmation, *Resorts* admonished that the limitations embodied in "interpretation, implementation, consummation, execution, or administration of the confirmed plan" preclude the "unending jurisdiction" in bankruptcy over such trusts. 372 F.3d at 167.

In *Resorts* the issue was whether the bankruptcy court had related to jurisdiction over a professional malpractice cause initiated as an adversary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387                                                    Page 5

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

proceeding by the litigation trustee against the accountant to the litigation trust nearly seven years post-confirmation. *The cause of action clearly arose post-confirmation.* The plan-created litigation trust's beneficial interests were allocated to two classes of creditors. *Resorts,* 372 F.3d at 157-58. The Trust, per the plan, " 'retain[ed] and preserve[d] the Litigation Claims for enforcement, as representative of and successor to the Reorganizing Entities in accordance with Bankruptcy Code §§ 1123(b)(3)(B) and 1145(a).' " *Resorts,* 372 F.3d at 157. These Litigation Claims, originally held by the debtor prepetition against Donald Trump and affiliates, were the assets assigned to the Trust for prosecution. After confirmation the Trustee retained a public accountant to aid in prosecuting the Litigation Claims, as provided in the Litigation Trust Agreement. The Trustee settled the Litigation Claims, and the proceeds of settlement became assets of the Trust. *Resorts,* 372 F.3d at 158.

Nearly six years after the settlement (and seven years after confirmation), the Trustee filed a professional malpractice action against the public accounting firm which he had retained. The Trustee alleged that the accountant, in a post-confirmation act, had erroneously reported certain interest accruals related to the Litigation Claims, and that the Trust had incurred damages and unnecessary litigation expense as a result. The Trustee demanded damages and fee disgorgement. *Resorts,* 372 F.3d at 158-59. [FN10]

The Third Circuit concluded that the Trustee's malpractice claims did not have a sufficiently close nexus to the bankruptcy plan or proceeding to allow the bankruptcy court to exercise subject matter jurisdiction over it. In rejecting the Trustee's argument the Court found the relation of the Trustee's malpractice claims to the debtor's plan and estate so attenuated that the bankruptcy court lacked jurisdiction to hear them. In particular, the Court decided:

(1) "The Litigation Trust's connection to the bankruptcy is not identical to that of the estate." The Final Plan deliberately separated the Litigation Claims from the estate so that the plan could be confirmed before those Claims were

resolved and the debtor could thereby be "freed from bankruptcy court oversight." The Litigation Trust therefore did not have the same "jurisdictional nexus" as did the estate. *Resorts,* 372 F.3d at 169.

*5 (2) The possibility that the reorganized debtor might have a claim against the Trust in the continuing dispute about accrued interest did not create a close jurisdictional nexus. As the debtor assigned all its interest in the Litigation Claims to the Trust, the debtor would have no greater status than any other creditor of the Trust in the event that it was due a recovery. *Resorts,* 372 F.3d at 170.

(3) The resolution of the malpractice claims will "have no substantial effect on the success of the Plan." *Resorts,* 372 F.3d at 170.

(4) There was no need to interpret the Plan or the Litigation Trust Agreement in order to resolve the malpractice claims. *Resorts,* 372 F.3d at 170.

(5) The malpractice claims were ordinary state law claims for negligence and for breach of contract. That they occurred in the "context" of the Plan and Trust Agreement is a "bare factual nexus" which did not confer bankruptcy court jurisdiction. *Resorts,* 372 F.3d at 170.

(6) The potential for the malpractice action to increase the assets of the Trust "does not necessarily create a close nexus sufficient to confer 'related to' bankruptcy court jurisdiction post-confirmation." Because the beneficiaries of the Trust relinquished their status as creditors of the estate to become claimants of the Trust, "their connection to the bankruptcy plan or proceeding is more attenuated." *Resorts,* 372 F.3d at 170.

Ultimately, the Third Circuit decided that allowing any and all proceedings which have the potential for increasing the assets of a post-confirmation trust to claim the "related to" jurisdiction of the bankruptcy court would simply explode bankruptcy court jurisdiction beyond acceptable Constitutional and statutory limits:

[I]f the mere possibility of a gain or loss of trust assets sufficed to confer bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the "related to" grant. Such a result would widen the scope of bankruptcy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387                                                                                  Page 6

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

court jurisdiction beyond what Congress intended for non-Article III bankruptcy courts.

*Resorts,* 372 F.3d at 170. "Accordingly, resolution of these malpractice claims will not affect the interpretation, implementation, consummation, execution, or administration of the Plan." *Resorts,* 372 F.3d at 170-71.

### Comparison to Resorts

Defendants' effort *sub judice* to characterize this case as being beyond the subject matter jurisdiction of this Court based upon *Resorts* encounters obvious factual hurdles. Unlike *Resorts* (where the cause at issue developed post-confirmation), here the cause of action developed prepetition. Moreover, unlike *Resorts, sub judice* the Plan of Reorganization and related organic orders and agreements defined the cause of action as an "asset" intended to be distributed to certain creditors as part of the reorganization process. These facts, without more, could well establish the "close nexus to the bankruptcy plan or proceeding" which the Third Circuit requires for subject matter jurisdiction. Though not involving matters of "interpretation" or "administration" of a confirmed plan, this adversary proceeding plainly serves the plan through the "implementation, consummation [and] execution" which typify many post-confirmation matters.

*\*6 Notwithstanding this typicality (and the general use in the reorganization process of distribution or litigation trusts or other plan-created post-confirmation entities), the defendants challenge subject matter jurisdiction. Their arguments are:

(1) The Plan assigned all right, title and interest in the Trust Assets to the Distribution Trust, which is not a continuation of the estates "but rather a separate and distinct legal entity from the Debtors' estates" (Defendants' Supplemental Memorandum of Law, [FN11] p. 6).

(2) The creditors to be benefited by a Trust recovery from the World Color action "no longer have the same connection to the bankruptcy proceeding as when they were creditors of the bankruptcy estates" (Defendants' Supplemental Memorandum, p. 6); rather, these creditors, as

beneficiaries of the Trust, are no longer creditors of the estates.

(3) The World Color action was expressly assigned to the post-confirmation Trust for litigation and not specifically retained by the debtor's estate (as, for example, the claims were retained by the estate in *In re S.N.A. Nut Co.,* 206 B.R. 495, 499-500 (Bankr.N.D.Ill.1997)).

(4) The World Color claims arose prepetition but "left" the bankruptcy estate when the estate assigned its interest in those claims to the Distribution Trust (Defendants' Supplemental Memorandum, p. 7). As with any prepetition property which leaves the estate, the defendants argue, the Court loses jurisdiction over that property.

(5) The World Color action consists of "basic state-law contract and negligence claims," are not "premised on any bankruptcy law," and "do not require this Court's expertise in interpreting, implementing, consummating, or administering the terms of the Confirmed Plan or Distribution Trust Agreement." (Defendants' Supplemental Memorandum, p. 7).

In broadest terms, these arguments ignore the fundamental factual difference between the case *sub judice* and *Resorts.* To reiterate, in this case the claims in the World Color action arose prepetition and were specifically identified in the Asset Purchase Agreement among Excluded Assets. The Asset Purchase Agreement was incorporated by reference into the Plan which specifically transferred the Excluded Assets to the Distribution Trust for prosecution. (Plan § 7.07). Unlike the professional malpractice action in *Resorts,* the World Color action was not an accidental happenstance arising first in the operation of the Distribution Trust, but was an important substantive element of the Plan to be prosecuted by the Distribution Trustee. (In this regard, the matter *sub judice* closely resembles the Litigation Claims preserved in *Resorts* and acknowledged by the Third Circuit as having the requisite "close nexus." 372 F.3d at 167.) The World Color action, therefore, invokes the "implementation, consummation [and] execution" of the confirmed Plan.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387                                                              Page 7

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

Defendants' specific points of contention are addressed as follows:

1. *The "separate and distinct legal entity" argument.*

**\*7** The defendants' insistence that the Third Circuit's distinction between the debtor's estate and the Litigation Trust as separate entities destroys the nexus between the Trust and the plan overstates that distinction. [FN12] Such a reading of *Resorts* would render meaningless the Third Circuit's effort to create a refined *Pacor* analysis applicable to post-confirmation trusts. The Third Circuit already acknowledged that post-confirmation trusts by their nature maintain "a connection" to the bankruptcy, though post-confirmation trust litigation could spread bankruptcy court jurisdiction to unacceptable limits absent certain controls. *Resorts,* 372 F.3d at 167. The Court, therefore, provided a general test to establish, in the typical case, the "requisite close nexus" which supports bankruptcy court jurisdiction ("[m]atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan"). *Resorts,* 372 F.3d at 167. Defendants' overstated position would recharacterize the nature of a post-confirmation trust litigation so that *every* post-confirmation trust case would fail the "close nexus" test by virtue of having an identity separate from the debtor's estate. *Resorts* does not so eliminate, wholesale, related to jurisdiction as to all post-confirmation trust litigation in the bankruptcy court. [FN13] In the case *sub judice* this Court finds, regardless of any entity distinction between the debtor's estate and the Distribution Trust, that the prosecution of the World Color action promotes the "implementation, consummation [and] execution" of the Plan. The adversary proceeding therefore maintains the requisite close nexus to the Plan and sustains post-confirmation related to subject matter jurisdiction in the bankruptcy court. Indeed, the Plan was in part premised and confirmed on the basis of potential proceeds of this action being distributed to creditors.

2. *The argument that the creditors who would benefit from any litigation recovery "no longer*

*have the same connection to the bankruptcy proceeding."*

Again, the defendants would have this Court "disconnect" the Plan-contemplated benefits of post-confirmation litigation from the actualizing of that litigation, as if the chose-in-action (i.e., the World Color action) were not an asset to be distributed to *creditors* of the debtor's estate. Unlike the post-confirmation malpractice claim in *Resorts,* the World Color action here is both legally linked to the debtor's prepetition losses, and entrusted to the plaintiff *via the Plan for the benefit of creditors.*

3. *The argument that complete assignment of the World Color action to the Trust severs the jurisdictional nexus.*

This challenge by the defendants extends their theme based largely upon mechanics of Plan implementation rather than bankruptcy policy. Defendants' reference to *S.N.A. Nut* is, however, unavailing in this regard. In that case, *the estate* retained, per a plan of liquidation, a certain prepetition cause of action. However the jurisdictional lynchpin was not the estate's retention, but rather *implementation of the plan.* [FN14]

4. *The argument that jurisdiction "lapses" because the World Color action "left the estate."*

**\*8** This is yet another recasting of all-too-mechanical defense arguments and is likewise not supported by *Resorts.* Such an argument, if correct, would have impelled the Third Circuit in *Resorts* to deem that the prepetition Litigation Claims could not be adjudicated in the bankruptcy court. Instead, the Third Circuit used a dispute involving the Litigation Claims as "[a]n example ... in which there was a sufficiently close nexus to the plan or proceeding...." *Resorts,* 372 F.3d at 167. [FN15] Rather than referring to the *Resorts* Litigation Claims, defendants cite by way of analogy *Grimes. Grimes,* however, used by the Third Circuit in *Resorts* as an example of a nonproximate nexus case (372 F.3d at 168), is not helpful to the defendants. In *Grimes* the Trustee of the Liquidating Trust which had been created by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

Page 8

confirmed plan of these *individual* Chapter 11 debtors filed an adversary proceeding two years after confirmation against one debtor's former business partner. The Trustee sought, for the benefit of creditors, to recover funds which the partner received and which the Trustee alleged were due the debtor. *Grimes,* 158 B.R. at 967. The bankruptcy court found that it lacked subject matter jurisdiction over the Trustee's adversary proceeding:

[T]he charges which form the basis of this adversary proceeding were not raised until after the plan had been confirmed and the bankruptcy case closed. If these causes of action were assets of [the debtors], apparently they were not treated in the confirmed plan. The record reflects that [the partner] did not file a proof of claim in this bankruptcy case, nor was the claim pertaining to the purported partnership listed in the debtors' schedules. [The debtor] has never sent a demand letter to [the partner] nor complained that [the partner] diverted revenues from him. This adversary appears to be an effort by some of [the debtors'] creditors to proceed after the bankruptcy is over with against a non-debtor third party who was never involved in this bankruptcy case.

Additionally, the causes of action asserted do not involve federal bankruptcy law. *Assets such as the lawsuit embodied in this adversary that are not drawn into the plan are vested with the debtor upon confirmation, and matters concerning the disposition of these non-plan assets do not affect the implementation or execution of the plan.*

*In re Grimes,* 158 B.R. at 970 (emphasis added) (internal citation omitted). The cause of action at the center of the jurisdictional dispute in *Grimes* involved state law claims which arose prepetition; which were never referred to in the bankruptcy case, in the plan, or at confirmation; which consequently vested in the debtors at confirmation; and which simply represented an effort to increase post-confirmation trust assets *but not through implementation of the plan.* By contrast, in the case *sub judice,* the plan and supporting documents sufficiently identified the trustee's claims and assigned them to the post-confirmation trust for the benefit of certain creditors. Consequently, this proceeding invokes the "implementation, consummation [and] execution" of the plan and maintains the close nexus which confers subject matter jurisdiction on this Court.

*\*9* Although the defendants did not cite *Falise, supra,* this nonproximate nexus case used by way of illustration by the Third Circuit in *Resorts* is likewise not helpful to the defendants. There the post-confirmation Trust created in the Johns-Manville asbestos bankruptcy sued tobacco manufacturers for their purported cause or worsening of asbestos-related injuries. *Falise,* 241 B.R. at 54. The possibility of suing tobacco manufacturers was considered during the bankruptcy case but not adopted as part of the plan. *Id.* at 54. The court in *Falise* noted that the debtor was not a party to the Trust's suit and indeed had "been freed of any connection to all asbestos litigation" by the termination of the bankruptcy and by the special "safe harbor" provisions of 11 U.S.C. § 524(g) and (h). *Id.* at 57. The court characterized the adversary proceeding as involving "an entity that was a product of the bankruptcy proceeding ... [suing] a third party for money allegedly owed to it." *Id.* at 57. The possibility that tobacco litigation would increase the distribution to Trust claimants was insufficient to confer subject matter jurisdiction *Id.* at 58. By contrast, the claims which the plaintiff pursues in the case *sub judice* were not an independent afterthought of the post-confirmation trustee, but were integral to the Plan, thus maintaining the close nexus which confers bankruptcy court jurisdiction. [FN16]

*5. Since the World Color action is state-law based, the defendants contend that this Court should not exercise jurisdiction.*

This, of course, is not an argument against subject matter jurisdiction, but rather in favor of abstention. [FN17] Indeed, if the adversary proceeding at issue was "premised on ... bankruptcy law," core rather than related to jurisdiction would be implicated, and subject matter jurisdiction post-confirmation could be more readily established. In fact, the Third Circuit recognized in *Resorts* that the requisite jurisdictional nexus could exist for state law based

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387                                                                    Page 9

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

proceedings. *Montana,* referred to with approval in *Resorts,* is a clear illustration of such a state law case. *See* 372 F.3d at 168.

\* \* \*

Two additional points should be addressed in evaluating this Court's subject matter jurisdiction over the World Color action. Does the participation in any recovery by the debtor's insurer (as subrogee) attenuate the close nexus to the Plan needed for continuing jurisdiction? And, does the passage of time since confirmation negate jurisdiction?

**Subrogee's Participation**

[6] The immediate adversary proceeding was initiated by the Distribution Trustee for the benefit of creditors, plainly as contemplated in the Plan and in furtherance of Plan objectives. Plan implementation likewise anticipated the coverage action. While two such litigations could under certain circumstances be collapsed into a single adversary proceeding, these cases include separate and distinct issues (e.g., notice and policy interpretation issues exclusive to the coverage action). In any event, as *originally* formulated and initiated, both matters were to develop distributions to the Trust beneficiaries (i.e., creditors provided for in the Plan).

\*10 The fact that resolution of the coverage action vested the subrogee insurer with an interest in the long-pending contract/product liability/negligence case should not cause this Court's jurisdiction to suddenly "evaporate." And, the Trust remains a party with an ultimate interest in any recovery to the extent of approximately twenty-five percent. [FN18]

**Passage of Time Since Confirmation**

[7] The age of this Chapter 11 case, as extended by this litigation, is troubling as a matter of court administration. However, *Resorts* was careful to point out the following:

Price Waterhouse also argues the lapse of time since confirmation factors against bankruptcy jurisdiction. The Bankruptcy Court issued an Order confirming the Plan on August 28, 1990.

The Trustee filed this malpractice action on April 15, 1997. The Trustee responds that Price Waterhouse's malpractice "began barely after the ink dried on the confirmation order," and notes that Price Waterhouse released its allegedly erroneous report that the interest income belonged to the Debtor in 1992.... Though in some circumstances, the lapse of time since confirmation may be relevant to whether a matter has a "close nexus" to a bankruptcy plan or proceeding, we do not find it to be so here. 372 F.3d at 171 n. 12.

In *Resorts,* the adversary proceeding was filed almost seven years after the confirmation (though the acts of alleged malpractice occurred immediately after confirmation). Passage of time was not found to be relevant in assessing the "close nexus" issue. *Sub judice,* prepetition acts were embodied in a Plan-contemplated complaint filed about sixteen months post-confirmation (and following the filing of the coverage action a year earlier). The long delay in this case was *after* these proceedings were initiated; such delay should not be relevant to the subject matter jurisdiction over *pending* litigation.

**CONCLUSION**

This Court has subject matter jurisdiction of the World Color adversary proceeding; that litigation, contemplated by the Plan and part of the corpus of the Distribution Trust, serves the "implementation, consummation [and] execution" of the Plan. Consequently, the requisite close nexus to the Plan is clear. Neither reallocation of the potential benefits of the litigation by virtue of the subrogee's after-acquired interest, nor the delay in advancing the long-pending adversary proceeding toward trial attenuates that close nexus. Defendants' motion is therefore DENIED.

The Court will enter its implementing order.

FN1. *See* docket entry 612.

FN2. At § 1.60 of the Plan, Excluded Assets has the meaning assigned to that term in the Brightline Stipulation and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

Page 10

Order which, in turn, incorporates the term's definition as per the Asset Purchase Agreement.

FN3. World Color, a Delaware corporation with a principal place of business in Connecticut, owned and operated the printing facility. Unarco, a Tennessee corporation with a principal place of business in Tennessee, manufactured the racks on which the catalogs were stored, and GWJ, a Tennessee corporation with a principal place of business in Tennessee, supplied and erected the racks.

FN4. *See* "causes of action" as defined in the Distribution Trust Agreement (at Art. I, p. 3), including its there referenced linkage to Excluded Assets.

FN5. *See* the Standing Order of Reference of the United States District Court of New Jersey, dated July 23, 1984, under which this Court operates.

FN6. In *Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 129, 135, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995) the United States Supreme Court implicitly overruled *Pacor* for its holding at 743 F.2d at 991-92 that 28 U.S.C. § 1447(d) (which prohibits review of a remand order) does not apply in bankruptcy cases. The decision in *Things Remembered* did not disturb and indeed did not even address the *Pacor* test for related to jurisdiction. In fact, shortly before deciding *Things Remembered,* the Supreme Court in *Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), expressly approved the test for related to jurisdiction enunciated by the Third Circuit in *Pacor.*

FN7. References were to: *United States Trustee v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 555-56 (3d Cir.1999) (where the United States Trustee objected

post-confirmation to the Chapter 11 debtor's motion for a final decree because the debtor had not paid Trustee fees, the bankruptcy court had "related to" (and even "arising in") jurisdiction to hear the Trustee's objection, since an award of fees to the Trustee "creates a liability [which] could impact the handling and administration of the estate"); and *Donaldson,* 104 F.3d at 552-54 (where, after the Chapter 11 debtor defaulted in payments under a confirmed plan and a creditor filed a motion to compel the debtor's compliance, the bankruptcy court reopened the case, converted it to Chapter 7, and appointed a trustee; the trustee sued the debtor's principals for false pretenses (claiming that they had obtained confirmation of a plan the terms of which they knew the debtor could not meet) and for breach of fiduciary duty (claiming that they had diverted business from the debtor to another business which they owned); notwithstanding the conversion and the state law nature of the Chapter 7 trustee's claims, the trustee charged in the bankruptcy court that the principals "violated their fiduciary duties to the unsecured creditors by diverting business from [the debtor]," *Id.* at 553; in so doing the trustee "basically [was] seeking to carry out the intent of the reorganization plan," *Id.;* the Third Circuit therefore confirmed subject matter jurisdiction, deciding that the dispute was not collateral but "implicates the integrity of the bankruptcy process," as the principals' defalcation impaired the debtor's ability to effect the plan, *Id.).*

FN8. *Bergstrom v. Dalkon Shield Claimants' Trust (In re A.H. Robins Co.),* 86 F.3d 364, 372-73 (4th Cir.1996) (post-confirmation fee dispute between counsel and a mass tort Claimants' Trust); *New Nat'l Gypsum Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.),* 219 F.3d 478, 479 and 493 (5th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387                                                                      Page 11

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

Cir.2000) (post-confirmation declaratory judgment action by an asbestos Settlement Trust asking the court to interpret the plan as to future claimants' rights); *Plotner v. AT & T Corp.,* 224 F.3d 1161, 1171 (10th Cir.2000) (post-confirmation litigation for fraud in the sale of assets from a plan-developed asset marketing and liquidation trust); *United States v. Unger,* 949 F.2d 231, 233-35 (8th Cir.1991) (post-confirmation action for embezzlement against the trustee of a nonliquidating plan-developed trust); *In re Eagle-Picher Indus., Inc.,* 285 F.3d 522, 524 (6th Cir.2002) (post-confirmation dispute over distribution of proceeds of an asbestos Settlement Trust).

FN9. Court-cited examples of cases demonstrating the requisite "close nexus" are: the underlying Litigation Claim dispute in *Resorts, see In re Resorts Int'l,* 199 B.R. 113 (Bankr.D.N.J.1996); *Bergstrom, supra;* and *Montana v. Goldin (In re Pegasus Gold Corp.),* 296 B.R. 227 (D.Nev.2003). In *Bergstrom* the bankruptcy court was found to have had related to subject matter jurisdiction post-confirmation to enter an order which modified the attorneys' contingent fee arrangement in this medical device mass tort-related bankruptcy; the court deemed the attorneys' argument that the estate had ceased to exist "too restrictive"; although the debtor had stopped operating, because both the Trust and the case would remain open until the claims had been paid, the attorney fee dispute "could have an effect on the estate being administered." 86 F.3d at 372. In *Montana* a post-confirmation entity was formed per the plan to do contracted-for environmental reclamation with the Montana Department of Environmental Quality ("DEQ"); the DEQ terminated that contract and undertook the work with another organization using employees from the post-confirmation entity; the bankruptcy court was found to

have subject matter jurisdiction over the suit brought by the liquidating trustee and post-confirmation entity against DEQ for breach of contract, fraud in the inducement, and breach of the duty of good faith and fair dealing; it was determined that the DEQ's conduct, if proven, would undermine the plan and interfere with its consummation by depriving the debtors of the means to fulfill their reclamation obligations. Note that as to *Montana,* following the issuance to the *Resorts* decision, the Ninth Circuit affirmed in relevant part, adopting the *Resorts* "close nexus" test and finding that resolution of the claims involved interpreting the plan and certain related agreements. Moreover, it was found that the remedies sought in *Montana,* would, if granted, affect the execution and implementation of the plan. *Montana v. Goldin,* 394 F.3d 1189, 1194 (9th Cir.2005). In contradistinction to the aforereferenced three illustrations, the Third Circuit in *Resorts* cited two examples of insufficiently close nexus cases: *Falise v. Am. Tobacco Co.,* 241 B.R. 48 (E.D.N.Y.1999); and, *Grimes v. Graue (In re Haws),* 158 B.R. 965 (Bankr.S.D.Tex.1993).

FN10. Obviously, the Litigation Claims did not include the later-developed malpractice cause. In this regard, it is noteworthy that the Third Circuit readily found "a sufficiently close nexus to the plan or proceeding" and thus bankruptcy court subject matter jurisdiction over the Litigation Claims. 372 F.3d at 167.

FN11. Docket entry 39.

FN12. "Given the limited jurisdiction on non-Article III bankruptcy courts, jurisdiction does not extend *necessarily* to all matters involving litigation trusts." *Resorts,* 372 F.3d at 169 (emphasis added). Defendants would incorrectly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387                                                                                    Page 12

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

restate this proposition by eliminating subject matter jurisdiction for all litigation trust post-confirmation proceedings. Such a sea change is not the import of *Resorts.*

FN13. *See* n. 8, *supra.*

FN14. *Zerand-Bernal Group, Inc. v. Cox,* 158 B.R. 459, 463 (N.D.Ill.1993), *aff'd* 23 F.3d 159 (7th Cir.1994) was quoted in *S.N.A. Nut* (206 B.R. at 500), as follows: On the one hand, it is important for a bankruptcy court to retain jurisdiction so that it can monitor property transferred in *accordance with the terms of the plan of reorganization;* however, it is also important to end the reorganization process at some point so that the participants can go about their business without constant bankruptcy court supervision or approval. (Emphasis added.) Again, emphasizing plan implementation, *S.N.A. Nut* acknowledged that "[o]ther courts have exercised jurisdiction over post-confirmation disputes when the matter sufficiently impacted on creditors' recoveries *under a plan of reorganization.* " 206 B.R. at 500 (emphasis added).

FN15. The full text of the Third Circuit's positive reference to this dispute is as follows: An example of a dispute in which there was a sufficiently close nexus to the plan or proceeding to uphold bankruptcy court jurisdiction post-confirmation was an earlier proceeding involving the Resorts International, Inc. bankruptcy. *See In re Resorts Int'l,* 199 B.R. 113 (Bankr.D.N.J.1996). There, unlike here, the Bankruptcy Court was required to construe and enforce provisions of the Plan to resolve a post-confirmation dispute over whether the Litigation Trust or the debtor was entitled to accrued interest. *Id.* at 120-25. The court correctly held that it retained jurisdiction to enter appropriate

orders to enforce the intent and specific provisions of the Plan. *Id.* at 118-19.

FN16. A lesson to be drawn from the Third Circuit's reference to *Grimes* and *Falise* is that a post-confirmation *asserted* cause of action which merely enhances the post-confirmation entity's assets but does not call for plan "interpretation, implementation, consummation, execution, or administration," will not in the ordinary course have the requisite close jurisdictional nexus. This is the case even where the cause of action *arises* prepetition.

FN17. Given that (i) this adversary proceeding has been pending for years and is now impacted by resolution of the coverage action, and (ii) no state court litigation involving the same causes and parties was ever initiated, mandatory abstention could not be satisfied (*see* 28 U.S.C. § 1334(c)(2)), nor could permissive abstention be reasonably exercised (*see* 28 U.S.C. § 1334(c)(1)).

FN18. While this Court's post-confirmation jurisdiction should not be "endless," consideration of the variations in post-confirmation circumstances might well be perpetual. One could posit different facts: e.g., there being *no remaining Trust interest* in the outcome and/or the subrogation case being initiated only *after* the coverage dispute is settled. Whether the close nexus to Plan implementation shall have attenuated under such different factual scenarios is worth pondering. Questions of supplemental jurisdiction under 28 U.S.C. § 1367 might also be implicated. *See Chapman v. Currie Motors, Inc.,* 65 F.3d 78, 81 (7th Cir.1995) ("There is a serious question whether 28 U.S.C. § 1367 is applicable to bankruptcy cases."); *Walker v. Cadle Co. (In re Walker),* 51 F.3d 562, 570 (5th Cir.1995) ("[W]e do not address

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 613387

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

**(Cite as: 2005 WL 613387 (Bankr.D.N.J.))**

the difficult question of whether a *district court* may address claims that are supplemental to its bankruptcy jurisdiction."); *Susan Block-Lieb, The Case Against Supplemental Bankruptcy Jurisdiction: A Constitutional, Statutory, and Policy Analysis,* 62 FORDHAM L.REV. 721 (1994). *But see Montana,* 394 F.3d at 1194-95; *Security Farms v. Int'l Broth. of Teamsters,* 124 F.3d 999, 1009 n. 5 (9th Cir.1997) (holding that a claim "only tenuously connected to" the bankruptcy estate came within the district court's supplemental jurisdiction).

322 B.R. 95, 2005 WL 613387 (Bankr.D.N.J.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

1994 WL 672629 (E.D.Pa.)

(Cite as: 1994 WL 672629 (E.D.Pa.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
ST. LUKE'S HOSPITAL OF BETHLEHEM, INC.,
v.
James A. O'LEARY, M.D.
**Civ. A. No. 94-3724.**

Nov. 29, 1994.

David M. Spitko, John S. Harrison, Heimbach, Spitko & Heckman, Allentown, PA, for plaintiff St. Luke's Hosp. of Bethlehem, Inc.

Malcolm J. Gross, Gross, McGinley, La Barre & Eaton, Allentown, PA, for defendant James A. O'Leary, M.D.

*MEMORANDUM*

CAHN, Chief Judge.

**\*1** St. Luke's Hospital of Bethlehem, Inc. ("St. Luke's") brought this action against one of its former employees, Dr. James A. O'Leary ("O'Leary"), alleging trademark infringement, fraud, breach of contract, and conversion. O'Leary has filed counterclaims against St. Luke's for breach of contract, invasion of privacy, tortious interference with prospective contractual relations, intentional infliction of emotional distress, and violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Jurisdiction is proper pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.

Currently before the court are St. Luke's motions to dismiss O'Leary's invasion of privacy, tortious interference with prospective contractual relations, and intentional infliction of emotional distress

counterclaims. In deciding St. Luke's motions, the court will accept all facts alleged by O'Leary as true, and will grant St. Luke's motions only if O'Leary could prove no set of facts entitling him to relief. *Malia v. General Electric Company,* 23 F.3d 828, 830 (3d Cir.1994); *Ala, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994).

1. Facts

The facts as alleged are as follows. In July, 1990, St. Luke's and O'Leary entered into an employment agreement ("Agreement"). Pursuant to the Agreement, O'Leary was to serve as the professional administrative chief of St. Luke's OB/GYN Department. The Agreement required O'Leary to devote his best ability to the proper management of the Department. It also required O'Leary to refrain from outside business activities, such as testifying as an expert witness, unless he obtained St. Luke's written permission.

In September, 1991, St. Luke's began to suspect that O'Leary was conducting outside business without St. Luke's permission. St. Luke's also suspected that O'Leary was working on these activities during St. Luke's business hours with the assistance of other St. Luke's employees. Between October, 1991 and April, 1994, the President of St. Luke's, Richard Anderson ("Anderson"), repeatedly questioned O'Leary about his outside work. O'Leary assured Anderson that his outside work was not interfering with his regular hospital duties. O'Leary also informed Anderson that his outside work was limited to testifying as an expert witness in only a few cases. Anderson ultimately agreed to allow O'Leary to continue working on a few of these cases.

In April, 1994, St. Luke's began an investigation of O'Leary's outside business activities. As part of its investigation, St. Luke's examined O'Leary's personal files and prevented O'Leary from opening

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

his mail unless the mail was also examined by St. Luke's counsel. At some point during its investigation, St. Luke's learned that O'Leary was using the "St. Luke's of Bethlehem" and "St. Luke's" trademarks in connection with his outside work. On April 11, 1994, St. Luke's terminated O'Leary. However, St. Luke's continued to investigate O'Leary after April 11.

*2 O'Leary began looking for work elsewhere, and eventually entered into employment negotiations with Easton Hospital. St. Luke's employees then contacted Easton Hospital and attempted to dissuade Easton Hospital from hiring O'Leary. Although Easton Hospital eventually hired O'Leary, St. Luke's actions delayed Easton Hospital's offer of employment to O'Leary and caused Easton Hospital to pay O'Leary less than it otherwise would have been willing to pay.

St. Luke's filed various claims against O'Leary, to which O'Leary responded with numerous counterclaims. O'Leary alleges that St. Luke's investigation constituted an invasion of O'Leary's privacy. He also contends that St. Luke's tortiously interfered with O'Leary's contract with Easton Hospital. Finally, O'Leary claims that St. Luke's intentionally inflicted emotional distress upon him.

II. Supplemental Jurisdiction

On August 12, 1994, this court issued an order directing the parties to file briefs addressing the issue of whether this court should exercise supplemental jurisdiction over the various state law claims made in this case. Resolution of this issue is governed by 28 U.S.C. § 1367 ("Section 1367").

Subsection (a) of Section 1367 provides that in any civil action over which a district court has original jurisdiction, the court has supplemental jurisdiction over "all other claims that are so related to claims in the actions within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Claims are part of the same constitutional case or controversy when they "derive from a common nucleus of operative fact"

and are such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966). *Accord Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991).

St. Luke's sole federal claim arises under the trademark laws of the United States. The evidence needed to resolve this claim substantially overlaps with the evidence relevant to many of St. Luke's other claims. Therefore, the court will exercise supplemental jurisdiction over all of the claims in this case.

St. Luke's claims that O'Leary infringed its trademarks by using the St. Luke's name to promote his outside business activities. To prove this claim, St. Luke's will rely upon the testimony of O'Leary's outside employers to establish that O'Leary improperly used St. Luke's trademarks while marketing his services. Additionally, in proving its trademark damages, St. Luke's must introduce evidence demonstrating the extent of O'Leary's use of St. Luke's trademarks. [FN1]

The evidence relevant to St. Luke's trademark infringement overlaps with the evidence which St. Luke's will offer in proving its fraud claim. To establish fraud, St. Luke's will have to show that O'Leary was untruthful when he told Anderson that his outside business consisted of testifying as an expert witness in only a few cases. *See Gibbs v. Ernst,* 647 A.2d 882, 889 (Pa.1994) (as part of proving fraud, plaintiff must show that a material misrepresentation was made by a defendant who acted with knowledge of its falsity or in reckless disregard of its truth). To establish such deception, St. Luke's will have to demonstrate the true extent of O'Leary's outside business. Presumably, St. Luke's will accomplish this by offering the testimony of O'Leary's various outside employers.

*3 The evidence relevant to St. Luke's trademark claim also overlaps with its breach of contract evidence. In establishing that O'Leary breached the Agreement, St. Luke's will have to show that O'Leary engaged in outside business beyond the few cases for which Anderson gave permission.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 3

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

Therefore, like the trademark and fraud claims, resolution of St. Luke's breach of contract claim requires a determination of the true extent of O'Leary's outside work.

O'Leary has filed a counterclaim against St. Luke's for allegedly violating ERISA. Specifically, O'Leary claims that St. Luke's violated ERISA by firing O'Leary in order to keep his rights in St. Luke's pension plan from vesting.

If O'Leary successfully establishes a prima facie ERISA violation, St. Luke's will then have the "burden of articulating a permissible reason for the personnel action." *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 347 (3d Cir.1990). St. Luke's will likely claim that O'Leary was fired because he performed outside work without permission and was accomplishing this outside work on St. Luke's time. St. Luke's may also offer O'Leary's alleged trademark infringement as a justification for terminating O'Leary. Thus, O'Leary's ERISA counterclaim implicates issues similar to St. Luke's claims.

The court is mindful that only two claims in this case arise under federal law. However, the state law claims will not dominate the federal claims. *See* 28 U.S.C. § 1367(C)(2). Instead, the court concludes that the evidence needed to prove the federal and state law claims is sufficiently similar to justify this court's exercising supplemental jurisdiction over the state law claims. *Nanavati v. Burdette Tomlin Memorial Hospital,* 857 F.2d 96, 105 (3d Cir.1988) (total congruity between the operative facts of the federal and state law claims not necessary in order for the court to exercise supplemental jurisdiction), *cert. denied,* 489 U.S. 1078 (1989). Accordingly, the court will exercise supplemental jurisdiction over all of the state claims in this case. [FN2]

III. Discussion

O'Leary claims that St. Luke's invaded his privacy, tortiously interfered with his contract with Easton Hospital, and acted in such an extreme manner as to constitute an intentional infliction of emotional distress. These three causes of action will be discussed seriatim.

*A. Invasion of Privacy*

Invasion of privacy encompasses four analytically distinct torts. *Marks v. Bell Telephone Co. of Pennsylvania,* 331 A.2d 424, 430 (Pa.1975); *Santillo v. Reedel,* 634 A.2d 264, 266 (Pa.Super.1993). The only privacy cause of action at issue in the present case is the so-called "intrusion upon seclusion" tort. The Restatement defines this tort as follows:
> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

**\*4** Restatement (Second) of Torts § 652B. *See also Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 620 (3d Cir.1992). [FN3]

In the present case, O'Leary claims that St. Luke's investigation of O'Leary intruded upon O'Leary's seclusion. However, St. Luke's contends that O'Leary's claim is barred by the exclusive remedy provision (the "exclusivity provision") of Pennsylvania's Worker's Compensation Act, 77 P.S. § 481(a) (the "Act"). The exclusivity provision provides in pertinent part:
> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees, his legal representative, husband, or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death ...

77 P.S. § 481(a). The Act further defines "injury" as "an injury to an employee, regardless of his previous physical condition, arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury." 77 Pa.C.S.A. § 411(1). *See generally Winterberg v. CNA Insurance Company,* CIV.A.No. 94-5406, 1994 WL 583183, at *3-5 (E.D.Pa. Oct. 25, 1994).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 4

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

The exclusivity provision bars common law claims against employers for intentional torts arising out of the employment relationship. *See, e.g., Hicks v. Arthur,* 843 F.Supp. 949, 957 (E.D.Pa.1994); *Danese v. Morrison-Knudsen/Slattery,* 784 F.Supp. 228, 229 (E.D.Pa), *aff'd,* 975 F.2d 1549 (3d Cir.1992); *Poyser v. Newman & Co.,* 522 A.2d 548 (Pa.1987). The exclusivity provision does not merely bar claims by employees to recover for physical injuries, but also bars actions based upon emotional damage. *See Shaffer v. Procter & Gamble,* 604 A.2d 289 (Pa.Super.1992) (intentional infliction of emotional distress, intentional interference with contract and civil conspiracy); *Papa v. Franklin Mint Corp.,* 583 A.2d 826 (Pa.Super.1990) (intentional infliction of emotional distress). Accordingly, the court concludes that O'Leary may not recover for intrusion upon seclusion based upon St. Luke's investigation occurring while O'Leary was an employee of St. Luke's.

O'Leary concedes that tort claims arising out of the employment relationship are barred by the exclusivity provision. However, the parties disagree about whether O'Leary was a St. Luke's employee at the time St. Luke's allegedly invaded his privacy. O'Leary claims that he was terminated on April 11, 1994, and that St. Luke's investigation continued after that date. (*See* Memorandum of Law of the Defendant/Counterclaim Plaintiff in Opposition to Plaintiff's Motion to Dismiss p. 5-10.) If this were true, O'Leary's invasion of privacy claim would fall outside the scope of the Act's exclusivity provision. *See Southland Cable Co. v. Workmen's Compensation Appeal Board (Emmett),* 598 A.2d 329, 330 (Pa.Cmwlth.1991) (employment relationship must exist at the time of the injury for the Act to apply). However, St. Luke's counters that O'Leary was not terminated on April 11, but was merely suspended. Therefore, St. Luke's argues that the exclusivity provision totally bars O'Leary's invasion of privacy claim. Thus, the court must determine whether O'Leary was terminated or merely suspended on April 11.

**\*5** Pennsylvania courts have "long utilized the same rules that apply for ascertaining a common

law master-servant relationship" when deciding whether an employer/employee relationship exists for purposes of the Act. *Southland Cable,* 598 A.2d at 330. The existence of an employment relationship under the Act presents "a question of law which must be determined on the basis of the facts of an individual case." *Industrial Abrasives v. Workmen's Compensation Appeal Board (Caceres),* 630 A.2d 547, 548 (Pa.Cmwlth.1993); *Paul Arpin Van Lines v. Workmen's Compensation Appeal Board (Selvey),* 609 A.2d 906 (Pa.Cmwlth.1992).

At this time, the court is unable to make the fact-specific determination of whether an employer/employee relationship existed between St. Luke's and O'Leary after April 11, 1994. To make this determination the court will need to be informed of St. Luke's actions on April 11, and must learn of the nature of the parties' relationship after that date. Accordingly, the court will allow the parties to augment the factual record and resubmit this issue to the court at a later point in this litigation.

St. Luke's also argues that O'Leary's invasion of privacy claim is defective because O'Leary has failed to allege facts showing that St. Luke's investigation was so invasive as to be highly offensive to a reasonable person. The court disagrees.

In evaluating a motion to dismiss, the court must accept as true "all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). In the present case, O'Leary has sufficiently alleged a cause of action for invasion of privacy. In his Amended Counterclaims O'Leary alleges:

The manner in which [St. Luke's] conducted its "investigation," including, but not limited to, examining [O'Leary's] personal files, calendars, and the like, and refusing to allow [O'Leary] to open and read his mail unless the mail was concurrently examined by [St. Luke's] counsel, constituted an intentional intrusion upon [O'Leary's] solitude and seclusion and an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 5

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

intentional intrusion upon [O'Leary's] private affairs and concerns.
The intrusion was highly offensive to [O'Leary] and would be highly offensive to a reasonable person.
(*See* Defendant/Counterclaim Plaintiff's Amended Counterclaims, ¶¶ 24 & 25) Accepting these allegations as true, as well as all reasonable inferences which can be drawn from them, the court cannot conclude as a matter of law that O'Leary has failed to properly allege a claim for invasion of privacy. [FN4] Obviously, St. Luke's is free to file a motion for summary judgment if O'Leary is unable to establish facts supporting his invasion of privacy claim.

B.   *Tortious   Interference   with   Prospective Contractual Relations*

Under Pennsylvania law, a plaintiff alleging tortious interference with prospective contractual relations must prove the following elements: (1) a prospective contractual relationship; (2) the purpose or intent to harm the plaintiff by preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) occurrence of actual damage resulting from the defendant's conduct. *Advent Systems, Ltd. v. Unisys Corp.,* 925 F.2d 670, 673 (3d Cir.1991). *Accord Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466, 471 (Pa.1979); *Atlantic Paper Box Co. v. Whitman's Chocolates,* 844 F.Supp. 1038, 1047 (E.D.Pa.1994).

**\*6** In the present case, O'Leary contends that St. Luke's dissuaded Easton Hospital from hiring O'Leary. O'Leary claims that St. Luke's actions delayed Easton Hospital from entering into an employment contract with O'Leary and caused Easton Hospital to pay O'Leary less than it otherwise would have been willing to pay.

St. Luke's has moved this court to dismiss O'Leary's tortious interference cause of action. St. Luke's contends that it cannot be held responsible for the delay which plagued the negotiations between Easton Hospital and O'Leary or for the less remunerative offer which O'Leary ultimately

received. In a nutshell, St. Luke's contention is that the only damage recognized under the tortious interference with prospective contractual relations tort is the total loss of the prospective contractual relation. Although there is very little law specifically addressing this issue, the court disagrees.

In   *Pelagatti   v.   Cohen,*   536   A.2d   1337 (Pa.Super.1987), the Pennsylvania Superior Court addressed the type of harm which a plaintiff must allege in order to state a claim for tortious interference with prospective contractual relations. The court stated that "the gravamen of this tort is the lost pecuniary benefits flowing from the contract itself; other losses, such as emotional damages and loss of reputation, are consequential harms." *Id.* at 1343. *See also* Restatement (Second) of Torts, § 766, comment t ("[t]he cause of action is for pecuniary loss resulting from the interference").

Although St. Luke's has cited *Pelagatti* for the proposition that pecuniary harm is a necessary component of tortious interference, St. Luke's nevertheless contends that O'Leary cannot recover for the delay and less favorable contract which St. Luke's allegedly caused. In making this argument, St. Luke's relies upon Pennsylvania precedent which appears to allow recovery only when the plaintiff has totally lost a prospective contract. For instance, in *SHV Coal, Inc. v. Continental Grain Co.,* 545 A.2d 917 (1988), *rev'd on other grounds,* 587 A.2d 702 (Pa.1991), the Pennsylvania Superior Court stated that recovery for tortious interference is proper "when the factfinder is satisfied that but for the wrongful acts of the defendants it is reasonably probable that a contract would have been entered." *SHV Coal,* 545 A.2d at 921.

The court is not persuaded that *SHV Coal* limits recovery for tortious interference to situations where a plaintiff has totally lost the prospective contractual relation. Instead of discussing the type of harm which can be remedied under the tort, the *SHV Coal* court was addressing the first element of tortious interference with prospective contractual relations: the existence of a prospective contractual relation. This becomes apparent when the quoted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                      Page 6

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

language is read in context:

> Although anything that is prospective is necessarily uncertain and although the term "prospective contractual relations" eludes precise definition, the law holds that a principal may recover when the factfinder is satisfied that but for the wrongful acts of the defendants it is reasonably probable that a contract would have been entered.

*7 *SHV Coal,* 545 A.2d at 921 (citing *Glenn v. Point Park College,* 272 A.2d 895, 898-899 (Pa.1971)). In addition, the *SHV Coal* court's citation of *Glenn* further reveals that the court was speaking to the existence of a prospective contractual relation and not to the type of harm which a plaintiff must allege. [FN5]

The court has found only one Pennsylvania case which has specifically addressed the question of whether a plaintiff can recover for the delay caused by the defendant's interference with contract. In *Kelly-Springfield Tire Co. v. D'Ambro,* 596 A.2d 867 (Pa.Super.1991), the plaintiff property owner filed a claim for tortious interference with prospective contractual relations against a law firm which had filed suit against the plaintiff. Plaintiff claimed that the law firm's actions delayed the plaintiff's sale of its property to the National Life Insurance Company. The court denied the law firm's motion to dismiss, explaining:

> It also was not fatal to [plaintiff's] cause of action that an agreement for the sale of the warehouse property was ultimately reached with National Life Insurance Company. The complaint contains averments that a resale was unnecessarily delayed by the interference of [the defendant] and that actual damage was caused thereby. This was sufficient.

*Id.* at 871.

Finally, the court notes that the position offered by St. Luke's would create an anomaly in tort law involving interference with contract. Under Pennsylvania law, a plaintiff alleging tortious interference with an existing contract need not establish that the contractual relationship was totally lost. *See Consolidation Coal Co. v. District 5, United Mine Workers,* 485 A.2d 1118, 1126

(Pa.Super.1984) (plaintiff need not establish a total severance of the employment relation in order to recover for tortious interference with contractual relations). Therefore, application of St. Luke's reasoning would lead to an inconsistent result whereby injuries to plaintiffs with existing contractual relations would be fully remedied, while injuries to plaintiffs with prospective contracts would not. The court has been unable to find, and St. Luke's has failed to offer, any Pennsylvania cases supporting such a distinction. In addition, St. Luke's position would allow defendants who have harmed a plaintiff's prospective contract to totally avoid liability so long as the plaintiff were able to salvage some economic value from the now-damaged contractual relation. Such an outcome is inconsistent with tort law's goals of compensation and deterrence. Accordingly, the court will deny St. Luke's motion to dismiss O'Leary's tortious interference with prospective contractual relations cause of action.

C. *Intentional Infliction of Emotional Distress*

A plaintiff alleging intentional infliction of emotional distress must establish the following elements: (1) intentional or reckless conduct by the defendant; (2) which was extreme and outrageous; (3) causing emotional distress; and (4) the distress must be severe. *Williams v. Guzzardi,* 875 F.2d 46, 52 (3d Cir.1989); *Weinstein v. Bullick,* 827 F.Supp. 1193, 1203 (E.D.Pa.1993). [FN6]

*8 St. Luke's argues that O'Leary's claim should be dismissed because he has failed to allege the extreme and outrageous behavior necessary for the intentional infliction of emotional distress tort. [FN7] The court agrees.

As a preliminary matter, it is for the court to determine if St. Luke's actions are so extreme and outrageous to permit recovery. *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988); Restatement (Second) of Torts § 46, comment h. Pennsylvania courts have been reluctant to declare conduct "outrageous" and have allowed recovery "only in limited circumstances where the conduct has been clearly outrageous." *Cox,* 861 F.2d at 395.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 7

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

In order to recover, O'Leary must allege conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Heywood v. Cruzan Motors, Inc.,* 792 F.2d 367, 371-72 (3d Cir.1986); *Clark v. Township of Falls,* 890 F.2d 611, 623 (3d Cir.1989); Restatement (Second) of Torts § 46, comment d. [FN8]

It is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox,* 861 F.2d at 395 (citing *Rinehimer v. Luzerne County Community College,* 539 A.2d 1298. 1305 (Pa.Super.1988)). The act of terminating an employee does not provide a basis for maintaining a claim for intentional infliction of emotional distress. *Cox,* 861 F.2d at 395.

In *Cox,* an employer fired an employee on the first day the employee returned to work after triple by-pass surgery, even though the employer knew of the employee's weakened mental and physical condition. *Id.* In addition, it was shown that the employer's objective was to deprive the employee of medical and disability benefits. Despite this repugnant behavior, the Court of Appeals affirmed a directed verdict in favor of the employer, reasoning that the employer's conduct failed to rise to the level of outrageousness required for intentional infliction of emotional distress. *Id.*

In *Clark,* the Court of Appeals reversed a jury verdict in favor of the plaintiff where the defendants, a township chief of police and township supervisor, had accused the plaintiff of engaging in immoral and illegal activity. *Clark,* 890 F.2d at 622-624. The defendants behavior also consisted of "forwarding charges to the district attorney, confirming that [the plaintiff] was being investigated, showing disparaging reports in public, changing [plaintiff's] duties and depriving him of privileges, and, possibly, limiting [plaintiff's] speech at Board meetings." *Clark,* 890 F.2d at 624. The Court of Appeals concluded that although the defendants actions were "deplorable," they did "not

constitute extreme and outrageous conduct as Pennsylvania has defined those terms." *Id.* Other courts applying Pennsylvania law have reached similar conclusions. *See, e.g., Cautilli v. GAF Corp.,* 531 F.Supp. 71, 74 (E.D.Pa.1982) (no outrageous conduct found where employer deceived employee into foregoing other employment); *Madreperla v. Williard Co.,* 606 F.Supp. 874, 880 (E.D.Pa.1985) (no outrageous conduct found where employer engaged in a premeditated plan to force an employee to resign by making employment conditions difficult).

*9 Based upon the foregoing, the court concludes that O'Leary has failed to allege conduct sufficiently outrageous to withstand St. Luke's motion to dismiss. [FN9] *See Bougher v. University of Pittsburgh,* 882 F.2d 74, 80 (3d Cir.1989) (affirming dismissal of intentional infliction of emotional distress claim where alleged acts were not outrageous). Viewing O'Leary's complaint in the light most favorable to him, the court is unable to conclude that St. Luke's actions rose to the level of outrageousness necessary to provide a basis for recovery for intentional infliction of emotional distress. *See Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.1990) (conduct must be "both extreme and very offensive to the moral values of society"). Accordingly, the court will grant St. Luke's motion to dismiss O'Leary's claim for intentional infliction of emotional distress.

An appropriate order follows.

*ORDER*

AND NOW, this 28 day of November, 1994, upon consideration of St. Luke's Motion to Dismiss, and O'Leary's response thereto, it is hereby ORDERED that:

(1) St. Luke's motion to dismiss O'Leary's invasion of privacy cause of action is GRANTED with regard to conduct occurring prior to April 11, 1994.

(2) St. Luke's motion to dismiss O'Leary's invasion of privacy cause of action is DENIED with regard to conduct occurring on or after April 11, 1994.

(3) St. Luke's motion to dismiss O'Leary's tortious

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

Page 8

interference with prospective contractual relations cause of action is DENIED.

(4) St. Luke's motion to dismiss O'Leary's intentional infliction of emotional distress cause of action is GRANTED.

At later stages of this litigation, each party will have the opportunity to file one reply brief if they so choose.

FN1. If St. Luke's is able to prove that O'Leary violated its trademark, St. Luke's recovery could include the amount of profit which O'Leary earned as a result of his use of St. Luke's trademark. *See* 15 U.S.C. § 1117. In assessing these profits, St. Luke's "shall be required to prove [O'Leary's] sales ..." *Id.*

FN2. Even if this court were to decline to exercise supplemental jurisdiction over St. Luke's state law claims, O'Leary could still raise his ERISA claim as a permissive counterclaim pursuant to Federal Rule of Civil Procedure 13(b). *See Aldens, Inc. v. Packel,* 524 F.2d 38, 52 n. 21 (3d Cir.1975), *cert. denied,* 425 U.S. 943 (1976) (court has jurisdiction over permissive counterclaims having an independent basis of federal jurisdiction).

In this event, St. Luke's state law claims for breach of contract, conversion, and fraud would enter the case as compulsory counterclaims. The court has considered the likelihood that all of the parties' claims will eventually come before the court in determining whether to exercise supplemental jurisdiction over all of the claims at the present time. *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277 (3d Cir.1993) (district court should take into consideration judicial economy, convenience, and fairness to the litigants when determining whether to exercise supplemental jurisdiction).

FN3. The Court of Appeals for the Third Circuit has predicted that the Pennsylvania Supreme Court would adopt the

Restatement's definition of the intrusion upon seclusion tort. *O'Donnell v. United States,* 891 F.2d 1079, 1082 n. 1 (3d Cir.1989).

FN4. St. Luke's has cited various cases holding that an employer's investigation into its employee's affairs was not unreasonable as a matter of law. *See, e.g., Rogers v. International Business Machines Corporation,* 500 F.Supp. 867 (W.D.Pa.1980). Because of the liberal pleading standards embodied in Federal Rule of Civil Procedure 8, however, the court will not grant St. Luke's motion to dismiss O'Leary's invasion of privacy claim. In addition, St. Luke's overlooks the fact that precedent governing the employer/employee relationship may not be relevant to the determination of whether St. Luke's investigation of a terminated employee was lawful.

FN5. In *Glenn,* 272 A.2d at 898-899, the Pennsylvania Supreme Court addressed the question of whether the plaintiff real estate brokers had properly alleged that the defendants' interference caused them to lose a prospective contract with the Sheraton Hotel. The Court stated:

It is true that there could be no guarantee of Sheraton's reaction to any offer that might be submitted, and it of course was under no compulsion to deal with either the [plaintiffs] or [defendants]. But anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the [plaintiffs]. As the Superior Court of New Jersey has put it, "... the rule to be applied ... is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is reasonably probable that the plaintiff would have effected the sale of property and received a commission."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 9

1994 WL 672629 (E.D.Pa.)

**(Cite as: 1994 WL 672629 (E.D.Pa.))**

*Myers v. Arcadio, Inc.,* 73 N.J.Super. 493, 180 A.2d 329, 331 (1962).
*Glenn,* 272 A.2d at 898-899.

FN6. The tort of intentional infliction of emotional distress is defined in the Restatement as follows:
One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and, if bodily harm to the other results from it, for such bodily harm.
Restatement (Second) of Torts § 46. The Pennsylvania Supreme Court has applied he Restatement definition to intentional infliction of emotional distress claims. *See, e.g., Kazatsky v. King David Memorial Park, Inc.,* 527 A.2d 988, 991-95 (Pa.1987).

FN7. St. Luke's also correctly argues that any claim based upon conduct occurring while O'Leary was a St. Luke's employee is barred by the Act's exclusivity provision. *Hicks,* 843 F.Supp. at 957.

FN8. Furthermore, in the absence of an allegation of bodily harm, a plaintiff must satisfy the test set forth in Comment k of Section 46 of the Restatement (Second) of Torts. *Heywood,* 792 F.2d at 372. Comment k provides that the intentional infliction of emotional distress tort is not limited to cases where there has been bodily harm. However, "in such cases the courts may perhaps look for more in the way of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required." Restatement (Second) of Torts § 46, Comment k.

FN9. O'Leary's reliance on *Williams* is misplaced. There, the Court of Appeals affirmed a judgment in favor of a tenant who sued his landlord for intentional infliction of emotional distress. Although the Court of Appeals recognized that "the case [was] close," it nevertheless upheld the jury verdict. *Williams,* 875 F.2d at 52.
  The Court explained, however, that its holding was based upon "the special relationship between a landlord and tenant," as well as the "tenant protective policy" evidenced by Pennsylvania law. *Id.* at n. 13.

1994 WL 672629 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:94CV03724 (Docket)

(Jun. 16, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

2004 WL 1628922 (E.D.Pa.)

**(Cite as: 2004 WL 1628922 (E.D.Pa.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Gregory D. MARTIN, Plaintiff,
v.
PHILADELPHIA FACILITIES MANAGEMENT
CORP., et al., Defendants.
**No. Civ.A. 04-1258.**

July 16, 2004.

Gilbert J. Scutti, Dickstein & Scutti, Philadelphia,
PA, for Plaintiff.

Howard Lebofsky, Philadelphia, PA, for
Defendants.

MEMORANDUM AND ORDER

SCHILLER, J.

*1 Plaintiff Gregory Martin was terminated from
his position as Chief Operating Officer of
Defendants Philadelphia Facilities Management
Corporation and Philadelphia Gas Works
(collectively "PGW") after he was accused of
stealing from PGW. Plaintiff now brings this action
against his former employers alleging that he was
(1) wrongfully terminated, (2) terminated in
violation of his employment contract, (3) defamed,
and (4) not given his procedural due process right to
a pretermination hearing. PGW has filed a
counterclaim accusing Plaintiff of fraud, gross
negligence in the oversight of the corporation,
conversion of corporate property to his own use,
and other looting of the company. For the reasons
set out below, the Court declines to exercise
supplemental jurisdiction over Plaintiff's state-law
claims and PGW's counterclaim and remands these

claims to the Court of Common Pleas.

The supplemental jurisdiction statute provides that
in any case in which a district court has original
jurisdiction over one claim, the court has
supplemental jurisdiction over state-law claims
arising from the same case or controversy. *See* 28
U.S.C. § 1367. The statute also provides, however,
that a district court "may decline to exercise
supplemental jurisdiction over a [state-law] claim ...
if ... the claim substantially predominates over the
claim or claims over which the district court has
original jurisdiction." 28 U.S.C. § 1367(c)(2). A
district court will generally find that a state-law
claim substantially predominates where it
"constitutes the real body of a case, to which the
federal claim is only an appendage," *United Mine
Workers of Am. v. Gibbs,* 383 U.S. 715, 727, 86
S.Ct. 1130, 16 L.Ed.2d 218 (1966), and "where
permitting litigation of all claims in the district
court can accurately be described as allowing a
federal tail to wag what is in substance a state dog."
*De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 309
(3d Cir.2003) (*quoting Borough of W. Mifflin v.
Lancaster,* 45 F.3d 780, 789 (3d Cir.1995)). "The
'substantially predominate' standard, however, is not
satisfied simply by a numerical count of the state
and federal claims the plaintiff has chosen to assert
on the basis of the same set of facts." *Borough of W.
Mifflin,* 45 F.3d at 789. Rather, as the Third Circuit
has interpreted *Gibbs,* there are generally three
ways in which a state-law claim may predominate
for purposes of § 1367(c)(2): (1) quantity of
evidence; (2) comprehensiveness of remedy; and
(3) scope of issues raised. *Id.*

In the instant case, Plaintiff's state-law claims,
especially when combined with Defendant's entirely
state-law counterclaim, predominate over the sole
federal claim in all three of these areas. First,
evidence relating to the due process claim will be
minimal: it will consist only of testimony regarding
the discrete issue of the formal process accorded

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1628922 (E.D.Pa.)

**(Cite as: 2004 WL 1628922 (E.D.Pa.))**

Page 2

Plaintiff before he was terminated. In contrast, evidence regarding the other claims will involve complicated testimony into areas including corporate governance, employment contracts, and third-party payments, as well as physical records relating to all of the above. Second, Plaintiff's remedy for his due process claim would be limited to either a hearing regarding the reasons for his termination or nominal compensation for being deprived thereof. *Cf. Perry v. Sindermann,* 408 U.S. 593, 602-03 (1972) (noting that remedy for violation of procedural due process could include hearing but "would not, of course, entitle [plaintiff] to reinstatement"); *Ersek v. Township of Springfield,* 102 F.3d 79, 84 (3d Cir.1996) (holding that "principal relief" for termination of plaintiff in violation of due process was hearing). This remedy pales in comparison to the potential damages he might receive if he were to prevail on his wrongful termination or breach-of-contract claims. (*See* Compl. Ex. C (setting base salary at $220,480 per year).) Finally, the scope of the state-law issues far exceeds that of Plaintiff's due process claim because the former involve application of state tort and contract doctrines spanning employment, defamation, negligence, and corporate law, while the federal claim turns on application of the fairly well-defined technical requirements imposed on government employers by the Due Process Clause. *See generally Perry,* 408 U.S. 593.

**\*2** Although any one of these factors might provide sufficient grounds for the Court to decline to exercise supplemental jurisdiction, their combination persuades the Court that the state-law claims are more appropriately addressed in a state forum. Accordingly, the Court exercises its discretion and remands Plaintiff's state-law claims and Defendant's counterclaim to the Court of Common Pleas for Philadelphia County. [FN1] An appropriate Order follows.

> FN1. At a scheduling conference held on May 27, 2004, the Court informed the parties of its intent to remand the state claims and gave Plaintiff the option of withdrawing his due process claim to allow the proceeding to be remanded in its

entirety. Plaintiff's counsel indicated that Plaintiff would accept this option, but subsequently informed the Court that Plaintiff was unwilling to withdraw his due process claim, and therefore "the case will be tried in both federal and state court." (Letter from Scutti to Court of 7/13/04.)

*ORDER*
AND NOW, this 16th day of July, 2004, it is hereby ORDERED that:

Counts I, II, and IV of Plaintiff's Complaint and all Counts of Defendants' Counterclaim are REMANDED to the Court of Common Pleas for Philadelphia County.

2004 WL 1628922 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 1432098 (Trial Pleading) Defendants' Answer, Affirmative Defenses and Counterclaim (Apr. 12, 2004)

• 2:04CV01258 (Docket)
(Mar. 23, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

2003 WL 22240660 (S.D.N.Y.)

**(Cite as: 2003 WL 22240660 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
OCCUNOMIX INTERNATIONAL LLC, Plaintiff,
v.
NORTH OCEAN VENTURES, INC., et al.,
Defendants.
**No. 03 Civ. 6047(GEL).**

Sept. 30, 2003.

Acquiring corporation brought action against corporation to be acquired, alleging fraud, breach of contract, and violations of the Electronics Communications Privacy Act (ECPA). Defendant moved for abstention from exercising jurisdiction over ECPA claim, and to dismiss state-law claims. The District Court, Lynch, J., held that: (1) exercise of supplemental jurisdiction over state-law claims was not warranted; (2) absent concurrent state proceedings, *Colorado River* abstention was not warranted; but (3) voluntary dismissal of federal claim, without prejudice, was warranted.

Ordered accordingly.

West Headnotes

**[1] Federal Courts** ⟶**18**
170Bk18 Most Cited Cases
Acquiring corporation's state-law claims against corporation to be acquired substantially predominated over its federal claim, and thus, exercise of supplemental jurisdiction over state-law claims was not warranted, where 12 of 13 claims asserted in complaint were state law claims seeking

to undo corporate transaction, and federal claim under the Electronics Communications Privacy Act (ECPA), alleging that defendant deleted some e-mails from plaintiff's database after transaction had closed, was only tangentially related to real subject of dispute. 18 U.S.C.A. § 2701 et seq.; 28 U.S.C.A. § 1367(c)(2).

**[2] Federal Courts** ⟶**64**
170Bk64 Most Cited Cases
*Colorado River* abstention for acquiring corporation's federal claim against corporation to be acquired was not warranted, where there was no state proceeding pending concurrently with federal action.

**[3] Federal Civil Procedure** ⟶**1700**
170Ak1700 Most Cited Cases

**[3] Federal Civil Procedure** ⟶**1713.1**
170Ak1713.1 Most Cited Cases
Voluntary dismissal without prejudice of acquiring corporation's federal claim against corporation to be acquired was warranted, where defendant did not stipulate to voluntary dismissal of action, and there was no indication that
defendant would be prejudiced by withdrawal of federal claim. Fed.Rules Civ.Proc.Rule 41(a)(1), 28 U.S.C.A.
James B. Zane, Zane and Rudofsky, New York, NY, for plaintiff OccuNomix International LLC.

Richard B. Cohen, Akabas & Cohen, New York, NY, for defendants North Ocean Ventures, Inc., et al.

*OPINION AND ORDER*

LYNCH, J.

**\*1** Plaintiff OccuNomix International LLC sues defendants North Ocean Ventures, Inc., et al., for fraud, contract breach and violation of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 22240660 (S.D.N.Y.)

**(Cite as: 2003 WL 22240660 (S.D.N.Y.))**

Page 2

Electronics Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701 *et seq.,* concerning plaintiff's acquisition of defendants' company. Following written submissions by the parties and oral argument, the Court denied plaintiff's motion for emergency relief in the form of a asset-freezing order on September 2, 2003.

Following a discussion of whether this case is properly brought in federal court, plaintiff moved the Court to abstain from exercising jurisdiction over the federal claim under *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and to dismiss the state-law claims under 28 U.S.C. § 1367(c)(2) because the state-law claims predominate over the federal claims. Essentially, plaintiff seeks to withdraw the Complaint without prejudice to its right to reinstitute the state court proceedings that it voluntarily discontinued on August 11, 2003. Defendants oppose a dismissal without prejudice, arguing that Fed. R. Civ. P 41(a)(1) requires dismissal with prejudice because plaintiff has previously brought and withdrawn an action in state court including the same state-law claims.

For the reasons that follow, the Court declines to exercise its discretion to take supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(c)(2), since those claims substantially predominate over the sole federal claim. The remaining federal cause of action is dismissed without prejudice pursuant to Fed.R.Civ.P. 41(a)(2).

I. *State Law Claims*

[1] The Court declines to exercise jurisdiction over the state-law claims because those claims substantially predominate over the federal claim. As the Chief Judge of this District has noted, § 1367(c)(2) creates a limited exception to the exercise of supplemental jurisdiction, "that should be invoked only when 'permitting litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog.' *Borough of West Mifflin v.*

*Lancaster,* 45 F.3d 780, 789 (3d Cir.1995)." *Luongo v. Nationwide Mutual Insurance Co.,* No. 95 Civ. 3190(MBM), 1996 WL 445365 (S.D.N.Y. Aug.7, 1996). In determining whether state law claims substantially predominate, courts consider "whether the state law claims are more complex or require more judicial resources to adjudicate or are more salient in the case as a whole than the federal law claims." *Diven v. Amalgamated Transit Union Int'l & Local 689,* 38 F.3d 598, 601 (D.C.Cir.1994).

Here, twelve of the thirteen claims asserted in the complaint are state law claims describing a multitude of business torts as well as a religious discrimination claim. The state-law claims go to the very heart of, and largely seek to undo, a complex and contested corporate transaction. The sole federal claim is described in four paragraphs (less than one page) of a 115-paragraph (50-page) complaint, and regards allegations that defendants deleted some e-mails from an OccuNomix database after the transaction had closed. (Compl.¶¶ 66-69.) Because the federal claim is only tangentially related to the real subject of this dispute, the "substantially predominates" standard of § 1367(c)(2) is easily met. Since the dismissal of the state-law claims is on jurisdictional grounds, this dismissal is by definition not an adjudication on the merits and is without prejudice.

II. *Federal Claim*

*2 [2] The sole remaining federal claim will be dismissed without prejudice pursuant to Fed.R.Civ.P. 41(a)(2). Plaintiff's request for *Colorado River* abstention is unavailing. That case authorizes abstention in certain narrow circumstances involving concurrent federal and state proceedings, despite the federal courts' usual "virtually unflagging obligation ... to exercise the jurisdiction given to them." 424 U.S. at 817. Here, there are no pending state proceedings, so the fundamental prerequisite for *Colorado River* abstention is not met.

[3] What plaintiff really seeks is a dismissal without prejudice, despite defendants' argument that any dismissal must be with prejudice under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3

2003 WL 22240660 (S.D.N.Y.)

**(Cite as: 2003 WL 22240660 (S.D.N.Y.))**

Fed.R.Civ.P. 41(a)(1). Defendants' argument that Rule 41(a)(1) provides the sole vehicle to dismiss the federal claim is incorrect, however. Rule 41(a)(1), as its title suggests, concerns voluntary dismissal "By Plaintiff; By Stipulation." Here there is no stipulation. In the absence of a stipulation by the parties, Rule 41(a)(2), concerning voluntary dismissal "By Order of Court," is the applicable rule. At any rate, even if Rule 41(a)(1) were applicable, this is not a case in which plaintiff seeks to withdraw from federal court a claim previously made and withdrawn in state court. The federal claim under the ECPA, the only claim remaining in the case in light of the jurisdictional dismissal of the state-law claims, was not included in the original state complaint and has never been made in state court.

Where defendants do not stipulate to the voluntary dismissal of the action, a dismissal may be granted only "upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(2). In deciding whether a voluntary dismissal under Rule 41(a)(2) is proper, the appropriate terms of such a dismissal (including whether the dismissal should be without prejudice) courts consider, among other factors, "(1) the plaintiff's diligence in bringing the motion; (2) any 'undue vexatiousness' on the plaintiff's part; (3) the extent to which the suit has progressed ...; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss." *Catanzano v. Wing,* 277 F.3d 99, 110 (2d Cir.2001). None of these factors warrant a denial of the motion to withdraw the Complaint: (1) plaintiff was not dilatory in filing the motion; (2) the motion was not made to harass, but rather in response to the Court's invitation to reconsider where to bring the action; (3) the federal litigation is in the very early stages and there has been no discovery or even a fully-briefed motion to dismiss; (4) relitigation would not be duplicative of anything that has occurred in this forum; and (5) plaintiff's explanation for the withdrawal is adequate, in that it responds to the Court's suggestion that the dispute may be more appropriately tried before a state court because state law claims predominate.

The purpose of Rule 41(a)(2) "is primarily to prevent voluntary dismissals which unfairly affect the other side." *Alamance Indus., Inc. v. Filene's,* 291 F.2d 142, 146 (1st Cir.1961), *cited in* 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2364, at 279 (2d ed.1995). *See also Correspondent Services Corp. v. First Equities Corp. of Florida,* 338 F.3d 119, 126 (2d Cir.2003). Here, there is no indication that defendants will be prejudiced by the withdrawal of the federal claim, which plaintiff brought for the first time in this proceeding.

**\*3** Defendants suggest, with some justification, that plaintiff has engaged in unjustified forum-shopping. But the gravamen of defendants' forum-shopping charge is that plaintiff unjustifiably withdrew its state-court suit and sought to proceed in federal court on a slim jurisdictional reed. The present order does not reward or facilitate forum-shopping; rather, it returns the case to the court where it was first brought and has always belonged.

As noted above, a dismissal under Rule 41(a)(2) may be granted "upon such terms as the court deems proper." Defendants' argument that the dismissal should be with prejudice must be rejected. However meritless defendants believe plaintiff's claims to be, they have never been addressed on the merits. Plaintiff's jurisdictional maneuverings have wasted some time and effort, but that does not warrant denying it the opportunity to have its claims adjudicated.

For the foregoing reasons, it is hereby ORDERED that:
    1. The state law claims (Claims Two through Thirteen) are dismissed for lack of subject matter jurisdiction pursuant to 28 U.S .C. § 1367(c)(2); and
    2. The remaining federal claim (Claim One) is dismissed without prejudice on plaintiff's motion pursuant to Fed.R.Civ.P. 41(a)(2).
The Clerk of Court is respectfully directed to mark the case closed.

2003 WL 22240660 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 22240660 (S.D.N.Y.)

**(Cite as: 2003 WL 22240660 (S.D.N.Y.))**

- 1:03CV06047  (Docket)

(Aug. 11, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.