# Unpublished Opinions Cited in Plaintiff's Memorandum in Opposition to Dismiss for Failure to State a Claim

Case 1:04-cv-01268-***-MPT   Document 54-2   Filed 04/18/2005   Page 1 of 20

165074v1

Westlaw.

Not Reported in B.R. Page 1

2004 WL 483580 (Bankr.D.Del.), 42 Bankr.Ct.Dec. 198

**(Cite as: 2004 WL 483580 (Bankr.D.Del.))**

C

United States Bankruptcy Court,
D. Delaware.
In re: WEBVAN GROUP, INC., et al., Debtors.
R. Todd NEILSON, as the Responsible
Individual/Disbursing Agent for Webvan
Group, Inc., et al., Reorganized Agent, Plaintiff,
v.
SHERI SOUTHERN, Defendant.
No. 01-2404 (CGC), ADV. 03-54375(CGC).

March 9, 2004.
Laura Davis Jones, James E. O'Neill, Curtis A. Hehn, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE, and Kevin W. Coleman, Scott H. McNutt, McNutt & Litteneker, LLP, San Francisco, CA, for the Reorganized Debtors, on behalf of R. Todd Neilson, as Responsible Individual/Disbursing Agent for Reorganized Debtors.

William D. Sullivan, Charles J. Brown, III, Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, DE, Counsel to Defendant, Sheri Southern.

*MEMORANDUM DECISION*

CASE, Bankruptcy J.

*1 Before this Court is Sheri Southern's Motion to Dismiss [Adv. Docket No. 6] R. Todd Neilson's Complaint, on the grounds that the complaint fails to state a claim upon which the plaintiff is entitled to relief, pursuant to Fed.R.Civ.P. 12(b)(6) made applicable to the adversary proceeding through Fed.R.Bankr.P. 7012. For the following reasons, the Court denies the Defendant's Motion to Dismiss.

*FACTS*
On July 11, 2003, R. Todd Neilson (the "Plaintiff") filed and served the above-referenced Complaint. Sheri Southern (the "Defendant") answered the Complaint on August 11, 2003, asserting the following affirmative defenses: (1) ordinary course of business pursuant to § 547(c)(2) of the Bankruptcy Code, (2) new value pursuant to § 547(c)(4) of the Bankruptcy Code, and (3) failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ .P. 12(b)(6). On February 9, 2004, Defendant moved this Court to dismiss the Complaint. Completion of briefing was filed February 26, 2004.

Defendant seeks an Order dismissing Count One through Count Three of the Plaintiff's Complaint, which seeks to avoid preferential and fraudulent transfers, on the grounds that the Complaint fails to state a claim upon which relief may be granted. More specifically, the Defendant claims that the Plaintiff has merely recited the statute and has not provided factual information regarding (1) the date of the transfers, (2) the number of transfers, (3) what property was transferred, (4) the means of conveyance, (5) the amount of each individual transfer, and (6) the alleged antecedent debt on account of which the transfers were made. In the alternative, the Defendant seeks an order requiring the Plaintiff to provide a more definite statement of its claim pursuant to Fed.R.Civ .P. 12(c).

The Plaintiff objects to the Motion to Dismiss on the grounds that (1) the motion is untimely because the Defendant answered the Complaint, (2) Defendant's request for a more definite statement of the claim is untimely, (3) all facts germane to the claim have been stated as required by Fed.R.Civ.P. 8, and (4) the Complaint states a claim upon which relief may be granted. In the alternative, the Plaintiff seeks an order granting leave to file an amended complaint.

The Complaint alleges that Webvan acquired HomeGrocer.com, Inc. on September 5, 2000. Pursuant to Webvan and HomeGrocer.com's Merger Agreement, Webvan agreed to pay

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1;04-cv-01268-***-MPT    Document 54-2    Filed 04/18/2005    Page 3 of 20

Page 3 of 4

Not Reported in B.R.                                                                                                                          Page 2

2004 WL 483580 (Bankr.D.Del.), 42 Bankr.Ct.Dec. 198

**(Cite as: 2004 WL 483580 (Bankr.D.Del.))**

severance benefits to certain employees who were terminated after September 5, 2003. That after the acquisition, Sheri Southern, Vice President Technology Operations, remained employed by Webvan. On October 5, 2002, Webvan paid Sheri Southern a signing bonus in the amount of $35,000, and an additional $52,500 bonus on December 15, 2000. Sometime after September 5, 2000, Sheri Southern's employment was terminated. During the one-year preference period, July 13, 2000 and July 13, 2001, Webvan paid severance benefits to Sheri Southern in an amount of $98,437.50. Webvan's made one or more transfers to Sheri Southern in an aggregate amount not less than $185,937.50. Count One of the Complaint seeks to avoid the transfers made to Sheri Southern as preferences pursuant to § 547(b) of the Bankruptcy Code, Count Two seeks to avoid the transfers to Sheri Southern as fraudulent conveyances pursuant to § 548(a)(1)(B) of the Bankruptcy Code, and Count Three seeks to recover the avoided transfers for the benefit of the debtor pursuant to § 550(a)(1) of the Bankruptcy Code.

### DISCUSSION

*2 A defendant may move to dismiss a complaint on the grounds that the complaint fails to state a claim upon which relief may be granted pursuant to the Fed.R.Civ.P. 12(b)(6) made applicable by Fed .R.Bankr.P. 7012. A motion to dismiss on these grounds is a drastic remedy, thus, the complaint should not be dismissed "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) . This defense may be raised at any time prior to trial or at trial. In addition, the defendant may choose not to file a motion and may raise the defense in his answer.

In determining whether to grant a motion to dismiss on the grounds that the complaint fails to state a claim upon which relief may be granted, the Court is required to accept all of the allegations in the complaint as true, and draw all reasonable inferences in the light most favorable to the plaintiff. *See Hechinger Inv. Co. of Delaware Inc., v. M.G.H. Home Improvement (In re Hechinger Inv. Co. of Delaware Inc.),* 288 B.R. 398, 400 (Bankr.D.Del.2003).

The Federal Rules of Civil Procedure merely requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Thus, this Court disagrees with a heightened pleading standard set forth in *TWA Inc. v. Marsh USA Inc.,* 2004 WL 180421 *1 (Bankr.D.Del. January 20, 2004) and *Valley Media, Inv. v. Borders, Inc. (In re Valley Media, Inc.),* 288 B.R. 189, 192 (Bankr.D.Del.2003). [FN1]

> FN1. In those cases, the court determined that a complaint seeking to avoid a transfer as a preference must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." *TWA Inc.,* 2004 WL 180421 at *3, *citing, In re Valley Media.,* 288 B.R. at 192 (*citation omitted* ). The court held that in a preference action "simply quoting the statutory language is not sufficient to survive a motion to dismiss." *TWA Inc.,* 2004 WL 180421 at *2; *In re Valley Media,* 288 B.R. at 192. In addition, a party cannot provide specifics necessary to survive a motion to dismiss in its reply. *See TWA Inc.,* 2004 WL 180421 at *3. In both cases, the court granted the defendants' motion to dismiss and granted leave to plaintiffs to amend their respective complaints.

This Court must take the facts alleged in the Complaint as true, that the transfers made to the Defendant, an insider, are transfers to a creditor, on account of an antecedent debt (the Merger Agreement), while the company was insolvent, within one year prior to the petition date, and received more than it would have under chapter 7, if the transfer was never made, and received payment of its debt to the extent provided under the Bankruptcy Code. Thus pursuant to § 547(b) of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 3
2004 WL 483580 (Bankr.D.Del.), 42 Bankr.Ct.Dec. 198

**(Cite as: 2004 WL 483580 (Bankr.D.Del.))**

Bankruptcy Code, the Defendant has set forth a claim upon which relief may be granted.

In addition, according to the facts alleged in the Complaint, the Plaintiff received less than the reasonable equivalent value in exchange for the $185,937.50 transfer to the Defendant, and that Webvan was insolvent at the time. Pursuant to § 548(a)(1)(B) the Plaintiff has set forth a claim upon which relief may be granted.

This Court agrees with Judge Bernstein that (1) the Federal Rules of Bankruptcy Procedure does not impose a heightened pleading standard on preference claims, and (2) the heightened pleading standard could cut off valid claims prematurely. *In re Randall's Island Family Golf Centers, Inc.*, 290 B.R. 55, 65 (Bankr.S.D.N.Y.2003). Although a debtor should provide specific information when available, requiring such information at the pleading stage is a heavy burden given the time constraints for filing preference actions and the condition of the debtor's books and records. [FN2]

> FN2. Even in the *TWA Inc.* case, Judge Walsh indicated that the debtor might face difficulty in satisfying the elements set forth in the *In re Valley Media* case, thus the situation would warrant relaxation of the rule and the debtor would be entitled to pursue these details in discovery. *TWA Inc.*, 2004 WL 180421 *4.

*3 Lastly, the Court finds that the Plaintiff's reply is procedurally timely.

*CONCLUSION*

For the reasons set forth above, the Defendant's Motion to Dismiss is denied. If the Defendant wishes to proceed by dispositive motion at a later date, he may do so.

*ORDER*

AND NOW, this 9 day of March, 2004, upon consideration of Defendant Sheri Southern's Motion to Dismiss (Adv. Docket No. 6) and the opposition thereto, and for the reasons set forth in the accompanying Memorandum Decision; it is hereby

ORDERED that Defendant's Motion to Dismiss is DENIED.

2004 WL 483580 (Bankr.D.Del.), 42 Bankr.Ct.Dec. 198

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy  
2004 WL 3101575 (D.Del.)

(Cite as: 2004 WL 3101575 (D.Del.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,  
D. Delaware.  
THE LITIGATION TRUST OF MDIP, INC.  
(Formerly Known as Mosler, Inc.) and its  
Affiliates, as Assignee of Certain Claims Pursuant  
to the Second Amended Joint  
Plan of Liquidation of MDIP, Inc. and its Affiliates,  
Plaintiff,  
v.  
Michael RAPOPORT, William A. Marquard,  
Thomas R. Wall, IV, Robert A. Young,  
III, and Kelso & Co., Inc., Defendants.  
No. C.A. 03-779(GMS).

Nov. 29, 2004.  
Michael F. Bonkowski, Mark Minuti, Saul Ewing LLP, Wilmington, DE, for Plaintiff.

Paul J. Lockwood, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On August 5, 2003, plaintiff Litigation Trust of MDIP, Inc. ("Mosler") filed a complaint against the above-named defendants (D.I. 1), and on February 9, 2004, filed an amended complaint (D.I.28), which states four causes of action. The first two causes of action are for breach of the fiduciary duties of due care, good faith and loyalty, with Count I against defendants Marquard, Wall and Young (collectively, the "Kelso Directors") (id.¶¶ 81-84), and Count II against defendant Rapoport (id. ¶¶ 85-88). In Count III, Mosler seeks avoidance and recovery of constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) against Kelso & Co., Inc. ("Kelso"). (D.I. 28 ¶¶ 89-94.) Similarly, in Count IV Mosler seeks avoidance and recovery of constructively fraudulent transfers under 11 U.S.C. § 544(b) against Kelso. (D.I. 28 ¶¶ 95-101.) Currently before the court is the defendants' March 10, 2004 motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (D.I.35.) For the following reasons, the court will deny the defendants' motion.

II. JURISDICTION

The court's jurisdiction is pursuant to 28 U.S.C. § 1332 (2004).

III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted when, accepting all well-pleaded factual allegations as true, the plaintiff is not entitled to relief as a matter of law. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). In a motion to dismiss for failure to state a claim, the moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991). While the court must accept the factual allegations in the complaint as true, it "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1429 (citation omitted). Therefore, "[a] complaint which consists of conclusory allegations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
2004 WL 3101575 (D.Del.)  
(Cite as: 2004 WL 3101575 (D.Del.))

Page 2

unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996).

IV. BACKGROUND

In its amended complaint, Mosler alleges the detailed set of facts (totaling 80 paragraphs) on which it bases its four claims for relief. (D.I.28.) The following is a brief summary of that background. For the purpose of this motion, the court assumes all allegations of fact to be true.

"Through leveraged buyouts in 1986 and 1990, Kelso acquired control of Mosler, a manufacturer of physical security products and systems, and installed defendants Marquard, Wall and Young (collectively, the 'Kelso Directors') on Mosler's Board of Directors...." (Id.¶ 2.) From 1992 to 1995, Mosler's sales increased from $203.7 million to $216.9 million. (Id.¶ 26.) Then, in 1995, defendant Rapoport was hired as President and CEO of Mosler (id.¶ 30), despite the fact that he had no prior experience as a CEO of a company of Molser's stature (id.¶ 33). The Kelso Directors allegedly consented to his hiring on the basis of two lines in a one-page memorandum written by the outgoing CEO. (Id.¶ 30.) There was no discussion of "succession planning" at either of the two board meetings immediately preceding Rapoport's hiring (id.¶ 29), and there was no consideration of any alternative candidates (id.¶ 31).

*2 In October 1998, Mosler acquired another security business, named LeFebure, from a company called De La Rue for $39.2 million. (Id.¶ 36.) Prior to the acquisition, Rapoport had assumed responsibility for Mosler's due diligence without formal board approval. (Id.¶ 38.) However, he failed to hire outside consultants to assist in the valuation and due diligence process, relying instead on numbers provided by De La Rue and the evaluations of his own personnel. (Id.¶ 39.) The Kelso Directors gave their approval to begin negotiations with De La Rue at a special September 1998 board meeting, but did so without the benefit of any tangible information concerning the proposed acquisition. (Id.¶ 40.) Unfortunately, LeFebure's financial condition was not as good as was originally represented by De La Rue. (Id.¶ 42.) Thus, it turned out that Mosler had grossly overpaid for LeFebure. (Id.) This problem was compounded by the fact that Rapoport failed to retain key personnel from LeFebure (id.¶ 43) and otherwise mismanaged the integration of the two businesses (id.¶ 45), resulting in "a serious deterioration of Mosler's liquidity (id).

Subsequent to the LeFebure acquisition, mismanagement by Rapoport and the Kelso Directors continued. In 1999, Mosler attempted to convert to a new enterprise software system, which was essential to the proper functioning of its business. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house information technology ("IT") employees that this type of conversion would require them to hire outside specialists. (Id.¶ 47.) However, Rapoport ignored this advice and, with the approval of the Kelso Directors, set out to convert the new system using only the in-house IT staff. (Id.¶¶ 48-49.) As a result, the conversion was not entirely successful, and for the next several years Mosler had difficulty invoicing customers, collecting receivables, tracking inventory, etc. (Id.¶ 50.) Furthermore, Rapoport failed to address "sustained and systematic flaws" in Mosler's inventory management system, resulting in untimely deliveries to customers and a loss of goodwill. (Id.¶¶ 52-53.) Rapoport and the Kelso Directors also failed to institute standard internal control procedures for ensuring timely invoicing of customers and collection of accounts receivable. (Id. ¶ 54.) As a result, Mosler's accounts receivable rose from $46 million in 1995 to nearly $100 million in 1999. (Id.¶ 55.) Yet, there was no discussion of these problems at either the February 1999 board meeting or the May 1999 board meeting. (Id.¶¶ 56-57.) Thus, Mosler contends, the Kelso Directors' failed to properly monitor Rapoport's management of the company or to investigate the sudden explosion of the accounts receivable. (Id.¶ 58.)

"Moreover, on at least ten occasions between

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
(Cite as: 2004 WL 3101575 (D.Del.))

Page 3

November 1997 and January 2001, certain of the Kelso Directors were approached by veteran, senior Mosler employees about the threat that Mosler's serious business problems and Rapoport's gross mismanagement posed to the company." (Id.¶ 60.) Rapoport allegedly fired at least one of these employees in response to the complaints, and effectively forced another to resign. (Id.) Instead of investigating these reports of mismanagement and attempting to address the problems identified, the Kelso Directors ignored the reports and "actively took steps to ensure that any additional concerns of Mosler's employees would not be brought to the Board's attention." (Id.¶ 61.)

*3 Mosler's financial problems become so serious that its outside auditor and independent accountant, Deloitte, issued a letter in September 1999 to Mosler's board advising it that the matters summarized in the letter were "reportable conditions" with respect to the company's internal controls. (Id.¶ 66.) " 'Reportable conditions' are significant deficiencies in the design or operation of internal control, which could adversely affect Mosler's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements." (Id.) Accompanying Deloitte's letter was a report identifying more than forty problems with Mosler's internal controls and suggesting corrective action. (Id.) These problems included:
  1. Failure to reconcile the progress billings detail to the general ledger;
  2. Duplication of invoices for time and materials;
  3. Failure to post cash disbursements in a timely fashion, resulting in "unusual reconciling items;"
  4. Unexplained discrepancies in reported accrued vacation time between the detail and the general ledger;
  5. Lack of corporate oversight and accountability with respect to service contracts, resulting in lost contracts; and
  6. Inaccurate and untimely fulfillment of branch orders for replacement parts from headquarters.
(Id.¶ 67.) Neither Rapoport nor the Kelso Directors took any corrective action in response to Deloitte's warning. (Id.¶ 68.)

Again in November 2000, Deloitte issued another letter to the board advising it that the conditions reported in the letter were "material weaknesses." (Id.¶ 70.) "A material weakness is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts material to Mosler's financial statements might occur and not be detected within a timely period by Mosler's employees." (Id.) This letter also included a report, this time identifying over fifty problem areas, many of which were identified in the 1999 letter and report. (Id.¶ 71.) Again, neither Rapoport nor the Kelso Directors took any remedial action. (Id.¶ 72.) Consequently, Mosler alleges that Rapoport and the Kelso Directors knew or were on constructive notice that the financial statements and results prepared by Mosler's management were materially misstated and misleading. (Id.¶ 73.) Specifically, the management reported a net loss in 2000 of nearly $11 million, while the net loss reported in Mosler's audited financial statements was nearly $22 million. (Id.¶ 74.)

Mosler's financial problems continued in this direction until August 6, 2001, when it filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Id.¶ 79.) On or about October 17, 2001, Mosler's assets were sold at auction for nearly $28 million, but Mosler's unsecured creditors did not receive any distribution from the proceeds of the sale. (Id.¶¶ 79-80.) There is more than $200 million in unsecured debt. (Id.¶ 4.) Mosler now seeks to recover, on behalf of the unsecured creditors, damages for breach of fiduciary duties by Rapoport and the Kelso Directors, as well as management fees fraudulently transferred to Kelso by Mosler in the years prior to its bankruptcy. (Id.¶ 5.)

V. DISCUSSION

A. COUNT I--Breach of Fiduciary Duty Against the Kelso Directors

*4 Mosler alleges the Kelso Directors breached their fiduciary duties by failing to be informed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 3101575 (D.Del.)
**(Cite as: 2004 WL 3101575 (D.Del.))**

Page 4

before making business decisions, failing to employ rational business practices, failing to take action in circumstances where due attention would have prevented harm, failing to exercise good faith judgment with regard to Mosler's information and reporting systems, ignoring deficiencies in Mosler's internal control system and the account improprieties reported to them, and failing to ensure the accuracy and reliability of Mosler's financial statements. (D.I.28.¶ 83.)

The Kelso Directors argue that this breach of fiduciary duty claim is barred by Mosler's certificate of incorporation, which limits the liability of directors to the corporation or stockholders pursuant to Del.Code Ann. tit. 8, § 102(b)(7). Specifically, the certificate of incorporation provides:
> No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.

(D.I. 25 at A134.) Mosler counters by citing two non-binding cases for the proposition that such provisions are inapplicable when the action is brought for the benefit of creditors in a bankruptcy proceeding. *See Ben Franklin Retail Stores, Inc. v. Kendig,* No. 97C7934, 2000 U.S. Dist. LEXIS 276, at * 23-*24 (N.D.Ill. Jan. 12, 2000); *Pereira v. Cogan,* No. 00 Civ. 619(RWS), 2001 U.S. Dist. LEXIS 2461, at *29-*38 (S.D.N.Y. Mar. 13, 2001).

The court finds persuasive a recent (but unpublished) decision of the Court of Chancery of Delaware, in which Vice Chancellor Noble applied § 102(b)(7) in a suit brought by unsecured creditors against the directors of a company in bankruptcy. *See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,* No. Civ. A. 20228-NC, 2004 WL 1949290, at *9 (Del.Ch. Aug.24, 2004). Although *Elkins* did not directly address the issue presented here, it is clear that application of § 102(b)(7) in cases involving creditors was not seen as problematic. Therefore, the court believes Delaware law permits defensive use of § 102(b)(7) provisions even when the suit is for the benefit of a creditor.

As a result, it would seem that the duty of care portion of Count I could be dismissed, leaving only the duty of loyalty/good faith portion to be scrutinized for the requisite factual allegations. However, "[k]nowing or deliberate indifference by a director to his or her duty to act faithfully *and with appropriate care* is conduct ... that may not have been taken honestly and in good faith to advance the best interests of the company." *In re The Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch. May 28, 2003) (emphasis added). In other words, "[w]here a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either 'not in good faith' or involve 'intentional misconduct' [of the type contemplated by § 102(b)(7) ]." *Id.* at 290. Thus, regardless of whether the claim is labeled as a breach of the duty of care, loyalty, or good faith, when a § 102(b)(7) provision is involved the underlying alleged facts must tend to show that the defendants *"knew"* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* at 289 (emphasis in original).

*5 Viewing the totality of the allegations, the court believes Mosler has met its burden of alleging facts sufficient to show that the Kelso Directors *"knew"* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." While it may be the case that the Kelso Directors were justified in each and every decision they made, it would be inappropriate for the court to make such a determination before adequate discovery has taken

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
2004 WL 3101575 (D.Del.)
**(Cite as: 2004 WL 3101575 (D.Del.))**

place. Thus, the defendants' motion to dismiss with regard to Count I will be denied. [FN1]

> FN1. The defendants also argue that the business judgment rule insulates them from liability. The defendants' formulation the business judgment rule is that there can be no liability "so long as the directors' decision 'can be attributed to any rational business purpose.' " (D.I. 36 at 24.) Since the court finds that Mosler has alleged facts sufficient to show (if proven) that the defendants *"knew"* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss," then those decisions surely could not be attributable to any rational business purpose.

B. COUNT II--Breach of Fiduciary Duty Against Rapoport

The factual basis for Count II is largely the same as for Count I. However, Mosler argues that the § 102(b)(7) provision in its charter is additionally inapplicable to Rapoport because he is both an officer *and* a director, whereas § 102(b)(7) is limited on its face to directors. Rapoport counters by arguing that "[w]here a defendant was both an officer and a director, he can only be sued for actions taken solely as an officer, and the plaintiff must 'highlight any specific actions [the defendant] undertook as an officer (as distinct from a director)' " (D.I. 50 at 2.) Here, he says, Mosler has not made any specific distinctions, so the § 102(b)(7) provision should protect him. (Id.)

To the extent that Rapoport acted in his capacity as a director, the § 102(b)(7) provision applies to him in the same way it applies to the Kelso Directors. In other words, the plaintiff must allege facts sufficient to show that Rapoport *"knew"* that [he was] making material decisions without adequate information and without adequate deliberation, and that [he] simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." To the extent that Rapoport acted solely in his capacity as an officer, he is not insulated by the § 102(b)(7) provision at all.

Therefore, the defendants' motion to dismiss Count II of the complaint will be denied.

C. COUNTS III & IV--Constructively Fraudulent Transfers

In Counts III and IV, Mosler seeks to avoid and recover for constructively fraudulent transfers from Mosler to Kelso totaling $150,000 and $800,000 in violation of 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. The defendants argue that Mosler's amended complaint merely restates the elements of constructive fraud under these sections, without asserting any facts to support its claims. (D.I. 36 at 36-38.) Admittedly, the factual allegations supporting these claims are sparse. However, Mosler does allege two specific amounts it paid to Kelso for "management fees" and that it received nothing in return. (D.I. 28 ¶¶ 89-101.) It is also true that Mosler filed for bankruptcy during the relevant time period, which tends to shore up Mosler's assertion that the transfers were completed during insolvency or that the transfers rendered the company insolvent. Therefore, the court believes it would be premature to dismiss these claims before adequate discovery. Thus, the defendants' motion to dismiss Counts III and IV will be denied.

V. CONCLUSION

*6 For the aforementioned reasons, the defendants' motion to dismiss all counts of the plaintiff's amended complaint will be denied.

*ORDER*
IT IS HEREBY ORDERED that:

The defendants' motion to dismiss all counts of the second amended complaint (D.I.35) be DENIED.

2004 WL 3101575 (D.Del.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
2004 WL 3101575 (D.Del.)  
**(Cite as: 2004 WL 3101575 (D.Del.))**

Page 6

**Motions, Pleadings and Filings (Back to top)**

- 1:03CV00779 (Docket)    (Aug. 05, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d

Page 1

2002 WL 31584292 (Del.Ch.)

**(Cite as: 2002 WL 31584292 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Ariff ALIDINA, David Swart, Mohamed Alidina, and Marion Jack Rickard, Plaintiffs,
v.
INTERNET.COM CORPORATION, Alan Meckler, Christopher S. Cardell, Wayne A. Martino, Walter H. Lippincott, Gilbert F. Bach, Beverly C. Chell, Michael J. Davies and Charles R. Ellis, Defendants.
No. Civ.A. 17235-NC.

Submitted Oct. 3, 2002.
Decided Nov. 6, 2002.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Sanford P. Dumain, Samuel H. Rudman and Susan M. Greenwood, of Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York, for Plaintiffs, of counsel.

Allen M. Terrell, Jr. and Dominick Gattuso, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Stephen Greiner, Albert M. Myers III and Barbara B. Farley, of Willkie Farr & Gallagher, New York, New York, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 This class action arises out of a tender offer for shares of a Delaware corporation followed by a merger between it and the acquiring company. Certain shareholders who tendered their stock filed this lawsuit, challenging the two-step transaction.

They charge the directors who approved and recommended the transaction with breaches of their fiduciary duties of care, loyalty and candor. Similar to other recent cases in this Court, the challenged transactions involve a chief executive officer/director who negotiated most of the terms of the transaction, including one aspect in which the officer/director was clearly self-interested. The defendants have moved to dismiss all of the asserted claims, which I deny for the reasons set forth below.

I. INTRODUCTION

In late 1998, Penton Media, Inc. ("Penton") purchased Mecklermedia Corporation ("Mecklermedia" or the "Company"). This two-step transaction ("Transaction") was accomplished by way of a tender offer followed by a merger, pursuant to an Agreement and Plan of Merger among Mecklermedia, Penton and Internet World Media Inc., dated October 7, 1998.

The plaintiff shareholders of Mecklermedia brought this class action challenging the fairness of the Transaction, alleging that the individual board members breached their fiduciary duties. They allege that these breaches resulted in merger consideration that was "grossly unfair," largely due to the concurrent sale of an 80.1% interest in Internet.com (the "iWorld transaction"), Mecklermedia's wholly owned subsidiary, at an allegedly unfair price to Alan Meckler ("Meckler"), who was a 26% shareholder, board member, and the CEO of Mecklermedia. Plaintiffs allege that Meckler demanded this sale in exchange for his approval of the Transaction and that this sale diverted funds from the Company to Meckler. Because of this, plaintiffs contend that the board members could not have approved and recommended the Transaction and iWorld transaction (collectively, the "Transactions") in good faith. Last, plaintiffs allege that the board members were grossly negligent in the negotiation and approval of the Transactions and in failing to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2002 WL 31584292 (Del.Ch.)

**(Cite as: 2002 WL 31584292 (Del.Ch.))**

Page 2

disclose all material facts to the shareholders. In short, plaintiffs' complaint alleges breaches of the directors' fiduciary duties of loyalty, care, and disclosure.

## II. STATEMENT OF FACTS

Mecklermedia was an internet media company providing internet information to industry professionals via trade shows, conferences and print publications. Internet.com was its wholly owned subsidiary that disseminated internet information electronically through a network of web sites.

Penton, the acquiror, is also a company that specializes in internet industry trade shows and<WB

Westlaw.

Slip Copy

Page 1

2004 WL 2980736 (D.Del.)

(Cite as: 2004 WL 2980736 (D.Del.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
CONTINUING CREDITORS' COMMITTEE OF STAR TELECOMMUNICATIONS INC., Plaintiff,
v.
Christopher EDGECOMB, et al., Defendants.
No. Civ.A.03-278-KAJ.

Dec. 21, 2004.

Joseph A. Rosenthal, Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, for Plaintiff, Daniel A. Lowenthal, III, Jonathan D. Siegfried, Lawrence S. Hirsh, Thelen Reid & Priest LLP, New York, New York, of counsel.

John C. Phillips, Jr., Phillips, Goldman & Spence P.A., Wilmington, Delaware, for Defendants, Marc J. Sonnenfeld, Karen Pieslak Pohlmann, Jill Baisinger, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. Introduction

*1 Before me is a motion (Docket Item ["D.I."] 63; the "Motion to Dismiss") filed by defendants Christopher E. Edgecomb ("Edgecomb"), Mary A. Casey ("Casey"), Arunas A. Chesonis, ("Chesonis"), David Vaun Crumly ("Crumly"), Kelly D. Enos ("Enos"), Mark Gershien ("Gershien"), Gordon Hutchins, Jr. ("Hutchins"), James E. Kolsrud ("Kolsrud"), Allen Sciarillo ("Sciarillo"), John R. Snedegar ("Snedegar"), Samer A. Tawfik ("Tawfik"), Brett S. Messing ("Messing"), and Paul Vogel ("Vogel") (collectively the "Defendants"), seeking to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

The First Amended Complaint (the "Complaint"), filed by the Continuing Creditors' Committee of Star Telecommunications, Inc. (the "Plaintiff"), for itself and on behalf of the Star Creditors' Liquidating Trust (the "Liquidating Trust"), contains allegations that the Defendants, as directors and officers of Star Telecommunications Inc. ("Star" or the "Company"), breached their fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste. (D.I. 4 at ¶¶ 147-76.) The Plaintiff further alleges that payments made from Star to Messing constitute unjust enrichment at the expense of Star. (*Id.*)

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. For the reasons set forth herein, the Motion to Dismiss will be granted as to all defendants except Messing.

II. Background [FN1]

> FN1. The following rendition of the background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party, the Plaintiff.

Star was a telecommunications carrier specializing in long distance telephone service. (*Id.* at ¶ 1.) Through expanding capacity and acquiring other companies, Star grew rapidly in the mid-1990s and by the late 1990s was the seventh-largest telecommunications carrier in the United States. (*Id.* at ¶¶ 1-2.) By 2000, however, Star's financial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

Page 2

position had deteriorated considerably, and, in early 2001, the Company was forced to file for bankruptcy. (*Id.* at ¶ 3.)

Star was founded in the Mid-1990s by Edgecomb, who served as Chief Executive Officer ("CEO") and Chairman of Star's Board of Directors from 1996 through January 10, 2001, and defendant Casey, who served as President from 1996 through January 10, 2001, and served as a Director from 1996 through March 13, 2001. (*Id.* at ¶¶ 7-8.) Defendant Tawfik was a Director of Star and President of its subsidiary PT-1 from February 1999 through March 18, 2000, the date that Star filed for bankruptcy protection. (*Id.* at ¶¶ 17, 21.) Defendants Chesonis, Gershien, Hutchins, and Snedegar were Directors of Star but did not hold management positions within the Company. (*Id.* at ¶¶ 9, 12-13, 16-17.) Hutchins and Snedegar served from the mid-1990s until Star filed for bankruptcy in early 2001; Chesonis served from May 1998 through February 2000; Gershien served from March 1998 through October 1999. (*Id.*)

*2 In June 1997, Star completed an initial public offering, raising $32 million. (*Id.* at ¶¶ 2-3.) In 1998, the price of Star's common stock peaked and Star raised $145 million through an additional stock offering. (*Id.* at ¶ 29.) By the end of the year, however, Star had only $64.4 million of net working capital, due in part to massive capital expenditures. (*Id.* at ¶¶ 3, 29.)

On June 8, 1998, Star's Board of Directors met to discuss the acquisition of PT-1, which was in the prepaid calling card business. (*Id.* at ¶ 40.) At that meeting, the Board received a presentation from one of the investment banks advising them on the acquisition, Hambrecht & Quist ("H & Q"). (*Id.*) Despite the fact that H & Q had represented PT-1 in a failed initial public offering, the Board did not wait to receive a report from the other investment bank advising them, Credit Suisse First Boston, before acting on the acquisition. (*Id.*) On the following day, after meeting for 12 minutes, the Board approved the acquistion. (*Id.*) In February 1999, despite Star's poor cash position and a drop in value of PT-1 from $590 million to $190 million, Star closed the PT-1 acquisition. (*Id.* at ¶ 45.) PT-1's principal shareholder was Tawfik, who, after the acquisition by Star, remained President of PT-1, and, additionally, became a member of Star's Board of Directors. (*Id.* at ¶¶ 17, 46.)

Shortly after completing the PT-1 acquisition, Star announced to the public that a syndicate of banks, led by Goldman Sachs Credit Partners, had committed to supply the Company with $275 million in senior secured credit facilities. (*Id.* at ¶ 52.) The credit facilities were not delivered as announced, however, which caused the financial markets to view Star negatively. (*Id.* at ¶¶ 52-53.) There is no record of the Board discussing why the financing fell through or who was responsible for the failure of the agreement and its premature announcement. (*Id.* at ¶ 53.)

As a result of the failure to close the proposed credit agreement, Star was forced to agree to more costly financing from another source, Foothill Capital Corporation ("Foothill"). (*Id.* at ¶ 55.) The financing from Foothill, which was finalized on June 9, 1999, included a $25 million term loan and a $75 million revolving line of credit based on Star's accounts receivable. (*Id.*) When Star released its quarterly financial statements a few weeks later, on June 30, 1999, it was clear that it had already breached certain covenants. (*Id.* at ¶ 56.) The breaches were caused by two of Star's financial measurements falling below required levels, specifically, tangible net worth and earnings before interest, taxes, depreciation, and amortization. (*Id.*) Foothill threatened to sue Star for breach of the covenants, and, consequently, Star agreed to additional fees in order to amend the credit agreement. (*Id.* at ¶ 57.) The additional fees Star agreed to pay included a $500,000 agency fee, an increase in the interest rate of the loan, and a payment of $2 million if the term loan was not paid back by January 31, 2001. (*Id.*)

*3 In the fall of 1999, World Access, Inc. ("World Access") expressed interest in acquiring Star. (*Id.* at ¶ 66.) World Access bundled voice and data services for the European market. (*Id.*) The Plaintiff, however, alleges that the primary business

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

Page 3

purpose of World Access was to acquire companies for MCI WorldCom Inc. ("WorldCom"), when WorldCom could not openly undertake such transactions itself. (*Id.*) The Plaintiff contends that WorldCom controlled World Access through stock holdings and a carrier service agreement. (*Id.*) At the time World Access expressed its interest in Star, Star owed WorldCom approximately $56 million and was facing serious financial difficulties. (*Id.* at ¶ 67.) The Plaintiff alleges that WorldCom's purpose in acquiring Star through World Access was to hide unrecoverable receivables Star owed to WorldCom. [FN2] (*Id.* at ¶ 69.) At a December 16, 1999 meeting, Star's Board discussed its financial difficulties, specifically, the Company's mounting past due accounts payable and lack of available cash. (*See id.* at ¶ 65.) Some Board members at this meeting suggested that "insolvency ... was a clear possibility without fundamental changes in [Star's] operation." (*Id.*)

> FN2. The Plaintiff argues that the Board should have examined the relationship between World Access and WorldCom further because "the relationship of those companies was relevant to when and under what terms a merger transaction could be comp[l]eted." (D.I. 4 at ¶ 69 .) How their relationship would affect the terms of the agreement is not described, however. It could be argued that such a relationship and WorldCom's alleged motivation to hide unrecoverable receivables would have been a benefit to Star in closing the proposed merger, not a detriment.

In that same meeting, Star's Board authorized a letter of intent to enter into a merger with World Access, wherein Star shareholders would receive World Access stock and cash equal to approximately $10 .50 per share of Star common stock. (*Id.* at ¶ 71.) Additionally, World Access agreed to provide Star with tens of millions of dollars in bridge financing when the deal closed. (*Id.*) As part of the transaction, World Access was to assume Star's WorldCom debt. (*Id.*)

On February 2, 2000, World Access announced that it was reducing its offer to Star from $650 million to $440 million, due to facts uncovered during due diligence on Star's condition. (*Id.* at ¶ 72.) On February 7, 2000, Star's Board held a 90 minute meeting to discuss the merger and, following another 75 minute meeting on February 11, 2000, voted to approve the merger. (*Id.* at ¶ 73.) The approved merger had a number of conditions precedent, the most notable being the requirement that Star divest itself of PT-1 and receive at least $150 million in consideration for that business. (*Id.* at ¶ 74.)

Citing the Board's minutes, the Plaintiff alleges that the Board did not investigate whether it would be feasible to sell PT-1 for such a price. (*Id.*) The Board did, however, receive a fairness opinion from Deutsche Banc, which stated that the transaction, as revised by World Access, was fair from a financial standpoint. (D.I. 66, Ex. 22 at 3.) The Board also received a memorandum from its Delaware counsel advising it of its obligations under Delaware law. (*Id.* at 2.) Finally, the Board was informed that no serious interest with respect to acquiring Star had been shown by any third parties. (*Id.*) In March 2000, Star signed a letter of intent to sell PT-1 to Counsel Corporation ("Counsel") for $150 million. (D.I. 4 at ¶ 75.) By the end of 2000, Counsel had informed Star that it was lowering its price for PT-1 from $150 million to $70 million. (*Id.* at ¶ 97.) Consequently, World Access terminated its merger with Star for failure to satisfy one of the conditions precedent, namely selling PT-1 for $150 million. (*Id.* at ¶ 101 .)

\*4 The Plaintiff alleges that the myopic focus of Star's Board and management on completing the merger was to Star's detriment. (*Id.* at ¶ 84.) As a result of the merger negotiations with World Access, the Directors and Officers of Star did not pay appropriate attention to the day-to-day operations of the Company. (*Id.* at ¶ 78.) In a registration statement sent to the Securities and Exchange Commission (the "SEC") Star admitted that:
> FOR THE LAST 16 MONTHS, OUR MANAGEMENT AND KEY EMPLOYEES HAVE FOCUSED ALMOST ENTIRELY ON

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980736 (D.Del.)

(Cite as: 2004 WL 2980736 (D.Del.))

Page 4

CLOSING THE WORD ACCESS MERGER AND THE PT-1 ASSET SALE AND HAVE NOT CONCENTRATED ON OUR DAY-TO-DAY OPERATIONS ... Given these efforts, our management and key employees have not spent the requisite time or effort necessary to run our day-to-day operations.
(*Id.* at ¶ 79.) The Plaintiff alleges that the fact that Stars' Chief Financial Officer ("CFO"), Enos, did not attend any Board meetings after December of 1998, further highlights that the Board was not concerned with the day-to-day operations of Star. (*Id.* at ¶ 81.)

In the Summer of 2000, prior to the termination of the proposed merger with World Access, Edgecomb sold 6.2 million shares of Star common stock, Tawfik sold more than 2.2 million shares, and Crumly sold 112,000 shares. (*Id.* at ¶ 85.) They all sold their shares for less than the proposed merger price, and the Plaintiff alleges that this was due to the unique information they were privy to as Officers and Directors of the Company. (*Id.* at ¶ 86.)

On January 9, 2001, some five to six months after those individuals sold shares of Star's common stock, Star announced that World Access was abandoning its merger with Star due to Star's inability to sell PT-1 for $150 million, as required by the merger agreement. (*Id.* at ¶ 101.) As a result of the merger failing to close and Star's worsening financial condition, Star's creditors began to threaten drastic action to protect their interests. (*Id.* at ¶¶ 92, 101.) The Board, realizing the severity of the situation, invited Messing, as a representative of Gotel Investments Ltd. ("Gotel"), one of Star's investors, to make a presentation to the Board on January 1, 2001. (*Id.* at ¶ 93.) Messing offered to assemble a new management team for Star, with the aim of closing the World Access merger and, failing that, repairing the Company's relationships with its vendors and creditors. (*Id.* at ¶ 95.)

On January 10, 2001, the Board turned over control of the Company to Messing. (*Id.* at ¶ 100-03.) At the same time, Edgecomb resigned his position as CEO, Chairman, and a Director; [FN3] Casey resigned as President but retained her position on the Board. (*Id.* at ¶ 7-8, 103.) After Messing was appointed Chairman and CEO, Sciarillo was named CFO, Timothy Sylvester was named General Counsel, and Vogel joined the Board. (*Id.* at ¶ 103.) Vogel is alleged to have long-standing business and professional relations with Messing. (*Id.* at ¶ 116.)

> FN3. Although the complaint only states that Edgecomb resigned as the Company's CEO and Chairman of the Board (D.I. 4 at ¶ 103), it is assumed that he resigned his directorship as well. (*See Id.* at ¶ 7 (stating that Edgecomb "served as Chief Executive Officer and Chairman of the Board of Directors of Star from in or about January 1996 through on or about January 10, 2001," without any mention of further service as a Director).)

*5 The first action Messing completed was a short term financing deal with Gotel, a company with which he is alleged to have been affiliated. (*Id.* at ¶ 104.) The deal provided Star with $25-35 million in new capital over six months, in exchange for attractively priced warrants for 30 million shares of Star's common stock. (*Id.*) Messing admitted that the cost of capital in this transaction was high, but that without it the Company would likely not survive. (*Id.*) Some directors were concerned that the new warrants would allow Gotel to take control of the Company, and certain Board members believed that Messing controlled Gotel. (*Id.* at ¶ 105-06.) Upon completion of the transaction with Gotel, Gotel was permitted to name two directors to Star's Board. (*Id.* at ¶ 115.) The two new directors chosen by Gotel were Alan Rothenberg and Steve Carroll, both of whom are alleged to have long-standing business dealings and personal relationships with Messing. (*Id.* at ¶ 116.)

The next major transaction into which Messing led Star, was the sale of PT-1's pre-paid calling card business. (*Id.* at ¶ 119.) On January 21, 2001, Messing, Sciarillo, and Crumly, among others, met with officers of IDT Corporation ("IDT") and negotiated a deal to sell the PT-1 business to IDT;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980736 (D.Del.)
**(Cite as: 2004 WL 2980736 (D.Del.))**

Page 5

Messing allegedly entered into this agreement (the "January 21 Agreement") without considering other buyers, such as PT-1's management team. (*Id.* at ¶¶ 121-22.) The January 21 Agreement included the transfer of the PT-1 business to IDT, the indemnification of PT-1 by IDT in connection with certain pending lawsuits, and the transfer of $5 million, $4 million of which was paid at the time of the agreement and $1 million of which was to be paid at closing. (*Id.* at ¶ 124.) It also included an indemnity for $3.5 to $5 million in connection with three pending lawsuits. (*Id.*) This agreement was conditioned on PT-1 having $25 million in gross receivables and the release of all liens and security interests in PT-1 by all creditors. (*Id.* at ¶ 125.) On January 23, the two parties entered into an agreement, whereby IDT and Star agreed to direct $100 million in products and services to each other over a two-year period. (*Id.* at ¶ 126.) In addition, IDT Investments, a company affiliated with IDT, agreed to purchase 5% of Star's common stock, as well as warrants giving them the right to purchase an additional 10% of Star's common stock. (*Id.*) IDT Investments also entered into a standstill agreement with Star that forbade IDT Investments from owning more than 20% of Star's outstanding common stock without first gaining the approval of Star. (*Id.*)

On February 1, 2001, Star and IDT closed the deal pursuant to the January 21 Agreement. (*Id.* at ¶ 127.) But, allegedly at the behest of Messing, IDT did not pay the $1 million owed to Star at the time of closing; it instead wired the money to WorldCom in return for WorldCom releasing its security interest in PT-1. (*Id.*)

*6 Between January 18, 2001 and February 7, 2001, IDT Investment purchased 15,006,236 shares of Star's common stock, or about a 21.1% beneficial ownership in Star. (*Id.* at ¶ 129.) IDT Investments did not, however, retain the voting rights associated with these shares. Rather, it transferred those rights to Messing through a voting proxy. (*Id.*)

In early March of 2001, WorldCom declared its intention to force Star into bankruptcy, and another Star creditor, RFC Capital, decided not to purchase additional receivables from Star. (*Id.* at ¶ 130.) Shortly thereafter, Messing and IDT renegotiated certain parts of the PT-1 transaction. (*Id.* at ¶ 131.) The Plaintiff alleges that Star received no benefit in this renegotiation. Instead, the renegotiation permitted IDT to eliminate its $3.5 million indemnity obligation on the basis of the $5 million in cash IDT had already paid as part of the deal. (*Id.* at ¶¶ 124, 133.) Another $1.5 million debt obligation IDT owed to Star was eliminated on the basis of the prepayment. (*Id.*) On March 8, 2001, soon after agreeing to the renegotiation of the PT-1 deal, Messing resigned from Star, as did his team. (*Id.* at ¶ 137.)

The Plaintiff alleges that Messing's actions with respect to IDT were a result of his wish to curry favor with IDT and its principal owner, Howard Jonas ("Jonas"). (*Id.* at ¶ 139.) In fact, shortly after Messing left Star, he became a partner in a capital management firm and he received a $5 million investment from Jonas. (*Id.* at ¶ 140.) Jonas later invested another $2 million with Messing. (*Id.*)

Before Messing left Star, he submitted a request and received a $25,000 reimbursement for expenses incurred in his capacity as CEO of Star. (*Id.* at ¶ 141.) The largest expenses for which he sought reimbursement were $10,000 given to SAR Academy, a private school of which Jonas was a significant benefactor, and $10,616 to an investment vehicle, partially run by Messing, for rent and support services for offices in Los Angeles. (*Id.* at ¶¶ 143-145.)

Star filed for bankruptcy protection on March 13, 2001. (*Id.* at ¶ 21.)

III. Standard of Review

The standard for reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts,* Inc., 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

Page 6

inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

This case is unusual in that it alleges corporate misfeasance and malfeasance of a type most frequently challenged in derivative suits, [FN4] but, because of the bankruptcy context in which it arises, the case is brought by the Plaintiff directly, without the Plaintiff having first had to make a demand on the Company's Board of Directors for some corrective action. [FN5] In a context like this, the Delaware Court of Chancery has said, "[b]ecause the filing of this action was approved by the Bankruptcy Court, there is no motion to dismiss for failure to comply with Court of Chancery Rule 23.1 's demand requirement. Thus, the Plaintiff's allegations are not subject to the more exacting standard imposed by Court of Chancery Rule 23.1 for derivative actions." *Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins,* C.A. No. 20228-NC, 2004 WL 1949290, at *2 n.2 (Del. Ch. August 24, 2004). [FN6]

> FN4. A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. *See Black's Law Dictionary* at 475 (8th ed.2004). Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. *Cf. Steinman v. Levine,* 2002 WL 31761252, at * 12 & n.50 (Del.Ch.2002) (noting that events affecting all stockholders in the same way, such as corporate waste and mismanagement, "fall squarely within the definition of a derivative action.").

> FN5. The Star Creditors' Liquidating Trust is the successor in interest to Star and has assigned its claims and rights of action to the Plaintiff. (D.I. 4 at ¶ 6.) Thus, the Plaintiff has been enabled to bring this action directly and not derivatively. In derivative suits, the shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. *See* Del. Ch. Ct. Rule 23.1; *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1983) (by promoting demand on the board, "rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations"). The demand requirement is not a procedural matter, it is, rather, a matter of substantive state law. *See Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 96-97 (1991) ("the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of substance, not procedure" (internal citations omitted)); *Blasband v. Rales,* 971 F.2d 1034, 1048 (3d Cir.1992) ("[I]t is clear that the demand requirement is not a mere formality, but rather is an important aspect of Delaware's substantive law."); *In re General Motors Class E Stock Buyout Sec. Litigation,* 790 F.Supp. 77, 80 (D.Del.1992) ("the federal pleading requirements ... which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged").

> FN6. While accepting this direct statement as the clearest direction from the Delaware courts about the applicability of Rule 23.1 in this context, I am nevertheless left to wonder whether the heightened pleading standard ought not apply with full force in a circumstance like this. From a policy standpoint, it seems that the particularized pleading requirement of Rule 23.1 serves a purpose beyond preserving managerial responsibility to directors and officers and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
2004 WL 2980736 (D.Del.)  
(Cite as: 2004 WL 2980736 (D.Del.))

Page 7

beyond encouraging dispute resolution before litigation. It can be argued that one very important purpose of the particularized pleading requirement is to give added force to the business judgment rule at the pleading stage, so that, regardless of the anomalous circumstance of derivative-type claims being raised here without the necessity of a demand on the Board, the heightened standard of particularity should still apply. There are some references in case law that may support a heightened pleading standard even in the 12(b)(6) context. *See Leung v. Schuler,* No. C.A. 17089, 2000 WL 1478538 at *19 (Del. Ch. Oct 02, 2000) (under "Rule 12(b)(6) *or* Rule 23.1, the complaint must plead specific facts from which it can be inferred that the decision by the board is so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other grounds" (emphasis added; internal citation omitted)); *cf. Telxon Corp. v. Bogomolny,* 792 A.2d 964, 974 (Del. Ch.2001) (stating that the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under Rule 23.1 is "is somewhat lower" under Rule 12(b)(6)). The Chancery Court's recent decision in *Production Resources Group, L.L.C. v. NCT Group, Inc.,* C.A. No. 114-N, 2004 WL 2647593 (Nov. 17, 2004) also suggests that the bringing of a derivative claim in the context of a bankruptcy should not lower the pleading bar. *Cf., id.* at *15 ("It would be puzzling if, in insolvency, the equitable law of corporations *expands* the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions.").

*7 Nevertheless, the parties apparently agree, as they ought, that analysis of the present Motion must be informed by precedents arising from derivative actions where the plaintiff alleges that demand should be excused as futile. (*See* D.I. 88 at 24-25 (plaintiff's counsel stating his view of the applicable standard and saying, "is that a different standard than the demand excused cases? Probably not.").) The "demand excused" cases are essential precedent in reviewing the sufficiency of the Complaint because those cases embody and articulate the business judgment rule's impact on claims such as the Plaintiff seeks to assert. *See Levine v. Smith,* 591 A.2d 194, 205 (Del.1991) ("[T]he demand requirements of [Chancery Court] Rule 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim."), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del.2000); *cf. Gagliardi v. TriFoods Intern., Inc.,* 683 A.2d 1049, 1051 (Del. Ch., 1996) (analysis of claims of mismanagement and waste begins with business judgment rule).

The Third Circuit has observed that the "business judgment rule eludes precise categorization, as it assumes different shapes in different settings." *Weiss v. Temporary Inv. Fund,* 692 F.2d 928, 941 (3d Cir.1982) (internal citation omitted). Although it may be articulated in a variety of ways, it's import is straightforward: "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi,* 683 A.2d at 1051. It's public policy underpinnings, too, are well known. It "serves two important functions." *Weiss,* 692 F.2d at 941. First, it prevents the courts from "injecting themselves into a management role for which they were neither trained nor competent." *Id.* (quoting Duesenberg, *The Business Judgment Rule and Shareholder Derivative Suits: A View from Inside,* 60 Wash.U.L.Q. 311, 314 (1982)("Duesenberg")). Second, it "encourage[s] others to assume entrepreneurial and risk-taking activities by protecting them against personal liability when they have performed in good faith and with due care, however unfortunate the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980736 (D.Del.)
**(Cite as: 2004 WL 2980736 (D.Del.))**

Page 8

consequence." *Id.* (Again quoting Duesenberg). In the words of former Chancellor William T. Allen of Delaware's Court of Chancery, the business judgment rule is "the first protection against a threat of sub-optimal risk acceptance...." *Gagliardi,* 683 A.2d at 1052. Expanding on that theme, he observed:
> Shareholders don't want (or shouldn't rationally want) directors to be risk averse. Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital.
> *8 But directors will tend to deviate from this rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.

*Id.* (emphasis added).

Thus, even if Plaintiff is not required to plead "particularized facts" to raise "a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment[,]" *Levine,* 591 A.2d at 205, it must still plead facts from which such an inference can be drawn. *See In re Tri-Star Pictures, Inc., Litigation,* 634 A.2d 319, 326 (Del.1993) (under Chancery Court Rule 12(b)(6), "review is ... limited to the well-pled facts contained in the Complaint which, viewing all inferences in a light most favorable to the plaintiff, we must take as true. Conclusions, however, will not be accepted as true *without specific allegations of fact to support them."* (emphasis added; internal citation omitted)). (D.I. 88 at 24 (plaintiff's counsel stating, "I think ... the standard for the Court here really can be stated as we need to allege facts to raise at least a reasonable doubt as to the directors breach of fiduciary duty.").)

IV. Discussion

The Plaintiff has alleged a series of claims, including breach of fiduciary duty, gross negligence, and corporate waste, against the directors and officers of Star.

In Counts I, II, and III of the Complaint, the Plaintiff alleges that Casey, Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, Tawfik, Enos, Kolsrud, and Crumly [FN7] breached their fiduciary duties, were grossly negligent, and wasted corporate assets. (D.I. 4 at ¶ 147-59.) In Counts IV, V, and VI of the Complaint, the Plaintiff makes the same allegations against Vogel, Casey, Hutchins, Snedegar, [FN8] Messing, and Sciarillo. (*Id.* at ¶ 160-72.) In Count VII of the Complaint, the Plaintiff alleges that Messing unjustly enriched himself at the expense of Star. (*Id.* at ¶ 173-76.) Each claim will be analyzed according to the roles and actions of the various defendants.

> FN7. Ms. Casey and Messrs. Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, and Tawfik are referred to herein at times as the "Edgecomb Directors". Messrs. Enos, Kolsrud, and Crumly are referred to as the "Edgecomb Non-Director Officers". The Edgecomb Directors and the Edgecomb Non-Director Officers are referred to collectively as the "Edgecomb Directors and Officers."

> FN8. Messrs. Vogel, Hutchins, and Snedegar, and Ms. Casey are referred to collectively as the "Messing Outside Directors." Messrs. Hutchins and Snedegar and Casey are members of both the "Edgecomb Directors" class of defendants and the "Messing Outside Directors" class.

A. *Count I*

The Plaintiff alleges in Count I of the Complaint that the Edgecomb Directors and Officers breached their fiduciary duties to Star by participating in decisions, or failing to prevent decisions, that resulted in the acquisition of PT-1, the expansion of Star's business and facilities in a manner that left it unable to pay its debts and continue as a going concern, the onerous short-term financial obligations that burdened the Company, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.