Slip Copy                                                                                    Page 9

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

agreement to merge with World Access, the neglect of the day-to-day operations of Star while management attempted to close the World Access merger, and the disregard of the need for an independent audit committee. (*See id.* at ¶ 149.)

The Defendants argue that any claim alleging breach of fiduciary duty must be dismissed because all the named defendants are protected by the business judgment rule or an exculpation clause in the Company's charter. (*See* D.I. 64 at 2.)

1. Duty of Loyalty [FN9]

> FN9. Although the Plaintiff also invokes the duty of good faith as separate from the duty of loyalty, Delaware case law states that the two duties are identical. *See, e.g., Nagy v. Bistricer,* 770 A.2d 43, 49 n.2 (Del. Ch.2000) (holding that "[i]f it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes"). Therefore, throughout this opinion, reference to the duty of loyalty also refers to the duty of good faith.

*9 "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor,* 634 A.2d 345, 361 (Del.1993) (internal citation omitted).

i. *Edgecomb Directors*

To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must "plead facts demonstrating that a *majority* of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002) (internal citation omitted) (emphasis added). To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders. *Orman,* 794 A.2d at 23; *see also Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993) ( "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders").

In the instant case, the Plaintiff alleges that Edgecomb was interested in the PT-1 acquisition and the World Access merger, that Tawfik was interested in the World Access Merger, and that a majority of the remaining directors, while not interested in these transactions, were beholden to Edgecomb and consequently lacked the requisite independence. [FN10] (*See* D.I. 73 at 14.) Because the Plaintiff must show that a majority of the directors that voted on the transactions were not disinterested and because the board had six members when the PT-1 and Word Access transactions were considered, it is necessary for the Plaintiff to allege facts showing that a minimum of four directors were not disinterested. [FN11] *See Orman,* 794 A.2d at 23.

> FN10. The Plaintiff does not allege that Edgecomb was interested with respect to any of the other claims levied against him. (D.I. 73 .)

> FN11. Although the Plaintiff is required to show that a majority of the directors that voted on the transaction in question violated their duty of loyalty, *Chaffin v. GNI Group, Inc.,* No. Civ.A. 16211-NC, 1999 WL 721569 at *5 (Del. Ch. Sept. 3, 1999), the Plaintiff does not allege that any of the directors failed to vote on any of the transactions in question. (*See* D.I. 4.)

The Plaintiff contends that Edgecomb was interested in the PT-1 transaction as a result of his large stock position in the Company, combined with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 10

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

his motivation to increase the price of Star's stock. (D.I. 73 at 23-24.) In the Plaintiff's words, Edgecomb's "desire to increase the share price overrode his obligation to consider other effects of the [PT-1] acquisition." (*Id.*) In essence, the Plaintiff's argument rests on the unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote. No precedent cited by the Plaintiff stands for the proposition that stock ownership, coinciding with a Board decision that may affect the price of those shares, is adequate to show a breach of the duty of loyalty. [FN12] Therefore, I conclude that the allegations regarding Edgecomb's stock ownership are insufficient to show he was interested in the PT-1 transaction.

> FN12. The Plaintiff cites *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 208 B.R. 288 (Bankr.D.Mass.1997), but that case concludes that, under Delaware law, a director who approves a leveraged buy-out ("LBO") is engaging in a transaction with his own company. *Id.* at 302. The court held that the sale of stock to a third party, who financed the purchase through the use of debt assumed by the company, was in essence a transaction between the directors and the company. *Id.* Consequently, the court held directors who owned a small percentage of company stock could still be considered interested if they were approving an LBO. *Id.* 303. *Brandt* does not support the broader proposition that a director who owns company stock is, by that fact alone, interested in a Board decision that affects the price of that stock.

As to the World Access Merger, the Plaintiff argues that Edgecomb and Tawfik were interested because it gave them an opportunity to sell their shares before the company sought bankruptcy protection. (*Id.* at 32-33.) The Plaintiff contends that the fact that "Edgecomb [and Tawfik] sold the bulk of ... [their] shares at prices below the publicly announced merger price, corroborate[s] the reasonable inference that ... [they] knew but failed to disclose the merger was not likely to close." (*Id.*

at 33-34.) The Plaintiff appears to assert that Edgecomb and Tawfik approved the merger knowing that it could not be closed, withheld this information from shareholders, and then illicitly traded on this information. However, neither the allegations in the Complaint [FN13] nor the pertinent precedent warrants such a leap. Under Delaware law, simply selling company stock does not make a director interested. *See Guttman v. Jen-Hsun Huang,* 823 A.2d 492, 502 (Del. Ch.2003) ("it is unwise to formulate a common law rule that makes a director 'interested' whenever [it is] allege[d] that he made sales of company stock in the market at a time when he possessed material, non-public information"). The argument that one must assume insider trading and breach of fiduciary duty because directors sold stock below the announced merger price simply cannot withstand scrutiny. The merger price was a matter of public record. The stock sales too were based on public information. They were not priced in some back alley; they were traded in the open, regulated securities market. Edgecomb and Tawfik enjoyed no benefit that was not also available to any other shareholder wishing to sell shares at the price the market set, which happened to be below the announced merger price.

> FN13. The Factual Allegation's section of the Complaint states that officers and Board members sold Star Shares "because they were in a unique position to know the fragile state of the company." (D.I. 4 at ¶ 86.) The First Claim for Relief does not list this as one of the "acts and omissions" that breached the Defendant's duties to the Company. (*Id* at ¶ 149.) In addition, the Plaintiff's Opposition to the Motion also does not address such a claim. (D.I.74.)

**\*10** The Plaintiff argues that Edgecomb and Tawfik had a personal interest in the transaction because they had motivations beyond the good of the company when approving the transaction. (D.I. 4 at ¶¶ 32-34.) As previously stated, the general rule is that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director...." *Cede,* 634 A.2d at 361

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2004 WL 2980736 (D.Del.)

(Cite as: 2004 WL 2980736 (D.Del.))

Page 11

(internal citation omitted). Delaware cases repeatedly state, however, that a plaintiff must prove breach of loyalty through a showing of interest in a transaction or lack of independence. *See, e.g., Orman,* 794 A.2d at 23. The Plaintiff has not alleged that Edgecomb and Tawfik received a benefit from approving the World Access merger that was not shared by the stockholders generally. In short, the Plaintiff has failed to plead any facts that would, even inferentially, support its claim that Edgecomb and Tawfik were interested in the World Access merger and therefore breached their duty of loyalty.

Turning to Hutchins, Snedegar, and Chesonis, the Plaintiff alleges that those directors were beholden to Edgecomb during all of the events that are the subject of Count I, and, therefore, that they lacked independence. (D.I. 4 at 9, 13, 16, 147-48.) It is obvious, though, that showing a director lacks independence because of a subservient relationship to an interested person depends in the first instance on showing that the supposedly dominating person actually is interested in the transaction in question. *In re Oracle Corp. Derivative Litig.,* 824 A.2d 917, 938 (Del. Ch.2003). Because the Plaintiff has failed to plead facts from which it could be inferred that Edgecomb was interested in the transactions in question, it follows that the Plaintiff has failed to plead facts from which it could be inferred that those remaining directors were beholden to an interested director. Consequently, the Plaintiff has failed to adequately plead that a majority of the Board was interested in the PT-1 and World Access transactions. By extension, the Plaintiff has not adequately pleaded a breach of the duty of loyalty by the Board. *See Orman,* 794 A.2d at 23.

*ii. Edgecomb Non-Director Officers*

Defendants Enos, Kolsrud, and Crumly, were officers of the Company but not directors. As non-directors, they did not participate in any Board votes. Further, two of those defendants, Enos and Kolsrud, are scarcely mentioned in the Complaint. (D.I. 4 at ¶¶ 14, 48, 81.) Enos was the CFO of Star, and Kolsrud was the Executive Vice President of Operations and Engineering. (*Id.*) No facts are

pleaded about them, other than their job titles, their dates of service, and the fact that Enos did not attend any board meetings. (*Id.*) Like Edgecomb and Tawfik, Crumly is alleged to have sold shares in Star at a time when he was in a unique position to know that the merger was unlikely to close. (*Id.* at ¶ 86.) The Plaintiff does not address in its Opposition to the Defendants' Motion to Dismiss how Crumly breached his duty of loyalty by selling stock. *See supra* at 19-21. Simply put, no basis in fact or law is given to support a grant of relief against Enos, Kolsrud, or Crumly. *See Elkins,* 2004 WL 1949290 at *13 (stating conclusory allegations are insufficient to defeat a motion to dismiss under Rule 12(b)(6)).

2. Duty of Care

**\*11** If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, if applicable, to shield him from liability for a breach of the duty of care. *Emerald Partners v. Berlin,* 787 A.2d 85, 90 (Del.2001).

Under Delaware law, the business judgment rule operates as a presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988). In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability. Section 102(b)(7) of the Delaware General Corporation Law allows corporations to adopt a provision in their charters to exculpate directors from breaches of the duty of care. The section states:
  the certificate of incorporation may also contain ... [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director ... provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 12

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

good faith or which involve intentional misconduct or a knowing violation of law; ... or (iv) for any transaction from which the director derived an improper personal benefit. 8 Del. C. § 102(b)(7). When "the standard of review *ab initio* is the business judgment rule, properly raising the existence of a valid exculpatory ... provision in the corporate charter entitles director [defendants] to dismissal of any claims for [monetary] damages against them that are based solely on alleged breaches of the board's duty of care." *Emerald Partners,* 787 A.2d at 93 (internal citations omitted).

Plaintiff argues that Star's corporate charter, which contains an exculpatory provision, was a contract between the corporation and the shareholders and that it therefore does not prevent them, as creditors, from recovering from the defendants for breaches of the duty of care. (D.I. 73 at 46-47.) To support its argument, the Plaintiff relies on cases from various jurisdictions outside of Delaware. *See Pereira v. Cogan (In re Trace Int'l Holdings, Inc.),* No. 00 Civ. 619, 2001 WL 243537 at *11 (S.D.N.Y. March 8, 2001); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.),* No. 97 C7934, No. 97C6043, 2000 WL 28266 at *7-8 (D.Ill. Jan. 12, 2000). Recently, however, the Delaware Chancery Court has ruled directly on this point and held that exculpation clauses do indeed apply to prevent creditors as well as shareholders from bringing duty of care claims. *Production Resources Group, L.L.C. v. NCT Group, Inc.,* C.A. No. 114-N, 2004 WL 2647593 at *13-14 (Del. Ch. Nov. 17, 2004).

*12 In that opinion, the court noted that a breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency was derivative in nature. *Id.* In explaining why the creditor's claim was derivative, the court stated that

the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put

simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation. *Id.* at 14.

Relying on the fact that any claim held by a creditor is derivative in nature, the court went on to hold that § 102(b)(7) applies to all claims asserted by the company on behalf of the creditors. *Id.* at *14 ("Although § 102(b)(7) itself does not mention creditors specifically, its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors"). Consequently, § 102(b)(7) applies to all actions for which the Plaintiff alleges duty of care violations.

In the Plaintiff's Complaint, it lists several alleged breaches of the Edgecomb Directors and Officers' duty of care. (D.I. 4 at ¶ 149.) In its brief, Plaintiff argues that the Edgecomb Directors and Officers breached their duty of care with respect to the PT-1 purchase, the Company's efforts to obtain capital, the World Access merger, and the abdication of management duties while trying to close the World Access merger. (D.I. 73 at 26-32, 35-40.) Although not addressed in their brief, the lack of an independent audit committee, which is alleged in the Complaint (D.I. 4 at ¶ 149), also appears to be a claim for breach of the duty of care. This claim, like the others argued in the Plaintiff's brief, fails as a matter of law because the exculpation clause protects the Edgecomb Directors and Officers against any claim for a breach of the duty of care. *See Emerald Partners,* 787 A.2d at 93. The Plaintiff itself implicitly admits this in its brief, when it does not refute the notion that a proper exculpation clause bars all claims of the breach of the duty of care. (D.I. 73 at 46-47.) Consequently, all claims of a breach of the duty of care against the Edgecomb Directors and Officers must be dismissed.

*B. Count II*

The Plaintiff alleges in Count II of the Complaint that the Edgecomb Directors and Officers committed gross negligence with respect to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 13

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

same actions as alleged in Count I. (D.I. 4 at ¶¶ 152-55.) However, a "claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care." *Albert v. Alex. Brown Mgmt. Servs.,* No. C.A. 04C-05-250, 2004 WL 2050527 at *6 (Del.Super.Ct. Sept. 15, 2004); *see also McMullin v. Beran,* 765 A.2d 910, 921 (Del.2000) (stating that "[d]irector liability for breaching the duty of care is predicated upon concepts of gross negligence" (internal citations omitted)).

\*13 Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence. *See Malpiede v. Townson,* 780 A.2d 1075, 1094-1095 (Del.2001) (stating that "even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the Section 102(b)(7) charter provision that bars such claims"). Therefore, the exculpatory clause protections described in Section VI(A)(2), *supra,* also shield the Edgecomb Directors and Officers from a charge of gross negligence. *See supra* at 22-25; *Malpiede,* 780 A.2d at 1094-1095.

*C. Count III*

The Plaintiff alleges in Count III of the Complaint that the Edgecomb Directors and Officers committed corporate waste with respect to the same actions as alleged in Counts I and II. (D.I. 4 at ¶¶ 156-59.) In a case similar to the one at bar, the Chancery Court dismissed a claim of waste. *Elkins,* 2004 WL 1949290, at *63-64. In that case, the Official Committee of Unsecured Creditors brought suit against a group of directors on behalf of the company they used to serve. With respect to their claim of waste, the court noted that the Delaware standard for pleading corporate waste is stringent: "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Id.* at 17. Further,
[w]aste is a standard rarely satisfied in Delaware courts. Indeed, waste is an extreme test, very rarely satisfied by a plaintiff. In *Brehm v. Eisner,*

the Supreme Court described the plaintiffs' allegations as that the board not only committed a procedural due care violation in approving an employment agreement, but also that the Board committed a substantive due care violation constituting waste. The Court went on to dismiss the characterization of waste in this manner, equating due care with process. In evaluating a waste claim, courts look to the exchange itself. The exchange must be irrational.
*Id.* That standard applies equally to claims against officers and directors. *See In re Walt Disney Co.,* No. C.A. 15452, 1322004 WL 2050138, at *3 (Del. Ch. Sept. 10, 2004) ("the fiduciary duties of officers have been assumed to be identical to those of directors"). Absent a breach loyalty, § 102(b)(7) protects directors and officers from a claim of corporate waste. *Green v. Phillips,* C.A. No. 14436, 76 1996 WL 342093 at *7 (Del. Ch. June 19, 1996).

In the instant case, I have already found that the Plaintiff has not pleaded facts sufficient to show a breach of the duty of loyalty by any of the Edgecomb Directors and Officers. *See supra* at 17-22. Therefore, the exculpation clause protects the Edgecomb Directors and Officers from a claim of corporate waste.

Moreover, even without the protection of the exculpation clause, the Plaintiff has not alleged facts that Star did not receive adequate consideration for the transactions entered into and approved by the Edgecomb Directors. (*Id.* at ¶ 158.) In fact, the Plaintiff merely relists the same actions cited as support for Counts I and II of the Complaint. The corporate waste claim is conclusory and insufficient to overcome the protections of the business judgment rule. *See Brehm v. Eisner,* 746 A.2d 244, 263 (Del.2000) (noting that if "there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky").

*D. Count IV & V*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 14

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

*14 The Plaintiff alleges in Count IV of the Complaint that Messing and the Messing Outside Directors breached their fiduciary duties to Star and its creditors, and specifically their duty of care. (D.I. 4 at ¶ 160-64.) In Count V of the Complaint, the Plaintiff alleges gross negligence as to the same actions listed in Count IV. As previously discussed, gross negligence allegations are analyzed under the same frame work as are allegations of a breach of the duty of care. *See supra* at 25-26. Therefore, any finding that the Plaintiff failed to adequately plead a breach of the fiduciary duty of care, includes a conclusion that the Plaintiff has failed to adequately plead gross negligence.

i. *The Messing Outside Directors*

The Plaintiff alleges in its Complaint that the Messing Outside Directors breached their fiduciary duty with respect to the Gotel transaction, the IDT transaction, and the payment of $25,000 in expenses to Messing. (D.I. 4 at ¶ 162.) In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff states that the Board only met once during the two-month period that Messing was in charge. (D.I. 73 at 43.)

The Complaint states, however, that upon request by Messing to approve the Gotel financing, the Board promptly held a special meeting. (D.I. 4 at ¶ ¶ 104- 05.) The Complaint goes on to say that "certain directors were concerned that control of the Company would change hands if the Company were to issue the warrants [as required by the financing]." (*Id.* at ¶ 105.) "Nevertheless, the directors ultimately yielded to Messing's insistence that they had no choice but to take whatever financing was available, and they authorized him to negotiate the Gotel transaction on behalf of Star." (*Id.* at ¶ 107.) With respect to the sale of PT-1 to IDT, the Complaint does not mention the Messing Outside Directors, aside from stating that "[w]ithout any knowledge or approval from Star's Board, Messing signed the March 5 Letter on behalf of Star...." (*Id.* at ¶ 136.)

In short, there are no allegations supporting, even inferentially, a claim for breach of the fiduciary

duty of loyalty. As to any duty of care or gross negligence claims, again the Plaintiff's Complaint must yield to the exculpation clause contained in Star's charter. *See supra* at 22-25. Therefore, as to Count IV and V, the Plaintiff has failed to state a claim against the Messing Outside Directors. [FN14]

FN14. Even without the exculpation clause, this claim could not stand. There is no denying that Star faced dire financial circumstances. In light of Star's desperate need for capital, the most damning conclusion that can be drawn from the facts pleaded in the Complaint is that the directors, when confronted with the difficult decision of whether to accept the Gotel financing, may have made a poor decision. But that does not amount to an abdication of responsibility by the Board.

The Plaintiff relies on *Mills Acquisition Co. v. MacMillan, Inc.,* 559 A.2d 1261 (Del.1989), to argue that the Board breached its duty of care (D.I. 73 at 43), but the facts of that case are easily distinguished from the one at bar. In *Mills,* the Court of Chancery held that the defendant directors were not protected by the business judgment rule when the directors approved a "lock-up" that restricted further bidding on the company that was to be sold. *Mills Acquisition Co.,* 559 A.2d at 1286. The court held that "[w]hile those lock-ups which draw bidders into a battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholders' detriment." *Id.* (internal citation omitted). In that case, the claim was that the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out. *Id.* at 1279-80, 1286. Here, however, there were no other bidders for Star, the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

Page 15

financing option presented to the Board. (D.I. 4 at ¶ 104-07.)

**ii. *Sciarillo***

The Complaint only mentions Sciarillo directly two times. First, it states that when Messing took control of Star, Sciarillo was made CFO, and, second, it contends that Sciarillo assisted Messing with the sale of PT-1 to IDT. (D.I. 4 at ¶¶ 103, 122.) With respect to the other actions in which Messing participated, the Complaint frequently uses the term "his team," which presumably includes Sciarillo. (*Id.* at ¶¶ 119-140.) The Plaintiff does not allege that Sciarillo received an improper benefit from any of the transactions in which the Plaintiff alleges he participated, or that he was interested in the transactions in any other way. In fact, the only mention of Sciarillo in the Plaintiff's Opposition to the Defendants' Motion to Dismiss is that "Defendants Crumly and Sciarillo also participated in the IDT transaction as officers, though further discovery is required to establish the extent of their involvement." [FN15] (D.I. 73 at 23, n.10.) Consequently, the Plaintiff has failed to plead any facts to support a claim that Sciarillo breached his fiduciary duty of loyalty. Nor does it adequately plead a duty of care or gross negligence claim, and, if it did, the § 102(b)(7) charter provision would prevent such claims.

> FN15. Although Crumly is referenced with respect to Count IV and V, the Complaint does not even name him as a defendant in these claims. (D.I. 4 at ¶¶ 160-68.) If it did, however, the conclusion as to Mr. Crumly would be the same as it is for Mr. Sciarillo.

**iii. *Messing***

**\*15** The Plaintiff alleges that Messing violated his fiduciary duties to Star and its creditors and committed gross negligence with respect to the same actions as alleged against the Messing Outside Directors. (D.I. 4 at ¶ 162.) The Plaintiff alleges that Messing controlled Gotel, directly benefitted from the financing agreement entered into between

Star and Gotel, and entered into an agreement with IDT to sell it PT-1 in order to secure future benefits from IDT. (*Id.* at ¶¶ 117, 140.) Additionally, the Complaint alleges that Messing submitted a bill for $25,000, $10,616 of which was payed to another company that he allegedly controlled. (*Id.* at ¶ 145.) The Plaintiff contends that this was far in excess of the value that was received by Star. (*Id.*)

If the facts pleaded by the Plaintiff are taken as true, then Messing received a direct financial benefit from all of these transactions. Because Messing is alleged to have received a benefit from these transactions, which was not received by the shareholders generally, the Plaintiff has pleaded sufficient facts to support the allegation that Messing was interested in these transactions. *See Rales,* 634 A.2d at 936 (holding that "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders"). Therefore, as to Messing and Counts IV and V, the Plaintiff has pleaded claims of breach of the fiduciary duty of loyalty sufficient to withstand the Motion to Dismiss. [FN16]

> FN16. Because the Plaintiff has adequately pleaded a breach of the duty of loyalty, at this stage of the proceeding, Messing cannot claim the protection of § 102(b)(7) from claims of gross negligence. *See Levy v. Stern,* 687 A.2d 573 (Del.1996) (holding that § 102(b)(7) "is inapplicable ... where the alleged breach entails bad faith, intentional misconduct, or a breach of the duty of loyalty").

**E. *Count VI***

The Plaintiff alleges in Count VI of the Complaint that Messing, Sciarillo, and the Messing Outside Directors wasted corporate assets. (D.I. 4 at ¶ 160-64.) As discussed in relation to Count III, a finding of corporate waste requires that the transaction in question be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.,* 731 A.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 16

2004 WL 2980736 (D.Del.)

**(Cite as: 2004 WL 2980736 (D.Del.))**

342, 362 (Del. Ch.1998) (internal citation omitted); *see supra* at 26-27. In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff only addresses Messing and his involvement in the March 5 Letter agreement and the $25,000 disbursement. The Plaintiff alleges that Star received no compensation for the March 5 Letter agreement, which would lead any reasonable business person to find that there had been corporate waste.

The Plaintiff also alleges that Messing requested and received a $25,000 disbursement. (D.I. 4 at ¶ 141.) $10,616 of that disbursement is alleged to have been paid to a company Messing controlled. (*Id.* at ¶ 145.) That fact, coupled with the timing of the submission, shortly before Messing resigned (*Id.* at ¶¶ 141-45.), sufficiently supports the Plaintiff's allegation of corporate waste to withstand the Motion to Dismiss. Therefore, with respect to Messing, the claim of corporate waste is allowed. As to all other defendants, the same pleading failures that resulted in the dismissal of Counts IV and V necessitate dismissal of this claim against them. *See supra* at 28-30.

*F. Count VII*

**\*16** The Plaintiff alleges in Count VII of the Complaint that Messing unjustly enriched himself at the expense of Star. (D.I. 4 at ¶ 173-76.) Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum,* 539 A.2d 1060, 1062 (Del.1988) (internal citation omitted). For the reasons discussed in section IV(D), *supra,* the Plaintiff has sufficiently pleaded its claim that Messing was unjustly enriched, and, consequently, Count VII will not be dismissed. *See supra* at 30-31.

*V. Conclusion*

For the reasons set forth herein, the Defendants' Motion to Dismiss will be granted as to all the Defendants except Messing. An appropriate order

will issue.

*ORDER*

For the reasons stated in the Memorandum Opinion issued today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I. 63; the "Motion") is DENIED as to Counts IV, V, VI, and VII of the First Amended Complaint (D.I.4) insofar as those Counts allege claims against defendant Brett S. Messing; and,

IT IS FURTHER ORDERED that the Motion is GRANTED in all other respects.

2004 WL 2980736 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00278  (Docket)

(Mar. 12, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                              Page 1

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

ᴴ

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Charles STANZIALE, Plaintiff,
v.
Morris NACHTOMI, et al., Defendants.
**No. Civ.A.01-403 KAJ.**

April 20, 2004.
John L. Reed, Duane Morris LLP, Wilmington, Delaware, for Plaintiff.

Bruce E. Jameson, Prickett Jones & Elliott, Wilmington, Delaware, for Defendants.

James E. Tolan, Rodney M. Zerbe, Dechert Price & Rhoads, New York, New York, P. Gregory Schwed, Loeb & Loeb LLP, New York, New York, Robert M. Kaplan, Robson Ferber Frost Chan & Eisner, New York, New York, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. Introduction

**\*1** Presently before the court is a motion (Docket Item ["D.I."] 22; the "Motion") filed by defendants Morris K. Nachtomi ("Nachtomi"), Stephen L. Gelband ("Gelband"), Stephen A. Osborn ("Osborn"), Henry P. Baer ("Baer"), Leo-Arthur Kelmenso ("Kelmenso"), Eli J. Segal ("Segal"), and Terry v. Hallcom ("Hallcom") (collectively the "Defendants"), seeking to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

The Complaint filed by Charles A. Stanziale, Jr. (the "Plaintiff"), in his capacity as Chapter 7 Trustee of Tower Air, Inc. (the "Debtor"), alleges that the Defendants, as directors and officers of the Debtor, breached their fiduciary duties of loyalty, care, and good faith, and that their acts or omissions to act constituted gross negligence, mismanagement and corporate waste. (D.I.19.) The Plaintiff seeks compensatory damages, consequential damages, punitive damages, interest, and costs. (*Id.*)

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. For the reasons set forth herein, the Motion will be granted.

II. Background [FN1]

> FN1. The following rendition of the background information for my decision is cast in the light most favorable to the non-moving party, the Plaintiff.

Nachtomi founded the Debtor in 1982. (D.I.¶ 18.) The Debtor began operations primarily as a charter airline offering chartered international flights for private, government, and military customers. (*Id.* at ¶ 19.) Eventually, the Debtor offered scheduled passenger service, and by 1998, scheduled passenger service accounted for approximately two-thirds of the Debtor's total revenue. (*Id.* at ¶ 20.) By 1999, the Debtor maintained and operated a fleet of jet airliners consisting of 14 passenger aircraft and three cargo aircraft, and had more than 1,700 employees worldwide. (*Id.* at ¶¶ 23-24.)

On February 29, 2000, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.,* in the Bankruptcy Court for the District of Delaware. (*Id.* at ¶ 7.) Plaintiff was appointed as the Chapter 11 Trustee for the Debtor's bankruptcy estate on or about May 5, 2000. (*Id.* at ¶ 10.) On December 20, 2000, the case was converted to a proceeding under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.* (*Id.* at ¶ 7), and the Plaintiff was appointed as Chapter 7 Trustee for the Debtor's bankruptcy estate.

Nachtomi has been a director of the Debtor since 1982, the Debtor's President from 1986 until January 1998 and again since July 1998, and Chairman of the Board of Directors and Chief Executive Officer of the Debtor since 1989. (*Id.* at ¶ 11.) [FN2] Nachtomi and members of his family owned a majority of the outstanding common stock and a controlling interest in the Debtor at all times relevant to Plaintiff's Complaint. (*Id.*) Defendants Osborn, Baer, Kelmenson, and Segal were at all times directors of the Debtor. (*Id.* at ¶¶ 13-16.) Osborn was a director from May 1993 until the bankruptcy; Baer was a director from 1997 until the bankruptcy; Kelmenson was a director from 1997 until the bankruptcy; and Segal was a director from 1998 until the bankruptcy. (*Id.*) Gelband was a director of the Debtor from 1985 until bankruptcy, as well as the Debtor's Secretary and General Counsel from 1988 until bankruptcy. (*Id.* at ¶ 12.) Hallcom was the Debtor's President and Executive Vice President for Operations and a director from January through July 1998. (*Id.* at ¶ 17.)

> FN2. There is no indication in the record of when Nachtomi's service as an officer and director may have ended.

**\*2** Plaintiff "brings this action in his capacity as the representative of the Debtor and of its estate and for the benefit of creditors of the Debtor and any other parties in interest." (*Id.* at ¶ 10.) In Count 1, Plaintiff alleges that the Defendants, as directors of the debtor (collectively the "Directors"), breached their "fiduciary duties of loyalty, good faith and due care" by "leasing and/or financing the purchase of new jet engines rather than repairing and properly maintaining the Debtor's older engines." (*Id.* at ¶ 75.) In Count II, Plaintiff alleges that Nachtomi, Gelband, and Hallcom, as officers of the Debtor (collectively "the Officers"), breached their "fiduciary duties of loyalty, good faith and due care" by failing to fully inform the Board of Directors concerning the condition of the engines,

the long-term financial ramifications of the failure to properly maintain the Debtor's older engines, the decision to lease and/or finance the purchase of new jet engines, and the problems with the Debtor's maintenance division, and by failing to maintain the engines and physical assets in good repair and condition. (*Id.* at ¶ 87.)

In Count III, Plaintiff claims that the Directors breached their "fiduciary duties of loyalty, good faith, and due care" by failing to adequately oversee and control the management and by failing to keep themselves informed. (*Id.* at ¶ 97.) In Count IV, Plaintiff contends that the Officers breached their fiduciary duties of "loyalty, good faith, and due care" by, among other things, failing to process used airline tickets for payment, failing to implement and maintain the proper oversight and control of ticket processing and operations, reducing fairs to unprofitable levels, expanding the Debtor's international routes during financial hardships, and ceding all management responsibility to Nachtomi. (*Id.* at ¶ 107.) In Count V, Plaintiff asserts that the Officers' acts and omissions caused "significant losses," and constitute "gross mismanagement of the Debtor's business, gross negligence, and a gross violation of Defendants' duties of due care to the Debtor." (*Id.* at ¶¶ 117-118.) In Counts VI and VII, Plaintiff alleges that the Directors and Officers "wasted corporate assets to the financial loss and detriment of the Debtor's estate." (*Id.* at ¶¶ 125-132.) [FN3]

> FN3. Plaintiff does not state what specific actions by the Defendants constitute corporate waste. Presumably, the Plaintiff is relying on allegations in Counts I-V regarding the purchase and lease of new jet engines and the failure to repair old jet engines, the expansion of the Debtor's international routes, the reduction of fares, and the failure to process some of the airline tickets.

III. Standard of Review

In analyzing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

**IV. Discussion**

**\*3** The Defendants argue that the Plaintiff's claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because "Plaintiff has failed to plead any basis for overcoming the protections" of the business judgment rule. (D.I. 23 at 18.) Under Delaware law, the business judgment rule operates as a presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988). "[A] Plaintiff[ ] may prevent the application of the business judgment rule within well-pleaded facts establishing that the directors acted out of self-interest." *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1132 (D.Del.1988) (citing *Aronson v.. Lewis,* 473 A.2d 805, 812 (Del.1984)). Directors act in self-interest if they appear on "both sides of the transaction, or ... [derive] any personal financial benefit from it which did not devolve upon the corporation and the shareholders generally." *In re General Motors,* 694 F.Supp. at 1132.

In the Amended Complaint, Plaintiff alleges that the Defendants have acted in self-interest and engaged in self-dealing (D.I. 19 at ¶¶ 97, 108), but has not alleged any facts to support this assertion. "Given that self-interest was not sufficiently alleged, in order to overcome the presumption of the business judgment rule, plaintiffs must allege with particularity facts which establish that the contested decision was not a

product of valid business judgment." *In re General Motors,* 694 F.Supp. at 1132. *See also Brehm v. Eisner,* 746 A.2d 244, 255 (Del.2000) (stating that "[t]he issue is whether plaintiffs have alleged particularized facts creating a reasonable doubt that the actions of the defendants were protected by the business judgment rule").

A. Count I

In Count I of the Amended Complaint, Plaintiff has alleged that the business judgment rule is inapplicable because the Directors breached their fiduciary duties of loyalty, good faith, and due care by causing significant losses to the Debtor and to its estate through the decision to lease or purchase new jet engines rather than repair and properly maintain the Debtor's older jet engines. (D .I. 19 at ¶¶ 75, 78-79). "[I]n the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible ... for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch.1996). As previously mentioned, Plaintiff does not sufficiently allege that the directors' decision was the product of self dealing or improper motive. A "theoretical exception" to the above-mention rule "holds that some decisions may be so 'egregious' that liability for losses they cause may follow even in the absence of proof of conflict of interest or improper motivation." *Id.* at 1051-1052. [FN4]

> FN4. The court went on to say that the "exception, however, has resulted in no awards of money judgments against corporate officers or directors in this jurisdiction." *Gagliardi,* 683 A.2d at 1052.

**\*4** Plaintiff alleges that the Directors resolved to borrow millions of dollars for the purchase of new jet engines and authorized the lease of new jet engines, while the Debtor still had debt associated with its older engines, and at the same time that Nachtomi reported that the Debtor was suffering a severe cash flow problem. (D.I. 19 at ¶¶ 61-68.) Plaintiff also asserts that because the older engines

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

were not repaired, a "significant diminution in their value as assets of Debtor" resulted. (*Id.*) According to Plaintiff, these decisions caused the Debtor to incur "substantial additional debt" and led to "significant losses" (*Id.; see also id.* at ¶ 81). While the directors' may, indeed, have exercised poor business judgment in borrowing and authorizing the purchase and lease of new jet engines, the facts that Plaintiff alleges, taken in the light most favorable to the Plaintiff, do not constitute such egregiously bad decisions as to abrogate the business judgment rule. *See Aronson,* 473 A.2d at 812 (stating that an egregious, patently frivolous, or capricious act is one which "no person of ordinary sound business judgment would believe" to be rational and is an "abuse of discretion" not protected by the business judgment rule). A person of sound business judgment could have believed the decision to purchase or lease new engines was rational. Nor does that decision show that the directors did not act in good faith. [FN5] Therefore, Plaintiff's allegations do not fall into any exceptions to the general statement that an officer or director, absent self-dealing or improper motive, is not liable for business decisions made in good faith.

> FN5. *See In re J.P. Stevens & Co. S'holders Litig.,* 542 A.2d 770, 780-81 (Del.1998) ("A court may ... review the substance of a business decision made by an apparently well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith"). Here, the decision to purchase or lease new engines is not "so far beyond the bounds of reasonable judgment" that bad faith is the only explanation.

The Delaware Supreme Court has also stated that "to allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against

that fiduciary no matter how foolish the [the decision] may appear in retrospect." *Gagliardi,* 683 A.2d at 1052. Plaintiff has not alleged that the decision to lease or finance new engines instead of repair old engines was not the result of a lawful transaction, not within the Debtor's powers, and not made in a good faith pursuit of corporate purposes. Therefore, Plaintiff's claims in Count I of the Amended Complaint do not rebut the presumption that the Directors' decisions were the product of valid business judgment.

B. Count II

Plaintiff alleges in Count II of the Amended Complaint that the Officers "breached their fiduciary duties of loyalty, good faith and due care, and acted recklessly" by neglecting to repair and properly maintain the Debtor's older jet engines and by leasing or financing the purchase of new jet engines. (D.I. 19 at ¶ 86.) Furthermore, Plaintiff alleges that the Officers breached their fiduciary duties by failing to inform the Directors concerning the jet engines. (*Id.* at ¶ 87.) Specifically, Plaintiff states that the Director of Safety reported to "management ... at least as early as June 1998" that there were a lack of spare part for repairs, deficient quality assurance on repairs that were performed, deficient record keeping regarding needed repairs and the absence of any type of maintenance program. (D.I. 19 at ¶ 55; D.I. 26 at 27.) Plaintiff asserts that the Director of Safety called for additional staffing for the maintenance department as well as changes to the Debtor's management structure to address these and other deficiencies in the Debtor's maintenance department. (*Id.*) Plaintiff claims that the Officers "took no actions or steps to evaluate and/or remedy or to provide any substantive resolution" to those problems with the maintenance division and did not inform the directors of such problems because minutes of the Debtor's Board of Director meetings held after June 1998 "do not discuss, address and/or give any consideration" to them. (*Id.* at ¶ 56.) Plaintiff alleges that the Officers' breaches of their fiduciary duties "caused significant losses" and that "the business judgment rule provides no protection and/or no defense" to his claims. (*Id.* at ¶¶ 90-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

Page 5

91.)

**\*5** As previously discussed, even if the Officers'
decision to lease or purchase new jet engines rather
than repair older jet engines, or the Officers'
decision to "cannibalize[ ] its own planes and older
engines by taking them out of service and using
them as sources of spare parts for other planes and
engines" (*Id.* at ¶¶ 58-60), caused loss to the
Debtor, a corporate officer is not legally responsible
to the corporation for losses that are the result of a
good faith decision. *Gagliardi v. TriFoods Int'l,
Inc.,* 683 A.2d at 1051. Plaintiff has not alleged any
facts that the Officers' acted in bad faith, nor any
facts that would characterize their actions as
egregious. *See id.* at 1052. Plaintiff has merely
alleged that the Officers acted in bad faith, and
"conclusory allegations are not considered as
expressly pleaded facts or factual inferences,"
sufficient to rebut the presumption of good faith
inherent in the business judgment rule. *Brehm v.
Eisner,* 746 A.2d 244, 255 (Del.2000).

With respect to Plaintiff's claims that the Officers'
failure to "inform and advise" the Directors
concerning the jet engines was a breach of their
fiduciary duties, and is therefore not protected by
the judgment rule (D.I. 19 at ¶¶ 87-88, 91),
Plaintiff does not explain how this alleged failure by
the Officers violates any of their fiduciary duties,
nor does Plaintiff cite any legal authority is support
of that theory. (*See* D.I. 26.) Plaintiff's claims are
merely conclusory, and, once again, Plaintiff's
conclusory allegations do not overcome the
presumption that the Officers' acted in good faith
and in the best interest of the Debtor. *See Brehm,*
746 A.2d at 255.

C. Count III

In Count III of the Amended Complaint, Plaintiff
alleges that the directors breached their fiduciary
duties of loyalty, good faith, and due care by:

allowing the mismanagement of the Debtor to
continue and to persist to the detriment of the
Debtor and its best interests, and ... fail[ing]
adequately to oversee and to control the
management of the Debtor and thereby allow[ing]

the specific instances of mismanagement set forth
in Count II to occur .... [and] fail[ing] to keep
themselves fully and adequately informed
concerning the daily management of the Debtor
and thereby ma[king] or fail[ing] to make
decisions on a fully informed basis.

(*Id.* at ¶ 97.)

Specifically, Plaintiff asserts that the Directors,
other than Nachtomi, "abdicated their
responsibility over the management and business
affairs of the Debtor" because the minutes of the
special meeting in April 1998, at which the
Directors resolved to borrow $50 million and
authorized the purchase of eight new jet engines,
"do not reflect that the Board engaged in any
discussion concerning, or gave any consideration to,
the need for such new engines, the status and/or
state of repair of the older engines already owned or
under lease by the Debtor, and/or the long term
financial impact on the Debtor of the decision to
incur additional debt to purchase such new
engines." (*Id.* at ¶ 61.). Plaintiff also asserts that
the minutes of the October 1998 meeting, at which
the Directors authorized Nachtomi to negotiate the
leasing of four new jet engines, did not "give any
consideration to the need for the four ... new
engines, the status and/or state of repair of the older
engines already owned or under lease by the
Debtor, and/or the long term financial impact on the
Debtor." (*Id.* at ¶ 62.) Plaintiff further claims that
the minutes of each Board meeting subsequent to
June 1998 show that nothing was done by any of the
Directors to address any of the issues identified the
Debtor's Director of Safety, *supra,* which "is at best
evidence of the Boards' failure to erect systems to
gather such information and at worst evidence of
the Board's reckless disregard of such deficiencies
if they were, in fact, aware of any of the conditions
covered by the Director of Safety's June 1990
report." (*Id.* at ¶ 56; D.I. 26 at 27-28.)

**\*6** Plaintiff also claims that the Board,
"complete[ly] abandon[ed] its duties to monitor [the
Debtor's] overall business" because the directors
permitted Nachtomi to operate the Debtor's office in
Tel Aviv [FN6] "independently of the Debtor's
other offices and without any oversite or control."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

(D.I. 26 at 30; D.I. 19 at ¶ 43.) As evidence of this assertion, Plaintiff alleges that the Tel Aviv office maintained its financial records separate from the rest of the company, and opened its own bank account in Israel that only Nachtomi and two other members of management in that office had access to. (D.I. 19 at ¶ 44.) Plaintiff alleges that despite the large revenues of the Tel Aviv operation, the Debtor was eventually forced into liquidation proceedings in Israel. (*Id.* at ¶ 46.)

> FN6. Plaintiff claims that the Debtor's 1998 Annual Report stated that the Tel Aviv service was "the largest United States carrier and second only to El Al, Israel's national flag carrier" in the passenger airline market between the United States and Israel. (D.I. 19 at ¶ 28.)

Plaintiff further claims that the Board abdicated its responsibility for the business affairs of the Debtor by not conducting a feasibility, profitability, or other similar study, and by not seeking the advice of an outside consultant prior to opening the Santo Domingo route, a route that, according to Plaintiff, was never profitable. (*Id.* at ¶¶ 34-35.) Plaintiff also alleges that there "was an absolute lack of any management controls or procedures to ensure that used passenger tickets were processed for payment," the value of which was at least one million dollars. (D.I. 26 at 32; D.I. 19 at ¶¶ 40-41.) Finally, Plaintiff alleges that the directors failed to oversee the Debtor's operations department. (*Id.* at ¶¶ 50-53.)

Plaintiff asserts that the business judgment rule does not apply to those alleged actions or omissions by the Directors because "unconsidered inaction," or the "failure of the Board to consider, or even be aware of conditions or activities within the corporation that cause the corporation harm," is an independent basis for liability. (D.I. 26 at 22-23.) In support of this theory, Plaintiff cites *In re Caremark Int'l, Inc. Deriv. Litig.,* 698 A.2d 959 (Del. Ch.1996). In *Caremark,* the claim was that "the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active

monitors of corporate performance." *Id.* at 967. Like the case at bar, the complaint in *Caremark* did not charge either director self-dealing or loyalty-type problems arising from cases of suspect director motivation. *Id.* The complaint asserted a theory of liability against the defendant directors based on their inaction, which Chancellor William T. Allen said "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* Chancellor Allen went on to explain the theoretical basis for such liability, saying, "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses cause by non-compliance with applicable legal standards." *Id.* at 970.

\*7 *Caremark* is inapposite to the present case because there is no claim, nor evidence, that the directors' alleged failure to assure an adequate reporting system resulted in a violation of the law. However, Plaintiff's theory of "unconsidered inaction" does find some support in *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275 (Del. Ch.2003). In that case, the plaintiffs alleged that the defendant directors breached their fiduciary duties by blindly approving an employment agreement with the company's president and then, again without any review or deliberation, ignored the chief executive officer's dealings with that officer regarding his termination. *Id.* at 277. Similar to Plaintiff in the case at bar, the plaintiffs alleged that the directors "failed to exercise *any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties" to the corporation. *Id.* at 278 (emphasis in the original). "In short, th[at] ... complaint," like this complaint "allege[d] facts implying that the ... directors failed to 'act in good faith and meet minimal proceduralist standards of attention." *Id.* (citing *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1052 (Del. Ch.1996).

In holding that the business judgment rule didn't apply, the court in *In re Walt Disney Co.* stated that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 878469 (D.Del.)

(Cite as: 2004 WL 878469 (D.Del.))

Page 7

"the facts alleged ... suggest that the defendant directors consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning a material corporate decision." *Id* . at 289. "Put differently, all of the alleged facts, if true, imply that the defendant directors knew that they were making material decisions without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* While Plaintiff asserts in the Amended Complaint that the directors "blindly" approved Nachtomi's decision to purchase or lease new jet engines, this case is distinguishable from *In re Walt Disney Co.,* because Plaintiff has not alleged facts that show that the directors "consciously and intentionally" disregarded their responsibilities, nor do they show that the directors didn't care about the effect their decision would have on the Debtor. The Plaintiff has only alleged that minutes of various board meetings do not reflect a discussion about the need for new engines or the repair of the old engines.

With respect to the Tel Aviv office, Plaintiff argues that the directors "ceded all responsibility" to Nachtomi, and that the office eventually was forced into liquidation proceedings (D.I. 26 at 30-31), but once again, the facts that Plaintiff has alleged do not show deliberate indifference on the part of the directors. Moreover, Plaintiff does not allege facts that show the deliberate indifference with respect to the Santo Domingo route, the processing of tickets, the operations department of the Debtor, or the report by the Director of Safety. Accordingly, Plaintiff has not alleged facts with sufficient particularity to overcome the protections of the business judgment rule.

D. Count IV

*8 Plaintiff alleges in Count IV of the Amended Complaint that the Officers breached their fiduciary duties of loyalty, good faith and due care by failing to process used airline tickets for payment, failing to implement and maintain the proper oversight and control of ticket processing and operations, reducing fairs to unprofitable levels, expanding the

Debtor's international routes during financial hardships, failing to implement and maintain the proper oversight and control over the Debtor's Tel Aviv operations, establishing and continuing to service the New York to Santo Domingo routes when there was no evidence that such route could be profitable, ceding all responsibility to manage and control the affairs of the Debtor to Nachtomi, failing to address problems with the debtor's operations department and maintenance division, failing to maintain the Debtor's jet engines in good repair, and failing to inform the Directors of mismanagement and the financial ramifications of such acts or omissions. (*Id.* at ¶ 107.) Plaintiff asserts that the Officers' breaches of their fiduciary duties "caused significant losses to the Debtor and to its estate."

As previously discussed, a corporate officer is not legally responsible for losses that result from a good faith decision if there are not any facts showing self-dealing or improper motive. See *Gagliardi,* 683 A.2d at 1051. In Count IV, Plaintiff has not alleged self-dealing or improper motive, and the allegations Plaintiff has made are not supported by facts showing that the Officers acted in bad faith or that there was an abuse of discretion that would void the protections of the business judgment rule. *See id* at 1052, *Aronson,* 473 A.2d at 812. Finally, to the extent that Plaintiff alleges Officer liability for "unconsidered inaction" in this Count, Plaintiff has not cited any authority that the Delaware courts have applied this theory to corporate officers.

E. Count V

In Count V, Plaintiff claims that the Officers' acts and omissions, as previously stated, "constitute gross mismanagement of the Debtor's business, gross negligence, and a gross violation of Defendants' duties of due care to the Debtor," and that the Debtor and its estate has suffered significant losses as a result. (D.I. 19 at ¶¶ 117-118.) "To state a claim of gross negligence, plaintiffs must allege facts to support the conclusion that the Board acted with so little information that their decision was 'unintelligent and unadvised,' or outside of the 'bounds of reason and reckless[ ]." ' *In re General*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 878469 (D.Del.)

**(Cite as: 2004 WL 878469 (D.Del.))**

*Motors,* 694 F.Supp. at 1133. Gross negligence also applies to the decisions made by corporate officers. *See Kaufman v. Beal,* CIV. A. Nos. 6485, 6526, 1983 WL 20295 at *3 (Del. Ch. Feb. 25, 1983). As discussed, other than to allege that the minutes of various Board meetings in 1998 do not reflect any discussion about the purchase or lease of new jet engines, or the repair of old jet engines, which, by itself, does not support a conclusion that the decisions of any of the Officers or Directors were unintelligent, unadvised, or reckless, Plaintiff does not allege any facts that any of the other decisions, acts, or omissions of the Officers were unintelligent, unadvised, or reckless. Accordingly, Plaintiff's conclusory allegations of gross negligence do not overcome the protections of the business judgment rule. *See Brehm,* 746 A.2d at 255.

F. Counts VI and VII

**\*9** Plaintiff alleges in Counts VI and VII that the Directors and Officers "wasted corporate assets to the financial loss and detriment of the debtor's estate." (D.I. 19 at ¶¶ 125, 132. The Delaware law standard for pleading waste is stringent. "Directors are only liable for waste when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Deriv. Litig.* 731 A.2d at 362. Here, the Debtor has not alleged facts that the Debtor did not receive adequate consideration for the transactions entered into and approved by the Officers and Directors, such as the decision to purchase or lease new engines and not repair the older engines, the decision to reduce fares, the decision to expand the Debtor's international routes, and the failure to process some airline tickets. Therefore, Plaintiff's corporate waste claim is conclusory, and conclusory allegations are not sufficient to overcome the protections of the business judgment rule. *See Brehm,* 746 A.2d at 255 .

V. Conclusion

For the reasons set forth herein, the Defendants' Motion will be granted. An appropriate order will

issue.

*ORDER*

For the reasons stated in the Memorandum Opinion issued today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I.22) is GRANTED.

2004 WL 878469 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2002 WL 32501955 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Mar. 18, 2002)

• 2001 WL 34546528 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Dec. 12, 2001)

• 2001 WL 34131252 (Trial Pleading) Complaint (Jun. 15, 2001)

• 1:01CV00403  (Docket)
(Jun. 15, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d

Page 1

1997 WL 10263 (Del.Ch.), 22 Del. J. Corp. L. 1282

**(Cite as: 1997 WL 10263 (Del.Ch.))**

**H**
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle
County.
SICPA HOLDING S.A., Plaintiff,
v.
OPTICAL COATING LABORATORY, INC.,
Herbert M. Dwight, Jr., John McCullough,
James Seeser, and Flex Products, Inc., Defendants.
OPTICAL COATING LABORATORY, INC.,
Counterclaimant,
v.
SICPA HOLDING S.A., Maurice A. Amon and
Eduardo Beruff, Counterdefendants.
**No. CIV. A. 15129.**

Submitted Oct. 17, 1996.
Decided Jan. 6, 1997.
Michael D. Goldman, and Stephen C. Norman, of
Potter Anderson & Corroon, Wilmington, Edwin B.
Mishkin, of CLEARY, GOTTLIEB, STEEN &
HAMILTON, New York, New York, of counsel,
for Plaintiff and Counterdefendants.

Gregory P. Williams, and Matthew E. Fischer, of
Richards, Layton & Finger, Wilmington, Stephen C.
Neal, William S. Freeman, and Timothy S. Teter, of
Cooley Godward LLP, Palo Alto, California, of
counsel, for Defendants and Counterclaimant.

MEMORANDUM OPINION

ALLEN, Chancellor.

**\*1** The complaint in this action by SICPA Holdings
S.A. ("SICPA"), a 40% shareholder of Flex
Products, Inc. ("Flex"), originally sought an
injunction against a proposed stock sale by Flex,
Inc. Defendants are: (1) Optical Coating
Laboratory, Inc. ("OCLI"), a 60% shareholder of

Flex, (2) three individuals who serve as directors of
Flex, are designated by OCLI and who constitute a
majority of Flex's board of directors, and (3) the
corporation itself.

The central claim asserted was that the Flex board,
acting at the direction of and for the interests of
OCLI, was presently attempting to take corporate
action -- the issuance of some 16,000 shares of
authorized Flex stock (constituting approximately
12% of the corporations authorized common stock)
in an unusual registered private placement. It is
alleged that this transaction was proposed for the
improper purpose of trying to destroy rights arising
from several related 1994 contracts between SICPA
and OCLI in their capacities as Flex's sole
shareholders. The rights in question are certain call
rights that SICPA has on OCLI's stock interest in
Flex. Those rights become exercisable on May 8,
1998 and arguably terminate upon an initial public
offering of Flex stock. It is asserted that the Flex
board began to contemplate the feasibility of an
immediate or prompt stock sale by the company
only after SICPA informed the OCLI that it
intended to exercise its call rights promptly after
May 8, 1998. The allegation was that the proposed
sale of stock by Flex was being pursued by OCLI
and its representatives on the Flex board for the sole
purpose of extinguishing SICPA's call right, despite
the alleged fact that the capital that could be raised
by such a private placement was not currently
needed by Flex, and that the IPO market was not
attractive for technology companies at that time.

The complaint alleged that the proposed action
would constitute (1) a violation of the 1994
contracts entered into between OCLI and SICPA.
(Second and Third Claims), (2) was unauthorized as
a matter of corporation law (Fourth Claim), and (3)
that in all events it would constitute a breach of
fiduciary duty by the majority shareholder and the
board that it allegedly controls (First Claim). In
addition, the complaint sought a construction of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 2

1997 WL 10263 (Del.Ch.), 22 Del. J. Corp. L. 1282

**(Cite as: 1997 WL 10263 (Del.Ch.))**

1994 contracts (Prayer for Relief (c)) to the effect that if the stock sale occurred it would not constitute an "IPO" within the meaning of the those contracts.

A counterclaim was filed by Flex seeking, *inter alia,* a declaration that it possesses the legal power to accomplish an initial public offering of its stock presently, not withstanding the terms of the stockholders' agreements that its sole shareholders have entered.

Discovery disclosed that matters had evolved since the filing of the complaint. The evidence now shows that following the filing of the complaint Flex's investment banker declined for the present to proceed with a stock sale of the type that had been discussed at a recent Flex board meeting and which had triggered SICPA's filing suit. It is undisputed that the Flex board had been considering a placement of stock, as plaintiff had alleged. It appears, however, that in the circumstances of the case, including most notably the financial condition of Flex at the time, the retained investment banker was unwilling to continue with a possible underwriting at that time.

**\*2** With this development in mind, SICPA apparently is now content that, as a practical matter OCLI, acting through Flex, will be unable at present to impair its call or option rights. Thus SICPA sought to voluntarily dismiss its complaint and sought to dismiss OCLI's counterclaim. SICPA now contends that there is no proper occasion for adjudication of its rights or Flex's rights with respect to a possible IPO, since none is on the horizon. The practical impact of the uncertainty surrounding the SICPA claims, and the current financial condition of Flex, has caused the parties to reverse position to some extent, however. OCLI resists SICPA's motion to dismiss the counterclaim and seeks an adjudication that Flex possesses the corporate power to engage in a public sale of authorized stock. SICPA responds that the issues presented by its complaint and by the counterclaim are moot insofar as the specific underwriting originally contemplated is concerned and not yet ripe with respect to any other underwriting or private placement that may in the future be

authorized by the Flex board. I deferred ruling on SICPA's motion to dismiss the counterclaim and heard evidence.

I.

It is apparent, however, that much that was originally sought to be adjudication when Flex was pursuing an active transaction, cannot now be adjudicated. The parties appear to agree that the question whether a Flex stock offering at this time would violate the fiduciary duty that the law imposes, under some circumstances, upon controlling shareholders and upon corporate directors cannot not be adjudicated at this time. Questions of compliance with the fiduciary duty of loyalty rarely can be answered by abstractions. Determination whether this broadly abstract duty has been complied with customarily requires analysis that is highly contextual and particularistic. Questions of justification, knowledge, and motivation --in other words questions concerning the good faith of corporate directors-- are often central. For closely similar reasons a contract claim that any such offering or placement by Flex would constitute a breach of a duty of good faith and fair dealing under the stockholders' agreement is also premature at this time.

It is my conclusion, as well, that any questions that a stock sale by Flex may raise under the 1994 agreements, such as whether such a sale of stock constitutes an "initial public offering" that would terminate the SICPA option, or whether a stock sale that does constitute an "initial public offering" nevertheless does not terminate SICPA's call right, if it occurs prior to the first effective exercise date of the call right (as SICPA contends), may only be addressed in the context of a specific transaction in which the particulars of the sale are fixed.

What is then left? SICPA urges that there is nothing left for current judicial resolution. Flex, on the other hand, still seeks a declaratory adjudication to the effect that it possess the *legal power* to engage in an initial public offering of Flex stock and that nothing in the shareholders' contract restricts its legal power to do so. That is, it seeks in its counterclaim to negative the assertion contained

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

1997 WL 10263 (Del.Ch.), 22 Del. J. Corp. L. 1282

**(Cite as: 1997 WL 10263 (Del.Ch.))**

in the Fourth Claim of the Complaint. That assertion is that under the terms of the supermajority provisions of the Flex certificate of incorporation-- which require a 67% affirmative vote of the corporation's shareholders for certain actions including the amendment of the corporation's certificate of incorporation-- the concurrence of SICPA would be required for any "traditional IPO" (cplt. paragraph 60). SICPA claims that:

*3 "Flex may not be permitted to do indirectly what it will be precluded by a vote of shareholders from doing directly. By proceeding with the alleged IPO after SICPA votes against a recapitalization [that would have permitted a "traditional IPO"] the action of the Flex and OCLI directors *will be without authority and in violation of Flex's certificate of incorporation,* as they will amount to an impermissible end-run around the supermajority provisions" (emphasis added).

Flex asserts the contrary and seeks an adjudication that it is correct. Specifically it asserts:

"...the only issue that needs to be adjudicated ...is whether... [t]he right of the board...has been restricted in any way so that a majority of the board would be prohibited either by contract or by the articles from voting to do an initial public offering of some 16,000 shares that have been authorized and unissued, assuming the offering is otherwise consistent with their fiduciary duties." Tr. Oct. 1 conf. at 5.

At the commencement of trial I stated that I had reserved the ripeness issue that formed the basis of SICPA's motion to dismiss the counterclaim and invited evidence from the parties on that issue.

II.

Two sets of questions are presented with respect to what remains of this case. The first set revolves around the inquiry whether the remaining issue satisfies the requisites of the Declaratory Judgment Act so as to constitute a fit topic for current adjudication. The second set of questions relates to the substantive assertion of OCLI, that the Flex board is not restricted by the corporations' charter or the shareholders' agreements in its ability to authorize the sale of 16,000 shares of authorized stock.

III.

The question whether a declaratory judgment action is ripe necessarily entails a judgment that attempts to weight the practical difficulty that the declaratory plaintiff purports to face as a result of the existence of the unasserted claim, against the benefit that might be achieved from the point of view of the legal system of waiting until facts are more fully developed. *See Schick Inc. v. Amalgamated Clothing and Textile Workers Union,* 533 A.2d 1235 (Del. Ch. 1987); *Kingsbridge Capital Group v. Dunkin Donuts* Inc., Del. Ch., C.A. 10907, Chandler, V.C. (Aug. 7, 1989). Certainly much of what the parties initially disputed simply is not litigable at this stage for the reasons touched upon above. Only the question of the technical authority of the Flex board under circumstances currently existing to issue stock appears amenable to resolution now. Resolution of the question presented will only advance the matter slightly, for reasons mentioned below, but I am persuaded that the dispute may impact currently on Flex and the responsible or better exercise of judicial discretion in the circumstances is to attempt to answer the narrow question that is presented since properly and narrowly defined, it requires no further factual development.

IV.

*4 To address the narrow question posed it is necessary to have in mind two fundamental aspects of Delaware corporation law. They are, first, the relationship between legal analysis of corporate power or authority and fiduciary analysis of director or controlling shareholder action; and, second, the doctrine of independent legal significance. Both features of our law bear on the narrow question posed.

The two investors in this enterprise, having entered into complex contracts to govern their relationship, find themselves in an intense conflict of interest with respect to prospective ownership and control of the company. SICPA has a contract right to buy out OCLI at an advantageous price effective in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

1997 WL 10263 (Del.Ch.), 22 Del. J. Corp. L. 1282

(Cite as: 1997 WL 10263 (Del.Ch.))

Page 4

sixteen months. Its principal interest is in exercising that right, which it claims has a present value of $30 million. OCLI controls Flex through its designation of three of its five directors. It has an intense financial interest in continuing such control through (1) terminating the call right on its stock held by SICPA (which can be done under the contracts by the completion of an initial public offering of stock) and (2) diluting SICPA's stock thus affecting its veto power under the corporation charter's supermajority provisions. While the parties have in the 1994 contracts contracted various protections against each other, as is prudent, nevertheless in their bargain OCLI has been left with residual control of the joint investment (i.e., Flex). This control is effected through OCLI's power to designate a majority of the board. This residual power to control the parties' joint investment, gives rise to a fiduciary duty. The fiduciary duty is a broad duty of loyalty that demands that one who agrees to the control of the property in which another has an equitable interest will exercise that control with due regard for the legitimate interest of the other in the property.

The core element of the fiduciary duty of loyalty impressed upon corporate directors is a good faith attempt to exercise power over corporate property or process so as to advance legitimate interests of the corporation and not for any selfish reason. When a corporate fiduciary authorizes a transaction that confers a special benefit on himself or an affiliate, he assumes a burden to show that sound reasons, independent of the benefit that he derived, supported the transaction and its terms were completely fair in light of those reasons and other relevant factors (e.g., market prices).

As the Flex board considers whether and when it should authorize the sale of authorized stock, it cannot in its present circumstances fail to help or to hurt the financial interests of its two principle shareholders. If the board were to authorize action that assists the financial interests of OCLI, its controlling shareholder, the directors will bear a burden to establish that the decision to do so is fully justified by a corporate purpose and that in fact it was not motivated in any substantial part by a desire

to employ corporate power to assist the interest of the controlling shareholder at the cost to the minority shareholder. This simply is the classic role of the fiduciary duty in a self-interested context: to supply an *ex post* fairness check on the multifarious exercises of power that cannot efficiently or feasibly be governed specifically *ex ante* by the parties in their contracts. The fiduciary analysis is specific and textured. It does not lend itself to rule-bounded formulation. This is the source of its strength and of its weakness.

*5 In this circumstance of inevitable conflicting interest and control by one of the two investors, it is the fiduciary analysis that will in the end provide the rule of decision, when the question is, if it ever is presented, whether the issuance of stock authorized by the Flex board constitutes a breach of duty.

In corporation law, fiduciary analysis is a different (supervening) level of analysis from legal analysis. That is, the question whether an act constitutes a breach of fiduciary duty and is subject to possible equitable remedy, such as rescission, is distinct from the question whether such an act was properly authorized or is legally valid. The foundational fact of fiduciary obligations is that they are equitable in origin and impose an equitable obligation "on top of," so to speak, duly exercised legal power. Thus, regardless of the fact that the Flex board may have the legal power to sell authorized stock, should it do so in the present circumstances, it would be under a duty to justify any such action to a court of equity as fair in the circumstances.

I take this to be fundamental and well understood. The second elementary concept of Delaware corporation law that is related to the idea that analysis of corporate transactions may occur at a legal level of analysis and at an equitable level, is the doctrine of independent legal significance holds that legal action authorized under one section of the corporation law is not invalid because it causes a result that would not be achievable if pursued through other action under other provisions of the statute. *E.g., Rothschild International Corp. v. Liggett Group, Inc.,* Del. Supr., 474 A.2d 133

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

1997 WL 10263 (Del.Ch.), 22 Del. J. Corp. L. 1282

**(Cite as: 1997 WL 10263 (Del.Ch.))**

Page 5

(1984). That doctrine applies to exercise of legal power. It does not apply to fiduciary review. These two points --the bi-level nature of corporate law and the doctrines of independent legal significance-- would come together to require the rejection of the claim asserted in the Fourth Claim of the complaint. That is, under the doctrine of independent legal significance, the fact that the proposed transaction could not be accomplished in a way that required shareholder approval, does not mean that an alternative way to accomplish the same end is "unauthorized" or "invalid" or "void".

This conclusion does not mean that it is always irrelevant that a board attempts to accomplish a transaction in a way other than a more conventional way that is blocked. In some circumstances, especially where the transaction has a disparate effect on shareholders and the board or a controlling shareholder benefits disproportionately, such transaction, though legally valid, will be subject to fiduciary or fairness review.

All of this is prologue to the question whether the Flex board lacks legal power to sell authorized stock so that any attempt to do so, under circumstances of the kind the evidence shows, would be "unauthorized" "legally invalid" or "legally void". With respect to this substantive question I note that nothing has been shown that constitutes a binding relinquishment by the Flex board of its legal power to sell authorized stock. Any exercise of that power in circumstances of the kind now present will, as I have indicated above, be subject to a fiduciary duty level of review. But it cannot be concluded that the board lacks legal authority to sell authorized shares or that it would be *ultra vires* for it to do so. No express term of a contract purports to do so and its fiduciary duty is not implicated in the question of legal authority.

V.

**\*6** Thus most of the issues that will inevitably arise from any attempt by the conflicted board to complete a stock sale that would qualify as an initial public offer under the shareholder agreements, remain for future adjudication once a real transaction is formulated.

The questions of legal authority can be settled now, but in these circumstances other pertinent issues remain. As a practical matter it may be a challenge hereafter to afford timely protection to the legal interests and claims of all involved parties. How can an IPO of even the available 16,000 shares (if such a thing is technically possible and financially feasible) be completed if the underwriter understands that some risk of the imposition of an equitable remedy exists. Furthermore, from the perspective of the other side, further questions remain. For example, if a "registered private placement" to a third party (which did constitute an IPO under the 1994 agreements) were completed before a hearing on the fiduciary duty question was held, what effect would that have upon SICPA's call rights in the event the sale was later found to constitute a breach of loyalty? The decided cases offer guidance. These problems are not insuperable, but they do present grist for the legal mill. I note that even if an IPO were quickly accomplished before a hearing on the fiduciary claim, if a breach of fiduciary duty were thereafter determined, a court that had jurisdiction over OCLI would not be powerless to shape and force a remedy that fully restores the rights of persons affected.

It would appear to be in the best interest of both sides, in the event the Flex board resolves to attempt a sale of the sort earlier contemplated, to cooperate, in order to have a prompt pre-distribution hearing on the fiduciary (and any related contract) claims. While such a procedure may impose some delay, and thus market risks and other costs, I am not sure another way exists to protect all interests in this fundamentally conflicted situation. In all events, if an IPO is attempted the court will be available, upon the filing of a further complaint, at the behest of either party.

The parties shall confer and attempt to agree on a form of order implementing the foregoing.

1997 WL 10263 (Del.Ch.), 22 Del. J. Corp. L. 1282

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.