# EXHIBIT A

1991 Del. Ch. LEXIS 29, *; Fed. Sec. L. Rep. (CCH) P96,120

LEXSEE 1991 DEL. CH. LEXIS 29

IN RE BUDGET RENT A CAR CORPORATION SHAREHOLDERS LITIGATION

Civil Action No. 10,418 Consolidated

Court of Chancery of Delaware, New Castle

1991 Del. Ch. LEXIS 29; Fed. Sec. L. Rep. (CCH) P96,120

November 15, 1990, Submitted
March 15, 1991, Decided
March 15, 1991, Filed

LexisNexis(R) Headnotes

COUNSEL: [*1]

R. Bruce McNew, Esquire, Pamela S. Tikellis, Esquire and Carolyn D. Mack, Esquire of GREENFIELD & CHIMICLES, Wilmington, Delaware and Michael D. Donovan, Esquire of GREENFIELD & CHIMICLES, Haverford, Pennsylvania; Of Counsel: GENE MESH & ASSOCIATES, Cincinnati, Ohio, Lead Counsel for Plaintiffs.

Richard L. Sutton, Esquire and Edmond D. Johnson, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; Of Counsel, Mitchell A. Karlan, Esquire of GIBSON, DUNN & CRUTCHER, New York, New York and KRAMER, LEVIN, NESSEN, KAMIN & FRANKEL, New York, New York, Attorneys for Defendants.

JUDGES:

Berger, Vice Chancellor.

OPINIONBY:

BERGER

OPINION:

MEMORANDUM OPINION

This is the decision on defendants' motion to dismiss a purported class action brought by former minority stockholders of Budget Rent A Car Corporation ("Budget"), following the merger between Budget and Beech Holdings Corp. ("Holdings"). Plaintiffs characterize the merger as a management led cash out of the minority public stockholders at a grossly inadequate price. Defendants, by contrast, say that this was a third party transaction agreed to by a board of directors, a majority of whom were disinterested. For the reasons that follow, I conclude that [*2] the Amended Complaint fails to state a claim and must be dismissed.

The relevant facts, as alleged in the Amended Class Action Complaint (the "Complaint") and the Budget Proxy Statement, n1 are as follows. Budget is a Delaware corporation engaged in the vehicle renting business. The company was wholly-owned by Transamerica Corporation until September, 1986 when it was acquired in a leveraged buy out by a group that included defendant, Gibbons, Green, van Amerongen Ltd. ("GGVA") and certain members of Budget's management. As a result of that transaction, defendant Fulcrum II, L.P. ("Fulcrum"), a limited partnership whose general partner is GGVA, became Budget's majority stockholder.

n1 The Complaint relies heavily on the description of the transaction as contained in the proxy statement. Accordingly, the proxy

statement will be deemed incorporated by reference in the Complaint. See *Lewis v. Straetz*, 1986 Del. Ch. LEXIS 365, Del. Ch., Civil Action No. 7859, Hartnett, V. C. (February 12, 1986).

In May, 1987, Budget made a public offering of [*3] approximately 30% of its common stock at $ 14.00 per share. The public offering generated approximately $ 40 million which was used to pay down a portion of the company's debt. The offering reduced Fulcrum's interest in Budget's common stock to about 44%. Through the third quarter of 1988, Budget's common stock traded on the over the counter market at between $ 9.50 and $ 16.00 per share. At all relevant times, Budget's six member board of directors consisted of Messrs. Green, van Amerongen and Walker, general partners of GGVA; Mr. Goodall, president of another GGVA company; and Messrs. Haley and Belzberg, Budget's two most senior officers and the owners of more than 8% of Budget's common stock.

In August, 1988, an investment banking firm contacted Budget's board and expressed its belief that the market was undervaluing Budget's stock. After written and oral presentations by five investment firms concerning the valuation of Budget's stock, the board announced on October 7, 1988 that it had engaged Morgan Stanley & Co., Inc. ("Morgan Stanley") to explore alternatives to enhance stockholder value, including the possible sale of the company. Morgan Stanley contacted twenty-one potential [*4] acquirors including Ford Motor Company ("Ford"), which for many years had been the principal supplier of Budget's rental vehicles.

Morgan Stanley was preparing for a possible auction of Budget. However, when approached by an officer of Ford, a Morgan Stanley representative indicated that a preemptive bid -- one that was at least in the low $ 30's per share -- would be given consideration. After several meetings between the parties or their respective investment advisers, on October 28, 1988, Ford presented its proposal to acquire all of Budget's outstanding stock for $ 30.00 per share. Ford's representative stated that its bid would be withdrawn if the parties were unable to reach an agreement before the opening of business on October 31, 1988 or if the bid were revealed to any third party. In addition, Ford's representative advised that if Budget were to forego the bid in favor of an auction, Ford's auction bid, if any, could be lower than $ 30.00 per share.

The parties negotiated over the next three days and on October 31, 1988, Budget's directors approved the merger and related transactions. Pursuant to the Merger Agreement, all of Budget's stockholders received $ 30.00 per share [*5] for their stock. Holdings, which became the sole stockholder of Budget, was capitalized as follows: (1) Fulcrum contributed $ 1 million in exchange for all of the outstanding Holdings common stock (10,000 shares); (2) Ford contributed $ 334 million in exchange for all of the outstanding Series A and Series B preferred stock (150,000 shares of Series A and 174,000 shares of Series B); and (3) Messrs. Haley, Belzberg and other of Budget's top management contributed $ 10 million in Budget common stock valued at $ 30.00 per share and cash for all of the outstanding shares of Series C preferred (10,000 shares). Only the common stock and the Series C preferred stock were given voting rights, with the common entitled to one vote per share and the Series C entitled to 1/4 vote per share. Thus, Ford, the owner of the Series A and Series B stock, had no direct control over Holdings. The representation on Holdings' board of directors also reflected Ford's lack of direct control. Subject to certain conditions, the Holdings board was to consist of five directors designated by a majority of the common stock, two of whom had to be unaffiliated with Fulcrum or Budget, and two members designated by [*6] the holders of a majority of the Series C stock, one of whom had to be Budget's Chief Executive Officer. A majority of the Series C stockholders could add two more members to the board of directors, one of whom had to be unaffiliated.

Notwithstanding this capitalization and division of voting rights, Ford retained significant indirect control through agreements limiting transferability and in other ways restricting both the common stock and the Series C preferred stock. Significantly, the common stock could not receive any dividends, share in any other distributions or be sold for more than $ 30.00 per share. In addition, Ford had the power to require that Fulcrum sell its stock to a purchaser designated by Ford at any time. The Series C stock is generally not transferable except to Holdings, other members of Budget management or a party that purchases the Series B stock from Ford. The Series C stock is also subject to several puts and calls which, in general terms, provide the members of Budget management with a method of liquidating their investment and provide Holdings and Ford, under certain circumstances, the right to purchase all or a portion of the outstanding Series C stock. [*7]

In conjunction with the merger, two pre-existing arrangements were continued or formalized. GGVA had performed management services for Budget prior to the merger and it was agreed that GGVA would continue to provide those services at the then current annual fee of $ 415,000 for as long as Fulcrum owned any Holdings common stock. In addition, Ford and Budget entered into

a Supply Agreement pursuant to which at least 70% of Budget's vehicles would be purchased from Ford. Prior to the merger, Budget had been buying and leasing a large portion of its fleet from Ford, but it does not appear that the parties had any contractual commitments.

The merger was unanimously approved by Budget's directors after considering, among other things, that: (1) in Morgan Stanley's opinion, the merger price was fair from a financial point of view; (2) the merger price represented a significant premium over historical trading prices; and (3) based upon Morgan Stanley's discussions with other potential acquirors, it did not appear that other parties would propose a transaction at a higher price. The proposed merger was presented to Budget's stockholders at a special meeting on March 30, 1989. However, it [*8] was a foregone conclusion that the merger would be approved since Fulcrum, Haley and Belzberg, who collectively owned 52% of the outstanding stock, had committed to vote in favor of the merger.

Plaintiffs' claim depends upon their characterization of the merger. Plaintiffs argue that Budget's directors were interested in the transaction and that, in light of their failure to institute procedural safeguards, they must establish that the merger was entirely fair. Defendants do not dispute that Messrs. Haley and Belzberg were interested. They were members of Budget's top management and were going to continue their employment following the merger. Messrs. Haley and Belzberg also were given the opportunity to share in the future profits of Budget through their purchase of Holdings' Series C stock.

The remaining four members of Budget's board of directors, however, were not members of Budget's management and were not to become owners of any Series C stock. Those four directors' interest, if any, arose from their ties to GGVA and Fulcrum. Plaintiffs argue that, since Fulcrum became the owner of the Holdings' common stock, Fulcrum and its designees on the Budget board stood on both sides [*9] of this merger. In addition, plaintiffs point out that GGVA obtained a lucrative management services agreement in conjunction with the merger.

It is settled law that the entire fairness of a transaction will be scrutinized by the courts where a majority of the directors approving the transaction were interested or where a majority stockholder stands on both sides of the transaction. See *Aronson v. Lewis*, Del. Supr., 473 A.2d 805, 812 (1984); *Summa Corp. v. Transworld Airlines, Inc*, Del. Supr., 540 A.2d 403, 406-7 (1988). Directors are "interested" if they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812. Similarly, a majority stockholder stands on both sides of a transaction when, "by virtue of its domination of the subsidiary, [it] causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to the minority stockholders of the subsidiary." *Sinclair Oil Corporation v. Levien*, Del. Supr., 280 A.2d 717, 720 (1971), [*10] cited with approval in *Summa Corporation v. Transworld Airlines, Inc*, 540 A.2d at 406. The question, thus, is whether Fulcrum or its designees on the Budget board obtained any benefits from the merger to the exclusion and detriment of Budget's minority stockholders. As noted above, plaintiffs claim that they did in the form of Fulcrum's ownership of Holdings common stock and GGVA's consulting agreement. I disagree.

While it is true that Fulcrum became the owner of the Holdings common stock, the restrictions on its ownership were so complete as to guarantee that Fulcrum would receive no benefit as a Holdings stockholder. Fulcrum could not share in Budget's growth or profits either by receiving any distribution as a stockholder or by disposing of its Holdings common stock. Ford provided virtually all of the funds for the acquisition of Budget and, through the restrictions on the Holdings common stock, Ford reduced Fulcrum's interest in Holdings to that of a mere stakeholder. The reason for this somewhat unusual arrangement was acknowledged by plaintiffs in their Complaint, where they noted that the merger was structured as it was, in part, to enable Ford to avoid [*11] antitrust problems. The Proxy Statement explains that, since Fulcrum had been given clearance in 1986 to acquire more than 50% of Budget stock, there was no need to make any pre-merger filings with the Federal Trade Commission and Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

Plaintiffs do not offer any concrete examples of how Fulcrum could derive a benefit from its ownership of Holdings common stock. Nonetheless, they argue that Fulcrum must be more than a mere stakeholder. Plaintiffs say that Ford would have violated the antitrust laws if Fulcrum's ownership of Holdings stock were a sham. Since, apparently, the FTC has taken no action against Ford, plaintiffs contend that Fulcrum's ownership of Holdings common stock must have had some real value.

I am not persuaded by plaintiffs' argument. It is not for this Court to decide whether Ford violated any antitrust laws. It would be equally inappropriate for this Court to make any assumptions or draw any conclusions from the FTC's failure to take action. The question is

only whether Fulcrum obtained any benefit from its ownership of Holdings common stock. The answer to that question depends upon [*12] the nature of the stock and not the action or inaction of the FTC.

The GGVA consulting agreement presents a slightly different issue. I am satisfied that Fulcrum obtained no benefit from the merger through its ownership of Holdings common stock because that stock had no value to Fulcrum. The consulting agreement, by contrast, provided $ 415,000 per year to GGVA. Thus, it could be said that the four GGVA/Fulcrum directors benefitted from the consulting agreement. However, I conclude that this benefit does not create a disabling directorial interest.

By the terms of its agreement with Ford, Fulcrum was to remain the owner of Holdings common stock for no more than 16 months. Thus, the maximum amount that GGVA could expect under the terms of the consulting arrangement would be approximately $ 550,000. This amount, standing alone, appears to be very sizeable. However, Fulcrum and its affiliates received slightly under $ 140 million for their 4.6 million shares of Budget stock. Under these circumstances, there can be no question but that Fulcrum's interest was in obtaining the highest possible price for its stock, not in obtaining a short term consulting agreement for GGVA. See *Grobow v. Perot, Del. Supr., 539 A.2d 180, 188 (1988)* [*13] (where, in the context of determining demand futility, the Court held that directors have no financial interest by virtue of the fact that they are paid for their services as directors) and; *In re Mobile Communications Corp. of America, Inc., 1991 Del. Ch. LEXIS 4,* *28, Del. Ch., Civil Action Nos. 10,627, 10,638, 10,644, 10,656, 10,697, Allen, C. (January 7, 1991) (where, in considering a settlement, the Court noted that the directors' substantial stock holdings "created powerful economic . . . incentives to get the best available deal in the sale of [the company]").

Based upon the foregoing, I conclude that the Budget/Holdings merger was not an interested transaction and that the decisions made by the Budget directors are protected by the business judgment rule. Accordingly, the Complaint fails to state a claim and defendants' motion to dismiss is granted.

*IT IS SO ORDERED*