# EXHIBIT B

LEXSEE 1999 DEL. CH. LEXIS 215

IN RE 3COM CORPORATION SHAREHOLDERS LITIGATION

C.A. NO. 16721

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

1999 Del. Ch. LEXIS 215

July 27, 1999, Submitted
October 25, 1999, Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court November 9, 1999.

**DISPOSITION:**

Defendants' motion to dismiss is granted as to both counts.

**LexisNexis(R) Headnotes**

**COUNSEL:** Norman M. Monhait, of Rosenthal Monhait Gross & Goddess, Wilmington, Delaware, OF COUNSEL: A. Arnold Gershon, New York, New York; Wechsler Harwood Halebian & Feffer, New York, New York, Attorneys for Plaintiffs.

Bruce M. Stargatt and James P. Hughes, Jr., of Young Conaway Stargatt & Taylor, Wilmington, Delaware, OF COUNSEL: Boris Feldman and Keith E. Eggleton, of Wilson Sonsini Goodrich & Rosati, Palo Alto, California; Lowell E. Sachnoff and Sarah R. Wolff, of Sachnoff & Sweaver, Chicago, Illinois, Attorneys for Defendants.

**JUDGES:** Myron T. Steele, Vice Chancellor

**OPINIONBY:** Myron T. Steele

**OPINION:**

*MEMORANDUM OPINION*

STEELE, V.C.

Issues Presented

ISSUE 1

Do a corporation's directors commit waste and breach their fiduciary duty of loyalty when they receive stock options approved under a plan endorsed in advance by shareholder vote?

No. Decisions of directors who administer a stockholder approved director stock option plan are entitled to the protection of the business judgment rule, and, in the absence of waste, a total failure of consideration, they [*2] do not breach their duty of loyalty by acting consistently with the terms of the stockholder approved plan.

ISSUE 2

When the directors of a corporation disclose the material terms of a stock option plan for compensating these same directors, the plan has already been approved by the shareholders, and the directors seek shareholder approval of an amendment to expand the pool of shares available for administering this plan, do the directors commit disclosure violations by omitting from the proxy statement 1) the present value of the options as determined by the Black-Scholes Option Pricing Model and 2) that the directors may realize present cash by selling options identical to those received under the plan?

No. When the directors of a corporation seek to amend an existing director stock option plan and they have disclosed the plan's material terms and the material terms of the amendment, they are not required to disclose the option values under the Black-Scholes model. They do not mislead shareholders when they fail to state that

the directors may choose to receive cash by selling these options.

I. Background

Plaintiff is a shareholder of 3COM, a Delaware corporation that produces [*3] computer-related products. The individual defendants are the 10 members of the 3COM board of directors and the nominal defendant is 3COM itself. n1 Plaintiff sues 1) derivatively for corporate waste and breach of fiduciary duty of loyalty and 2) in a class action, on behalf of all 3COM shareholders, for breach of the "duty of candor." n2

> n1 All but one of the defendants, Mr. Eric A. Benhamou, are outside directors, i.e. not employed by 3COM. Mr. Benhamou is the Chief Executive Officer and Chairman of the Board of Directors of 3COM. n2 plaintiff uses this phrase to describe the disclosure violations which allegedly constitute breaches of the fiduciary duty of loyalty.

The Plaintiff's claims flow from 3COM stock options granted to members of the board under the company's Director Stock Option Plan (the "Plan"), adopted in 1988 and later amended from time to time. On July 22, 1998 the board amended the Plan to expand the pool of shares available for grants by 1 million (from 2 million to 3 million [*4] total shares). n3 The amendment required shareholder approval in order to take effect. n4 On August 20, 1998 the board distributed proxy materials for the upcoming annual shareholders' meeting in which it solicited shareholder approval of the Amendment. Those proxy materials are alleged to contain material disclosure violations. No options have been granted or received from the 1 million share possible increase ultimately approved by the shareholders at the 1998 annual meeting.

> n3 In fiscal year 1998 (ending May 31, 1998) the defendant directors received options ranging between 22,500 and 45,000 each. At the time of the proposed amendment 167,000 shares remained in the pool of shares available for granting options to directors. n4 The Plan may be amended, suspended, or terminated by the Board unilaterally except that to expand the reserve of shares available for director options or to expand the class of persons receiving such options shareholder approval is required. At the time of the amendment 167,000 shares remained in the pool of shares available for granting options to directors.

[*5]

III. Contentions

In Count I the plaintiff alleges that the members of the board wasted 3COM's assets and breached their fiduciary duty of loyalty to the 3COM shareholders when they approved the grant of and received stock options under the Plan. Specifically the plaintiff suggests that these stock options constitute lavish and excessive compensation tantamount to a waste of corporate assets.

In Count II the plaintiff alleges that defendants failed to disclose fully the value of the stock options granted by: (1) omitting material information about the options' value; and, (2) mischaracterizing material information about the options' value. In the omission claim, the plaintiff alleges that the proxy statement should have included the present values of these options under the Black-Scholes Option Pricing Model. In the mischaracterization claim, the plaintiff alleges that language in the proxy statement describing the value of options masks the potential for the recipients to realize immediate cash from the options. Plaintiff claims that the Board's description of the value of options did not inform shareholders of the possibility that the directors could make money by selling option [*6] contracts on 3COM stock, which would be backed by their own 3COM options. The plaintiff believes these allegations of omission and mischaracterization show that the board breached its fiduciary "duty of candor."

The defendants move to dismiss this action on all counts for failure to state a claim upon which relief can be granted, under Court of Chancery Rule 12(b)6. Defendants maintain that the plaintiff offers nothing more than conclusory statements to support the elements of his claims.

IV. Standard For A Motion to Dismiss

The standard for a motion to dismiss is a basic, well-settled mantra under Delaware law: that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. n5 Further, allegations which are merely conclusory and lacking factual basis in the complaint will not survive a motion to dismiss. n6 In examining the complaint, I must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party. n7

n5 *Lewis v. Austen, 1999 Del. Ch. LEXIS 125, *12*, Del. Ch., C.A. No. 12937, mem. op. at 4, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted."). [*7]

n6 *In re The Walt Disney Company Shareholders' Litigation, Del. Ch., 731 A.2d 342, 353 (1998)* n7 *O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 911*, Steele, V.C. (August 20, 1999).

V. Count I - Breach Of The Duty Of Loyalty By Waste Of Corporate Assets

A. The Standard of Review

A clear example of an 'interested' transaction is one in which the fiduciary directly pays or otherwise benefits himself using corporate assets. The plaintiff contends that the directors granted themselves options under the Director Stock Plan, creating just such a self-interested transaction. Because the transaction presents a conflict between the self-interest of the directors and the best interests of the Corporation and its shareholders, the plaintiff seeks to have his claim reviewed under the entire fairness standard. If the plaintiff were correct, heightened scrutiny would be applied to the transaction and the burden of proof would shift to the defendants to show that the transactions were entirely fair to the corporation and its shareholders. [*8]

Though plaintiff correctly points out that these option grants appear to be self-interested transactions, he cannot overcome the indisputable fact that the directors authorized grants made within the limitations of a plan *already approved by the shareholders.* This crucial distinction leads me to conclude that the board's actions are entitled to the protection of the business judgment rule.

1. Prior Shareholder Approval of the Plan

Directors' decisions administering a shareholder approved Plan consistently with that Plan are entitled to the protection of the business judgment rule. The plaintiff argues that because he never pleaded that shareholders approved the Plan that I may not consider this fact when I evaluate his claims.

Although I must evaluate the plaintiff's claims within the bounds of his Complaint and draw all inferences in his favor, I can not blind myself to plaintiff's clear statement in his Complaint that the directors received the stock options "pursuant to the Company's Director Stock Option Plan." n8 I need not look beyond the 1998 Proxy Statement (incorporated by reference into the Complaint) to find that the Plan resulted from shareholder action. Since [*9] plaintiff's claims arise in the context of a board proposal for the shareholders to amend the Plan I can only logically infer that the Plan must be the result of prior shareholder action - a result fully supported by the facts pleaded.

n8 Complaint, P 8.

The plaintiff's argument that I can not consider the effect of this prior shareholder approval merely because he has not raised this fact in his Complaint is too clever by half. After pleading that the directors granted options according to the Plan and that the Board then sought to have the shareholders amend the Plan to increase the amount of options to be available in the future, plaintiff cannot now escape the only obvious conclusion from these alleged facts. Certainly the plaintiff could have challenged the validity of the Director Stock Option Plan itself or whether the board's conduct falls within the strictures of this Plan. n9 However, his Complaint does not do so here.

n9 The strictures of this plan include (at minimum) specific ceilings on the awarding of options each year. These ceilings differ based on specific categories of service such as service on a committee, position as a lead director, and chairing the Board. It is implicit that the Board may only exercise discretion within these parameters and is free to award as many options as the Plan permits or as few as zero options. The plaintiff does not allege that the Board ever acted outside the set terms of this plan, nor that the Board ever exceeded limitations of the Plan. *See* Notice of Annual Meeting of Stockholders of 3COM Corporation to be held September 24, 1998, p. 17. This document is incorporated into the Complaint by reference.

[*10]

2. The Business Judgment Rule is the Proper Standard

Since prior shareholder action approved the Plan, I must examine whether the directors' actions taken to administer the Plan are entitled to the protection of the

business judgment rule or whether they should be subject to heightened scrutiny. Plaintiff argues that the business judgment rule does not apply here, since shareholder approval of the Plan amounts to ratification - an affirmative defense that can only be raised in defendants' answer and on which defendants' bear the burden of proof. The facts do not support the argument that the defendants raise an ordinary ratification defense.

Ratification, in the usual sense, involves shareholders' affirmatively sanctioning earlier *board action*, the effect of which is to validate that action. Neither the facts pleaded here nor the defendants' arguments suggest such a circumstance. These options clearly flow from a plan created by *previous* shareholder action. To suggest that this undisputed fact supports a shareholder ratification defense is absurd. The notion of "advance ratification" is oxymoronic. The undisputed facts support only one rational conclusion: That valid [*11] shareholder action instituted a stock option plan and that the Board's administration of the Plan within its approved limits needed no further stockholder approval. I do not see this as a case of directors independently or unilaterally granting themselves stock options, but instead a case where stock options accrued to these directors under the terms of an established option plan with sufficiently defined terms. One cannot plausibly contend that the directors structured and implemented a self-interested transaction inconsistent with the interests of the corporation and its shareholders when the shareholders knowingly set the parameters of the Plan, approved it in advance, and the directors implemented the Plan according to its terms. Precedent in this Court clearly establishes that "self-interested" director transactions made under a stock option plan approved by the corporation's shareholders are entitled to the benefit of the business judgment rule. n10

n10 *See Steiner v. Meyerson*, 1995 Del. Ch. LEXIS 95, * 21, Del. Ch., C.A. No. 13139, Allen, C. (July 18, 1995). ("Unlike the other self-interested transactions challenged by plaintiff, the stock option plan was presented to the Telxon shareholders at the 1991 annual meeting and approved by a majority of the stockholders. The Supreme Court held in *Kerbs v. California Eastern Airways, Inc.*, Del. Supr., 33 Del. Ch. 69, 90 A.2d 652, 655 (1952) that "stockholders' ratification of voidable acts of directors is effective for all purposes unless the action of the directors constituted a gift of corporate assets to themselves or was ultra vires, illegal, or fraudulent.") (reviewing the stock option grants pursuant to this plan, granting them the benefit of the business judgment rule and finding no cognizable cause of action).

[*12]

B. The Plaintiff's Waste Claim

Since the Board's administration of the plan is entitled to the protection of the business judgment rule, the plaintiff must allege waste of corporate assets in order to state a cause of action under these circumstances. n11 I find he has not done so.

n11 *In re The Walt Disney Company Shareholders' Litigation*, 731 A.2d at 369.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The standard for a waste claim is high and the test is "extreme...very rarely satisfied by a shareholder plaintiff." n12 To state a claim for waste the plaintiff must allege facts to establish that the Delaware directors "authorize[d] an exchange that [was] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration". n13 The transfer must either serve no corporate purpose or be so completely bereft of consideration that "such transfer is in effect a gift." n14

n12 *Steiner v. Meyerson*, 1995 Del. Ch. LEXIS 95, * 3. [*13]

n13 *Glazer v. Zapata Corp.*, Del. Ch., 658 A.2d 176, 183 (1993) n14 *Lewis v. Vogelstein*, Del. Ch., 699 A.2d 327, 336 (1997).

Further, to find the plaintiff's claim sufficient I must be satisfied that the alleged facts establish a complete *failure* of consideration, and not merely the insufficiency of the consideration received. n15 A complete failure of consideration is difficult to show since the acts alleged have to be so blatant that *no* ordinary business person would ever consider the transaction to be fair to the corporation. The company would literally have to get nothing whatsoever for what it gave. Under this standard I am *not* to examine the allegations to see whether consideration, once received, was excessive or lopsided, was proportional or not, or even whether it was a 'bad deal' from a business standpoint. n16 If I were to do so I would not be deferring to the board's business judgment,

as I am required to do here.

> n15 *See Id at 338*, ("The Court of Chancery has interpreted the waste standard in the ratified option context as invoking not a proportionality or reasonableness test a la *Kerbs* but the traditional waste standard referred to in *Michelson*."). The *Vogelstein* Court noted that this standard pertains to the "ratified option context," which I find to be the case here in that the "ratified options" include those approved under a company's stock option plan. As plaintiff alleges in his Complaint: the directors "receive stock options pursuant to the Company's Director Stock Option Plan." [*14]

n16 In *Lewis v. Vogelstein* this Court found that the waste standard for options granted under plans such as here has gradually evolved from a proportionality test, which required examining the sufficiency of the consideration, to a traditional waste standard, which requires showing an absence of consideration or an effective gift of corporate assets.

The plaintiff only alleges (in a conclusory manner) that inadequate consideration is given for the benefit 3COM receives, not that 3COM received *no* benefit from these options. Plaintiff's only factual allegation about the options is that the dollar values on these options were quite large (at least $ 650,000 per director). n17 But his legal allegations flowing from these facts, specifically that the compensation is "grossly excessive" and that "no reasonable person not acting under compulsion and in good faith would have done it," are wholly conclusory. n18 Although "the consideration typically involved in stock options, i.e. continued and greater efforts by employees, is ephemeral and not susceptible to identification and valuation [*15] in dollar terms," the plaintiff must still allege some bare minimum facts showing that 3COM failed to receive *any* benefit from issuing these options. Plaintiff simply has not done so.

> n17 It does not help plaintiff that he calculated his alleged values under the Black-Scholes option pricing formula. This Court has consistently taken a rather jaundiced view of these valuations and their reliability. *See Rovner v. Health-Chem Corp.*, 1998 Del. Ch. LEXIS 65, * 17, Del. Ch., C.A. No. 15007, Chandler, C. (April 23, 1998); *Lewis v. Vogelstein*, 699 A.2d at 331 n18

> Complaint, P 18.

The plaintiff further argues that "the alleged value of the option grants alone is sufficient to raise an inference of inadequate consideration" and this is the "ineluctable result of this Court's holding in *Vogelstein*." n19 I disagree. As plaintiff himself states, my review of his allegation of waste is an inherently fact-intensive inquiry and so I will evaluate his claim strictly within the context of the facts he actually [*16] alleges, and not by way of a side-by-side factual comparison with the holding in *Vogelstein*. The plaintiff suggests by comparing the alleged values of the 3COM options (at least $ 650,000 per director) to the values of the options the *Vogelstein* Court found wasteful ($ 180,000) one must infer that he has established the minimum factual support for his waste claim.

> n19 Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, p. 11.

But this suggestion simply does not jibe with plaintiff's correct assertion that an allegation of waste "is inherently factual." n20 I can only draw inferences in his favor from the facts he alleges in his Complaint, not from facts found in another case. That the options here are at least threefold the amount of those which Chancellor Allen found to constitute waste in *Vogelstein* is not a fact which can salvage the plaintiff's otherwise facially insufficient claim. For my purposes in deciding these motions, the facts in *Vogelstein* only help me discern [*17] the legal standard to be applied and are not, as plaintiff argues, a benchmark for what specific dollar amounts may constitute excessive director compensation. n21 Even if I were to use the *Vogelstein* comparison in order to determine the sufficiency of plaintiffs claims, I still could not find that he states a claim here since, as stated above, the standard is whether plaintiff sufficiency alleges a complete *failure* of consideration, not whether he sufficiently alleges that the consideration is "inadequate" (which is all that plaintiff himself says this comparison would show).

> n20 *Id* (citing *Lewis v. Vogelstein*, Del. Ch., 699 A.2d 327, 339 (1997).) n21 *See Steiner v. Meyerson*, 1995 Del. Ch. LEXIS 95, * 19 ("There is, of course, no single template for how corporations should be governed and no single compensation scheme for corporate directors...").

In sum, plaintiff alleges only that certain amounts of compensation were given to the director defendants and then concludes that [*18] these amounts are excessive. Plaintiff has not alleged facts, either directly or by even the most strained inference, to indicate why 3COM did not benefit from these grants, and that they, therefore, amounted to a gratuity and corporate waste. Bare allegations that the alleged option values are excessive or even lavish, as pleaded here, are insufficient as a matter of law to meet the standard required for a claim of waste. Because the Board's alleged actions are protected by the business judgment rule and the plaintiff has failed to make out a case of waste, there can be no underlying breach of the fiduciary duty of loyalty. I grant the defendant's motion to dismiss Count I's claims of waste and breach of the fiduciary duty of loyalty for failure to state a claim upon which relief can be granted.

VI. Count II - Breach Of The Fiduciary Duty Of "Candor"

In his second Count the plaintiff alleges that the Board:

1. Omitted from the proxy statement the value of the options as calculated under the Black-Scholes Option Pricing Model and that shareholders would have found that information material to the decision-making process; and,

2. Mischaracterized the value of these options by stating [*19] that:

> No gain to an optionee is possible without an increase in stock price, which will benefit all stockholders commensurately. A zero percent gain in the stock price will result in zero dollars for the optionee.

Corporate fiduciaries have an obligation to disclose all material facts when seeking shareholder action. n22 Material facts are those for which "there is a substantial likelihood that a reasonable person would consider them important in deciding how to vote." n23 The board sought shareholder approval of an amendment to 3COM's existing Director Stock Option Plan which expanded the pool of shares available for administering this plan. It is the board's actions surrounding this decision that form the basis for plaintiff's disclosure violation claims. It follows from this that the disclosure violation allegations here must then relate to the details of this Amendment. As a threshold matter, I find generally that basic details concerning the value of these options would be material to a reasonable shareholder's decision whether to vote for or against an expansion of the share pool available under the Plan. The question then remains whether the Board provided sufficiently [*20] detailed and accurate information.

---

n22 *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (citing *Malone v. Brincat, Del. Supr.*, 722 A.2d 5, 11 (1998)). n23 *Rosenblatt v. Getty Oil Co., Del. Supr.*, 493 A.2d 929, 944 (1985).

---

A. Failure To Include Option Values Derived Under The Black-Scholes Model (Omission Allegation)

I find, as this Court has consistently found, that the Black-Scholes Option Pricing Model is neither sufficiently reliable nor necessary to apprise shareholders of the value of the options in question. I am rather surprised that the plaintiff has chosen to pursue this claim vigorously, knowing, as he must, that both the current Chancellor and his predecessor have questioned, if not outright rejected, the proposition that values derived from this model must be disclosed to shareholders. n24 I see nothing in the facts pleaded here which would lead me to believe that this case is so different that the Board should have disclosed [*21] these values to the shareholders. If anything, I find even less cause here for the disclosure than Chancellor Allen did in *Lewis v. Vogelstein* where he concluded that the exclusion of the Black-Scholes Model from proxy materials rendered them neither incomplete nor misleading. In that case, the shareholder action contemplated was the wholesale adoption of a stock option plan. Here, the action sought is merely approval of an amendment to a plan already in existence. Further, the amendment here just makes more shares available so that it is possible to carry out the existing plan, and does not seek to do more than raise the ceiling on the number of options available to each individual director.

---

n24 *See Lewis v. Vogelstein*, 699 A.2d at 331 ("The directors' fiduciary duty of disclosure does not mandate that the board disclose one or more estimates of present value of options that may be granted under the plan."); *Rovner v. Health-Chem Corp*, 1998 Del. Ch. LEXIS 65, *17 ("This Court has always accepted such valuations with a healthy dose of skepticism.").

---

[*22]

The plaintiff has established the usefulness of the Black-Scholes model in other contexts and established its merit generally as a tool for pricing options. However, he has failed to plead any facts to indicate that this model would be of such material importance to shareholders that it would alter the total mix of information needed to properly inform shareholders. I find no facts in the Complaint demonstrating a substantial likelihood that a reasonable person would consider this information important in deciding how to vote on the Amendment here.

B. Misleading Statement About The Potential Realizable Value of the Options (Mischaracterization Allegation)

Plaintiff also complains that the proxy materials contained a misleading statement about the potential realizable value of these options:

> No gain to an optionee is possible without an increase in stock price, which will benefit all stockholders commensurately. A zero percent gain in the stock price will result in zero dollars for the optionee.

It is appropriate here to point out, as defendants have, that this language has been extracted from a footnote to a table entitled "OPTION GRANTS IN FISCAL YEAR 1998" which [*23] falls under the section of the Proxy Statement on *Executive Compensation*. Considering that the plaintiff has raised issue only with the director options, his claim that this statement misled shareholders in deciding how to vote on the Amendment requires a rather tortured version of the facts.

However, even taking it out of its proper context and reading it as favorably as possible in light of the plaintiff's claims, I still find it to be accurate and a reasonable presentation of the information it seeks to convey, and not, as alleged, an attempt to mask some obscure, underlying truth. In the Proxy Statement the above-quoted language appears as follows (it is describing a table which shows the gains possible from the options granted to the company's officers, if the stock price were to rise by 5% and 10%, respectively):

> (4) Potential realizable values are net of exercise price, but before deduction of taxes associated with exercise. These amounts represent certain assumed rates of appreciation only, based on Securities and Exchange Commission rules, and do not represent the company's estimate of future stock prices. No gain to an optionee is possible without an increase [*24] in stock price, which will benefit all stockholders commensurately. A zero percent gain in stock price will result in zero dollars for the optionee. Actual realizable values, if any, on stock option exercises are dependent on the future performance of the Common Stock, overall market conditions and the option holders' continued employment through the vesting period.

The truth of the questioned statement may be evaluated 1) on its face and 2) in its context in the Proxy Statement. I find that the statement, at a minimum, is true on its face, even standing alone. Under no set of facts or interpretation of the facts contained in this statement could I find that it was misleading or somehow mischaracterized how gains may be derived from options. Placing the statement in its context in the Proxy Statement makes its veracity even less questionable in my estimation. The statement is simply a note which explains a chart on "Potential Realizable Value" for option grants *given to executive officers* and can hardly appear to mischaracterize director compensation from option grants. But as stated above, even if I inferred that the statement would be cross-read by the shareholders into the [*25] context of an amendment to the plan on *director* compensation, no facts support the claim that these disclosures were somehow misleading.

However, plaintiff's substantive argument bears examination. The plaintiff argues that it is possible for the Board members to derive cash value from these options by simply selling identical options, backed by those options they received as compensation. Even if the value of the option is eventually nothing (because the stock price is at or below the option's strike price) the director may still keep the cash. Plaintiff claims that the statement above masks this possibility, and thus is a mischaracterization of the compensation scheme.

The plaintiff's claims do not take into account the downside of this type of transaction, namely that selling such an option also creates a risk of economic loss for the director and thus the value gained is not a guaranteed form of compensation, but more akin to an investment risk the director may choose to take. Certainly a director can sell an option contract (a short call) for the amount of shares over which he simultaneously holds an option (a long call), and may do so at equal exercise prices, giving him [*26] net present cash for options which may or may not be worth anything as of their exercise date. But by

doing this, the director has merely cashed in his own future options for present money and not received any form of additional compensation at the expense of 3COM shareholders. No reasonable 3COM shareholder would find this scenario material in deciding how to vote on expanding the pool of shares available under the Plan.

Collapsing this purported transaction shows that really all that the plaintiff alleges is that a director can sell his options to another party. Plaintiff, however, does not point out that in doing so a director forgoes *any* potential future gain in the share price in order to receive present cash for the option contract. If at the time of exercise the net gain on his options exceeds the cash amount the director had received for selling identical options, the director must still deliver his shares to his optionee at the strike price, and simply stand by, watching the optionee take all of the gain. It is quite possible that the gain on these shares may be far more than he received in cash for selling the option contract (3COM is likely susceptible to the same rapid [*27] upswings and downturns common among technology stocks).

The transaction the plaintiff uses to illustrate the point is simply one involving a director's choice to place a personal asset at risk. Must the proxy statement point out that any director might be able to borrow money against his future pay and bet it at a racetrack, reaping a windfall if he wins? Put simply, the fact that an informational statement on compensation does not contain every possibility lying behind that compensation does not render it misleading or incomplete, particularly where that possibility is one which may only come about through the personal discretion of the individual being compensated, based on his or her own predilection for risk taking.

I find that the mere possibility of such a transaction is one about which the average investor need not be explicitly apprised. To mix metaphors: my holding otherwise would open Pandora's Box such that we would slide down a slippery slope towards mandating excessive detail in disclosures. I find on the facts before me that the statement questioned, even ignoring how far out of context the plaintiff has taken it, is accurate, and would not mislead a reasonable investor [*28] in a way which masks true compensation. Further, the compensation about which plaintiff seeks disclosure would not, if realized, come at the economic detriment of 3COM's shareholders. I find that the plaintiff has failed to plead facts sufficient to support a claim upon which this Court could grant relief.

VII. Conclusion

Defendants' motion to dismiss is granted as to both counts.

IT IS SO ORDERED.

Myron T. Steele

Vice Chancellor