# EXHIBIT G

# Westlaw.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Cherie HACKETT, Plaintiff,
v.
COMMUNITY BEHAVIORAL HEALTH, et al.,
Defendants.
No. Civ.A. 03-6254.

May 6, 2005.

*MEMORANDUM*

KELLY, J.

*1 The Plaintiff, Cherie Hackett ("Hackett"), brings this action alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 951 et seq. and the Pennsylvania Workers' Compensation Act ("Workers' Compensation Act"), 77 P.S. § 1 et seq. in connection with her employment with Defendant, Community Behavioral Health ("CBH"). [FN1] Before this Court is a Motion for Summary Judgment filed by Defendants and Plaintiff's response thereto. Upon consideration of the parties' respective filings, the Motion for Summary Judgment is granted.

> FN1. CBH is a non-profit organization responsible for planning and coordinating the delivery of mental health and substance abuse treatment services to the uninsured, underinsured and Medicaid eligible residents of the City of Philadelphia. CBH operates under a contract with the City of Philadelphia to serve these behavioral health needs and contracts with approximately 300 area treatment providers offering a full array of behavioral health services. CBH is an equal opportunity employer with a diverse staff of approximately 300 employees.

I. BACKGROUND [FN2]

> FN2. The following material facts are either undisputed or are based upon allegations made by Hackett and accepted by Defendants as true for purposes of this Motion only.

A. *Work History with CBH*

Hackett, an African-American female, was hired by CBH on March 2, 1998 as a Help Desk Support Administrator in its Information Services ("IS") department. [FN3] At the time of her hire, Hackett had not graduated from high school, but she had obtained her General Equivalency Diploma. Hackett attended business communication courses at the Orlands Institute and received an Associates Degree in Computer Technology from the Computer Learning Center. At the beginning of her employment, Hackett did not experience any problems and she received a positive performance appraisal in September 1998.

> FN3. During her tenure at CBH from March 1998 until May 2003, Hackett claims that she was the only African-American female technician employed in the IS department. Hackett estimates that seven of the twenty-five to thirty people employed in the IS Department were African-American.

In November of 1998, the Help Desk Support Administrator position merged with the Technical Support Specialist position. Upon this merger, Hackett's job title changed to Technical Support Specialist. At the time of her title change, Hackett believes that Defendant, Troy Pearsall ("Pearsall"), became her supervisor. Pearsall, an African-American male, was employed by CBH as a Senior Technical Support Specialist. Hackett alleges that Pearsall gave her problems from 1998 through 1999 when she worked as a Technical Support Specialist. Hackett believes that her problems with Pearsall stem from his being threatened by her because of "[her] determination and [her] drive and [her] relentlessness, and diligent work habits." (Pl.'s Dep. I, Defs.' Ex. 1, p. 51). Hackett also claims that Pearsall treated her unfairly and differently than the other five technicians because she was a woman. [FN4] (Id, p. 134-35). Hackett bases her claim upon the following incidents:

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 2

> FN4. Hackett admits that she does not believe that Pearsall engaged in any unpleasant behavior towards her because of her race. (Pl.'s Dep. I, Defs.' Ex. 1, p. 138-44).

Pearsall stated that he could not believe that Hackett was crying when she broke her nail;
Pearsall told Hackett that she should be like the rest of the technicians and remember what he was saying;
Pearsall stated "just like a dumb woman" after Hackett stated that she wanted to use her notes; [FN5] and

> FN5. Hackett admits that she never advised any individual at CBH that Pearsall call her "a dumb woman." (Id., p. 139).

Pearsall referred to Hackett as dumb, stupid and ignorant.
(Id., p. 134-39). Although Hackett claims that Pearsall treated her differently because she is a female, she acknowledges that he also had problems with Jonathan Lee, an African-American male, and Thomas Rodriguez, a Hispanic male. Additionally, Hackett acknowledges that Pearsall had an altercation with Joseph Kincaid, a Caucasian male. According to Defendant, Wayne Lepp ("Lepp"), who was the Technical Services Director and Pearsall's supervisor, Pearsall had a difficult personality and experienced difficulties with many of the technicians, and he had received complaints that Persall had belittled a male technician. (Lepp Aff., Defs.' Ex. 10, ¶¶ 6-7). Without any documentary evidence, Hackett claims that she complained to Lepp about Pearsall's harassment and claims that she informed him that Pearsall was discriminating against her because she was a female. Hackett claims that she told Lepp that the harassment was solely on the basis of her gender, and not based upon her race. Hackett admits that she never put in writing, during the years of 1998 or 1999, that she felt that she was being discriminated against because she was a female. (Pl.'s Dep. I, Defs.' Ex. 1, p. 172). Even after she complained, Hackett received positive evaluations from Lepp from 1998 through 2001. Also, Hackett was not subject to any adverse action or loss of any benefits during 1998 and 1999.

1. Novell Network Administrator Position

*2 On December 3, 1999, Defendant, Lance Groff ("Groff"), the Chief Information Officer, approved Hackett's promotion to the position of Novell Network Administrator ("Network Administrator") effective December 13, 1999. Hackett was the only individual employed as the Network Administrator and the position held an EP Grace Level of 22 which increased Hackett's salary from $24,456.00 to $39,621.00. As the Network Administrator, Hackett was responsible for overseeing operations of the systems network and monitoring the computer system which included the following: performing network user maintenance; maintaining server disk space; upgrading and updating the system; performing security auditing and system refining; and implementing data recovery/protection and back-up procedures. As the Network Administrator, Hackett directly reported to Lepp and Pearsall was not her supervisor. Prior to Hackett's promotion, Lepp had reservations about giving Hackett full responsibilities for administering the network because of her lack of experience. (Leff Aff., Defs.' Ex. 10, ¶ 9). Lepp expressed his concern to Groff regarding whether Hackett would be able to handle the position. (Id.; Groff Aff., Defs.' Ex. 6, ¶ 6). Lepp and Groff expressed their concerns to Hackett regarding whether she would be able to handle the position and she advised that she was willing to take the risk and that she should be demoted if she failed. (Id. ¶¶ 9-10; Groff Aff., Defs.' Ex. 6, ¶ 7). In 2000 through 2001, while Network Administrator, Hackett claims that Pearsall harassed her and treated her improperly in front of people. Hackett alleges that Pearsall stated that "she would not last 6 months as network administrator." [FN6] (Am.Compl., ¶¶ 22-25). Hackett also alleges that she was denied access to equipment and supplies, as well as necessary information regarding technical and policy changes. Although employed as the only Network Administrator, Hackett contends that her male counterparts were given more access to equipment, supplies and information.

> FN6. Although Pearsall was not Hackett's supervisor, Lepp spoke to Pearsall about Hackett's allegation that Pearsall was attempting to hold her back from advancing. (Lepp Aff., Defs.' Ex. 10, ¶ 12).

On March 1, 2000, Hackett complained to Lepp about Pearsall's treatment of her. During their conversation, Pearsall entered Lepp's office and a dispute erupted between Hackett and Pearsall. [FN7] Hackett states that she reported the incident to the Human Resources department ("HR") in March 2000. [FN8] Hackett continued to receive good performance evaluations in 2000 and 2001 from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lepp. She received salary increases on March 28, 2000 and November 27, 2000, and salary adjustment increases on January 1, 2001, January 3, 2001 and January 3, 2002, as well as an annual increase on January 4, 2002.

> FN7. In a memo dated March 3, 2000, Lepp wrote that he individually met with Hackett and Pearsall on March 2, 2000 to discuss the incident. (Lepp Memo, Defs.' Ex. 14).

> FN8. Hackett claims that she filed a complaint with HR Director, Peter Bezrucik ("Bezrucik"), but he never responded to her complaint. Hackett also alleges that her profile from HR was tampered with and, as a result, the complaint that she filed regarding Pearsall in 2000 was missing.

On March 19, 2002, Hackett and Pearsall had a verbal altercation when she asked him to perform tasks that he believed she should have been able to perform. [FN9] On March 21, 2002, Hackett submitted a written complaint regarding the incident. Hackett's complaint includes allegations against Pearsall, Lepp and Groff. The allegations primarily focus upon Pearsall's demeaning attitude, including verbal attacks, against Hackett's skills and qualifications. The allegations against Lepp focus on his lack of support of Hackett. As for the allegations against Groff, Hackett asserts that in November 2001 she requested a meeting with Groff, in which Lepp also attended, and Groff told Hackett that he was not impressed with her work and that she would have to prove herself to him. Hackett's complaint does not include any claims of discrimination or retaliation by Pearsall, Lepp or Groff. Sometime after the March 19, 2002 dispute, Lepp met with Hackett and Pearsall to discuss the dispute and any issues. On April 2, 2002, Lepp issued written disciplinary warnings concerning the incident to both Hackett and Pearsall.

> FN9. For the interim two year period, Hackett presents no evidence of any altercations or allegations concerning Pearsall.

*3 Hackett initially performed satisfactorily as the Network Administrator. In 2001, she received an Improvement Needed in job knowledge on her job appraisal. (Dec. 13, 2001 Performance Appraisal, Defs.' Ex. 18). According to Lepp, he assigned Hackett an Improvement Needed because her knowledge of the Network System started to stagnate. (Lepp Aff., Defs.' Ex. 10, ¶ 16). During Hackett's tenure as Network Administrator, Groff detected the following various deficiencies in her performance: a continual crashing of ARC (the back up system installed by Hackett); the incorrect installation of ADP; difficulties with Great Plains (the finance program used by CBH); difficulties with the Hermes Server; unsuccessful installation of the Windows 2000 Test Bed; and unnecessary reliance upon outside consultants. [FN10] (Groff Aff., Defs.' Ex. 6, ¶ 8).

> FN10. Groff was advised by two outside consultants that Hackett was "in above her head" because of her lack of experience. (Groff Aff., Defs.' Ex. 6, ¶ 9; Defs.' Ex. 19).

In the middle of 2001, CBH decided to change its operating system and it began the process of migrating from the Novell System to Microsoft. The migration process was facilitated by Phillip S. Rohrbach, a Network Engineer and Microsoft Certified Systems Engineer who was employed by Versalign, Inc. (the outside consulting company utilized by CBH). Since Hackett was not a Microsoft Certified Systems Engineer, CBH sent her for training in certain Microsoft courses to assist her with the upcoming changes. Hackett was not comfortable with the Microsoft System and repeatedly requested a separate computer to practice the skills that she learned. In May/June 2002, Groff, after discussing his concerns with Lepp regarding the deficiencies of Hackett's performance over the past year, decided that she could not continue as the Network Administrator under the new system based upon her lack of experience and the deficiencies in her performance. (Groff Aff., Defs.' Ex. 6, ¶¶ 11-12).

2. FMLA Leave

On June 19, 2002, Hackett requested a family medical leave as a result of major depression. CBH granted Hackett's family medical leave request. While out on FMLA leave, Hackett sent a letter dated June 24, 2002 to Nancy Lucas, the CEO of CBH, complaining about problems with the migration process. The letter also included complaints concerning Pearsall, Groff and Lepp. The letter did not contain any allegations regarding discrimination or retaliation. On July 31, 2002, Hackett returned to work from her FMLA leave. Hackett was assigned to the position of Data Integrity and Recovery Administrator. [FN11] Groff and Lepp created the position after Groff had made the decision to remove Hackett as Network Administrator. (Groff Aff., Defs.' Ex. 6, ¶¶ 12-13; Lepp Aff., Defs.' Ex. 10, ¶ 22). The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 4

position was at the same EP level as the Network Administrator position, and Hackett's salary, work location and hours remained the same. Hackett continued reporting to the Director of Technical Services and she was responsible for ensuring that all network servers and PC backups were functioning properly. The Data Integrity and Recovery Administrator position was created for Hackett in order to allow her to continue in the capacity of an administrator while restricting her access to certain systems based upon concerns regarding her lack of experience. (Groff Aff., Defs.' Ex. 6, ¶ 13; Lepp Aff., Defs.' Ex. 10, ¶ 22). Apparently, the differences between the two positions were that Hackett had restricted access to certain systems and did not have a laptop or private internet access. As a result of being denied access to certain systems on the Network, Hackett complained that she was unable to perform her job duties. Through a letter dated August 30, 2002, Hackett complained to Bezrucik that she was unable to perform her functions as Data Integrity and Recovery Administrator. Hackett set forth the following three reasons as the causes for her inability to perform: lack of access to the Network; duties gradually being directed to male counterparts; and security concerns being ignored. Hackett did not make any complaints about discrimination or retaliation in her letter.

> FN11. Initially, this position was going to be identified as Data Integrity and Recovery Specialist; however, the title of Data Integrity and Recovery Administrator was agreed upon pursuant to Hackett's request.

*4 At the time Hackett's position was created, Groff and Lepp believed that they could restrict Hackett's access to certain secure systems on the network while allowing her access to other systems in order to perform her job. (Groff Aff., Defs.' Ex. 6, ¶ 14; Lepp Aff., Defs.' Ex. 10, ¶ 23). While Hackett was acting as the Data Integrity and Recovery Administrator, Groff and Lepp learned that the they could not restrict Hackett's access to certain systems while permitting her access to other systems. (Id. ¶ 15). Groff was unwilling to allow Hackett the needed access to the secured system because of the potential damage that could result from allowing her such access. (Id. ¶ 16; Lepp Aff., Defs.' Ex. 10, ¶ 24). Since Hackett was unable to continue as the Data Integrity and Recovery Administrator without access to the secured systems, she was transferred to the position of Senior Technical Support Specialist. (Id. ¶ 17; Lepp Aff., Defs.' Ex. 10, ¶ 25). In a memo dated September 3, 2002, Groff explained to Hackett that he questioned her job knowledge, skills and judgment. Groff listed five pages of instances in which he questioned Hackett's job knowledge and conduct. Groff concluded the memo by stating that he did not have the high degree of confidence in Hackett's skills and judgment to grant her the access needed to perform in the Data Integrity and Recovery Administrator position. As a result, Groff informed Hackett that she was being transferred to the position of Senior Technical Support Specialist.

3. Senior Technical Support Specialist Position

As a Senior Technical Support Specialist, Hackett was to report to Orlando Rivera. The Senior Technical Support Specialist position was an EP level of 16 with a salary of $42,478.00. After the transfer, Hackett filed a complaint with the Department of Labor in September 2002 alleging that CBH failed to reinstate her to an equivalent position. On September 12, 2002, Hackett, through her representative Clarence Allen ("Allen"), also submitted a complaint of discrimination to the Equal Employment Opportunity Commission ("EEOC"). [FN12] On September 16, 2002, Hackett submitted her Allegations of Employment Discrimination Questionnaire Response to the EEOC, and filed a Verified Charge of Discrimination with the Pennsylvania Commission on Human Relations.

> FN12. Allen is Hackett's friend who informed her that he knew how to write a complaint. Hackett did not know, and was not concerned, if Allen had any qualification to write a complaint. Allen also initially assisted Hackett in the beginning stages of the instant action.

4. Workers' Compensation Benefits Claim

On October 4, 2002, Hackett fell backwards at work while carrying a computer and filed a Workers' Compensation Benefits claim that was approved by CBH's Workers' Compensation Insurer. Due to this injury, Hackett was absent from work from October 4, 2002 until November 5, 2002, when her physician released her back to work with lifting restrictions. [FN13] Due to the lifting restriction, Hackett was reinstated in the position of Help Desk Operator, which did not require any lifting, and was paid the same compensation. Hackett claimed that she could not sit at the help desk due to her injuries. When Hackett's treating physician, Neil Kahanovitz, M.D. ("Dr.Kahanovitz"), released her to return to her pre-injury position, Hackett was returned to the Senior

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 5

Technical Support Specialist position on November 27, 2002. Upon her release, Dr. Kahanovitz restricted Hackett to working four hours per day. On January 13, 2003, Dr. Kahanovitz restricted Hackett to working three days a week for eight hours and CBH permitted her to work on a part-time basis as directed by her physicians. On January 24, 2003, Bezrucik offered Hackett the opportunity to advance to the position of Microsoft Network Administrator provided that she attended and completed training to allow her to become a Microsoft Certified Systems Administrator. CBH offered to pay for the training and did condition this offer upon any release of Hackett's pending claims before the Pennsylvania Commission on Human Relations ("PCHR"). By letter dated January 25, 2003, Hackett rejected the position. Hackett explained that the she was promised the position of Network Administrator following the migration from Novell to Microsoft. Hackett further explained that she completed most of the Microsoft training courses. Hackett then set forth a proposal containing a list of conditions including, but not limited to, the following: full and complete reinstatement to Network Administrator with retroactive salary effective July 31, 2002; letters of apologies from Pearsall, Groff and Bezrucik; and immediate compensatory/punitive payment in the amount equivalent to two years salary. In her deposition, Hackett stated that she rejected the offer due to her need to be out on Workers' Compensation; however, Hackett's letter did not include any mention of issues with Workers' Compensation as a basis for her rejection.

> FN13. On October 17, 2002, Leslie Edwards, the Benefits Manager at CBH, advised Hackett that her absence from work due to her Workers' Compensation injury would be designated as Family Medical Leave.

*5 On April 9, 2003, Bezrucik advised Hackett that she needed to return to work full-time without any restrictions by May 12, 2003 or else her employment would be terminated. CBH requires that Technical Support Specialists work full-time and does not employ any part-time Technical Support Specialists on a permanent basis. [FN14] Hackett claims that she was unable to return to full-time work by May 12, 2003 as a result of continued restrictions. On April 23, 2003, Hackett's Workers' Compensation attorney advised Bezrucik that she was unable to return to work full-time and requested that her Workers' Compensation Benefits be immediately reinstated to total disability. On May 12, 2003, Hackett was terminated based upon her inability to return to full-time work. Immediately after her termination, Hackett petitioned the Workers' Compensation Board to reinstate her benefits to total disability. On June 24, 2003, she also filed an Amended Charge of Discrimination with the PCHR.

> FN14. Hackett admits that she does not know of any Technical Support Specialist employed part-time.

Hackett has continued to receive full Workers' Compensation benefits subsequent to her termination. On January 27, 2004, Hackett signed a Verification to the Pennsylvania Department of Labor and Industry Bureau of Workers' Compensation verifying that she has been unable to work in her former position because her physician has not released her to return to work and she is totally disabled. At her deposition on December 20, 2004, Hackett stated that she has not made any real effort to obtain employment.

B. *Procedural History*

Hackett filed her *pro se* Complaint on January 5, 2003, and filed an Amended Complaint on May 3, 2004. Additionally, she filed a second Civil Action Complaint (Civ.A.04-2806) based upon similar grounds on June 25, 2004. This second action was consolidated with her pending action on August 13, 2004. On September 23, 2004, Emanuel A. Coker, Esq. ("Coker") entered his appearance on Hackett's behalf. Defendants filed their Motion for Summary Judgment on February 18, 2005. Hackett's Response in opposition to the Motion was filed on April 1, 2005.

II. *STANDARD*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). An issue is genuine only if

there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248.

*6 To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989)(citing *Celotex*, 477 U.S. at 325 (1986)). Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. *Celotex*, 477 U.S. at 322-23. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id.* at 322; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir.1987).

III. *DISCUSSION*

Hackett's Amended Complaint involves claims pursuant to numerous legal grounds and statutes. [FN15] In their Motion for Summary Judgment, Defendants note the confusion engendered by Hackett's voluminous Amended Complaint which fails to separately list her numerous claims and their supporting allegations. Additionally, Defendants note that Coker has failed to clarify Hackett's claims after making his appearance in this action. In response to Defendants' Motion for Summary Judgment, Coker clarified that this action is being pursued upon the following grounds: (1) race and gender discrimination under Title VII and the PHRA; (2) violation of rights under the FMLA; and (3) retaliation for Hackett's exercise of her rights under Title VII, PHRA, FMLA and the Workers' Compensation Act. Accordingly, it appears that Hackett has abandoned most of her claims except for the claims based upon the aforementioned three grounds.

> FN15. Hackett's Amended Complaint asserts the following grounds: Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; Deprivation of Rights Under 1983; the FMLA; the Pennsylvania Equal Rights Amendment; the Pennsylvania Equal Pay Act; PHRA; the Pennsylvania Whistleblower Act; the Pennsylvania Workers' Compensation Act; Breach of Contract; Breach of the CBH Personnel Policy and Procedures Manuel; Gender, Age, Race and Retaliatory Discrimination; Slander; Libel; Defamation; Harassment; Adverse Employment Action; Hostile Work Environment; Constructive Termination; Wrongful Termination and/or Discharge; Deprivation of Property Interest Without Due Process; Loss of Enjoyment of Life; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Deprivation of Rights Under the Due Process and the Equal Protection Clauses of the Fifth and Fourteenth Amendments of the United States Constitution and the Pennsylvania Constitution. (*See* Am. Compl.). Hackett's Amended Complaint further alleges that "her unjustified demotions and subsequent termination appear to be part of a company pattern of discrimination, the purpose of which is to eliminate Black heterosexual women employed in excess of two years and earning more than forty thousand dollars annually, via either demotions, forced resignations, or outright terminations and to have them replaced with other persons not of her (their) racial, gender, or age class." (*Id.* at 2).

Although Hackett's response to Defendants' Motion for Summary Judgment clarifies the claims that she is asserting, the response only addresses Plaintiff's retaliation claims. Thus, the response does not defend the viability of Hackett's claims based upon race and gender discrimination under Title VII and the PHRA, or the claim of a violation of her rights under the FMLA. As a result, it appears that Hackett has also abandoned these claims. [FN16] *See Ankele v. Hambrick*, 286 F.Supp.2d 485, 496 (E.D.Pa.2003)(granting summary judgment based upon the premise that plaintiff's failure to respond to one of the defendant's arguments in his summary judgment motion results in his waiver of the opportunity to contest summary judgment on that ground); *see also Evans v. Nine West Group, Inc.*, No. 00-4850, 2002 WL 550477, at *4 (E.D.Pa. Apr. 15, 2002)(finding that plaintiff abandoned one of her claims by failing to defend the claim's viability in her opposition to defendant's summary judgment motion: "Under analogous circumstances, courts both within and beyond the Third Circuit routinely have held the claim at issue to have been abandoned.")

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 7

Accordingly, summary judgment is granted in Defendants' favor regarding all of Hackett's abandoned claims. The only remaining claims in this action are retaliation claims based upon the exercise of Hackett's rights under Title VII, PHRA, FMLA and the Workers' Compensation Act.

> FN16. Even disregarding the abandonment issue pertaining to Hackett's claims based upon race and gender discrimination under Title VII and the PHRA and violation of her rights under the FMLA, summary judgment would be granted in Defendants' favor because the claims fail as a matter of law. Regarding Hackett's Title VII and PHRA claims, she fails to make out a *prima facie* case of discrimination and fails to provide any evidence to rebut the Defendants' legitimate nondiscriminatory reasons for her change in position and salary decrease by a showing of pretext.
> As for the FMLA claim, Hackett contends that Defendants violated the FMLA by failing to return her the same position that she had prior to her FMLA leave. "The FMLA entitles eligible employees to reinstatement at the end of their FMLA leave to the position held before taking leave or an equivalent position." *Bearley v. Friendly Ice Cream Corp.,* 322 F.Supp.2d 563, 571 (M.D.Pa.2004) (citation omitted). "Under an interference claim, it is plaintiff's burden to demonstrate that she was entitled to a benefit under the FMLA, but was denied that entitlement." *Id.* (citations omitted). "If the plaintiff meets this burden, then it is defendant's burden to demonstrate that she would have been denied reinstatement even if she had not taken FMLA leave." *Id.* (citation omitted). CBH has shown, and the evidence supports, that Hackett was not going to be restored to Network Administrator irrespective of whether she took FMLA leave. Regarding Hackett's termination, CBH has shown, and the record supports, that Hackett was terminated because of her inability to work full-time.

A. *McDonnell Douglas Burden-Shifting Framework*

*7 The parties do not dispute that the McDonnell Douglas burden-shifting framework is the appropriate mechanism with which to analyze Hackett's claims that she was the victim of unlawful retaliation under Title VII, PHRA, FMLA and the Workers' Compensation Act. [FN17] See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Summarized briefly, the McDonnell Douglas analysis proceeds in the following three stages:

> FN17. See *Knabe v. Boury Corp.,* 114 F.3d 407, 410 n. 5 (3d Cir.1997)(stating "[e]mployer liability under the [PHRA] follows the standards set out for employer liability under Title VII"); *Christman v. Cigas Mach. Shop, Inc.,* 293 F.Supp.2d 538, 543 (E.D.Pa.2003)(under the Workers' Compensation Act, "[t]he Pennsylvania Supreme Court has not yet set forth the elements of a *prima facie* case of retaliatory discharge, so courts in this district borrow the analytical structure used in Title VII retaliation claims"); *Sherrod v. Phila. Gas Works,* 209 F.Supp.2d 443, 450 (E.D.Pa.2002)(claims of unlawful retaliation under the PHRA and FMLA may be proved through the McDonnell Douglas analysis); *Ryales v. Phoenixville Sch. Dist.,* 177 F.Supp.2d 391, 395 (E.D.Pa.2001)(stating "[w]hen evaluating retaliation claims under Title VII, courts apply the well-known burden shifting framework first set forth in McDonnell Douglas"). All four of Hackett's claims, therefore, will be viewed in accordance with the McDonnell Douglas analytical framework.

[f]irst, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
*Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999) (citations omitted). "[M]ost cases turn on the third stage, i.e., can the plaintiff establish pretext." *Id.* "While the burden of production may shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."' *Id.* (quoting *Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981)).

B. *Analysis of Claims*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 8

1. Title VII and the PHRA

*a.) Prima Facie Case*

Under Title VII and the PHRA, in order to advance a *prima facie* case of retaliation, "a plaintiff must show that (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." [FN18] *Shesko v. City of Coatesville, 292 F.Supp.2d 719, 727 (E.D.Pa.2003)*(quotation and internal quotation marks omitted). I will assume for purposes of this Motion only that Hackett has met the first and second elements of her *prima facie* case of retaliation based upon race and gender discrimination. Even with this assumption, Hackett's claims fail because she cannot show the final element; namely, the existence of a causal link between her protected activity and the employer's adverse action.

> FN18. "Preliminarily, it is important to note that there are several jurisdictional prerequisites to the valid assertion of a claim under Title VII," such as administrative exhaustion requirements. *Schouten v. CSX Transp., Inc., 58 F.Supp.2d 614, 616 (E.D.Pa.1999)* (citations omitted). "The PHRA also requires the exhaustion of administrative remedies before suit may be filed in court." *Id.* at 617 (citation omitted). In this action, there are various and multiple questions concerning administrative exhaustion issues (i.e., whether Hackett's numerous filings were timely, whether Hackett filed the instant action within the applicable time limits, whether the filings sufficiently named/included the current Defendants). Such questions cannot be definitively answered due to the confusing manner in which this action has been initiated and pursued from the administrative filings to the present court filings. From Hackett's filing in response to Defendants' Summary Judgment Motion, it appears that she premises her Title VII and PHRA claims solely based upon the issuance of the disciplinary warning resulting from the March 19, 2002 altercation with Pearsall. For the sake of expediency, I conclude that Hackett has satisfied all prerequisites in order to validly assert her claims based upon the aforementioned premise.

The only analysis presented by Hackett regarding her Title VII and PHRA claims is the following:
> [i]n this instance, Hackett filed two internal complaints, one in March 2000 and the other in March 2002. No action was taken on her first complaint. On her second complaint, no one conducted an investigation. However, Hackett was given a written disciplinary warning. This adverse action was the result of her filing an internal complaint.

(Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 5). Thus, it appears that Hackett's *prima facie* retaliation claim is solely based upon her internal complaints and the disciplinary warning issued to her after she filed her second internal complaint. As for the causal connection element, Hackett conclusively argues, without pointing to any evidence or materials of record, that the disciplinary warning was a result of her filing the internal complaint. Conclusory allegations, without more, are insufficient to withstand summary judgment. *See* Fed. R. Civ. P. 56(e); *Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir.1993)*. The record shows that the issuance of Hackett's disciplinary warning was the result of her March 19, 2002 altercation with Pearsall. Both Hackett and Pearsall were individually addressed pertaining to the incident and both were separately issued similar disciplinary warnings. As for Hackett's second internal complaint, it included allegations against Pearsall, Lepp and Groff regarding general work-related issues and did not include any claims of discrimination or retaliation. Thus, the evidence in the record belies Hackett's unsupported conclusory allegation that a causal connection exists between the filing of her internal complaints and the disciplinary warning issued after she filed her second internal complaint. Viewing the evidence in a light most favorable to Hackett, I conclude that she has not shown a *prima facie* case because she had failed to show the requisite existence of a causal link. Consequently, summary judgment is granted in Defendants' favor pertaining to Hackett's retaliation claims under Title VII and PHRA.

*b.) Legitimate, Nondiscriminatory Reason*

*8 Even if Hackett successfully established a *prima facie* case, her claims would fail because she has not proffered any argument or evidence concerning the requisite showing of pretext to rebut Defendants' asserted legitimate, nondiscriminatory reasons. Supported by the record, Defendants proffer

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 9

legitimate, nondiscriminatory reasons for transferring Hackett from the position of Data Integrity and Recovery Administrator to Senior Technical Support Specialist and for thereafter terminating her employment. Concerning Hackett's transfer from the position of Data Integrity and Recovery Administrator to Senior Technical Support Specialist, Defendants argue that it is undisputed that she was transferred because she needed access to security systems in order to perform her duties as Data Integrity and Recovery Administrator, and Defendants did not authorize such access based upon Hackett's prior performance. As for the termination of Hackett's employment, Defendants argue that they terminated Hackett because she held a full-time position and she was unable to work full-time.

I conclude that Defendants have met their burden of production because their contentions are sufficiently supported by the record through affidavits and other documentation.

*c ) Pretext*

Since Defendants have proffered legitimate, nondiscriminatory reasons for their actions, Hackett must meet her "burden of persuasion by proving that the defendant's proffered reasons are not the 'true reasons' for its decision, but instead are merely a pretext for discrimination." *Jones v. WDAS FM/AM Radio Stations,* 74 F.Supp.2d 455, 461 (E.D.Pa.1999) (citation omitted). "[A] plaintiff may ... survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir.2000) (citations omitted). Hackett fails to met her burden by neither arguing, nor presenting evidence, that Defendants' articulated reasons are untrue, but are merely pretext for discrimination. As explained earlier, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. By failing to address the pretext issue in anyway, Hackett fails to satisfy her burden of production by presenting evidence such that a factfinder could reasonably either disbelieve Defendants' articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In light of Defendants' arguments and the objective evidence presented in the record, no reasonable factfinder could conclude that Defendants' articulated reasons for transferring, and eventually terminating Hackett, were pretextual. As a result, Hackett's retaliation claims under Title VII and the PHRA fail. Accordingly, Defendants' Motion for Summary Judgment will be granted.

2. FMLA

*a.) Prima Facie Case*

*9 Hackett's retaliation claim under the FMLA also fails under the McDonnell Douglas burden-shifting framework. Similar to Title VII and the PHRA, under the FMLA, in order "[t]o prove a *prima facie* case of retaliation, [plaintiff] must show that: 1) he is protected under the FMLA, 2) he suffered an adverse employment action and 3) a causal connection exists between the adverse decision and plaintiff's exercise of his or her FMLA rights." *Baltuskonis v. U.S. Airways, Inc.,* 60 F.Supp.2d 445, 448 (E.D.Pa.1999) (citations omitted). I will assume for purposes of this Motion only that Hackett has met her burden of establishing a *prima facie* case of retaliation under the FMLA. [FN19]

> FN19. There is no question that Hackett is protected under the FMLA; however, there are significant issues concerning whether she suffered an adverse employment action when she was returned to work as the Data Integrity and Recovery Administrator and whether she has shown the requisite causal connection. Upon her return from FMLA leave, Hackett claims that she was placed in a lower position and, when she complained, she was again demoted and paid a lesser salary. Defendants argue that Hackett was returned to an equivalent position based upon the following: she did not suffer any change in salary and benefits; her hours remained the same; she was returned to the same work location; her supervisor remained the same; and she continued to perform some of the same responsibilities as her previous position. Acknowledging that Hackett did have restricted access to certain systems and did not have a laptop or private internet access, Defendants argue that such differences are akin to sharing work space and are *de minimus.* For purposes of expediency, I will not address the issues of whether Hackett was reinstated in an equivalent position and whether a causal connection exists because her claim fails on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 10
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

other grounds.

*b) Legitimate Nondiscriminatory Reason*

Assuming that Hackett has shown her *prima facie* case, her claim fails because she has not presented any argument or evidence to show that Defendants' proffered legitimate, nondiscriminatory reasons for their actions were pretext for FMLA discrimination. The legitimate, nondiscriminatory reasons asserted by Defendants concerning Hackett's FMLA retaliation claim are the following: Hackett was reinstated to the position of Data Integrity and Recovery Administrator as a result of her performance, and that this decision was made prior to Hackett taking her FMLA leave; Hackett's transfer to the position of Senior Technical Support Specialist was because Defendants could not authorize her to have access to certain secured systems; and Hackett was ultimately terminated because she was unable to return to full-time work. I conclude that Defendants have met their burden of production because their contentions are sufficiently supported by the record through affidavits and other documentation.

*c) Pretext*

Since Defendants have successfully met their burden of proffering legitimate, nondiscriminatory reasons for their actions, Hackett must prove by a preponderance of the evidence that the legitimate reasons offered by the Defendants were not their true reasons, but were a pretext for discrimination. The sole analysis presented by Hackett regarding her FMLA retaliation claim is the following:
> [i]n this instance, Hackett returned to work after a six week FML[A] leave. She was transferred to a lower position without explanation. When she complained about the position, she was again demoted and her salary was reduced. One month after Hackett returned from her FML[A] leave, Defendant produced a document stating that her work was substandard. Up until that time, all of Hackett's performance appraisals were positive.
> (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 6).

Viewing this analysis, upon which Hackett's entire claim rests, it is clear that a showing of pretext has not been made. As with the previous analysis of Hackett's retaliation claims under Title VII and the PHRA, Hackett fails to meet her burden of showing pretext because she neither addresses, nor presents any evidence, that Defendants' proffered reasons are not true, but are merely pretext for discrimination. In failing to address Defendants' articulated legitimate reasons, Hackett presents no evidence from which a factfinder could reasonably either disbelieve Defendants' articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Although Hackett acknowledges that the burden of persuasion rests with her at all times, she has woefully failed to present any argument, or pointed to any evidence, to satisfy her burden of showing pretext in the instant action. In light of Defendants' arguments and the objective evidence presented in the record, no reasonable factfinder could conclude that Defendants' articulated reasons were pretextual. As a result, Hackett's retaliation claim under the FMLA fails. Defendants' Motion for Summary Judgment will be granted.

3. Workers' Compensation Claim

*a) Prima Facie Case*

*10 Like her previous claims, Hackett's Workers' Compensation retaliation claim also does not survive summary judgment. As with the other claims, in order to present a *prima facie* case for retaliation under the Workers' Compensation Act, "a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Christman*, 293 F.Supp.2d at 543 (quotation and internal quotation marks omitted). It is clear that the first two elements have been met. Hackett engaged in the projected activity of filing a Workers' Compensation claim and her employer took the adverse action of terminating her after she engaged in that protected activity. As for the third element of causation, Hackett fails to make the requisite showing of a causal link between the two events.

Regarding her Workers' Compensation retaliation claim, the only analysis presented by Hackett is the following:
> [a]gain Hackett was on restricted duty and was only able to work part time. After demoting Hackett to her original entry level position, CBH informed her that if she was not able to return to work full time, then her employment would be terminated. CBH could have accommodated her disability, but chose not to because Hackett had filed a workers compensation claim.
> (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 7).

Hackett conclusively argues, without pointing to any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 11

evidence or materials of record, that CBH could have accommodated her disability, but chose not to, and her termination was a result of the filing of her Workers' Compensation claim. By only proffering a conclusory assertion, without providing any support through the record, Hackett fails to satisfy her burden of demonstrating a causal link between the filing of her claim or her receipt of Workers' Compensation and her termination. "[T]he mere fact that an alleged discharge occurs subsequent to the filing of a claim is insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Christman, 293 F.Supp.2d at 544 (citations omitted). As explained,

> [a] plaintiff must produce at least some evidence that connects the dots between her claim for workers' compensation and her termination, such as adverse personnel action promptly after her workers' compensation claim was made, statements by supervisors referencing her claim, documents from the employer discussing her claim with respect to her termination, etc.

Id. (quoting Landmesser v. United Air Lines, Inc., 102 F.Supp.2d 273, 278 (E.D.Pa.2000)). Hackett does not connect any of the dots between her claim or receipt of Workers' Compensation and her termination through any evidence or materials of record. She merely conclusively asserts that such a connection exists. As previously explained, conclusory allegations, without more, are insufficient to withstand summary judgment. See Fed. R. Civ. P. 56(e); Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir.1993). Viewing the evidence in Hackett's favor, I do not find any evidence that suggests a connection between her Workers' Compensation claim or her receipt of Workers' Compensation benefits and her termination. Thus, Hackett has not established her *prima facie* case and her claim fails as a matter of law.

*b.) Legitimate Nondiscriminatory Reason*

\*11 Assuming that Hackett has successfully shown a *prima facie* case, her claim fails because she has not proffered any argument or evidence to show that Defendants' proffered legitimate, nondiscriminatory reason for their actions were pretext for discrimination. The legitimate, nondiscriminatory reason asserted by Defendants for Hackett's termination is that she was unable to work full-time and her position required full-time employment. Defendants' contention is sufficiently supported by the record through affidavits and other documentation. The record supports Defendants' contention; therefore, they have met their burden of production.

*c.) Pretext*

In light of Defendants successfully meeting their burden of production, Hackett must prove by a preponderance of the evidence that the legitimate reason offered by the Defendants were not their true reason, but were a pretext for discrimination. As with all of the previous claims, Hackett neither addresses, nor presents any evidence, concerning the pretext issue. Thus, Hackett does not dispute Defendants' contention that Hackett's position required full-time employment and that she was unable to meet that requirement of the job. Other than the aforementioned conclusory statement by Hackett that she was terminated because of the filing of her Workers' Compensation claim, Hackett does not respond to, or dispute, Defendants' asserted legitimate reason that she was terminated due to her inability to work full-time. By failing to address the pretext issue in anyway, Hackett fails to satisfy her burden of production by presenting evidence such that a factfinder could reasonably either disbelieve Defendants' articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In light of Defendants' arguments and the objective evidence presented in the record, no reasonable factfinder could conclude that Defendants' articulated reasons for terminating Hackett were pretextual. Consequently, Defendants' Motion for Summary Judgment will be granted.

IV. *CONCLUSION*

Summary judgment is granted in Defendants' favor regarding all of Hackett's abandoned claims. Even disregarding the abandonment issue pertaining to Hackett's claims based upon race and gender discrimination under Title VII and the PHRA and violation of her rights under the FMLA, Defendants are entitled to summary judgment because the claims fail as a matter of law. They fail because Hackett has not adduced sufficient evidence in support of the claims. Summary judgment is also appropriate in relation to Hackett's remaining retaliation claims based upon the exercise of her rights under Title VII, PHRA, FMLA and the Workers' Compensation Act. The record establishes that Defendants are entitled to summary judgment. Hackett bears the burden of proof, and has failed to adduce sufficient evidence to support her claims. Therefore, Defendants are entitled to judgment as a matter of law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1084621 (E.D.Pa.)
(Cite as: 2005 WL 1084621 (E.D.Pa.))

Page 12

*12 An appropriate Order follows.

### ORDER

AND NOW, this 6th day of May, 2005, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 33), and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED.

2005 WL 1084621 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

- 2:03CV06254 (Docket) (Nov. 14, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.