# EXHIBIT J

Page 1

2003 Del. Ch. LEXIS 5, *

LEXSEE 2003 DEL. CH. LEXIS 5

In re NATIONAL AUTO CREDIT, INC. SHAREHOLDERS LITIGATION

Consolidated C.A. No. 19028

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

2003 Del. Ch. LEXIS 5

March 8, 2002, Submitted
January 10, 2003, Decided

**SUBSEQUENT HISTORY:** Motion denied by *In re Nat'l Auto Credit, Inc. - Shareholders Litig.*, 2004 Del. Ch. LEXIS 114 (Del. Ch., Aug. 3, 2004)

**DISPOSITION:** [*1] Plaintiffs' claim for breach of fiduciary duty of care and application for rescission of ZoomLot Agreement dismissed. Defendants' motions to dismiss denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Norman M. Monhait, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Brian P. Glancy, Esquire, of Hughes Sisk & Glancy, P.A., Wilmington, Delaware; Goodkind Labaton Rudoff & Sucharow LLP, New York, New York; Harnes Keller LLP, New York, New York, for Plaintiffs.

Edward P. Welch, Esquire, and Julie A. Tostrup, Esquire, of Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware; Jonathan J. Lerner, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Herbert F. Kozlov, Esquire, of Parker Duryee Rosoff & Haft, New York, New York, for Defendants, James J. McNamara, John A. Gleason, William S. Marshall, Henry Y. L. Toh, Donald Jasensky, Peter T. Zackaroff, Mallory Factor and Thomas F. Carney, Jr.

Barry M. Klayman, Esquire, of Wolf, Block, Schorr and Solis-Cohen, LLP, Wilmington, Delaware, for Nominal Defendant, National Auto Credit, Inc.

**JUDGES:** John W. Noble, Vice Chancellor.

**OPINIONBY:** John W. Noble

**OPINION:**

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

At issue are motions [*2] to dismiss the operative complaint (the "Complaint") in this consolidated derivative action brought on behalf of Nominal Defendant National Auto Credit, Inc. ("NAC"), a Delaware corporation. n1 The Plaintiffs contend that members of NAC's board of directors (the "Board") committed corporate waste and breached their fiduciary duties of care and loyalty by entering into a series of interlocking transactions, approved at a December 15, 2000, Board meeting (the "Meeting"). Furthermore, the Plaintiffs seek to rescind the agreement to acquire ZoomLot Corporation ("ZoomLot"), approved by the Board at the Meeting (the "ZoomLot Agreement").

n1 This litigation originated with three derivative actions: *Academy Capital Management, Inc. v. McNamara*, C.A. No. 19028 (filed July 31, 2001); *Markovich v. McNamara*, C.A. No. 19061; and *Harbor Finance Partners v. McNamara*, C.A. No. 19087. Pursuant to the Order of Consolidation, the complaint in *Academy Capital Management v. McNamara*, C.A. No. 19028, was "deemed the operative complaint in the consolidated action." Defendants were not required to respond to the complaints filed in the other actions.

[*3]

The Defendants have moved to dismiss the

Complaint on several grounds. First, they contend that the Complaint must be dismissed because the Plaintiffs have failed to satisfy the pre-suit demand requirements imposed by Court of Chancery Rule 23.1. The Defendants also urge a dismissal of the Complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim for corporate waste or breach of fiduciary duty upon which this Court can grant relief. Finally, the Defendants assert that the Plaintiffs' application to rescind the ZoomLot Agreement must be dismissed pursuant to Court of Chancery Rule 19 for failure to join indispensable parties.

For the reasons that follow, I deny the Defendants' motions to dismiss, under Court of Chancery Rule 23.1, because demand was futile and thus excused. In addition, I also deny the Defendants' motions to dismiss, under Court of Chancery Rule 12(b)(6), the Plaintiffs' claims for breach of the duty of loyalty and for corporate waste. However, I grant the Defendants' motions to dismiss, under Court of Chancery Rule 12(b)(6), the Plaintiffs' claim for breach of the duty of care and the Defendants' motions to dismiss, pursuant to Court of Chancery [*4] Rule 19, the Plaintiffs' application for rescission of the ZoomLot Agreement.

### I. FACTUAL BACKGROUND n2

> n2 The factual background is taken from the well-pleaded allegations of the Complaint. *White v. Panic*, 783 A.2d 543, 548 n.5 (Del. 2001).

#### A. *The Parties*

Plaintiffs Academy Capital Management, Inc., Harbor Finance Partners, and Levy Markovich (collectively, the "Plaintiffs") are common stockholders of NAC and have continuously held shares of NAC common stock at all relevant times. The Complaint challenges the adoption at the Meeting of three resolutions (approving an employment agreement for NAC's Chairman and Chief Executive Officer, authorizing the ZoomLot Agreement, and awarding to the directors compensation for past services in addition to increasing their directors' fees) (collectively, the "Resolutions"), each allegedly approved as a *quid pro quo*.

NAC's executive offices are in Solon, Ohio. NAC stock trades on the OTC Bulletin Board. n3 Until March 2000, NAC primarily "invested [*5] in subprime used automobile consumer loans it purchased from used car dealerships." n4 However, as explained subsequently, NAC, under the leadership of Defendant James J.

McNamara ("McNamara") and the Board, would radically alter its core business activity and the composition of the Board.

> n3 As of July 31, 2001, NAC's market capitalization had dropped to $ 2.9 million. The Plaintiffs note that the market price for common shares of NAC was significantly and consistently undervalued in comparison to NAC's book value or liquidation value. Compl. P3.

> n4 *Id.*

McNamara has been Chairman and CEO of NAC since the Meeting in December 2000. n5 Between November 3, 2000, and the Meeting, McNamara served as interim Chairman and CEO. McNamara also heads the Board's Special Committee, which manages the business and affairs of NAC, and serves on the Board's Compensation Committee, which reviews compensation of NAC officers. He has been a director of NAC since February 1998.

> n5 McNamara also served as Chairman of NAC from April 1998 to November 1999.

[*6]
The other defendants are those directors present at the Meeting who approved the Resolutions. They, and their dates of service as NAC directors, are: John A. Gleason ("Gleason"), February 1998 to September 1999, and November 3, 2000, to present; William S. Marshall ("Marshall"), 1983 to 1993, March 1998 to September 28, 1999, and November 3, 2000, to present; Henry Y. L. Toh ("Toh"), December 1998 to present; Mallory Factor ("Factor"), December 15, 2000, to present; n6 Thomas F. Carney ("Carney"), December 15, 2000, to present; Donald Jasensky ("Jasensky"), November 1999 to present; n7 and Peter T. Zackaroff ("Zackaroff"), November 1999 to present (collectively, including McNamara, the "Defendant Directors"). None of the Defendant Directors, except for McNamara, Zackaroff, and Jasensky, was elected by shareholders of NAC; instead, they were appointed by the other Defendant Directors. n8 The terms of McNamara, Factor, and Gleason, as Class III directors, had expired prior to the Meeting. n9 At the time of the filing of the Complaint, NAC had last held an annual stockholders' meeting in September 1999. n10

n6 Factor also is the owner of Mallory Factor, Inc., a stock-promoting firm that has conducted business, in the form of investor relations services, with NAC since April 2000. Additionally, Mallory Factor, Inc., has subleased property to NAC which will serve as NAC's new executive offices. [*7]

n7 Jasensky is also the President of Automotive Personnel LLC, a company that provided placement services to NAC in 1998 and 2000.

n8 Compl. P5(b). McNamara, Zackaroff, and Jasensky were elected by written consent.

n9 Id. P5(c).

n10 Id. P5(d).

Though not named as a defendant in this consolidated action, Ernest C. Garcia, Jr. ("Garcia") is a central figure in the events surrounding NAC and any alleged wrongdoing by the Defendant Directors, in particular any by McNamara. Garcia, with his affiliates, formed ZoomLot in March 2000. In a transaction that allegedly occurred in mid-1999, McNamara directed NAC to pay Garcia $ 1,000,000 for an option to purchase all of his holdings in NAC stock (the "Garcia Option"). Garcia then granted Defendant Director Toh a proxy to vote all of Garcia's NAC shares. The Garcia Option was extended for another 120 days on June 24, 1999, for additional consideration of $ 500,000, and later re-extended for another 120 days on August 8, 1999, for an additional $ 1,000,000. NAC exercised its rights under the Garcia Option on November 22, 1999, and paid [*8] to Garcia $ 2,274,445 for his 2,849,630 shares subject to the Garcia Option. n11 As will be discussed, Garcia, as the holder of the Garcia Option, allegedly played a key role in McNamara's 1999-2000 struggle for control of NAC. Even after McNamara acquired control of NAC, Garcia's dealings with NAC were not yet over.

n11 Id. P29.

B. *The History of NAC, Before December 15, 2000.*

The issues before the Court principally concern the adoption of the Resolutions at the Meeting. However, to understand fully their adoption and my ultimate disposition of the Defendants' motions, it is necessary to review a broader slice of NAC's troubled history. Therefore, I begin my discussion of NAC several years before the Meeting.

NAC is no stranger to litigation. In the past four years, NAC has resolved significant suits concerning possible violations of securities laws and an internal contest for control. In January 1998, NAC found itself involved in class action securities fraud litigation after its auditor, Deloitte [*9] and Touche LLP, resigned due to its perceived inability to rely upon management's representations. This litigation ultimately concluded in April 2000 with a $ 6.5 million settlement. n12

n12 The Plaintiffs also note that there were simultaneous investigations by the Securities and Exchange Commission, the United States Attorney for the Northern District of Ohio, and the Federal Bureau of Investigation.

In addition to the securities litigation, NAC was beset by internal strife. The Board, led by McNamara, challenged the supremacy of Sam J. Frankino ("Frankino"), NAC's former chairman and its then-largest shareholder. The Plaintiffs allege that during that conflict, McNamara's entrenchment motive was evidenced by the Garcia Option granted in exchange for the proxy for Garcia's shares given to Toh, who could be trusted to vote those shares in favor of McNamara. n13 The factions in this contest for control, which was heavily litigated before this Court, reached a settlement on November 3, 2000. The settlement provided [*10] for, *inter alia*, the repurchase by NAC of the shares then held by Frankino and his affiliates for an aggregate price in excess of $ 35 million, n14 the reimbursement of Frankino's significant litigation costs, n15 the execution of a standstill agreement between Frankino and NAC, and the release by Frankino of NAC's directors from any and all liability. Most importantly for the McNamara faction, Frankino and his affiliates resigned from the Board.

n13 Compl. P29.

n14 This equates to an approximate per share repurchase price of $ 2.25.

n15 These costs surpassed $ 2 million.

In the course of dealing with the adverse consequences from the battle for control, the Board also supervised the exit of NAC from its old line of business

(investment in consumer automobile loans) and its subsequent entry into unrelated ventures. In March 2000, NAC sold nearly all of its portfolio of automobile loans; thus, at that point, NAC's assets consisted primarily of cash and short-term, highly-liquid investments. n16 Then [*11] in early April 2000, NAC purchased from Reading Entertainment, Inc., ("Reading") a fifty-percent passive interest in Angelika Film Center, LLC, which operated a multiplex cinema in Manhattan's SoHo district. NAC provided, as consideration, 8.9 million shares of NAC common stock and 100 shares of NAC Series A preferred stock. n17 Yet, NAC and Reading were not finished, and their relationship, like that between the feuding blocks of NAC directors, would be altered on November 3, 2000.

n16 Compl. P8.

n17 Id. P9.

Contemporaneously with the settlement reached between the warring factions of the Board, NAC, at McNamara's direction, executed a stock purchase and standstill agreement with Reading. Pursuant to this agreement, "NAC repurchased from Reading 5.2 million (of Reading's 8.9 million) shares of NAC common stock and all of its Series A [preferred stock]." n18 Additionally, and perhaps more significantly, Reading accepted a standstill agreement prohibiting Reading and its affiliates from purchasing any [*12] more shares of NAC and from altering the composition of the Board until August 31, 2003. Finally, Reading was permitted to designate two members of the Board. n19

n18 Id. P11.

n19 Id. Reading appointed James Cotter ("Cotter") and Scott A. Braly ("Braly").

One would think that, given the agreements reached between NAC and Frankino, and those between NAC and Reading, some equilibrium had been achieved. But the composition of the Board would again be changed prior to December 15, 2000. On November 3, 2000, NAC's then-Chairman and CEO, David Huber, resigned from those positions, allegedly under pressure from McNamara. McNamara was then chosen to serve as interim Chairman and CEO. n20 On November 22, 2000, director Philip Sauder resigned from the Board, again allegedly at the behest of McNamara. n21 Thus, much had transpired before the Meeting. However, the events that occurred at the Meeting are the focus of the litigation now before me.

n20 Id. P12. [*13]

n21 Id. P13.

C. *The Meeting*

On December 11, 2000, the then-members of the Board received an agenda for the Meeting. Slated items included: McNamara's transition to permanent Chairman and CEO of NAC and the attendant change in his compensation, discussion and possible adoption of a business plan, and consideration of several transactions with various third-parties. The draft of the business plan and the materials regarding third-party transactions were first circulated on December 12 and December 12-13, respectively. McNamara's elevation to a position of permanency did not go unchallenged; Cotter, one of the directors designated by Reading, circulated a memo critical of McNamara's background, concluding that McNamara was unqualified to serve in the capacities proposed.

At the beginning of the Meeting, the Board appointed Factor and Carney to fill the vacancies caused by the resignations of Phillip Sauder and David Huber. The Board then deliberated on the merits of the third-party transactions and the terms of a contract for the retention and compensation of McNamara as permanent Chairman [*14] and CEO of NAC (the "McNamara Employment Agreement" or the "Employment Agreement"). Also at this time, McNamara proposed awarding the other Defendant Directors supplemental payments in consideration for services previously rendered, granting them stock options and increasing their directors' fees for future services.

During a break, a representative of NAC approached the two directors appointed by Reading, Cotter and Braly, with a proposed buy-out of the remaining NAC common stock held by Reading. This repurchase was conditioned upon the immediate resignations of Cotter and Braly from the Board and the execution of another standstill preventing future purchases by Reading or its affiliates of any NAC shares. That same day, Reading agreed to surrender "all 4.7 million of [its] remaining NAC shares for $ 8 million." n22 Furthermore, Cotter and Braly tendered their immediate resignations. n23

n22 Id. P20. Thus, NAC ultimately repurchased 9.9 million shares from Reading for

$ 16 million, an approximate per share price of $ 1.60. I acknowledge that the aggregate number of shares claimed to have been repurchased from Reading (9.9 million) does not equal the number of shares allegedly transferred to Reading in consideration for the 50% passive interest in Angelika Film Center, LLC (8.9 million). [*15]

n23 Id.

While these actions cast a shadow over the discernible motives of the Board and its "leader" McNamara in the controversy now before me, the Plaintiffs principally complain of the Resolutions adopted at the Meeting.

D. *The Resolutions*

The Resolutions adopted by the Board at the Meeting concerned various subjects: the McNamara Employment Agreement, the ZoomLot Agreement, and a compensation package and increase in future directors' fees.

The McNamara Employment Agreement secured McNamara's position as CEO until December 31, 2003. For his services, McNamara would be paid an annual base salary of $ 500,000 and an annual bonus of a minimum of $ 250,000. Pursuant to the Employment Agreement, McNamara also received: a $ 750,000 signing bonus; $ 134,856 for past services rendered; 350,000 shares of NAC common stock; n24 an additional 750,000 options; n25 and finally, a $ 1 million bonus, contingent upon the listing of NAC on a "major exchange." In the event of termination of the employment relationship for specified reasons, either by NAC or McNamara, NAC would pay McNamara three times [*16] his annual base salary, plus the minimum annual bonus ($ 250,000) for each year remaining on the Employment Agreement, plus any excise taxes thereon. n26

n24 This represented approximately 4% of NAC's common stock prior to the approval of the ZoomLot Agreement.

n25 The options have a 10-year duration, and a strike price equal to NAC's share price at the time of the grant, or $ 0.664. These options represented approximately 8.5% of the common stock of NAC prior to the approval of the ZoomLot Agreement.

n26 Compl. P24.

At the Meeting, the Defendant Directors also approved the ZoomLot Agreement. In consideration for the acquisition of ZoomLot, NAC agreed to issue 270,953 shares of NAC Series B preferred stock n27 and 729,047 shares of NAC Series C preferred stock. n28 Furthermore, NAC agreed to supply $ 6.5 million in working capital to ZoomLot, of which NAC funded $ 2 million within ten days of the closing. n29 Finally, other amounts may be expended if ZoomLot exercises an option to repurchase dealer [*17] management software, an application critical to ZoomLot's operations, from Cygnet Capital (the "Cygnet Option"). This software was transferred from ZoomLot to Cygnet Capital by Garcia immediately before December 15, 2000. The Cygnet Option was exercisable until December 15, 2002, at a price equal to Cygnet Capital's cost of acquiring the software plus imputed annual interest of 30%. n30 Thus the Plaintiffs note that, "as a result of the ZoomLot Agreement, the equivalent of 2.7 million common shares . . ., or 23.5% of [NAC's] outstanding common shares[,]" was issued to Garcia and his affiliates. n31 Therefore, as Garcia and his affiliates then held approximately 3 million common shares (or 26.7% of NAC's outstanding common shares), Garcia could "block any attempt to alter, amend, or repeal [NAC's] by-laws, which include [NAC's] staggered board provision." n32 Depending on whether one utilizes book value for the NAC shares or the approximate repurchase values of the shares from Frankino and Reading ($ 2.245 or $ 1.60), NAC paid for ZoomLot between $ 36.5 million and $ 27.5 million.

n27 Id. P31(a). The NAC Series B preferred stock became convertible into shares of NAC common stock, at a preferred stock to common stock ratio of 1:10, shortly after the ZoomLot Agreement was approved. [*18]

n28 At the option of its holders, the NAC Series C preferred stock may be redeemed, after September 30, 2003, or on or after January 1, 2003, if a defined "valuation event" occurs, for a per share price of the greater of $ 15 or ten times the market price at the time of redemption. Id. P31 (b)-(c).

n29 Also at the time of the closing, NAC advanced funds to ZoomLot, so ZoomLot could repay the approximately $ 5 million it owed to

Cygnet Capital Corporation ("Cygnet Capital"), a corporation wholly-owned by Garcia. *Id.* P33.

n30 *Id.* P34.

n31 *Id.* P35.

n32 Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 10. Altering, amending, or repealing NAC's bylaws requires an affirmative 80% vote of NAC's outstanding shares.

What the Plaintiffs allege to be so striking about the ZoomLot Agreement is the condition of ZoomLot. ZoomLot, a "dot-com" company, provides business-to-business e-commerce services to non-franchise used car dealerships and other used car industry entities. Such services are aimed at enabling the delivery of financing and insurance to the used [*19] car dealers' customers. ZoomLot had been formed by Garcia and his affiliates in March 2000 to acquire the internet operations of Cygnet Dealer Finance, Inc., a company wholly-owned by Garcia. n33 As of November 30, 2000, ZoomLot reported a negative shareholders equity of $ 3,900,761, and revenues for the previous year of $ 115,244, n34 resulting in an operating loss of $ 3,721,875. ZoomLot's assets were valued at $ 1,280,451. n35 Thus, the Plaintiffs conclude, NAC paid "an excessive amount" for ZoomLot. n36

n33 ZoomLot completed the acquisition of these operations on July 1, 2000.

n34 Eighty-six percent of these revenues were derived from one customer.

n35 Compl. P30(b).

n36 *Id.* P36.

Moreover, the Defendant Directors approved at the Meeting monetary compensation for the Defendant Directors' (excluding McNamara) past services, options, and increases in directors' fees to be paid in the future (collectively, the "Directors' Fees"). Previously, NAC's directors had been paid $ 1,000 per board meeting [*20] they attended. For their past services rendered, the individual Defendant Directors were to receive the following sums: $ 208,000 (Zackaroff, Jasensky); $ 203,500 (Toh); and $ 66,916 (Marshall, Gleason). n37 The Defendant Directors also were each awarded stock options n38 for the underlying common stock amounts of: 70,000 shares (Zackaroff, Jasensky, Toh, Gleason, Marshall), and 50,000 shares (Factor, Carney). Finally, the directors' fees to be paid to each of the Defendant Directors (excluding McNamara) in the future were increased to an annual rate of $ 55,000, plus $ 5,000 annually for serving on one or more committees of the Board. n39

n37 Jasensky and Factor can also be regarded as indirectly receiving payments from NAC through payments to third-party companies. During its 2001 fiscal year, NAC agreed to pay Automotive Personnel LLC, of which Jasensky is President, $ 43,000 for "placement services" rendered three years prior. NAC additionally agreed to pay Automotive Personnel LLC $ 59,800 for "outplacement services" shortly after December 15, 2000. Also, since April 2000, NAC paid to Mallory Factor, Inc., a stock promoting firm owned by Factor, $ 20,000 per month plus reimbursement for expenses, totaling $ 251,000. Additionally, on May 29, 2001, NAC paid $ 80,000 to Mallory Factor, Inc., for "investor relations services." *Id.* P4. [*21]

n38 These options were exercisable for 10 years, at a strike price of the then current NAC market price of $ 0.664.

n39 Compl. P4.

The Defendant Directors' business plans were not received well by the market. On December 19, 2000, NAC's closing price was $ 0.62 per share. Upon announcing the ZoomLot Agreement the following day, NAC's stock plummeted 32%. By June 29, 2001, NAC's stock had declined to a closing price of $ 0.25 per share. n40

n40 *Id.* P38.

## II. CONTENTIONS

In the Complaint, the Plaintiffs claim that the Defendant Directors, in adopting the Resolutions, breached their fiduciary duty of loyalty, their fiduciary duty of care, and committed corporate waste. Specifically, the Plaintiffs allege that the adoption of the McNamara Employment Agreement and the ZoomLot Agreement was the culmination of a long-brewing entrenchment scheme, designed to secure McNamara's control over NAC and also to confer upon [*22] him excessive compensation. The Plaintiffs characterize the

Directors' Fees as authorized as a *quid pro quo* for the remaining Defendant Directors' support. Thus, the Plaintiffs conclude, the Defendant Directors engaged in a series of interrelated transactions that furthered their interests at the expense of all other NAC shareholders. By doing so, it is charged, the Defendant Directors violated their duty of loyalty. Moreover, the Plaintiffs assert, the Defendant Directors (excluding McNamara) arrived at these decisions uninformed and, therefore, violated the duty of care owed to NAC and its stockholders. Finally, the Plaintiffs claim that the McNamara Employment Agreement, the ZoomLot Agreement, and the Directors' Fees are so egregious as to constitute corporate waste.

In response, the Defendants have moved to dismiss the Complaint on the grounds that the Plaintiffs failed to make a pre-suit demand upon the Board as required by Court of Chancery Rule 23.1 ("Rule 23.1"). The Defendants contend that pre-suit demand was not excused with respect to the adoption of the McNamara Employment Agreement, the ZoomLot Agreement, or the Directors' Fees because a majority of the Board were [*23] independent and disinterested when their individual conduct is evaluated on a separate, resolution-by-resolution basis. Thus, the Defendants approach the issue of determining demand futility from the perspective that each Resolution must be analyzed distinctly from the others; in other words, the Defendants argue that the Resolutions do not constitute one interrelated group of transactions, but instead are three separate transactions, each to be analyzed in isolation regarding any alleged breach of fiduciary duty. Furthermore, the Defendants posit that each Resolution, individually, is the product of an informed business judgment, and thus no breach of the duty of care has occurred. Lastly, the Defendants deny that the McNamara Employment Agreement, the ZoomLot Agreement, or the Directors' Fees amount to corporate waste.

The Defendants have also moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) ("Rule 12(b)(6)"), arguing that the Plaintiffs have failed to state a claim for any of the alleged breaches of the fiduciary duties of loyalty and care or for corporate waste. Additionally, the Defendants maintain that the Plaintiffs' demand for rescission of the ZoomLot [*24] Agreement must be dismissed, pursuant to Court of Chancery Rule 19 ("Rule 19"), for failure to join the indispensable parties of Garcia or any of the other ZoomLot shareholders who relinquished their ZoomLot shares pursuant to the ZoomLot Agreement (the "Relinquishing Shareholders").

The Plaintiffs respond that any pre-suit demand was futile, and thus excused "because the challenged transactions are each a *quid pro quo* for the others and the [Defendant Directors] are personally interested in the challenged transactions collectively." n41 They contend the Complaint sets forth particularized facts that establish a reasonable doubt that a majority of the Board was disinterested and independent at the time the Complaint was filed. Considering the Resolutions together, each Defendant Director had an interest, personally benefiting from excessive compensation and securing and maintaining control of NAC (McNamara) or from increased directors' fees and payments (the seven remaining Defendant Directors), in approving the interrelated transactions. Thus, when the Resolutions are analyzed together, the particularized facts, and reasonable inferences drawn from them, establish that a reasonable [*25] doubt exists as to the disinterestedness and independence of eight of the ten directors of NAC. Moreover, the Plaintiffs insist that the sheer amount of money received by the Defendant Directors in connection with the adoption of the Resolutions creates a reasonable doubt as to their disinterestedness. Finally, the Plaintiffs contend that demand is also excused because the particularized facts of the Complaint establish a reasonable doubt that the adoption of the Resolutions was the result of a valid exercise of business judgment.

n41 *Id.* P49.

### III. ANALYSIS

The Defendants have moved to dismiss the Complaint pursuant to Rules 23.1 and 12(b)(6). I begin with Rule 23.1.

#### A. *Demand Futility*

Under Delaware law, the board of directors of a corporation manages the business and affairs of the corporation. n42 This authority encompasses the decision to initiate litigation. n43 "Because a derivative action fetters managerial prerogative, it is regulated by . . . Rule 23.1 which requires a shareholder first [*26] to demand that the directors pursue the alleged cause of action." n44 Rule 23.1 requires a plaintiff in a derivative action to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort" in his complaint.

n42 *8 Del. C. § 141(a)* ("The business and affairs of every corporation organized under this

chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

n43 *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

n44 *In Re NVF Co. Litig.*, 1989 Del. Ch. LEXIS 167, 1989 WL 146237, at *4 (Del. Ch. Nov. 22, 1989) (citation omitted). The demand requirement established by Rule 23.1 prevents "a stockholder [from causing] the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation." *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

[*27]

There are, however, circumstances in which a plaintiff in a derivative action can plead that demand was futile and, therefore, excused. n45 "Under *Aronson v. Lewis*, demand is considered futile and, therefore, excused only if the particularized facts alleged in the complaint create a reasonable doubt that: 1) the directors are disinterested and independent; or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment." n46 In the controversy before me, the Plaintiffs assert that demand was futile under both prongs of *Aronson*.

n45 *Aronson v. Lewis*, 473 A.2d 805, 812-13 (Del. 1984).

n46 *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 353-54 (Del. Ch. 1998), aff'd in part and rev'd in part sub nom. *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The rule is one of substantive right, and, as such, the failure to satisfy the demand requirement, in this case to meet either of the two prescribed showings of *Aronson*, precludes a court from considering the merits of an otherwise valid claim. *Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch. 1983).

[*28]

In determining whether demand was futile, I must limit the scope of my inquiry to the allegations of the Complaint. n47 These allegations are accepted as true in deciding the motions to dismiss. n48 Furthermore, I must afford the Plaintiffs all reasonable inferences that logically flow from the alleged facts. n49 However, I need not accept as true "conclusionary allegations of fact or law not supported by allegations of specific fact," nor need I "draw all inferences from [the allegations] in plaintiffs' favor unless they are reasonable inferences." n50

n47 *White*, 783 A.2d at 548 n.5; *In re The Limited Inc. S'holders Litig.*, 2002 Del. Ch. LEXIS 28, 2002 WL 537692, at *1 n.1 (Del. Ch. 2002).

n48 *Haber*, 465 A.2d at 357.

n49 *White*, 783 A.2d at 549.

n50 *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).

After reviewing the Complaint with these principles in mind, I find that the Plaintiffs have alleged particularized facts that create a reasonable [*29] doubt regarding the disinterestedness of the Defendant Directors (excluding McNamara), who constituted a majority (seven of ten) of the Board when the Complaint was filed. Thus, demand is futile and, hence, excused under the first prong of *Aronson*. n51

n51 The Plaintiffs also allege that the two directors appointed after the Meeting, Stephen Johnson, who is Garcia's brother-in-law and General Counsel to Cygnet Capital, and Gary Trujillo, who is affiliated with other Garcia investments, are beholden to Garcia. Compl. P47. Because I conclude that the Plaintiffs have established a reasonable doubt as to the disinterestedness of a majority of the Board, I need not speculate on the possible independence of these two directors or any claims of a lack of independence of a majority of the Board.

Under *Aronson's* first prong, demand is deemed futile if the particularized facts alleged in the complaint create a reasonable doubt that a majority of the board of directors was disinterested and independent at the time [*30] the action was filed. n52 It is the Plaintiffs' burden to allege particularized facts that create a reasonable doubt that a majority of the Board was "interested." n53 Directors are deemed disinterested when they "neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." n54

Subsequently, "this definition was further refined... when our Supreme Court recognized that 'directoral interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.'" n55

---

n52 *Pogostin v Rice*, 480 A.2d 619, 627 (Del. 1984).

n53 *Katz v Halperin*, 1996 Del Ch LEXIS 13, 1996 WL 66006, at *7 (Del. Ch. Feb. 5, 1996).

n54 *Aronson*, 473 A.2d at 812; see also *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).

n55 *Orman*, 794 A.2d at 23 (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

---

[*31]

The Plaintiffs' claim that all eight Defendant Directors were materially interested in the adoption of the Resolutions is premised upon the existence of a single scheme designed to entrench McNamara while advancing the personal financial interests of the Defendant Directors. The Complaint alleges that McNamara financially benefited from obtaining approval of the Employment Agreement. The Complaint further alleges that McNamara consolidated his control of NAC through the ZoomLot Agreement. n56 In return for their approvals of the McNamara Employment Agreement and the ZoomLot Agreement, the Defendant Directors obtained the Directors' Fees. The timing of the Resolutions, it is urged, is simply too coincidental and compels the drawing of an inference of a single, self-interested scheme. Thus, demand is excused because the Resolutions, enacted as a *quid pro quo*, establish a reasonable doubt that the Defendant Directors were disinterested.

---

n56 It is the Plaintiffs' theory that by transferring to Garcia NAC preferred stock convertible unto a sizable block of common stock, enough to block any changes to NAC's bylaws, McNamara all but guaranteed his position in NAC. Garcia, in light of his previous involvement in the contest for control with Frankino, could be trusted to act accordingly.

---

[*32]

The Defendants maintain that the Plaintiffs have failed to allege particularized facts so as to excuse demand under the first prong of *Aronson*. They characterize the Plaintiffs' *quid pro quo* theory as conclusory and unsupported by the particularized facts of the Complaint. As a consequence, the disinterestedness of the Defendant Directors must be analyzed distinctly and individually for each of the three Resolutions. The Defendants, proceeding under such an approach, assert that a majority of the Board was disinterested with respect to the ZoomLot Agreement because none (and certainly far less than a majority) had any personal interest (other than as a shareholder in a general sense) in the transaction. Next, the Defendants contend that the Plaintiffs have failed to allege with particularity that any Defendant Director (other than McNamara) received a personal benefit from the adoption of the McNamara Employment Agreement. The Defendants also assert that the payment of directors' fees alone is insufficient to disqualify a director from considering demand. Furthermore, the Defendants claim that the Plaintiffs have failed to plead (with particularity) facts proving the materiality [*33] to the individual Defendant Directors of any benefits received from receiving the Directors' Fees. Therefore, after analyzing each Resolution in isolation, the Defendants conclude that pre-suit demand was not excused.

Thus, the contentions of the Plaintiffs and the Defendants regarding whether or not pre-suit demand was futile, because a reasonable doubt exists as to the disinterestedness of a majority of the Board, ultimately devolve into two competing views of the nature of the Resolutions. The Plaintiffs urge that the adoption of the Resolutions was a single, self-interested transaction and, thus, I should consider the Resolutions collectively. Conversely, the Defendants characterize the Resolutions as three separate and distinct business decisions; therefore, I am to analyze each Resolution independently. In the procedural context of this litigation, I accept as a reasonable inference from the particularized facts of the Complaint that the Resolutions are to be viewed as a single, interrelated set of transactions, authorized as a *quid pro quo*, in determining whether reasonable doubt exists as to the disinterestedness of each of the Defendant Directors.

In deciding whether [*34] to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transactions, as alleged by the particularized facts of the complaint, to decide whether it can be reasonably inferred that those transactions constituted a single, self-interested scheme. n57 The timing of the transactions factors significantly into the Court's decision. n58 Here the Resolutions were adopted at the same meeting, within

minutes of each other. They also immediately followed the proposed buy-back from Reading conditioned upon the resignation of its two designees on the Board and were adopted less than a month and a half after the conclusion of a bitter contest for control. I find that it is a reasonable inference from the particularized facts of the Complaint that the Resolutions were adopted as a *quid pro quo*, and, as they amount to a single plan furthering the individual interests of the Defendant Directors, they are to be considered together for purposes of deciding demand futility.

n57 This is not to say that the decision based on the allegations of the Complaint to consider the challenged transactions collectively for purposes of determining demand futility also determines the outcome of this proceeding. *See Heineman v. Datapoint Corp.*, 1990 Del Ch. LEXIS 162, 1990 WL 154149, at *3 (Del. Ch. Oct. 9, 1990) (noting, after deciding to consider the board of directors' approvals of two payment plans collectively for purposes of excusing demand, that "if a review of the actual facts would show that these two aspects of the complaint are in fact and should in law be treated as completely independent, then that may be shown in an application for summary judgment"). [*35]

n58 *See Noerr v. Greenwood*, 1997 Del. Ch. LEXIS 121, 1997 WL 419633, at *9 (Del. Ch. July 16, 1997) (noting that two plans comprised a unified scheme when, among other things, the two plans were "presented to the board at the same meeting, and to the stockholders in the same proxy solicitation"); *see also Strougo v. Carroll*, 17 Del J. Corp. L 352, 1991 WL 9978, at *4 (Del. Ch. Jan. 29, 1991) (viewing a series of insider trading claims collectively "where all the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information"); *Heineman*, 1990 Del Ch. LEXIS 162, 1990 WL 154149, at *3 (noting that the recent and ongoing attempts to remove directors, when coinciding with the directors' transfer of $ 13.1 million into a trust account established to pay directors' salaries and purchase of $ 2.1 million in annuities payable to the directors upon their termination, "clearly do charge that the board approved the different payments as part of a single transaction").

The Defendants' attempt to distinguish previous instances when this Court treated multiple transactions [*36] collectively, though factually correct, misses the point of my inquiry. The Defendants stress that in each case the Court bundled together transactions that were substantively similar; they argue that acquiring ZoomLot and increasing directors' fees are substantively quite different. However, I am deciding whether it is a reasonable inference, from the particularized facts of the Complaint, whether the Resolutions constitute a single plan furthering the interests of the Defendant Directors. By the Defendants' logic, if directors wish to engage in such a transaction, which "goes without saying... raises a reasonable doubt about whether the business judgment rule protects the board's actions," n59 all they would need to do is approve inducements in different forms. The issue is whether it is a *reasonable inference* that the Resolutions constituted and implemented a single plan. Restricting my analysis to those transactions that "appear" similar to one another would be clearly unreasonable in these circumstances. Thus, I reject the Defendants' argument to consider the Resolutions individually for purposes of deciding demand futility.

n59 *Heineman*, 1990 Del Ch LEXIS 162, 1990 WL 154149, at *3.

[*37]

If a majority of the Board appeared on both sides of this unitary undertaking or expected to derive personal financial benefit from it, as opposed to a benefit which devolves upon the corporation or all stockholders, then demand is deemed futile as a majority of the Board is considered to have been interested in the adoption of the Resolutions. n60 The Defendant Directors, excluding McNamara (the "Seven Defendant Directors"), constituted seven of ten directors when the demand was made, and with a determination that the Seven Defendant Directors were interested in the single, unified transaction, the Plaintiffs have successfully alleged that a majority of the Board was interested in the adoption of the Resolutions. The Plaintiffs have asserted that McNamara sought to assure his continued status at NAC through the ZoomLot Agreement, because the consideration given Garcia and his affiliates, ultimately in the form of NAC common stock, guaranteed that no bylaw could be changed without Garcia's approval. However, I need not consider the Plaintiffs' allegations as to the possible interest of McNamara in this single *quid pro quo* transaction. Demand is excused under the first prong of [*38] *Aronson* because I find particularized

facts establish a reasonable doubt as to the disinterestedness of the Seven Defendant Directors, who as a bloc constituted a majority of the Board at the time the Complaint was filed.

n60 See Bergstein v. Texas Int'l Co., 453 A.2d 467, 471 (Del. Ch. 1982).

The Defendants argue, citing numerous authorities, that the receipt of directors' fees alone is "insufficient to disqualify any director from considering demand." n61 This oversimplifies Delaware law. This Court has stated that under Delaware law, the receipt of customary directors' fees does not suggest a conflict of interest, the rationale being that, if it did, every director who receives a director's fee would be deemed biased. n62

> It should be noted, however, that the rule that receipt of customary directors' fees does not create a disqualifying interest is one involving the application of a presumption (i.e., the presumption of director disinterest). It is not an unvarying principle [*39] that mechanically applies irrespective of the circumstances. Conceivably a situation might arise where directors' compensation, in the form of "directors' fees," becomes so lavish that a mechanical application of the presumption would be totally at variance with reality. n63

Recently this Court has noted, regarding the holdings of Grobow v. Perot n64 and Moran v. Household Int'l, Inc., n65 "that these cases were based on circumstances in which the fees paid to directors were customary and usual in amount. *This Court's view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee.*" n66 That "conceivable situation" is what now exists before me. Ignoring the possible fees for serving on a Board committee (an additional $5,000 annually), the Seven Defendant Directors received an increase in directors' compensation from $1,000 per meeting to $55,000 annually. And this "reward" was combined with significant compensation for past services and the bestowing of a substantial number of stock options. Moreover, the Seven Defendant Directors [*40] were fully aware of the upcoming increase in directors'

compensation; this is the essence of the *quid pro quo.* Thus, the Seven Defendant Directors voted on the Resolutions authorizing both the McNamara Employment Agreement and the ZoomLot Agreement with a known causal link to their remuneration. It is not that the Directors' Fees are large amounts paid on a regular basis; rather, the Directors' Fees were the product of massive increases which reasonably can be inferred to have been granted in return for the Defendant Directors' support of the McNamara Employment Agreement and the ZoomLot Agreement. Therefore, there is nothing "usual and customary" about the Directors' Fees, and as such, they are distinguishable from the fees paid in *Grobow* and its progeny.

n61 Opening Br. in Supp. of Individual Defs.' Mot. to Dismiss at 20. The Defendants principally rely upon Grobow, 539 A.2d at 188, and its progeny, including In re Walt Disney, 731 A.2d at 354 n.18, 360 (noting that to hold otherwise "expressly would overrule the Delaware Supreme Court"); Silverzweig v. Unocal Corp, 1989 Del. Ch. LEXIS 4, 1989 WL 3231, *2 (Del. Ch. Jan. 19, 1989) at, aff'd, 561 A.2d 993 (Del. 1989) (Table). [*41]

n62 Grobow v. Perot, 526 A.2d 914, 923 n.12 (citing In re E.F. Hutton Banking Practices Litig., 634 F. Supp. 265, 271 (S.D.N.Y. 1986); Pogostin, 480 A.2d at 624).

n63 Grobow, 526 A.2d at 923 n.12.

n64 539 A.2d at 188 ("The only averment permitting such an inference [of financial interest on the part of the defendant directors] is the allegation that all [the defendant] directors are paid for their services as directors. However, such allegations, without more, do not establish any financial interest.").

n65 490 A.2d 1059, 1074-75 (Del. Ch. 1985) ("Where a majority of the directors are independent or outside directors receiving no income other than usual directors' fees the presumption of good faith is heightened.").

n66 Orman, 794 A.2d at 29 n.62 (emphasis added); see also A.R. Demarco Enters., Inc. v. Ocean Spray Cranberries, Inc., 2002 Del. Ch. LEXIS 135, 2002 WL 31820970, at *5 n.13 (Del. Ch. Nov. 26, 2002).

The Defendants also correctly point out that any disqualifying interest [*42] arising from the Directors' Fees, which include the increased future fees, must be material. n67 While no detailed showing has been made as to the Seven Defendant Directors' financial status, it is a reasonable inference, drawn from the Complaint's particularized facts, that such amounts are material, and, thus, I conclude that the Complaint does state a reasonable basis to question their disinterestedness. n68 Thus, a reasonable doubt exists as to whether the Seven Defendant Directors were disinterested in the adoption of the Resolutions.

n67 "Materiality means that the alleged benefit was significant enough 'in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.'" *Orman*, 794 A.2d at 23 (alteration in original) (emphasis removed) (quoting *In re GM Class H Shareholders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

n68 *See In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 Del. Ch. LEXIS 84, 2001 WL 755133, at *9 (Del. Ch. June 26, 2001) (reasonable basis exists to question a director's independence when that director receives $ 91,000 in consulting fees); *see also Friedman v. Beningson*, 1995 Del. Ch. LEXIS 154, 1995 WL 716762, at *5 (Del. Ch. Dec. 4, 1995) (director's receipt of $ 48,000 in consulting fees, "when considered in the context of the other facts alleged, represents a substantial interest").

[*43]

Therefore, the particularized facts of the Complaint, and the reasonable inferences drawn therefrom, create a reasonable doubt as to the disinterestedness of a majority of the Board in its adoption of the Resolutions. Thus I conclude any pre-suit demand was futile with respect to claims regarding the Resolutions, and is therefore excused under the first prong of *Aronson*.

*B Defendants' Motions Under Rule 12(b)(6)*

The Defendants have also moved to dismiss the Complaint pursuant to Rule 12(b)(6). Rule 12(b)(6), while involving many of the same issues addressed under Rule 23.1, presents a more lenient standard under which I review the Plaintiffs' claims than that posed by the demand requirement of Rule 23.1. n69

n69 Rule 23.1, as noted previously, requires the plaintiff to plead facts with particularity. In contrast, the evaluation of a Rule 12(b)(6) motion is consistent with the more lenient notice pleading concepts embodied in Court of Chancery Rule 8(a). *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991).

[*44]

"The standard on a motion to dismiss under . . . Rule 12(b)(6) is well known. The motion will be granted if it appears with 'reasonable certainty' that the plaintiff could not prevail on any set of facts that can be inferred from the pleading." n70 In evaluating whether the Plaintiffs could not prevail on any set of facts that can be inferred from the Complaint, I am again to assume the truthfulness of the well-pleaded allegations in the Complaint, and furthermore, I am to favor the Plaintiffs with all reasonable inferences drawn from those allegations. n71 However, "neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true." n72 With this in mind, I turn to the Defendants' contentions.

n70 *Kohls v. Kenetech Corp.*, 791 A.2d 763, 767 (Del. Ch. 2000), aff'd, 794 A.2d 1160 (Del. 2002) (Table) (quoting *Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 38 (Del. 1996))

n71 *Solomon*, 672 A.2d at 38; *see also Grobow*, 539 A.2d at 188 n.6 [*45]

n72 *Grobow*, 539 A.2d at 188 n.6.

1. Claims for Breach of the Fiduciary Duty of Loyalty

For the reasons set forth above, I find that the Plaintiffs have sufficiently stated a claim for the Defendant Directors breach of the fiduciary duty of loyalty. The Resolutions, constituting a single, self-interested transaction were approved by the Board; however, it has been noted that the particularized facts of the Complaint, and reasonable inferences drawn therefrom, establish a reasonable doubt that a majority (the Seven Defendant Directors) of the Board was disinterested in the Resolutions' approval. Thus, the

Plaintiffs' claims for breach of the fiduciary duty of loyalty survive the Defendants' challenge under the more lenient notice standard of Rule 12(b)(6).

2. Claim for Breach of the Fiduciary Duty of Care

The Plaintiffs have also asserted a claim for the Defendant Directors' breach of the fiduciary duty of care in adopting the Resolutions. Because pre-suit demand was excused under the first prong of *Aronson*, I did not consider, under the more exacting standards of [*46] Rule 23.1, whether the actions of the Defendant Directors were otherwise a valid exercise of business judgment. This issue must now be confronted under the more lenient standard of Rule 12(b)(6). However, even under this relatively plaintiff-friendly standard, I find that the Plaintiffs have failed to state a claim for a breach of the duty of care.

The duty of care requires that "in making business decisions, directors must consider all material information reasonably available, and the directors' process is actionable only if grossly negligent." n73 The Plaintiffs have set forth nothing but conclusory descriptions of any deficiency in the Board's decision-making process. Thus, the dearth of allegations of fact in the Complaint leads me to conclude with reasonable certainty that the Plaintiffs cannot prevail on any claim for breach of the duty of care.

n73 *Brehm*, 746 A.2d at 259.

3. Claims of Corporate Waste

The Plaintiffs' claims of corporate waste also present issues distinct from those [*47] of the fiduciary duty of loyalty. n74 The Plaintiffs contend that the outrageous facts of this case differentiate the Board's actions from those previously afforded the benefit of the business judgment rule. The Defendants counter that the Plaintiffs' allegations are indistinguishable from past situations in which Delaware courts have rejected a plaintiff's claim of corporate waste. They say the Plaintiffs are merely challenging, with the benefits of hindsight, three business judgments of the Board and, as such, their claims should be dismissed.

n74 *In re The Limited, Inc. S'holders Litig.*, 2002 Del. Ch. LEXIS 28, 2002 WL 537692, at *7 ("Although the challenged transactions may be questioned because of doubts about the loyalty of the directors approving them, it does not necessarily follow that they constitute corporate waste.").

Waste has been defined as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. [*48] '" n75 This is a very high burden, not easily met by would-be plaintiffs; any other rule would allow plaintiff shareholders to second guess the decisions of boards of directors, thereby creating disincentives for the optimal assumption of economic risk. n76 Thus, "under this standard, a corporate waste claim must fail if 'there is *any substantial* consideration received by the corporation, and . . . there is a *good faith judgment* that in the circumstances the transaction is worthwhile.'" n77

n75 *White*, 783 A.2d at 554 (quoting *Brehm*, 746 A.2d at 263); see also *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).

n76 *Steiner v. Meyerson*, 1995 Del. Ch. LEXIS 95, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995).

n77 *White*, 783 A.2d at 554 (alteration in original) (quoting *Brehm*, 746 A.2d at 263).

a. The ZoomLot Agreement

The Plaintiffs contend that the acquisition of ZoomLot at an outrageous price, amidst circumstances [*49] that suggest self-interested behavior, amounts to corporate waste by the Defendant Directors. The Defendants respond that the Plaintiffs' assertion is exactly the kind of second-guessing protected by the business judgment rule; the fact that, in retrospect, NAC overpaid for a speculative dot-com venture does not mean that the Defendant Directors committed corporate waste. I agree with the Plaintiffs.

I cannot say with reasonable certainty that the ZoomLot Agreement did not constitute corporate waste. It is not merely the sheer magnitude of the purchase price. Instead, it is doubtful whether NAC was purchasing anything, other than shelter for McNamara by placing a preclusive amount of stock into the hands of Garcia, when it acquired ZoomLot. NAC had already divested itself of its portfolio of car loans and thus cannot reasonably argue for any gained synergies. Moreover, I cannot say with reasonable certainty that the ZoomLot Agreement was approved as "a good faith judgment that in the circumstances the transaction [was] worthwhile." Garcia transferred critical application software out of ZoomLot immediately before December 15, 2000,

leaving to ZoomLot only an option to repurchase [*50] the software at a price equal to the cost to acquire plus 30% interest per annum. n78 Thus, these factors, combined with the history between Garcia and McNamara, preclude me from dismissing the Plaintiffs' claim of corporate waste with respect to the ZoomLot Agreement.

n78 I realize that the Cygnet Option may be ultimately viewed as a secured loan at a 30% annual interest rate, made by Cygnet Capital (and, thus, Garcia). However, this does not detract from my inability to conclude with reasonable certainty that the approval of the ZoomLot Agreement was "a good faith judgment that in the circumstances the transaction was worthwhile."

b. Director and Officer Compensation

The Plaintiffs have also pressed claims of corporate waste regarding the Board's approval of the McNamara Employment Agreement and the Directors' Fees. The Plaintiffs argue that, while the Defendants are correct in stating that Delaware courts are loathe to find that executive compensation packages constitute corporate waste, the situation presented [*51] here is beyond the pale. They point to two factors that distinguish the McNamara Employment Agreement: first, the relative size of the compensation in relation to the value of NAC and, second, as "NAC no longer had an active business to manage," n79 the Company was paying McNamara essentially to sit idle. The Defendants answer by stressing that the size of an executive compensation package does not open the door for courts to second guess the business judgments of boards of directors. n80 They characterize the Complaint as deficient and devoid of any discussion of what McNamara was worth to NAC and also question the weight I should give to the Plaintiffs' "pre-*Brehm* authority." n81 Similarly, the Plaintiffs assert that the approval of the Directors' Fees constitutes corporate waste. The Defendants once again characterize the Plaintiffs' argument as merely complaining that NAC has overpaid, this time in the market for directors' services, a decision that is protected by the business judgment rule. I find the Plaintiffs' arguments persuasive and refuse to dismiss under Rule 12(b)(6) their claims for corporate waste with respect to the McNamara Employment Agreement and the Directors' [*52] Fees.

n79 Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 30.

n80 *See In re Walt Disney Co. Deriv. Litig.*, 731 A.2d at 350 ("Nature does not sink a ship merely because of its size, and neither do courts overrule a board's decision to approve and later honor a severance package, merely because of *its* size." (emphasis in original)).

n81 The Plaintiffs cited in support of their argument *Rosan v. Chicago Milwaukee Corp.*, 1990 Del. Ch. LEXIS 19, 1990 WL 13482 (Del. Ch. Feb. 6, 1990) (noting that the Court allowed to proceed a claim for waste when the defendant railroad company that became an investment company holding primarily liquid assets that were managed by an outside firm continued to pay its president an annual salary of $ 450,000). Pls. Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 30.

While acknowledging that the test for waste poses an extremely high burden to disappointed shareholder plaintiffs, I cannot say with reasonable certainty that, given the exceptional [*53] facts of this case, the Plaintiffs could not prevail on their claim for corporate waste regarding the McNamara Employment Agreement. It is not the mere allegation that McNamara is being compensated some threshold amount that permits the Plaintiffs' waste claim to proceed; instead, it is that McNamara is being paid a large sum of money to be the head of what essentially is a passive corporation. Accepting the Plaintiffs' allegations as true, NAC's assets consist of a 50% passive interest in Angelika, ZoomLot, and cash and highly liquid marketable securities. n82 This Court has ruled that maintaining the same level of executive compensation, after a divestment of a corporation's assets to create essentially a passive company, "barely" excused demand under Rule 23.1. n83 Here, the Board actually increased McNamara's compensation. Thus, I conclude that, under the more lenient standard of Rule 12(b)(6), the Plaintiffs have sufficiently stated a claim for corporate waste in relation to the McNamara Employment Agreement.

n82 For present purposes, I accept the Plaintiffs' allegations that NAC is now a "passive" company. The Complaint notes that "Garcia and his affiliates retained the complete right to manage" ZoomLot. Compl. P25. Thus, I cannot tell with any confidence that the presence of ZoomLot as part of the NAC corporate family requires a different conclusion. [*54]

n83 *Rosan*, 1990 Del. Ch. LEXIS 19, 1990 WL 13482, at *8.

Furthermore, I find that the Plaintiffs' waste claims concerning the Directors' Fees survive the Defendants' motions to dismiss. The basis for dismissal of the typical waste claim regarding directors' fees is that the corporation received services of some value in consideration for the payments made. Here, the reasonable inference is that the increase in future fees to be paid, in addition to the granting of stock options and rewarding of significant sums for past efforts, were to induce the Seven Defendant Directors to engage in a self-interested transaction. As such, I cannot say with reasonable certainty that the approval of the unusual and not customary Directors' Fees does not constitute corporate waste.

Finally, I believe at this stage it would be imprudent to dismiss the corporate waste claims for the McNamara Employment Agreement and the Directors' Fees. "Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the [*55] receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation." n84 Thus in *Telxon*, the Delaware Supreme Court noted that because a trial would clarify the directors' contribution to the corporation (to establish the reasonableness of their compensation), and as this Court "did not consider the interplay between the directors' compensation and the possible breach of their fiduciary duties[,]... [the claim] was decided prematurely" by this Court in granting summary judgment. n85 In this case, I have found it a reasonable inference that the Defendant Directors, in adopting the Resolutions, engaged in a *quid pro quo* effort that, if true, raises serious questions regarding a breach of their fiduciary duties. Therefore, I reject the Defendants' motions to dismiss pursuant to Rule 12(b)(6) the Plaintiffs' claims for corporate waste concerning the approval of the McNamara Employment Agreement and the grant of Directors' Fees.

n84 *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002).

n85 *Id.* at 266.

[*56]

C. *Defendants' Motions to Dismiss for Failure to Join Indispensable Parties*

Lastly, the Defendants contend that the Plaintiffs' application to rescind the ZoomLot Agreement should be dismissed pursuant to Rule 19 for failure to join indispensable parties. Specifically, the Defendants argue that because the Plaintiffs have not joined as parties Garcia or the other Relinquishing Shareholders, and because rescission of that agreement would necessarily affect the rights of those parties, the Plaintiffs have failed to join indispensable parties; thus, dismissal is warranted. In response, the Plaintiffs do not contest the merits of dismissal pursuant to Rule 19; instead, they posit that the Court is not required to decide this issue presently. n86

n86 Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 32 (citing *Crescent/Mach I Partners, L.P. v. Turner*, 2000 Del. Ch. LEXIS 145, 2000 WL 1481002 (Del. Ch. Sept. 29, 2000); *Meeker v. Bryant*, 1981 Del. Ch. LEXIS 650, 1981 WL 7616 (Del. Ch. May 12, 1981)). The Defendants have also asserted, uncontested by the Plaintiffs, that this Court has no personal jurisdiction over the Relinquishing Shareholders.

[*57]

I am satisfied that now is a proper time to resolve the Defendants' motions. The Plaintiffs' reliance upon *Crescent/Mach I Partners, L.P.* is misplaced. In that case, the Court refused to decide the defendants' argument that a pending appraisal proceeding was the sole remedy for plaintiffs seeking rescission of a challenged merger, or alternatively, rescissory damages. In so abstaining from deciding whether rescission was an appropriate remedy, the Court noted that in response to a motion to dismiss, it "simply determine[s] whether [a] plaintiff has stated a claim for which relief might be granted." n87 The Court further noted that if "plaintiffs have stated cognizable claims, then 'the nature of that relief is not relevant and need not be addressed.'" n88 However, though I need not determine the nature of relief to be granted while considering the Defendants' motions to dismiss, it does not follow that I must currently refrain from deciding whether the Plaintiffs have failed to join indispensable parties. That is because the factual needs of such a determination are different from those required to decide whether rescission is an appropriate remedy.

n87 *Crescent/Mach I Partners, L.P.*, 2000 Del. Ch. LEXIS 145, 2000 WL 1481002, at *20.

[*58]

2003 Del. Ch. LEXIS 5, *

n88 *Id.* (quoting *Chaffin v. GNI Group, Inc.*, 1999 Del. Ch. LEXIS 182, 1999 WL 721569, at *7 (Del. Ch. Sept. 3, 1999)).

The determination of whether a plaintiff has failed to join an indispensable party entails a set of factual concerns different from those involved in a decision regarding the nature of relief to be granted. As this Court noted, when considering a motion to dismiss, "to decide whether rescission relief is (or is not) feasible would not only go beyond the scope of a motion to dismiss, but also would be imprudent, because the issue is fact driven and cannot be decided in the absence of an evidentiary record." n89 In this case, the facts as pleaded are sufficiently well developed to permit me to render a decision regarding the Plaintiffs' alleged failure to join indispensable parties. Therefore, because such a determination is proper at this time and because the Plaintiffs do not contest the merits of the Defendants' arguments in favor of dismissal, I find that the Plaintiffs' failure to join as parties Garcia and the other Relinquishing Shareholders amounts to a failure to join indispensable [*59] parties. Thus, the Plaintiffs' application to rescind the ZoomLot Agreement is dismissed pursuant to Rule 19.

### IV. CONCLUSION

For the foregoing reasons, the Plaintiffs' claim for breach of the fiduciary duty of care and their application for rescission of the ZoomLot Agreement are dismissed. n90 Otherwise, Defendants' motions to dismiss are denied.

n90 Dismissal of the duty of care claim is with prejudice. Dismissal of the application for rescission of the ZoomLot Agreement is without prejudice.

**IT IS SO ORDERED.**

John W. Noble

Vice Chancellor