**EXHIBIT A TO DECLARATION OF DAVID A. BECKER**

# IT GROUP INC (ITX)

2790 MOSSIDE BLVD
MONROEVILLE, PA 15146
412. 372 7701

## DEF 14A

**DEFINITIVE NOTICE & PROXY STATEMENT**
**Filed on 11/01/1996 – Period: 11/20/1996**
File Number 001–09037

GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc
800.669.1154
www.gsionline.com

SCHEDULE 14A INFORMATION

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF
1934

Filed by the Registrant [X]

Filed by a Party other than the Registrant [_]

Check the appropriate box:

[_]Preliminary Proxy Statement

[_]CONFIDENTIAL, FOR USE OF THE
COMMISSION ONLY (AS PERMITTED BY
RULE 14a-6(e)(2))

[X]Definitive Proxy Statement

[_]Definitive Additional Materials

[_]Soliciting Material Pursuant to
(S)240.14a-11(c) or (S)240.14a-12

INTERNATIONAL TECHNOLOGY CORPORATION
(NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

(NAME OF PERSON(S) FILING PROXY STATEMENT, IF OTHER THAN THE REGISTRANT)

Payment of Filing Fee (Check the appropriate box):

[_] $125 per Exchange Act Rules 0-11(c)(1)(ii), 14a-6(i)(1), 14a-6(i)(2) or
Item 22(a)(2) of Schedule 14A.

[_] $500 per each party to the controversy pursuant to Exchange Act Rule 14a-
6(i)(3)

[_] Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

  (1) Title of each class of securities to which transaction applies:

  (2) Aggregate number of securities to which transaction applies:

  (3) Per unit price or other underlying value of transaction computed
      pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the
      filing fee is calculated and state how it was determined):

  (4) Proposed maximum aggregate value of transaction:

  (5) Total fee paid:

[X] Fee paid previously with preliminary materials.

[_] Checkbox if any part of the fee is offset as provided by Exchange Act Rule
    0-11(a)(2) and identify the filing for which the offsetting fee was paid
    previously. Identify the previous filing by registration statement number,
    or the Form or Schedule and the date of its filing.

  (1) Amount Previously Paid:

  (2) Form, Schedule or Registration Statement No.:

  (3) Filing Party:

  (4) Date Filed:

Notes:

[LOGO OF INTERNATIONAL TECHNOLOGY CORPORATION]

October 30, 1996

Dear Stockholder:

   We are pleased to enclose proxy materials for the Annual Meeting of
Stockholders to be held November 20, 1996 and the 1996 Annual Report to
Stockholders.

   This year's Annual Meeting is extraordinarily important to the future of our
Company. At the Meeting, stockholders will vote upon proposals related to a
proposed $45 million investment by The Carlyle Group, a well-known, and very
successful Washington, D.C.-based investment group. If this transaction is
approved, the Company will have a new seven member board of directors,
consisting of four persons designated by Carlyle and three existing directors.

   Complete information concerning the preferred stock and warrants to be
issued in the Carlyle transaction, the Company's agreements with Carlyle, and
the new directors is contained in the accompanying proxy statement. We urge
you to review it carefully.

   You should know that the Carlyle transaction was approved unanimously by the
Board of Directors following a 6-month exploration of a broad range of
strategic alternatives, in which the Company was assisted by the Company's
financial advisor, Donaldson, Lufkin & Jenrette Securities Corporation
("DLJ"). The Board of Directors believes that the proposed transaction is the
highest value alternative available to the Company and urges you to vote in
favor of it.

   The contribution of $45 million will substantially increase the financial
strength and stability of the Company. In addition, it will be the primary
source of capital to finance an active acquisition program to take advantage
of opportunities presented by the industry-wide consolidation that is now
underway. Our objective, and Carlyle's, is to make the Company a platform to
build a multi-billion dollar global consulting, engineering and construction
firm.

   Without the cash infusion from Carlyle, the Company faces significant
financial issues and formidable obstacles to growth in the foreseeable future.
Unsatisfactory operating results in the first half of this fiscal year left
the Company unable to comply with covenants in its bank credit and senior note
agreements, and with no borrowing capacity under its bank credit line.
Following a series of short-term waivers, the lenders have agreed to
amendments to their agreements which will enable the Company to avoid future
covenant defaults if operations are in accordance with the Company's current
plan. The proceeds of the Carlyle investment and the amendments to the credit
agreements will provide the Company greater operational flexibility and the
ability to use such sources for selected acquisitions. Without the Carlyle
investment, the amended agreements would provide the Company with no
significant operating flexibility which, combined with limited cash and debt
availability, would substantially restrict the ability of the Company to grow.
Further, without the Carlyle investment, if the presently anticipated recovery
in operations does not materialize, or is significantly delayed, the Company
could face serious liquidity issues in future periods.

   In short, the proposed Carlyle transaction will restore the Company's
financial health and provide exciting new opportunities to enhance stockholder
value. Without the transaction, the Company's future can only be described as
uncertain and precarious.

    We strongly urge your favorable vote on the Carlyle transaction and the
other proposals in the proxy statement.

                                        Sincerely yours,

                                        /s/ Anthony J. Deluca

                                        ANTHONY J. DELUCA
                                        President and Acting Chief Executive
                                         Officer

INTERNATIONAL TECHNOLOGY CORPORATION
23456 HAWTHORNE BOULEVARD
TORRANCE, CALIFORNIA 90505

NOTICE OF 1996 ANNUAL MEETING OF STOCKHOLDERS

The 1996 Annual Meeting of Stockholders (the "Annual Meeting") of International Technology Corporation (the "Company") will be held at the Sheraton Grande Hotel, located at 333 South Figueroa Street, Los Angeles, California 90071, on Wednesday, November 20, 1996, at 9:00 a.m. Pacific Standard time, for the following purposes:

Proposal 1: To consider and vote upon the issuance and sale of (i) 45,000 shares of Cumulative Convertible Participating Preferred Stock, par value $100 per share, of the Company ("Convertible Preferred Stock") and (ii) warrants to purchase 5,000,000 shares of Common Stock, $1.00 par value per share, of the Company to certain investors affiliated with The Carlyle Group (collectively, "Carlyle"), at an aggregate price of $45,000,000 (the "Investment") on the terms and subject to the conditions set forth in that certain Securities Purchase Agreement, dated August 28, 1996, between the Company and Carlyle; and a related amendment to the Company's Certificate of Incorporation (the "Certificate") to (a) effect a one-for-four reverse stock split (the "Reverse Stock Split") pursuant to which each four shares of Common Stock will be exchanged for one share of Common Stock, (b) reduce the number of authorized shares of Common Stock from 100,000,000 to 50,000,000 and (c) reduce the par value of the Company's Common Stock from $1.00 per share to $.01 per share. Except as otherwise indicated, all share and per share information in this Proxy Statement is presented without giving effect to the Reverse Stock Split.

Proposal 2: To elect three directors to hold office until the 1999 Annual Meeting of Stockholders and until their successors are elected and qualified.

Proposal 3: To consider and vote upon the approval of the Company's 1996 Stock Incentive Plan.

Proposal 4:
To consider and vote upon amendments to the Certificate to: (i) eliminate the provisions of the Certificate that provide for cumulative voting with respect to the election of directors; and (ii) eliminate the provisions of the Certificate that provide for a classified board of directors

and to transact such other business as may properly come before the Annual Meeting.

Proposal 4 will not be implemented unless Proposal 1 is approved.

Holders of record of the Company's Common Stock at the close of business on September 27, 1996 are entitled to notice of and to vote at the Annual Meeting and at any adjournment(s) or postponement(s) thereof. A list of stockholders entitled to vote at the Annual Meeting will be open to examination by any stockholder for any purpose germane to the Annual Meeting, during ordinary business hours, from November 8, 1996 until November 20, 1996 at the Company's executive offices located at 23456 Hawthorne Boulevard, Torrance, California.

Each stockholder is requested to sign and date the enclosed proxy card and to return it without delay in the enclosed postage-paid envelope. Any stockholder present at the Annual Meeting may withdraw the proxy and vote personally on each matter brought before the Annual Meeting.

By Order of the Board of Directors,

/s/ James G. Kirk

JAMES G. KIRK
Secretary

October 30, 1996
Torrance, California

TABLE OF CONTENTS

|                                                                                          | PAGE |
|------------------------------------------------------------------------------------------|------|
| VOTING AT THE MEETING.....................................................................| 1    |
| SUMMARY OF MATTERS TO BE CONSIDERED.......................................................| 2    |
| RECOMMENDATION OF THE BOARD OF DIRECTORS OF THE COMPANY...................................| 2    |
| PROPOSAL 1--PROPOSED CARLYLE INVESTMENT...................................................| 3    |
|   Summary of Proposed Carlyle Investment.......................................| 3    |
|   Capitalization...............................................................| 6    |
|   Price Range for the Company's Common Stock and Related Stockholder           |      |
|     Matters..........................................................| 7    |
|   Second Quarter Results.......................................................| 7    |
|   Use of Proceeds..............................................................| 8    |
|   Events Leading to the Carlyle Investment.....................................| 8    |
|   Impact on Company's Business Strategy of Carlyle Investment...................| 9    |
|   Board of Directors' Recommendations..........................................| 9    |
|   Opinion of Financial Advisor.................................................| 11   |
|   Dissenters' Rights and Preemptive Rights.....................................| 14   |
|   Impact of the Transaction on the Company and Existing Stockholders;          |      |
|     Certain Considerations...........................................| 14   |
|   The Securities Purchase Agreement............................................| 16   |
|   Interest of Certain Persons in the Investment................................| 26   |
|   Proposed Compensation of Convertible Preferred Stock Directors and           |      |
|     Carlyle Fee......................................................| 26   |
|   Reverse Stock Split, Reduction in Number of Authorized Shares and            |      |
|     Reduction of Par Value...........................................| 26   |
|   Vote Required for Approval of the Investment Proposal........................| 28   |
| PROPOSAL 2--ELECTION OF DIRECTORS.........................................................| 29   |
|   Board of Directors Following the Investment..................................| 29   |
|   Election of Directors at the Annual Meeting..................................| 30   |
|   Background of the Nominees, Proposed Convertible Preferred Stock             |      |
|     Directors and Current Directors..................................| 30   |
|   Cumulative Voting and Nominations............................................| 32   |
|   Meetings of the Board of Directors and Committees............................| 33   |
|   Compensation of Directors....................................................| 33   |
| PROPOSAL 3--APPROVAL OF THE 1996 STOCK INCENTIVE PLAN.....................................| 36   |
|   Objectives of the Plan.......................................................| 36   |
|   1996 Stock Incentive Plan....................................................| 36   |
|   Awards To Employees, Directors and Consultants...............................| 37   |
|   Non-employee Director Options................................................| 37   |
|   Plan Duration................................................................| 37   |
|   Amendments...................................................................| 38   |
|   Tax Treatment................................................................| 38   |
|   Board Recommendation.........................................................| 39   |
| PROPOSAL 4--APPROVAL OF THE ELIMINATION OF CUMULATIVE VOTING AND                          |      |
|   ELIMINATION OF CLASSIFIED BOARD OF DIRECTORS PROPOSAL........................| 40   |
|   Proposed Amendments to Certificate of Incorporation..........................| 40   |
|   Further Information..........................................................| 40   |
|   Vote Required for Approval of the Elimination of Cumulative Voting and       |      |
|     Elimination of Classified Board of Directors Proposal............| 41   |
| BENEFICIAL OWNERSHIP OF SHARES............................................................| 42   |
| EXECUTIVE COMPENSATION....................................................................| 44   |
|   Summary Compensation Table...................................................| 44   |
|   Stock Option Grants In Last Fiscal Year......................................| 46   |
|   Aggregated Option Exercises During Last Fiscal Year And Option Values        |      |
|     At End Of Last Fiscal Year.......................................| 46   |

i

```
                                                                      PAGE
                                                                      -----

REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION.........   47
     Compensation Program Objectives...............................   47
     Base Salary...................................................   47
     Total Annual Cash Compensation (base salary plus bonus).......   48
     The Incentive Compensation "Bonus" Plan.......................   48
     Long-Term Incentive Compensation Program......................   49
     Total Direct Compensation (total annual cash compensation plus the
       annualized value of long-term incentives)...................   49
     Section 162(m) of the Internal Revenue Code...................   50
     Compensation of Chief Executive Officer.......................   50
STOCK PRICE PERFORMANCE GRAPH.........................................   51
CERTAIN TRANSACTIONS..................................................   52
INDEPENDENT AUDITOR...................................................   55
STOCKHOLDER PROPOSALS.................................................   55
ANNUAL REPORT.........................................................   56
FORM 10-K ANNUAL REPORT...............................................   56
INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE.......................   56
GENERAL AND OTHER MATTERS.............................................   56
APPENDICES............................................................   57
     APPENDIX I--DLJ FAIRNESS OPINION..............................   I-1
APPENDIX II--QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED
     JUNE 28, 1996................................................   II-1
APPENDIX III--CERTIFICATE OF DESIGNATIONS OF CONVERTIBLE PREFERRED
     STOCK.......................................................   III-1
APPENDIX IV--AMENDMENT TO CERTIFICATE OF INCORPORATION EFFECTING A ONE-
     FOR-FOUR REVERSE STOCK SPLIT, REDUCING THE NUMBER OF AUTHORIZED SHARES
     OF COMMON STOCK AND REDUCING THE PAR VALUE OF SHARES OF COMMON STOCK...   IV-1
APPENDIX V--AMENDMENT TO CERTIFICATE OF INCORPORATION ELIMINATING
     CUMULATIVE VOTING AND AMENDMENT TO CERTIFICATE OF INCORPORATION
     ELIMINATING THE CLASSIFIED BOARD OF DIRECTORS...............   V-1
     APPENDIX VI--1996 STOCK INCENTIVE PLAN.......................   VI-1
```

ii

INTERNATIONAL TECHNOLOGY CORPORATION
23456 HAWTHORNE BOULEVARD
TORRANCE, CALIFORNIA 90505

-----------------

PROXY STATEMENT

ANNUAL MEETING OF STOCKHOLDERS

NOVEMBER 20, 1996

This Proxy Statement is furnished in connection with the solicitation of proxies by the Board of Directors of International Technology Corporation, a Delaware corporation (the "Company"), for use at the 1996 Annual Meeting of Stockholders of the Company to be held at 9:00 a.m. Pacific Standard time, on Wednesday, November 20, 1996, at the Sheraton Grande Hotel, located at 333 South Figueroa Street, Los Angeles, California 90071, and at any adjournment(s) or postponement(s) thereof (the "Annual Meeting"). It is anticipated that this Proxy Statement, together with the proxy and the 1996 Annual Report to Stockholders, will first be mailed to the Company's stockholders on or about October 30, 1996.

VOTING AT THE MEETING

The close of business on September 27, 1996 has been fixed as the record date for determination of holders of the Company's Common Stock, $1.00 par value (the "Common Stock"), entitled to notice of and to vote at the Annual Meeting. On that date, there were outstanding and entitled to vote 36,251,130 shares of Common Stock. The presence, either in person or by proxy, of persons entitled to cast a majority of such votes constitutes a quorum for the transaction of business at the Annual Meeting.

Stockholders are entitled to one vote per share on all matters submitted for consideration at the Annual Meeting, subject to cumulative voting rights in the election of directors (see "Election of Directors"). With regard to the election of directors, votes may be cast in favor of or withheld from nominees. Votes that are withheld will be excluded entirely from the vote and will have no effect. Abstentions may be specified on all proposals other than the election of directors. Abstentions and broker non-votes on returned proxies are counted as shares present in the determination of whether the shares of stock represented at the Annual Meeting constitute a quorum. Each proposal is tabulated separately. Abstentions are counted in tabulations of the votes cast on proposals presented to the stockholders, whereas broker non-votes are not counted for purposes of determining whether a proposal has been approved.

A person giving the enclosed proxy has the power to revoke it at any time before it is exercised by (i) attending the Annual Meeting and voting in person, (ii) duly executing and delivering a proxy for the Annual Meeting bearing a later date, or (iii) delivering written notice of revocation to the Secretary of the Company prior to use of the enclosed proxy at the Annual Meeting.

1

SUMMARY OF MATTERS TO BE CONSIDERED

The following is a summary of the proposals contained in this Proxy Statement. The summary is not intended to be complete and is qualified in its entirety by the more detailed information appearing elsewhere in this Proxy Statement and the Appendices hereto. Stockholders are urged to read this Proxy Statement and the Appendices to this Proxy Statement in its and their entirety

. Proposal 1 Carlyle Investment. Stockholders are being asked to consider and approve a cash investment of $45,000,000 in the Company by certain investors affiliated with The Carlyle Group (collectively, "Carlyle"). In consideration of its investment, Carlyle will receive 45,000 shares of newly issued Cumulative Convertible Participating Preferred Stock, par value $100 per share (the "Convertible Preferred Stock"), and warrants (the "Warrants") to purchase up to 5,000,000 shares of the Company's Common Stock at a price of $3.00 per share. Initially, the holders of this Convertible Preferred Stock will own approximately 30% of the voting power of the Company (43% assuming exercise of the Warrants). Carlyle will also have the right to elect a majority of the Company's Board of Directors until the fifth anniversary of the closing of the Investment  Information relating to the conversion, redemption and dividends with respect to the Convertible Preferred Stock is set forth below under "Proposal 1--Proposed Carlyle Investment." To accommodate the Carlyle Investment, the Company's Certificate of Incorporation (the "Certificate") will be amended to (i) effect a one-for-four reverse stock split (the "Reverse Stock Split") pursuant to which each four shares of Common Stock will be exchanged for one share of Common Stock, (ii) reduce the number of authorized shares of Common Stock from 100,000,000 to 50,000,000 in connection with the Reverse Stock Split and (iii) reduce the par value of the shares of Common Stock from $1.00 per share to $.01 per share  Approval of a majority of the outstanding shares of Common Stock will be required for this proposal

All share and per share information in this Proxy Statement is presented without giving effect to the Reverse Stock Split, unless otherwise indicated

. Proposal 2  Election of Directors. At the Annual Meeting, Stockholders will elect three directors to hold office until the 1999 Annual Meeting of Stockholders and until their successors are elected and qualified. If the Investment is approved, the Board will initially consist of seven directors and Carlyle will have the right to designate a majority of the Board (four of seven directors) for a period of five years from the closing of the Investment  All of the directors other than Anthony J. DeLuca, E. Martin Gibson and James C. McGill have advised the Company that they will resign from the Board of Directors, effective upon the consummation of the Investment

. Proposal 3  1996 Stock Incentive Plan. Stockholders are being asked to consider and approve the 1996 Stock Incentive Plan in order to allow the Company to attract, motivate and retain qualified professionals and employees with stock-based incentives. Authority to grant new awards under the Company's prior stock incentive plan, the 1991 Stock Incentive Plan (the "1991 Plan"), expired as of March 31, 1996. Approval of a majority of the outstanding shares of Common Stock will be required for this proposal

. Proposal 4  Election of Directors for Annual Terms and Deletion of Cumulative Voting. Stockholders are being asked to consider and approve an amendment to the Certificate to delete the provision related to a classified board of directors, and an amendment to the Certificate to remove the provisions related to cumulative voting for directors  Approval of two-thirds of the outstanding shares will be required for this proposal, which will be implemented only if the Carlyle Investment is completed

. Other Business. In addition to the foregoing, stockholders will be asked to transact such other business as may properly come before the Annual Meeting and any postponement(s) or adjournment(s) thereof.

RECOMMENDATION OF THE BOARD OF DIRECTORS OF THE COMPANY

THE BOARD OF DIRECTORS OF THE COMPANY HAS UNANIMOUSLY APPROVED EACH OF THE PROPOSALS AND UNANIMOUSLY RECOMMENDS THAT THE STOCKHOLDERS VOTE FOR THE APPROVAL OF EACH OF THE INVESTMENT, THE ELECTION OF DIRECTORS, THE 1996 STOCK INCENTIVE PLAN, AND THE ELIMINATION OF CUMULATIVE VOTING AND THE ELIMINATION OF THE CLASSIFIED BOARD OF DIRECTORS

PROPOSAL 1

Proposed Carlyle Investment

SUMMARY OF PROPOSED CARLYLE INVESTMENT

The following is a brief summary of the main provisions of the proposed Investment. This summary is not intended to be complete and is qualified in its entirety by the more detailed information appearing elsewhere in this Proxy Statement and the Appendices hereto

All share and per share information in this Proxy Statement is presented without giving effect to the Reverse Stock Split, unless otherwise indicated

Overview. This proxy statement relates to a proposal for significant investment (referred to herein as the "Carlyle Investment" or "Investment") in the Company by certain investors affiliated with The Carlyle Group (collectively, "Carlyle") which management considers critical to the Company's ability to build profitability and shareholder values. The Carlyle Investment will provide significant funds and operating flexibility to enable the Company to take advantage of opportunities for expansion and diversification of its business through the acquisition of other companies in the environmental consulting, engineering and remediation industry in order to create long-term value for its stockholders

As of June 28, 1996, the Company was unable to comply with certain financial covenants in its $65,000,000 senior secured notes and $60,000,000 bank line of credit. The Company received temporary waivers of such covenants which were extended through November 1, 1996. The Company has recently negotiated amendments to the foregoing credit agreements, which are intended to avoid future covenant defaults and provide enhanced flexibility in its operations following the consummation of the Carlyle Investment. See "Capitalization." The Carlyle Investment will also provide additional liquidity which will help the Company to avert future severe liquidity constraints that may occur in the event the recovery of the Company's business from recent periods does not develop as the Company anticipates.

If this proposal is approved, Carlyle will make a cash investment of $45,000,000 in the Company in exchange for shares of newly issued Cumulative Convertible Participating Preferred Stock, par value $100 per share (the "Convertible Preferred Stock"), and warrants (the "Warrants") to purchase 5,000,000 additional shares of Common Stock, par value $1.00 per share, of the Company (the "Common Stock"). Initially, the holders of the Convertible Preferred Stock will own approximately 38% of the voting power of the Company (43% assuming exercise of the Warrants).

The initial conversion price of the Convertible Preferred Stock will be $2.00 per share and the initial exercise price of the Warrants will be $3.00 per share. The conversion price and exercise price could be reduced to as low as $1.45 and $2.18, respectively, if all shares of the Company's existing 7% Cumulative Convertible Exchangeable Preferred Stock (the "7% Preferred Stock") were converted into Common Stock at an assumed special conversion price of $3.17. The special conversion price will be in effect for a period of 45 days following notice to holders of the 7% Preferred Stock after completion of the Investment, with the actual special conversion price equal to the higher of $3.17 or the average closing price of the Common Stock for the five trading days ending on the day prior to the completion of the Investment. In such event, the number of shares of Common Stock issuable upon conversion of the Convertible Preferred Stock could be as much as 31,965,517. See "Impact of the Transaction on the Company and Existing Stockholders; Certain Considerations-- Special Conversion Price of 7% Preferred Stock."

The Carlyle Group. The Carlyle Group is a Washington D C based private merchant bank that has sponsored more than $5 billion of mergers, acquisitions and other corporate investments and has made numerous successful investments. The Company believes that association with Carlyle as a major investor in the Company will enhance the Company's credibility and standing in its industry, and will provide the Company's stockholders

3

the opportunity to benefit from Carlyle's sponsorship, support and financial strength  Most importantly, the Company's management believes that Carlyle's interests will be closely aligned with the interests of the Company's public stockholders

Dividend Rights and Conversion  The Convertible Preferred Stock will be entitled to cumulative annual dividends  No dividends will be payable in the first year  Thereafter, dividends will be payable quarterly in kind for one year at the rate of 3% per annum and in cash thereafter at the rate of 6% per annum  In addition, the Convertible Preferred Stock will have the right to participate in any dividends paid with respect to the Common Stock, on the basis of the number of shares of Common Stock into which it may be converted, as described below

Holders of the Convertible Preferred Stock will have the right, at their option at any time, to convert such shares of Convertible Preferred Stock into shares of Common Stock at an initial conversion price of $2 00 per share (which is approximately equal to trading prices for the Company's Common Stock on the New York Stock Exchange (the "NYSE") prior to announcement of the Investment)  The conversion price of the Convertible Preferred Stock (a) could be reduced by reason of the conversion of shares of the 7% Preferred Stock at a special conversion price or as a result of certain other anti-dilution provisions described under "The Securities Purchase Agreement--Description of Convertible Preferred Stock," and (b) will be reduced to one-half of the then-current conversion price per share after the eighth anniversary of the closing of the Investment if the Convertible Preferred Stock has not earlier been redeemed or converted  The Convertible Preferred Stock will be entitled to a liquidation preference equal to $1,000 per share

Convertible Preferred Stock Voting Rights  For five years from the consummation of the Investment (the "Five-Year Period"), holders of the Convertible Preferred Stock will be entitled to elect a majority of the Company's Board of Directors, provided that Carlyle continues to own at least 20% of the voting power of the Company. The Company's Board will consist of an odd number of directors and initially will consist of seven directors, of whom four will be elected by the Convertible Preferred Stock and the remaining three will be elected by the Common Stock  Initially, at least two of the directors elected by the holders of the Common Stock will be persons who have no employment or other relationship with the Company or Carlyle, other than their positions as directors of the Company  During the Five-Year Period, holders of the Convertible Preferred Stock will not participate in elections of the remaining directors ("Non-Preferred Stock Directors") and those directors elected by the holders of the Convertible Preferred Stock will not have the right to vote on the election of any director to fill a vacancy among the Non-Preferred Stock Directors  At the end of the Five-Year Period, provided that Carlyle continues to own at least 20% of the voting power of the Company, holders of the Convertible Preferred Stock will be entitled to elect the largest number of directors which is a minority of the directors of the Company and to vote with the Common Stock (as a single class) on the election of the remaining directors  Additionally, the holders of the Convertible Preferred Stock, in the event they no longer have the right to elect at least a minority of the directors, will have the right (voting as a class with holders of the 7% Preferred Stock and any other parity stock) to elect two directors to the Board in the event the Company shall fail to make payment of dividends on the Convertible Preferred Stock for six dividend periods

In addition, regardless of the aggregate amount of voting power they own, holders of the Convertible Preferred Stock will always have the right (i) to vote with the Common Stock (as a single class) on all matters other than the election of directors, with the Convertible Preferred Stock having the number of votes equal to the number of shares of Common Stock into which it might be converted and (ii) voting as a separate class, to approve certain major corporate transactions  Additional information about the Convertible Preferred Stock voting rights is discussed below under "--The Securities Purchase Agreement--Description of Convertible Preferred Stock--Voting Rights."

Special Provisions for the Protection of Public Stockholders. The transaction documents contain provisions for the protection of those stockholders not affiliated with Carlyle, including: (i) a requirement that actions in connection with the Company's rights under the Carlyle agreements (such as any claims for indemnity) shall be determined by a majority of the Non-Preferred Stock Directors; (ii) a similar requirement for approval

4

by a majority of the Non-Preferred Stock Directors of certain determinations in connection with the anti-dilution provisions of the Convertible Preferred Stock and Warrants; (iii) a requirement that transactions or contracts between the Company and Carlyle (or its affiliates) must be approved by a majority of the Non-Preferred Stock Directors; (iv) a requirement for approval by a majority of the Non-Preferred Stock Directors for any acquisition of additional shares of capital stock of the Company by Carlyle or its affiliates if such acquisition would result in Carlyle and its affiliates holding 75% or more of the general voting power of the Company; and (v) an additional requirement for approval by holders of a majority of the Company's Common Stock, not including Carlyle, for any "going private" transaction within the meaning of SEC Rule 13e-3 under the Exchange Act.

Redemption  The Company will be entitled, at its option (as determined by a majority of the Non-Preferred Stock Directors), to redeem all of the Convertible Preferred Stock at its liquidation preference of $1,000 per share plus accumulated and unpaid dividends on or after the seventh anniversary of the closing date of the Investment.

Registration Rights. Carlyle will have piggyback and demand registration rights with respect to the Common Stock issuable upon conversion of the Convertible Preferred Stock and/or exercise of the Warrants.

Reverse Stock Split and Reduction in Par Value. In order to enable the Company to reserve the appropriate number of shares of Common Stock for issuance pursuant to the Investment while retaining a sufficient number of shares for other corporate purposes, to allow for the conversion of the Convertible Preferred Stock and exercise of the Warrants, and to enhance the liquidity of the Common Stock it has been proposed that the Company's Certificate of Incorporation be amended to effect a one-for-four reverse stock split pursuant to which each four shares of Common Stock will be exchanged for one share of Common Stock and to reduce the par value from $1.00 to $.01 per share. If all shares were issued that are potentially subject to issuance by reason of the Investment, exercise of all outstanding stock options, conversion of outstanding convertible securities and the proposed 1996 Stock Incentive Plan, the total number of shares outstanding would be 95,629,085. After giving effect to the proposed Reverse Stock Split, such number would be 23,907,271. Except as otherwise indicated, all share and per share information in this Proxy Statement is presented without giving effect to the Reverse Stock Split. As of September 27, 1996, the Company had outstanding 36,251,130 shares of Common Stock; 2,485,438 additional shares are reserved for issuance upon the exercise of outstanding options and 10,273,920 shares are reserved for issuance upon conversion of the 7% Preferred Stock. As described under "--Special Conversion Price of Outstanding 7% Preferred Stock," the number of shares required for issuance upon conversion of the 7% Preferred Stock could be increased to 18,927,000 by reason of the Investment. 23,175,000 shares will be required for conversion of the Convertible Preferred Stock (including shares issuable as in-kind dividends), 5,000,000 shares for issuance upon exercise of the Warrants and 1,000,000 shares for issuance pursuant to the proposed 1996 Stock Incentive Plan. As described under "--Special Conversion Price of Outstanding 7% Preferred Stock," the number of shares of Common Stock issuable upon conversion of the Convertible Preferred Stock could be increased to as much as 31,965,517 if all shares of 7% Preferred Stock were converted to Common Stock at the special conversion price. In connection with the Reverse Stock Split, it is proposed to reduce the number of authorized shares of Common Stock from 100,000,000 to 50,000,000.

This Amendment will not be implemented if the Investment is not completed.

5

CAPITALIZATION

The following table sets forth the capitalization of the Company at June 28, 1996 and as adjusted to give effect to the Investment, the addition of the estimated net proceeds therefrom to cash (see "Use of Proceeds") and the reclassification of $65,000,000 of 8.67% Senior Secured Notes from short-term debt to long-term debt after certain modifications which were recently made to the Company's credit agreements. For additional financial information about the Company please refer to the Company's 1996 Annual Report (enclosed with this Proxy Statement and incorporated herein by reference), its Quarterly Report on Form 10-Q for the quarter ended June 28, 1996, attached as Appendix II hereto and incorporated herein by reference, and "--Second Quarter Results" below.

|  | JUNE 28, 1996 | |
|  | ACTUAL | AS ADJUSTED |
|  | (IN THOUSANDS) | |
| Cash | $ 25,104 | $ 66,104(1) |
| Short-term debt, including current portion of long term debt: | | |
| 8.67% Senior Secured Notes(2) | $ 65,000 | $ -- |
| Other | 259 | 259 |
| Total short-term debt, including current portion of long-term debt | $ 65,259 | $ 259 |
| Long-term debt: | | |
| 8.67% Senior Secured Notes due 2003(2) | $ -- | $ 65,000 |
| Other | 392 | 392 |
| Total long-term debt | 392 | 65,392 |
| Stockholders' equity: | | |
| Preferred stock, $100 par value, 180,000 shares authorized: | | |
| 7% Cumulative Convertible Exchangeable Preferred Stock, $100 par value, 24,000 shares issued and outstanding | 2,400 | 2,400 |
| Cumulative Convertible Preferred Stock, $100 par value, 45,000 shares to be issued | -- | 4,500 |
| Common stock, $1.00 par value, 100,000,000 shares authorized: | | |
| 36,601,778 shares issued and outstanding(3) | 36,602 | 36,602 |
| Treasury stock, at cost (27,811 shares) | (84) | (84) |
| Additional paid-in capital | 170,069 | 206,569 |
| Deficit | (70,598) | (70,598) |
| Total stockholders' equity | 138,389 | 179,389 |
| Total capitalization | $138,781 | $244,781 |

--------

(1) Includes $45,000,000 of proceeds from the Carlyle Investment less an estimated $4,000,000 of related offering costs.

(2) In anticipation of the loss reported by the Company for its current first fiscal quarter, the Company, prior to June 28, 1996, obtained a waiver through August 1996 (which was later extended through November 1, 1996) of certain covenants in its lending arrangements which allowed it to maintain compliance with those arrangements as of the end of the first quarter of fiscal year 1997. Due to the short-term nature of the waiver, the Company's $65,000,000 senior secured notes, which otherwise would have been classified as long-term, were classified as current in the June 28, 1996 consolidated balance sheet.

(3) Does not include approximately 2,485,438 shares of Common Stock issuable upon exercise of outstanding stock options under the Company's stock incentive plans or 10,273,920 shares reserved for issuance upon conversion of the 7% Preferred Stock.

6

The Company has recently negotiated amendments to its 8.67% senior secured notes and $60 million line of credit, which are intended to avoid future covenant defaults and provide enhanced flexibility in the Company's operations. The modifications will enable the Company to again classify its 8.67% senior secured notes as long term debt. Among other things, the changes will modify certain financial covenants; permit proceeds from borrowings to be used to finance acquisitions in certain circumstances, increase the Company's allowable debt; permit the Carlyle Investment and the payment of dividends on the Convertible Preferred Stock and increase the cost of the senior secured notes and credit line based upon certain leverage thresholds. Covenants applicable to the Company after completion of the Carlyle Investment will require the Company to achieve results in accordance with its current plan, and any failure to do so could result in future defaults and/or create a need for further waivers. It is a condition of Carlyle's obligation to make the Investment that such amendments to these credit agreements which are reasonably satisfactory to Carlyle are made, and Carlyle has informed the Company that the amendments the Company has negotiated are satisfactory in all material respects to Carlyle.

PRICE RANGE FOR THE COMPANY'S COMMON STOCK AND RELATED STOCKHOLDER MATTERS

The Company's Common Stock is listed on the NYSE and Pacific Stock Exchange under the symbol ITX. The following table sets forth the high and low sale prices of the Common Stock, as reported by the NYSE for the periods indicated

| QUARTER ENDED | HIGH | LOW |
|---|---|---|
| June 30, 1994..... | $3 1/4 | $2 |
| September 30, 1994 | 3 7/8 | 2 3/8 |
| December 31, 1994 | 4 1/2 | 2 3/4 |
| March 31, 1995 | 3 1/4 | 2 1/4 |
| June 30, 1995..... | 3 3/8 | 2 3/8 |
| September 29, 1995 | 3 7/8 | 2 3/4 |
| December 29, 1995 | 3 3/8 | 2 1/4 |
| March 29, 1996 | 2 3/4 | 2 |
| June 28, 1996 | 3 1/2 | 2 1/8 |
| September 27, 1996 | 3 | 1 7/8 |

On October 25, 1996, the closing sale price of the Common Stock on the NYSE was $2 3/8 per share. On that date, there were 2,131 stockholders of record. The high and low sales price of the Common Stock on the NYSE on August 28, 1996, the date preceding the public announcement of the proposed Investment was $2 and $1 7/8, respectively.

The Company has not paid a cash dividend on its Common Stock for the three years ended March 29, 1996. The Company has no present intention to pay cash dividends on its Common Stock for the foreseeable future in order to retain all earnings for investment in the Company's business. The Company's credit agreements prohibit cash dividends on Common Stock.

SECOND QUARTER RESULTS

On October 24, 1996, the Company reported its financial results for the second fiscal quarter ended September 27, 1996. Revenues for the second quarter were $92.5 million compared with $106.3 million in the prior year. Net loss for the quarter, excluding a special restructuring charge described below, was $1.5 million, or $0.04 per share, compared with net income of $1.3 million, or $0.04 per share, for the same period of last year. The Company took a special charge in the second quarter of $8.4 million in conjunction with corporate restructuring. Including the restructuring charge, the net loss for the quarter was $9.9 million, or $0.27 per share. The one-time $8.4 million restructuring charge included costs for severance, for closing or reducing the size of a number of the Company's offices, and for other related items

7

USE OF PROCEEDS

The net proceeds to the Company from the Carlyle Investment are estimated to be approximately $41,000,000, after the deduction of the expenses of the Investment transactions, which are expected to total approximately $4,000,000. Such proceeds will be used for acquisitions, working capital and other corporate purposes.

EVENTS LEADING TO THE CARLYLE INVESTMENT

In light of the Company's stock performance in recent years, and continuing difficult operating conditions in its industry (as noted in the Company's Quarterly Report on Form 10-Q for the quarter ended June 28, 1996, included as Appendix 11 to this Proxy Statement), on February 6, 1996 the Company announced that it had retained Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and The Environmental Financial Consulting Group ("EFCG") to assist it in exploring strategic alternatives. Among the Company's important objectives was to take advantage of opportunities for consolidation in the current environmental consulting, engineering and remediation industry. The Company announced that all opportunities would be actively explored, including mergers, acquisitions and strategic and financial alliances.

From February through May 1996, the Company's representatives communicated with 96 corporations and financial investors regarding their interest in a potential transaction. Of the 96 persons contacted, 18 entered into a confidentiality agreement and were furnished non-public information concerning the Company. The Company's representatives had numerous discussions with these 18 persons and by mid May it appeared that only four had a possible interest in proceeding with a transaction. Following a presentation by DLJ and EFCG of the strategic review process undertaken and communications to date, on May 15 the Board of Directors authorized DLJ to seek preliminary, non-binding indications of interest from the remaining interested parties for consideration by the Board of Directors at a meeting on June 27, 1996.

At the June 27 Board of Directors meeting, Carlyle was the only party to submit such an indication of interest. Among the principal reasons given by other parties for their decision not to proceed were the following:

(i) perceived risks of further negative developments in the environmental consulting, engineering and remediation industry;

(ii) the Company's material exposure to environmental liabilities relating to its discontinued operations;

(iii) the Company's significant current and future cash requirements;

(iv) heavy dependence by the Company on federal government contracts;

(v) the recent decline in the Company's operating performance and operating losses;

(vi) the availability of alternative acquisition opportunities in the environmental consulting, engineering and remediation industry; and

(vii) risks associated with contractor liability issues in the environmental consulting, engineering and remediation industry.

Following a complete review of the process which had been undertaken to date, the Board of Directors authorized management, with the assistance of DLJ, to enter into negotiations with Carlyle to establish specific terms for a potential Carlyle transaction. Between June 28 and July 19, 1996, there were extensive discussions and negotiations concerning the Carlyle proposal. The Company was represented in these, and subsequent, discussions and negotiations by its Chairman, E. Martin Gibson, its President and Acting Chief Executive Officer, Anthony J. DeLuca (who was appointed to such position following the resignation of Robert B. Sheh as of July 1, 1996), representatives of DLJ and outside legal counsel.

A meeting of the Board of Directors was held July 22, 1996, at which a report was made on the status of negotiations and a full discussion of the principal terms of the proposed investment occurred. Following further

8

discussions and negotiations between Carlyle and the Company, the proposed transaction was unanimously approved by the Board of Directors on August 8, 1996. At the August 8 meeting, the Board of Directors received a further report on the progress of the negotiations and the detailed terms of the proposed transaction, and the oral opinion of DLJ that the consideration to be received by the Company is fair to the Company from a financial point of view.

From August 8, 1996 to August 28, 1996 definitive documentation for the terms of the transaction was negotiated; and further discussions occurred between the Company's representatives, Carlyle and representatives of the NYSE concerning the corporate governance provisions of the proposed transaction and their compliance with the rules of the NYSE. Upon satisfactory resolution of these discussions, the definitive agreements were signed on August 28, 1996.

IMPACT ON COMPANY'S BUSINESS STRATEGY OF CARLYLE INVESTMENT

The Company and Carlyle intend that the Carlyle Investment will provide additional working capital and cash reserves to help the Company address the current challenging market conditions that the Company faces, to more aggressively pursue existing internal growth opportunities and the commercial remediation market, and to enable the Company to take advantage of opportunities for expansion and diversification of its business through the acquisition of, or other business combination with, other companies in the environmental consulting, engineering and remediation industry.

In its acquisition program, the Company plans to initially pursue two strategic paths. The first part of the plan involves seeking acquisition candidates that are specialty consulting/engineering firms that perform economically-driven/value-added services for clients, which the Company believes are extensions of or complementary to IT's existing services. These types of acquisitions will enable IT to expand into higher growth, higher margin services and markets and will be synergistic in that the acquired companies will benefit from IT's nationwide presence, market position and infrastructure, and IT will benefit from exposure to new clients for which IT can perform its existing services. The second part of the Company's strategy would be to acquire participants in IT's existing businesses that could be purchased at attractive prices and leveraged off IT's existing infrastructure, generating economies of scale.

Additionally, the Company will consider exploring opportunities for growth which utilize its existing capabilities and infrastructure but which may be partially in or outside of the environmental management industry.

The Company intends that the above growth plans would be financed by a combination of the cash received from the Carlyle Investment, acquisition debt financing, which may be more available to the Company due to the reduced financial leverage resulting from the Carlyle Investment, and possibly newly issued shares of Common Stock of the Company. Although there is no present intent to divest any major part of IT's existing services, any assets or business segments that are ultimately evaluated as "non-core" could be considered for disposition to further fund the growth and diversification strategy.

BOARD OF DIRECTORS' RECOMMENDATIONS

The Board of Directors has unanimously approved the Investment and believes that it is in the best interests of the Company and its stockholders. The Board of Directors, in approving the Carlyle Investment and recommending stockholder approval, considered a number of factors, including, without limitation, the following:

(i) The Carlyle Investment will provide significant funds and operating flexibility to enable the Company to take advantage of opportunities for expansion and diversification of its business through the acquisition of other companies in the environmental consulting, engineering and remediation industry in order to create long-term value for its stockholders

9

(ii) At June 28, 1996, the Company was not in a position to comply with certain financial covenants in its $65,000,000 senior secured notes and $60,000,000 bank line of credit agreements, with such non-compliance temporarily waived by the lenders.

In anticipation of the Carlyle Investment, the Company recently negotiated amendments to its 8.67% senior secured notes and $60 million line of credit which are intended to avoid future covenant defaults and provide enhanced flexibility in the Company's operations. Additionally, the anticipated earnings increase from the expansion and diversification of the Company's business resulting from the use of the proceeds of the Carlyle Investment is expected to provide the Company with the opportunity to reduce its borrowing costs in the future. Without the Carlyle Investment, the amended agreements would provide the Company with no significant operating flexibility which, combined with limited cash and debt availability, would substantially restrict the ability of the Company to grow. See "Capitalization."

(iii) Because of the Company's present inability to comply with covenants in its bank credit facility, its only significant sources of liquidity are cash flow from operations and invested cash of approximately $19,000,000. However the Company continues to have significant cash requirements, including working capital, capital expenditures, closure costs relating to its inactive disposal sites and environmental cleanup costs related to discontinued operations, 7% Preferred Stock dividend obligations and contingent liabilities. In the event the anticipated recovery in the Company's business does not develop during the remainder of fiscal year 1997, the Company could encounter severe liquidity constraints. Such a development could have other major business implications: (a) the Company's bonding availability could be substantially reduced, which could limit its ability to bid on and perform new contract work, (b) the lack of operating flexibility caused by near-term cash pressures could negatively impact the Company's competitiveness and (c) the combination of reduced bonding capacity and lack of operating flexibility could result in loss of market share. Proceeds from the Carlyle Investment will provide a valuable cushion against any such contingency.

(iv) The Company's financial advisor has given its opinion to the effect that, as of the date of such opinion, and based on, and subject to, the assumptions, limitations and qualifications set forth in such opinion, the consideration to be received by the Company pursuant to the Purchase Agreement is fair to the Company from a financial point of view. See "-- Opinion of Financial Advisor."

(v) The terms and conditions of the Carlyle Investment are structured in a manner which the Board of Directors believes is favorable to the Company. The Convertible Preferred Stock to be issued will require no cash for the payment of dividends for two years to accommodate the Company's significant cash requirements during this period.

(vi) Based upon the Company's lengthy exploration of strategic alternatives, with the assistance of the Company's financial advisor, the Board of Directors does not believe that there is any alternative transaction which would be more advantageous to stockholders than the proposed Carlyle Investment.

(vii) The Board of Directors believes that there are material potential advantages to the Company and its stockholders from the Company's association with Carlyle. Carlyle is an investment group whose commitment to the Company and majority representation on the Board of Directors should add to investor interest in the Company's Common Stock and confidence that management will be responsive to investor interests. In addition, while there is no legal obligation to do so, it will be in the interests of Carlyle, as the Company's largest stockholder, to make available to the Company the resources and expertise of Carlyle personnel in matters involving capital markets, government contracting and regulation and acquisitions and strategic alliances.

Based upon all of the factors mentioned above, and the Board of Directors' evaluation of the Company's prospects as an ongoing business without the Carlyle Investment, the Board of Directors concluded that the prospects for enhancing stockholder value will be materially increased by the Carlyle Investment.

In view of the variety of factors considered by the Board in connection with its evaluation of the Investment, the Board of Directors did not qualify or otherwise assign relative weights to the individual factors considered in reaching its determination and recommendations set forth herein. Neither the Board nor any individual director articulated the consideration of, or otherwise identified, any one factor or group of factors as more significant than any other in reaching the determination or recommendation set forth herein.

THE BOARD OF DIRECTORS BELIEVES THAT THE PROPOSED CARLYLE INVESTMENT IS FAIR TO, AND IN THE BEST INTERESTS OF, THE COMPANY AND ITS STOCKHOLDERS AND UNANIMOUSLY RECOMMENDS THAT THE STOCKHOLDERS OF THE COMPANY VOTE "FOR" APPROVAL OF THE INVESTMENT.

OPINION OF FINANCIAL ADVISOR

In its role as financial advisor to the Company, DLJ was asked by the Company to render an opinion to the Board of Directors of the Company as to the fairness to the Company, from a financial point of view, of the consideration to be received by the Company pursuant to the terms of the Securities Purchase Agreement dated August 28, 1996, between the Company and Carlyle (the "Purchase Agreement") On August 8, 1996, DLJ delivered its oral opinion to the Board of Directors of the Company (subsequently confirmed in a written opinion to the Board of Directors of the Company, dated October 30, 1996 (the "DLJ Opinion")), that, as of the date of the DLJ Opinion, and based upon and subject to the assumptions, limitations and qualifications set forth in such opinion, the consideration to be received by the Company pursuant to the Purchase Agreement is fair to the Company from a financial point of view.

THE FULL TEXT OF THE DLJ OPINION IS ATTACHED HERETO AS APPENDIX I. THE DLJ OPINION SHOULD BE READ CAREFULLY IN ITS ENTIRETY FOR ASSUMPTIONS MADE, MATTERS CONSIDERED AND LIMITS OF THE REVIEW AND PROCEDURES FOLLOWED BY DLJ IN CONNECTION WITH SUCH OPINION

The Board selected DLJ as its financial advisor because it is a nationally recognized investment banking firm that has substantial experience in the environmental consulting, engineering and remediation industry and is familiar with the Company and its business. As part of its investment banking business, DLJ is regularly engaged in the valuation of businesses and securities in connection with mergers, acquisitions, underwritings, sales and distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes

The DLJ Opinion was prepared for the Company's Board of Directors and is directed only to the fairness of the transaction to the Company from a financial point of view and does not constitute a recommendation to any stockholder as to how such stockholder should vote at the Annual Meeting. The DLJ Opinion does not constitute an opinion as to the price at which the Common Stock will actually trade at any time  No restrictions or limitations were imposed by the Company upon DLJ with respect to the investigations made or the procedures followed by DLJ in rendering its opinion

In arriving at its opinion, DLJ reviewed the Purchase Agreement and the exhibits thereto including the Certificate of Designations relating to the Preferred Stock, the form of Warrant Agreement and the form of Registration Rights Agreement to be entered into upon the consummation of the Investment by and among the Company and Carlyle. DLJ also reviewed financial and other information that was publicly available or furnished to it by the Company including information provided during discussions with the Company's management  Included in the information provided during discussions with the Company's management were financial projections of the Company for the period beginning July 1, 1996 and ending March 31, 2001, prepared by the management of the Company. In addition, DLJ compared certain financial and securities data of the Company with various other companies that DLJ deemed relevant, reviewed the historical stock prices and trading volumes of the Common Stock and the 7% Preferred Stock of the Company, and conducted such other financial studies, analyses and investigations as DLJ deemed appropriate for purposes of its opinion. DLJ also considered

11

alternative financing sources available to the Company and DLJ examined the terms of certain investments by private investors in public companies

In rendering its opinion, DLJ relied upon and assumed the accuracy, completeness and fairness of all of the financial and other information that was available to it from public sources, that was provided to it by the Company or that was otherwise reviewed by it  DLJ did not make any independent evaluation of the assets or liabilities of the Company, nor did DLJ independently verify the information reviewed by it  DLJ also assumed that the financial projections supplied to it were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of the Company as to the future operating and financial performance of the Company

The DLJ Opinion was necessarily based on economic, market, financial and other conditions as they existed on, and on the information made available to it as of, the date of its opinion  It should be understood that, although subsequent developments may affect its opinion, DLJ does not have any obligations to update, revise or reaffirm the DLJ Opinion. The DLJ Opinion does not address the relative merits of the proposed transaction and other business strategies being considered by the Company's Board of Directors, nor does it address the Board's decision to proceed with the proposed transaction

The following is a summary of certain factors considered and financial analyses performed by DLJ in connection with the DLJ Opinion that were included in a presentation to the Board of Directors of the Company on August 8, 1996

Analysis of Certain Other Publicly Traded Companies. To provide contextual data and comparative market information. DLJ compared selected historical share price, earnings and operating and financial ratios for the Company to the corresponding data and ratios of certain other companies whose securities are publicly traded (collectively, the "Comparable Companies") The Comparable Companies were chosen because they possess general business, operating and financial characteristics representative of companies in the industry in which the Company operates  The Comparable Companies consisted of: Dames & Moore, Inc., EMCON, Harding-Lawson Associates Group, Inc , ICF Kaiser International, Inc., OHM Corporation, Sevenson Environmental Services, Inc , IRC Companies, Inc , and Roy F. Weston, Inc  Such data and ratios included Enterprise Value ("Enterprise Value" is defined as the product of the stock price and total shares outstanding ("Equity Value") plus Net Debt ("Net Debt" is defined as total debt (including liabilities of discontinued operations) plus preferred stock less cash and cash equivalents)) as a multiple of gross revenues, earnings before interest, taxes, depreciation and amortization ("EBITDA") and earnings before interest and taxes ("EBIT") for the latest reported twelve months ("LTM"). In addition, DLJ examined the ratios of Equity Value to LTM net income, 1996 estimated net income and 1997 estimated net income and current book value for the Comparable Companies and compared such ratios with those of the Company

Applying the median multiples obtained for the Comparable Companies to the operating data for the Company, this analysis indicated a range of implied Enterprise Values for the Company of $82.8 million to $152.7 million; a range of implied Equity Values for the Company of $15.3 million to $72.9 million; and a range of implied prices per share from $0.42 to $1.99 with an average of $0.99. The implied Equity Values and per share prices exclude the impact of values which are less than zero.

Transaction Analysis. DLJ reviewed publicly available information for 13 selected transactions involving the combination of selected environmental consulting, engineering and remediation companies. The 13 transactions reviewed (the "Comparative Transactions") were: (i) Fluor Daniel, Inc./Groundwater Technology, Inc.; (ii) EMCON/Organic Waste Technologies, Inc.; (iii) Tyco International Ltd./Earth Technology Corporation; (iv) Tetra Tech, Inc./PRC Environmental Management. Inc ; (v) OHM Corporation/Rust International, Inc.; (vi) Dames & Moore, Inc./Walk, Haydel & Associates  Inc ; (vii) Dames & Moore, Inc./O'Brien-Kreitzberg & Associates, Inc ; (viii) Earth Technology Corporation/HazWaste Industries, Inc ; (ix) Canonie Environmental Services Corporation/Riedal Environmental Services, Inc ; (x) Foster Wheeler Corporation/Enserch Environmental Corporation; (xi) Earth Technology Corporation/Summit Environmental Group. Inc ; (xii) TRC

12

Companies, Inc./Environmental Solutions, Inc.; and (xiii) Heidemij N.V./Geraghty & Miller, Inc. The 13 transactions selected are not intended to represent the complete list of environmental consulting, engineering and remediation transactions which have occurred during the last three years; rather they include only transactions involving combinations of companies with operating characteristics, size or financial performance characteristics which DLJ believed to be comparable to those of the Company. DLJ reviewed the Enterprise Value of such transactions as a multiple of LTM gross revenue, LTM EBITDA and LTM EBIT and the Equity Value as a multiple of LTM net income

Applying the median multiples obtained for the Comparative Transactions to the operating data for the Company, this analysis indicated a range of implied Enterprise Values for the Company of $201.3 million to $212.0 million; a range of implied Equity Values for the Company of $64.0 million to $74.6 million; and a range of implied prices per share ranging from $1.75 to $2.04 with an average of $1.89. The implied Equity Values and per share prices exclude the impact of values which are less than zero. In its presentation to the Board, DLJ noted that the value of this analysis was somewhat limited in its view because such analysis was based on publicly available historical information, whereas prices paid in transactions in the environmental consulting and engineering industry are generally based on future financial expectations, for which data is unavailable

Stock Trading History. To provide contextual data and comparative market data, DLJ examined the history of the trading prices for the Common Stock for the latest twelve-month period ended August 5, 1996 DLJ also reviewed the daily closing prices of the Common Stock and compared the closing stock prices with an index consisting of the Comparable Companies. This information was presented solely to provide the Board with background information regarding the stock prices of the Company over the period indicated. DLJ noted the high and low prices for the Common Stock over the twelve-month period ended August 5, 1996 was $3.88 and $1.88, respectively

Discounted Cash Flow Analysis. DLJ also performed a discounted cash flow analysis of the Company. In conducting its analysis, DLJ relied on certain assumptions, financial projections and other information provided by the Company. Using the information set forth in the Company projections, DLJ calculated the estimated "Free Cash Flow" based on projected unleveraged operating income adjusted for: (i) taxes; (ii) certain projected non-cash items (i.e., depreciation and amortization); (iii) projected changes in non-cash working capital; and (iv) projected capital expenditures. DLJ analyzed the Company forecast and discounted the stream of cash flows using discount rates ranging from 11% to 13%. To estimate the residual value of the Company at the end of the forecast period, DLJ applied a range of terminal EBITDA multiples of 4.5 to 5.5. DLJ then aggregated the present value of the free cash flows and residual value to derive a range of implied per share equity values for the Company. Based on this analysis, DLJ calculated Equity Values for the Company ranging from $24.1 million to $65.1 million and per share prices of $0.66 to $1.78, with a midpoint per share price of $1.20

The summary set forth above does not purport to be a complete description of the analyses performed by DLJ. The preparation of a fairness opinion involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods to the particular circumstances and, therefore, such an opinion is not readily susceptible to summary description. Each of the analyses conducted by DLJ was carried out in order to provide a different perspective on the transaction and add to the total mix of information available. DLJ did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion as to fairness. Rather, in reaching its conclusion, DLJ considered the results of the analyses in light of each other and ultimately reached its opinion based on the results of all analyses taken as a whole. DLJ did not place particular reliance or weight on any individual analysis, but instead concluded that its analyses, taken as a whole, supported its determination. Accordingly, notwithstanding the separate factors summarized above, DLJ believes that its analyses must be considered as a whole and that selecting portions of its analysis and the factors considered by it, without considering all analyses and factors, could create an incomplete or misleading view of the evaluation process underlying its opinions. In performing its analyses, DLJ made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by DLJ are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses

13

Pursuant to the terms of an engagement letter dated February 1, 1996, the Company has agreed to pay DLJ a fee equal to 1.20% (of which $600,000 is due upon delivery of the DLJ Opinion) of the aggregate amount of consideration received by the Company or its stockholders, plus the amount of any debt assumed or repaid, preferred stock redeemed or remaining outstanding, and short and long-term liabilities of discontinued operations assumed in connection with the transaction, to be paid upon consummation of the transaction. The Company has also agreed to reimburse DLJ promptly for all out-of-pocket expenses (including the reasonable fees and out-of-pocket expenses of counsel) incurred by DLJ in connection with its engagement, and to indemnify DLJ and certain related persons against certain liabilities in connection with its engagement, including liabilities under the federal securities laws. The terms of the arrangement with DLJ, which DLJ and the Company believe are customary in transactions of this nature, were negotiated at arm's length between the Company and DLJ and the Board was aware of such arrangement, including the fact that a significant portion of the aggregate fee payable to DLJ is contingent upon consummation of the transaction.

In the ordinary course of business, DLJ may actively trade the securities of the Company for its own account and for the accounts of its customers and, accordingly, may at any time hold a long or short position in such securities. DLJ has provided financial advisory and investment banking services to the Company in the past, including the placement on behalf of the Company of its 8 67% Senior Notes due 2003 and related services for which DLJ received usual and customary fees.

DISSENTERS' RIGHTS AND PREEMPTIVE RIGHTS

Stockholders have no dissenters' rights or preemptive rights in connection with the issuance of the Convertible Preferred Stock or the Warrants.

IMPACT OF THE TRANSACTION ON THE COMPANY AND EXISTING STOCKHOLDERS; CERTAIN CONSIDERATIONS

While the Board of Directors is of the opinion that the proposed Carlyle Investment is fair to, and its approval is advisable and in the best interests of, the Company and its stockholders, stockholders should consider the following possible effects in evaluating the Investment Proposal.

Impact on Voting and Other Rights of Stockholders; Impact on Future Share Issuances

As described in more detail above under "--Summary of Proposed Investment-- Convertible Preferred Stock Voting Rights," the Investment would give the holders of the Convertible Preferred Stock the right to elect a majority of the Company's Board of Directors for the Five-Year Period, provided that Carlyle continues to own at least 20% of the voting power of the Company. Thus, during the Five-Year Period, holders of Common Stock of the Company will be entitled to elect only a minority of the Board of Directors. After the Five-Year Period, provided that Carlyle continues to own at least 20% of the voting power of the Company, holders of Convertible Preferred Stock will have the right to elect the largest number of directors which is a minority of the directors of the Company.

Aside from the foregoing, approval of the holders of the Convertible Preferred Stock will be required: (i) to approve the creation of additional classes or series of preferred stock on a parity with or prior to the Convertible Preferred Stock, any increase in the number of shares of Convertible Preferred Stock, any amendment to the Certificate of Incorporation that would adversely affect the rights of the Convertible Preferred Stock, or any reorganization, recapitalization, sale of substantially all assets or merger of the corporation, if such transaction would adversely affect the rights of the Convertible Preferred Stock; and (ii) to approve the payment of dividends on any junior stock. In addition, as such time as the voting rights in the preceding paragraph are no longer in effect, holders of the Convertible Preferred Stock (voting as a class with holders of the Company's already outstanding 7% Preferred Stock and any parity stock that may be issued with similar rights in the future) will have the right to elect two additional directors in the event of a default in the payment of preferred dividends for six quarterly periods.

14

Diminished Ability to Sell the Company and to Raise Additional Preferred
Equity Capital

As a result of Carlyle's substantial ownership interest in the Company's
securities, it may be more difficult for a third party to acquire control of
the Company without Carlyle's approval. In addition, the consent of at least a
majority of the outstanding shares of Convertible Preferred Stock, voting
separately as a class, will be required for approval of certain corporate
transactions including the merger or consolidation of the Company or the sale
of substantially all of its assets  See "--The Securities Purchase Agreement--
Description of Convertible Preferred Stock--Voting Rights "

Effect on Dividends and Distributions to Common Stockholders

After giving effect to expenses of the Investment, the sale of the
Convertible Preferred Stock and the Warrant to Carlyle would increase the
Company's capital by approximately $41,000,000. No dividends will be payable
on the Convertible Preferred Stock in the first year  Thereafter, dividends
will be payable quarterly in kind for one year at the rate of 3% and in cash
thereafter at the rate of 6% per annum  Additionally, although the first two
years' dividends to be paid are at a rate of 0% and 3%, respectively, for
earnings per share calculation purposes, dividends will be imputed at a rate
of approximately 6% per annum as required by SEC Staff Accounting Bulletin No
78 "Increasing Rate Preferred Stock." All dividends payable must be paid, or
declared (and a sum of money sufficient for payment set apart), prior to the
payment of any dividends on the Common Stock. In addition, if dividends are
paid on the Common Stock (which requires the approval of holders of 67% of the
Convertible Preferred Stock) there must also be paid to holders of the
Convertible Preferred Stock the amount of dividends that would have been
payable if such shares had been fully converted into Common Stock  In the
event of any voluntary or involuntary liquidation, dissolution or other
winding up of the affairs of the Company, before any payment or distribution
of assets may be made to the holders of Common Stock, the holders of
Convertible Preferred Stock must be paid the full liquidation preference
($1,000 per share) plus all dividends accrued and unpaid

Special Conversion Price of Outstanding 7% Preferred Stock

The consummation of the Carlyle Investment will trigger the right of the
holders of the Company's outstanding 7% Preferred Stock to convert into a
greater number of shares of Common Stock than that to which they are otherwise
entitled. The 7% Preferred Stock does not trade on the NYSE  Instead, the 7%
Preferred Stock trades through and is represented by Depositary Shares, each
representing 1/100 of a share of the 7% Preferred Stock  The 7% Preferred
Stock is currently convertible into a number of shares of Common Stock
determined by dividing the liquidation price of the 7% Preferred Stock ($2,500
per share) by the conversion price (currently $5 84 per share)  At this price
each share of 7% Preferred Stock would convert into approximately 428.08
shares of Common Stock (each Depositary Share would convert into 4 2808 shares
of Common Stock)  The terms of the 7% Preferred Stock provide that if any
person or group shall beneficially own at least 50% of the total voting power
of all classes of capital stock of the Company entitled to vote generally in
the election of directors of the Company, each holder of the 7% Preferred
Stock shall have the right, at the holder's option, for a period of 45 days
after the mailing of a notice by the Company, to convert all  but not less
than all, of such holder's shares of 7% Preferred Stock into Common Stock at a
special conversion price of the higher of the market value of one share of
Common Stock or $3.17 per share  Because Carlyle will have the right to elect
a majority of the Board of Directors, and holders of the Convertible Preferred
Stock will have the right to approve other significant corporate actions (see
"--The Securities Purchase Agreement--Description of Convertible Preferred
Stock--Voting Rights"), based on the advice of counsel, the Company believes
that the special conversion price will be triggered by the Investment. Thus,
if the market value of the Common Stock is at or below $3 17 per share, one
share of 7% Preferred Stock would become, as a result of the Investment,
convertible into 788 64 shares of Common Stock (each Depositary Share would
convert into 7 8864 shares of Common Stock)  Such number of shares may have a
market value in excess of the then-current market value of the 7% Preferred
Stock, leading some or all holders of the 7% Preferred Stock to exercise their
special conversion right. If holders of a substantial number of shares of 7%
Preferred Stock choose to convert, the prevailing market price of the Common
Stock could be depressed  The Company will mail notice of the special
conversion right not later than 30 days following completion of the
Investment

15

The Convertible Preferred Stock and the Warrants provide for an adjustment to the conversion price and exercise price, respectively, and the number of shares of Common Stock issuable upon exercise of the Convertible Preferred Stock, in the event that any shares of 7% Preferred Stock are converted into Common Stock at the special conversion price. If all shares of 7% Preferred Stock were converted at a special conversion price of $3.17 per share, the conversion price of the Convertible Preferred Stock would be reduced from $2.00 to $1.45 and the number of shares of Common Stock issuable upon conversion of the Convertible Preferred Stock (including shares issuable as in-kind dividends) would be increased from 23,175,000 to 31,965,517. Under such circumstances, the exercise price of the Warrants would be reduced from $3.00 to $2.18. In such event, the shares of Common Stock issuable upon conversion of the Convertible Preferred Stock would represent approximately 37% of the shares outstanding, on an "as converted" basis; and upon exercise of the Warrants the total shares so issued would represent approximately 40% of the shares outstanding, on such basis.

THE SECURITIES PURCHASE AGREEMENT

The following summary of the material provisions of the Securities Purchase Agreement by and among the Company and Carlyle, dated August 28, 1996 (the "Purchase Agreement") is not intended to be complete and is subject to, and qualified in its entirety by reference to, all of the provisions of such agreement, a copy of which was filed with the SEC as an exhibit to the Company's Current Report on Form 8-K on September 20, 1996 and is incorporated herein by reference. Stockholders are urged to read the Purchase Agreement in its entirety.

Issuance and Sale of Convertible Preferred Stock and Warrants

Pursuant to the Purchase Agreement, the Company will sell, and certain investors affiliated with The Carlyle Group (collectively, "Carlyle") will purchase, 45,000 shares of newly issued Convertible Preferred Stock of the Company and the Warrants to purchase 5,000,000 shares of Common Stock of the Company for an aggregate purchase price of $45,000,000.

Certain Representations and Warranties

Under the Purchase Agreement, the Company has made certain representations and warranties to Carlyle as to the Company and its subsidiaries, including (i) due corporate organization and qualification to do business; (ii) the capital structure of the Company; (iii) the due authorization and issuance of the Convertible Preferred Stock and the Warrants and the shares of Common Stock issuable upon conversion or exchange thereof, respectively; (iv) the due authorization, execution, delivery and performance of the Purchase Agreement and related agreements and their enforceability; (v) no conflict with or violation of the Company's Certificate of Incorporation or bylaws, any of the Company's material agreements and applicable law; (vi) required consents from governmental authorities or other third parties; (vii) the capital structure of the Company's subsidiaries; (viii) employee benefits plans; (ix) the reports and other documents filed by the Company with the SEC and the accuracy of the information contained therein; (x) the absence of undisclosed liabilities and guarantees; (xi) absence of certain changes to the Company's business, financial condition or capitalization; (xii) compliance with laws; (xiii) pending and threatened litigation; (xiv) accuracy of all representations and warranties and good faith basis for financial projections; (xv) taxes; (xvi) environmental matters; (xvii) insurance; (xviii) title to assets; (xix) condition of tangible assets; (xx) contracts; (xxi) books and records; (xxii) labor matters; (xxiii) payments to government authorities; (xxiv) the accuracy of the information contained in this Proxy Statement; (xxv) Board recommendation of the Investment; (xxvi) intellectual property; (xxvii) recent securities offerings; (xxviii) absence of other agreements to sell assets or the Company; (xxix) financial advisors and brokers and (xxx) absence of required approval of the holders of the Company's 7% Preferred Stock.

Under the Purchase Agreement, each Carlyle-affiliated purchaser has made certain representations and warranties to the Company as to (i) its due organization and qualification to do business; (ii) its due authorization, execution, delivery and performance of the Purchase Agreement and related agreements and their enforceability; (iii) no conflict with or violation of the applicable governing instruments of each purchaser, any agreements and

16

applicable law; (iv) required consents from governmental authorities or other third parties; (v) investment intent; (vi) accuracy of written material supplied by Carlyle for this proxy statement; and (vii) absence of brokers or finders

Certain Covenants

General  The Purchase Agreement contains various covenants regarding the Investment  It requires that the Company take action necessary to call and hold the Annual Meeting as promptly as practicable to consider and vote upon the Investment and the ancillary related proposals including the proposed amendments to the Company's Certificate of Incorporation. The Purchase Agreement provides that, subject to its fiduciary duties, the Board of Directors of the Company shall (i) recommend to the stockholders that they vote in favor of all matters necessary to effectuate the Investment, (ii) use its reasonable best efforts to solicit from the stockholders proxies in favor of such adoption and approval and (iii) take all other action reasonably necessary to secure a favorable vote of the stockholders  The Company must also use its reasonable best efforts to obtain a statement from its executive officers and directors who own voting stock of the Company that such persons intend to vote all shares of voting stock owned by them in favor of the transactions contemplated by the Purchase Agreement at the Annual Meeting

SEC Filings and Blue Sky Laws. The Company has also agreed, pursuant to the Purchase Agreement, to use its reasonable best efforts to promptly prepare and file with the SEC any documents or materials, including a proxy statement pertaining to the issuance of the Convertible Preferred Stock and Warrants and the Annual Meeting and to have the proxy materials cleared by the SEC. Additionally, the Company must take such action as may be required under applicable state securities or blue sky laws in connection with the issuance of the Convertible Preferred Stock and Warrants or the shares of Common Stock issuable pursuant thereto

NYSE Confirmation. The Company further agreed to use its best efforts and take all action necessary to obtain the confirmation of the NYSE that the transactions contemplated by the Purchase Agreement (including the proposed amendments to the Company's Certificate of Incorporation) will not violate Section 313 of the NYSE's Listed Company Manual.

Business in Ordinary Course  Pursuant to the Purchase Agreement, the Company has agreed that, prior to the closing date of the Investment (the "Closing Date"), the Company will conduct its business in the ordinary course and, among other things, will not, without the consent of Carlyle (i) amend its Certificate of Incorporation or bylaws; split, combine, or reclassify any shares of its capital stock; adopt resolutions authorizing a liquidation, dissolution, merger, consolidation, restructuring, recapitalization, or other reorganization of the Company's capital structure or of any subsidiary; or make any other material changes in its or any subsidiary's capital structure; (ii) except in the ordinary course and consistent with past practice, incur any material liability or obligation, become liable or responsible for the material obligations of any other person (other than wholly-owned subsidiaries), or pay. discharge or satisfy any material claims, liabilities or obligations, other than as is consistent with past practice provided that the Company shall not enter into any settlement or compromise of any litigation or claims involving liability in excess of $1,000,000 without the prior consent of Carlyle; (iii) incur any indebtedness for borrowed money other than revolving debt and letters of credit under the Company's bank credit facility and up to an aggregate of $2,000,000 of debt for capital assets; (iv) make any loans or advances to any person, other than advances to employees in the ordinary course of business and transactions among or between the Company and its subsidiaries with respect to cash management conducted in the ordinary course of business; (v) declare or pay any dividend (other than dividends to be paid by any subsidiary to the Company or another subsidiary in the ordinary course of business or to holders of the 7% Preferred Stock) or make any other distributions; (vi) issue, sell, or deliver any of its capital stock or other securities other than pursuant to stock options issued and outstanding as of the date of the Purchase Agreement or purchase any of its capital stock, employee or director stock options or debt securities; (vii) subject any of its assets or properties to certain encumbrances other than as permitted under the Company's bank credit facility; (viii) other than in the ordinary course of business and sales of non-core assets of up to $3,000,000 in the aggregate, sell, lease, transfer, or otherwise dispose of any assets. or waive, release. grant, or transfer any rights of value; (ix) acquire (by merger.

17

consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or division thereof, create or make any investment in any subsidiary (other than a wholly-owned subsidiary); or make any other investment or expenditure of a capital nature, other than in any amounts already included in the capital expenditure budget for the Company and its subsidiaries for the fiscal year ended March 28, 1997, as previously provided to and approved by Carlyle; (x) enter into, adopt, or amend or terminate any collective bargaining agreement or any employee benefit plan, approve or implement any employment severance arrangements (other than in accordance with past practice) or retain or discharge any officers and executive management personnel; authorize or enter into any employment, severance, consulting services or other agreement with any officers and executive management personnel or any of their affiliates; or change the compensation or benefits provided to any director, officer, or employee as of March 29, 1996 other than arrangements previously disclosed to Carlyle; (xi) enter into any contract, agreement or lease involving total value or consideration or liability in excess of $50,000,000 or other commitment (not including cost reimbursable contracts) which other commitment involves any material risk of loss to the business, assets, properties, or financial position of the Company and its subsidiaries; or except as otherwise provided in the Purchase Agreement, amend, modify, or change in any materially adverse respect any of the agreements pertaining to existing indebtedness or any other existing contract, agreement, lease involving total value or consideration or liability in excess of $50,000,000, or other commitment which is material to the business, assets, properties, or financial position of the Company and its subsidiaries, taken as a whole; (xii) enter into any speculative or commodity swaps, hedges or other derivatives transactions or purchase any securities for investment purposes, other than in connection with cash management of the Company; or (xiii) grant any option or preferential right to purchase or enter into agreements that could adversely affect the marketability of any material asset of the Company or any subsidiary

   Press Releases; Financial Statements; Access; Notification. The Company and Carlyle agreed not to issue press releases with respect to the Purchase Agreement without the consent of the other. The Company also agreed to provide Carlyle, prior to the Closing Date, with certain interim financial statements and with access to the Company and Company information. Additionally, the Company and Carlyle agreed to notify the other of any event which would be likely to cause any representation or warranty to be materially untrue or inaccurate, and of any material failure to comply with or satisfy any covenant, condition or agreement to be complied with under the Purchase Agreement

   No Solicitation. Under the Purchase Agreement, prior to the Closing Date, neither the Company, its affiliates or any officers, directors and employees thereof shall solicit or initiate any discussions, submissions of proposals or offers, provide information to, or otherwise cooperate in any way with any corporation or other person other than Carlyle concerning any alternative transaction, except to the extent that the Board of Directors determines in good faith that such action is required for the Board to comply with its fiduciary duties. In such case, the Board must provide specified written notice to Carlyle prior to furnishing any information to such other party and obtain a confidentiality agreement from the other party.

   Miscellaneous. The Purchase Agreement also requires that (i) the Company and Carlyle will file any applicable notices and reports pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) the Company will use its best efforts to enter into employment agreements with certain senior executives of the Company on or prior to the Closing Date (see "Certain Transactions--Employment Agreements"), (iii) the Company adopt an amendment to the Company's Non-Employee Directors Retirement Plan and obtain the consent of affected beneficiaries under such Plan, (iv) the Company shall use its best efforts to obtain waivers from each non-employee director of all rights to the acceleration of vesting requirements under any non-employee director nonqualified option agreement under the 1991 Plan, (v) the Board of Directors shall take all action necessary to ensure that the acquisition of the Convertible Preferred Stock and Warrants by Carlyle shall not result in the acceleration or creation of any rights of any person to benefits under any employee plan other than the outstanding options under the Company's 1983 Stock Incentive Plan (the "1983 Plan"), and options granted to non-employee directors under the 1991 Plan and the Non-Employee Directors Retirement Plan, (vi) the Company shall use its best efforts to enter into an amendment to its bank

18

credit agreements which will, among other things, (x) modify current covenants, (y) increase capital expenditure limits and (z) confirm that consummating the Investment and related transactions will not conflict with or breach the bank credit agreements, (vii) if the Company is notified by government contracting authorities that the Company may not participate in bidding or performing work under a government contract based on the degree of foreign ownership, control or influence over the Company, Carlyle will use all reasonable efforts to cooperate with the Company in attempting to appeal or overturn such a decision (this obligation shall not obligate Carlyle to take any action which results in an impairment of the economic or tax benefits of their investment in the Company) and (viii) by the Closing Date, the Company shall have ensured that each person serving on the Board on and after the Closing Date will receive the same liability insurance coverage as such a member as the directors of the Company received as of the date of the Purchase Agreement, and that such policies will be in full force and effect in accordance with their terms as of the Closing Date.

Conditions Precedent

   Conditions to Both Parties' Obligations. The Purchase Agreement provides that the respective obligations of the Company and Carlyle to consummate the transactions contemplated by the Purchase Agreement are subject to the fulfillment prior to or on the Closing Date of certain conditions precedent, or the waiver thereof including the following: (i) no governmental or other proceedings or litigation restraining the consummation of the transactions contemplated by the Purchase Agreement, (ii) approval by the Company's stockholders, (iii) the consent of the Company's lenders, (iv) expiration of any waiting periods under the HSR Act, if applicable, and (v) the NYSE shall have informed the Company that the transactions contemplated hereby will not violate Section 313 of the NYSE Listed Company Manual and shall not have indicated any intention to delist the Company's Common Stock

   Conditions to Carlyle's Obligations. The Purchase Agreement provides that the obligations of Carlyle to consummate the transactions contemplated by the Purchase Agreement are subject to the fulfillment prior to or on the Closing Date of certain conditions precedent, or the waiver thereof by Carlyle including the following: (i) the representations and warranties of the Company shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date; (ii) the Company and its subsidiaries shall have performed and complied in all material respects with all agreements and conditions contained in the Purchase Agreement required to be performed or complied with by the Company or its subsidiaries prior to or at the Closing; (iii) the Company shall have received or obtained all required consents, approvals, permits and waivers from governmental entities and other parties required to consummate the transactions contemplated by the Purchase Agreement, except where the failure to do so does not have a material adverse effect upon the Company or Carlyle; (iv) Carlyle shall have received a legal opinion from counsel to the Company with respect to certain matters; (v) since the date of the Purchase Agreement, there shall not have been any material adverse effect on the Company; (vi) all actions shall have been taken by the Company, its stockholders and Board of Directors so that, immediately upon Carlyle's purchase of the Convertible Preferred Stock and Warrants, the Board of Directors of the Company comprises seven directors and Carlyle may, by execution and delivery of a written consent, elect four members of the Board of Directors of the Company effective as of the Closing Date; (vii) the Certificate of Incorporation and/or Bylaws of the Company will have been amended on or prior to the Closing Date in a form acceptable to Carlyle in order to effectuate the transactions contemplated by the Purchase Agreement and none of the provisions of the Certificate of Incorporation or Bylaws shall prohibit or restrict the authority of the Board of Directors of the Company by action of a majority of its members, from amending the Bylaws; (viii) the Company shall have delivered to Carlyle certificates, executed by the President and Acting Chief Executive Officer and the Secretary of the Company, dated the Closing Date, as to certain matters; (ix) the Company shall have provided to Carlyle a copy of certain insurance policies and schedules evidencing that each person serving on the Board on and after the Closing Date shall receive the same liability coverage as a member of the Board as the Company's directors received as of the date of the Purchase Agreement and that such policies are in full force and effect; (x) the average of the daily high and low sales price for a share of Common Stock on the NYSE for each ten (10) NYSE trading day period commencing on the date of the Purchase Agreement and ending prior to the Closing Date shall be greater than or equal to $1 75; (xi) the Company and certain executives

19

shall have entered into the employment agreements contemplated by the Purchase Agreement; (xii) the Company shall have obtained waivers from the Company's directors with respect to foregoing accelerated benefits under the Non-Employee Directors' Retirement Plan and any option agreements for such directors under the 1991 Stock Incentive Plan; and (xiii) the Company shall have entered into certain specified amendments to its bank credit agreements (see "Capitalization").

Conditions to the Company's Obligations. The obligations of the Company to consummate the transactions contemplated by the Purchase Agreement are subject to the fulfillment prior to or on the Closing Date of certain conditions precedent reciprocal to the conditions contained in paragraphs (i), (ii), (iii), (iv), (viii), and (x).

Termination

The Purchase Agreement may be terminated (i) by the mutual written consent of the Company and Carlyle; (ii) by the Company or Carlyle if (a) the Closing shall not have occurred on or before December 31, 1996, provided that such provision shall not be available to either party if the other party has the right to terminate the agreement due to a material breach by such other party after an adequate opportunity to cure or (b) holders of the Common Stock of the Company fail to approve the Investment Proposal and the consummation of transactions contemplated by the Purchase Agreement; (iii) by Carlyle, if the Company shall have breached in any material respect any of its representations or warranties, or the covenants or agreement contained in the Purchase Agreement, which breach is not cured by the Company; (iv) by the Company if Carlyle shall have breached in any material respect any of the representations or warranties, or covenants or agreements, contained in the Purchase Agreement, which breach is not cured; (v) by either party if at any time prior to the Closing Date, the Board of Directors of the Company has entered into a definitive agreement, in the exercise of its fiduciary obligation, with respect to an alternative transaction; or (vi) by either party if at any time prior to the Closing Date, the average of the daily high and low sales price for a share of Common Stock on the NYSE for any ten (10) NYSE trading day period commencing on or after the date of the Purchase Agreement and ending prior to the Closing Date shall be less than $1.75.

If the Purchase Agreement is terminated as provided above, each party will redeliver all documents and work papers of any other party, the fees and expense provisions remain in effect, and such termination shall be without liability or further obligation of either the Company or Carlyle to the other party to the Purchase Agreement, except that no such termination shall relieve any party from liability or a prior breach of the Purchase Agreement.

Minority Protections

The Purchase Agreement provides that during any period in which Carlyle beneficially owns shares of capital stock of the Company having 20% or more of the votes that may be cast generally at annual or special meetings of stockholders (i) any contract or transaction between the Company and any affiliate of Carlyle shall be voidable by the Company unless the Board in good faith authorizes the contract or transaction by the affirmative vote of a majority of the Non-Preferred Stock Directors, (ii) any acquisition of capital stock of the Company by any affiliate of Carlyle, the result of which shall cause one or more affiliates of Carlyle to beneficially own, in the aggregate, shares of capital stock of the Company having 75% or more of the votes that may be cast generally at annual or special meetings of stockholders shall be subject to the prior approval of the Non-Preferred Stock Directors, provided that for purposes of (i) and (ii), the Non-Preferred Stock Directors may be counted in determining the presence of a quorum at the relevant meeting of the Board of Directors; and (iii) no Carlyle affiliate shall consummate any "going private" transaction (within the meaning of Rule 13e-3 under the Exchange Act) without the prior approval of the Board (by the affirmative vote of a majority of Non-Preferred Stock Directors) and a majority of the shares of Common Stock held by persons other than Carlyle affiliates.

Indemnification

All representations and warranties of the Company and Carlyle contained in the Purchase Agreement shall survive the consummation of the transactions contemplated by the Purchase Agreement for a period of 18 months from the Closing Date; provided that there shall be no termination with respect to any representation or warranty as to which a bona fide claim has been asserted prior to such expiration date.

The Purchase Agreement provides that the Company will indemnify, defend and hold harmless Carlyle, and its affiliates, directors, officers, advisors, employees and agents to the fullest extent lawful from and against all demands, losses, damages, penalties, claims, liabilities, obligations, actions, causes of action and reasonable expenses ("Losses") arising out of the Purchase Agreement or the related transactions or arising by reason of or resulting from the breach of any representation, warranty, covenant or agreement of the Company contained in the Purchase Agreement for the period for which such representation or warranty survives; provided, however, that the Company shall not have any liability to indemnify Carlyle with respect to Losses arising from the bad faith or gross negligence of the Carlyle indemnified party.

The Purchase Agreement provides that Carlyle will indemnify, defend and hold harmless the Company, its affiliates, directors, officers, advisors, employees and agents from and against all Losses arising out of the breach of any representation, warranty, covenant or agreement of Carlyle contained in the Purchase Agreement for the period for which such representation or warranty survives; provided, however, that Carlyle shall not have any liability to indemnify the Company with respect to Losses arising from the bad faith or gross negligence of the Company indemnified party.

The Purchase Agreement provides that no claim may be made against an indemnifying party for indemnification until the aggregate dollar amount of all Losses exceeds $1,500,000 and the indemnification obligations of the respective parties shall be effective only until the dollar amount paid in respect of the Losses indemnified against aggregates to an amount equal to $45,000,000.

Expenses of the Transaction

The Company shall be responsible for the payment of all expenses incurred by the Company in connection with the transactions contemplated by the Purchase Agreement, regardless of whether such transactions close, including, without limitation, all fees and expenses incurred in connection with this Proxy Statement and the fees and expenses of the Company's legal counsel and all third party consultants engaged by the Company to assist in the transactions. On the Closing Date, the Company shall reimburse Carlyle for reasonable expenses incurred by Carlyle including fees and expenses of legal counsel, accountants, consultants and travel expenses and similar expenses incurred in connection with transactions contemplated by the Purchase Agreement in an amount not to exceed $900,000 (the "Carlyle Transaction Expenses"). In the event that the Agreement is terminated (other than due to a material breach of Carlyle or the Company's entering into an agreement for an alternate transaction pursuant to the Board's fiduciary duties), the Company shall pay the Carlyle Transaction Expenses as described above. If the Purchase Agreement is terminated because the Company enters into an alternative transaction or the transactions are not consummated for any reason other than a breach by Carlyle and it thereafter the Company consummates an alternative transaction other than on an affiliate of the Company, on or prior to June 30, 1997, the Company shall pay to Carlyle the greater of (i) three percent of the proceeds of such sale of equity securities or (ii) the Carlyle Transaction Expenses. In addition, if the closing of the Investment does not occur for any reason and the Company successfully closes at a later date an acquisition as to which Carlyle has provided significant advisory services, the Company shall pay Carlyle a standard investment banking fee and reimburse Carlyle for the Carlyle Transaction Expenses.

Description of Convertible Preferred Stock

The following summary of the material terms of the Convertible Preferred Stock does not purport to be complete and is subject to, and qualified in its entirety by reference to. all of the provisions of (including the definitions of certain terms defined in) the Certificate of Designations, Preferences and Relative, Participating,

21

Optional and Other Special Rights and Qualifications, Limitations and Restrictions thereof of Cumulative Convertible Participating Preferred Stock (the "Certificate of Designations"), a copy of which is attached as Appendix III to this Proxy Statement.

Dividends  Holders of Convertible Preferred Stock will be entitled to receive, when and as declared by the Board of Directors out of funds legally available therefor, cumulative annual dividends  Dividends will be payable quarterly in arrears on dates to be specified (each a "Dividend Payment Date"), commencing on the first anniversary of the closing of the Investment for shares paid as PIK Dividends (as defined). and for dividends payable in cash, commencing on the second anniversary of the closing of the Investment. Dividends on the Convertible Preferred Stock payable during the period beginning on the first Dividend Payment Date on or following the first anniversary of the closing of the Investment and ending on the first Dividend Payment Date on or following the second anniversary of the closing of the Investment, shall be paid in fully paid and nonassessable shares of Convertible Preferred Stock (such dividends paid in kind being herein called "PIK Dividends")  Dividends on the Convertible Preferred Stock payable thereafter shall be paid in cash  In addition, if dividends are paid on the Common Stock (which requires the approval of two-thirds of the Convertible Preferred Stock) there must also be paid to holders of the Convertible Preferred Stock the amount of dividends that would have been payable if such shares had been fully converted into Common Stock immediately prior to the record date for such dividend

The dividends payable shall be at the "Applicable Dividend Rate" which is defined to mean the following per annum percentages of liquidation preference: (i) zero percent with respect to dividends payable on the first four Dividend Payment Dates following the closing of the Investment, (ii) three percent with respect to dividends payable on the fifth through eighth Dividend Payment Dates following the closing of the Investment, and (iii) six percent with respect to dividends payable thereafter  PIK Dividends shall be paid by delivering to the record holders of Convertible Preferred Stock a number of shares of Convertible Preferred Stock determined by dividing the total amount of the cash dividend which otherwise would be payable on the Dividend Record Date to such holders (rounded to the nearest whole cent) by the liquidation preference ($1,000 per share)

Ranking and Liquidation  The Convertible Preferred Stock will rank on a parity with the Company's 7% Preferred Stock and senior to the Common Stock as to payment of dividends, redemption payments and distributions and upon liquidation, dissolution or winding up of the Company. In the event of any such liquidation, dissolution or winding up, each holder of a share of Convertible Preferred Stock will be entitled to receive, before any distribution to the holders of Common Stock, a liquidation preference equal to the liquidation preference of such shares, plus all accrued and unpaid dividends thereon

Conversion. A holder of shares of Convertible Preferred Stock shall have the right, at the holder's option, to convert all or a portion of its shares into shares of Common Stock at any time before the close of business on the business day preceding the Redemption Date (See "--Redemption" below). For the purposes of conversion, each share of Convertible Preferred Stock shall be valued at the liquidation preference plus all accrued and unpaid dividends through the Conversion Date. which shall be divided by the Conversion Price in effect on the Conversion Date to determine the number of shares issuable upon conversion  The Conversion Price is defined to mean initially $2.00 and thereafter be subject to adjustment from time to time, provided, however, that on the eighth anniversary of the closing of the Investment, the Conversion Price shall be adjusted to equal one half of the then-current conversion price per share of Common Stock, subject thereafter to further adjustment  The Certificate of Designations provides for customary adjustments to the conversion price and number of shares issuable upon conversion in the event of certain dividends and distributions to holders of Common Stock, stock splits, combinations, sales of Common Stock at less than market value and mergers, tender offers and similar transactions  In addition, the Certificate of Designations provides for an adjustment to the conversion price and number of shares issuable upon conversion in the event shares of 7% Preferred Stock are converted into Common Stock at the special conversion price following the closing. See "--Impact of the Transaction on the Company and Existing Stockholders; Certain Considerations--Special Conversion Price of Outstanding 7% Preferred Stock" above

22

Immediately following such conversion, the rights of the holders of converted Convertible Preferred Stock shall cease and the persons entitled to receive the Common Stock upon the conversion of Convertible Preferred Stock shall be treated as the owners of such Common Stock. The Company is required to maintain a reserve of authorized but unissued shares of Common Stock to permit the conversion of the Convertible Preferred Stock in full.

Redemption. The Company will be entitled, at its option (as determined by a majority of the Non-Preferred Stock Directors of the Board of Directors), to redeem all, but not less than all, of the outstanding shares of Convertible Preferred Stock at any time after the seventh anniversary of the closing of the Investment. The redemption price upon any redemption will be equal to the Liquidation Preference per share, plus an amount equal to the dollar amount of all accrued and unpaid cumulative dividends through the redemption date.

Voting Rights. Holders of Convertible Preferred Stock will generally have the right to vote (on an as-converted basis) as a single class with the holders of Common Stock, together with all other classes and series of stock of the Company that are entitled to vote as a single class with the Common Stock, on all matters coming before the Company's stockholders, except (i) matters for which class voting is required by law or under the Company's Certificate of Incorporation, including the Certificate of Designations and (ii) with respect to the election of the Non-Preferred Stock Directors during the period beginning on the closing date of the Investment and ending on the fifth anniversary thereof (the "Five-Year Period"). In any vote with respect to which Convertible Preferred Stock shall vote with the holders of Common Stock as a single class, each share of Convertible Preferred Stock shall entitle the holder thereof to cast the number of votes equal to the number which could be cast in such vote by a holder of the number of shares of Common Stock into which such share of Convertible Preferred Stock is convertible on the date of such vote.

With respect to any matter for which class voting is required by law or under the Company's Certificate of Incorporation, except as otherwise described herein, the holders of Convertible Preferred Stock will vote as a class and each holder shall be entitled to one vote for each share held.

The following matters will require the approval of the holders of at least a majority of the issued and outstanding shares of Convertible Preferred Stock, voting together as a separate class:

(i) the creation, authorization or issuance (including on conversion or exchange of any convertible or exchangeable securities or by reclassification) of any class or series of shares ranking on a parity with or prior to the Convertible Preferred Stock either as to dividends or redemption or upon voluntary or involuntary liquidation, dissolution or winding up;

(ii) the increase in the authorized shares of, or issuance (including on conversion or exchange of any convertible or exchangeable securities or by reclassification) of any shares of Convertible Preferred Stock, except for the issuance of PIK Dividends in accordance with the Certificate of Designations;

(iii) the amendment, alteration, waiver of the application of, or repeal (whether by merger, consolidation or otherwise) of any provision of the Company's Certificate of Incorporation, the entering into any agreement or taking of any other corporate action which in any manner would alter, change, or otherwise adversely affect the powers, rights or preferences of the Convertible Preferred Stock;

(iv) the reorganization, recapitalization, liquidation, dissolution or winding up of the Company, or the sale, lease, conveyance or exchange of all or substantially all of the assets, property or business of the Company, or the merger or consolidation of the Company with or into any other corporation, if such transaction in any manner would alter, change or otherwise adversely affect the powers, rights, or preferences of the Convertible Preferred Stock; or

(v) any action which would cause a dividend or other distribution to be deemed to be received by the holders of the Convertible Preferred Stock for federal income tax purposes unless such dividend or other distribution is actually received by such holders.

Approval of the holders of at least two-thirds of the Convertible Preferred Stock will be required for the payment of any dividend on the Common Stock or any other junior stock of the Corporation

For so long as Carlyle continues to beneficially own shares of capital stock having 20% or more of the votes that may be cast at annual or special meetings of stockholders, then the number of directors comprising the Company's Board of Directors shall be an odd number and the holders of the Convertible Preferred Stock will have the exclusive right. voting separately as a class. to elect (i) during the Five-Year Period, the smallest number of directors that constitutes a majority of the Board and (ii) subsequent to the Five-Year Period, the greatest number of directors that constitutes a minority of the Board of Directors (each such director, a "Convertible Preferred Stock Director") at any special meeting of stockholders called for such purpose, at any annual meeting and in any written consent pursuant to Delaware law. So long as the Convertible Preferred Stock has the right to elect Convertible Preferred Stock Directors pursuant to the foregoing, then (i) during the Five-Year Period the holders of Common Stock shall have the exclusive right to elect the Non-Preferred Stock Directors and (ii) subsequent to the Five-Year Period, each share of Convertible Preferred Stock will entitle the holder thereof to vote, together with the Common Stock as a single class, for the election of Non-Preferred Stock Directors. After such time as Carlyle ceases collectively to beneficially own capital stock having 20% or more of the votes that may be cast at annual or special meetings of stockholders, then the rights of the holders of Convertible Preferred Stock to elect Convertible Preferred Stock Directors shall cease and the holders of Convertible Preferred Stock shall thereupon and thereafter vote for the election of all directors together with the holders of the Common Stock voting as a single class.

The Convertible Preferred Stock Directors elected as provided in the Certificate of Designations shall serve until the next annual meeting or until their respective successors shall be elected and shall qualify. The Convertible Preferred Stock Directors may be removed with or without cause. and may be removed only by a vote or consent of the holders of a majority of the outstanding shares of Convertible Preferred Stock, voting separately as a class. Vacancies among the Convertible Preferred Stock Directors shall be filled by a majority vote of the remaining Convertible Preferred Stock Directors or by the holders of a majority of Convertible Preferred Stock. Upon any termination of the right of the holders of the Convertible Preferred Stock to elect Convertible Preferred Stock Directors, the Convertible Preferred Stock Directors then serving may continue to hold office for the remainder of their term. Only Non-Preferred Stock Directors shall have the right to vote in the election of any person to fill any vacancy created by the death, resignation, retirement, disqualification or removal from office of a Non-Preferred Stock Director and all such rights will be exercised by a majority of the Non-Preferred Stock Directors. The foregoing provision may not be amended without (x) the affirmative vote of the holders of a majority of the outstanding shares of Common Stock and (y) the affirmative vote of the holders of a majority of the outstanding shares of Convertible Preferred Stock.

In the event that the Convertible Preferred Stock no longer has the right to elect Convertible Preferred Stock Directors as described above and dividends payable on the Convertible Preferred Stock at the time outstanding shall be cumulatively in arrears for six Dividend Periods (whether or not consecutive), then the holders of the Convertible Preferred Stock shall have the right, voting as a class with other parity stock, to elect two directors at the Company's next annual meeting and at each subsequent annual meeting of stockholders. Such right to elect two directors shall continue until all dividends accumulated on such stock have been paid or funds have been set aside for such payment

Mergers and Similar Transactions. In the event that the Company is a party to any merger or consolidation in which any class or series of the Common Stock is reclassified, converted, exchanged or canceled, or in case of any sale or transfer of all or substantially all of the assets of the Company each share of Convertible Preferred Stock then outstanding will, without the consent of such holder, become convertible only into the kind and amount of securities, cash and other property receivable upon such consolidation. merger, sale or transfer by a holder of the number of shares of Common Stock (and other securities, if applicable) into which such Convertible Preferred Stock was convertible immediately prior thereto (assuming such holder of Common Stock (and other securities, if applicable) failed to exercise any rights or election and that such Convertible Preferred Stock was then convertible).

24

Certain Covenants of the Company. The Certificate of Designations contains customary covenants regarding reservation of shares for issuance upon conversion, compliance with laws regarding registration of securities, maintaining eligibility of the Common Stock for trading, payment of certain taxes, preparation of financial statements and other matters.

Listing. The Company does not intend to list the Convertible Preferred Stock for trading on the NYSE or any other exchange.

Description of the Warrant

Pursuant to a Warrant Agreement to be entered into upon the closing of the Investment (the "Warrant Agreement"), the Company shall issue and sell to Carlyle, or its designees, the Warrants to purchase up to an aggregate of 5,000,000 shares of Common Stock of the Company. The Warrants shall have a term of five years and will be exercisable in full or in part from time to time by means of payment of the Exercise Price ($3.00 per share of Common Stock) in cash or by the election of the holder of the Warrant to receive the shares issuable upon exercise of the Warrants (the "Warrant Shares") on a net basis (based on the fair market value of the Common Stock at the time). The Warrant Agreement provides for customary adjustments to the exercise price in the event of certain dividends and distributions to holders of Common Stock, stock splits, combinations, sales of Common Stock at less than market value and mergers, tender offers and similar transactions. Such provisions are consistent with the similar provisions of the Certificate of Designations.

The Warrant Agreement also provides for customary provisions with respect to, among other things, payment of taxes, reservation of Warrant Shares, mutilated or missing Warrant certificates, listing of Warrant Shares for trading on the appropriate stock exchange, preparation of financial statements, and notices to holders of Warrants.

Regulatory Filings and Approvals

Under the HSR Act and the rules promulgated thereunder, certain transactions, including certain of the transactions contemplated by the Purchase Agreement, may not be consummated unless certain information has been furnished to the Federal Trade Commission (the "FTC") and the Antitrust Division of the Justice Department (the "Antitrust Division") and certain waiting period requirements have been satisfied. In the event that, as a result of the Investment, any of the Carlyle entities purchasing the Convertible Preferred Stock and Warrants in the Investment would hold voting securities of the Company with a value in excess of $15,000,000 or 15% of the voting securities of the Company, then, in the event that no exemption from the reporting requirement and waiting period of the HSR Act were available, each such entity and the Company will be required to file Notification Report Forms with the FTC and the Antitrust Division and to observe the applicable waiting period prior to consummating the Investment. Notwithstanding the termination of the HSR Act waiting period, if applicable, at any time before or after the consummation of the transactions contemplated by the Purchase Agreement, any person may take action under the antitrust laws, including seeking to enjoin the consummation of the transactions contemplated by the Purchase Agreement or seeking the divestiture by Carlyle of all or any part of the securities received by it pursuant to the Purchase Agreement. There can be no assurance that a challenge to the transactions contemplated by the Purchase Agreement on antitrust grounds will not be made or that, if such a challenge is made, it would not be successful.

Registration Rights

As of the Closing Date, the Convertible Preferred Stock and the Warrants will not be listed on the NYSE or any other national securities exchange and the issuance of the Convertible Preferred Stock and the Warrants will not be registered with the SEC and therefore they will be restricted securities. On the Closing Date, the Purchase Agreement provides that the Company shall enter into a Registration Rights Agreement with Carlyle (the "Registration Rights Agreement"), pursuant to which Carlyle or its transferee (a "Holder") will be entitled to certain additional rights with respect to the registration under the Securities Act of shares of Common Stock

25

issuable upon conversion of the Convertible Preferred Stock or the exercise of the Warrants (or certain securities issuable with respect to such Common Stock by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or reorganization) ("Registrable Shares").

The Registration Rights Agreement provides for demand and piggyback registration rights. Holders of at least 20% of the then outstanding Registrable Securities may demand registrations of the Registrable Securities up to five times, provided that the proposed public offering price of such Registrable Securities is at least $5,000,000. Additionally, the Company is not required to file a demand registration statement if such demand is made within six months after the effective date of the Company's most recent Common Stock registration statement unless at holders of 50% of the Registrable Securities make such demand. Generally, the Company bears the expense of the first four such demand registration statements and the Holders who participate in the fifth bear the expense thereof. The Holders have the right to select the managing underwriter of any underwritten public offering covered by a demand registration, subject to approval of a majority of the Non-Preferred Stock Directors of the Company's Board of Directors

The Registration Rights Agreement also provides for unlimited "piggyback" registration rights. That is, in the event the Company proposes to register the sale for cash of any of its securities under the Securities Act for its own account or for the account of any other person, the Holders will be entitled to include Registrable Shares in any such registration, subject to the right of the managing underwriter of any such offering in certain circumstances to exclude some or all of such Registrable Shares from such registration. The Company bears the expense of any piggyback registrations. The Registration Rights Agreement also includes (i) customary indemnification and contribution provisions among the Company and the Holders and (ii) a provision allowing the Company to postpone filing or the declaration of effectiveness of, or to require Holders to suspend sales of securities under, an applicable registration statement for up to an aggregate of 60 days if the applicable prospectus contains a misstatement or if there exists material non-public information the disclosure of which would be materially harmful to the Company.

INTEREST OF CERTAIN PERSONS IN THE INVESTMENT

In connection with the Investment, certain executive officers of the Company will enter into employment agreements with the Company. See "Certain Transactions--Employment Agreements "

PROPOSED COMPENSATION OF CONVERTIBLE PREFERRED STOCK DIRECTORS AND CARLYLE FEE

Compensation of Directors. It is anticipated that following the completion of the Carlyle Investment: (i) as long as Carlyle has the right to appoint Convertible Preferred Stock Directors, one of the Convertible Preferred Stock Directors will be named Chairman of the Board and will receive compensation at the rate of $120,000 per year, the amount the present chairman receives (see "Election of Directors--Compensation of Directors--Chairman of the Board"); (ii) the remaining non-employee directors will each receive annual compensation of approximately $35,000, which amount will comprise a retainer fee of $6,000 per quarter and a board meeting fee of $2,750 for each board meeting attended (no additional compensation will be given for attendance at committee meetings); and (iii) the directors' compensation may be paid in cash and/or stock, and the Compensation Committee will administer any plan for stock options to be granted to the directors.

Carlyle Financial Advisory Fees  In addition, it is anticipated that the Company will pay Carlyle (i) an annual financial advisory fee of $100,000, payable quarterly; and (ii) investment banking fees and reimbursement of reasonable out-of-pocket expenses for investment banking services rendered to the Company

REVERSE STOCK SPLIT, REDUCTION IN NUMBER OF AUTHORIZED SHARES AND REDUCTION OF PAR VALUE

To accommodate the Investment, an amendment to the Company's Certificate of Incorporation is proposed to (i) effect a reverse stock split pursuant to which each four shares of Common Stock will be exchanged for one share of Common Stock (the "Reverse Stock Split"), (ii) reduce the number of authorized shares of Common

Stock and (iii) decrease the par value of all shares of Common Stock from $1.00 per share to $ 01 per share If all shares were issued that are potentially subject to issuance by reason of the Investment, exercise of all outstanding stock options, conversion of outstanding convertible securities and the proposed 1996 Stock Incentive Plan, the total number of shares outstanding would be 95,629,085 After giving effect to the proposed Reverse Stock Split, such number would be 23.907,271.

As of September 27, 1996, the Company had outstanding 36,251.130 shares of Common Stock; 2,485,438 additional shares are reserved for issuance upon the exercise of outstanding options and 10,273,920 shares upon conversion of the 7% Preferred Stock. As described above under "--Special Conversion Price of Outstanding 7% Preferred Stock," the number of shares required for issuance upon conversion of the 7% Preferred Stock could be increased to 18,927,000 by reason of the Investment 23,175.000 shares will be required for conversion of the Convertible Preferred Stock (including shares issuable as PIK dividends), 5,000,000 shares for issuance upon exercise of the Warrants and 1,000,000 shares for issuance pursuant to the proposed 1996 Stock Incentive Plan As described above under "--Special Conversion Price of Outstanding 7% Preferred Stock," the number of shares of Common Stock issuable upon conversion of the Convertible Preferred Stock could be increased to as much as 31,965.517 if all shares of 7% Preferred Stock were converted to Common Stock at the special conversion price As a result, the Company desires to effect the Reserve Stock Split to allow it to reserve for issuance the appropriate number of shares in the Investment while retaining a sufficient number of shares for other corporate purposes. Except for minor differences resulting from the aggregation and sale of fractional shares, as described below, the Reverse Stock Split will not affect any stockholder's percentage ownership interest in the Company or of the outstanding Common Stock.

Purpose and Effect of Proposed Amendment

In addition to accommodating the Investment, the Board believes that the Reverse Stock Split is advantageous to the Company and its stockholders as a means of enhancing the liquidity and marketability of the Common Stock The Board believes that the current low per share market price of the Common Stock may impair the acceptability of the Company's equity securities to the financial community and the investing public Although, theoretically, the number of shares outstanding should not affect an investor's decision to own shares of Common Stock as an investment, in practice many investors may regard lower-priced stock as unduly speculative in nature and may therefore avoid investment in such stocks In addition. the Board believes that the current market prices for the Common Stock may reduce the effective marketability of the Company's equity securities because of the potential reluctance of many leading brokerage firms to recommend lower-priced stocks to their clients Furthermore, certain brokerage house policies and practices may tend to discourage individual brokers with those firms from dealing in lower-priced stocks, and some brokerage houses will not permit clients to carry lower-priced stocks on a margin basis Finally, the structure of trading commissions also tends to have an adverse impact on holders of lower-priced stocks because the brokerage commission on a sale of lower-priced stock generally represents a higher percentage of the sales price than the commission on a relatively higher-priced issue

Although there can be no assurance that the market price per share of Common Stock will increase proportionately to the decrease in the number of outstanding shares following the Reverse Stock Split, the Reverse Stock Split is intended to result in a price level for the Common Stock that will increase investor and broker interest. It is impossible to predict the market's reaction to any reverse stock split or. in this case, to separate that reaction from the market's reaction to the proposed Investment as a whole. However, the Company would expect that immediately after the Reverse Stock Split each share of Common Stock would be valued at a price approximately four times greater than without the split.

A holder of Common Stock will be entitled to receive a whole number of shares plus a fraction of a share if the number of shares of Common Stock held by him prior to the Reverse Stock Split is not evenly divisible by four. However, no certificates or scrip representing fractional shares of Common Stock will be issued. In lieu of any fractional shares, the transfer agent of the Common Stock on behalf of all persons otherwise entitled to receive fractional shares will, promptly following the effective time of the Reverse Stock Split. aggregate such

27

fractional shares and sell the resulting whole shares of Common Stock for the accounts of those persons in open market transactions on the NYSE. Those persons will thereafter be entitled to receive their allocable portion of the net proceeds of the sale thereof upon surrender of their Common Stock certificates as described below.

The Company is currently authorized to issue 100,000,000 shares of Common Stock. In connection with the Reverse Stock Split, it is proposed to amend the Company's Certificate of Incorporation to reduce the Company's authorized number of shares of Common Stock to 50,000,000.

There were 2,130 stockholders of record of the Common Stock as of September 27, 1996. The Reverse Stock Split is not expected to cause a significant change in the number of record holders of the Common Stock. The Company has no plans for the cancellation or purchase of shares of Common Stock from holders of a nominal number of shares following the Reverse Stock Split, and has no present intention to take the Company private through the Reverse Stock Split or otherwise.

As of September 27, 1996, there were reserved for issuance upon exercise of outstanding options an aggregate of 2,485,438 shares of Common Stock under the Company's 1991 Stock Option Plan and other stock incentive plans. All of such outstanding options include provisions for adjustment in the number of shares covered thereby and the exercise price therefor in the event of a reverse stock split. If the Reverse Stock Split is approved and effected, there would be reserved for issuance upon exercise of all outstanding options a total of approximately 621,360 shares of Common Stock. Each of the outstanding options would thereafter evidence the right to purchase one-fourth of the number of shares of Common Stock previously covered thereby, and the exercise price per share would be four times the previous exercise price.

If the Reverse Stock Split is approved as part of the Investment, the Company will file an amendment to the Company's Certificate of Incorporation with the Secretary of State of the State of Delaware. The Company will notify holders of Common Stock of the effectiveness of the Reverse Stock Split and will furnish the holders of record of shares of Common Stock at the close of business on such effective date with a letter of transmittal for use in exchanging certificates. The holders of Common Stock will be required to promptly mail their certificates representing shares of Common Stock to the transfer agent, in order that new certificates giving effect to the Reverse Stock Split may be issued and the proceeds of the sale of any fractional shares may be distributed. Commencing with the effective date of the Reverse Stock Split, previously outstanding certificates representing shares of Common Stock will be deemed for all purposes to represent one-fourth of the number of shares previously represented thereby (subject to the treatment of fractional interests as described above).

Except as otherwise indicated, all share and per share information in this Proxy Statement is presented without giving effect to the Reverse Stock Split.

Additionally, the Board believes that changing the par value of the Common Stock to $.01 per share is in the best interests of the Company and its stockholders to ensure the Company's ability to adjust the conversion or exercise price of outstanding securities, in accordance with their terms, in the future.

VOTE REQUIRED FOR APPROVAL OF THE INVESTMENT PROPOSAL

The affirmative vote of a majority of the outstanding shares of Common Stock entitled to vote is required to approve Proposal 1.

PROPOSAL 2
ELECTION OF DIRECTORS

BOARD OF DIRECTORS FOLLOWING THE INVESTMENT

Upon completion of the Investment, the Board of Directors of the Company will consist of seven directors, of whom four will be elected by Carlyle, as holder of the Convertible Preferred Stock, acting by written consent without a meeting. As described below under "--Election of Directors at the Annual Meeting," stockholders will elect three directors at the Annual Meeting. Until completion of the Investment (and thereafter if the Investment is not completed), the Board of Directors of the Company will consist of nine directors, including the three directors elected by the stockholders at the Annual Meeting (see "--Current Board of Directors" below). All of such directors, other than Anthony J. DeLuca, E. Martin Gibson and James C. McGill, have advised the Company that they will resign upon completion of the Investment.

Under the Company's current Certificate of Incorporation, the directors of the Company serve for three-year terms which are staggered to provide for the election of approximately one-third of the Board members each year. See "Proposal 4--Elimination of Cumulative Voting and Classified Board of Directors." Whether or not the Certificate of Incorporation is amended as set forth under Proposal 4, the four directors elected by holders of the Convertible Preferred Stock will serve for annual terms.

The names of the directors who will remain on the Board of Directors following completion of the Investment (assuming that Mr. McGill is reelected as a director at the Annual Meeting) and the directors proposed to be selected by Carlyle, and their respective terms if Proposal 4 (with respect to elimination of classified terms) is not adopted, are set forth in the following table. If Proposal 4 is adopted then, following the completion of the Investment, all directors will serve one year terms.

Board of Directors Upon Completion of the Investment:

| NAME | AGE | CURRENT POSITION | TERM TO EXPIRE(1) | DIRECTOR OF THE COMPANY SINCE |
| ---- | --- | ---------------- | ----------------- | ----------------------------- |
| PRESENT DIRECTORS OF THE COMPANY: | | | | |
| Anthony J. DeLuca | 49 | Director, President and Acting Chief Executive Officer | 1997 | 1996 |
| E. Martin Gibson(2)(3) | 58 | Director and Chairman of the Board (non-officer position)(4) | 1998 | 1994 |
| James C. McGill(3)(5) | 52 | Director | 1999 | 1990 |
| PROPOSED CONVERTIBLE PREFERRED STOCK DIRECTORS: | | | | |
| Daniel A. D'Aniello | 50 | Managing Director, Carlyle | 1997 | n/a |
| Philip B. Dolan | 38 | Vice President, Carlyle | 1997 | n/a |
| James David Watkins | 69 | President, Joint Oceanographic Institutions, Inc. President, Consortium Oceanographic Research and Education | 1997 | n/a |
| Robert F. Pugliese | 63 | Special Counsel, Eckert Seamans Cherin & Mellott | 1997 | n/a |

--------
(1) Terms set forth are current terms of each director. If the Investment is consummated, each director will stand for re-election every year. Thus, the terms of each of the directors would expire in 1997.
(2) Member of Compensation Committee.
(3) Member of Nominating Committee.
(4) Mr. Gibson will remain a member of the Board but will resign as Chairman of the Board upon consummation of the Investment.
(5) Member of Audit Committee

29

ELECTION OF DIRECTORS AT THE ANNUAL MEETING

   At the Annual Meeting, stockholders will elect three directors to hold
office until the 1999 Annual Meeting of Stockholders and until their
successors are elected and qualified. All of the directors, other than Messrs.
DeLuca, Gibson and McGill have advised the Company that they will resign from
the Board of Directors, effective upon completion of the Investment.

   The names of the nominees for election as directors at the Annual Meeting
and the present directors whose terms of office do not expire in 1996 are set
forth in the following table. The Company has no reason to believe that any
nominee for election will not be able to serve as a director. However, should
any nominee become unavailable to serve, the proxies solicited hereby may be
voted for election of such other person as may be nominated by the Board of
Directors.

   Present Board of Directors including Nominees for Re-election:

| NAME | AGE | POSITION | TERM TO EXPIRE | DIRECTOR OF THE COMPANY SINCE |
| --- | --- | --- | --- | --- |
| ---- | --- | -------- | ------- | ----------- |
| NOMINEES FOR TERMS EXPIRING IN 1999: | | | | |
| Kirby L. Cramer(1) ......... | 60 | Director | 1999 | 1995 |
| James C. McGill(2)(3) ...... | 52 | Director | 1999 | 1990 |
| W. Scott Martin(3)..... .... | 46 | Director | 1999 | 1994 |
| DIRECTORS WHOSE TERMS EXPIRE AFTER 1996 AND WHO ARE NOT CURRENTLY NOMINEES FOR RE-ELECTION: | | | | |
| Ralph S. Cunningham(1)(2) .. | 56 | Director | 1997 | 1981 |
| Donald S. Burns(2)(3) ...... | 71 | Director | 1997 | 1989 |
| Anthony J. DeLuca.......... | 49 | Director, President and Acting Chief Executive Officer | 1997 | 1996 |
| Henry E. Riggs(3) ......... | 61 | Director | 1998 | 1995 |
| Jack O. Vance(1) ........... | 71 | Director | 1998 | 1987 |
| E. Martin Gibson(1)(2) ..... | 58 | Director and Chairman of the Board (non-officer position) | 1998 | 1994 |

--------
(1) Member of Compensation Committee.
(2) Member of Nominating Committee.
(3) Member of Audit Committee.

   If Proposal 4 (with respect to eliminating classified terms) is approved and
if the Investment is completed, all of the directors will serve for one-year
terms.

BACKGROUND OF THE NOMINEES, PROPOSED CONVERTIBLE PREFERRED STOCK DIRECTORS AND
CURRENT DIRECTORS

   Mr. DeLuca was named President and Acting Chief Executive Officer and a
director of the Company as of July 1, 1996. Prior thereto, Mr. DeLuca had been
Senior Vice President and Chief Financial Officer of the Company since March
1990. Before joining the Company, Mr. DeLuca had been a senior partner at the
public accounting firm Ernst & Young LLP.

30

Mr. Gibson became a director of the Company on October 11, 1994 and was elected Chairman of the Board of Directors, a non-officer, non-employee position, on April 6, 1995. From 1990 until December 1994, Mr. Gibson served as Chairman of Corning Life Sciences, Inc., a subsidiary of Corning Incorporated. Mr. Gibson served in various other senior management capacities with Corning Incorporated during his 32 year career there, including as a Senior Vice President and General Manager of Corning Medical and Scientific Division from 1980 until 1983, and as Group President of Corning Consumer Products and Laboratory Sciences from 1983 until 1990. From 1983 to 1994, Mr. Gibson served on the Board of Directors of Corning Incorporated. Mr. Gibson also serves on the Boards of Directors of Hardinge, Inc. and NovaCare, Inc.

Mr. McGill is currently, and has been for at least five years, a private investor. He served as Chairman of McGill Environmental Systems, Inc. from 1970 to 1987. Mr. McGill serves on the Board of Trustees of the University of Tulsa and on the Boards of Directors of four private corporations that are engaged in tax consulting, health care, pipeline construction and golf.

Mr. D'Aniello has been a Managing Director for Carlyle since 1987. Mr. D'Aniello was Vice President, Finance and Development for Marriott Corporation, a hospitality company, from 1981 to 1987. He currently serves on the Board of Directors for GTS Duratek, Inc., an environmental services company, Baker & Taylor, Inc., a wholesale distributor of books, and CB Commercial Real Estate Group, Inc., a commercial real estate firm. Mr. D'Aniello is Chairman of GTS Duratek, Inc. and Vice Chairman of Baker & Taylor, Inc.

Mr. Dolan has been a Vice President for Carlyle since 1989. Prior to joining Carlyle, Mr. Dolan was an investment analyst and fund manager with the Trust Division of the Mercantile-Safe Deposit and Trust Company and was engaged in management consulting and practiced public accounting with Seidman & Seidman. Mr. Dolan is a Certified Public Accountant.

Admiral Watkins has been the President of the Joint Oceanographic Institutions, Inc. since 1993 and President of Consortium Oceanographic Research and Education since 1994. Admiral Watkins was appointed Chief of Naval Operations in 1982 by President Reagan and served as Secretary of Energy under President Bush from 1989 to 1993. Prior to his appointment as Secretary of Energy, Admiral Watkins served on the Board of New York Medical College and the Math/Science Advisory Council of the National Executive Service Corps. He also served as a consultant to the Carnegie Corporation of New York, the Education Commission of the States and the Exxon Education Foundation. Additionally, he was a member of the Marymount University's Board of Trustees and co-chair of the National Committee for the Vatican Judaica Exhibition. In 1987, Admiral Watkins was appointed Chairman of the Presidential Commission on the Human Immunodeficiency Virus Epidemic. Admiral Watkins has also served on the Boards of Directors of the Philadelphia Electric Company, a biopharmaceutical company, VESTAR, Inc. and the Ford Aerospace Corporation. After leaving the Department of Energy, Admiral Watkins became a trustee to the Carnegie Corporation of New York, a Director of the Southern California Edison Company and joined the Committee for Economic Development.

Mr. Pugliese has been Special Counsel to Eckert Seamans Cherin & Mellott since 1993. Mr. Pugliese was Executive Vice President, Legal and Corporate Affairs for Westinghouse Electric Corporation and served as General Counsel from 1976 to 1992. Mr. Pugliese is a member of the Association of General Counsel and a director of St. Clair Memorial Hospital. Mr. Pugliese has served as Secretary to the Board of Directors of Westinghouse Electric Corporation and Chairman of the Board of Trustees at the University of Scranton.

Mr. Burns has been Chairman, President and Chief Executive Officer of Prestige Holdings, Ltd., a property management and business consulting firm, since 1978. Mr. Burns serves on the Boards of Directors of ESI Corporation and International Rectifier Corporation.

Mr. Cramer became a director of the Company on November 2, 1995. He is the Chairman Emeritus of Hazleton Laboratories Corporation, a contract biological and chemical research laboratory, which was acquired by Corning Incorporated in 1987. He is also Chairman of Northwestern Trust Company and is the President of Keystone Capital Company, an investment company. Mr. Cramer is a member of the University of Washington Foundation and also is Chairman of the Advisory Board of the University of Washington School of Business Administration. He is the past President and Trustee Emeritus of the Darden School Foundation of the University of Virginia. In addition, Mr. Cramer serves on the Boards of Directors of Immunex Corporation, Unilab Corporation, The Commerce Bank of Washington, N.A., Northwestern Trust Company, Landec Corporation, Advanced Technology Laboratories and Applied Bioscience International.

Since May 1, 1995, Dr. Cunningham has served as President and Chief Executive Officer of CITGO Petroleum Corporation. From May 1994 to May 1995, he served as the Vice Chairman of the Board of Huntsman Corporation and Huntsman Specialty Chemicals Corporation. Prior to joining Huntsman in 1994 he served as the President of Texaco Chemical Company from 1990 to 1994 when Texaco Chemical Company was acquired by Huntsman Corporation in 1994. From 1989 to 1990, he was Chairman and Chief Executive Officer of Clark Oil Refining Corporation. In 1980, he joined Tenneco Oil Processing and Marketing as Executive Vice President and served as President of that company from 1982 to 1989. Dr. Cunningham served as the Company's Chairman of the Board of Directors from May 5, 1994 to January 5, 1995. Such position was a non-officer, non-employee position. Dr. Cunningham serves as a director of Viridan, Inc. (formerly Sherritt, Inc.), Enterprise Products Company, Huntsman Corporation, CITGO Petroleum Corporation and Bank of Oklahoma.

Mr. Martin has been President of the Tulsa Loan Production Office of the First Bank & Trust Company, Wagoner, Oklahoma, since September 1994. He was the President, Chief Executive Officer and a member of the Board of Directors of WestStar Bank in Tulsa, Oklahoma, from 1984 until September 1994. He has also served as a member of the Boards of Directors of First Bank & Trust Company, Wagoner, Oklahoma, since 1974; of First Bank of Chandler, Chandler, Oklahoma, since 1977; and of First National Bank, Burkburnett, Texas, since 1983.

Mr. Riggs became a director of the Company on November 2, 1995. He has been the President of Harvey Mudd College in Claremont, California since August 1, 1988. He was Vice President for Development of Stanford University from 1983 to 1988, and was Chairman of the Stanford University Department of Industrial Engineering and Engineering Management from 1978 to 1982. He is currently a director of several mutual funds managed by The Capital Group.

Mr. Vance was a director of McKinsey & Company from 1960 until he retired on December 31, 1989. He currently serves as Managing Director of Management Research, Inc., a management consulting firm. Mr. Vance also serves as a member of the Boards of Directors of International Rectifier Corporation, The Olson Company, Vencor, Inc., ESCORP, University Restaurant Group, FCG Enterprises, Inc. and Semtech Corporation.

All of the nominees named above who are to be elected by holders of the Company's Common Stock at the Annual Meeting were selected by the full board of directors in view of the pendency of the Investment; and no recommendations were made by the Nominating Committee. Messrs. DeLuca, Gibson and McGill were selected by the full Board of Directors to continue as directors following the Investment, in view of the offices held by Messrs. DeLuca and Gibson, as President and Acting Chief Executive Officer and Chairman, respectively, and in view of Mr. McGill's substantial investment in Common Stock of the Company.

CUMULATIVE VOTING AND NOMINATIONS

Under the Company's current Certificate of Incorporation, stockholders are entitled to cumulate voting rights in the election of directors. Under cumulative voting, each stockholder is entitled to a number of votes equal to the number of directors to be elected multiplied by the number of shares of Common Stock the stockholder is entitled to vote. Such votes may be cast for one nominee or distributed among two or more candidates. The candidates for election receiving the highest number of affirmative votes of the shares entitled to vote for them up to the number of directors to be elected by those shares will be elected.

No stockholder shall be entitled to cumulate votes for a candidate unless such candidate's name has been placed in nomination prior to the voting. In voting by proxy, a stockholder is conferring upon the proxyholders the discretionary authority to cumulate votes in electing directors. If any person is properly nominated for director other than the nominees set forth in the table above, the persons named in the accompanying proxy may vote at their discretion cumulatively for less than all the nominees set forth.

Under the Company's Bylaws, in order to be effective, nominations for election as a director must be submitted to the Secretary of the Company not later than sixty days in advance of the Annual Meeting or, if later, the fifteenth day following the first public disclosure of the date of the Annual Meeting. Any such notice of nomination must set forth: (i) the name and address of the stockholder who intends to make the nomination and of the person or persons to be nominated; (ii) a representation that the stockholder is a holder of record of Common Stock of the Company entitled to vote at the Annual Meeting and intends to appear in person or by proxy at the Annual Meeting and nominate the person or persons specified in the notice; (iii) a description of all arrangements or understandings between the stockholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder, (iv) such other information regarding each nominee proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the rules and regulations of the SEC had the nominee been nominated, or intended to be nominated, by the Board of Directors; and (v) the consent of each nominee to serve as director of the Company if so elected. In addition, a stockholder making such a nomination must promptly provide any other information reasonably requested by the Company.

MEETINGS OF THE BOARD OF DIRECTORS AND COMMITTEES

During the period April 1, 1995 through March 29, 1996, the end of the Company's last fiscal year, the Company's Board of Directors held nine meetings. During such fiscal year, each director attended 75% or more of the aggregate of (i) the total number of meetings of the Board of Directors (held during the period for which he has been a director) and (ii) the total number of meetings held by all committees of the Board on which he served (during the period that he served).

The Company's Audit Committee held six meetings from April 1, 1995 through March 29, 1996. The Audit Committee makes recommendations to the Board of Directors concerning the selection of the Company's independent auditors and reviews with the independent auditors the scope and results of the annual audit. The members of the Audit Committee are set forth in the table above.

The Company's Compensation Committee held nine meetings from April 1, 1995 through March 29, 1996. The Compensation Committee reviews salaries, bonuses and other aspects of executive compensation and administers the Company's 1991 Plan, which provided for the granting of stock incentive awards to employees and directors of the Company until the Plan expired on March 31, 1996. The members of the Compensation Committee are set forth in the table above.

The Company's Nominating Committee held four meetings from April 1, 1995 through March 29, 1996. The members of the Nominating Committee are set forth in the table above.

COMPENSATION OF DIRECTORS

Retainer Fees. Non-employee directors receive a retainer fee of $5,000 per quarter, $1,000 for each Board or committee meeting attended, $500 for each telephonic Board or committee meeting attended (reduced from $1,000 previously), $500 per day for travel on business days and reimbursement of air travel and other expenses incurred in connection with attending Board or committee meetings. Committee chairmen receive $1,500 for each committee meeting attended and $750 for each telephonic committee meeting attended (reduced from $1,500 previously). The fees paid for meeting attendance are limited to no more than one committee meeting for all committee meetings held in tandem with a Board meeting, regardless of the actual number of committee meetings attended. Additionally, in order to more closely align the compensation of the Board members with the

33

interests of Company's stockholders, effective with the third quarter of fiscal year 1996. the quarterly retainer fee payable to each director for the third quarter of each fiscal year is paid in the form of shares of Common Stock, rather than in cash. Such shares are purchased by the Company in the open market and reissued to directors. See "Proposed--Carlyle Investment--Proposed Compensation of Convertible Preferred Stock Directors and Carlyle Fee."

Chairman of the Board  Mr  E. Martin Gibson was elected on April 6, 1995 as Chairman of the Board, which is a non-officer, non-employee position. In lieu of the non-employee director fees described above, Mr  Gibson receives compensation at the rate of $120,000 per year  Mr  Gibson serves as a member or ex-officio member of all committees of the Board and spends significant time on Company matters  Mr  Gibson will resign as Chairman of the Board upon the consummation of the Investment, if approved. See "Proposed--Carlyle Investment--Proposed Compensation of Convertible Preferred Stock Directors and Carlyle Fee "

Stock Options  Prior to expiration of the 1991 Plan on March 31, 1996, each non-employee director also received automatic grants of nonqualified stock options under the 1991 Plan, to purchase 20,000 shares of Common Stock upon his initial election as a director plus options to purchase an additional 10,000 shares of Common Stock at each subsequent annual meeting after having served at least six months  Because the 1991 Plan has expired, no additional awards may be made including option grants to the non-employee directors  The non-employee director options that are outstanding have an exercise price equal to the fair market value of Common Stock at the date of grant; become exercisable in installments of 25% on each of the first four anniversaries of the date of grant; have a five year term; and terminate when the holder ceases to be a director unless due to death, disability or retirement. All such grants were subject to the limitation that a non-employee director may not hold, at any time, nonqualified stock options to purchase a number of shares that, when added to all shares previously purchased by such director under the 1983 Plan or 1991 Plan, exceeds 50,000 shares  The Company has proposed that stockholders adopt a 1996 Stock Incentive Plan  See Proposal 3.

Retirement Plan. Under the Company's current retirement plan for non-employee directors, non-employee directors qualify for five years of retirement payments if on retirement (i) they have five years of Board service (in which case payments would begin at age 70, or upon retirement if the director is between 70 and 73 when he retires) or (ii) they have ten years of Board service (in which case payments would begin at age 65, or upon retirement if the director is between 65 and 73 when he retires). However, directors who served or have served continuously from December 4, 1984 to retirement are not subject to such requirements and have qualified for the retirement plan, provided that they retire at the conclusion of the annual meeting following the date they reach age 75 unless the Board otherwise provides  In the event of an eligible director's death, the director's beneficiary will be entitled to receive a lump sum payment of the amount that would otherwise have been payable to the director, less any amounts previously paid under the plan  In the event of a director's disability or a change of control (as defined in the plan) pursuant to which a director elects not to remain on the Board, the service and age requirements are waived. Payment will be made in the normal manner upon disability or in a lump sum if a director elects not to remain on the Board in the event of a change of control. As described below, under the current retirement plan the Carlyle Investment would constitute such a change in control  The annual retirement amount is equal to the retainer fee and the meeting and committee fees paid for a normal schedule of meetings during a fiscal year (or the actual schedule of meetings during the 12-month period prior to such director's retirement, if such schedule would result in higher retirement benefits), as determined in accordance with the Board's retirement plan. Additionally, former employees of the Company become eligible to participate in the plan once they have completed five years of service as a non-employee director.

Pursuant to the terms of the Retirement Plan, the consummation of the Carlyle Investment would cause the payment of certain benefits payable to non-employee directors of the Company who do not elect to remain on the Board of Directors following such a change in control to be accelerated to a lump sum payment  The Company and the non-employee directors of the Company who will not remain on the board following the closing of the Investment have agreed to amend the Retirement Plan, effective upon the consummation of the Carlyle Investment, such that the vested benefits otherwise payable to each director as a lump sum will be paid over a five-year period and that directors whose benefits have not vested prior to the closing of the Investment

34