will have such benefits vest partially under the plan pro rata based on their years of service. In addition, such amendment provides that Messrs. Gibson and McGill will be paid amounts under the Retirement Plan, in lieu of any benefits that may become payable to them under the plan in the future, notwithstanding the fact that it is anticipated that they will remain on the Board following the Carlyle Investment. Each of the non-employee directors of the Company has acknowledged and agreed to a waiver of the right to receive the accelerated lump sum payment. The payments to be received by non-employee directors are significantly less than such waived lump sum payments. Pursuant to the plan as amended, the directors would receive the following payments as of October 31, 1996:

| DIRECTOR | AGE | YEARS OF SERVICE(1) | VESTED BENEFIT | ANNUAL PAYMENT(2) |
|---|---|---|---|---|
| Jack O. Vance | 71 | 9 | $ 200,000 | $ 40,000 |
| Donald S. Burns | 71 | 7 | 200,000 | 40,000 |
| Ralph S. Cunningham | 56 | 13 | 200,000 | 40,000 |
| James C. McGill | 52 | 6 | 200,000 | 40,000 |
| W. Scott Martin | 46 | 2 | 80,000 | 16,000 |
| E. Martin Gibson | 58 | 2 | 80,000 | 16,000 |
| Kirby L. Cramer | 60 | 1 | 40,000 | 8,000 |
| Henry E. Riggs | 61 | 1 | 40,000 | 8,000 |
| TOTAL | | | $1,040,000 | $208,000 |

--------
(1) Directors with five years of service have qualified for the full vested benefit of $200,000. The benefit for directors with less than five years service has been prorated.
(2) Benefits will be paid in equal monthly installments over five years.

PROPOSAL 3
APPROVAL OF THE 1996 STOCK INCENTIVE PLAN

OBJECTIVES OF THE PLAN

The principal objectives of the proposed 1996 Stock Incentive Plan are summarized below and then discussed in detail:

 i. Motivate and retain qualified professionals in a highly competitive industry

 ii. Recruit and attract new technical and professional talent.

iii. Preserve cash for growth.

 iv. Tie the interests of key employees, directors and consultants to those of stockholders.

  v. Maintain a competitive total compensation package.

The success of the Company in the highly competitive environmental consulting, engineering and remediation industry depends in large part upon its ability to attract, motivate, and retain a large number of engineers, scientists and other environmental professionals with specialized technical training and experience. The continued volatility in the environmental consulting, engineering and remediation industry has created a shortage of qualified professionals and produced intense competition to recruit and attract those professionals. The Company believes that an increasingly important factor affecting an environmental consulting, engineering and remediation company's ability to motivate and retain its current professional staff, and to attract additional qualified environmental professionals, is its ability to offer compensation packages that make significant use of stock-based incentives.

The Company's authority to grant awards under its 1991 Plan expired on March 31, 1996.

With the assistance of independent outside compensation consulting experts, the Company has reviewed its compensation practices in comparison to competitors, general industry and the Company's strategic objectives. As a result, the Company has developed a long-term compensation strategy which makes use of stock-based incentives in lieu of cash payments to tie the interests of management and key professional employees to those of stockholders.

To increase the aggregate number of shares available for stock-based incentive employees and for non-employee directors and to provide greater flexibility in the type of incentives that may be awarded to employees, the Board of Directors approved the 1996 Stock Incentive Plan (the "1996 Plan") on September 17, 1996 and is submitting it to the stockholders for their adoption at the Annual Meeting. The following description of the 1996 Plan is qualified in its entirety by reference to the full text of such plan, a copy of which is attached as Appendix VI to this Proxy Statement.

1996 STOCK INCENTIVE PLAN

The purpose of the 1996 Plan is to enable the Company and its subsidiaries to attract, retain and motivate employees by providing for or increasing their proprietary interests in the Company, and to attract non-employee directors and further align their interests with those of the stockholders by providing for or increasing their proprietary interests in the Company. Every employee of the Company or any of its subsidiaries is eligible to be considered for the grant of awards under the 1996 Plan.

The maximum number of shares of Common Stock that may be issued pursuant to awards granted under the 1996 Plan is 1,000,000 (approximately 2.8% of the number of shares of Common Stock outstanding on September 27, 1996); provided, however, that on April 1 of each of the years 1997, 1998, 1999, 2000 and 2001, such maximum number will be increased by a number equal to 2% of the number of shares of Common Stock issued and outstanding on each of such dates.

36

The 1996 Plan will be administered by one or more committees of the Board (any such committee, the "Committee"). Subject to the provisions of the 1996 Plan, the Committee will have full and final authority to adopt, amend and rescind rules and regulations relating to the 1996 Plan, select the employees to whom awards will be granted thereunder, to grant such awards, and to determine the terms and conditions of such awards and the number of shares to be issued pursuant thereto

AWARDS TO EMPLOYEES, DIRECTORS AND CONSULTANTS

The 1996 Plan authorizes the Committee to enter into any type of arrangement with any person who is an employee, director or consultant of the Company or any of its subsidiaries or affiliates (an "Eligible Person") that, by its terms, involves or might involve the issuance of Common Stock or any other security or benefit with a value derived from the value of Common Stock. Awards are not restricted to any specified form or structure and may include, without limitation, sales or bonuses of stock, restricted stock, stock options, stock purchase warrants, other rights to acquire stock, securities convertible into or redeemable for stock, stock appreciation rights, limited stock appreciation rights, phantom stock, dividend equivalents, performance units or performance shares. An award may consist of one such security or benefit, or two or more of them in tandem or in the alternative.

An award granted under the 1996 Plan to an Eligible Person may include a provision accelerating the receipt of benefits upon the occurrence of specified events, such as the achievement of performance goals, the exercise or settlement of a previous award, the satisfaction of an event or condition within the control of the employee or within the control of others, an acquisition of a specified percentage of the voting power of the Company, a change of control of the Company or a dissolution, liquidation, merger, reclassification, sale of substantially all of the property and assets of the Company or other significant corporate transaction. Any stock option granted to an Eligible Person may be a tax-benefited incentive stock option or a nonqualified stock option that is not tax-benefited. See "Tax Treatment" below.

An award to an Eligible Person may permit the Eligible Person to pay all or part of the purchase price of the shares or other property issuable pursuant to an award, and/or to pay all or part of such Eligible Person's tax withholding obligation with respect to such issuance, by (i) delivering cash, (ii) delivering other property acceptable to the Committee, (iii) delivering previously owned shares of capital stock of the Company or other property or (iv) reducing the amount of shares or other property otherwise issuable pursuant to the award. If an option granted to an Eligible Person permitted the Eligible Person to pay for the shares issuable pursuant thereto with previously owned shares, the Eligible Person would be able to exercise the option in successive transactions, starting with a relatively small number of shares and, by a series of exercises using shares acquired from each such transaction to pay the purchase price of the shares acquired in the following transaction, to exercise an option for a large number of shares with no more investment than the original share or shares delivered.

NON-EMPLOYEE DIRECTOR OPTIONS

The 1991 Plan provided that each person who became a non-employee director of the Company would automatically be granted an option to purchase 20,000 shares of Common Stock, upon the date of such person's initial election as a director of the Company or, if such person became a non-employee director by ceasing to be an employee, upon the last business day of the fiscal year of the Company during which such person ceased to be an employee and further provided for annual options to each non-employee director to purchase 10,000 shares of Common Stock. The 1996 Plan does not contain such automatic grant features. Instead, the Company is not required to make grants to non-employee directors and the grant of such options is discretionary. The Company expects to use such options selectively to attract and incentivize qualified non-employee directors and to pay such directors' retainer and meeting fees.

PLAN DURATION

The 1996 Plan will become effective upon its adoption by the Company's stockholders. Awards may not be granted under the 1996 Plan after the fifth anniversary of the effective date of the 1996 Plan. Although any award

that was duly granted on or prior to such date may thereafter be exercised or settled in accordance with its terms, no shares of Common Stock may be issued pursuant to any award after the fifteenth anniversary of the effective date of the 1996 Plan

AMENDMENTS

The Board of Directors may amend, alter or discontinue the 1996 Plan at any time and in any manner, provided that the action may not deprive the recipient of a previously granted award or any rights thereunder without consent, provided that no consent shall be required if the Committee determines that such amendment or alteration is not reasonably likely to significantly diminish the benefits provided under the award or that any such diminishment has been adequately compensated  Notwithstanding the foregoing, if an amendment to the 1996 Plan would affect the awards' compliance with any law, rule or regulation, and if the Committee determines it is necessary for the awards to so comply, the amendment shall be approved by the Company's stockholders to the extent required for compliance with such law, rule or regulation

TAX TREATMENT

The following is a description of the federal income tax treatment that will generally apply to awards made under the 1996 Plan. Such an award may, depending on the conditions applicable to the award, be taxable as an option, an award of restricted or unrestricted stock, an award which is payable in cash, or otherwise

Pursuant to the 1996 Plan, participants may be granted options which are intended to qualify as incentive stock options ("Incentive Options") under the provisions of Section 422 of the Internal Revenue Code (the "Code") Generally, the optionee is not taxed and the Company is not entitled to a deduction on the grant or exercise of an Incentive Option However, if the optionee sells the shares acquired upon the exercise of an Incentive Option at any time within (i) one year after the date of exercise of the Incentive Option or (ii) two years after the date of grant of the Incentive Option, then the optionee will recognize ordinary income in an amount equal to the excess, if any, of the lesser of the sale price or the fair market value on the date of exercise over the exercise price of the Incentive Option. The Company will generally be entitled to a deduction in an amount equal to the amount of ordinary income recognized by the optionee.

The grant of an option or other similar right to acquire stock that does not qualify for treatment as an Incentive Option is generally not a taxable event for the optionee  Upon exercise of the option, the optionee will generally recognize ordinary income in an amount equal to the excess of the fair market value of the stock acquired upon exercise (determined as of the date of exercise) over the exercise price of such option, and the Company will be entitled to a deduction equal to such amount

Special rules will apply, however, if the optionee is subject to Section 16(b) of the Exchange Act and during any period of time (the "Section 16(b) Period"), a sale of the stock acquired upon exercise of the option could subject such optionee to suit under Section 16(b)  In such case, the optionee will not recognize ordinary income, and the Company will not be entitled to a deduction, until the expiration of the Section 16(b) Period.

Upon such expiration, the optionee will recognize ordinary income, and the Company will be entitled to a deduction, equal to the excess of the fair market value of the stock (determined as of the expiration of the Section 16(b) Period) over the option exercise price  As described below, such an optionee may elect under Code Section 83(b) to recognize ordinary income on the date of exercise, in which case the Company would be entitled to a deduction at that time equal to amount of the ordinary income recognized

Awards to employees under the 1996 Plan may also include stock sales, stock bonuses or other grants of stock  Stock issued pursuant to these awards may be subject to certain restrictions  Pursuant to Section 83 of the Code, stock sold or granted under the 1996 Plan will give rise to taxable income at the earliest time at which such stock is not subject to a substantial risk of forfeiture or is freely transferable for purposes of Section 83  At

38

that time, the holder will recognize ordinary income equal to the excess of the fair market value of the shares (determined as of such time) over the purchase price, and the Company will be entitled to a deduction equal to such amount. If the holder of the stock is a person subject to Section 16(b) and if the sale of the stock at a profit could subject such person to suit under Section 16(b), income will be recognized in accordance with the rules described above regarding stock issued to such persons upon the exercise of an option, unless the holder makes an election under Section 83(b) to recognize income on the date the stock is issued.

Awards may be granted to employees under the 1996 Plan that do not fall clearly into the categories described above. The federal income tax treatment of these awards will depend upon the specific terms of such awards. The Company will generally be required to withhold applicable taxes with respect to any ordinary income recognized by a participant in connection with awards made under the 1996 Plan.

The terms of the agreements pursuant to which specific awards are made to employees under the 1996 Plan may provide for accelerated vesting or payment of an award in connection with a change in ownership or control of the Company. In that event, and depending upon the individual circumstances of the recipient employee, certain amounts with respect to such awards may constitute "excess parachute payments" under the golden parachute provisions of the Code. Pursuant to these provisions, an employee will be subject to a 20% excise tax on any "excess parachute payment" and the Company will be denied any deduction with respect to such excess parachute payment.

BOARD RECOMMENDATION

For the reasons set forth under "General" above, the Board of Directors believes that it is in the best interests of the Company and its stockholders to adopt the 1996 Plan in order to help attract, retain and motivate qualified employees and non-employee directors. A majority of the votes cast at the Annual Meeting is necessary for the approval of this proposal.

THE BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE FOR THE APPROVAL OF THE 1996 STOCK INCENTIVE PLAN DESCRIBED ABOVE. PROXIES SOLICITED BY THE BOARD OF DIRECTORS WILL BE SO VOTED UNLESS STOCKHOLDERS SPECIFY OTHERWISE.

THE PROPOSAL WITH RESPECT TO THE APPROVAL OF THE 1996 STOCK INCENTIVE PLAN WILL BE VOTED UPON BY THE STOCKHOLDERS SEPARATELY FROM PROPOSALS ONE, TWO AND FOUR. THE IMPLEMENTATION OF PROPOSALS ONE, TWO AND FOUR IS NOT CONDITIONED UPON APPROVAL OF THE APPROVAL OF THE 1996 STOCK INCENTIVE PLAN BY THE STOCKHOLDERS OF THE COMPANY.

PROPOSAL 4
APPROVAL OF THE ELIMINATION OF CUMULATIVE VOTING AND
ELIMINATION OF CLASSIFIED BOARD OF DIRECTORS PROPOSAL

The stockholders are being asked to approve at the Annual Meeting amendments to the Company's Certificate of Incorporation to eliminate cumulative voting in future elections of directors and to eliminate the classified board of directors.

Cumulative voting is presently permitted by Article NINTH of the Company's Certificate of Incorporation and its effects are described above under Proposal 2 "Election of Directors." Under Delaware law, stockholders do not have cumulative voting rights in the election of directors unless the company's certificate of incorporation specifically provides such rights.

Article SEVENTH of the Company's Certificate of Incorporation currently provides for three classes of directors with one-third of the directors elected annually to three-year terms (a "classified board"). This provision was designed to help assure continuity of Company policies and make management changes more gradual. This provision also was designed to ensure that any person seeking to acquire control of the Company would seek approval of the Board of Directors, rather than proceeding unilaterally.

PROPOSED AMENDMENTS TO CERTIFICATE OF INCORPORATION

The amendments to the Company's Certificate of Incorporation to eliminate cumulative voting and the classified board of directors shall be in substantially the form of proposed revised Article SEVENTH and Article NINTH set forth in Appendix V to this Proxy Statement.

FURTHER INFORMATION

Description of Operation of Cumulative Voting

Cumulative voting entitles each stockholder to cast a number of votes that is equal to the number of voting shares held by such shareholder multiplied by the total number of directors to be elected, and to cast all such votes for one nominee or distribute the votes among up to as many candidates as there are positions to be filled. See "Proposal 2 Election of Directors" above. Without cumulative voting, a stockholder group or group of stockholders must hold a majority of the voting shares to cause the election of one or more nominees. Cumulative voting enables a minority stockholder or group of stockholders holding a relatively small number of shares to elect a representative or representatives to the Board. For example, in the election of six directors, with cumulative voting, a stockholder or stockholders holding greater than one-seventh (approximately 14.3%) of the voting shares is guaranteed the ability to elect one director.

Effect of and Reasons for the Amendments

Given the restructuring of the Company's Board of Directors to be implemented in connection with the Investment (see "Election of Directors-- Board of Directors Following the Investment"), the Board of Directors believes that neither the Company's current classified board of directors nor cumulative voting will be in the best interest of the holders of the Company's Common Stock upon consummation of the Investment. The proposed amendments, if adopted, will enable the holders of the Company's Common Stock to vote each year on the election of directors (other than the directors elected each year by the Convertible Preferred Stock voting as a separate class). The elimination of cumulative voting will make it more difficult for a minority stockholder to obtain representation on the Board of Directors without the concurrence of a holder of a majority of the shares of Common Stock. In addition, the elimination of cumulative voting will prevent the holders of Convertible Preferred Stock from utilizing cumulative voting to elect a majority of the Board of Directors after the lapsing of the Five-Year Period.

40

VOTE REQUIRED FOR APPROVAL OF THE ELIMINATION OF CUMULATIVE VOTING AND
ELIMINATION OF CLASSIFIED BOARD OF DIRECTORS PROPOSAL

The affirmative vote of the holders of not less than two-thirds of shares of
the Company's Common Stock outstanding as of the Record Date will be required
to approve the proposed amendments.

THE BOARD OF DIRECTORS RECOMMENDS THAT THE STOCKHOLDERS VOTE "FOR" APPROVAL
OF THE ELIMINATION OF CUMULATIVE VOTING AND THE ELIMINATION OF CLASSIFIED
BOARD OF DIRECTORS PROPOSAL. PROXIES SOLICITED BY THE BOARD OF DIRECTORS WILL
BE SO VOTED UNLESS STOCKHOLDERS SPECIFY OTHERWISE.

IF PROPOSAL ONE IS NOT APPROVED, THE PROPOSAL WITH RESPECT TO THE
ELIMINATION OF CUMULATIVE VOTING AND THE ELIMINATION OF THE CLASSIFIED BOARD
OF DIRECTORS WILL NOT BE IMPLEMENTED.

BENEFICIAL OWNERSHIP OF SHARES

The following table sets forth information as of October 1, 1996 with respect to beneficial ownership of (i) the Company's Common Stock and (ii) the Company's Depositary Shares, each representing 1/100 of a share of 7% Preferred Stock by (a) each person known by the Company to be the beneficial owner of 5% or more of the outstanding Common Stock or Depositary Shares, (b) each director and nominee, (c) the named officers listed in the following Summary Compensation Table (the "Named Officers"), and (d) all directors and persons serving as executive officers as a group.

| NAME AND ADDRESS | AMOUNT AND NATURE OF BENEFICIAL OWNERSHIP OF COMMON STOCK(1)(2) | PERCENT OF COMMON STOCK BENEFICIALLY OWNED(2) | AMOUNT AND NATURE OF BENEFICIAL OWNERSHIP OF DEPOSITARY SHARES | PERCENT OF DEPOSITARY SHARES BENEFICIALLY OWNED |
| --- | --- | --- | --- | --- |
| Wisconsin Investment Board(3)........ | 3,551,800 | 9.93% | -- | -- |
| Dimensional Fund Advisors Inc.(4) | 1,884,300 | 5.27 | -- | -- |
| Donald S. Burns...... | 20,721 | * | -- | -- |
| Kirby L. Cramer...... | 55,548 | * | 10,000 | * |
| Ralph S. Cunningham... | 8,721 | * | -- | -- |
| E. Martin Gibson ... | 33,904 | * | 5,000 | * |
| W. Scott Martin ...... | 50,721(5) | * | -- | -- |
| James C. McGill ...... | 90,354(6) | * | 1,000 | * |
| Henry E. Riggs....... | 31,740 | * | -- | -- |
| Robert B. Sheh(7).... | 406,598 | 1.12 | -- | * |
| Jack O. Vance........ | 25,071(8) | * | -- | -- |
| Anthony J. DeLuca ... | 315,257 | * | -- | -- |
| James R. Mahoney ... | 233,547 | * | -- | -- |
| Raymond J. Pompe .... | 160,802 | * | -- | -- |
| Eric Schwartz(9)..... | 150,590 | * | 1,200 | * |
| All directors and executive officers as a group (15 persons) ... | 1,727,186 | 4.65% | 17,200 | * |

--------
* Less than 1%

(1) The number of shares of the Common Stock beneficially owned includes shares of the Common Stock in which the persons set forth in the table have either investment or voting power. Unless otherwise indicated, all of such interests are owned directly, and the indicated person or entity has sole voting and investment power, subject to community property laws where applicable. The number of shares beneficially owned also includes shares that the following individuals have the right to acquire within sixty days of October 1, 1996 upon exercise of stock options (and conversion of Depositary Shares in the case of Messrs. Cramer, Gibson, McGill and Schwartz) in the following amounts: (i) 17,500 shares as to Mr. Burns, (ii) 10,000 shares upon exercise of options and 42,808 shares upon conversion of Depositary Shares as to Mr. Cramer, (iii) 2,500 shares as to Dr. Cunningham, (iv) 12,500 shares upon exercise of options and 21,404 shares upon conversion of the Depositary Shares as to Mr. Gibson, (v) 12,500 shares as to Mr. Martin, (vi) 20,000 shares upon exercise of options and 4,281 shares upon conversion of the Depositary Shares as to Mr. McGill, (vii) 10,000 shares as to Mr. Riggs, (viii) 362,500 shares upon exercise of options as to Mr. Sheh, (ix) 20,000 shares as to Mr. Vance, (x) 132,000 shares as to Mr. DeLuca, (xi) 110,000 shares as to Mr. Mahoney, (xii) 43,000 shares as to Mr. Pompe; and (xiii) 105,000 shares upon exercise of options and 5,136 shares upon conversion of Depositary Shares as to Mr. Schwartz.

(2) For the purposes of determining the number of shares of Common Stock beneficially owned as well as the percentage of outstanding Common Stock held by each person or group set forth in the table, the number of

42

shares is divided by the sum of the number of outstanding shares of the Common Stock on October 1, 1996 plus (i) the number of shares of Common Stock subject to options exercisable currently or within 60 days of October 1, 1996 by such person or group, and/or (ii) shares of Common Stock into which persons who hold Depositary Shares or other securities may convert the Preferred Stock represented by such Depositary Shares (or otherwise obtain Common Stock), in accordance with Rule 13d-3(d)(1) under the Securities Exchange Act of 1934, as amended ("Rule 13d-3(d)(1)").

(3) Such information is derived solely from a Schedule 13G filed by such beneficial owner with the SEC dated February 7, 1996. The address of the Wisconsin Investment Board set forth in its Form 13G is P.O. Box 7842, Madison, Wisconsin 53707.

(4) Such information is derived solely from a Schedule 13G dated February 7, 1996 filed by such beneficial owner with the SEC. The address of Dimensional Fund Advisors Inc. set forth in its Form 13G is 1299 Ocean Avenue, 11th Floor, Santa Monica, California 90401.

(5) Includes 5,000 shares owned by Martcon, Inc., a company owned by Mr. Martin. Mr. Martin disclaims beneficial ownership of such shares.

(6) Includes 4,000 shares of Common Stock and 1,000 Depositary Shares (convertible into 4,281 shares of Common Stock) owned by Mr. McGill's wife, as to which Mr. McGill has no voting or dispositive power, and 5,000 shares owned by McGill Resources, Inc., a company owned by Mr. McGill. Mr. McGill disclaims beneficial ownership of all such shares

(7) Mr. Sheh resigned as President and Chief Executive Officer and a director of the Company effective July 1, 1996, but will be treated as an employee of the Company through June 26, 1998. See "Certain Transactions--Sheh Agreement."

(8) Includes 300 shares owned by Mr. Vance as a custodian under the California Uniform Gifts to Minors Act. Mr. Vance disclaims beneficial ownership of such shares.

(9) Mr. Schwartz resigned his officer positions pursuant to a separation agreement with the Company dated as of September 30, 1996. See "Certain Transactions--Schwartz Agreement."

43

EXECUTIVE COMPENSATION

SUMMARY COMPENSATION TABLE

The following table sets forth the annual, long-term compensation and other compensation for services in all capacities to the Company for the fiscal years 1996, 1995 and 1994 of those persons who were, as of March 29, 1996, the Chief Executive Officer and the other four most highly compensated executive officers of the Company (the "Named Officers")

| | | ANNUAL COMPENSATION | | | LONG TERM COMPENSATION AWARDS | | |
|---|---|---|---|---|---|---|---|
| NAME AND PRINCIPAL POSITION | YEAR | SALARY($) | BONUS($)(5) | OTHER ANNUAL COMPEN- SATION($)(6) | RESTRICTED STOCK AWARDS($)(7) | SECURITIES UNDERLYING OPTIONS(#)(8) | ALL OTHER COMPEN- SATION($)(8) |
| Robert B. Sheh(1) | 1996 | $450,000 | $ 26,578 | $      0 | $475,000 | 0 | $ 52,100 |
| President and | 1995 | 450,000 | 225,000 | 0 | 74,993 | 150,000 | 34,519 |
| Chief Executive Officer | 1994 | 450,000 | 0 | 175,449 | 0 | 50,000 | 103,219 |
| Anthony J. DeLuca(2)... | 1996 | 270,400 | 12,776 | 0 | 296,875 | 0 | 17,732 |
| Senior Vice President | 1995 | 270,400 | 108,160 | 0 | 173,550 | 77,000 | 16,519 |
| and Chief Financial Officer | 1994 | 268,667 | 0 | 0 | 0 | 22,000 | 34,759 |
| James R Mahoney... ... | 1996 | 260,000 | 12,285 | 0 | 118,750 | 0 | 28,579 |
| Senior Vice President. | 1995 | 256,925 | 104,000 | 0 | 172,163 | 77,000 | 20,330 |
| Technical Operations and Corporate Development | 1994 | 232,834 | 0 | 5,630 | 0 | 22,000 | 32,420 |
| Eric Schwartz(3)...... | 1996 | 250,000 | 11,813 | 0 | 268,750 | 0 | 17,575 |
| Senior Vice President, | 1995 | 250,000 | 100,000 | 0 | 33,330 | 77,000 | 11,488 |
| Law and Administration General Counsel and Secretary | 1994 | 245,834 | 0 | 0 | 0 | 22,000 | 2,828 |
| Raymond J. Pompe(4)... | 1996 | 206,691 | 9,923 | 0 | 118,750 | 0 | 16,250 |
| Senior Vice President. | 1995 | 192,992 | 57,000 | 0 | 156,498 | 35,000 | 11,328 |
| Project Operations | 1994 | 165,692 | 0 | 0 | 0 | 18,000 | 8,423 |

--------

(1) Mr Sheh resigned as President and Chief Executive Officer and a director of the Company as of July 1, 1996. but will be treated as an employee of the Company through June 26, 1998  See "Certain Transactions--Sheh Agreement "

(2) As of July 1, 1996, Mr DeLuca was named President and Acting Chief Executive Officer and a director of the Company

(3) Mr Schwartz resigned his officer positions pursuant to a separation agreement with the Company dated as of September 30, 1996  See "Certain Transactions--Schwartz Agreement "

(4) Mr Pompe, who joined the Company on September 1, 1988, was promoted to the position of Senior Vice President, Project Operations in March 1995

(5) Bonus amounts are reported in the fiscal year they are earned or accrued, even though the actual cash payment for the fourth quarter may be made in the next fiscal year  All bonus amounts reported for fiscal year 1995 include all cash bonus amounts paid. earned or accrued for the fiscal year even though the actual cash payment for the fourth quarter were actually paid in fiscal year 1996. In lieu of additional cash, each Named Officer also received an award of restricted stock in fiscal year 1996 attributable to the fiscal year 1995 incentive compensation plan  The value of such restricted stock awards is reported in this table under Restricted Stock Awards in 1995  The total value of bonuses, including the aforementioned restricted stock awards, earned in fiscal year 1995. by each of the Named Officers are as follows: Mr  Sheh. $299,993; Mr. DeLuca. $144,210; Mr. Mahoney. $138,663; Mr  Schwartz. $133,330; and Mr  Pompe. $75,998.

44

(6) The dollar value of perquisites and other personal benefits, if any, for each of the Named Officers, except Mr. Sheh and Mr. Mahoney in 1994 was less than the reporting thresholds established by the SEC. The amount shown for Mr. Sheh in fiscal year 1994 includes (i) $58,171 for a tax gross up on the relocation expenses reported under Other Annual Compensation; and (ii) $95,794 for club memberships; all in accordance with terms of agreements between the Company and Mr. Sheh. Of the $95,794 reported for club memberships, $25,000 was a one-time non-refundable admission fee and $59,400 is a membership fee. Mr. Sheh was permitted to retain such membership upon his resignation as President and Chief Executive Officer. See "Certain Transactions--Sheh Agreement." The amount shown for Mr. Mahoney for fiscal year 1994 is a tax gross up on relocation expenses reported under Other Annual Compensation; all in accordance with the terms of agreements between the Company and Mr. Mahoney.

(7) 50,000 shares of restricted stock were awarded to each of Messrs. DeLuca, Mahoney and Pompe on March 2, 1995, with a fair market value of $2.75 per share on the date of grant. The shares vest in 20% increments over five years provided that Messrs. Mahoney, DeLuca and Pompe remain employed by the Company on the vesting dates. 50,000 shares of restricted stock were awarded to Mr. Schwartz on June 1, 1995, with a fair market value of $3.00 per share on the date of the grant. 20,000 of such shares have been returned to the Company pursuant to Mr. Schwartz's separation agreement with the Company (see "Certain Transactions--Schwartz Agreement"). In lieu of cash, each Named Officer received awards of restricted stock in connection with a fiscal year 1995 incentive compensation plan. A total of 63,371 shares of restricted stock were awarded to the Named Officers on July 5, 1995 with a fair market value of $3.125 per share. The shares awarded were as follows: Mr. Sheh, 23,998 shares; Mr. DeLuca, 11,536 shares; Mr. Mahoney, 11,092 shares; Mr. Schwartz, 10,666 shares; and Mr. Pompe, 6,079 shares. With the exception of Mr. Schwartz's shares, which shall be fully vested on September 29, 1997 (see "Certain Transactions-- Schwartz Agreement"), the restrictions on the shares will lapse three years from the date of award provided that each Named Officer remains employed by the Company at that date. On March 28, 1996, the following number of restricted shares were issued to the Named Officers, with a fair market value of $2.375 per share on the date of grant: Mr. Sheh, 200,000 shares (which shares were returned to the Company pursuant to Mr. Sheh's separation agreement with the Company (see "Certain Transactions--Sheh Agreement")); Mr. DeLuca, 125,000 shares; Mr. Mahoney, 50,000 shares; Mr. Schwartz, 50,000 shares (which shares have been returned to the Company pursuant to Mr. Schwartz's separation agreement with the Company (see "Certain Transactions--Schwartz Agreement")); and Mr. Pompe, 50,000 shares. The restrictions on the shares will lapse upon the earlier of: (i) attainment of an average $4.00 or greater price of the Company's Common Stock for any period of sixty consecutive calendar days; (ii) four years from the date of issuance of the restricted shares; or (iii) upon death, disability or retirement of the holder or a change of control (as defined).

(8) For 1994, the amount shown for Mr. Sheh includes $83,679 in moving expenses in accordance with the terms of an agreement between the Company and Mr. Sheh, $10,000 for partial principal forgiveness on a relocation loan to purchase a residence and $9,540 of life insurance premiums in excess of $50,000. The amount shown for Mr. DeLuca includes $23,400 paid for accrued but unused vacation, $1,925 of life insurance premiums in excess of $50,000 and $9,434 for the Company's contribution to the Company's Retirement Plan, a defined contribution plan. Plan participants are fully vested in the plan following six years of service. The amount shown for Mr. Mahoney includes $13,091 in previously unreimbursed moving expenses in connection with his relocation to Southern California, $10,000 for partial principal forgiveness on a relocation loan to purchase a residence, $9,119 for the Company's contribution to the Company's Retirement Plan and $210 of life insurance premiums in excess of $50,000. The amounts shown for Messrs. Pompe and Schwartz include $1,878 and $2,828, respectively, of life insurance premiums in excess of $50,000. For 1995, the amount shown for Mr. Sheh includes $6,572 for the Company's contribution to the Company's Retirement Plan, $10,000 for partial principal forgiveness on a relocation loan to purchase a residence and $17,947 of life insurance premiums in excess of $50,000. The amount shown for Mr. DeLuca includes $6,608 for the Company's contribution to the Company's Retirement Plan, $5,200 paid for accrued but unused vacation and $4,711 of life insurance premiums in excess of $50,000. The amount shown for Mr. Mahoney includes $6,599 for the Company's contribution to the Company's Retirement Plan, $3,731

45

of life insurance premiums in excess of $50,000 and $10,000 for partial principal forgiveness on a relocation loan to purchase a residence. The amounts shown for Mr. Schwartz and Mr Pompe represent $4 916 and $4,711 respectively, of life insurance premiums in excess of $50,000 and the Company's contributions to the Company's Retirement Plan. For 1996, the amount shown for Mr. Sheh includes $9,003 for the Company's fixed and 401(k) Company matching contributions to the Company's Retirement Plan, $10,000 for partial forgiveness on a relocation loan to purchase a principal residence and $20,034 of life insurance premiums in excess of $50,000. The amounts shown for Messrs. DeLuca, Schwartz and Pompe represent $5,798, $5,177 and $5,706, respectively, of life insurance premiums in excess of $50,000 and the Company's contributions to the Company's Retirement Plan for the Company's fixed and 401(k) Company matching contributions. The amount shown for Mr. Mahoney includes $7,498 for the Company's contributions to the Company's Retirement Plan for the Company's fixed and 401(k) Company matching contributions, $10,000 for partial forgiveness on a relocation loan to purchase a principal residence and $5,990 of life insurance premiums in excess of $50,000. Although required to be reported as income, the Named Officers pay the cost for all life insurance premiums for coverage in excess of one and one-half times their salary, as do all salaried employees. In addition, each of the Named Officers received in fiscal year 1996 a contribution to the Company's Restoration Plan, a non-qualified supplemental retirement plan, as follows: Mr. Sheh, $13,063; Mr DeLuca, $5,475; Mr Mahoney, $5 091; Mr Schwartz, $4,722; and Mr Pompe, $3,334

STOCK OPTION GRANTS IN LAST FISCAL YEAR

No stock options were granted to any of the Named Officers during the last fiscal year No stock appreciation rights ("SARs") were granted during the last fiscal year or at any time under either the 1983 Stock Incentive Plan (the "1983 Plan") or the 1991 Stock Incentive Plan (the "1991 Plan")

AGGREGATED OPTION EXERCISES DURING LAST FISCAL YEAR AND OPTION VALUES AT END OF LAST FISCAL YEAR

The following table provides information with respect to the exercise of stock options during the fiscal year ended March 29, 1996 by the Named Officers, and with respect to unexercised "in-the-money" stock options outstanding as of March 29, 1996 In-the-money stock options are options for which the exercise price is less than the market price of the underlying stock at the end of the fiscal year No executive officer or any other employee of the Company held or exercised any SARs at any time during fiscal year 1996

| | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT FISCAL YEAR END (IN SHARES) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT FISCAL YEAR END(S)(2) | |
| | SHARES ACQUIRED ON | VALUE | | | | |
| NAME | EXERCISE | REALIZED(S) | EXERCISABLE | UNEXERCISABLE(3) | EXERCISABLE | UNEXERCISABLE |
| ---- | -------- | -------- | -------- | -------- | -------- | -------- |
| Robert B. Sheh(1) | 0 | $ 0 | 250 000 | 200.000 | $ 0 | $ 0 |
| Anthony J. DeLuca | 0 | 0 | 107 250 | 78.750 | 0 | 0 |
| James R. Mahoney | 0 | 0 | 85 250 | 76 750 | 0 | 0 |
| Eric Schwartz(4) | 0 | 0 | 67 750 | 81 250 | 0 | 0 |
| Raymond J Pompe | 0 | 0 | 36 020 | 43 250 | 0 | 0 |

-------
(1) Mr Sheh resigned as President and Chief Executive Officer and a director of the Company as of July 1, 1996. but will be treated as an employee of the Company through June 26, 1998 See "Certain Transactions--Sheh Agreement."

(2) Represents the difference between the $2 50 closing market price of the Company's Common Stock at March 29, 1996, minus the exercise price of the options

(3) Messrs. DeLuca, Mahoney and Pompe's options with respect to 7,500 shares, 6,000 shares and 6,000 shares, respectively, have vested as a result of the passage of time but may not be exercised unless the Company's stock price increases to certain predetermined levels. Because this condition has not been satisfied and the options therefore are not vested, such options are not included in the foregoing "Beneficial Ownership of Shares" table

(4) Mr. Schwartz resigned his officer positions pursuant to a separation agreement with the Company dated as of September 30 1996 See "Certain Transactions--Schwartz Agreement "

46

REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

The Compensation Committee of the Board of Directors is composed of four non-employee directors  No member of the Compensation Committee is a former or current officer or associate of the Company or its subsidiaries and there are no Compensation Committee interlocks  The Compensation Committee reviews management compensation levels and evaluates management performance and related matters  The Compensation Committee also administers the Company's various management incentive plans, including the 1991 Plan  This report relates to the fiscal year ended March 29, 1996

To assist the Compensation Committee in performing these functions, the Compensation Committee retains the services of nationally known independent consulting firms specializing in executive compensation issues  Since 1987, these services have been provided primarily by Towers Perrin, which advises the Committee as to executive compensation and its relationship to achieving the Company's goals  In doing so, Towers Perrin prepares and reviews for the Compensation Committee surveys and other materials describing the compensation practices of other companies, including those in the environmental consulting, engineering and remediation industry, and considers other factors which Towers Perrin and the Committee deem relevant

COMPENSATION PROGRAM OBJECTIVES

The Compensation Committee has developed and implemented compensation strategies, plans and programs which are designed to attract, retain, and motivate key management and to align the financial interests of the Company's executive officers with those of stockholders  The Company's management compensation programs are designed to provide:

(i) Base salary levels that are competitive with those of engineering, environmental services, and general industry companies;

(ii) Competitive total annual cash compensation delivered through annual incentive compensation that varies in a consistent and predictable manner with the financial performance of the Company; and

(iii) Long-term incentive compensation that focuses management efforts on building stockholder value through attainment of longer-term financial and strategic goals, and encourages management stock ownership

A substantial portion of an executive officer's compensation is "at risk" with annual and long-term incentives, at target levels, intended generally to provide between 40% to 60% of total compensation  In designing and administering its management compensation program, the Company attempts to achieve an appropriate balance among the various elements of compensation, each of which is discussed in greater detail below

In fiscal year 1996, the Compensation Committee initiated several actions to further align management and stockholder interests, including the linking of a larger portion of management's incentive compensation, both annual incentive bonus and long-term incentive, to the value of the Company's Common Stock

The Company's management compensation program and the Committee's actions are discussed in greater detail below

BASE SALARY

As a guideline, base salary for the Company is targeted at the sixtieth percentile level of comparable engineering and environmental services and other companies with similar revenues or numbers of employees in order to attract and retain key talent in this highly competitive industry  To meet this objective, the Company, with the assistance of compensation consulting firms, reviews compensation survey data from (i) large engineering companies from which it recruits and with which it competes for human resources, (ii) environmental services companies with which it competes, including some that are and some that are not in

47

the peer group index in the Five-Year Stock Price Performance Graph included in this Proxy Statement; and (iii) other companies in general industry with similar revenues or numbers of employees. The Company's salary plan for executive officers is approved, on an annual basis, by the Compensation Committee and considers individual performance, the Company's overall financial performance and competitive practice. Annual performance reviews and formal merit increase guidelines determine individual salary increases.

The Compensation Committee completed an annual review of officer based pay levels in fiscal year 1996. The Committee, upon Management's recommendations, did not grant annual salary increases to the Named Officers other than Mr. Pompe because the compensation policy was to increase the "at risk" compensation under the annual and long-term incentive plans and the salaries of the Named Officers were determined to be within competitive norms. A salary increase of 10.5% was granted to Mr. Pompe to reflect his promotion and increased responsibilities related to an organizational realignment effected in fiscal year 1996.

TOTAL ANNUAL CASH COMPENSATION (BASE SALARY PLUS BONUS)

As a guideline, total annual cash compensation is set at the sixtieth percentile of comparable engineering and environmental service and other companies when annual objectives and targets are achieved. Upper quartile cash compensation can be earned only if business results significantly exceed Company objectives.

THE INCENTIVE COMPENSATION "BONUS" PLAN

The Incentive Compensation "Bonus" Plan is designed to reward executive officers and other key employees, on an annual basis, for their contributions to corporate and business unit/division objectives, and for individual performance. Each eligible employee's award is expressed as a percentage of the individual's base salary for such fiscal year. The incentive bonus targets equate to the Company's annual budget objectives as approved by the Board of Directors. If the Company's performance exceeds budget, the maximum bonus payable to participants would be 150% of the target. This compensation structure is based on the Compensation Committee's policy that increasing amounts of compensation should be "at risk" for those employees with greater influence on stockholder value. Company objectives are measured by performance criteria that relate to both individual and Company performance. The Compensation Committee believes that these performance criteria have a high degree of correlation to the price of the Company's Common Stock over time. Company objectives are expressed in specific financial targets that are established as part of the annual budgeting process, which includes a review of performance of a comparable group of environmental consulting, engineering and remediation companies.

The incentive bonus targets for fiscal 1996 adopted under the Incentive Compensation "Bonus" Plan were intended to provide an incentive to key management to build upon the improved financial performance realized in fiscal year 1995. The Committee selected both operating income and earnings per share, weighted equally, as the key financial measures for fiscal year 1996 and specific financial targets were established both on an annual and quarterly basis under the plan. The financial targets for 1996 were increased from those of 1995. Incentive bonus target awards under the 1996 incentive compensation program ranged from 10% of salary for certain key employees to 50% of salary for the Chief Executive Officer. Incentive bonus awards would begin to be earned when the Company achieved 75% of any quarterly objective and amounts up to 75% of the annual target bonus incentives would be paid in quarterly installments. The residual 25% of the incentive bonus funds accrued would be eligible for distribution at the end of the fiscal year contingent on the performance of the individual and the individual's business unit. An incentive amount equivalent to 25% of the incentive earned could be paid in cash or stock at the discretion of the Committee. For the six most senior executives, including the five Named Officers, the financial measures were modified to also require the Company's stock price to increase to emphasize share price appreciation and stockholder value.

The minimum financial target relating to operating income was achieved in the first quarter of the fiscal year. Financial targets were not achieved in the subsequent three quarters or for the fiscal year. The distribution of all incentive awards was determined, at the Committee's discretion, according to an assessment of Company

48

and individual performance in relation to pre-established objectives. Cash incentive awards were paid to 142 participants. The total incentive awards earned by the 11 officers (including the Named Officers) was $98,251. The total awards earned by the Named Officers under the plan for fiscal 1996 were as follows: Mr. Sheh, $26,578; Mr. DeLuca, $12,776; Mr. Mahoney, $12,285; Mr. Schwartz, $11,813 and Mr. Pompe, $9,923. These were only incurred because of the first quarter's achievement of the minimum financial target. No incentives were awarded for the next three quarters of the fiscal year.

LONG-TERM INCENTIVE COMPENSATION PROGRAM

Prior to the expiration of the 1991 Plan on March 31, 1996, the Company's long-term incentive program consisted of the 1991 Plan. At the time the 1991 Plan expired, there were 502,205 shares remaining available for grant, none of which were or will be granted. The Compensation Committee has initiated a review of various long-term incentive alternatives to ensure the Company has a long-term incentive program that is competitive with comparable engineering, environmental services and other companies and will enable the Company to acquire and retain key management talent.

The 1991 Plan authorized the granting of various stock-based incentive awards to officers and key employees of the Company and its subsidiaries. During fiscal year 1996, the Compensation Committee considered the desirability of granting stock-based awards to officers and other key employees under the 1991 Plan. In determining the grant of awards to officers and other key employees, the Compensation Committee considered, among other things, the ability of the individual to influence stockholder value, personal performance and prior option grants. The 1991 Plan gave the Compensation Committee the flexibility to provide longer-term incentive awards in a variety of forms to further align the long-term interest of the Company's management with those of its stockholders.

During fiscal year 1996, the senior management of the Company was responsible for a number of significant events including: settlement of major litigation; refinancing of senior debt; the recapitalization of the Company's investment in Quanterra and major cost reductions. In recognition of these significant accomplishments of the senior management group in fiscal year 1996 and to encourage an increased focus on share price appreciation, the Compensation Committee, with input from independent compensation consultants, awarded performance-based restricted stock to the five Named Officers. A total of 475,000 shares were granted which will vest upon the earlier of: (i) attainment on an average per share price of $4.00 or greater of the Common Stock for any period of sixty consecutive calendar days; (ii) four years from the date of issuance; or (iii) death, disability or retirement of the holder or a change of control, as defined. The stock grants for the five Named Officers were as follows: Mr. Sheh, 200,000 shares (which shares were relinquished to the Company pursuant to Mr. Sheh's separation agreement with the Company (see "Certain Transactions--Sheh Agreement")); Mr. DeLuca, 125,000 shares and 50,000 shares each for Messrs. Mahoney, Pompe and Schwartz. Mr. Schwartz's shares have been relinquished to the Company pursuant to Mr. Schwartz's separation agreement with the Company (see "Certain Transactions--Schwartz Agreement").

In June 1995, Mr. Schwartz was awarded an additional 50,000 shares of restricted stock as a result of his additional responsibilities following the Company's organization realignment and his efforts toward the settlement of a significant legal proceeding (Motco). 20,000 of such shares have been returned to the Company pursuant to Mr. Schwartz's separation agreement with the Company (see "Certain Transactions--Schwartz Agreement").

TOTAL DIRECT COMPENSATION (TOTAL ANNUAL CASH COMPENSATION PLUS THE ANNUALIZED VALUE OF LONG-TERM INCENTIVES)

As a guideline, total direct compensation, through incentive awards to executive officers under the 1991 Plan, is set between the fiftieth percentile and the upper quartile of comparable environmental consulting, engineering and remediation and other companies, when the Company's long-term goals to increase stockholder value are achieved or exceeded.

SECTION 162(M) OF THE INTERNAL REVENUE CODE

As of January 1, 1994, the Internal Revenue Code of 1986 was amended to eliminate the deductibility of certain compensation in excess of $1,000,000. Compensation awarded under a "performance-based" compensation program which has been approved by stockholders is exempted from the deduction limitation. The Compensation Committee expects to consider the impact of Section 162(m) on "performance-based" compensation programs adopted in the future and intends to develop a formal policy regarding Section 162(m).

COMPENSATION OF CHIEF EXECUTIVE OFFICER

Mr. Sheh's annual salary for fiscal year 1996 was $450,000 and remained at that rate since he was hired, except for a temporary salary reduction applicable to all senior executives in fiscal year 1993. Mr. Sheh resigned as President and Chief Executive Officer and a director of the Company as of July 1, 1996, but remains an employee of the Company through June 26, 1998. See "Certain Transactions--Sheh Agreement." The Committee assessed the competitiveness of Mr. Sheh's salary for fiscal year 1996 using several compensation data sources. Mr. Sheh's salary was considered to be within the competitive range of the sixtieth percentile of salaries paid by engineering and environmental services companies. No bonus payments were made to Mr. Sheh for fiscal year 1996 except for the payment of $26,578 with respect to the first quarter of fiscal year 1996. In consideration of the competitive data, the incentive opportunities under the incentive compensation bonus plan and the performance-based stock awards, Mr. Sheh's salary was not increased during fiscal year 1996.

As part of the grant of an aggregate of 475,000 shares to Named Officers described above, Mr. Sheh was granted 200,000 shares of performance-based stock in March 1996 under the 1991 Plan. The shares were granted to link Mr. Sheh's total compensation opportunity to increases in stockholder value and in recognition of his role in the accomplishments of the Company in fiscal year 1996, described above under the caption "Long-Term Incentive Compensation Program." The shares were returned to the Company pursuant to Mr. Sheh's separation agreement with the Company. See "Certain Transactions--Sheh Agreement."

                    THE COMPENSATION COMMITTEE
                    Jack O. Vance, Chairman
                    Kirby L. Cramer
                    Ralph S. Cunningham
                    E. Martin Gibson

                              50

STOCK PRICE PERFORMANCE GRAPH

The following graph sets forth the Company's cumulative total stockholder return on its Common Stock as compared to the S&P 500 Index and the Smith Barney ("SB") Hazardous Waste Index on March 31 of each listed year. The graph covers the period from March 31, 1991 through March 29, 1996.

COMPARISON OF FIVE-YEAR CUMULATIVE TOTAL RETURN
INTERNATIONAL TECHNOLOGY CORPORATION, S&P 500 INDEX,
SB HAZARDOUS WASTE INDEX(1)

PERFORMANCE GRAPH APPEARS HERE

| Measurement Period (Fiscal Year Covered) | INTERNATIONAL TECHNOLOGY CORP. | S&P 500 INDEX | SB HAZARDOUS WASTE |
|---|---|---|---|
| Measurement Pt- 1991 | $100 | $100 | $100 |
| FYE 1992 | $ 57 | $112 | $ 79 |
| FYE 1993 | $ 54 | $128 | $ 68 |
| FYE 1994 | $ 28 | $129 | $ 55 |
| FYE 1995 | $ 22 | $150 | $ 50 |
| FYE 1996 | $ 23 | $197 | $ 50 |

--------
(1) Assumes $100 invested on March 31, 1991 in the Company's Common Stock, the S&P 500 Index, and the SB Hazardous Waste Index, and assumes the reinvestment of all dividends.

THIS GRAPH REPRESENTS HISTORICAL STOCK PRICE PERFORMANCE AND IS NOT NECESSARILY INDICATIVE OF ANY FUTURE STOCK PRICE PERFORMANCE.

THE FOREGOING REPORT OF THE COMPENSATION COMMITTEE AND THE PERFORMANCE GRAPH THAT APPEARS IMMEDIATELY AFTER SUCH REPORT SHALL NOT BE DEEMED TO BE SOLICITING MATERIAL OR TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OR THE EXCHANGE ACT OR INCORPORATED BY REFERENCE IN ANY DOCUMENT SO FILED.

51

CERTAIN TRANSACTIONS

Executive Agreements  In connection with his employment as Chief Executive Officer, Mr. Sheh and the Company entered into an agreement dated July 15, 1992. The agreement was intended to specify annual stock option grants and a minimum level of base pay for Mr. Sheh, as well as to address certain other matters. Pursuant to the agreement, Mr. Sheh's annual base salary was $450,000 subject to merit increases and the agreement provides the opportunity to participate in the Company's Incentive Bonus Plan with a bonus of up to 50% of base salary at target levels. Pursuant to the agreement, Mr. Sheh received stock options covering 250,000 shares of Common Stock upon joining the Company and was entitled to receive a minimum specified number of stock options during the first three years of his employment. The agreement provided for certain insurance and other benefits. The agreement also provided that if Mr. Sheh was terminated for "cause," he would be entitled to receive one year of base salary and bonuses.

Employment Agreements  In connection with the proposed Carlyle Investment, each of Anthony J. DeLuca, Franklin E. Coffman, James R. Mahoney and Raymond J. Pompe will enter into an employment agreement with the Company effective upon the closing of the Investment for a term of three years, unless terminated. The employment agreements of each of Messrs. DeLuca and Mahoney will replace in their entirety their respective severance benefit agreements with the Company. See "--Severance Benefit Agreements" below.

The employment agreements provide for initial base salaries at the rates in effect at the present time. Salaries shall be subject to annual upward adjustment at the discretion of the Compensation Committee of the Board of Directors (the "Compensation Committee"). Salaries shall be subject to reduction only in connection with action taken by the Board of Directors for all management employees. Each of the employment agreements will provide for a short-term incentive compensation plan to be administered by the Compensation Committee. The Company shall also maintain long-term incentive plans to be administered by the Compensation Committee, which will make awards, primarily of stock options, based on appropriate performance criteria. The annual awards will be at the discretion of the Compensation Committee but will generally target long-term incentive opportunities. The Company will have "good reason" to terminate Messrs. DeLuca, Coffman, Mahoney or Pompe if such persons fail to meet certain management forecasts for two fiscal years.

The Company will provide loans to Messrs. DeLuca, Coffman, Mahoney and Pompe to allow them to make substantial purchases of the Company's Common Stock in the open market. Within three months of the closing of the Investment, the agreements provide that Mr. DeLuca will purchase between $100,000 and $125,000 worth of Common Stock and each of Messrs. Coffman, Mahoney and Pompe will purchase between $75,000 and $100,000 worth of Common Stock. In connection with the short-term compensation plan described above, the Company may provide for forgiveness of a certain portion of the loan principle and interest if previously agreed to targets are met or exceeded. The loans shall bear interest and be repayable at mutually agreeable terms. The employment agreements also provide for reimbursement for business expenses and vacation and other benefits consistent with existing Company policies and practices.

Additionally, as part of their employment agreements, each of Messrs. DeLuca, Coffman, Mahoney and Pompe will be bound by non-compete provisions with the Company if they terminate their employment by resignation.

Severance Benefit Agreements  The Company currently maintains change in control severance benefit agreements (the "Severance Agreements") with certain executive officers. The Severance Agreements generally have a two-year term. The persons with whom the Company has entered into Severance Agreements are Anthony J. DeLuca and James R. Mahoney expiring on April 2, 1998 and September 15, 1997, respectively. If the Carlyle Investment is consummated, Messrs. DeLuca and Mahoney will enter into employment agreements with the Company, which employment agreements will replace in their entirety Mr. DeLuca's and Mr. Mahoney's respective Severance Agreements (see "--Employment Agreements" above).

The Severance Agreements provide, upon the occurrence of certain events, for the payment of lump sum cash compensation equal to 2.99 times the executive officer's annual base salary and the highest aggregate cash bonus paid to the executive officer in the preceding three fiscal years (subject to reduction in certain

52

circumstances, including the limitation that the Company's aggregate severance liability shall not exceed 5% of the Company's market capitalization (as defined in the Severance Agreements). The Company is obligated to pay such compensation to the executive officer if a change in control of the Company as defined in the Severance Agreements occurs and the officer's employment subsequently is terminated by the Company or by the officer for specified reasons. The Severance Agreements also provide that the Company will arrange in such event to provide the officer for two years with disability, life, accident and health insurance substantially similar to those insurance benefits being received by the officer at the time of the termination of employment. The Severance Agreements generally have a two-year term if no change in control of the Company occurs. If there is a change in control of the Company, the Severance Agreements remain in effect for three years from the date of the change in control if it has not been approved by the Board of Directors and for two years if the change in control has been approved by the Board of Directors.

The purpose of the Severance Agreements is to continue to attract and retain well-qualified executives and key personnel who are an integral part of the management of the Company and whose performance is considered critical to the future success of the Company. To this end, the Severance Agreements are intended to protect the continued employment of such executives and key personnel which would be at risk in the event of a change in control and to provide an incentive to such executives and key personnel to remain in the employ of the Company, notwithstanding the uncertainty in job security caused by an actual or threatened change in control.

Sheh Agreement. Mr. Robert B. Sheh resigned as President and Chief Executive Officer and a director of the Company as of July 1, 1996. Pursuant to the terms of an agreement between the Company and Mr. Sheh, Mr. Sheh will continue to be treated as an employee of the Company until June 26, 1998, but will have no further duties or responsibilities to the Company. Pursuant to the agreement, until June 26, 1998, Mr. Sheh will continue to be paid $450,000 per annum and will receive a car allowance of $5,850 per annum. Mr. Sheh will also receive a one-time payment of $40,300 for accrued but unused vacation. Additionally, a relocation loan made by the Company to Mr. Sheh with an outstanding principal amount of $150,000 was forgiven. Mr. Sheh will retain a club membership in his name for which the Company has previously paid admission and membership fees. Mr. Sheh remains eligible for certain insurance benefits and is entitled to certain other benefits until the earlier of June 26, 1998 or the date on which Mr. Sheh becomes a full-time employee of another company. Under the agreement, 23,998 shares of restricted Common Stock awarded to Mr. Sheh in July 1995 will become fully vested on June 26, 1998, and options to purchase a total of 450,000 shares of Common Stock will continue to vest in accordance with the terms of the applicable stock option agreements and will become fully vested on April 27, 1998. Finally, 200,000 shares of restricted stock awarded to Mr. Sheh in March 1996 were returned to the Company.

Schwartz Agreement. Mr. Eric Schwartz resigned his officer positions of Senior Vice President--Law and Administration, General Counsel and Secretary pursuant to a separation agreement dated as of September 30, 1996. Pursuant to the terms of an agreement between the Company and Mr. Schwartz, Mr. Schwartz will remain an employee of the Company until the earlier of his resignation of employment, his obtaining full-time, permanent employment with another company, or September 29, 1997. Pursuant to the agreement until September 29, 1997, Mr. Schwartz will continue to be paid $250,000 per annum and will receive a car allowance of $5,850 per annum. Mr. Schwartz remains eligible for certain insurance benefits and is entitled to certain other benefits until the earlier of September 29, 1997 (December 31, 1998 in the case of medical benefits) or the date on which Mr. Schwartz becomes a full-time employee of another company. Mr. Schwartz will receive a one-time payment of $19,512 for accrued but unused vacation and the Company will reimburse Mr. Schwartz for expenses related to seeking employment up to an amount of $25,000. Mr. Schwartz has relinquished 70,000 shares of restricted stock to the Company. Additionally, the remaining options and restricted shares held by Mr. Schwartz will be treated as follows: (i) 20,000 and 10,666 shares of restricted stock will vest on June 1, 1997 and September 29, 1997, respectively, (ii) options to purchase 128,750 shares of Common Stock will fully vest on April 29, 1997 and (iii) options to purchase 19,250 shares of Common Stock will expire on September 29, 1997.

Hart Agreement. Mr. Larry M. Hart resigned as Senior Vice President and Chief Operating Officer of the Company effective as of October 1, 1995. Pursuant to the terms of an agreement between the Company and

53

Mr Hart, Mr. Hart will remain an employee of the Company until the earlier of his resignation of employment, his obtaining full-time, permanent employment with another company, or November 1, 1996. Pursuant to the agreement, the Company paid Mr. Hart an aggregate of $535,770 in salary and severance payments. Additionally, a relocation loan made by the Company to Mr Hart remains outstanding, with no interest accruing or payable from October 1, 1995 until September 30, 1996. The loan will become due and payable upon the earlier of the sale of the principal residence purchased with the relocation loan or October 1, 1997. Additionally, pursuant to the agreement, Mr Hart remains eligible for certain insurance benefits, until the termination of his employment and is entitled to certain other benefits. Finally, under the agreement, 15,998 shares of restricted Common Stock and options to purchase a total of 280,000 shares of Common Stock will become fully vested upon Mr Hart's termination of his employment.

Relocation Loans. In certain circumstances, the Company has granted and may in the future grant interest-free loans to executive officers, officers and certain other employees principally for real estate purchases in connection with company-initiated transfers to a new location. All loans are approved by the Compensation Committee and are secured by the principal residence of the individual. Mr James R. Mahoney, Senior Vice President, entered into a relocation loan arrangement with the Company with an original principal amount of $200,000 and secured by a deed of trust on his respective personal residence. The loan will remain interest free so long as Mr. Mahoney remains an employee. Beginning December 31, 1991 and on each December 31st thereafter until the due date of the loan, 5% of the original principal amount (to a maximum of 50% of the original principal amount) was scheduled to be forgiven by the Company, provided Mr. Mahoney remains employed by the Company. The loan to Mr. Mahoney is due and payable on December 31, 2000. Additionally, Mr. Mahoney has agreed to repay the remaining 50% of the original principal amount in installments related to the issuance of awards under the Company's incentive compensation plan. Since no bonuses were awarded or paid under the Company's incentive compensation plan during fiscal years 1993 and 1994. Mr. Mahoney was not required to make any installment payments to the Company in those years. During the fiscal year ended March 29, 1996. (i) Mr Mahoney repaid $7,549 of the loan, and (ii) the maximum amount owed by Mr Mahoney to the Company under the loan was $150,000. As of March 29, 1996, the principal amount outstanding for Mr Mahoney's loan was $132,451.

Indemnification. The General Corporation Law of the State of Delaware, the state of incorporation of the Company, and the Bylaws of the Company provide for indemnification of directors and officers. Section 145 of the Delaware General Corporation Law provides generally that a person sued as a director. officer, employee or agent of a corporation may be indemnified by the corporation for reasonable expenses. including attorneys' fees, if, in cases other than actions brought by or in the right of the corporation, he or she has acted in good faith and in a manner he or she reasonably believed to be in. or not opposed to, the best interests of the corporation (and in the case of a criminal proceeding, had no reasonable cause to believe that his or her conduct was unlawful). Section 145 provides that no indemnification for any claim or matter may be made, in the case of an action brought by or in the right of the corporation. if the person has been adjudged to be liable, unless the Court of Chancery or other court determines that indemnity is fair and reasonable despite the adjudication of liability. Indemnification is mandatory in the case of a director, officer, employee or agent who has been successful on the merits. or otherwise, in defense of a suit against him or her. The determination of whether a director, officer. employee or agent should be indemnified must be made by a majority of disinterested directors, independent legal counsel or the stockholders.

Directors and officers of the Company are covered under policies of directors' and officers' liability insurance. The directors and all officers serving the Company as Senior Vice President or in a higher position are parties to Indemnity Agreements (the "Indemnity Agreements"). The Indemnity Agreements provide indemnification for the directors and covered officers in the event the directors' and officers' liability insurance does not cover a particular claim for indemnification or if such a claim or claims exceed the limits of such coverage. The Indemnity Agreements are generally intended to provide indemnification for any amounts a director or covered officer is legally obligated to pay because of claims arising out of the director's or officer's service to the Company.

54

Additionally, in 1987 the Company's Certificate of Incorporation was amended with the approval of stockholders to provide that its directors are not to be liable to the Company or its stockholders for monetary damages for breach of fiduciary duty to the fullest extent permitted by law. This provision is intended to allow the Company's directors the benefit of the Delaware General Corporation Law which provides that directors of Delaware corporations may be relieved of monetary liabilities for breach of their fiduciary duty of care, except under certain circumstances, including breach of the director's duty of loyalty, acts or omissions not in good faith or involving intentional misconduct or a knowing violation of law or any transaction from which the director derived an improper personal benefit.

Compliance with Securities Reporting Requirements. Section 16(a) of the Exchange Act requires directors, certain officers of the Company and persons holding more than 10% of the Company's Common Stock to file reports concerning their ownership of Common Stock by dates established under the Exchange Act and also requires that the Company disclose in this Proxy Statement any noncompliance with those requirements during fiscal year 1996. Based solely upon a review of reports delivered to the Company, all Section 16(a) filing requirements were satisfied, except that (i) Mr. Murray Hutchison, who resigned from the Board of Directors in July 1995, filed one late report with respect to three transactions during October 1995 involving the sale of an aggregate of 23,480 shares of Common Stock in the aggregate, and (ii) Mr. James C. McGill filed one late report with respect to his wife's inheritance of 1,000 Depositary Shares. Mr. McGill disclaims beneficial ownership of such Depositary Shares.

## INDEPENDENT AUDITOR

Ernst & Young LLP was the Company's independent auditor for the year ended March 29, 1996 and has been selected as the auditor for the current fiscal year, as recommended by the Audit Committee. A representative of that firm is expected to be at the Annual Meeting and will have an opportunity to make a statement, if desired. The representative will also be available to respond to appropriate questions from stockholders.

## STOCKHOLDER PROPOSALS

Any eligible stockholder (as defined below) of the Company wishing to have a proposal considered for inclusion in the Company's 1997 proxy solicitation materials must set forth such proposal in writing and file it with the Secretary of the Company a reasonable time in advance of the date of mailing the Company's proxy statement. The Company will consider any proposal filed on or before March 30, 1997 to be in compliance with such requirement. The Board of Directors of the Company will review any proposals from eligible stockholders which it receives by that date and, with advice of counsel, will determine whether any such proposal will be included in its 1997 proxy solicitation materials under applicable SEC proxy rules. An eligible stockholder is one who is the record or beneficial owner of at least 1% or $1,000 in market value of securities entitled to be voted at that annual meeting and has held such securities for at least one year and who shall continue to own such securities through the date on which the annual meeting is held.

55

ANNUAL REPORT

The Company's 1996 Annual Report to Stockholders is being mailed to stockholders together with this Proxy Statement  Stockholders are referred to the report for financial and other information about the Company, and such information is incorporated in this Proxy Statement by reference and is part of the proxy soliciting material

FORM 10-K ANNUAL REPORT

The Company will provide to any stockholder, without charge, a copy of its Annual Report on Form 10-K for the fiscal year ended March 29, 1996, including financial statements, filed with the SEC, upon the request of any such stockholder  Requests should be directed to International Technology Corporation, Attention: Investor Relations Department, 23456 Hawthorne Boulevard, Torrance, California 90505, 310-378-9933

INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Company hereby incorporates by reference in this Proxy Statement its Annual Report on Form 10-K for the fiscal year ended March 29, 1996 (as amended by Amendment No  1 on Form 10-K/A dated July 29, 1996), the Quarterly Report on Form 10-Q for the quarter ended June 28, 1996, which Quarterly Report is attached hereto as Appendix II, and the Company's Current Report on Form 8-K filed with the SEC on September 20, 1996.

GENERAL AND OTHER MATTERS

The Company will bear the cost of this solicitation of proxies, including expenses in connection with preparing, assembling and mailing the proxy solicitation materials and the charges and expenses of brokerage firms and others for forwarding solicitation materials to beneficial owners. The Company has engaged D F  King & Co., Inc  ("D F  King") to assist in the solicitation of proxies, for which D F  King will be paid a management fee of $7,000 plus out-of-pocket expenses, which fee and expenses are expected to be in excess of $20,000. In addition to solicitation by mail, proxies may be solicited personally or by telephone or telegraph by D.F  King, as well as by directors, officers or employees of the Company, who will receive no additional compensation for such services

As of the date of this Proxy Statement, there are no other matters to be brought before the Annual Meeting  Pursuant to the Company's Bylaws, in order to present business at the Annual Meeting other than that proposed by the Board, a stockholder must give written notice to the Secretary of the Company not later than sixty days in advance of the Annual Meeting or, if later, the fifteenth day following the first public disclosure of the date of the Annual Meeting  Any such notice must set forth as to each matter the stockholder proposes to bring before the meeting: (i) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting; (ii) the name and address, as they appear on the Company's books, of the stockholder proposing such business; (iii) the class, series and number of shares of the Company that are beneficially owned by the stockholder, and (iv) any material interest of the stockholder in such business  In addition, a stockholder making any such proposal must promptly provide any information reasonably requested by the Company  Should any other matters come before the Annual Meeting, action may be taken thereon pursuant to the proxies in the form enclosed, which confer discretionary authority on the persons named therein or their substitutes with respect to such matters

By Order of the Board of Directors,

LOGO

JAMES G  KIRK
Secretary

October 30, 1996
Torrance, California

APPENDICES

Appendix I      Opinion of Donaldson, Lufkin & Jenrette Securities Corporation
Appendix II     International Technology Corporation Form 10-Q for Quarter Ended
                June 28, 1996
Appendix III    Proposed Certificate of Designations of Convertible Preferred
                Stock
Appendix IV     Proposed Amendment to Certificate of Incorporation Effecting a
                One-for-Four Reverse Stock Split and Reducing the Par Value of
                Shares of Common Stock
Appendix V      Proposed Amendments to Certificate of Incorporation Eliminating
                Cumulative Voting and Eliminating a Classified Board of Directors
Appendix VI     1996 Stock Incentive Plan

57

APPENDIX I

DLJ FAIRNESS OPINION

[LETTERHEAD OF DONALDSON, LUFKIN

& JENRETTE SECURITIES CORPORATION]

October 30, 1996

The Board of Directors
International Technology Corporation
23456 Hawthorne Boulevard
Torrance, CA 90505

Members of the Board:

You have requested our opinion as to the fairness from a financial point of view to International Technology Corporation (the "Company") of the Consideration (as defined below) to be received by the Company pursuant to the transactions contemplated by the Securities Purchase Agreement (the "Agreement"), dated as of August 28, 1996, by and between the Company and Carlyle Partners II, L.P., Carlyle Partners III, L.P., Carlyle International Partners II L.P., Carlyle International Partners III L.P. and CIS International Partners (collectively, the "Investors").

Pursuant to the Agreement, the Investors will purchase (i) an aggregate of 450,000 shares of Cumulative Convertible Participating Preferred Stock (the "Preferred Stock"), $100 par value per share, of the Company and (ii) warrants to purchase 5,000,000 shares of common stock, par value $1.00 per share (the "Common Stock"), of the Company at a purchase price per share of $3.00 for aggregate consideration (the "Consideration") of $45 million (together, the "Proposed Transaction"). Pursuant to the Certificate of Designations relating to the Preferred Stock (the "Certificate of Designations") and subject to the conditions set forth therein, each share of Preferred Stock shall be convertible at the option of the holder thereof into shares of Common Stock at a price of $2.00 per share, subject to certain adjustments, and the holders of the Preferred Stock shall be entitled to elect a majority of the Board of Directors of the Company following completion of the Proposed Transaction. The terms and conditions of the Proposed Transaction are set forth in more detail in the Agreement, the Certificate of Designations and the Ancillary Agreements. Certain capitalized terms used herein shall have the meaning ascribed in the Agreement.

In arriving at our opinion, we have reviewed the Agreement and the exhibits thereto, including the Certificate of Designations and the Ancillary Agreements. We have also reviewed financial and other information that was publicly available or furnished to us by the Company, including information provided during discussions with the Company's management. Included in the information provided during discussions with the Company's management were financial projections of the Company for the period beginning July 1, 1996 and ending March 31, 2001, prepared by the management of the Company. In addition, we have compared certain financial and securities data of the Company with various other companies that we deemed relevant, reviewed the historical stock prices and trading volumes of the Common Stock and the 7% Cumulative Convertible Exchangeable Preferred Stock, par value $100 per share, of the Company, reviewed prices paid in certain business combinations and certain investments by private investors in public companies and conducted such other financial studies, analyses and investigations as we deemed appropriate for purposes of this opinion.

In rendering our opinion, we have relied upon and assumed the accuracy, completeness and fairness of the financial and other information that was available to us from public sources, that was provided to us by the Company or its representatives, or that was otherwise reviewed by us. With respect to the financial projections of the Company, we have assumed that such projections have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of the Company as to the future operating and financial performance of the Company. We have not assumed any responsibility for making any independent evaluation of the Company's assets or liabilities or for making any independent verification of any of the information reviewed by us. We have relied as to all legal matters on advice of counsel to the Company.

I-1

Our opinion is necessarily based upon economic, market, financial and other conditions as they exist on, and on the information made available to us as of, the date of this letter. It should be understood that, although subsequent developments may affect this opinion, we do not have any obligation to update, revise or reaffirm this opinion. We are expressing no opinion as to the prices at which the Common Stock will actually trade at any time. Our opinion does not address the relative merits of the Proposed Transaction and other business strategies being considered by the Company's Board of Directors, nor does it constitute a recommendation to any member of the Board as to whether to recommend the Proposed Transaction to stockholders of the Company nor to any stockholder as to how such stockholder should vote on the Proposed Transaction.

Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), as part of its investment banking services, is regularly engaged in the valuation of businesses and securities in connection with mergers, acquisitions, underwritings, sales and distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes. DLJ has performed investment banking and other services for the Company in the past and has been compensated for such services. Such investment banking services include the placement on behalf of the Company of its 8.67% Senior Notes due 2003. In the ordinary course of business, we actively trade in the debt and equity securities of the Company for our own account and for the accounts of our customers and, accordingly, may at any time hold a long or short position in such securities.

Based upon the foregoing and such other factors as we deem relevant, we are of the opinion that the Consideration to be received by the Company is fair to the Company from a financial point of view.

Very truly yours,

Donaldson, Lufkin & Jenrette
Securities Corporation

/s/ Jeffrey A. Klein

By: _____

Jeffrey A. Klein

Managing Director

I-2

APPENDIX II

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------------

FORM 10-Q

(Mark One)

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
    ACT OF 1934

    FOR QUARTER ENDED JUNE 28, 1996

                              OR

[_] TRANSACTION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
    EXCHANGE ACT OF 1934

    FOR THE TRANSITION PERIOD FROM    TO

COMMISSION FILE NUMBER 1-9037

INTERNATIONAL TECHNOLOGY CORPORATION
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

          DELAWARE                          33-0001212
(STATE OR OTHER JURISDICTION OF          (I.R.S. EMPLOYER
 INCORPORATION OR ORGANIZATION)         IDENTIFICATION NO.)

        23456 HAWTHORNE BOULEVARD, TORRANCE, CALIFORNIA 90505
        (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)    (ZIP CODE)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (310) 378-9933

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Sections 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to
such filing requirements for the past 90 days.  Yes [X]    No [_]

At July 31, 1996 the registrant had issued and outstanding an aggregate of
36,602,401 shares of its common stock.

II-1

INTERNATIONAL TECHNOLOGY CORPORATION

INDEX TO QUARTERLY REPORT ON FORM 10-Q
FOR QUARTER ENDED JUNE 28, 1996

PART I. FINANCIAL INFORMATION

                                                                      PAGE
                                                                      -----

Item 1. Financial Statements
        Condensed Consolidated Balance Sheets as of June 28, 1996
          (unaudited) and March 29, 1996...............................    3
        Condensed Consolidated Statements of Operations for the
          First Fiscal Quarter ended June 28, 1996 and June 30, 1995
          (unaudited)..................................................    4
        Condensed Consolidated Statements of Cash Flows for the
          First Fiscal Quarter ended June 28, 1996 and June 30, 1995
          (unaudited)..................................................    5
        Notes to Condensed Consolidated Financial Statements
          (unaudited).................................................. 6-7
Item 2. Management's Discussion and Analysis of Results of
          Operations and Financial Condition.......................... 8-16

PART II. OTHER INFORMATION

Item 1. Legal Proceedings..............................................   17
Item 6. Exhibits and Reports on Form 8-K...............................   18
        Signatures.....................................................   19

II-2

PART I

ITEM 1  FINANCIAL STATEMENTS

INTERNATIONAL TECHNOLOGY CORPORATION

CONDENSED CONSOLIDATED BALANCE SHEETS

|  | JUNE 28, 1996 | MARCH 29, 1996 |
|---|---|---|
|  | (UNAUDITED) (IN THOUSANDS) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 25,104 | $ 24,493 |
| Restricted cash | 3,977 | -- |
| Receivables, net | 112,847 | 126,832 |
| Prepaid expenses and other current assets | 4,638 | 4,315 |
| Deferred income taxes | 12,149 | 12,149 |
| Total current assets | 158,715 | 167,789 |
| Property, plant and equipment, at cost: | | |
| Land and land improvements | 1,780 | 1,783 |
| Buildings and leasehold improvements | 10,955 | 10,961 |
| Machinery and equipment | 144,695 | 144,218 |
|  | 157,430 | 156,962 |
| Less accumulated depreciation and amortization | 104,559 | 101,201 |
| Net property, plant and equipment | 52,871 | 55,761 |
| Investment in Quanterra | 13,450 | 12,975 |
| Other assets | 38,017 | 37,084 |
| Long-term assets of discontinued operations | 41,705 | 41,705 |
| Total assets | $304,758 | $315,314 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 23,322 | $ 27,091 |
| Accrued liabilities | 31,279 | 32,157 |
| Billings in excess of revenues | 1,062 | 2,044 |
| Short-term debt, including current portion of long-term debt | 65,259 | 97 |
| Net current liabilities of discontinued operations | 17,094 | 17,226 |
| Total current liabilities | 138,016 | 78,615 |
| Long-term debt | 392 | 65,611 |
| Long-term accrued liabilities of discontinued operations | 22,610 | 24,771 |
| Other long-term accrued liabilities | 5,351 | 5,452 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $100 par value; 180,000 shares authorized; 24,000 shares issued and outstanding | 2,400 | 2,400 |
| Common stock, $1 par value; 100,000,000 shares authorized; 36,601,778 and 36,598,207 shares issued and outstanding, respectively | 36,602 | 36,598 |
| Treasury stock, at cost (27,811 shares) | (84) | (84) |
| Additional paid-in capital | 170,069 | 169,958 |
| Deficit | (70,598) | (68,007) |
| Total stockholders' equity | 138,389 | 140,865 |
| Total liabilities and stockholders' equity | $304,758 | $315,314 |

See accompanying notes.

II-3

INTERNATIONAL TECHNOLOGY CORPORATION

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)

|  | FIRST FISCAL QUARTER ENDED | |
| --- | --- | --- |
|  | JUNE 28, 1996 | JUNE 30, 1995 |
|  | (UNAUDITED) | |
| Revenues | $  81,416 | $  100,292 |
| Cost and expenses: | | |
| Cost of revenues | 73,637 | 83,348 |
| Selling, general and administrative expenses | 9,080 | 10,023 |
| Operating income (loss) | (1,301) | 6,921 |
| Equity in net loss of Quanterra | -- | (955) |
| Interest, net | (1,356) | (1,991) |
| Income (loss) before income taxes | (2,657) | 3,975 |
| (Provision) benefit for income taxes | 1,116 | (1,630) |
| Net income (loss) | (1,541) | 2,345 |
| Less preferred stock dividends | (1,050) | (1,050) |
| Net income (loss) applicable to common stock | $  (2,591) | $  1,295 |
| Net income (loss) per share | $  (.07) | $  .04 |

See accompanying notes.

II-4

INTERNATIONAL TECHNOLOGY CORPORATION

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

| | FIRST FISCAL QUARTER ENDED | |
|---|---|---|
| | JUNE 28, 1996 | JUNE 30, 1995 |
| | (UNAUDITED) | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income (loss)............................. | $ (1,541) | $ 2,345 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Equity in net loss of Quanterra..................... | -- | 955 |
| Depreciation and amortization........................ | 4,027 | 3,874 |
| Deferred income taxes................................ | (1,225) | 1,554 |
| Changes in assets and liabilities, net of effects from acquisitions and dispositions of businesses: | | |
| Decrease (increase) in receivables, net............. | 13,985 | (1,951) |
| Increase in prepaid expenses and other current assets.............................................. | (323) | (537) |
| (Decrease) increase in accounts payable............. | (3,769) | 813 |
| Decrease in accrued liabilities..................... | (878) | (5) |
| Decrease in billings in excess of revenues.......... | (982) | (1,822) |
| Decrease in other long-term accrued liabilities..... | (101) | (171) |
| Net cash provided by operating activities............. | 9,193 | 5,055 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Capital expenditures................................. | (592) | (1,868) |
| Investment in Quanterra............................. | (475) | -- |
| Restricted cash...................................... | (3,977) | -- |
| Other, net.......................................... | (148) | (574) |
| Investment activities of discontinued operations...... | (2,293) | (2,522) |
| Net cash used for investing activities............... | (7,485) | (4,964) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Repayments of long-term borrowings .................. | (57) | (10,933) |
| Long-term borrowings................................. | -- | 13,000 |
| Dividends paid on preferred stock ... ............... | (1,050) | (1,050) |
| Repurchases of common stock ......................... | -- | (740) |
| Issuances of common stock............................ | 10 | 150 |
| Net cash (used for) provided by financing activities.. | (1,097) | 427 |
| Net increase in cash and cash equivalents............. | 611 | 518 |
| Cash and cash equivalents at beginning of period........ | 24,493 | 6,547 |
| Cash and cash equivalents at end of period............. | $ 25,104 | $ 7,065 |

See accompanying notes.

II-5

INTERNATIONAL TECHNOLOGY CORPORATION

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

1. The condensed consolidated financial statements included herein have been prepared by International Technology Corporation (Company or IT), without audit, and include all adjustments of a normal, recurring nature which are, in the opinion of management, necessary for a fair presentation of the results of operations for the first fiscal quarter ended June 28, 1996, pursuant to the rules of the Securities and Exchange Commission. The Company's fiscal year includes four thirteen-week fiscal quarters with the fourth quarter ending on the last Friday in March. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations although the Company believes that the disclosures in such financial statements are adequate to make the information presented not misleading

These condensed consolidated financial statements should be read in conjunction with the Company's Annual Report on Form 10-K for the fiscal year ended March 29, 1996. The results of operations for the fiscal period ended June 28, 1996 are not necessarily indicative of the results for the full fiscal year

2. For the first fiscal quarters ended June 28, 1996 and June 30, 1995, the Company had an effective income tax benefit rate of 42% and an income tax rate of 41%, respectively, both of which exceed the 34% federal statutory rate primarily due to state income taxes and nondeductible expenses.

3. Net income (loss) per common share is computed by dividing net income (loss) applicable to common stock by the weighted average number of outstanding common shares and common share equivalents during each period as follows:

| FISCAL QUARTER ENDED | AVERAGE COMMON AND COMMON EQUIVALENT SHARES OUTSTANDING |
|---|---|
| June 28, 1996 | 36,601,836 |
| June 30, 1995 | 35,758,245 |

Common stock equivalents relate to dilutive stock options using the treasury stock method. For all periods presented, the computation of net income (loss) per share, assuming conversion into common shares of the Company's Preferred Stock, is antidilutive

4. In anticipation of the loss reported by the Company for its current first fiscal quarter, the Company, prior to June 28, 1996, obtained a waiver through August 1996 of certain covenants in its lending arrangements which allows it to maintain compliance with those arrangements as of the end of the first quarter of fiscal year 1997. In connection with this waiver, the Company has agreed to restrict the usage of its credit line to letters of credit during the period of the waiver. The Company is negotiating with its lenders additional modifications to the lending arrangement which will be required upon the expiration of the waiver. In the event such modifications are not obtained, there would be a material adverse effect on the consolidated financial condition of the Company. Additionally, due to the short-term nature of the waiver, the Company's $65,000,000 senior secured notes, which otherwise would have been classified as long-term, have been classified as current in the June 28, 1996 condensed consolidated balance sheet

5. In December 1987, the Company's Board of Directors adopted a strategic restructuring program which included a formal plan to divest the transportation, treatment and disposal operations through sale of some facilities and closure of certain other facilities. As of June 28, 1996, two of the Company's inactive disposal sites have been formally closed and the other two are in the process of closure. In connection with the plan of divestiture, from December 1987 through March 31, 1996, the Company recorded a provision for loss on disposition of transportation, treatment and disposal discontinued operations (including the initial provision and three subsequent adjustments) in the amount of $160,192,000, net of income tax benefit of $32,879,000. The

II-5

INTERNATIONAL TECHNOLOGY CORPORATION

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

(UNAUDITED)

adjustments principally related to a writeoff of the contingent purchase price from the earlier sale of certain assets, increased closure costs principally due to delays in the regulatory approval process, and costs related to certain waste disposal sites where IT has been named a potentially responsible party (PRP). At June 28, 1996, the Company's condensed consolidated balance sheet included accrued liabilities of $39,704,000 to complete the closure and related post-closure of its inactive disposal sites and related matters.

The provision for loss on disposition of transportation, treatment and disposal discontinued operations is based on various assumptions and estimates. The adequacy of the provision for loss has been currently evaluated in light of developments since the adoption of the divestiture plan and management believes the provision, as adjusted, is reasonable; however, the ultimate effect of the divestiture on the consolidated financial condition of the Company is dependent upon future events, the outcome of which cannot be determined at this time. Outcomes significantly different from those used to estimate the provision for loss could result in a material adverse effect on the consolidated financial condition of the Company.

6. For information regarding legal proceedings of the Company's continuing operations, please see the note "Commitments and contingencies" in the Notes to Consolidated Financial Statements in the Company's Annual Report on Form 10-K for the fiscal year ended March 29, 1996; current developments regarding continuing operations' legal proceedings are discussed in Part II of this filing. See Management's Discussion and Analysis of Results of Operations and Financial Condition--Financial Condition for information regarding the legal proceedings of the discontinued operations of the Company.

7. Unbilled receivables of $21,063,000 at June 28, 1996 ($20,945,000 at March 29, 1996) are included in accounts receivable. Unbilled receivables typically represent amounts earned under the Company's contracts but not yet billable according to the contract terms, which usually consider the passage of time, achievement of certain milestones, negotiation of change orders or completion of the project.

Included in unbilled receivables at June 28 and March 29, 1996 is approximately $8,500,000 of claims related to the Helen Kramer project, which is subject to a governmental investigation.

8. In March 1995, the FASB issued Statement of Financial Accounting Standards No. 121 (SFAS No. 121), "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," which requires impairment losses to be recorded on long-lived assets used in operations when indicators of impairment are present and the undiscounted cash flows estimated to be generated by those assets are less than the assets' carrying amount. SFAS No. 121 also addresses the accounting for long-lived assets that are expected to be disposed of. The Company has adopted SFAS No. 121 in the first quarter of fiscal year 1997 which did not result in any material impact on the results of operations or financial position of the Company. Long-term assets of discontinued operations are accounted for under APB Opinion No. 30, "Reporting the Results of Operations," and are not subject to SFAS No. 121.

II-7

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND
FINANCIAL CONDITION

INTERNATIONAL TECHNOLOGY CORPORATION

FOR QUARTER ENDED JUNE 28, 1996

RESULTS OF OPERATIONS

Overview

The Company's services are provided to a broad array of governmental and
commercial entities predominantly in the U.S. market. Additionally, the
Company pursues selected international business opportunities on a project-
specific basis. The Company's business strategy is to provide its
environmental services on a full-service basis, particularly by focusing on
its capabilities to manage complex environmental issues from the initial
assessment of the level and extent of contamination through the design,
engineering and execution of a solution which minimizes the client's total
cost.

Revenues

The Company experienced an 18.8% decrease in revenues from $100,292,000 in
the first quarter of fiscal year 1996 to $81,416,000 in the first quarter of
fiscal year 1997, primarily reflecting weak demand throughout the industry,
combined with ongoing delays in the funding of major existing U.S. Department
of Defense contracts. Although revenues are expected to increase progressively
from the first quarter level over the course of the year, the impact of the
difficult industry-wide trends is expected to cause the Company to continue to
show a year-to-year decline in revenues in its second fiscal quarter and
possibly beyond.

The following table shows, for the first fiscal quarters ended June 28, 1996
and June 30, 1995, the Company's revenues attributable to federal, state and
local governmental contracts as a percentage of the Company's consolidated
revenues:

|  | FISCAL QUARTER ENDED | |
| --- | --- | --- |
| SOURCE | JUNE 28, 1996 | JUNE 30, 1995 |
| Federal government: | | |
| U.S. Department of Defense (DOD) | 46% | 50% |
| U.S. Department of Energy (DOE) | 14 | 12 |
| Other federal agencies | 2 | 4 |
|  | 62 | 66 |
| State and local governments | 6 | 4 |
| Total | 68% | 70% |

The portion of the Company's revenues derived from the DOD decreased from
52% to 46% primarily due to delays in the funding of the Company's major
indefinite delivery order programs over the past several quarters. The Company
expects to continue to derive a substantial portion of its revenues from these
contracts, which are primarily related to remedial action type of work.
Additionally, an expected transition by the DOE over the next several years to
emphasize remediation over studies is expected to be positive for the Company
based on the Company's favorable experience in winning and executing similar
work for the DOD, the Company's experience with the DOE related to its past
performance of DOE studies and recent contract awards for such work.

The Company's revenues from commercial clients declined in the first quarter
of fiscal year 1997 compared to the prior year period. The Company believes
this is partly due to commercial clients delaying certain work until final
Congressional action is taken on the reauthorization of the Comprehensive
Environmental Response, Compensation and Liability Act of 1980 (CERCLA).
Funding authority under CERCLA lapsed on December 31, 1995, and it is
uncertain when reauthorization will occur or what the details of the
legislation, including

II-8

INTERNATIONAL TECHNOLOGY CORPORATION

RESULTS OF OPERATIONS--(CONTINUED)

retroactive liability, cleanup standards, and remedy selection, may include. Uncertainty regarding possible Congressional rollbacks of environmental regulation and enforcement have led commercial clients to delay projects as well, although there are recent indications that significant rollbacks are less likely than previously believed. Contemplated changes in regulations could decrease the demand for certain of the Company's services, as customers anticipate and adjust to the new regulations. However, the proposed legislation could also result in increased demand for certain of the Company's services if regulatory changes decrease the cost of remediation projects or result in more funds being spent for actual remediation. The ultimate impact of the proposed changes will depend upon a number of factors, including the overall strength of the U.S. economy and customers' views on the cost effectiveness of remedies available under the changed regulations.

A significant portion of IT's revenues (approximately 14% in the first quarter of fiscal year 1997) continue to be derived from large, complex thermal remediation contracts utilizing the Company's Hybrid Thermal Treatment System(R) (HTTS(R)) incineration technology. Incineration as an allowable remedy under CERCLA continues to come under legislative and regulatory pressures. If policies were implemented or regulations were changed such that the Company was unable to permit and use thermal treatment on remediation projects due to either regulatory or market factors, the Company would have to find alternative uses for its HTTS equipment. If alternative uses, such as foreign installations, were not found or were uneconomical, there could be a negative effect to the Company due to impairment of HTTS assets as well as lost project opportunities. The Company's backlog of contracts which utilize HTTS equipment was approximately $14,000,000 at June 28, 1996. The Company is actively pursuing other contract opportunities which utilize HTTS equipment. At June 28, 1996, IT's HTTS equipment had a net book value of approximately $14,000,000.

The Company's total contract backlog at June 28, 1996 was approximately $1,196,000,000, of which approximately $815,000,000 is future project work the Company estimates it will receive (based on historical experience) under existing governmental indefinite delivery order (IDO) programs which provide for a general undefined scope of work. Revenues from backlog and IDO contracts are expected to be earned over the next one to five years. Backlog increased during the current first fiscal quarter due principally to the $325,000,000 award to IT in May 1996 of the Savannah Total Environmental Restoration Contract IDO Program by the U.S. Army Corps of Engineers. Continued funding of existing backlog could be negatively impacted in the future due to reductions in current and future federal government environmental restoration budgets.

Gross Margin

Gross margin percentage for the first quarter of fiscal year 1997 declined to 9.6% of revenues from 16.9% of revenues for the corresponding period of the prior fiscal year. In the current quarter, gross margin was adversely impacted by the declining level of revenues as certain overhead cost elements are fixed in the short term, by lower staff utilization, and by lower pricing due to competitive industry conditions. The Company expects gross margin to improve from the first quarter level upon the anticipated progressive revenue increase noted above as fixed overhead costs are reduced due to organizational streamlining and spread over higher revenues and as staff utilization improves, but competitive pricing is expected to continue to adversely affect gross margin.

Selling, General and Administrative Expenses

Selling, general and administrative expenses of $9,080,000 for the first quarter of fiscal year 1997 were $943,000 or 9.4% lower than the prior year level, principally due to continued management attention to expenses. Selling, general and administrative expenses increased from 10.0% to 11.1% of revenues due to the lower revenue level. Selling, general and administrative expenses are expected to decline due to cost savings resulting from the reduction of a number of significantly compensated positions occurring in the second fiscal quarter. As a result, the Company anticipates taking a special charge during that quarter, reflecting severance and other associated costs.

II-9

INTERNATIONAL TECHNOLOGY CORPORATION

RESULTS OF OPERATIONS--(CONTINUED)

Interest, Net

For the first quarter of fiscal year 1997, net interest expense represented 1.7% of revenues compared to the 2.0% of revenues reported in the first quarter of fiscal year 1996. The lower first quarter net interest expense level compared to a year ago is due principally to an increased level of cash and cash equivalents generating more interest income.

Income Taxes

For the first fiscal quarters ended June 28, 1996 and June 30, 1995, the Company had an effective income tax benefit rate of 42% and an income tax rate of 41%, respectively, both of which exceed the 34% federal statutory rate primarily due to state income taxes and nondeductible expenses.

The Company's future tax rate is subject to the full realization of its deferred tax asset of $33,701,000 (net of a valuation allowance of $4,869,000). Realization of the tax asset is expected by management to occur principally as closure expenditures related to the Company's inactive disposal sites (see Note 5 to Condensed Consolidated Financial Statements) over the next several years are deductible in the year the expenditures are made and upon the ultimate tax disposition of the Company's 19% interest in Quanterra (see Management's Discussion and Analysis of Results of Operations and Financial Condition--Financial Condition), but is subject to the Company having a sufficient level of taxable income and taxable capital gains. The Company evaluates the adequacy of the valuation allowance and the realizability of the deferred tax asset on an ongoing basis.

II-10

INTERNATIONAL TECHNOLOGY CORPORATION

FINANCIAL CONDITION

Working capital of $20,699,000 at June 28, 1996 decreased by $60,475,000 or 76.8% from $89,174,000 at March 29, 1996 due principally to the classification of the Company's $65,000,000 of senior secured notes as current in the June 28, 1996 condensed consolidated balance sheet (see Note 4 to Condensed Consolidated Financial Statements). Consequently, the current ratio at June 28, 1996 decreased to 1.15:1 from 2.13:1 at March 29, 1996.

Cash provided by operating activities for the first quarter of fiscal year 1997 totaled $9,193,000, compared to $5,055,000 provided by operating activities in the corresponding first quarter of the prior fiscal year. During the current period, the increase in cash provided by operating activities is principally due to a net reduction in receivables reflecting the significantly lower revenue level. Additionally, capital expenditures of $592,000 for the current first fiscal quarter were $1,276,000 lower than the $1,868,000 reported for the corresponding period of the prior fiscal year principally due to a lower level of capital requirements reflecting the lower revenue level during the quarter. Management believes capital expenditures for fiscal year 1997 will increase slightly from the $4,696,000 level of fiscal year 1996, excluding any business acquisitions or strategic investments which might be made by the Company.

With regard to the Company's transportation, treatment and disposal discontinued operations, the Company has previously completed closure of its Montezuma Hills and Benson Ridge facilities and is pursuing closure of its inactive Panoche and Vine Hill Complex facilities. On November 17, 1995, the California EPA, Department of Toxic Substances Control (DTSC) approved the final closure plan and post-closure plan for the Vine Hill Complex facility. The approved final closure plan provides for solidification and capping of waste sludges and installation of underground barriers and groundwater control systems. Substantial remediation has already been completed over the past several years based upon interim approvals by DTSC, and the final closure is scheduled to be completed in fiscal year 1998.

On June 28, 1996, DTSC released a Draft Environmental Impact Report (DEIR) and Draft Closure Plan for public comment for the Panoche facility. The DEIR evaluates the Company's preferred closure plan as well as several alternative plans and states that the Company's preferred closure plan is the environmentally superior alternative. The alternative plans involve excavation and on-site relocation of substantial quantities of waste materials in addition to landfill capping and groundwater controls which are common to all alternatives. If selected, the alternative plans would extend the closure construction schedule and increase the cost of closure. The DEIR and Draft Closure Plan are subject to a 90-day public comment period during which the Company expects interested parties to support alternative plans. After the completion of the public comment period, DTSC, after considering all comments received, will approve a final closure plan and certify the final EIR. The Company expects the plan and all necessary permits to be approved during fiscal year 1997. Closure construction for the Company's preferred plan is scheduled to be completed within three years of approval of the plan. Although not anticipated, if DTSC were to approve an alternative plan or fail to timely approve any plan, the Company's cost to close the site would increase, which could have a material adverse impact on the consolidated financial condition of the Company.

Closure construction was completed for the Montezuma Hills and Benson Ridge facilities in December 1991 and December 1992, respectively. Upon completion of closure construction, the Company is required to perform post-closure monitoring and maintenance of its disposal facilities for at least 30 years. Operation of the facilities in the closure and post-closure periods is subject to numerous federal, state and local regulations. The Company may be required to perform unexpected remediation work at the facilities in the future or to pay penalties for alleged noncompliance with regulatory permit conditions.

Regulations of the DTSC and the United States Environmental Protection Agency (USEPA) require that owners and operators of hazardous waste treatment, storage and disposal facilities provide financial assurance for closure and post-closure costs of those facilities. The Company has provided such financial assurance equal

II-11

INTERNATIONAL TECHNOLOGY CORPORATION

FINANCIAL CONDITION--(CONTINUED)

to its estimate for closure costs at March 1, 1996. which could be subject to
increase at a later time as a result of regulatory requirements, in the form
of a corporate guarantee of approximately $14.900,000, letters of credit
totaling approximately $6,700,000 and a trust fund containing approximately
$11,500.000, and has purchased annuities which will ultimately mature over the
next 30 years to pay for its estimates of post-closure costs

Closure and post-closure costs are incurred over a significant number of
years and are subject to a number of variables including, among others,
completion of negotiations regarding specific site closure and post-closure
plans with DTSC, USEPA, the California State Water Resources Control Board.
the California Air Resources Board, Regional Water Quality Control Boards
(RWQCBs), Air Quality Management Districts, various other state authorities
and certain applicable local regulatory agencies. Such closure costs are
comprised principally of engineering, design and construction costs and of
caretaker and monitoring costs during closure. The Company has estimated the
impact of closure and post-closure costs in the provision for loss on
disposition of transportation, treatment and disposal discontinued operations;
however, closure and post-closure costs could be higher than estimated if
regulatory agencies were to require closure and/or post-closure procedures
significantly different than those in the plans developed by the Company or if
there are additional delays in the closure plan approval process. Certain
revisions to the closure procedures could also result in impairment of the
residual land values attributed to certain of the sites

The carrying value of the long-term assets of transportation, treatment and
disposal discontinued operations of $41,705,000 at June 28, 1996 is
principally comprised of residual land at the inactive disposal facilities (a
substantial component of which is adjacent to those facilities and was never
used for waste disposal) and assumes that sales will occur at current market
prices estimated by the Company based on certain assumptions (entitlements,
development agreements, etc.), taking into account market value information
provided by independent real estate appraisers. The Company has an agreement
with a real estate developer to develop some of this property as part of a
larger development in the local area involving a group of developers. The
entitlement process has been delayed pending approval of the Company's closure
plan for its adjacent disposal facility and local community review of growth
strategy. If the developers' plans change or the developers are unable to
obtain entitlements as planned, the carrying value of this property could be
significantly impaired. With regard to this property or any of the other
residual land, there is no assurance as to the timing of sales or the
Company's ability to ultimately liquidate the land for the sale prices
assumed. If the assumptions used to determine such prices are not realized,
the value of the land could be materially different from the current carrying
value.

In June 1986. USEPA notified a number of entities, including the Company.
that they were PRPs under CERCLA with respect to the Operating Industries.
Inc. (OII) Superfund site in Monterey Park, California, and as such, faced
joint and several liability for the cost to investigate and clean up this
site. Subsequently, USEPA alleged that the Company had generated approximately
2% by volume of the hazardous wastes disposed of at the site and that the
Company's share of certain past costs totaled not less than $8.500,000.
Between October 1994 and May 1995, the Company was served with summons and
complaints in two lawsuits (National Railroad Passenger Corporation, et al. v.
Harshaw Filtrol, U.S.D.C., Central District, California. Case No. CV 94-2861
WMB (GHKx) and National Railroad Passenger Corporation v. ACF United,
U.S.D.C, Central District, California. Case No. CV 95-2050 LGB (RMBx))
brought by members of a group of PRPs (the Steering Committee), which sought
from the Company at least $2,700,000 for costs incurred by the Steering Committee
members pursuant to the first three settlements (partial consent decrees)
negotiated between the USEPA and the Steering Committee. (The Company has not
been named as a defendant in any of the several personal injury and property
damage lawsuits brought by area residents.)

In October 1995, the Company and the USEPA agreed to a settlement of the
Company's alleged liability for response costs incurred by the USEPA pursuant
to the first three partial consent decrees entered into in connection with the
OII site. The settlement with USEPA, in the form of a consent decree (the
Fifth Partial

II-12

INTERNATIONAL TECHNOLOGY CORPORATION

FINANCIAL CONDITION--(CONTINUED)

Consent Decree), was approved by the U.S. District Court on July 10, 1996
Pursuant to the settlement, the Company made an initial payment of $1,000.000
in July 1996 and will pay to the USEPA approximately $4,400,000 in three
additional installments within one year, which amounts had been previously
accrued by the Company. Additionally, the Company has received from the USEPA
contribution protection and a covenant not to sue as to the matters addressed
in the Fifth Partial Consent Decree. While resolving the Company's alleged
liability for response costs incurred by the USEPA pursuant to the first three
partial consent decrees, the settlement does not include any costs for future
or final OII remedies. The USEPA has released a feasibility study and proposed
the final remedy for the site. Selection of the final remedy is subject to
public notice and comment. Response costs for the final remedy are estimated
by USEPA to range from $96,000,000 to $115,000,000 for the USEPA's preferred
alternative to $234,000,000 for the most expensive alternative

    In April 1996, the Company and the Steering Committee reached a settlement
of the Harshaw Filtrol and the ACF United lawsuits, pursuant to which the
Company will pay $250,000 in settlement of the Steering Committee's claims.
The Company and the Steering Committee also agreed, as a part of the
settlement, to cooperate and share on a pro-rata basis certain response and
other defense costs with respect to certain groundwater cleanup actions which
may be a part of the final remedy for the site. The Company and the Steering
Committee have not agreed to share all costs related to the final remedy at
the site, inasmuch as the Steering Committee claims that pursuant to earlier
consent decrees it is excused from paying for or performing certain actions
which may be required as a part of any final remedy and for which the Company
and other persons who settled with USEPA pursuant to the Fifth Partial Consent
Decree may be liable. The Company does not agree with these claims. The
Company's agreement with the Steering Committee to cooperate and share costs
with respect to certain groundwater cleanup actions may be terminated
voluntarily by either party, including in the event of a dispute as to the
parties' respective obligations to pay for or perform the final remedy for the
site

    Should the costs of the final remedy be greater than expected, or should the
Company be forced to assume a disproportionate share of the costs of the final
remedy (whether because of differences in the protections obtained by the
Steering Committee and the Company under the various consent decrees, or
otherwise), the cost to the Company of concluding this matter could materially
increase.

    In September 1987, the Company was served with a Remedial Action Order (RAO)
issued by the DTSC, concerning the GBF Pittsburg landfill site near Antioch,
California, a site which had been proposed by the USEPA to be added to the
National Priorities List under CERCLA. IT and 17 other firms and individuals
were characterized as responsible parties in the RAO and directed to undertake
investigation and potential remediation of the site which consists of two
contiguous parcels. From the 1960's through 1974, a predecessor to IT
Corporation operated a portion of one parcel as a liquid hazardous waste site.
The activity ceased in 1974, and the disposal facility was closed pursuant to
a closure plan approved by the appropriate RWQCB. Both of the parcels were
then operated by other parties as a municipal and industrial waste site
(overlying the former liquid hazardous waste site) and, until 1991, continued
to accept municipal waste. Water quality samples from monitoring wells in the
vicinity of the site were analyzed by the property owner in August 1986 and
indicated the presence of volatile organics and heavy metals along the
periphery of the site

    Additional PRPs, consisting primarily of known waste generators, were
subsequently served with an amended RAO by the DTSC. IT and other PRPs (the
PRP group) are participating to further investigate the nature and extent of
any subsurface contamination beneath the site and beyond its borders. The PRP
group has submitted Remedial Investigation and Feasibility Study (RI/FS)
reports to the DTSC. The studies indicate that groundwater quality impact is
not affecting drinking water supplies and is not attributable solely to the
portion of the site previously operated by IT's predecessor

II-13

INTERNATIONAL TECHNOLOGY CORPORATION

FINANCIAL CONDITION--(CONTINUED)

In July 1993, the Company, along with the other PRPs at the site, was issued a revised RAO and Imminent and Substantial Endangerment Order that, although it appears primarily to restate previous RAOs, also directs all previously named PRPs to undertake specific additional tasks including the closure of the municipal landfill.

In November 1995, the DTSC, by letter, required the PRP group to submit for public comment and DTSC approval a draft Remedial Action Plan (RAP) describing a remedial alternative not supported by the PRP group. The PRP group disputed the timing and content of the draft RAP as required by DTSC as not justified by the RI/FS process, but in January 1996 submitted a draft RAP discussing a number of remedial alternatives. In its November 1995 letter, the DTSC estimated that the costs of the remedial alternatives to range from approximately $4,100,000 for the PRP group's preferred alternative to between $18,300,000 to $32,600,000 for DTSC's favored alternative depending upon whether certain options for discharge of produced waters were available. The options range from continued limited site monitoring to actively pumping and treating groundwater from both the alleged source points of contamination and the allegedly contaminated groundwater plume emanating from the site. The DTSC has advised the PRP group that it has reviewed the group's data and arguments, and nevertheless intends to complete and release for public review and comment by the second quarter of fiscal year 1997 a draft RAP selecting DTSC's preferred alternative. The PRP group received this draft RAP on June 26, 1996 and submitted its comments in late July 1996. The PRP group is evaluating its potential remedies with respect to the DTSC's action.

As a part of the draft RAP that the PRP group submitted in January 1996, the group asserted that other PRPs at the site (principally, the current and past owner/operators of the site) were responsible for approximately 85% of the site's remediation costs, and that the PRP group was responsible for no more than approximately 15% of such costs. The current owner/operators recently submitted to DTSC their own proposal in which they claim that the Company and other members of the PRP group are responsible for at least 89% of the site's remediation costs and that they are responsible for only a small percentage of the site's remediation costs, and have demanded indemnity from the Company pursuant to the lease agreement under which IT Corporation's predecessor operated the site. The DTSC has not adopted either allocation. The Company has paid approximately 50% of the PRP group's costs to-date on an interim basis. The PRP group is initiating litigation against the current owner/operators of the site and other non-cooperating PRPs to cause them to bear their proportionate share of site remedial costs. The current owner/operators of the site have not cooperated with the PRP group in its efforts to study and characterize the site, except for limited cooperation which was offered shortly after the September 1987 RAO. The current owner/operators are expected to vigorously defend the PRP group's litigation, and the outcome of the litigation cannot be determined at this time.

Failure of the PRP group to effect a satisfactory resolution with respect to the choice of appropriate remedial alternatives or to obtain an appropriate contribution towards site remedial costs from the current owner/operators of the site and other non-cooperating PRPs, could substantially increase the cost to the Company of remediating the site, which would have a material adverse effect on the Company's consolidated financial condition.

In March 1995, IT was notified by the DTSC that it was among 13 companies identified as potentially responsible for costs associated with investigation and cleanup of the Environmental Protection Corporation (EPC) site known as the Eastside Facility near Bakersfield, California. The DTSC notice letter states that IT is believed to have arranged for disposal of hazardous substances at the Eastside Facility during the period between 1972 and 1985 when it was permitted and operated as a land treatment facility.

IT transported various waste streams both generated by IT and on behalf of its customers to the Eastside Facility at various times during that facility's operations and it was a minority shareholder in EPC for a period of its operations. In its March 1995 letter, the DTSC directed IT and the other parties which were notified to form a group and to respond to a proposed administrative order directing them to characterize the facility and

INTERNATIONAL TECHNOLOGY CORPORATION

FINANCIAL CONDITION--(CONTINUED)

undertake any appropriate remedial action to deal with any releases or threatened releases identified. In January 1996, the PRP group (of which the Company is a member) and the DTSC entered into an agreement for the performance of a RI/FS for the site, as well as for cost sharing for the RI/FS among the group and the DTSC. IT is cooperating with other group members to perform the work outlined in the agreement. Because of the early stage of the matter, IT has no estimate of its potential costs associated with the remediation of the Eastside Facility.

The provision for loss on disposition of transportation, treatment and disposal discontinued operations is based on various assumptions and estimates, including those discussed above. Management believes that the provision, as adjusted, is reasonable; however, the ultimate effect of the divestiture on the consolidated financial condition of the Company is dependent upon future events, the outcome of which cannot be determined at this time. Outcomes significantly different from those used to estimate the provision for loss could result in a material adverse effect on the consolidated financial condition of the Company.

The Company's shareholder agreements relating to Quanterra (an environmental analytical services business 81% owned by an affiliate of Corning Incorporated and 19% owned by IT) contain certain provisions which have affected and, in the future, could affect liquidity. IT was required by these agreements to contribute $2,500,000 to Quanterra in October 1995 and an additional $2,500,000 to Quanterra in January 1996. In connection with a recapitalization of Quanterra in January 1996, the Company committed to contribute up to an additional $2,500,000 to Quanterra (of which $475,000 was paid in each of March, April and July 1996) and has the option to contribute more in order to maintain its 19% interest. Due to the operating losses which Quanterra has been incurring and the requirement to contribute additional capital to Quanterra, the Company will continue to evaluate the ultimate recoverability of its investment in Quanterra, which is carried at $13,450,000 on the June 28, 1996 condensed consolidated balance sheet. As a result of Quanterra's continuing operating losses, the Company will assess the value of its investment in Quanterra on an ongoing basis and will recognize any impairment in value should it occur.

The Company's lending arrangements, consisting of $65,000,000 of senior secured notes and a $60,000,000 bank line of credit, contain various financial ratio and net worth covenants. In addition, the facilities contain certain other restrictive covenants, including prohibitions on the payment of cash dividends on common stock (and, if the Company is in default under the facilities, on the preferred stock), and on the repurchase of stock other than to fund IT's compensation plans, limitations on capital expenditures, the incurrence of other debt and the purchase or sale of assets and a negative pledge on substantially all of the Company's assets not pledged to the facilities.

In anticipation of the loss reported by the Company for its current first fiscal quarter, the Company, prior to June 28, 1996, obtained a waiver through August 1996 of certain covenants which allows it to maintain compliance with the lending arrangements as of the end of the first quarter of fiscal year 1997. (See Note 4 to Condensed Consolidated Financial Statements.) The Company is negotiating with its lenders additional modifications to the lending arrangement which will be required subsequent to the expiration of the waiver. In the event such modifications are not obtained, there would be a material adverse effect on the consolidated financial condition of the Company.

In aggregate, at June 28, 1996, letters of credit totaling approximately $29,000,000 related to the Company's insurance program, financial assurance requirements and bonding requirements were outstanding against the Company's bank line of credit. There were no borrowings under the credit line. Due to the significant reduction in the Company's accounts receivable (which are the principal collateral to the lending arrangements) during the three months ended June 28, 1996 related to the reduction in revenue, the Company posted $3,977,000 of cash as additional collateral to its lending arrangements during the quarter, and there was no availability under the line of credit. Excluding this cash collateral, the Company had invested cash of approximately $21,000,000 at June 28, 1996.

II-15

INTERNATIONAL TECHNOLOGY CORPORATION

FINANCIAL CONDITION--(CONTINUED)

The Company continues to have significant cash requirements, including working capital, capital expenditures, expenditures for the closure of its inactive disposal sites and PRP matters (which are expected to increase from recent levels over the next several years), dividend obligations on the depositary shares and contingent liabilities. The recent decline in the Company's business combined with these significant cash requirements has reduced and is expected to further reduce the Company's combined cash position and availability under its bank line; however, subject to the anticipated progressive recovery of the Company's business during the remainder of fiscal year 1997, the Company's liquidity position is expected to be sufficient to meet the foreseeable requirements.

On February 6, 1996, the Company announced that it had retained an investment banking firm and a consultant to advise it on ways to actively participate in the current environmental management industry consolidation, with the ultimate goal of maximizing shareholder value. This ongoing effort is directed toward responding to the challenges facing the environmental industry and seeking to reposition IT to create a platform which provides competitive advantage in its existing businesses and facilitates the exploitation of new and existing markets. The Company's chairman and its president and acting chief executive officer are jointly and actively leading this effort and all opportunities have been and are being aggressively explored, including possible mergers, acquisitions, opportunities for capital infusion, and strategic alliances. There can be no assurance, however, that any transaction will occur or what the timing of any such transaction may be.

FORWARD LOOKING STATEMENTS

All statements in the preceding discussion that are not historical are forward looking statements. Such statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those expressed in any of the forward looking statements. Such risks and uncertainties include, but are not limited to, additional delays in federal budget authorization and in the funding of federal government contracts, ongoing regulatory uncertainties which affect both governmental and commercial clients, industrywide market factors, liabilities and regulatory developments related to the Company's discontinued operations, negotiations with lenders, and financial and liquidity trends.

II-16

PART II

INTERNATIONAL TECHNOLOGY CORPORATION

ITEM 1. LEGAL PROCEEDINGS.

The following matter and other continuing operations litigation to which the Company is a party are more fully discussed in the note "Commitments and contingencies" in the Notes to Consolidated Financial Statements in the Company's Annual Report on Form 10-K for the fiscal year ended March 29, 1996. See also Management's Discussion and Analysis of Results of Operations and Financial Condition--Financial Condition for information regarding litigation related to the discontinued operations of the Company.

Class Action Lawsuit

Pursuant to the tentative settlement of the litigation, the Company paid $3,000,000 into an escrow account on July 23, 1996, such amount plus accrued interest thereon to be released to plaintiffs upon completion of the settlement and approval by the class and the court.

II-17