IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IT GROUP INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 02-10118 |
| | ) | Jointly Administered |
| IT LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL A. D'ANIELLO, FRANCIS J. | ) | Civil Action No. 04-1268-KAJ |
| HARVEY, JAMES C. McGILL, RICHARD | ) | |
| W. POGUE, PHILIP B. DOLAN, E. MARTIN | ) | |
| GIBSON, ROBERT F. PUGLIESE, | ) | |
| CHARLES W. SCHMIDT, JAMES DAVID | ) | |
| WATKINS, ANTHONY J. DELUCA, HARRY | ) | |
| J. SOOSE, THE CARLYLE GROUP, THE | ) | |
| CARLYLE GROUP L.L.C., CARLYLE | ) | |
| PARTNERS II, L.P., CARLYLE SBC | ) | |
| PARTNERS, II, L.P., CARLYLE | ) | |
| INTERNATIONAL PARTNERS II, L.P., | ) | |
| CARLYLE INTERNATIONAL PARTNERS | ) | |
| III, L.P., C/S INTERNATIONAL | ) | |
| PARTNERS, CARLYLE INVESTMENT | ) | |
| GROUP, L.P. CARLYLE-IT | ) | |
| INTERNATIONAL PARTNERS, L.P., | ) | |
| CARLYLE-IT INTERNATIONAL | ) | |
| PARTNERS II, L.P., CARLYLE-IT | ) | |
| PARTNERS L.P., and T.C. GROUP, L.L.C., | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM OPINION**

Jeffrey M. Schlerf, Thomas H. Kovach, Eric M. Sutty, The Bayard Firm, 222 Delaware
Avenue, Suite 900, P.O. Box 25130, Wilmington, Delaware 19899; Counsel for Plaintiff.
    Of Counsel:  Richard S. Wayne, Thomas P. Glass, John M. Levy, Strauss &
    Troy, The Federal Reserve Building, 150 E. Fourth Street, Cincinnati, Ohio
    45202.

Mark D. Collins, Marcos A. Ramos, Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899;

Roger D. Anderson, Smith, Katzenstein & Furlow LLP, 800 Delaware Avenue, 7th Floor, P.O. Box 410, Wilmington, Delaware 19899;

Ronald S. Gellert, Eckert, Seamans, Cherin & Mellott, LLC, The Towne Center, 4 East Eighth Street, Suite 200, Wilmington, Delaware 19801; Counsel for Defendants.
> Of Counsel: Thomas L. Patten, David A. Becker, Latham & Watkins, LLP, 555 Eleventh Street, N.W., Suite 1000, Washington, D.C. 20004;
> Laurie B. Smilan, Latham & Watkins, LLP, 11955 Freedom Drive, Suite 500, Reston, Virginia 20190;
> Charles A. De Monaco, Kimberly L. Haddox, Dickie McCamey & Chilcote, P.C., Two PPG Place, Suite 400, Pittsburgh, Pennsylvania 15222;
> Mark A. Willard, Paul D. Steinman, F. Timothy Grieco, Eckert, Seamans, Cherin & Mellot, LLC, U.S. Steel Tower, 600 Grant Street, 44th Floor, Pittsburgh, Pennsylvania 15219.

November 15, 2005
Wilmington, Delaware



JORDAN, District Judge

## I.    INTRODUCTION

Before me are Motions to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) and for Failure to State a Claim (D.I. 37) filed by defendants Daniel A. D'Aniello ("D'Aniello"), Francis J. Harvey ("Harvey"), James C. McGill ("McGill"), Richard W. Pogue ("Pogue"), Phillip B. Dolan ("Dolan"), E. Martin Gibson ("Gibson"), Robert F. Pugliese ("Pugliese"), Charles W. Schmidt ("Schmidt"), James David Watkins ("Watkins"), Anthony J. DeLuca ("DeLuca"), Harry J. Soose ("Soose"), and the following parties (collectively referred to as the "Carlyle Defendants"):  The Carlyle Group, The Carlyle Group, L.L.C., Carlyle Partners II, L.P., Carlyle SBC Partners, II, L.P., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, L.P., Carlyle-IT International Partners II, L.P., Carlyle-IT Partners L.P., and T.C. Group, L.L.C.[1]

The First Amended Complaint (D.I. 30, the "Complaint"), filed by IT Litigation Trust ("Plaintiff") alleges in Counts I-V[2] that Defendants, as directors, officers, and

---

[1]All of the defendants are referred to collectively as the "Defendants."

[2]The Complaint sets forth nine theories of recovery, which are denominated as "claims for relief" and, for convenience, are herein designated as "Counts."  Count I alleges that the IT Group directors and officers breached their corporate fiduciary duties.  Count II makes the same allegations against the directors and officers under the "Trust Fund" doctrine, explained *infra* note 8.  Count III alleges that the directors and officers wasted corporate assets.  Count IV alleges that the Carlyle Defendants breached their corporate fiduciary duties.  Count V alleges that the Carlyle Defendants aided and abetted the breaches committed by the directors and officers.  Count VI seeks, under the Bankruptcy Code, to avoid certain preferential transfers.  Count VII alleges that payments made to the Carlyle Defendants were constructively fraudulent transfers.  Count VIII alleges that payments made to the Carlyle Defendants and certain individual defendants were actual fraudulent transfers.  Count IX alleges that dividends

controlling shareholders of the IT Group, Inc. (the "IT Group" or the "Company"),
breached their corporate fiduciary duties, that their acts constituted waste of corporate
assets, and that the Carlyle Defendants aided and abetted the other Defendants'
breach of fiduciary duties. (D.I. 30 at ¶¶58-79.) Plaintiff also alleges, in Counts VI-VIII,
that payments made by the IT Group to certain Defendants are avoidable preferences
or fraudulent transfers under the Bankruptcy Code and Delaware state law. (Id. at
¶¶80-115.) Finally, Plaintiff alleges in Count IX that the directors unlawfully paid
dividends to the Carlyle Defendants. (Id. at ¶¶116-18.)

Defendants contend that the claims based exclusively on Delaware state law,
Counts I-V and IX, do not fall within the subject matter jurisdiction of this court, either
under the statute providing for original jurisdiction over bankruptcy cases, 28 U.S.C. §
1334, or under that providing for supplemental jurisdiction, 28 U.S.C. § 1367.
Defendants also contend that Counts I-VI and IX must be dismissed in their entirety,
and that Counts VII and VIII must be dismissed in part, for failure to state a claim upon
which relief can be granted. For the reasons that follow, I will deny Defendants' Motion
to Dismiss for Lack of Subject Matter Jurisdiction, and I will grant in part and deny in
part Defendants' Motion to Dismiss for Failure to State a Claim.

---

were paid unlawfully to the Carlyle Defendants.

## II.    BACKGROUND[3]

### A.    The Carlyle Defendants' Investment in the IT Group

The IT Group was a Delaware corporation with its principal office in Monroeville,

Pennsylvania, which provided services in "consulting, engineering, construction,

environmental remediation, and facilities and waste management." (Complaint, D.I. 30

at ¶30.)  These services "included the identification of contaminants in soil, air, and

water, as well as the subsequent design and execution of remedial solutions." (Id.)

The Carlyle Group is a private merchant bank headquartered in Washington

D.C. that invested in the IT Group "through a number of entities that it owns or

controls." (Id. at ¶14.)  Specifically, in or around November 1996, the Carlyle

Defendants collectively invested $45 million in the IT Group. (Id. at ¶31.)  That sum

included investments by several Cayman Islands limited partnerships, i.e., Carlyle

International Partners II, L.P., Carlyle International Partners III, L.P., C/S International

Partners, Carlyle-IT International Partners, L.P., and Carlyle-IT International Partners II,

L.P., made through their general partner, T.C. Group, L.L.C. (Id. at ¶¶18-20, ¶¶22-23,

¶31.)  In return for the $45 million in investments, the Carlyle Defendants received

45,000 shares of 6% Cumulative Convertible Participating Preferred Stock and

detachable warrants to purchase 1.25 million shares of the IT Group's common stock.

(Id. at ¶31.)

"The Carlyle Defendants also received approximately 25% of the IT Group's

voting power and obtained the right to elect a majority of IT Group's board of directors

---

[3]The following background information is drawn from the parties' submissions
and does not constitute findings of fact.

3

... ." (*Id.*) The IT Group Proxy Statement[4] dated May 20, 1999 shows that, prior to 1999, the Carlyle Defendants elected five of the nine members of the IT Group's board. (D.I. 39, Ex. D at A-0024.) More particularly, from 1996 to 1999, the Carlyle Defendants filled five of nine IT Group board positions by electing defendants D'Aniello, Dolan, Gibson, Pugliese, and Watkins. (*Id.* at A-0025.) Those directors remained on the IT Group board through 2002. (Complaint, D.I. 30 at ¶3, ¶¶7-9, ¶11.)

As of May 14, 1999, the IT Group increased the size of its board to eleven directors. (D.I. 39, Ex. D at A-0024.) The board nominated defendant Harvey to fill one of the two new board seats (*id.*), and he was promptly elected. (Complaint, D.I. 30 at ¶4.) He too remained on the board through 2002. (*Id.*) The Carlyle Defendants declined to exercise their right to elect the eleventh director, thus leaving the board with ten members, five of whom were elected by the Carlyle Defendants.[5] (D.I. 39, Ex. D at A-0024.)

Four of those ten directors had additional connections to the Carlyle Defendants. D'Aniello "has been a Managing Director of The Carlyle Group since at least 1987" and was also the Managing Director of TCG Holdings, L.L.C. and a Managing Member of TC Group, L.L.C. (*Id.* at ¶3.) Dolan "has been employed by The Carlyle Group since at least 1989." (*Id.* at ¶7.) "In 1998, Dolan became a Principal of The Carlyle Group, and

---

[4]In reviewing a 12(b) motion to dismiss in a case such as this, the court may consider a company's SEC filings, as well as other public records. *See In re Delmarva Sec. Litig.*, 794 F. Supp. 1293, 1299 (D. Del. 1992).

[5]In addition to the election rights associated with their investment, "the Carlyle Defendants procured a consulting agreement ... pursuant to which they were paid $100,000.00 per year and $10,000.00 per month." (Complaint, D.I. 30 at ¶31.)

4

in February 2001, he became a Managing Director of The Carlyle Group." (*Id.*) Harvey,

along with D'Aniello, served on the boards of directors of other companies that are

owned or controlled by The Carlyle Group. (*Id.* at ¶¶3-4.) Finally, Watkins "served as

director of Duratek, Inc. of which the Carlyle Defendants are the majority shareholder."

(*Id.* at ¶11.)

Plaintiff alleges that the Carlyle Defendants "took control" of the IT Group in or

around November 1996 (*id.* at ¶31), and that "[a]t all relevant times, the Carlyle

Defendants possessed and exercised control over the IT Group" (*id.* at ¶14).

B.    The Roll-Up Strategy

According to Plaintiff, "[a]s of 1998, the IT Group had experienced consecutive

fiscal years in which it had lost money." (*Id.* at ¶42.) The Carlyle Defendants, "through

[their] control of the board of directors of the IT Group, adopted and implemented a

purported 'Roll-Up Strategy' to grow the company by acquiring companies engaged in

the same or similar lines of business." (*Id.* at ¶32.) From 1998 to 2000, the IT Group

"acquired at least eleven companies" as part of this strategy. (*Id.*) In five of those

acquisitions, the IT Group paid approximately $526 million and booked goodwill[6] of

approximately $515.5 million. (*See id.* at ¶¶33-37.) In a sixth acquisition, the IT Group

paid approximately $1 million, along with contingent consideration of up to $8 million,

and booked goodwill of approximately $5.5 million. (*Id.* at ¶38.) "By or about the end of

2000, the IT Group had booked aggregate [goodwill] of approximately $539 million,

representing 41 percent of the IT Group's total assets." (*Id.* at ¶39.) Plaintiff asserts

---

[6]"Goodwill" is defined in the Complaint as the "Cost in excess of net assets of the
acquired businesses." (Complaint, D.I. 30 at ¶39.)

5

that the goodwill booked in those transactions was "of no value to the IT Group," and that consequently, "the value of the IT Group's assets was substantially less than the values reflected on its books." (*Id*. at ¶41.)

     C.    The IT Group's Insolvency

The Roll-Up acquisitions between 1998 and 2000 "were funded largely by debt financing ... including approximately $500 million in secured loans and credit facilities ... and approximately $255 million in subordinated bond debt issued in 1999." (*Id*. at ¶43.) This financing "increased the Company's leverage, increased its interest payments, and strained [its] liquidity." (*Id*. at ¶44.) To deal with this lack of liquidity, the IT Group obtained an additional $100 million term loan in March 2000. (*Id*. at ¶45.) Its "average debt outstanding during 2000 was approximately $650 million." (*Id*.)

"In March 1997, the Company reported approximately $360 million in revenues and total liabilities of approximately $172 million ... ." (*Id*. at ¶44.) "[B]y December 2000, [it] reported approximately $1.4 billion in revenues, while total liabilities had ballooned to approximately $1 billion ... ." (*Id*.) "For the period ended [sic] March 28, 1997, the IT Group had a tangible net worth of approximately $160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $277 million." (*Id*. at ¶46.) Plaintiff alleges that, "[b]eginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency." (*Id*. at ¶47.)

Finally, on January 16, 2002, the IT Group filed for bankruptcy protection. (*Id*. at ¶57.) "Thereafter, the IT Group was liquidated." (*Id*.)

6

D.     Allegations Regarding the Board's Actions and Failures to Act

Plaintiff alleges that, in addition to following the unwise Roll-Up Strategy, the IT
Group directors and officers also "failed to take prompt and prudent actions to preserve
and maximize [the IT Group's] assets and to restructure its debts" (*id*. at ¶50), "failed to
retain financial asset divestiture consultants, financial consultants, turnaround and
restructuring consultants, or bankruptcy and legal counsel" (*id*. at ¶51), and "failed to
inform themselves of all material information available to them concerning financial
restructuring" (*id*. at ¶52).  According to Plaintiff, those failures "caused or deepened
[the IT Group's] insolvency, and sealed [its] financial doom."  (*Id*. at ¶55.)  Because,
Plaintiff says, the IT Group board was under the control of the Carlyle Defendants (*see
id*. at ¶14, ¶31), those failures are also the Carlyle Defendants' failures (*see id*. at ¶1).
In Counts I-IV, Plaintiff alleges that those failures amount to waste of corporate assets
and to breaches of the Defendants' fiduciary duties to the IT Group and its creditors.
(*Id*. at ¶¶58-75.)  Count V alleges that the Carlyle Defendants also aided and abetted
the other Defendants' breaches.  (*Id*. at ¶¶76-79.)

Plaintiff further asserts that, while controlling the IT Group, the Carlyle
Defendants were paid in excess of $850,000 from consulting agreements with the
Company and in excess of $8.9 million in dividends from their preferred stock in the
Company.  (*Id*. at ¶1.)  Plaintiff particularly describes dividend payments to the Carlyle
Defendants of $1,362,254 in 1998 (*id*. at ¶99), $2,765,700 in 1999 (*id*. at ¶101),
$2,765,700 in 2000 (*id*. at ¶102), and $2,074,275 in 2001 (*id*. at ¶103), all of which are
alleged in Counts VII and VIII to be fraudulent transfers (*id*. at ¶¶97-115) and, in Count

7

IX, to be unlawful payments of dividends (*id*. at ¶¶116-18). Plaintiff also lists other payments made to particular Defendants, including the Carlyle Defendants, within the year before the bankruptcy petition (*id*. at ¶¶82-88) and which are alleged, in Count VI, to be avoidable preferential transfers (*id*. at ¶¶80-96) and, in Count VIII, to be fraudulent transfers (*id*. at ¶¶109-115).

Plaintiff alleges, again in Counts I-IV, that those payments to insiders, made while the IT Group was insolvent or in the vicinity of insolvency, are additional instances of corporate waste and breach of fiduciary duties. (*Id*. at ¶61(g), ¶65(g), ¶69(f), ¶74(g).) Also, those payments and the increased debt burden were allegedly part of a strategy to "artificially extend[] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id*. at ¶61(h), ¶65(h), ¶69(g), ¶74(h).) Count V alleges that the Carlyle Defendants aided and abetted those breaches as well. (*Id*. at ¶¶76-79.)

The claims in this case were originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. (D.I. 36 at 1.) By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was confirmed on April 5, 2004 (D.I. 52 at 6, D.I. 53 at A003-A062), the IT Litigation Trust was substituted as Plaintiff in this action.

## III.    STANDARD OF REVIEW

A challenge to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) requires a court to ask "whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996).

8

Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id*. The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Federal Rules "do not require a claimant to set out in detail the facts upon which he bases his claim," *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), and "a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 237 (3d Cir. 2005). Still, a plaintiff must allege the supporting facts "necessary to provide the defendant fair notice of the plaintiff's claim and the 'grounds upon which it rests.'" *Id*. (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

## IV.    DISCUSSION

### A.    The Motion Challenging Subject Matter Jurisdiction

The federal district courts have subject matter jurisdiction over bankruptcy cases pursuant to 28 U.S.C. § 1334. That statute provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related

9

to cases under title 11." § 1334(a), (b). "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 162 (3d Cir. 2004). It is conceded that none of the state law claims in Counts I-V and IX qualify as core proceedings. The motion to dismiss for lack of subject matter jurisdiction thus centers on the question of whether these claims are non-core claims falling within the category of "related to" jurisdiction.

"With 'related to' jurisdiction, Congress intended to grant bankruptcy courts comprehensive jurisdiction so that they could deal efficiently and expeditiously with matters connected with the bankruptcy estate." *Id*. at 163-64 (internal citations omitted). Prior to the confirmation of a bankruptcy plan, a proceeding will fall under "related to" jurisdiction if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). But the test must be formulated somewhat differently for proceedings that arise post-confirmation, because "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute." *Resorts*, 372 F.3d at 165. After plan confirmation, a proceeding will be within the "related to" jurisdiction if it has a "close nexus to the bankruptcy plan." *Id*. at 166. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id*. at 167.

10

Here, Defendants argue that, for two reasons, the state law claims do not have a close nexus to the confirmed IT Group plan. First, they say, because the IT Group estate no longer exists after plan confirmation, this lawsuit can have no effect on the estate. (D.I. 36 at 11.) Instead, any proceeds will be distributed by Plaintiff to the beneficiaries of the Litigation Trust. Second, Defendants argue that resolving the state law claims requires no construction, interpretation, or implementation of the plan. (Id. at 11-12.) Rather, the only connection to the bankruptcy "is that a recovery by the Plaintiff might increase the assets of the Litigation Trust and its beneficiaries," and that connection, on its own, is insufficient to support "related to" jurisdiction. (Id. at 13 (citing Resorts, 372 F.3d at 170).) Thus, Defendants conclude, this court does not have subject matter jurisdiction over Counts I-V and IX.

The Defendants' reasoning, however, depends upon an overstatement of the Third Circuit's conclusions in Resorts. First, no one disputes that the IT Group estate no longer exists, but that fact alone is not determinative. Indeed, the "close nexus" test was formulated to address jurisdiction over claims arising post-confirmation, recognizing that a literal interpretation of the Pacor test would end the court's jurisdiction when the plan was confirmed. Id. at 165-67. Thus, jurisdiction may be proper, even after confirmation of the bankruptcy plan.

Second, unlike the cause of action in Resorts, which arose nearly seven years after confirmation and was a malpractice claim by the litigation trust against its accountant, Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors

11

are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff by Section 7.16 of the IT Group bankruptcy plan. (D.I. 53 at A034.) The assignment in a confirmed plan of a prepetition cause of action "could well establish the 'close nexus to the bankruptcy plan or proceeding' which the Third Circuit requires." *Michaels v. World Color Press, Inc. (In re LGI, Inc.)*, 322 B.R. 95, 102 (Bankr. D.N.J. 2005). While resolving Plaintiff's state law claims may not require construction or interpretation of the plan, this proceeding "plainly serves the plan through the implementation, consummation, and execution which typify many post-confirmation matters." *Id.* Exhibit 1 of the confirmed plan includes within the listing of claims assigned to Plaintiff "[a]ny claims for acts or omissions of [the IT Group's] . . . present and former officers, directors, insiders and accountants." (D.I. 53 at A052.) The present claims are within that category, and their pursuit was therefore contemplated by the plan itself.

Thus, contrary to Defendants' position, the possible increase in Plaintiff's assets is not the only connection to the IT Group bankruptcy. Because this matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts*. 372 F.3d at 166-67. I therefore conclude that the state law claims in Counts I-V and IX are properly within the "related to" jurisdiction granted under § 1334.[7]

_____    _____

[7]Because of that conclusion, I need not address the parties' arguments concerning supplemental jurisdiction under 28 U.S.C. § 1367.

B.    The 12(b)(6) Motion to Dismiss

1.    Counts I, II, and IV - Breach of Corporate Fiduciary Duty Claims Against the Directors, Officers, and Carlyle Defendants

As earlier noted, *supra* note 2, Plaintiff alleges in Count I that the IT Group directors and officers breached their duties of loyalty and due care to the Company and its creditors.  In Count II, Plaintiff makes the same allegations against the directors and officers under the "Trust Fund" doctrine,[8] based on the IT Group's alleged insolvency. In Count IV, Plaintiff alleges that the Carlyle Defendants breached duties of loyalty and due care that they owed because of their alleged control over the IT Group board. Defendants attack the sufficiency of the pleading of all of those counts.  Since the allegations in Counts I, II, and IV are nearly identical, I treat them as a group in the following discussion, dealing first with the duty of loyalty claims and then with the duty of care claims.  I conclude that the Complaint adequately states claims for breaches of the duty of loyalty by the directors and Carlyle Defendants, but that all other claims for breach of fiduciary duties must be dismissed.

a.    Duty of Loyalty

Two of the ten separate breaches alleged in each of Counts I, II, and IV are identifiable as breaches of the duty of loyalty.  First, the Defendants allegedly made "transfers for the benefits [sic] of insiders."  (Complaint, D.I. 30 at ¶61(g), ¶65(g), ¶74(g).)  Second, the Defendants "artificially extend[ed] the life of the insolvent

---

[8]Under the Trust Fund doctrine, "the directors [of an insolvent corporation] become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 791 (Del. Ch. 2004).

Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at ¶61(h), ¶65(h), ¶74(h).)  These claims are apparently based on the payments made to Defendants, including the dividends paid to the Carlyle Defendants, while the IT Group was losing money and unable to service its debt.  I will discuss in turn the claims against the directors, the officers, and the Carlyle Defendants.

i.    Directors

Under Delaware law, a director's duty of loyalty "imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Belcom, Inc. v. Robb*, No. CIV.A.14663, 1998 WL 229527, at *3 (Del. Ch. 1998) (citing *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939)).  While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company," *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984),[9] unless the plaintiff shows that the presumption does not apply.  A plaintiff can avoid the presumption for a particular transaction by showing "that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).  A director is interested when appearing on both sides of a transaction or when deriving a personal benefit from a transaction that is not received

---

[9]While *Aronson* was a "classic Delaware derivative case," *Tower Air*, 416 F.3d at 236 n.10, citing it, along with other derivative cases, for propositions of substantive Delaware law concerning the business judgment rule is proper. *Cf. id.* at 238 (citing *Aronson* for definition of the business judgment rule).

by stockholders generally. *See Aronson*, 473 A.2d at 812; *Orman*, 794 A.2d at 23. "Independence means that a director's decision is based on the corporate merits of the subject ... rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. A lack of independence arises when "directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized." *Orman*, 794 A.2d at 24 (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

Here, Plaintiff's claims are based on payments made to insiders, and the Complaint describes payments made both to the Carlyle Defendants and to individual defendants. The board allegedly made payments to the Carlyle Defendants pursuant to a consulting agreement and as dividends arising from the preferred stock. (*Id*. at ¶1, ¶¶99-103.) The directors were not interested in those payments because no director is alleged to have received a personal benefit. However, Plaintiff appears to allege that the directors lacked independence concerning those payments, because of the Carlyle Defendants' influence. To successfully avoid the business judgment rule presumption, Plaintiff will have to show that directors were "beholden to [the Carlyle Defendants] or so under their influence that their discretion would be sterilized." *Orman*, 794 A.2d at 24. For the allegations to survive this Motion, Plaintiff must allege the supporting facts "necessary to provide the [Defendants] fair notice of the [Plaintiff's] claim and the 'grounds upon which it rests.'" *Tower Air*, 416 F.3d at 237 (quoting *Conley*, 355 U.S. at 47).

Four of the ten directors in place between 1999 and 2002, defendants D'Aniello, Dolan, Harvey, and Watkins, had other connections to the Carlyle Defendants, and two

15

of those, D'Aniello and Dolan, were Managing Directors of The Carlyle Group. (*Id.* at ¶¶3-4, ¶7, ¶11.) Two other directors, defendants Gibson and Pugliese, were elected by the Carlyle Defendants. (D.I. 39, Ex. D at A-0025.) Thus, before 1999, five of nine directors were elected by the Carlyle Defendants. (*See id.*) After 1999, five of ten directors were elected by the Carlyle Defendants (*see id.*), and a sixth director, Harvey, allegedly had other connections to the Carlyle Defendants (Complaint, D.I. 30 at ¶4). These alleged connections would not be sufficient on their own to prove that these six directors lacked independence. *See Aronson,* 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.") Nor do they show anything about the remaining director defendants, McGill, Pogue, Schmidt, and DeLuca.

Thus, the claim of a lack of independence is based largely on the allegations that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (Complaint, D.I. 30 at ¶31), and that "[a]t all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at ¶14). Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, while I seriously doubt that the conclusory allegations of control in the Complaint would survive a 12(b)(6) motion in the Delaware Court of Chancery, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has

16

emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff

to plead detailed facts to make out a claim for breach of fiduciary duties under

Delaware law, *Tower Air*, 416 F.3d at 236-39, I am bound to hold that the Plaintiff's

allegations are sufficient in this case.[10]

---

[10]A lengthy digression here will, I hope, be excused. The Third Circuit noted in *Tower Air*, 416 F.3d at 236-37 & n.11, that when a state procedural rule conflicts with an on-point Federal Rule of Civil Procedure, a federal court should apply the Federal Rule. *See Hanna v. Plumer*, 380 U.S. 460 (1965) (applying the federal standard for service of process). That proposition is beyond dispute. However, the Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims does not appear to me to be simply a matter of procedure. Rather, the pleading requirements shape the substance of fiduciary duty claims by enforcing the business judgment rule, which is fundamental to Delaware corporate law.

The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that corporation's management, and that directors cannot guarantee the success of their decisions. Thus, "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996).

This rule is a matter of substantive corporate law. *See Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) ("The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law.") First, it prevents the courts from second-guessing the decisions of directors and officers based on results of those decisions rather than on the care, loyalty, and good faith of the directors making the decision. Thus, the rule keeps courts from "injecting themselves into a management role for which they were neither trained nor competent." *Weiss v. Temporary Inv. Fund*, 692 F.2d 928, 941 (3d Cir. 1982). Second, the business judgment rule protects "against a threat of sub-optimal risk acceptance." *Gagliardi*, 683 A.2d at 1052. As a policy matter, directors should not be overly risk averse. "Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital." *Id.* Imposing liability for corporate losses on directors and officers will tend to deter them from seeking this optimum level of risk.

To implement the business judgment rule, the substance of Delaware corporate law includes a presumption that, absent self-interest or lack of independence, "the directors of a corporation acted on an informed basis, in good faith, and in the honest

belief that the action taken was in the best interest of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The plaintiff "may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest," and "in order to overcome the presumption of the business judgment rule [the plaintiff] must allege with particularity facts which establish that the contested decision was not a product of valid business judgment." *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1132 (D. Del. 1988) (citing *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988); *Aronson*, 473 A.2d at 812); *see also Crescent/Mach I Partners L.P. v. Turner*, 846 A.2d 963, 984 (Del. Ch. 2000) ("In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."); *Ash v. McCall*, No. CIV.A.17132, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000) ("[T]his Court has stated on several occasions that mere allegations that directors made a poor decision ... [do] not state a cause of action ... .").

Having been taken to task once for citing derivative suit precedents in a direct action, *Tower Air*, 416 F.3d at 236 ("[T]he District Court (mistakenly) cited derivative suit pleading cases ... ."), I hasten to note that, as on that earlier occasion, I cite the foregoing cases not under some confusion that this is a derivative suit but for the specific point they make about the protections of the business judgment rule. Those protections are a substantive point of law that, I believe, stands largely independent both of the procedural distinction between direct and derivative actions, *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 457 & n.6 (D. Del. 2004), and of the notice purpose inherent in procedural rules of pleading, *Stanziale v. Nachtomi*, No. CIV.A.01-403, 2004 WL 1812705, at *2 (D. Del. Aug. 6, 2004). In sum, though the Third Circuit apparently views the requirement for pleading facts in a context like this as a peculiarity of Delaware procedural law, *see Tower Air*, 416 F.3d at 236-37 ("Delaware courts consider Chancery Rule 8 specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species.") (citation omitted), it appears to me to be instead an implementation of the substantive presumption of the business judgment rule. This is true even though the standard of pleading "particularized" facts may be more stringent in a derivative action, governed by Rule 23.1, than in a direct action being challenged under Rule 12(b)(6). *Cf. Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001) (stating that the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under Rule 23.1 "is somewhat lower" under Rule 12(b)(6)). My understanding is that, even in the latter circumstance, sufficient factual specificity must be included in the complaint to raise a rational inference that the duty in question has been breached. The Third Circuit may be correct that this approach bears "scant resemblance" to simple notice pleading, but the difference is an entirely deliberate decision of substantive Delaware law, not a procedural peccadillo.

18

The *Tower Air* holding requires directors to face greater expense and risk in a federal court than they would in state court, because plaintiffs in a bankruptcy adversary proceeding can now more easily survive a Rule 12(b)(6) motion and therefore will have easier access to litigation and the opportunity to impose the burdens of litigation on corporate officials. This result is troubling for at least three reasons. First, and most fundamentally, if I am correct that we are dealing with substantive law here, the *Tower Air* approach creates a disparity between state and federal courts of the type condemned in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The outcome of an application of Delaware corporate law ought not turn on whether one is appearing in the Delaware Court of Chancery or a federal district court.

Second, as a matter of public policy, it makes little sense to expand the risk of directors and officers simply because a corporation is insolvent. This case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee. As the Delaware Chancery Court has rightly noted, "[i]t would be puzzling if, in insolvency, the equitable law of corporations expand[ed] the rights of firms to recover against their directors so to better protect creditors who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions." *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 794 (Del. Ch. 2004).

Third, the approach dictated by the Third Circuit in *Tower Air* does not merely make particularized pleading unnecessary; it actively penalizes it and, instead, rewards obscurity. Calling the business judgment rule presumption an affirmative defense, the Court of Appeals stated, "[g]enerally speaking, we will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6)." *Tower Air*, 416 F.3d at 238. It went on to say, however, that where the plaintiff mentions an affirmative defense in the complaint, that defense can be a basis of dismissal. *Id.* Thus, plaintiffs are given a powerful and perverse incentive to "dummy-up" about the obvious implications of the business judgment rule when drafting their complaints in the first instance. Any plaintiff unwise enough to actually allude to the rule "must plead that he overcomes the presumption created by that rule." *Id.* Since the standard to be applied is the notice pleading standard of Federal Rule of Civil Procedure 8, a pleading will not be insufficient for failure to include particularized facts. But it can be "self-defeating" by giving such facts, if they offer "an ostensibly legitimate business purpose for an allegedly egregious decision." *Id.* at 239. In short, because the Third Circuit sees a problem not when facts are omitted but only when they are presented, *see id.* ("The problem ... is not the facts that are not pleaded, but the facts that are."), the predictable and unfortunate result will be deliberately obtuse allegations. That is an outcome that truly bears scant resemblance to the operation of the business judgment rule in Delaware courts.

To conclude, the business judgment rule's presumption is a matter of substantive Delaware law. The *Tower Air* opinion requires me to apply a pleading standard far weaker than what I believe to be the Delaware requirement for pleading

In Count VI, discussed below in Section IV.B.4, Plaintiff also describes payments made to individual directors. (Complaint, D.I. 30 at ¶¶81-87.) None of the fiduciary duty counts point specifically to those payments, which are only mentioned later in Count VI, and Plaintiff may not have intended them to form the basis for fiduciary duty claims. But even if Plaintiff intended to include them in the "transfers to insiders" alleged in Counts I and II, the allegations concerning those payments are insufficient to meet even notice pleading requirements. Plaintiff alleges nothing other than the amounts and that the payments were made in satisfaction of antecedent debts and are avoidable preferences under Bankruptcy Code. (*See id.* at ¶¶81-87, ¶92.) No other information is given about the nature of the payments or the antecedent debts. Importantly for any fiduciary duty claims, the board is not alleged to have made any decision or acted in any way concerning those payments. And again, Plaintiff does not give notice in the Complaint that the payments to individual directors, mentioned only in Count VI, were intended to form the basis for claims in Counts I and II. Thus, even though particularized fact pleading is not required, the Complaint fails to give any satisfactory notice of a fiduciary duty claim based on those payments to individual directors.

Therefore, the Complaint states a claim against the directors for breach of their duty of loyalty in approving payments to the Carlyle Defendants and artificially

---

facts to overcome that presumption. I am uncomfortable changing the scope of Delaware fiduciary duty claims by weakening a substantive presumption, but, given the ruling in *Tower Air* and the lack of any Delaware authority directly stating that the *Tower Air* approach contravenes Delaware law, I must yield to the Third Circuit's interpretation.

extending the life of the Company to continue making those payments. Those two aspects of Counts I and II, as asserted against the directors, survive this Motion.

ii.    Officers

Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. Defendant Soose is the only officer named in the Complaint who was not also a director, but the Complaint alleges nothing about Soose other than his residence and position with the Company. (See Complaint, D.I. 30 at ¶13.) Soose is not alleged to have benefitted from any payments or to have been involved in the decisions to make payments. Therefore, the duty of loyalty claims in Counts I and II must be dismissed as to Soose.

The only other officer mentioned in the Complaint, DeLuca, was also a director during the alleged events. (See id. at ¶12.) Since no allegations are made against DeLuca based on his actions as an officer separate from those he supposedly took as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.a.i.

iii.    Carlyle Defendants

Under Delaware law, a shareholder will owe fiduciary duties to a corporation, including the duty of loyalty, "only if [that shareholder] owns a majority interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp. (In re Newmont Mining Corp. S'holders Litig.)*, 535 A.2d 1334, 1344 (Del. 1987). A dominating shareholder may, therefore, be subject to a claim for breach of a duty of loyalty, if that shareholder stands on both sides of a transaction.

21

Here, the issue is not whether the Carlyle Defendants were interested in the transactions that resulted in payments made to them. Obviously, they were; they derived a personal benefit that was not received by stockholders generally. *Aronson*, 473 A.2d at 812. The issue as to the Carlyle Defendants is whether they owed any fiduciary duties to the Company at all, i.e., whether they were controlling shareholders of the IT Group. As for the claims against the directors concerning the payments to the Carlyle Defendants, those claims depend on the allegations of actual control by the Carlyle Defendants over the IT Group directors. (*See* Complaint, D.I. 30 at ¶14, ¶31.) If Plaintiff can prove that the Carlyle Defendants exercised such control, then they owed fiduciary duties to the Company, and, as interested fiduciaries, may be liable on a duty of loyalty claim.

As discussed regarding the claims against the directors, *supra* Section IV.B.1.a.i, the allegations of control and self-interest put Defendants, including the Carlyle Defendants, on notice of Plaintiff's claim, satisfying the pleading standard set forth in *Tower Air*. The duty of loyalty claims set forth against the Carlyle Defendants in sections (g) and (h) of Count IV therefore survive the Motion to Dismiss for failure to state a claim.[11]

---

[11]Count IV actually alleges that the directors and officers breached various fiduciary duties, revealing that the allegations from Counts I and II were simply pasted into a count against the Carlyle Defendants. (*See* Complaint, D.I. 30 at ¶74.) However, the title indicates that Count IV is intended to make allegations against the Carlyle Defendants, and so I treat the Complaint as fairly making those allegations.

22

b.    Duty of Care

The remaining eight breaches alleged in Counts I, II, and IV are breaches of the

duty of care.  Plaintiff alleges that Defendants:  first, "fail[ed] to inform themselves of all

material information readily available to them," (Complaint, D.I. 30 at ¶61(a), ¶65(a),

¶74(a)); second, "incurr[ed] Acquisitions for more than the fair value of such

Acquisitions and increas[ed] the Company's debts through such Acquisitions," (*id*. at

¶61(b), ¶65(b), ¶74(b)); third, "deepen[ed] the Company's insolvency," (*id*. at ¶61(c),

¶65(c), ¶74(c)); fourth, "fail[ed] to preserve, maximize, and not dissipate the assets for

the benefit of the Company and its creditors," (*id*. at ¶61(d), ¶65(d), ¶74(d)); fifth,

"knowingly or recklessly ignor[ed] facts of, [sic] the Company's insolvency, that it was in

the vicinity of insolvency, and was inadequately capitalized," (*id*. at ¶61(e), ¶65(e),

¶74(e)); sixth, "pursu[ed] a 'Roll-Up Strategy' long after they knew or should have

known it was a failure," (*id*. at ¶61(f), ¶65(f), ¶74(f)); seventh, "fail[ed] to timely retain

restructuring advisors in order to fully inform themselves of their duties and to take

steps necessary and appropriate to maximize the value of the Company for its

creditors," (*id*. at ¶61(i), ¶65(i), ¶74(i)); and eighth, "wast[ed] corporate assets," (*id*. at

¶61(j), ¶65(j), ¶74(j)).  Again, the claims against the directors, the officers, and the

Carlyle Defendants are discussed in turn.

i.    Directors

Directors must "inform themselves ... of all material information available to them

[and] ... must then act with requisite care in the discharge of their duties." *Aronson*, 473

A.2d at 812.  The duty of care claims[12] must be dismissed, however, because the IT

Group's Certificate of Incorporation contains an exculpation provision that states:

> A director of this Corporation shall not be personally liable to the
> Corporation or its stockholders for monetary damages for breach of
> fiduciary duty as a director, except to the extent such limitation of liability
> is prohibited by the Delaware General Corporation Law as the same exists
> or may hereafter be amended.

(D.I. 39 at A-0028.)  This provision was adopted pursuant to § 102(b)(7) of Delaware's

General Corporation Law, 8 *Del. Code* § 102(b)(7), which provides:

> [T]he certificate of incorporation may ... contain ... (7) A provision
> eliminating or limiting the personal liability of a director to the corporation
> or its stockholders for monetary damages for breach of fiduciary duty as a
> director, provided that such provision shall not eliminate or limit the liability
> of a director: (i) For any breach of the director's duty of loyalty to the
> corporation or its stockholders; (ii) for acts or omissions not in good faith
> or which involve intentional misconduct or a knowing violation of the law;
> (iii) under § 174 of this title; or (iv) for any transaction from which the
> director derived an improper personal benefit.

The exculpatory provisions of § 102(b)(7) apply to claims brought by creditors of an

insolvent corporation.  *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 793-

95 (Del. Ch. 2004).  Once the § 102(b)(7) provision is raised against duty of care

claims, that is "the end of the case."  *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del.

2001).[13]

---

[12]To the extent that these allegations relate to the payments to insiders or to the
deliberate, artificial extension of the IT Group's life during insolvency to recoup the
Carlyle Defendants' investments, they are really duty of loyalty claims and have already
been discussed, Section IV.B.1.a.  Read in the light most favorable to Plaintiff, the
remaining duty of care claims allege, in parts (b)-(d), (f), and (j), poor decision-making
concerning the Roll-Up acquisitions, and, in parts (a), (e), and (i), a failure to make
informed decisions about the Roll-Up Strategy and the accompanying debt.

[13]The Third Circuit declined to address an exculpatory charter provision in *Tower
Air*, because the provision was raised for the first time on appeal.  416 F.3d at 242.  The

Thus, while the duty of loyalty claims are unaffected, the directors are protected by § 102(b)(7) against liability for breaching the duty of care. Counts I and II against the directors, to the extent that those counts allege breaches of the duty of care, must therefore be dismissed.

ii.    Officers

Again, Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at ¶13.) Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed. Therefore, these two counts are dismissed in their entirety as to Soose.

As discussed above, Section IV.B.1.a.ii, defendant DeLuca was a director and an officer. (*See id.* at ¶12.) Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.b.i.[14]

---

Delaware Supreme Court held in reviewing a 12(b)(6) motion that, while a § 102(b)(7) clause provides an affirmative defense, "proving the existence of a valid exculpatory provision ... entitles directors to dismissal of any claims ... against them that are based solely on alleged breaches of the board's duty of care." *Malpiede v. Townson*, 780 A.2d 1075, 1095-96 n.71 (Del. 2001).

[14]Even if the Complaint alleged a breach of the duty of care by DeLuca in his capacity as officer, which it does not, such an allegation, like the duty of care allegations against the Carlyle Defendants, would fail to overcome the business judgment rule. *See infra* Section IV.B.1.b.iii.

25

iii.    Carlyle Defendants

In Count IV, Plaintiff alleges that the Carlyle Defendants have committed the same breaches of fiduciary duties as have the directors and officers, the duties of the Carlyle Defendants arising from control over the IT Group directors.  As I noted in the discussion about the directors' alleged breaches, *supra* Section IV.B.1.b.i, these allegations against the Carlyle Defendants, read in the light most favorable to Plaintiff, concern poor decision-making about the Roll-Up acquisitions, and a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt.  Again, to the extent that these claims are made concerning the payments to insiders or concerning the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, *supra* Section IV.B.1.a.iii.  The remaining claims, therefore, center on the failed Roll-Up strategy.

While the § 102(b)(7) charter provision protects only directors from duty of care claims, to the extent that Plaintiff is seeking to hold the Carlyle Defendants responsible for those alleged breaches, the Complaint fails to state a claim.  Plaintiff is not required to plead detailed facts, but must still "plead around the business judgment rule." *Tower Air*, 416 F.3d at 238.  Thus, even at the pleading stage, if facts alleged in a complaint show "an ostensibly legitimate business purpose for an allegedly egregious decision," then the complaint fails to state a claim for which relief can be granted. *Id.* at 239.

Here, Plaintiff alleges that the Roll-Up Strategy was implemented "to grow the company by acquiring companies engaged in the same or similar lines of business." (Complaint, D.I. 30 at ¶32.)  Further, while the IT Group's debt increased during this

26

time, the Roll-Up Strategy increased revenues from approximately $360 million in 1997 to approximately $1.4 billion in 2000. (*Id*. at ¶44.) While the strategy "did not provide the Company with the desired benefits," (*id*. at ¶48), the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose. Thus, the Complaint is "self-defeating," *see Tower Air*, 416 F.3d at 239 ("[A] complaint is self-defeating when it states an ostensibly legitimate business purpose for an allegedly egregious decision."), to the extent that it claims that implementing the Roll-Up Strategy was a breach of the duty of care. Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule.

Therefore, to the extent that Count IV alleges that the Carlyle Defendants breached their duty of care, it fails to state a claim and is dismissed.

### 2.    Count III - Waste of Corporate Assets

In Count III, Plaintiff alleges that the directors and officers have wasted corporate assets through the same actions that are alleged to constitute breaches of their fiduciary duties. (Complaint, D.I. 30 at ¶69(a)-(h).) For a transaction to amount to waste, it must be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998).

#### a.    Directors

Because Plaintiff's allegations of waste mirror those concerning breach of fiduciary duties, they concern two sets of transactions. The first set of transactions involves payments made to some of the Defendants, including the Carlyle Defendants.

27

Defendants argue that the pleadings are insufficient. As discussed above, *supra* Section IV.B.1.a.i, the Complaint sufficiently alleges that payments were made to the Carlyle Defendants in violation of the directors' duties of loyalty, and the Company is alleged to have received no consideration in return for those multimillion dollar payments. Thus, for claims of waste based on those payments, Defendants have not shown that Count III fails to state a claim.

However, as discussed *supra* Section IV.B.1.a.i, the Complaint fails to state a claim for breach of fiduciary duty based on payments made to individual defendants. Since Count III provides no additional information, the Complaint similarly fails to state a claim for waste based on those payments.

The second set of transactions involves the Roll-Up acquisitions, for which the IT Group allegedly received inadequate consideration. While those acquisitions may appear unwise in retrospect, they do not raise a duty of loyalty question, and so, like the duty of care claims in Counts I and II, the § 102(b)(7) provision protects the directors from liability for those transactions. *See Green v. Phillips*, C.A. No. 14436, 1996 WL 342093, at *6-*7 (Del. Ch. June 19, 1996) (holding that a § 102(b)(7) provision protected directors from corporate waste claims based on transactions that did not "bring the directors' loyalty and good faith into question").

Therefore, the claims of corporate waste against the directors based on the payments to the Carlyle Defendants (Complaint, D.I. 30 at ¶69(f)-(g)) survive the Defendants' 12(b)(6) motion, while the other claims of corporate waste (*id*. at ¶69(a)-(e), (h)) must be dismissed.

28

          b.    Officers

The allegations in Count III mirror those in Counts I and II. And just as Counts I and II make no allegations against defendant Soose, *see supra* Sections IV.B.1.a.ii, IV.B.1.b.ii, Count III likewise makes none, and that count against Soose will be dismissed as well.

Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.2.a.

          3.    Count V - Aiding and Abetting Claim Against the Carlyle Defendants

In Count V, Plaintiff alleges that the Carlyle Defendants aided and abetted the other Defendants' breaches of fiduciary duties. To succeed in this claim, Plaintiff must show: "(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach." *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 989 (Del. Ch. 2000). While the parties agree that a fiduciary relationship existed between the IT Group directors and officers and the Company, Defendants argue that Plaintiff has failed to allege a breach or the knowing participation in that breach by the Carlyle Defendants. As with the duty of loyalty claims already discussed, Defendants' argument fails.

First, as discussed above, Section IV.B.1.a.i, Plaintiff has adequately alleged a breach of the duty of loyalty by the IT Group directors concerning the payments made to the Carlyle Defendants and artificially extending the life of the IT Group to keep those

payments going. Second, again as earlier discussed, Section IV.B.1.a.iii, the

allegations of the Carlyle Defendants' actual control of the IT Group board are sufficient

to survive the 12(b)(6) motion, and knowing participation could be inferred from that

alleged control. Thus, contrary to Defendants' argument, Plaintiff has alleged a breach

and the knowing participation in the breach by the Carlyle Defendants, and so Count V

adequately alleges that the Carlyle Defendants aided and abetted the directors' breach

of their duty of loyalty. By contrast, the duty of care claims in Counts I and II cannot

succeed, *see supra* Sections IV.B.1.b.i-ii, and so to the extent that Count V alleges

aiding and abetting of those supposed breaches, it too must be dismissed.

4.   Count VI - Avoidance Claims Under 11 U.S.C. § 547

In Count VI, Plaintiff sets out payments made to Gibson, Pogue, Harvey,

Pugliese, Schmidt, Watkins, and the Carlyle Defendants that the Plaintiff seeks to avoid

as preferential transfers pursuant to 11 U.S.C. §§547(b), 550. The Complaint lists

specific amounts transferred to the mentioned individual defendants and $2,076,000

transferred to the Carlyle Defendants. (D.I. 30 at ¶¶82-88.) The Complaint further

alleges that the payments were made within one year of the bankruptcy petition date

(*id*. at ¶81) to creditors (*id*. at ¶89) who are also insiders (*id*. at ¶90), that the payments

were made on account of antecedent debt (*id*. at ¶92), were made while the IT Group

was insolvent (*id*. at ¶93), and enabled the listed Defendants to receive more than they

would in the circumstances set forth in 11 U.S.C. § 547(b)(5) (*id*. at ¶94). Defendants

argue that those allegations, which mostly mirror the statutory language in § 547(b), are

insufficient and that Count VI must be dismissed.

30

Defendants base their argument on pleading requirements set out in *TWA, Inc. v. Marsh USA Inc. (In re TWA Inc.)*, 305 B.R. 228, 232 (Bankr. D. Del. 2004), and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003). Those cases instruct that, "to survive a motion to dismiss," a complaint must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." *TWA*, 305 B.R. at 232; *Valley Media*, 288 B.R. at 192. Because such information is lacking in the present Complaint, in which the only specific information is the amounts transferred, Defendants conclude that the pleading is inadequate. Further, according to Defendants, the listing of the payment made to the Carlyle Defendants as a group rather than to each individual entity reduces to guesswork any effort to understand which payments were made to whom.

The pleading standard described in *TWA* and *Valley Media* has sometimes been viewed as inconsistent with the liberal pleading requirements of Federal Rule of Civil Procedure 8. *See Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.)*, 313 B.R. 370, 373 (Bankr. D. Del. 2004); *Neilson v. Southern (In re Webvan Group, Inc.)*, Adv. Proc. No. 03-54365, 2004 WL 483580, at *2 (Bankr. D. Del. Mar. 9, 2004). It has been rightly observed that, "[w]hile plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases . . . [is] inappropriate and unnecessarily harsh." *IT Group*, 313 B.R. at 373. Even though

31

the information listed in *TWA* will eventually need to be proved, "it does not follow that it must be pleaded on pain of dismissal."[15] *Id.* (quoting *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.)*, 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003)).

Here, Plaintiff has described specific amounts paid to specific Defendants in the Complaint (D.I. 30 at ¶¶82-88), providing more information than did the complaint discussed in *TWA*, *see* 305 B.R. at 232 ("Within 90 days prior to the Petition Date, Marsh received payments from Debtors of approximately two million dollars."). Also, even though the Carlyle Defendants are grouped together as receiving a payment of $2,076,000 (D.I. 30 at ¶88), the information is sufficient to give the Defendants notice of the basis of the avoidance claim, given the relationship alleged between the Carlyle Defendants. That is all that Rule 8 requires. *Conley*, 355 U.S. at 47.

Accordingly, I decline to hold the Complaint to the pleading standard set forth in *TWA* and *Valley Media*. Count VI is sufficient to withstand the motion to dismiss.

### 5.    Counts VII and VIII - Fraudulent Transfer Claims

In Count VII, Plaintiff alleges that the dividend payments made to the Carlyle Defendants were constructively fraudulent transfers that Plaintiff can recover pursuant to 11 U.S.C. §§ 544 and 548. In Count VIII, Plaintiff alleges that both the dividend payments in Count VII and the payments described in Count VI were actual fraudulent conveyances in violation of 11 U.S.C. § 544 and the Delaware Uniform Fraudulent

---

[15]Notably, in *TWA*, the court gave the plaintiff leave to amend and agreed that the articulated standard might need to be relaxed in that case to allow the plaintiff to pursue details in discovery. 305 B.R. at 233-34.

32

Transfer Act. Defendants attack both the sufficiency of the pleadings and their timeliness.

First, Defendants argue that Count VII fails to give fair notice of the basis for alleging a violation of § 544. According to Defendants, the claim (1) lists payments made to the Carlyle Defendants as a group rather than individually; (2) fails to specify the relevant state law; (3) fails to specify an "actual creditor" as required by § 544(b); and (4) fails to disclose how the IT Group received less than reasonably equivalent value or fair consideration for those payments.

Reading the Complaint in the light most favorable to Plaintiff, these arguments must fail. First, because the payments were dividends associated with the Carlyle Defendants' preferred stock, grouping the payments together does not force the Defendants to guess about which payments are described or who received them. Second, when read with the allegations in Count VIII, the relevant state law is identified as that of Delaware. Third, "for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name." *Pardo v. Avanti Corporate Helath Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr. D. Del. 2001). In any case, Plaintiff represents the interests of the unsecured creditors that are beneficiaries of the Litigation Trust. Finally, as discussed above concerning the corporate waste claims, Plaintiff alleges that the IT Group received no consideration for those payments. Thus, Defendants are given fair notice of the basis of the § 544 claim in Count VII.

Next, Defendants argue that the § 548 claim of Count VII is untimely because it seeks to recover payments made more than one year prior to the bankruptcy petition

33

date. The Bankruptcy Code allows the trustee to "avoid any transfer of an interest of

the debtor in property ... that was made ... on or within one year before the date of the

filing of the [debtor's] petition." 11 U.S.C. § 548(a)(1). The IT Group filed its petition on

January 16, 2002, so any transfers made before January 16, 2001 are outside the

scope of § 548. Therefore, the § 548 claim for the dividends paid from 1998 to 2000

must be dismissed (see Complaint, D.I. 30 at ¶¶99-102), while the claim for payments

made on or after January 16, 2001 (see id. at ¶103) may continue.

As to Count VIII, Defendants argue that the claims for fraudulent conveyances

are untimely to the extent that they seek to recover transfers made before January 28,

2001. Delaware's Uniform Fraudulent Transfer Act provides that:

> A cause of action with respect to a fraudulent transfer or obligation under
> this chapter is extinguished unless action is brought . . . within 4 years
> after the transfer was made or the obligation was incurred or, if later,
> within 1 year after the transfer or obligation was or could reasonably have
> been discovered by the claimant.

6 Del. Code § 1309(1). Since the Complaint was filed on January 28, 2005,

Defendants argue that any claim for a payment made prior to January 28, 2001 is

extinguished. But Plaintiff correctly points out that there is a factual issue concerning

when the payments were or could reasonably have been discovered. Therefore,

dismissal is inappropriate at the pleading stage.

Accordingly, Counts VII and VIII survive this 12(b)(6) motion, except for the §

548 claims under Count VII for payments made prior to January 16, 2001, which must

be dismissed.

34

6.    Count IX - Unlawful Payment of Dividends Claim

In Count IX, Plaintiff alleges that the directors violated § 174 of the Delaware
General Corporation Law, 8 *Del. Code* § 174, by paying dividends to the Carlyle
Defendants from 1998 to 2001 while the IT Group was insolvent.  *See EBS Litig. LLC v.
Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) ("[I]f the stock
dividend occurred when [the company] was insolvent, or rendered [it] insolvent, it was
illegal under Delaware law.").  Defendants argue that the pleadings insufficiently allege
both the IT Group's insolvency during the time when the dividends were paid and the
directors' knowledge of the insolvency.  However, those arguments are not well-
founded.  The Complaint alleges that the IT Group was insolvent or in the vicinity of
insolvency as early as March 1998.  (D.I. 30 at ¶47.)  Further, the booked goodwill
associated with the Roll-Up acquisitions is alleged to have inflated the IT Group's
assets.  (*Id.* at ¶41.)  Finally, Defendants are alleged to have artificially extended the life
of the insolvent IT Group in order to keep making payments to the Carlyle Defendants
(*id.* at ¶61, ¶65, ¶69, ¶74), which is relevant for both the allegations of insolvency and of
the directors' knowledge.  Again, Defendants have notice of the basis of Plaintiff's
claims, and Count IX therefore survives the 12(b)(6) motion.

**V.    CONCLUSION**

Accordingly, I will deny the Motion to Dismiss for Lack of Subject Matter
Jurisdiction.  I will grant the Motion to Dismiss for Failure to State a Claim as to the
following:

(1)    Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;

(2)    Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;

(3)    Counts I, II, and III to the extent that they are brought against Defendant Soose;

(4)    Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under 11 U.S.C. § 548.

I will deny the Motion to Dismiss for Failure to State a Claim in all other respects. An appropriate order will issue.

36