# EXHIBIT B

LEXSEE 1999 DEL CH LEXIS 215

IN RE 3COM CORPORATION SHAREHOLDERS LITIGATION

C.A. NO. 16721

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

1999 Del. Ch. LEXIS 215

July 27, 1999, Submitted
October 25, 1999, Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court November 9, 1999.

**DISPOSITION:**

Defendants' motion to dismiss is granted as to both counts

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, corporation and corporate directors, moved to dismiss plaintiff's shareholder derivative action for corporate waste and breach of the duty of loyalty and candor for failure to state a claim upon which relief could be granted, under Del Chancery Ct R 12(b)(6)

**OVERVIEW:** Plaintiff was a shareholder of defendant corporation The individual defendants were the members of the corporation's board of directors and the nominal defendant was the corporation itself Plaintiff sued 1) derivatively for corporate waste and breach of fiduciary duty of loyalty and 2) in a class action on behalf of all of the corporation's shareholders for breach of the "duty of candor " Plaintiff's claims arose from corporate stock options granted to members of the board under the company's Director Stock Option Plan. Defendants moved to dismiss for failure to state a claim upon which relief could be granted, under Del. Chancery Ct 12(b)(6). The court held that the corporation's directors did not commit waste and breach their fiduciary duty of loyalty when they received stock options approved under a plan endorsed in advance by shareholder vote. There was no failure to disclose material information to stockholders regarding the plan

**OUTCOME:** Defendants' motion to dismiss was granted on both counts The corporation's directors did not com-

mit waste and breach their fiduciary duty of loyalty when they received stock options approved under a plan endorsed in advance by shareholder vote. There was no failure to disclose material information to stockholders regarding the plan.

**LexisNexis(R) Headnotes**

*Civil Procedure > Early Pretrial Judgments > Judgment on the Pleadings*
[HN1] The standard for a motion to dismiss is a basic, well-settled mantra under Delaware law: that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. Further, allegations which are merely conclusory and lacking factual basis in the complaint will not survive a motion to dismiss. In examining the complaint, a court must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN2] A clear example of an "interested" transaction is one in which the fiduciary directly pays or otherwise benefits himself using corporate assets.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN3] Under the entire fairness standard, heightened scrutiny would be applied to the transaction and the burden of proof would shift to the board of directors to show that the transactions were entirely fair to the corporation and its shareholders.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN4] Corporate directors' decisions administering a shareholder approved plan consistently with that plan are entitled to the protection of the business judgment rule.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents*
[HN5] Ratification, in the usual sense, involves shareholders' affirmatively sanctioning earlier board action, the effect of which is to validate that action.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN6] "Self-interested" director transactions made under a stock option plan approved by the corporation's shareholders are entitled to the benefit of the business judgment rule.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN7] When a board of directors' administration of a shareholder plan is entitled to the protection of the business judgment rule, a plaintiff must allege waste of corporate assets in order to state a cause of action for breach of the duty of loyalty.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN8] The standard for a waste claim is high and the test is extreme and very rarely satisfied by a shareholder plaintiff. To state a claim for waste a plaintiff must allege facts to establish that the directors authorized an exchange that was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration. The transfer must either serve no corporate purpose or be so completely bereft of consideration that such transfer is in effect a gift.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN9] To find a plaintiff's claim for waste sufficient, a court must be satisfied that the alleged facts establish a complete failure of consideration, and not merely the insufficiency of the consideration received. A complete failure of consideration is difficult to show since the acts alleged have to be so blatant that no ordinary business person would ever consider the transaction to be fair to the corporation. The company would literally have to get nothing whatsoever for what it gave. Under this standard, the court is not to examine the allegations to see whether

consideration, once received, was excessive or lopsided, was proportional or not, or even whether it was a bad deal from a business standpoint.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN10] The waste standard for options granted under shareholder approved plans has gradually evolved from a proportionality test, which required examining the sufficiency of the consideration, to a traditional waste standard, which requires showing an absence of consideration or an effective gift of corporate assets.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN11] An allegation of waste is inherently factual.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN12] Bare allegations that alleged option values are excessive or even lavish are insufficient as a matter of law to meet the standard required for a claim of waste.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN13] Corporate fiduciaries have an obligation to disclose all material facts when seeking shareholder action. Material facts are those for which there is a substantial likelihood that a reasonable person would consider them important in deciding how to vote.

COUNSEL: Norman M. Monhait, of Rosenthal Monhait Gross & Goddess, Wilmington, Delaware, OF COUNSEL: A. Arnold Gershon, New York, New York; Wechsler Harwood Halebian & Feffer, New York, New York, Attorneys for Plaintiffs.

Bruce M. Stargatt and James P. Hughes, Jr., of Young Conaway Stargatt & Taylor, Wilmington, Delaware, OF COUNSEL: Boris Feldman and Keith E. Eggleton, of Wilson Sonsini Goodrich & Rosati, Palo Alto, California; Lowell E. Sachnoff and Sarah R. Wolff, of Sachnoff & Sweaver, Chicago, Illinois, Attorneys for Defendants.

JUDGES: Myron T. Steele, Vice Chancellor

OPINIONBY: Myron T. Steele

OPINION:

1999 Del. Ch. LEXIS 215, *

*MEMORANDUM OPINION*

STEELE, V C

### Issues Presented

### ISSUE 1

Do a corporation's directors commit waste and breach their fiduciary duty of loyalty when they receive stock options approved under a plan endorsed in advance by shareholder vote?

No. Decisions of directors who administer a stockholder approved director stock option plan are entitled to the protection of the business judgment rule, and, in the absence of waste, a total failure of consideration, they [*2] do not breach their duty of loyalty by acting consistently with the terms of the stockholder approved plan.

### ISSUE 2

When the directors of a corporation disclose the material terms of a stock option plan for compensating these same directors, the plan has already been approved by the shareholders, and the directors seek shareholder approval of an amendment to expand the pool of shares available for administering this plan, do the directors commit disclosure violations by omitting from the proxy statement 1) the present value of the options as determined by the Black-Scholes Option Pricing Model and 2) that the directors may realize present cash by selling options identical to those received under the plan?

No. When the directors of a corporation seek to amend an existing director stock option plan and they have disclosed the plan's material terms and the material terms of the amendment, they are not required to disclose the option values under the Black-Scholes model. They do not mislead shareholders when they fail to state that the directors may choose to receive cash by selling these options.

### I. Background

Plaintiff is a shareholder of 3COM, a Delaware corporation that produces [*3] computer-related products. The individual defendants are the 10 members of the 3COM board of directors and the nominal defendant is 3COM itself. n1 Plaintiff sues 1) derivatively for corporate waste and breach of fiduciary duty of loyalty and 2) in a class action, on behalf of all 3COM shareholders, for breach of the "duty of candor." n2

n1 All but one of the defendants, Mr. Eric A. Benhamou, are outside directors, i.e. not em-

ployed by 3COM. Mr. Benhamou is the Chief Executive Officer and Chairman of the Board of Directors of 3COM.

n2 plaintiff uses this phrase to describe the disclosure violations which allegedly constitute breaches of the fiduciary duty of loyalty.

The Plaintiff's claims flow from 3COM stock options granted to members of the board under the company's Director Stock Option Plan (the "Plan"), adopted in 1988 and later amended from time to time. On July 22, 1998 the board amended the Plan to expand the pool of shares available for grants by 1 million (from 2 million to 3 million [*4] total shares). n3 The amendment required shareholder approval in order to take effect. n4 On August 20, 1998 the board distributed proxy materials for the upcoming annual shareholders' meeting in which it solicited shareholder approval of the Amendment. Those proxy materials are alleged to contain material disclosure violations. No options have been granted or received from the 1 million share possible increase ultimately approved by the shareholders at the 1998 annual meeting.

n3 In fiscal year 1998 (ending May 31, 1998) the defendant directors received options ranging between 22,500 and 45,000 each. At the time of the proposed amendment 167,000 shares remained in the pool of shares available for granting options to directors.

n4 The Plan may be amended, suspended, or terminated by the Board unilaterally except that to expand the reserve of shares available for director options or to expand the class of persons receiving such options shareholder approval is required. At the time of the amendment 167,000 shares remained in the pool of shares available for granting options to directors.

[*5]

### III. Contentions

In Count I the plaintiff alleges that the members of the board wasted 3COM's assets and breached their fiduciary duty of loyalty to the 3COM shareholders when they approved the grant of and received stock options under the Plan. Specifically the plaintiff suggests that these stock options constitute lavish and excessive compensation tantamount to a waste of corporate assets.

In Count II the plaintiff alleges that defendants failed to disclose fully the value of the stock options granted by: (1) omitting material information about the

options' value; and, (2) mischaracterizing material information about the options' value. In the omission claim, the plaintiff alleges that the proxy statement should have included the present values of these options under the Black-Scholes Option Pricing Model. In the mischaracterization claim, the plaintiff alleges that language in the proxy statement describing the value of options masks the potential for the recipients to realize immediate cash from the options. Plaintiff claims that the Board's description of the value of options did not inform shareholders of the possibility that the directors could make money by selling option [*6] contracts on 3COM stock, which would be backed by their own 3COM options. The plaintiff believes these allegations of omission and mischaracterization show that the board breached its fiduciary "duty of candor."

The defendants move to dismiss this action on all counts for failure to state a claim upon which relief can be granted, under Court of Chancery Rule 12(b)6. Defendants maintain that the plaintiff offers nothing more than conclusory statements to support the elements of his claims.

IV. Standard For A Motion to Dismiss

[HN1] The standard for a motion to dismiss is a basic, well-settled mantra under Delaware law: that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. n5 Further, allegations which are merely conclusory and lacking factual basis in the complaint will not survive a motion to dismiss. n6 In examining the complaint, I must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party. n7

n5 *Lewis v. Austen*, 1999 Del. Ch. LEXIS 125, *12, Del. Ch., C.A. No. 12937, mem. op. at 4, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted.")

[*7]

n6 *In re The Walt Disney Company Shareholders' Litigation*, Del. Ch., 731 A.2d 342, 353 (1998)
n7 *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 911, Steele, V.C. (August 20, 1999).

V. Count I - Breach Of The Duty Of Loyalty By Waste Of Corporate Assets

A. The Standard of Review

[HN2] A clear example of an 'interested' transaction is one in which the fiduciary directly pays or otherwise benefits himself using corporate assets. The plaintiff contends that the directors granted themselves options under the Director Stock Plan, creating just such a self-interested transaction. Because the transaction presents a conflict between the self-interest of the directors and the best interests of the Corporation and its shareholders, the plaintiff seeks to have his claim reviewed [HN3] under the entire fairness standard. If the plaintiff were correct, heightened scrutiny would be applied to the transaction and the burden of proof would shift to the defendants to show that the transactions were entirely fair to the corporation and its shareholders. [*8]

Though plaintiff correctly points out that these option grants appear to be self-interested transactions, he cannot overcome the indisputable fact that the directors authorized grants made within the limitations of a plan *already approved by the shareholders.* This crucial distinction leads me to conclude that the board's actions are entitled to the protection of the business judgment rule.

1. Prior Shareholder Approval of the Plan

[HN4] Directors' decisions administering a shareholder approved Plan consistently with that Plan are entitled to the protection of the business judgment rule. The plaintiff argues that because he never pleaded that shareholders approved the Plan that I may not consider this fact when I evaluate his claims.

Although I must evaluate the plaintiff's claims within the bounds of his Complaint and draw all inferences in his favor, I can not blind myself to plaintiff's clear statement in his Complaint that the directors received the stock options "pursuant to the Company's Director Stock Option Plan." n8 I need not look beyond the 1998 Proxy Statement (incorporated by reference into the Complaint) to find that the Plan resulted from shareholder action. Since [*9] plaintiff's claims arise in the context of a board proposal for the shareholders to amend the Plan I can only logically infer that the Plan must be the result of prior shareholder action - a result fully supported by the facts pleaded.

n8 Complaint, P 8

The plaintiff's argument that I can not consider the effect of this prior shareholder approval merely because he has not raised this fact in his Complaint is too clever by half. After pleading that the directors granted options

according to the Plan and that the Board then sought to have the shareholders amend the Plan to increase the amount of options to be available in the future, plaintiff cannot now escape the only obvious conclusion from these alleged facts. Certainly the plaintiff could have challenged the validity of the Director Stock Option Plan itself or whether the board's conduct falls within the strictures of this Plan. n9 However, his Complaint does not do so here.

> n9 The strictures of this plan include (at minimum) specific ceilings on the awarding of options each year. These ceilings differ based on specific categories of service such as service on a committee, position as a lead director, and chairing the Board. It is implicit that the Board may only exercise discretion within these parameters and is free to award as many options as the Plan permits or as few as zero options. The plaintiff does not allege that the Board ever acted outside the set terms of this plan, nor that the Board ever exceeded limitations of the Plan. *See* Notice of Annual Meeting of Stockholders of 3COM Corporation to be held September 24, 1998, p. 17. This document is incorporated into the Complaint by reference.

[*10]

2. The Business Judgment Rule is the Proper Standard

Since prior shareholder action approved the Plan, I must examine whether the directors' actions taken to administer the Plan are entitled to the protection of the business judgment rule or whether they should be subject to heightened scrutiny. Plaintiff argues that the business judgment rule does not apply here, since shareholder approval of the Plan amounts to ratification - an affirmative defense that can only be raised in defendants' answer and on which defendants' bear the burden of proof. The facts do not support the argument that the defendants raise an ordinary ratification defense.

[HN5] Ratification, in the usual sense, involves shareholders' affirmatively sanctioning earlier *board action*, the effect of which is to validate that action. Neither the facts pleaded here nor the defendants' arguments suggest such a circumstance. These options clearly flow from a plan created by *previous* shareholder action. To suggest that this undisputed fact supports a shareholder ratification defense is absurd. The notion of "advance ratification" is oxymoronic. The undisputed facts support only one rational conclusion: That valid [*11] share-

holder action instituted a stock option plan and that the Board's administration of the Plan within its approved limits needed no further stockholder approval. I do not see this as a case of directors independently or unilaterally granting themselves stock options, but instead a case where stock options accrued to these directors under the terms of an established option plan with sufficiently defined terms. One cannot plausibly contend that the directors structured and implemented a self-interested transaction inconsistent with the interests of the corporation and its shareholders when the shareholders knowingly set the parameters of the Plan, approved it in advance, and the directors implemented the Plan according to its terms. Precedent in this Court clearly establishes [HN6] that "self-interested" director transactions made under a stock option plan approved by the corporation's shareholders are entitled to the benefit of the business judgment rule. n10

> n10 *See Steiner v Meyerson*, 1995 Del. Ch. LEXIS 95, * 21, Del. Ch., C.A. No. 13139, Allen, C. (July 18, 1995). ("Unlike the other self-interested transactions challenged by plaintiff, the stock option plan was presented to the Telxon shareholders at the 1991 annual meeting and approved by a majority of the stockholders. The Supreme Court held in Kerbs v. California Eastern Airways, Inc., Del. Supr., 33 Del. Ch. 69, 90 A.2d 652, 655 (1952) that "stockholders' ratification of voidable acts of directors is effective for all purposes unless the action of the directors constituted a gift of corporate assets to themselves or was ultra vires, illegal, or fraudulent.") (reviewing the stock option grants pursuant to this plan, granting them the benefit of the business judgment rule and finding no cognizable cause of action).

[*12]

B. The Plaintiff's Waste Claim

[HN7] Since the Board's administration of the plan is entitled to the protection of the business judgment rule, the plaintiff must allege waste of corporate assets in order to state a cause of action under these circumstances. n11 I find he has not done so.

> n11 *In re The Walt Disney Company Shareholders' Litigation*, 731 A.2d at 369.

1999 Del. Ch. LEXIS 215, *

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - -
- - - - - - - - -[HN8]

The standard for a waste claim is high and the test is "extreme very rarely satisfied by a shareholder plaintiff " n12 To state a claim for waste the plaintiff must allege facts to establish that the Delaware directors "authorize[d] an exchange that [was] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration". n13 The transfer must either serve no corporate purpose or be so completely bereft of consideration that "such transfer is in effect a gift " n14

n12 *Steiner v Meyerson,* 1995 Del. Ch. LEXIS 95, * 3

[*13]

n13 *Glazer v Zapata Corp* , Del. Ch. , 658 A 2d 176, 183 (1993).
n14 *Lewis v Vogelstein,* Del. Ch. , 699 A 2d 327, 336 (1997)

Further, [HN9] to find the plaintiff's claim sufficient I must be satisfied that the alleged facts establish a complete *failure* of consideration, and not merely the insufficiency of the consideration received n15 A complete failure of consideration is difficult to show since the acts alleged have to be so blatant that *no* ordinary business person would ever consider the transaction to be fair to the corporation The company would literally have to get nothing whatsoever for what it gave. Under this standard I am *not* to examine the allegations to see whether consideration, once received, was excessive or lopsided, was proportional or not, or even whether it was a 'bad deal' from a business standpoint. n16 If I were to do so I would not be deferring to the board's business judgment, as I am required to do here

n15 *See Id* at 338, ("The Court of Chancery has interpreted the waste standard in the ratified option context as invoking not a proportionality or reasonableness test a la *Kerbs* but the traditional waste standard referred to in *Michelson* ") The *Vogelstein* Court noted that this standard pertains to the "ratified option context," which I find to be the case here in that the "ratified options" include those approved under a company's stock option

plan As plaintiff alleges in his Complaint: the directors "receive stock options pursuant to the Company's Director Stock Option Plan."

[*14]

n16 In *Lewis v Vogelstein* this Court found that [HN10] the waste standard for options granted under plans such as here has gradually evolved from a proportionality test, which required examining the sufficiency of the consideration, to a traditional waste standard, which requires showing an absence of consideration or an effective gift of corporate assets.

The plaintiff only alleges (in a conclusory manner) that inadequate consideration is given for the benefit 3COM receives, not that 3COM received *no* benefit from these options. Plaintiff's only factual allegation about the options is that the dollar values on these options were quite large (at least $ 650,000 per director). But his legal allegations flowing from these facts, specifically that the compensation is "grossly excessive" and that "no reasonable person not acting under compulsion and in good faith would have done it," are wholly conclusory. n18 Although "the consideration typically involved in stock options, i.e. continued and greater efforts by employees, is ephemeral and not susceptible to identification and valuation [*15] in dollar terms," the plaintiff must still allege some bare minimum facts showing that 3COM failed to receive *any* benefit from issuing these options Plaintiff simply has not done so.

n17 It does not help plaintiff that he calculated his alleged values under the Black-Scholes option pricing formula This Court has consistently taken a rather jaundiced view of these valuations and their reliability. *See Rovner v Health-Chem Corp* , 1998 Del. Ch. LEXIS 65, * 17, Del. Ch. , C A No. 15007, Chandler, C. (April 23, 1998); *Lewis v Vogelstein,* 699 A 2d at 331.
n18 Complaint, P 18.

The plaintiff further argues that "the alleged value of the option grants alone is sufficient to raise an inference of inadequate consideration" and this is the "ineluctable result of this Court's holding in *Vogelstein* " n19 I disagree. As plaintiff himself states, my review of his allegation of waste is an inherently fact-intensive inquiry and so I will evaluate his claim strictly within the context of the facts he actually [*16] alleges, and not by way of a side-by-side factual comparison with the holding in

*Vogelstein.* The plaintiff suggests by comparing the alleged values of the 3COM options (at least $ 650,000 per director) to the values of the options the *Vogelstein* Court found wasteful ($ 180,000) one must infer that he has established the minimum factual support for his waste claim.

n19 Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, p. 11

But this suggestion simply does not jibe with plaintiff's correct assertion that [HN11] an allegation of waste "is inherently factual." n20 I can only draw inferences in his favor from the facts he alleges in his Complaint, not from facts found in another case. That the options here are at least threefold the amount of those which Chancellor Allen found to constitute waste in *Vogelstein* is not a fact which can salvage the plaintiff's otherwise facially insufficient claim. For my purposes in deciding these motions, the facts in *Vogelstein* only help me discern [*17] the legal standard to be applied and are not, as plaintiff argues, a benchmark for what specific dollar amounts may constitute excessive director compensation. n21 Even if I were to use the *Vogelstein* comparison in order to determine the sufficiency of plaintiffs claims, I still could not find that he states a claim here since, as stated above, the standard is whether plaintiff sufficiency alleges a complete *failure* of consideration, not whether he sufficiently alleges that the consideration is "inadequate" (which is all that plaintiff himself says this comparison would show).

n20 *Id.* (citing *Lewis v. Vogelstein*, Del. Ch., 699 A.2d 327, 339 (1997).)
n21 *See Steiner v. Meyerson*, 1995 Del. Ch. LEXIS 95, * 19 ("There is, of course, no single template for how corporations should be governed and no single compensation scheme for corporate directors.")

In sum, plaintiff alleges only that certain amounts of compensation were given to the director defendants and then concludes that [*18] these amounts are excessive. Plaintiff has not alleged facts, either directly or by even the most strained inference, to indicate why 3COM did not benefit from these grants, and that they, therefore, amounted to a gratuity and corporate waste. [HN12] Bare allegations that the alleged option values are excessive or even lavish, as pleaded here, are insufficient as a matter

of law to meet the standard required for a claim of waste. Because the Board's alleged actions are protected by the business judgment rule and the plaintiff has failed to make out a case of waste, there can be no underlying breach of the fiduciary duty of loyalty. I grant the defendant's motion to dismiss Count I's claims of waste and breach of the fiduciary duty of loyalty for failure to state a claim upon which relief can be granted.

VI. Count II - Breach Of The Fiduciary Duty Of "Candor"

In his second Count the plaintiff alleges that the Board:

1. Omitted from the proxy statement the value of the options as calculated under the Black-Scholes Option Pricing Model and that shareholders would have found that information material to the decision-making process; and,

2. Mischaracterized the value of these options by stating [*19] that:

> No gain to an optionee is possible without an increase in stock price, which will benefit all stockholders commensurately. A zero percent gain in the stock price will result in zero dollars for the optionee.

[HN13] Corporate fiduciaries have an obligation to disclose all material facts when seeking shareholder action. n22 Material facts are those for which "there is a substantial likelihood that a reasonable person would consider them important in deciding how to vote." n23 The board sought shareholder approval of an amendment to 3COM's existing Director Stock Option Plan which expanded the pool of shares available for administering this plan. It is the board's actions surrounding this decision that form the basis for plaintiff's disclosure violation claims. It follows from this that the disclosure violation allegations here must then relate to the details of this Amendment. As a threshold matter, I find generally that basic details concerning the value of these options would be material to a reasonable shareholder's decision whether to vote for or against an expansion of the share pool available under the Plan. The question then remains whether the Board provided sufficiently [*20] detailed and accurate information.

n22 *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (citing *Malone v. Brincat*, Del. Supr., 722 A.2d 5, 11 (1998)).

n23 *Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929, 944 (1985)

A Failure To Include Option Values Derived Under The Black-Scholes Model (Omission Allegation)

I find, as this Court has consistently found, that the Black-Scholes Option Pricing Model is neither sufficiently reliable nor necessary to apprise shareholders of the value of the options in question. I am rather surprised that the plaintiff has chosen to pursue this claim vigorously, knowing, as he must, that both the current Chancellor and his predecessor have questioned, if not outright rejected, the proposition that values derived from this model must be disclosed to shareholders. n24 I see nothing in the facts pleaded here which would lead me to believe that this case is so different that the Board should have disclosed [*21] these values to the shareholders. If anything, I find even less cause here for the disclosure than Chancellor Allen did in *Lewis v. Vogelstein* where he concluded that the exclusion of the Black-Scholes Model from proxy materials rendered them neither incomplete nor misleading. In that case, the shareholder action contemplated was the wholesale adoption of a stock option plan. Here, the action sought is merely approval of an amendment to a plan already in existence. Further, the amendment here just makes more shares available so that it is possible to carry out the existing plan, and does not seek to do more than raise the ceiling on the number of options available to each individual director.

n24 *See Lewis v. Vogelstein*, 699 A.2d at 331 ("The directors' fiduciary duty of disclosure does not mandate that the board disclose one or more estimates of present value of options that may be granted under the plan."); *Rovner v. Health-Chem Corp.*, 1998 Del. Ch. LEXIS 65, * 17 ("This Court has always accepted such valuations with a healthy dose of skepticism.")

[*22]

The plaintiff has established the usefulness of the Black-Scholes model in other contexts and established its merit generally as a tool for pricing options. However, he has failed to plead any facts to indicate that this model would be of such material importance to shareholders that it would alter the total mix of information needed to properly inform shareholders. I find no facts in the Complaint demonstrating a substantial likelihood that a reasonable person would consider this information important in deciding how to vote on the Amendment here.

B. Misleading Statement About The Potential Realizable Value of the Options (Mischaracterization Allegation)

Plaintiff also complains that the proxy materials contained a misleading statement about the potential realizable value of these options:

> No gain to an optionee is possible without an increase in stock price, which will benefit all stockholders commensurately. A zero percent gain in the stock price will result in zero dollars for the optionee.

It is appropriate here to point out, as defendants have, that this language has been extracted from a footnote to a table entitled "OPTION GRANTS IN FISCAL YEAR 1998" which [*23] falls under the section of the Proxy Statement on *Executive Compensation*. Considering that the plaintiff has raised issue only with the director options, his claim that this statement misled shareholders in deciding how to vote on the Amendment requires a rather tortured version of the facts.

However, even taking it out of its proper context and reading it as favorably as possible in light of the plaintiff's claims, I still find it to be accurate and a reasonable presentation of the information it seeks to convey, and not, as alleged, an attempt to mask some obscure, underlying truth. In the Proxy Statement the above-quoted language appears as follows (it is describing a table which shows the gains possible from the options granted to the company's officers, if the stock price were to rise by 5% and 10%, respectively):

> (4) Potential realizable values are net of exercise price, but before deduction of taxes associated with exercise. These amounts represent certain assumed rates of appreciation only, based on Securities and Exchange Commission rules, and do not represent the company's estimate of future stock prices. No gain to an optionee is possible without an increase [*24] in stock price, which will benefit all stockholders commensurately. A zero percent gain in stock price will result in zero dollars for the optionee. Actual realizable values, if any, on stock option exercises

are dependent on the future performance of the Common Stock, overall market conditions and the option holders' continued employment through the vesting period.

The truth of the questioned statement may be evaluated 1) on its face and 2) in its context in the Proxy Statement. I find that the statement, at a minimum, is true on its face, even standing alone. Under no set of facts or interpretation of the facts contained in this statement could I find that it was misleading or somehow mischaracterized how gains may be derived from options. Placing the statement in its context in the Proxy Statement makes its veracity even less questionable in my estimation. The statement is simply a note which explains a chart on "Potential Realizable Value" for option grants *given to executive officers* and can hardly appear to mischaracterize director compensation from option grants. But as stated above, even if I inferred that this statement would be cross-read by the shareholders into the [*25] context of an amendment to the plan on *director* compensation, no facts support the claim that these disclosures were somehow misleading.

However, plaintiff's substantive argument bears examination. The plaintiff argues that it is possible for the Board members to derive cash value from these options by simply selling identical options, backed by those options they received as compensation. Even if the value of the option is eventually nothing (because the stock price is at or below the option's strike price) the director may still keep the cash. Plaintiff claims that the statement above masks this possibility, and thus is a mischaracterization of the compensation scheme.

The plaintiff's claims do not take into account the downside of this type of transaction, namely that selling such an option also creates a risk of economic loss for the director and thus the value gained is not a guaranteed form of compensation, but more akin to an investment risk the director may choose to take. Certainly a director can sell an option contract (a short call) for the amount of shares over which he simultaneously holds an option (a long call), and may do so at equal exercise prices, giving him [*26] net present cash for options which may or may not be worth anything as of their exercise date. But by doing this, the director has merely cashed in his own future options for present money and not received any form of additional compensation at the expense of 3COM shareholders. No reasonable 3COM shareholder would find this scenario material in deciding how to vote on expanding the pool of shares available under the Plan.

Collapsing this purported transaction shows that really all that the plaintiff alleges is that a director can sell his options to another party. Plaintiff, however, does not point out that in doing so a director forgoes *any* potential future gain in the share price in order to receive present cash for the option contract. If at the time of exercise the net gain on his options exceeds the cash amount the director had received for selling identical options, the director must still deliver his shares to his optionee at the strike price, and simply stand by, watching the optionee take all of the gain. It is quite possible that the gain on these shares may be far more than he received in cash for selling the option contract (3COM is likely susceptible to the same rapid [*27] upswings and downturns common among technology stocks).

The transaction the plaintiff uses to illustrate the point is simply one involving a director's choice to place a personal asset at risk. Must the proxy statement point out that any director might be able to borrow money against his future pay and bet it at a racetrack, reaping a windfall if he wins? Put simply, the fact that an informational statement on compensation does not contain every possibility lying behind that compensation does not render it misleading or incomplete, particularly where that possibility is one which may only come about through the personal discretion of the individual being compensated, based on his or her own predilection for risk taking.

I find that the mere possibility of such a transaction is one about which the average investor need not be explicitly apprised. To mix metaphors: my holding otherwise would open Pandora's Box such that we would slide down a slippery slope towards mandating excessive detail in disclosures. I find on the facts before me that the statement questioned, even ignoring how far out of context the plaintiff has taken it, is accurate, and would not mislead a reasonable investor [*28] in a way which masks true compensation. Further, the compensation about which plaintiff seeks disclosure would not, if realized, come at the economic detriment of 3COM's shareholders. I find that the plaintiff has failed to plead facts sufficient to support a claim upon which this Court could grant relief.

VII. Conclusion

Defendants' motion to dismiss is granted as to both counts.

IT IS SO ORDERED.

Myron T. Steele

Vice Chancellor

LEXSEE 1991 DEL CH. LEXIS 29

IN RE BUDGET RENT A CAR CORPORATION SHAREHOLDERS
LITIGATION

Civil Action No. 10,418 Consolidated

Court of Chancery of Delaware, New Castle

1991 Del. Ch. LEXIS 29; Fed. Sec. L. Rep. (CCH) P96,120

November 15, 1990, Submitted
March 15, 1991, Decided
March 15, 1991, Filed

CASE SUMMARY:

PROCEDURAL POSTURE: Defendants, a corpora-
tion, a limited partnership that was the corporation's for-
mer majority stockholder, and others, filed a motion to
dismiss a purported class action brought by plaintiff for-
mer minority stockholders to challenge a merger between
the corporation and a second corporation by which the
second corporation became the corporation's sole stock-
holder

OVERVIEW: A corporation's former minority stock-
holders filed a purported class action against the corpora-
tion, a limited partnership that was the former majority
stockholder, and others, challenging a merger between
the corporation and a second corporation. The defendants
filed a motion to dismiss the complaint. The court
granted the motion, holding that the merger was not an
interested transaction and that the decisions made by the
corporation's directors were protected by the business
judgment rule. The limited partnership and its designees
on the corporation's board did not obtain benefits from
the merger to the exclusion and detriment of the minority
stockholders. The restrictions on the limited partnership's
ownership of the common stock were so complete as to
guarantee that it would receive no benefit as a stock-
holder. Although some directors benefited from a con-
sulting agreement with a management company, the
value of the consulting contract was so small relative to
the value of the stock that the benefit did not create a
disabling directorial interest. The limited partnership's
interest was in obtaining the highest price for its stock
and not in obtaining the consulting agreement

OUTCOME: The court granted the motion to dismiss a
purported class action challenging a merger between a
corporation and a second corporation that was filed by
the corporation's former minority stockholders against
the corporation, a limited partnership that was the former
majority stockholder, and others

LexisNexis(R) Headnotes

Business & Corporate Entities > Business Combina-
tions > Mergers
[HN1] The entire fairness of a transaction will be scruti-
nized by the courts where a majority of the directors ap-
proving the transaction were interested or where a major-
ity stockholder stands on both sides of the transaction.
Directors are "interested" if they appear on both sides of
a transaction or expect to derive any personal financial
benefit from it in the sense of self-dealing as opposed to
a benefit which devolves upon the corporation or all
stockholders generally. Similarly, a majority stockholder
stands on both sides of a transaction when, by virtue of
its domination of the subsidiary, it causes the subsidiary
to act in such a way that the parent receives something
from the subsidiary to the exclusion of, and detriment to
the minority stockholders of the subsidiary.

COUNSEL: [*1]

R. Bruce McNew, Esquire, Pamela S. Tikellis, Es-
quire and Carolyn D. Mack, Esquire of GREENFIELD
& CHIMICLES, Wilmington, Delaware and Michael D.
Donovan, Esquire of GREENFIELD & CHIMICLES,
Haverford, Pennsylvania; Of Counsel: GENE MESH &
ASSOCIATES, Cincinnati, Ohio, Lead Counsel for
Plaintiffs

1991 Del. Ch. LEXIS 29, *; Fed. Sec. L. Rep. (CCH) P96,120

Richard L. Sutton, Esquire and Edmond D. Johnson, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; Of Counsel, Mitchell A. Karlan, Esquire of GIBSON, DUNN & CRUTCHER, New York, New York and KRAMER, LEVIN, NESSEN, KAMIN & FRANKEL, New York, New York, Attorneys for Defendants

JUDGES:

Berger, Vice Chancellor.

OPINIONBY:

BERGER

OPINION:

MEMORANDUM OPINION

This is the decision on defendants' motion to dismiss a purported class action brought by former minority stockholders of Budget Rent A Car Corporation ("Budget"), following the merger between Budget and Beech Holdings Corp ("Holdings"). Plaintiffs characterize the merger as a management led cash out of the minority public stockholders at a grossly inadequate price. Defendants, by contrast, say that this was a third party transaction agreed to by a board of directors, a majority of whom were disinterested. For the reasons that follow, I conclude that [*2] the Amended Complaint fails to state a claim and must be dismissed.

The relevant facts, as alleged in the Amended Class Action Complaint (the "Complaint") and the Budget Proxy Statement, n1 are as follows. Budget is a Delaware corporation engaged in the vehicle renting business. The company was wholly-owned by Transamerica Corporation until September, 1986 when it was acquired in a leveraged buy out by a group that included defendant, Gibbons, Green, van Amerongen Ltd. ("GGVA") and certain members of Budget's management. As a result of that transaction, defendant Fulcrum II, L.P. ("Fulcrum"), a limited partnership whose general partner is GGVA, became Budget's majority stockholder.

n1 The Complaint relies heavily on the description of the transaction as contained in the proxy statement. Accordingly, the proxy statement will be deemed incorporated by reference in the Complaint. See Lewis v. Straetz, 1986 Del. Ch. LEXIS 365, Del. Ch., Civil Action No. 7859, Hartnett, V. C. (February 12, 1986).

In May, 1987, Budget made a public offering of [*3] approximately 30% of its common stock at $ 14.00 per share. The public offering generated approximately $ 40 million which was used to pay down a portion of the company's debt. The offering reduced Fulcrum's interest in Budget's common stock to about 44%. Through the third quarter of 1988, Budget's common stock traded on the over the counter market at between $ 9.50 and $ 16.00 per share. At all relevant times, Budget's six member board of directors consisted of Messrs. Green, van Amerongen and Walker, general partners of GGVA; Mr. Goodall, president of another GGVA company; and Messrs. Haley and Belzberg, Budget's two most senior officers and the owners of more than 8% of Budget's common stock.

In August, 1988, an investment banking firm contacted Budget's board and expressed its belief that the market was undervaluing Budget's stock. After written and oral presentations by five investment firms concerning the valuation of Budget's stock, the board announced on October 7, 1988 that it had engaged Morgan Stanley & Co., Inc. ("Morgan Stanley") to explore alternatives to enhance stockholder value, including the possible sale of the company. Morgan Stanley contacted twenty-one potential [*4] acquirors including Ford Motor Company ("Ford"), which for many years had been the principal supplier of Budget's rental vehicles.

Morgan Stanley was preparing for a possible auction of Budget. However, when approached by an officer of Ford, a Morgan Stanley representative indicated that a preemptive bid -- one that was at least in the low $ 30's per share -- would be given consideration. After several meetings between the parties or their respective investment advisers, on October 28, 1988, Ford presented its proposal to acquire all of Budget's outstanding stock for $ 30.00 per share. Ford's representative stated that its bid would be withdrawn if the parties were unable to reach an agreement before the opening of business on October 31, 1988 or if the bid were revealed to any third party. In addition, Ford's representative advised that if Budget were to forego the bid in favor of an auction, Ford's auction bid, if any, could be lower than $ 30.00 per share.

The parties negotiated over the next three days and on October 31, 1988, Budget's directors approved the merger and related transactions. Pursuant to the Merger Agreement, all of Budget's stockholders received $ 30.00 per share [*5] for their stock. Holdings, which became the sole stockholder of Budget, was capitalized as follows: (1) Fulcrum contributed $ 1 million in exchange for all of the outstanding Holdings common stock (10,000 shares); (2) Ford contributed $ 334 million in exchange for all of the outstanding Series A and Series B preferred stock (150,000 shares of Series A and 174,000 shares of Series B); and (3) Messrs. Haley, Belzberg and other of Budget's top management contributed $ 10 million in Budget common stock valued at $ 30.00 per share

and cash for all of the outstanding shares of Series C preferred (10,000 shares). Only the common stock and the Series C preferred stock were given voting rights, with the common entitled to one vote per share and the Series C entitled to 1/4 vote per share. Thus, Ford, the owner of the Series A and Series B stock, had no direct control over Holdings. The representation on Holdings' board of directors also reflected Ford's lack of direct control. Subject to certain conditions, the Holdings board was to consist of five directors designated by a majority of the common stock, two of whom had to be unaffiliated with Fulcrum or Budget, and two members designated by [*6] the holders of a majority of the Series C stock, one of whom had to be Budget's Chief Executive Officer. A majority of the Series C stockholders could add two more members to the board of directors, one of whom had to be unaffiliated.

Notwithstanding this capitalization and division of voting rights, Ford retained significant indirect control through agreements limiting transferability and in other ways restricting both the common stock and the Series C preferred stock. Significantly, the common stock could not receive any dividends, share in any other distributions or be sold for more than $ 30.00 per share. In addition, Ford had the power to require that Fulcrum sell its stock to a purchaser designated by Ford at any time. The Series C stock is generally not transferable except to Holdings, other members of Budget management or a party that purchases the Series B stock from Ford. The Series C stock is also subject to several puts and calls which, in general terms, provide the members of Budget management with a method of liquidating their investment and provide Holdings and Ford, under certain circumstances, the right to purchase all or a portion of the outstanding Series C stock. [*7]

In conjunction with the merger, two pre-existing arrangements were continued or formalized. GGVA had performed management services for Budget prior to the merger and it was agreed that GGVA would continue to provide those services at the then current annual fee of $ 415,000 for as long as Fulcrum owned any Holdings common stock. In addition, Ford and Budget entered into a Supply Agreement pursuant to which at least 70% of Budget's vehicles would be purchased from Ford. Prior to the merger, Budget had been buying and leasing a large portion of its fleet from Ford, but it does not appear that the parties had any contractual commitments.

The merger was unanimously approved by Budget's directors after considering, among other things, that: (1) in Morgan Stanley's opinion, the merger price was fair from a financial point of view; (2) the merger price represented a significant premium over historical trading prices; and (3) based upon Morgan Stanley's discussions with other potential acquirors, it did not appear that other parties would propose a transaction at a higher price. The proposed merger was presented to Budget's stockholders at a special meeting on March 30, 1989. However, it [*8] was a foregone conclusion that the merger would be approved since Fulcrum, Haley and Belzberg, who collectively owned 52% of the outstanding stock, had committed to vote in favor of the merger.

Plaintiffs' claim depends upon their characterization of the merger. Plaintiffs argue that Budget's directors were interested in the transaction and that, in light of their failure to institute procedural safeguards, they must establish that the merger was entirely fair. Defendants do not dispute that Messrs. Haley and Belzberg were interested. They were members of Budget's top management and were going to continue their employment following the merger. Messrs. Haley and Belzberg also were given the opportunity to share in the future profits of Budget through their purchase of Holdings' Series C stock.

The remaining four members of Budget's board of directors, however, were not members of Budget's management and were not to become owners of any Series C stock. Those four directors' interest, if any, arose from their ties to GGVA and Fulcrum. Plaintiffs argue that, since Fulcrum became the owner of the Holdings' common stock, Fulcrum and its designees on the Budget board stood on both sides [*9] of this merger. In addition, plaintiffs point out that GGVA obtained a lucrative management services agreement in conjunction with the merger.

It is settled law that [HN1] the entire fairness of a transaction will be scrutinized by the courts where a majority of the directors approving the transaction were interested or where a majority stockholder stands on both sides of the transaction. See Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812 (1984); Summa Corp. v. Transworld Airlines, Inc., Del. Supr., 540 A.2d 403, 406-7 (1988). Directors are "interested" if they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing as opposed to a benefit which devolves upon the corporation or all stockholders generally." Aronson, 473 A.2d at 812. Similarly, a majority stockholder stands on both sides of a transaction when, "by virtue of its domination of the subsidiary, [it] causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to the minority stockholders of the subsidiary." Sinclair Oil Corporation v. Levien, Del. Supr., 280 A.2d 717, 720 (1971), [*10] cited with approval in Summa Corporation v. Transworld Airlines, Inc., 540 A.2d at 406. The question, thus, is whether Fulcrum or its designees on the Budget board obtained any benefits from the merger to the exclusion and detriment of Budget's minority stockholders. As noted above, plaintiffs claim that they did in the form of

1991 Del. Ch. LEXIS 29, *; Fed. Sec. L. Rep. (CCH) P96,120

Fulcrum's ownership of Holdings common stock and GGVA's consulting agreement. I disagree.

While it is true that Fulcrum became the owner of the Holdings common stock, the restrictions on its ownership were so complete as to guarantee that Fulcrum would receive no benefit as a Holdings stockholder. Fulcrum could not share in Budget's growth or profits either by receiving any distribution as a stockholder or by disposing of its Holdings common stock. Ford provided virtually all of the funds for the acquisition of Budget and, through the restrictions on the Holdings common stock, Ford reduced Fulcrum's interest in Holdings to that of a mere stakeholder. The reason for this somewhat unusual arrangement was acknowledged by plaintiffs in their Complaint, where they noted that the merger was structured as it was, in part, to enable Ford to avoid [*11] antitrust problems. The Proxy Statement explains that, since Fulcrum had been given clearance in 1986 to acquire more than 50% of Budget stock, there was no need to make any pre-merger filings with the Federal Trade Commission and Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

Plaintiffs do not offer any concrete examples of how Fulcrum could derive a benefit from its ownership of Holdings common stock. Nonetheless, they argue that Fulcrum must be more than a mere stakeholder. Plaintiffs say that Ford would have violated the antitrust laws if Fulcrum's ownership of Holdings stock were a sham. Since, apparently, the FTC has taken no action against Ford, plaintiffs contend that Fulcrum's ownership of Holdings common stock must have had some real value.

I am not persuaded by plaintiffs' argument. It is not for this Court to decide whether Ford violated any antitrust laws. It would be equally inappropriate for this Court to make any assumptions or draw any conclusions from the FTC's failure to take action. The question is only whether Fulcrum obtained any benefit from its ownership of Holdings common stock. The answer to that question depends upon [*12] the nature of the stock and not the action or inaction of the FTC.

The GGVA consulting agreement presents a slightly different issue. I am satisfied that Fulcrum obtained no benefit from the merger through its ownership of Holdings common stock because that stock had no value to Fulcrum. The consulting agreement, by contrast, provided $415,000 per year to GGVA. Thus, it could be said that the four GGVA/Fulcrum directors benefitted from the consulting agreement. However, I conclude that this benefit does not create a disabling directorial interest.

By the terms of its agreement with Ford, Fulcrum was to remain the owner of Holdings common stock for no more than 16 months. Thus, the maximum amount that GGVA could expect under the terms of the consulting arrangement would be approximately $550,000. This amount, standing alone, appears to be very sizeable. However, Fulcrum and its affiliates received slightly under $140 million for their 4.6 million shares of Budget stock. Under these circumstances, there can be no question but that Fulcrum's interest was in obtaining the highest possible price for its stock, not in obtaining a short term consulting agreement for GGVA. See Grobow v. Perot, Del. Supr., 539 A.2d 180, 188 (1988) [*13] (where, in the context of determining demand futility, the Court held that directors have no financial interest by virtue of the fact that they are paid for their services as directors); and In re Mobile Communications Corp. of America, Inc., 1991 Del. Ch. LEXIS 4, *28, Del. Ch., Civil Action Nos. 10,627, 10,638, 10,644, 10,656, 10,697, Allen, C. (January 7, 1991) (where, in considering a settlement, the Court noted that the directors' substantial stock holdings "created powerful economic . . . incentives to get the best available deal in the sale of [the company]")

Based upon the foregoing, I conclude that the Budget/Holdings merger was not an interested transaction and that the decisions made by the Budget directors are protected by the business judgment rule. Accordingly, the Complaint fails to state a claim and defendants' motion to dismiss is granted.

*IT IS SO ORDERED*

LEXSEE 2004 U.S. DIST. LEXIS 25807

**CONTINUING CREDITORS' COMMITTEE OF STAR TELECOMMUNICATIONS INC., Plaintiff, v. CHRISTOPHER EDGECOMB, et al., Defendants.**

Civil Action No. 03-278-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

385 F. Supp. 2d 449; 2004 U.S. Dist. LEXIS 25807

December 21, 2004, Decided

**DISPOSITION:** [**1] Defendants' motion to dismiss granted as to all defendants except Messing.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff creditors' committee brought suit against defendants, directors and officers of a bankrupt corporation, alleging the breach of fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste. The directors and officers moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

**OVERVIEW:** The creditors' committee claimed that the corporation's demise was a result of several ill-fated merger and financing transactions that were approved by the directors, who were alleged to have profited from stock sales while knowing that the transactions were risky or problematical. The non-director officers of the corporation were largely ignored in the complaint and were entitled to dismissal of claims against them. The directors argued that, in the absence of a breach of fiduciary duty, they were protected by Delaware's business judgment rule and an exculpation clause in the corporate certificate, pursuant to Del. Code Ann. tit. 8, § 102(b)(7). The court agreed that a proper exculpation clause barred all claims of the breach of the duty of care and for gross negligence. The corporate waste claim was conclusory and insufficient to overcome the protections of the business judgment rule. However, if the facts pleaded were taken as true, one outside director had received a direct financial benefit from the transactions that none of the shareholders received. The claims against him were sufficient to proceed.

**OUTCOME:** The directors motion to dismiss was granted as to all defendants except the outside director who was alleged to have received benefits and enrichment at the expense of the corporation that other shareholders did not receive.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] The standard for reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The moving party has the burden of persuasion.

*Civil Procedure > Class Actions > Derivative Actions*
[HN2] Where the filing of what otherwise would be a derivative action is approved by a bankruptcy court, there is no motion to dismiss for failure to comply with the demand requirement of Del. Ch. Ct. R. 23.1, and the allegations of the complaint are not subject to the more exacting standard imposed by Rule 23.1 for derivative actions.

*Civil Procedure > Class Actions > Derivative Actions*
[HN3] A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. Events affecting all stockholders in the same way, such as corporate waste

Case 1:04-cv-01268-***-MPT    Document 75-2    Filed 11/30/2005    Page 16 of 30

Page 2
385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

and mismanagement, fall squarely within the definition of a derivative action.

**Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations**
**Civil Procedure > Class Actions > Derivative Actions**
[HN4] In derivative suits, a shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. Del. Ch. Ct. R. 23.1. Rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations. The demand requirement is not a procedural matter; it is, rather, a matter of substantive state law.

**Civil Procedure > Pleading & Practice > Pleadings > Interpretation**
[HN5] The federal pleading requirements which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged.

**Civil Procedure > Class Actions > Derivative Actions**
**Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action**
[HN6] The high burden of pleading, with particularity, facts supporting the reasonableness of claims alleging required to withstand a motion to dismiss under Del. Ch. Ct. R. 23.1 is somewhat lower under Fed. R. Civ. P. 12(b)(6).

**Civil Procedure > Class Actions > Derivative Actions**
[HN7] The demand requirements of Del. Ch. Ct. R. 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN8] The business judgment rule eludes precise categorization, as it assumes different shapes in different settings. In the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN9] The business judgment rule serves two important functions: First, it prevents the courts from injecting themselves into a management role for which they were neither trained nor competent. Second, it encourages others to assume entrepreneurial and risk-taking activities by protecting them against personal liability when they have performed in good faith and with due care, however unfortunate the consequence.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN10] Even where a plaintiff is not required to plead particularized facts to raise a reasonable doubt that a challenged corporate transaction was the product of a valid exercise of business judgment, it must still plead facts from which such an inference can be drawn.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN11] Where it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes. Therefore, a reference to the duty of loyalty also refers to the duty of good faith.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN12] The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN13] To allege a breach of the duty of loyalty based on actions or omissions of a board of directors, a plaintiff must plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence. To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders. A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.

**Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities**
[HN14] Delaware cases repeatedly state that a plaintiff must prove a defendant director's breach of loyalty

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

through a showing of interest in a transaction or lack of independence.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN15] Showing that a corporate director lacks independence because of a subservient relationship to an interested person depends, in the first instance, on a showing that the supposedly dominating person actually is interested in the transaction in question

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN16] If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, if applicable, to shield him from liability for a breach of the duty of care

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN17] Under Delaware law, the business judgment rule operates as a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest. In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN18] Del. Code Ann. tit. 8, § 102(b)(7)

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN19] Where the standard of review ab initio is the business judgment rule, the directors' properly raising the existence of a valid exculpatory provision in the corporate charter entitles them to dismissal of any claims for monetary damages against them that are based solely on alleged breaches of the board's duty of care.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN20] A breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency is derivative in nature. The fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a

director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN21] Where a claim held by a creditor is derivative in nature, Del. Code Ann. tit. 8, § 102(b)(7) applies to all claims asserted on behalf of the creditors

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Torts > Negligence > Negligence Generally*
[HN22] A claim that a corporate manager or director acted with gross negligence is the same as a claim that he or she breached the fiduciary duty of care.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Torts > Negligence > Negligence Generally*
[HN23] Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence, under Del. Code Ann. tit. 8, § 102(b)(7).

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN24] The Delaware standard for pleading corporate waste is stringent: an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN25] Absent a breach loyalty, Del. Code Ann. tit. 8, § 102(b)(7) protects directors and officers from a claim of corporate waste

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN26] Where there is any substantial consideration received by a corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste by the corporate directors, even if the fact finder would conclude ex post that the transaction was unreasonably risky.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN27] A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

**COUNSEL:** Joseph A. Rosenthal, Esq.; Kevin Gross, Esq., Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington. Delaware; Counsel for Plaintiff, Of Counsel: Daniel A. Lowenthal, III, Esq., Jonathan D. Siegfried, Esq.; Lawrence S. Hirsh, Esq., Thelen Reid & Priest LLP, New York, New York

John C. Phillips, Jr., Esq., Phillips, Goldman & Spence P.A., Wilmington, Delaware; Counsel for Defendants, Of Counsel: Marc J. Sonnenfeld, Esq.; Karen Pieslak Pohlmann, Esq.; Jill Baisinger, Esq., Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE

**OPINIONBY:** Kent A. Jordan

**OPINION:**

[*451] **MEMORANDUM OPINION**

JORDAN, District Judge

**I. Introduction**

Before me is a motion (Docket Item ["D.I."] 63; the "Motion to Dismiss") filed by defendants Christopher E. Edgecomb ("Edgecomb"), Mary A. Casey ("Casey"), Arunas A. Chesonis, ("Chesonis"), David Vaun Crumly ("Crumly"), Kelly D. Enos ("Enos"), Mark Gershien ("Gershien"), Gordon Hutchins, Jr. ("Hutchins"), James E. Kolsrud ("Kolsrud"), Allen Sciarillo ("Sciarillo"), John R. Snedegar ("Snedegar"), Samer A. Tawfik ("Tawfik"), [**2] Brett S. Messing ("Messing"), and Paul Vogel ("Vogel") (collectively the "Defendants"), seeking to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

[*452] The First Amended Complaint (the "Complaint"), filed by the Continuing Creditors' Committee of Star Telecommunications, Inc. (the "Plaintiff"), for itself and on behalf of the Star Creditors' Liquidating Trust (the "Liquidating Trust"), contains allegations that the Defendants, as directors and officers of Star Telecommunications Inc. ("Star" or the "Company"), breached their fiduciary duties of loyalty, good faith, and care, and that their acts or omissions constituted gross negligence, mismanagement, and corporate waste (D.I. 4 at PP147-76.) The Plaintiff further alleges that payments made from Star to Messing constitute unjust enrichment at the expense of Star. (Id.)

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. For the reasons set forth herein, the

Motion to Dismiss will be granted as to all defendants except Messing.

**II. Background** n1

> n1 The following rendition of the background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party, the Plaintiff.

[**3]

Star was a telecommunications carrier specializing in long distance telephone service. (Id. at P1.) Through expanding capacity and acquiring other companies, Star grew rapidly in the mid-1990s and by the late 1990s was the seventh-largest telecommunications carrier in the United States. (Id. at PP1-2.) By 2000, however, Star's financial position had deteriorated considerably, and, in early 2001, the Company was forced to file for bankruptcy. (Id. at P3.)

Star was founded in the Mid-1990s by Edgecomb, who served as Chief Executive Officer ("CEO") and Chairman of Star's Board of Directors from 1996 through January 10, 2001, and defendant Casey, who served as President from 1996 through January 10, 2001, and served as a Director from 1996 through March 13, 2001. (Id. at PP7-8.) Defendant Tawfik was a Director of Star and President of its subsidiary PT-1 from February 1999 through March 18, 2000, the date that Star filed for bankruptcy protection. (Id. at PP17, 21.) Defendants Chesonis, Gershien, Hutchins, and Snedegar were Directors of Star but did not hold management positions within the Company. (Id. at PP9, 12-13, 16-17.) Hutchins and Snedegar served from [**4] the mid-1990s until Star filed for bankruptcy in early 2001; Chesonis served from May 1998 through February 2000; Gershien served from March 1998 through October 1999. (Id.)

In June 1997, Star completed an initial public offering, raising $ 32 million. (Id. at PP2-3.) In 1998, the price of Star's common stock peaked and Star raised $ 145 million through an additional stock offering. (Id. at P29.) By the end of the year, however, Star had only $ 64.4 million of net working capital, due in part to massive capital expenditures (Id. at PP3, 29.)

On June 8, 1998, Star's Board of Directors met to discuss the acquisition of PT-1, which was in the prepaid calling card business. (Id. at P40.) At that meeting, the Board received a presentation from one of the investment banks advising them on the acquisition, Hambrecht & Quist ("H&Q") (Id.) Despite the fact that H&Q had represented PT-1 in a failed initial public offering, the Board did not wait to receive a report from the other investment bank advising them, Credit Suisse First Boston,

Case 1:04-cv-01268-***-MPT    Document 75-2    Filed 11/30/2005    Page 19 of 30

Page 5

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

before acting on the acquisition. (Id.) On the following day, after meeting for 12 minutes, the Board approved the acquisition. [**5] (Id.) In February 1999, despite Star's poor cash position and a drop in value of PT-1 from $ 590 million to $ 190 million, Star closed the PT-1 acquisition. (Id. at P45.) PT-1's principal shareholder was Tawfik, who, after the acquisition by Star, remained President of [*453] PT-1, and, additionally, became a member of Star's Board of Directors. (Id. at PP17, 46.)

Shortly after completing the PT-1 acquisition, Star announced to the public that a syndicate of banks, led by Goldman Sachs Credit Partners, had committed to supply the Company with $ 275 million in senior secured credit facilities. (Id. at P52.) The credit facilities were not delivered as announced, however, which caused the financial markets to view Star negatively. (Id. at PP52-53.) There is no record of the Board discussing why the financing fell through or who was responsible for the failure of the agreement and its premature announcement. (Id. at P53.)

As a result of the failure to close the proposed credit agreement, Star was forced to agree to more costly financing from another source, Foothill Capital Corporation ("Foothill"). (Id. at P55.) The financing from Foothill, which was finalized on [**6] June 9, 1999, included a $ 25 million term loan and a $ 75 million revolving line of credit based on Star's accounts receivable. (Id.) When Star released its quarterly financial statements a few weeks later, on June 30, 1999, it was clear that it had already breached certain covenants. (Id. at P56.) The breaches were caused by two of Star's financial measurements falling below required levels, specifically, tangible net worth and earnings before interest, taxes, depreciation, and amortization. (Id.) Foothill threatened to sue Star for breach of the covenants, and, consequently, Star agreed to additional fees in order to amend the credit agreement. (Id. at P57.) The additional fees Star agreed to pay included a $ 500,000 agency fee, an increase in the interest rate of the loan, and a payment of $ 2 million if the term loan was not paid back by January 31, 2001 (Id.)

In the fall of 1999, World Access, Inc. ("World Access") expressed interest in acquiring Star. (Id. at P66.) World Access bundled voice and data services for the European market. (Id.) The Plaintiff, however, alleges that the primary business purpose of World Access was to acquire companies [**7] for MCI WorldCom Inc. ("WorldCom"), when WorldCom could not openly undertake such transactions itself. (Id.) The Plaintiff contends that WorldCom controlled World Access through stock holdings and a carrier service agreement. (Id.) At the time World Access expressed its interest in Star, Star owed WorldCom approximately $ 56 million and was facing serious financial difficulties. (Id. at P67.) The

Plaintiff alleges that WorldCom's purpose in acquiring Star through World Access was to hide unrecoverable receivables owed to WorldCom. n2 (Id. at P69.) At a December 16, 1999 meeting, Star's Board discussed its financial difficulties, specifically, the Company's mounting past due accounts payable and lack of available cash. (See id. at P65.) Some Board members at this meeting suggested that "insolvency ... was a clear possibility without fundamental changes in [Star's] operation." (Id.)

> n2 The Plaintiff argues that the Board should have examined the relationship between World Access and WorldCom further because "the relationship of those companies was relevant to when and under what terms a merger transaction could be completed." (D.I. 4 at P69.) How their relationship would affect the terms of the agreement is not described, however. It could be argued that such a relationship and WorldCom's alleged motivation to hide unrecoverable receivables would have been a benefit to Star in closing the proposed merger, not a detriment.

[**8]

In that same meeting, Star's Board authorized a letter of intent to enter into a merger with World Access, wherein Star shareholders would receive World Access stock and cash equal to approximately $ 10.50 per share of Star common stock. (Id. at P71.) Additionally, World Access [*454] agreed to provide Star with tens of millions of dollars in bridge financing when the deal closed. (Id.) As part of the transaction, World Access was to assume Star's WorldCom debt. (Id.)

On February 2, 2000, World Access announced that it was reducing its offer to Star from $ 650 million to $ 440 million, due to facts uncovered during due diligence on Star's condition. (Id. at P72.) On February 7, 2000, Star's Board held a 90 minute meeting to discuss the merger and, following another 75 minute meeting on February 11, 2000, voted to approve the merger. (Id. at P73.) The approved merger had a number of conditions precedent, the most notable being the requirement that Star divest itself of PT-1 and receive at least $ 150 million in consideration for that business. (Id. at P74.)

Citing the Board's minutes, the Plaintiff alleges that the Board did not investigate whether it would be feasible [**9] to sell PT-1 for such a price. (Id.) The Board did, however, receive a fairness opinion from Deutsche Banc, which stated that the transaction, as revised by World Access, was fair from a financial standpoint. (D.I. 66, Ex. 22 at 3.) The Board also received a memorandum from its Delaware counsel advising it of its obligations under Delaware law. (Id. at 2.) Finally, the Board was

informed that no serious interest with respect to acquiring Star had been shown by any third parties. (*Id.*) In March 2000, Star signed a letter of intent to sell PT-1 to Counsel Corporation ("Counsel") for $ 150 million. (D.I. 4 at P75.) By the end of 2000, Counsel had informed Star that it was lowering its price for PT-1 from $ 150 million to $ 70 million (*Id.* at P97.) Consequently, World Access terminated its merger with Star for failure to satisfy one of the conditions precedent, namely selling PT-1 for $ 150 million (*Id.* at P101.)

The Plaintiff alleges that the myopic focus of Star's Board and management on completing the merger was to Star's detriment (*Id.* at P84.) As a result of the merger negotiations with World Access, the Directors and Officers of Star did not pay appropriate [**10] attention to the day-to-day operations of the Company. (*Id.* at P78.) In a registration statement sent to the Securities and Exchange Commission (the "SEC") Star admitted that:

> FOR THE LAST 16 MONTHS, OUR MANAGEMENT AND KEY EMPLOYEES HAVE FOCUSED ALMOST ENTIRELY ON CLOSING THE WORD ACCESS MERGER AND THE PT-1 ASSET SALE AND HAVE NOT CONCENTRATED ON OUR DAY-TO-DAY OPERATIONS . Given these efforts, our management and key employees have not spent the requisite time or effort necessary to run our day-to-day operations

(*Id.* at P79.) The Plaintiff alleges that the fact that Stars' Chief Financial Officer ("CFO"), Enos, did not attend any Board meetings after December of 1998, further highlights that the Board was not concerned with the day-to-day operations of Star. (*Id.* at P81.)

In the Summer of 2000, prior to the termination of the proposed merger with World Access, Edgecomb sold 6.2 million shares of Star common stock, Tawfik sold more than 2.2 million shares, and Crumly sold 112,000 shares (*Id.* at P85.) They all sold their shares for less than the proposed merger price, and the Plaintiff alleges that this was due to the unique information they were [**11] privy to as Officers and Directors of the Company (*Id.* at P86.)

On January 9, 2001, some five to six months after those individuals sold shares of Star's common stock, Star announced that World Access was abandoning its merger with Star due to Star's inability to sell PT-1 for $ 150 million, as required by the merger agreement (*Id.* at P101.) As a result of the merger failing to close and

[*455] Star's worsening financial condition, Star's creditors began to threaten drastic action to protect their interests (*Id.* at PP92, 101.) The Board, realizing the severity of the situation, invited Messing, as a representative of Gotel Investments Ltd. ("Gotel"), one of Star's investors, to make a presentation to the Board on January 1, 2001. (*Id.* at P93.) Messing offered to assemble a new management team for Star, with the aim of closing the World Access merger and, failing that, repairing the Company's relationships with its vendors and creditors (*Id.* at P95.)

On January 10, 2001, the Board turned over control of the Company to Messing. (*Id.* at P100-03.) At the same time, Edgecomb resigned his position as CEO, Chairman, and a Director n3; Casey resigned as President but [**12] retained her position on the Board (*Id.* at P7-8, 103.) After Messing was appointed Chairman and CEO, Sciarillo was named CFO, Timothy Sylvester was named General Counsel, and Vogel joined the Board. (*Id.* at P103.) Vogel is alleged to have long-standing business and professional relations with Messing. (*Id.* at P116.)

> n3 Although the complaint only states that Edgecomb resigned as the Company's CEO and Chairman of the Board (D.I. 4 at P103), it is assumed that he resigned his directorship as well. (*See Id.* at P7 (stating that Edgecomb "served as Chief Executive Officer and Chairman of the Board of Directors of Star from in or about January 1996 through on or about January 10, 2001," without any mention of further service as a Director).)

The first action Messing completed was a short term financing deal with Gotel, a company with which he is alleged to have been affiliated. (*Id.* at P104.) The deal provided Star with $ 25-35 million in new capital over six months, in exchange for attractively [**13] priced warrants for 30 million shares of Star's common stock. (*Id.*) Messing admitted that the cost of capital in this transaction was high, but that without it the Company would likely not survive. (*Id.*) Some directors were concerned that the new warrants would allow Gotel to take control of the Company, and certain Board members believed that Messing controlled Gotel. (*Id.* at P105-06.) Upon completion of the transaction with Gotel, Gotel was permitted to name two directors to Star's Board. (*Id.* at P115.) The two new directors chosen by Gotel were Alan Rothenberg and Steve Carroll, both of whom are alleged to have long-standing business dealings and personal relationships with Messing. (*Id.* at P116.)

The next major transaction into which Messing led Star, was the sale of PT-1's pre-paid calling card busi-

Case 1:04-cv-01268-***-MPT    Document 75-2    Filed 11/30/2005    Page 21 of 30

Page 7

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

ness. (*Id.* at P119.) On January 21, 2001, Messing, Sciarillo, and Crumly, among others, met with officers of IDT Corporation ("IDT") and negotiated a deal to sell the PT-1 business to IDT; Messing allegedly entered into this agreement (the "January 21 Agreement") without considering other buyers, such as PT-1's management team. (*Id.* at PP121-22.) The January [**14] 21 Agreement included the transfer of the PT-1 business to IDT, the indemnification of PT-1 by IDT in connection with certain pending lawsuits, and the transfer of $ 5 million, $ 4 million of which was paid at the time of the agreement and $ 1 million of which was to be paid at closing. (*Id.* at P124.) It also included an indemnity for $ 3.5 to $ 5 million in connection with three pending lawsuits. (*Id.*) This agreement was conditioned on PT-1 having $ 25 million in gross receivables and the release of all liens and security interests in PT-1 by all creditors. (*Id.* at P125.) On January 23, the two parties entered into an agreement, whereby IDT and Star agreed to direct $ 100 million in products and services to each other over a two-year period. (*Id.* at P126.) In addition, IDT Investments, a company affiliated with IDT, agreed to [*456] purchase 5% of Star's common stock, as well as warrants giving them the right to purchase an additional 10% of Star's common stock. (*Id.*) IDT Investments also entered into a standstill agreement with Star that forbade IDT Investments from owning more than 20% of Star's outstanding common stock without first gaining the approval of Star. ( [**15] *Id.*)

On February 1, 2001, Star and IDT closed the deal pursuant to the January 21 Agreement. (*Id.* at P127.) But, allegedly at the behest of Messing, IDT did not pay the $ 1 million owed to Star at the time of closing; it instead wired the money to WorldCom in return for WorldCom releasing its security interest in PT-1. (*Id.*)

Between January 18, 2001 and February 7, 2001, IDT Investment purchased 15,006,236 shares of Star's common stock, or about a 21.1% beneficial ownership in Star. (*Id.* at P129.) IDT Investments did not, however, retain the voting rights associated with these shares. Rather, it transferred those rights to Messing through a voting proxy. (*Id.*)

In early March of 2001, WorldCom declared its intention to force Star into bankruptcy, and another Star creditor, RFC Capital, decided not to purchase additional receivables from Star. (*Id.* at P130.) Shortly thereafter, Messing and IDT renegotiated certain parts of the PT-1 transaction. (*Id.* at P131.) The Plaintiff alleges that Star received no benefit in this renegotiation. Instead, the renegotiation permitted IDT to eliminate its $ 3.5 million indemnity obligation on the basis of the $ 5 million [**16] in cash IDT had already paid as part of the deal. (*Id.* at PP124, 133.) Another $ 1.5 million debt obligation IDT owed to Star was eliminated on the basis of the pre-

payment. (*Id.*) On March 8, 2001, soon after agreeing to the renegotiation of the PT-1 deal, Messing resigned from Star, as did his team. (*Id.* at P137.)

The Plaintiff alleges that Messing's actions with respect to IDT were a result of his wish to curry favor with IDT and its principal owner, Howard Jonas ("Jonas"). (*Id.* at P139.) In fact, shortly after Messing left Star, he became a partner in a capital management firm and he received a $ 5 million investment from Jonas. (*Id.* at P140.) Jonas later invested another $ 2 million with Messing. (*Id.*)

Before Messing left Star, he submitted a request and received a $ 25,000 reimbursement for expenses incurred in his capacity as CEO of Star. (*Id.* at P141.) The largest expenses for which he sought reimbursement were $ 10,000 given to SAR Academy, a private school of which Jonas was a significant benefactor, and $ 10,616 to an investment vehicle, partially run by Messing, for rent and support services for offices in Los Angeles (*Id.* at PP143-145.) [**17]

Star filed for bankruptcy protection on March 13, 2001. (*Id.* at P21.)

### III. Standard of Review

[HN1] The standard for reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

This case is unusual in that it alleges corporate misfeasance and malfeasance of a type most frequently challenged in derivative suits, n4 but, because of the bankruptcy context in which it arises, the [*457] case is brought by the Plaintiff directly, without the Plaintiff having first had to make a demand on the Company's Board of Directors for some corrective action n5 [HN2] In a context like this, [**18] the Delaware Court of Chancery has said, "because the filing of this action was approved by the Bankruptcy Court, there is no motion to dismiss for failure to comply with Court of Chancery Rule 23.1's demand requirement. Thus, the Plaintiff's allegations are not subject to the more exacting standard imposed by Court of Chancery Rule 23.1 for derivative actions." *Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins,* 2004 Del. Ch. LEXIS

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

122, C.A. No. 20228-NC, 2004 WL 1949290, at *2 n.2 (Del. Ch. August 24, 2004) n6

n4 [HN3] A derivative suit is a suit brought on behalf of a corporation by a stockholder rather than by the management of the corporation. *See Black's Law Dictionary* at 475 (8th ed. 2004) Derivative claims typically include challenges to the actions or inaction of the corporation's officers or board of directors. *Cf Steinman v. Levine*, 2002 Del. Ch. LEXIS 132, 2002 WL 31761252, at *12 & n.50 (Del. Ch. 2002) (noting that events affecting all stockholders in the same way, such as corporate waste and mismanagement, "fall squarely within the definition of a derivative action.")

n5 The Star Creditors' Liquidating Trust is the successor in interest to Star and has assigned its claims and rights of action to the Plaintiff. (D.I. 4 at P6.) Thus, the Plaintiff has been enabled to bring this action directly and not derivatively. [HN4] In derivative suits, the shareholder plaintiff either must make a demand on the company's board of directors that it take some corrective action or must demonstrate that such a demand should be excused because it would be futile. *See* Del. Ch. Ct. Rule 23.1; *Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1983) (by promoting demand on the board, "rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations") The demand requirement is not a procedural matter; it is, rather, a matter of substantive state law. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96-97, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991) ("the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of substance, not procedure" (internal citations omitted)); *Blasband v. Rales*, 971 F.2d 1034, 1048 (3d Cir. 1992) ("It is clear that the demand requirement is not a mere formality, but rather is an important aspect of Delaware's substantive law."); *In re General Motors Class E Stock Buyout Sec. Litigation*, 790 F. Supp. 77, 80 (D. Del. 1992) [HN5] ("the federal pleading requirements . . . which dictate when and how facts must be alleged, must be read in conjunction with state substantive law, which controls what facts must be alleged")

[**19]

n6 While accepting this direct statement as the clearest direction from the Delaware courts about the applicability of Rule 23.1 in this context, I am nevertheless left to wonder whether the heightened pleading standard ought not apply with full force in a circumstance like this. From a policy standpoint, it seems that the particularized pleading requirement of Rule 23.1 serves a purpose beyond preserving managerial responsibility to directors and officers and beyond encouraging dispute resolution before litigation. It can be argued that one very important purpose of the particularized pleading requirement is to give added force to the business judgment rule at the pleading stage, so that, regardless of the anomalous circumstance of derivative-type claims being raised here without the necessity of a demand on the Board, the heightened standard of particularity should still apply. There are some references in case law that may support a heightened pleading standard even in the 12(b)(6) context. *See Leung v. Schuler*, 2000 Del. Ch. LEXIS 41, No. C.A. 17089, 2000 WL 1478538 at *19 (Del. Ch. Oct. 02, 2000) (under "Rule 12(b)(6) *or* Rule 23.1, the complaint must plead specific facts from which it can be inferred that the decision by the board is so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other grounds" (emphasis added; internal citation omitted)); *cf Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001) (stating that [HN6] the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under Rule 23.1 is "is somewhat lower" under Rule 12(b)(6)). The Chancery Court's recent decision in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 2004 Del. Ch. LEXIS 174, C.A. No. 114-N, 2004 WL 2647593 (Nov. 17, 2004) also suggests that the bringing of a derivative claim in the context of a bankruptcy should not lower the pleading bar. *Cf*, 2004 Del. Ch. LEXIS 174, [WL] at *15 ("It would be puzzling if, in insolvency, the equitable law of corporations *expands* the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions.")

[**20]

[*458] Nevertheless, the parties apparently agree, as they ought, that analysis of the present Motion must

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

be informed by precedents arising from derivative actions where the plaintiff alleges that demand should be excused as futile (*See* D.I. 88 at 24-25 (plaintiff's counsel stating his view of the applicable standard and saying, "is that a different standard than the demand excused cases? Probably not ") ) The "demand excused" cases are essential precedent in reviewing the sufficiency of the Complaint because those cases embody and articulate the business judgment rule's impact on claims such as the Plaintiff seeks to assert. *See Levine v. Smith,* 591 A.2d 194, 205 (Del. 1991) [HN7] ("The demand requirements of [Chancery Court] Rule 23.1 are predicated upon the application of the business judgment rule in the context of a board of directors' exercise of its managerial power over a derivative claim."), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del. 2000); *cf. Gagliardi v. TriFoods Intern., Inc.,* 683 A.2d 1049, 1051 (Del. Ch., 1996) (analysis of claims of mismanagement and waste begins with business judgment rule).

The Third [**21] Circuit has observed that [HN8] the "business judgment rule eludes precise categorization, as it assumes different shapes in different settings." *Weiss v. Temporary Inv. Fund,* 692 F.2d 928, 941 (3d Cir. 1982) (internal citation omitted). Although it may be articulated in a variety of ways, it's import is straightforward: "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi,* 683 A.2d at 1051. It's public policy underpinnings, too, are well known [HN9] It "serves two important functions." *Weiss,* 692 F.2d at 941. First, it prevents the courts from "injecting themselves into a management role for which they were neither trained nor competent." *Id.* (quoting Duesenberg, *The Business Judgment Rule and Shareholder Derivative Suits: A View from Inside,* 60 Wash U.L.Q. 311, 314 (1982)("Duesenberg")). Second, it "encourage[s] others to assume entrepreneurial and risk-taking activities by protecting them against [**22] personal liability when they have performed in good faith and with due care, however unfortunate the consequence." *Id.* (Again quoting Duesenberg). In the words of former Chancellor William T. Allen of Delaware's Court of Chancery, the business judgment rule is "the first protection against a threat of sub-optimal risk acceptance    " *Gagliardi,* 683 A.2d at 1052. Expanding on that theme, he observed:

> Shareholders don't want (or shouldn't rationally want) directors to be risk averse Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corpo-

rate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital.

> But directors will tend to deviate from this rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims for [*459] derivative liability for any resulting corporate loss.

*Id.* (emphasis added).

Thus, [HN10] even if Plaintiff is not required [**23] to plead "particularized facts" to raise "a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment[,]" *Levine,* 591 A.2d at 205, it must still plead facts from which such an inference can be drawn. *See In re Tri-Star Pictures, Inc., Litigation.* 634 A.2d 319, 326 (Del. 1993) (under Chancery Court Rule 12(b)(6), "review is ... limited to the well-pled facts contained in the Complaint which, viewing all inferences in a light most favorable to the plaintiff, we must take as true. Conclusions, however, will not be accepted as true *without specific allegations of fact to support them.*" (emphasis added; internal citation omitted)). (D.I. 88 at 24 (plaintiff's counsel stating, "I think ... the standard for the Court here really can be stated as we need to allege facts to raise at least a reasonable doubt as to the directors breach of fiduciary duty.").)

## IV. Discussion

The Plaintiff has alleged a series of claims, including breach of fiduciary duty, gross negligence, and corporate waste, against the directors and officers of Star.

In Counts I, II, and III of the Complaint, the Plaintiff alleges [**24] that Casey, Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, Tawfik, Enos, Kolsrud, and Crumly n7 breached their fiduciary duties, were grossly negligent, and wasted corporate assets (D.I. 4 at P147-59.) In Counts IV, V, and VI of the Complaint, the Plaintiff makes the same allegations against Vogel, Casey, Hutchins, Snedegar n8, Messing, and Sciarillo. (*Id.* at P160-72.) In Count VII of the Complaint, the Plaintiff alleges that Messing unjustly enriched himself at the expense of Star (*Id.* at P173-76.) Each claim will be analyzed according to the roles and actions of the various defendants.

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

n7 Ms. Casey and Messrs. Chesonis, Edgecomb, Gershien, Hutchins, Snedegar, and Tawfik are referred to herein at times as the "Edgecomb Directors". Messrs. Enos, Kolsrud, and Crumly are referred to as the "Edgecomb Non-Director Officers". The Edgecomb Directors and the Edgecomb Non-Director Officers are referred to collectively as the "Edgecomb Directors and Officers."

n8 Messrs. Vogel, Hutchins, and Snedegar, and Ms. Casey are referred to collectively as the "Messing Outside Directors." Messrs. Hutchins and Snedegar and Casey are members of both the "Edgecomb Directors" class of defendants and the "Messing Outside Directors" class.

[**25]

### A. Count I

The Plaintiff alleges in Count I of the Complaint that the Edgecomb Directors and Officers breached their fiduciary duties to Star by participating in decisions, or failing to prevent decisions, that resulted in the acquisition of PT-1, the expansion of Star's business and facilities in a manner that left it unable to pay its debts and continue as a going concern, the onerous short-term financial obligations that burdened the Company, the agreement to merge with World Access, the neglect of the day-to-day operations of Star while management attempted to close the World Access merger, and the disregard of the need for an independent audit committee (*See id* at P149.)

The Defendants argue that any claim alleging breach of fiduciary duty must be dismissed because all the named defendants are protected by the business judgment rule or an exculpation clause in the Company's charter (*See* D.I. 64 at 2.)

[*460] 1. Duty of Loyalty n9

n9 Although the Plaintiff also invokes the duty of good faith as separate from the duty of loyalty, Delaware case law states that the two duties are identical *See, e.g., Nagy v. Bistricer,* 770 A.2d 43, 49 n.2 (Del. Ch. 2000) (holding that [HN11] "if it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes").

Therefore, throughout this opinion, reference to the duty of loyalty also refers to the duty of good faith.

[**26]

[HN12] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor,* 634 A.2d 345, 361 (Del. 1993) (internal citation omitted).

i. Edgecomb Directors

[HN13] To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must "plead facts demonstrating that a *majority* of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch. 2002) (internal citation omitted) (emphasis added). To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders. *Orman,* 794 A.2d at 23; *see also Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993) ("[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders").

In the [**27] instant case, the Plaintiff alleges that Edgecomb was interested in the PT-1 acquisition and the World Access merger, that Tawfik was interested in the World Access Merger, and that a majority of the remaining directors, while not interested in these transactions, were beholden to Edgecomb and consequently lacked the requisite independence. n10 (*See* D.I. 73 at 14.) Because the Plaintiff must show that a majority of the directors that voted on the transactions were not disinterested and because the board had six members when the PT-1 and Word Access transactions were considered, it is necessary for the Plaintiff to allege facts showing that a minimum of four directors were not disinterested n11 *See Orman,* 794 A.2d at 23.

N10 The Plaintiff does not allege that Edgecomb was interested with respect to any of the other claims levied against him (D.I. 73.)

n11 Although the Plaintiff is required to show that a majority of the directors that voted on the transaction in question violated their duty of loyalty, *Chaffin v. GNI Group, Inc.,* 1999 Del. Ch. LEXIS 182, No. Civ.A. 16211-NC, 1999 WL 721569 at *5 (Del. Ch. Sept. 3, 1999), the Plaintiff does not allege that any of the directors failed

Case 1:04-cv-01268-***-MPT    Document 75-2    Filed 11/30/2005    Page 25 of 30

Page 11

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

to vote on any of the transactions in question. (*See* D.I. 4.)

[**28]

The Plaintiff contends that Edgecomb was interested in the PT-1 transaction as a result of his large stock position in the Company, combined with his motivation to increase the price of Star's stock. (D.I. 73 at 23-24.) In the Plaintiff's words, Edgecomb's "desire to increase the share price overrode his obligation to consider other effects of the [PT-1] acquisition." (*Id.*) In essence, the Plaintiff's argument rests on the unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote. No precedent [*461] cited by the Plaintiff stands for the proposition that stock ownership, coinciding with a Board decision that may affect the price of those shares, is adequate to show a breach of the duty of loyalty. n12 Therefore, I conclude that the allegations regarding Edgecomb's stock ownership are insufficient to show he was interested in the PT-1 transaction.

> n12. The Plaintiff cites *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 208 B.R. 288 (Bankr. D. Mass. 1997), but that case concludes that, under Delaware law, a director who approves a leveraged buy-out ("LBO") is engaging in a transaction with his own company. *Id.* at 302. The court held that the sale of stock to a third party, who financed the purchase through the use of debt assumed by the company, was in essence a transaction between the directors and the company. *Id.* Consequently, the court held directors who owned a small percentage of company stock could still be considered interested if they were approving an LBO. *Id.* 303. *Brandt* does not support the broader proposition that a director who owns company stock is, by that fact alone, interested in a Board decision that affects the price of that stock.

[**29]

As to the World Access Merger, the Plaintiff argues that Edgecomb and Tawfik were interested because it gave them an opportunity to sell their shares before the company sought bankruptcy protection. (*Id.* at 32-33.) The Plaintiff contends that the fact that "Edgecomb [and Tawfik] sold the bulk of ... [their] shares at prices below the publicly announced merger price, corroborate[s] the reasonable inference that ... [they] knew but failed to disclose the merger was not likely to close." (*Id.* at 33-34.) The Plaintiff appears to assert that Edgecomb and Tawfik approved the merger knowing that it could not be closed, withheld this information from shareholders, and

then illicitly traded on this information. However, neither the allegations in the Complaint n13 nor the pertinent precedent warrants such a leap. Under Delaware law, simply selling company stock does not make a director interested. *See Guttman v. Jen-Hsun Huang,* 823 A.2d 492, 502 (Del. Ch. 2003) ("it is unwise to formulate a common law rule that makes a director 'interested' whenever [it is] alleged that he made sales of company stock in the market at a time when he possessed material, non-public [**30] information"). The argument that one must assume insider trading and breach of fiduciary duty because directors sold stock below the announced merger price simply cannot withstand scrutiny. The merger price was a matter of public record. The stock sales too were based on public information. They were not priced in some back alley; they were traded in the open, regulated securities market. Edgecomb and Tawfik enjoyed no benefit that was not also available to any other shareholder wishing to sell shares at the price the market set, which happened to be below the announced merger price.

> n13. The Factual Allegation's section of the Complaint states that officers and Board members sold Star Shares "because they were in a unique position to know the fragile state of the company." (D.I. 4 at P86.) The First Claim for Relief does not list this as one of the "acts and omissions" that breached the Defendant's duties to the Company. (*Id.* at P149.) In addition, the Plaintiff's Opposition to the Motion also does not address such a claim. (D.I. 74.)

[**31]

The Plaintiff argues that Edgecomb and Tawfik had a personal interest in the transaction because they had motivations beyond the good of the company when approving the transaction. (D.I. 4 at PP32-34.) As previously stated, the general rule is that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director ... ." *Cede,* 634 A.2d at 361 (internal citation omitted). [HN14] Delaware cases repeatedly state, however, that a plaintiff must prove breach of loyalty through a [*462] showing of interest in a transaction or lack of independence. *See, e.g., Orman,* 794 A.2d at 23. The Plaintiff has not alleged that Edgecomb and Tawfik received a benefit from approving the World Access merger that was not shared by the stockholders generally. In short, the Plaintiff has failed to plead any facts that would, even inferentially, support its claim that Edgecomb and Tawfik were interested in the World Access merger and therefore breached their duty of loyalty.

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

Turning to Hutchins, Snedegar, and Chesonis, the Plaintiff alleges that those directors were beholden to Edgecomb during all of the events that are the subject of [**32] Count I, and, therefore, that they lacked independence. (D.I. 4 at 9, 13, 16, 147-48.) [HN15] It is obvious, though, that showing a director lacks independence because of a subservient relationship to an interested person depends in the first instance on showing that the supposedly dominating person actually is interested in the transaction in question. *In re Oracle Corp. Derivative Litig*, 824 A.2d 917, 938 (Del. Ch. 2003). Because the Plaintiff has failed to plead facts from which it could be inferred that Edgecomb was interested in the transactions in question, it follows that the Plaintiff has failed to plead facts from which it could be inferred that those remaining directors were beholden to an interested director. Consequently, the Plaintiff has failed to adequately plead that a majority of the Board was interested in the PT-1 and World Access transactions. By extension, the Plaintiff has not adequately pleaded a breach of the duty of loyalty by the Board. *See Orman*. 794 A.2d at 23.

### ii. Edgecomb Non-Director Officers

Defendants Enos, Kolsrud, and Crumly, were officers of the Company but not directors. As non-directors, they did not participate [**33] in any Board votes. Further, two of those defendants, Enos and Kolsrud, are scarcely mentioned in the Complaint. (D.I. 4 at PP14, 48, 81.) Enos was the CFO of Star, and Kolsrud was the Executive Vice President of Operations and Engineering. (*Id*.) No facts are pleaded about them, other than their job titles, their dates of service, and the fact that Enos did not attend any board meetings. (*Id*.) Like Edgecomb and Tawfik, Crumly is alleged to have sold shares in Star at a time when he was in a unique position to know that the merger was unlikely to close. (*Id* at P86.) The Plaintiff does not address in its Opposition to the Defendants' Motion to Dismiss how Crumly breached his duty of loyalty by selling stock. *See supra* at 19-21. Simply put, no basis in fact or law is given to support a grant of relief against Enos, Kolsrud, or Crumly. *See Elkins*. 2004 Del. Ch. LEXIS 122, 2004 WL 1949290 at *13 (stating conclusory allegations are insufficient to defeat a motion to dismiss under Rule 12(b)(6))

### 2. Duty of Care

[HN16] If a defendant does not breach his duty of loyalty to the company, he is permitted to rely on the business judgment rule or an exculpatory provision, [**34] if applicable, to shield him from liability for a breach of the duty of care. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001).

[HN17] Under Delaware law, the business judgment rule operates as a presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988). In addition to the protection afforded under the business judgment rule, Delaware statute also allows corporations to grant their directors further protection from liability. Section 102(b)(7) of the Delaware General Corporation Law [*463] allows corporations to adopt a provision in their charters to exculpate directors from breaches of the duty of care. The section states:

> [HN18] the certificate of incorporation may also contain ... [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director ... provided that such provision shall not eliminate or limit the liability of a director: (i) for [**35] any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; ... or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7). [HN19] When "the standard of review *ab initio* is the business judgment rule, properly raising the existence of a valid exculpatory ... provision in the corporate charter entitles director [defendants] to dismissal of any claims for [monetary] damages against them that are based solely on alleged breaches of the board's duty of care." *Emerald Partners*, 787 A.2d at 93 (internal citations omitted).

Plaintiff argues that Star's corporate charter, which contains an exculpatory provision, was a contract between the corporation and the shareholders and that it therefore does not prevent them, as creditors, from recovering from the defendants for breaches of the duty of care. (D.I. 73 at 46-47.) To support its argument, the Plaintiff relies on cases from various jurisdictions outside of Delaware. *See Pereira v. Cogan (In re Trace Int'l Holdings. Inc.)*, 2001 U.S. Dist. LEXIS 2461, No. 00 Civ. 619, 2001 WL. 243537 [**36] at *11 (S.D.N.Y. March 8, 2001); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 2000 U.S. Dist. LEXIS 276, No. 99 C7934, No. 97C6043, 2000 WL. 28266 at *7-8 (D. Ill. Jan. 12, 2000). Recently, however, the Delaware Chancery Court has ruled directly on this point and held that exculpation clauses do indeed apply to prevent creditors

as well as shareholders from bringing duty of care claims. *Production Resources Group, L.L.C. v NCT Group, Inc.*, C.A. No. 114-N, 2004 U.S. Del. Ch. LEXIS 174, 2004 WL 2647593 at *13-14 (Del. Ch. Nov. 17, 2004).

In that opinion, the court noted that [HN20] a breach of care claim brought by a creditor for actions that occurred while the company in question was in the zone of insolvency was derivative in nature. *Id.* In explaining why the creditor's claim was derivative, the court stated that

> the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a director of an insolvent [**37] corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

2004 Del. Ch. LEXIS 174, [WL] at 14

Relying on the fact that [HN21] any claim held by a creditor is derivative in nature, the court went on to hold that § 102(b)(7) applies to all claims asserted by the company on behalf of the creditors. 2004 Del. Ch. LEXIS 174, [WL] at *14 ("Although § 102(b)(7) itself does not mention creditors specifically, its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors"). Consequently, § 102(b)(7) applies to all actions for which the Plaintiff alleges duty of care violations.

In the Plaintiff's Complaint, it lists several alleged breaches of the Edgecomb Directors and Officers' duty of care (D.I. [*464] 4 at P149.) In its brief, Plaintiff argues that the Edgecomb Directors and Officers breached their duty of care with respect to the PT-1 purchase, the Company's efforts to obtain capital, the World Access merger, and the abdication of management duties while trying to close the World Access merger (D.I. 73 at 26-32, 35-40.) Although not addressed [**38] in their brief, the lack of an independent audit committee, which is alleged in the Complaint (D.I. 4 at P149), also appears to be a claim for breach of the duty of care. This claim, like the others argued in the Plaintiff's brief, fails as a

matter of law because the exculpation clause protects the Edgecomb Directors and Officers against any claim for a breach of the duty of care. *See Emerald Partners,* 787 A.2d at 93. The Plaintiff itself implicitly admits this in its brief, when it does not refute the notion that a proper exculpation clause bars all claims of the breach of the duty of care. (D.I. 73 at 46-47.) Consequently, all claims of a breach of the duty of care against the Edgecomb Directors and Officers must be dismissed.

**B. Count II**

The Plaintiff alleges in Count II of the Complaint that the Edgecomb Directors and Officers committed gross negligence with respect to the same actions as alleged in Count I. (D.I. 4 at PP152-55.) However, [HN22] a "claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care." *Albert v. Alex Brown Mgmt Servs.,* 2004 Del. Super. LEXIS 303, No. C.A. 04C-05-250, 2004 WL 2050527 [**39] at *6 (Del. Super. Ct. Sept. 15, 2004); *see also McMullin v. Beran,* 765 A.2d 910, 921 (Del. 2000) (stating that "director liability for breaching the duty of care is predicated upon concepts of gross negligence" (internal citations omitted)).

[HN23] Similar to a claim of breach of the duty of care, an exculpatory provision also protects directors from a claim of gross negligence. *See Malpiede v. Townson,* 780 A.2d 1075, 1094-1095 (Del. 2001) (stating that "even if the plaintiffs had stated a claim for gross negligence, such a well-pleaded claim is unavailing because defendants have brought forth the Section 102(b)(7) charter provision that bars such claims") Therefore, the exculpatory clause protections described in Section VI(A)(2), *supra,* also shield the Edgecomb Directors and Officers from a charge of gross negligence. *See supra* at 22-25; *Malpiede,* 780 A.2d at 1094-1095.

**C. Count III**

The Plaintiff alleges in Count III of the Complaint that the Edgecomb Directors and Officers committed corporate waste with respect to the same actions as alleged in Counts I and II. (D.I. 4 at PP156-59.) In a case similar to the one at [**40] bar, the Chancery Court dismissed a claim of waste. *Elkins,* 2004 Del. Ch. LEXIS 122, 2004 WL 1949290, at *63-64. In that case, the Official Committee of Unsecured Creditors brought suit against a group of directors on behalf of the company they used to serve. With respect to their claim of waste, the court noted that [HN24] the Delaware standard for pleading corporate waste is stringent: "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Id.* at 17. Further,

385 F Supp 2d 449, *; 2004 U S Dist LEXIS 25807, **

waste is a standard rarely satisfied in Delaware courts Indeed, waste is an extreme test, very rarely satisfied by a plaintiff In *Brehm v Eisner*, the Supreme Court described the plaintiffs' allegations as that the board not only committed a procedural due care violation in approving an employment agreement, but also that the Board committed [*465] a substantive due care violation constituting waste The Court went on to dismiss the characterization of waste in this manner, equating due care with process In evaluating a waste claim, courts look to the exchange itself The exchange must be irrational

*Id* That standard [**41] applies equally to claims against officers and directors *See In re Walt Disney Co*, 2004 Del Ch LEXIS 132, No C A 15452, 1322004 WL 2050138, at *3 (Del Ch Sept 10, 2004) ("the fiduciary duties of officers have been assumed to be identical to those of directors") [HN25] Absent a breach loyalty, § 102(b)(7) protects directors and officers from a claim of corporate waste *Green v Phillips*, 1996 Del Ch LEXIS 76, C A No 14436, 76 1996 WL 342093 at *7 (Del Ch June 19, 1996)

In the instant case, I have already found that the Plaintiff has not pleaded facts sufficient to show a breach of the duty of loyalty by any of the Edgecomb Directors and Officers *See supra* at 17-22 Therefore, the exculpation clause protects the Edgecomb Directors and Officers from a claim of corporate waste

Moreover, even without the protection of the exculpation clause, the Plaintiff has not alleged facts that Star did not receive adequate consideration for the transactions entered into and approved by the Edgecomb Directors (*Id* at P158 ) In fact, the Plaintiff merely relists the same actions cited as support for Counts I and II of the Complaint The corporate waste claim is conclusory and insufficient to [**42] overcome the protections of the business judgment rule *See Brehm v Eisner*, 746 A 2d 244, 263 (Del 2000) (noting that[HN26] if "there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky")

### D. Count IV & V

The Plaintiff alleges in Count IV of the Complaint that Messing and the Messing Outside Directors breached their fiduciary duties to Star and its creditors, and specifically their duty of care (D I 4 at P160-64 ) In

Count V of the Complaint, the Plaintiff alleges gross negligence as to the same actions listed in Count IV As previously discussed, gross negligence allegations are analyzed under the same frame work as are allegations of a breach of the duty of care. *See supra* at 25-26 Therefore, any finding that the Plaintiff failed to adequately plead a breach of the fiduciary duty of care, includes a conclusion that the Plaintiff has failed to adequately plead gross negligence

#### i The Messing Outside Directors

The [**43] Plaintiff alleges in its Complaint that the Messing Outside Directors breached their fiduciary duty with respect to the Gotel transaction, the IDT transaction, and the payment of $ 25,000 in expenses to Messing (D I 4 at P162 ) In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff states that the Board only met once during the two-month period that Messing was in charge (D I 73 at 43 )

The Complaint states, however, that upon request by Messing to approve the Gotel financing, the Board promptly held a special meeting (D I 4 at PP104-05 ) The Complaint goes on to say that "certain directors were concerned that control of the Company would change hands if the Company were to issue the warrants [as required by the financing]." (*Id* at P105 ) "Nevertheless, the directors ultimately yielded to Messing's insistence that they had no choice but to take whatever financing was available, and they authorized him to negotiate the Gotel transaction on behalf of Star." (*Id* at P107 ) With respect [*466] to the sale of PT-1 to IDT, the Complaint does not mention the Messing Outside Directors, aside from stating that "without any knowledge or approval from Star's Board, Messing [**44] signed the March 5 Letter on behalf of Star...." (*Id* at P136 )

In short, there are no allegations supporting, even inferentially, a claim for breach of the fiduciary duty of loyalty As to any duty of care or gross negligence claims, again the Plaintiff's Complaint must yield to the exculpation clause contained in Star's charter *See supra* at 22-25 Therefore, as to Count IV and V, the Plaintiff has failed to state a claim against the Messing Outside Directors n14

n14 Even without the exculpation clause, this claim could not stand There is no denying that Star faced dire financial circumstances In light of Star's desperate need for capital, the most damning conclusion that can be drawn from the facts pleaded in the Complaint is that the directors, when confronted with the difficult decision of whether to accept the Gotel financing, may have

Case 1:04-cv-01268-***-MPT     Document 75-2     Filed 11/30/2005     Page 29 of 30

Page 15
385 F. Supp. 2d 449, *; 2004 U S. Dist. LEXIS 25807, **

made a poor decision. But that does not amount to an abdication of responsibility by the Board.

The Plaintiff relies on *Mills Acquisition Co v. MacMillan, Inc.*, 559 A.2d 1261 (Del. 1989), to argue that the Board breached its duty of care (D.I. 73 at 43), but the facts of that case are easily distinguished from the one at bar. In *Mills,* the Court of Chancery held that the defendant directors were not protected by the business judgment rule when the directors approved a "lock-up" that restricted further bidding on the company that was to be sold. *Mills Acquisition Co.*, 559 A.2d at 1286. The court held that "while these lock-ups which draw bidders into a battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholders' detriment." *Id.* (internal citation omitted). In that case, the claim was that the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out. *Id.* at 1279-80, 1286. Here, however, there were no other bidders for Star, the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only financing option presented to the Board. (D.I. 4 at P104-07.)

[**45]

## ii. Sciarillo

The Complaint only mentions Sciarillo directly two times. First, it states that when Messing took control of Star, Sciarillo was made CFO, and, second, it contends that Sciarillo assisted Messing with the sale of PT-1 to IDT. (D.I. 4 at PP103, 122.) With respect to the other actions in which Messing participated, the Complaint frequently uses the term "his team," which presumably includes Sciarillo (*Id.* at PP119-140.) The Plaintiff does not allege that Sciarillo received an improper benefit from any of the transactions in which the Plaintiff alleges he participated, or that he was interested in the transactions in any other way. In fact, the only mention of Sciarillo in the Plaintiff's Opposition to the Defendants' Motion to Dismiss is that "Defendants Crumly and Sciarillo also participated in the IDT transaction as officers, though further discovery is required to establish the extent of their involvement." n15 (D.I. 73 at 23, n.10.) Consequently, the Plaintiff has failed to plead any facts to support a claim that Sciarillo breached his fiduciary duty of loyalty. Nor does it adequately plead a duty of care or gross negligence claim, and, if it did, the § [**46] 102(b)(7) charter provision would prevent such claims.

n15 Although Crumly is referenced with respect to Count IV and V, the Complaint does not even name him as a defendant in these claims. (D.I. 4 at PP160-68.) If it did, however, the conclusion as to Mr. Crumly would be the same as it is for Mr. Sciarillo.

## iii. Messing

The Plaintiff alleges that Messing violated his fiduciary duties to Star and its creditors and committed gross negligence [*467] [*468] with respect to the same actions as alleged against the Messing Outside Directors (D.I. 4 at P162.) The Plaintiff alleges that Messing controlled Gotel, directly benefitted from the financing agreement entered into between Star and Gotel, and entered into an agreement with IDT to sell PT-1 in order to secure future benefits from IDT (*Id.* at PP117, 140.) Additionally, the Complaint alleges that Messing submitted a bill for $25,000, $10,616 of which was payed to another company that he allegedly controlled (*Id.* at P145.) The Plaintiff contends that this was [**47] far in excess of the value that was received by Star. (*Id.*)

If the facts pleaded by the Plaintiff are taken as true, then Messing received a direct financial benefit from all of these transactions. Because Messing is alleged to have received a benefit from these transactions, which was not received by the shareholders generally, the Plaintiff has pleaded sufficient facts to support the allegation that Messing was interested in these transactions. *See Rales,* 634 A.2d at 936 (holding that [HN27] "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders"). Therefore, as to Messing and Counts IV and V, the Plaintiff has pleaded claims of breach of the fiduciary duty of loyalty sufficient to withstand the Motion to Dismiss n16

n16 Because the Plaintiff has adequately pleaded a breach of the duty of loyalty, at this stage of the proceeding, Messing cannot claim the protection of § 102(b)(7) from claims of gross negligence. *See Levy v. Stern,* 687 A.2d 573 (Del. 1996) (holding that § 102(b)(7) "is inapplicable ... where the alleged breach entails bad faith, intentional misconduct, or a breach of the duty of loyalty").

[**48]

## E. Count VI

385 F. Supp. 2d 449, *; 2004 U.S. Dist. LEXIS 25807, **

The Plaintiff alleges in Count VI of the Complaint that Messing, Sciarillo, and the Messing Outside Directors wasted corporate assets. (D.I. 4 at P160-64.) As discussed in relation to Count III, a finding of corporate waste requires that the transaction in question be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 362 (Del. Ch. 1998) (internal citation omitted); *see supra* at 26-27. In its Opposition to the Defendants' Motion to Dismiss, the Plaintiff only addresses Messing and his involvement in the March 5 Letter agreement and the $ 25,000 disbursement. The Plaintiff alleges that Star received no compensation for the March 5 Letter agreement, which would lead any reasonable business person to find that there had been corporate waste.

The Plaintiff also alleges that Messing requested and received a $ 25,000 disbursement. (D.I. 4 at P141.) $ 10,616 of that disbursement is alleged to have been paid to a company Messing controlled (*Id.* at P145.) That fact, coupled with the timing of the submission, [**49] shortly before Messing resigned (*Id.* at PP141-45.), sufficiently supports the Plaintiff's allegation of corporate waste to withstand the Motion to Dismiss. Therefore, with respect to Messing, the claim of corporate waste is allowed. As to all other defendants, the same pleading failures that resulted in the dismissal of Counts IV and V necessitate dismissal of this claim against them. *See supra* at 28-30.

### F. Count VII

The Plaintiff alleges in Count VII of the Complaint that Messing unjustly enriched himself at the expense of Star. (D.I. 4 at P173-76.) Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money [*469] or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum,* 539 A.2d 1060, 1062 (Del. 1988) (internal citation omitted). For the reasons discussed in section IV(D), *supra,* the Plaintiff has sufficiently pleaded its claim that Messing was unjustly enriched, and, consequently, Count VII will not be dismissed. *See supra* at 30-31.

### V. Conclusion

For the reasons set forth herein, the Defendants' Motion to Dismiss [**50] will be granted as to all the Defendants except Messing. An appropriate order will issue.

### ORDER

For the reasons stated in the Memorandum Opinion issued today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I. 63; the "Motion") is DENIED as to Counts IV, V, VI, and VII of the First Amended Complaint (D.I. 4) insofar as those Counts allege claims against defendant Brett S. Messing; and,

IT IS FURTHER ORDERED that the Motion is GRANTED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

December 21, 2004
Wilmington, Delaware