Westlaw.

Not Reported in A 2d                                                                                   Page 1

Not Reported in A 2d, 2001 WL 50203 (Del Ch ), 27 Del J Corp L 672

(Cite as: 2001 WL 50203 (Del.Ch.))

**H**

UNPUBLISHED OPINION CHECK COURT RULES BEFORE CITING

Court of Chancery of Delaware
In re FREEPORT-MCMORAN SULPHUR, INC.
SHAREHOLDERS LITIGATION,
No. C.A. 16729.

Date Submitted Sept 26, 2000
Date Decided Jan 5, 2001.
Date Revised Jan 11, 2001

Pamela S Tikellis, Robert J Kriner, Jr, and Timothy R Dudderar, Chimicles & Tikellis, Wilmington, Delaware and Norman M Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, and Goodkind Labaton, Rudoff & Sucharow LLP, New York, New York, for Plaintiffs

Henry N Herndon, Jr, and Lewis H Lazarus, Morris, James, Hitchens & Williams, Wilmington, Delaware, and Robert B Bieck, Jr, David G Radlauer and Amy L Landry, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L L P, for Defendant McMoRan Oil & Gas Company

A Gilchrist Sparks, III, Alan J Stone and Christopher F Carlton, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, and Dennis E Glazer and John J Clarke, Jr, Davis Polk & Wardwell, New York, New York, for Defendants James R Moffett, Rene L Latiolais, B M Rankin, Jr, Richard C Adkerson, Robert M Wohleber and Freeport-McMoRan Sulphur Inc

Allen M Terrell, Jr and Peter B Ladig, Richards, Layton & Finger, Wilmington, Delaware, and Terrence M Murphy and James P Karen, Jones, Day, Reavis & Pogue, Dallas, Texas, for Defendants Terrell J Brown and Thomas D Clark, Jr

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor

*1 The plaintiffs in this shareholder class action challenge a stock-for-stock merger on the basis that the interestedness of the directors of the subject corporation resulted in its stockholders receiving an unfair price for their shares. It is claimed that those directors breached their fiduciary duty of loyalty and that the other constituent corporation aided and abetted that breach. All defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6). The director-defendants have moved to dismiss on the additional ground that any monetary recovery is barred by the exculpatory clause of the corporation's certificate of incorporation This Opinion decides those motions

I. FACTS [FN1]

> FN1. The pertinent facts are as alleged in the complaint and documents incorporated therein by reference, including the Joint Proxy Statement/Prospectus ("the Proxy Statement"). Recited at this point are certain background facts. Other facts are set forth in the Analysis of the issues. See Part III, *infra*, of this Opinion.

On August 3, 1998, Freeport-McMoRan Sulphur Inc ("FSC") announced that it had entered into an agreement to merge with McMoRan Oil & Gas Co. (MOXY). That transaction took the form of FSC and MOXY being merged into McMoRan Exploration Co ("MEC"), a new holding company specially created for purposes of the Merger The shareholders of FSC and MOXY would receive, as consideration, stock of MEC in exchange for their shares in FSC and MOXY The MEC stock they would receive would be allocated among FSC's and MOXY's shareholders on the basis of .625 MEC shares for each share of FSC and 2 MEC shares for

Not Reported in A 2d                                                              Page 2

Not Reported in A 2d, 2001 WL 50203 (Del Ch ), 27 Del J Corp L 672

**(Cite as: 2001 WL 50203 (Del.Ch.))**

each share of MOXY

The merger was negotiated on behalf of FSC by a special committee of directors, none of whom (it appears) were employed by FSC or MOXY On October 9, 1998, the Proxy Statement was mailed to the shareholders of both companies, soliciting their approval of the Merger The Proxy Statement disclosed MOXY shareholders would receive approximately 61%, and that FSC shareholders would receive approximately 39%, of the MEC stock being distributed in the Merger Both the FSC and MOXY shareholders approved the Merger on November 17, 1998

The Amended Consolidated Complaint (the "complaint") was filed as both an individual and as a class action on February 18, 2000 That complaint alleges that the FSC board of directors (the "FSC Defendants") breached their fiduciary duty of loyalty in connection with the Merger, by permitting MOXY shareholders to receive a disproportionate share of the Merger consideration It is also claimed that MOXY aided and abetted those fiduciary breaches The defendants have challenged the legal sufficiency of all these claims [FN2]

> FN2 The original complaint, captioned *Krasner v Moffett. et al*, C A No 16792, was consolidated with *Sheffield & Katz v Adkerson, et al*, C A No 16845 Defendants moved to dismiss the complaint on December 17 & 18, 1998 and filed briefs in support of that motion on January 29, 1999 On February 18, 2000, plaintiffs filed the Consolidated Amended Complaint, which is the subject of the current motion to dismiss

## II THE LEGAL STANDARD AND THE PARTIES' CONTENTIONS
### A The Legal Standard

On a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court must assume the truthfulness of all well-pled allegations of the complaint and draw all reasonable inferences therefrom [FN3] A complaint will not be dismissed

unless it can be determined with reasonable certainty that the plaintiff could not prevail on any set of facts that are reasonably inferable from the complaint's allegations [FN4] These standards govern the Court's analysis of the issues presented

> FN3 *Grobow v Perot*, Del Supr, 539 A 2d 180, 187 n 6 (1988); *see also In re USA Cafes, L P Litig*, Del Ch, 600 A 2d 43, 47 (1991)

> FN4 *Solomon v Pathe Comm Corp*, Del Supr, 672 A 2d 35, 39 (1996)

### B The Contentions

*2 The FSC defendants' position is that the complaint must be dismissed for failure to state a cognizable legal claim. The premise of that position is that the applicable standard under which the Merger will be reviewed is the business judgment rule. Under that standard of review, the defendants urge, the complaint states no claim because it fails to allege that the FSC directors acted in a manner that was either grossly negligent or disloyal. The director defendants additionally argue that the plaintiff's claims for money damages are barred by the exculpatory provision in FSC's certificate of incorporation which tracks 8 Del C § 102(b)(7) of the Delaware General Corporation Law.

Defendant MOXY argues that the complaint must be dismissed as against it, for failure to state a cognizable claim for aiding and abetting.

In defense of its complaint, the plaintiffs argue that because the complaint alleges that a majority of the FSC directors were interested in the Merger transaction, the applicable standard of review is entire fairness Under that standard, the plaintiffs contend, the complaint states a cognizable claim because it alleges that the Merger resulted in unfair consideration being paid to FSC and MOXY shareholders, and also was the product of an unfair decision making process Those allegations, plaintiffs maintain, are sufficient to state a claim for breach of the FSC directors' fiduciary duty of loyalty, which cannot be exculpated under §

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A 2d                                                    Page 3

Not Reported in A 2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

(Cite as: 2001 WL 50203 (Del.Ch.))

102(b)(7) The plaintiffs further argue that the complaint sufficiently charges MOXY with having aided and abetted that fiduciary breach

## III ANALYSIS

### A. The Standard of Review

The parties agree that the critical issue on this motion is what standard of review-business judgment or entire fairness-governs the Merger That issue is critical because it is outcome-determinative: if the standard is entire fairness, the motion must be denied because the complaint adequately states a claim that the Merger consideration was unfair If, however, the applicable standard of review is business judgment, the complaint states no cognizable claim because (a) the plaintiffs have not adequately pled that the FSC defendants acted disloyally or in a grossly negligent manner, and (b) even if the Merger consideration paid to FSC shareholders was unfair, to overcome the business judgment rule presumption the plaintiff must allege that the price was so low as to constitute waste or fraud [FN5] Neither claim is alleged here

> FN5 See Smith v. Van Gorkom, Del Supr., 488 A 2d 858, 889 (1985) (stating that in order for the plaintiff to overcome the presumption of the business judgment rule, they "have the heavy burden of proving that the Merger price was so grossly inadequate as to display itself as a badge of fraud ")

I turn to the determinative issue: which of the standards of review applies?

### B. The Special Committee

In determining what review standard applies, the Court is constrained to address a threshold matter-the legal consequence of the fact that the FSC special committee negotiated the Merger terms on behalf of FSC Under Delaware law, where a transaction is negotiated and approved by an independent committee of directors and is subsequently approved by the stockholders of the company in an uncoerced, fully informed vote, the transaction is normally reviewed under the business judgment standard [FN6] In this case it appears undisputed that the two FSC board members who made up the special committee were disinterested and independent. [FN7] I say "appears," because the role of the committee is barely alluded to, let alone developed, in the briefs. Yet, the Proxy Statement, which is incorporated into the complaint by reference, [FN8] is replete with disclosures-not disputed by the plaintiffs-that the FSC special committee retained independent legal and financial advisors, met on several occasions, and recommended the Merger to the full board, which approved the Merger terms as recommended. [FN9] If true, those disclosures would establish that the Merger terms were negotiated by directors who had acted "on an informed basis, in good faith and in the honest belief that their actions [were] in the corporation's best interest." [FN10] In that case the business judgment review standard would govern, and the result would be the dismissal of the complaint for failure to state a claim upon which relief could be granted

> FN6. See In re Western Nat'l Corp Shareholders Litig., Del. Ch., C A No. 15927, Chandler, C, Mem. Op. at 67-68 (May 22, 2000).

> FN7 The plaintiffs do not specifically allege that the FSC special committee members were interested or lacked independence. Instead, they advance the argument that because the MOXY independent committee members held significantly more shares of MOXY than the FSC committee members held stock of FSC, the MOXY committee had an "overwhelmingly greater personal financial interest in obtaining the most advantageous exchange ratio for MOXY." Complaint, at ¶ 21 That argument, while creative, is not supported by any legal authority in the plaintiff's brief and, moreover, would be unwieldy and uncertain in its application. Under that rule, a board would not only have to decide each candidate's

© 2005 Thomson/West No Claim to Orig. U S. Govt. Works

Not Reported in A 2d                                                                                                   Page 4

Not Reported in A 2d, 2001 WL 50203 (Del Ch ), 27 Del J. Corp L 672

(Cite as: 2001 WL 50203 (Del.Ch.))

independence when appointing a special committee, but also it would have to measure each candidate's stockholdings against the stockholdings of each of the other candidates for appointment to the special committee, and then speculate whether the special committee collectively has a stronger interest in protecting its corporation's shareholders than would the counterpart special committee on the other side of the bargaining table.

FN8 Complaint, at ¶ 16.

FN9 Proxy Statement at 28-29

FN10 *See Grobow v. Perot*, Del Supr , 539 A 2d 180, 187 (1988)

*3 Because the parties nowhere address in a reasoned or developed way the legal import of a relevant reality-that the Merger appears to have been negotiated by a special committee of independent, disinterested FSC directors-the briefs on the instant motion have an unreal quality. Instead, the parties ignore that subject and frame the issues in terms of whether a majority of the *full* FSC board that approved the Merger was (or was not) disinterested or independent. [FN11] But even under that approach, the complaint fails to allege facts that would establish that the Merger was approved by a majority of interested directors. My reasons for this conclusion next follow.

FN11 One reason for the defendants' failure to raise that issue may be that the facts pertaining to the special committee were disclosed in the Proxy Statement but not in the complaint. If the plaintiffs were challenging the Proxy disclosures, then the truth of those disclosures could not be assumed for purposes of a dismissal motion *In re Santa Fe Pacific Corp Shareholders Litig*, Del Supr , 669 A 2d 59, 70 (1995) But, the Proxy Statement is incorporated by reference into the complaint and the plaintiffs do not claim that the disclosures in the Proxy Statement

were materially false or misleading. Thus, the reason for the defendants' failure to raise this issue remains mysterious

C. The Interestedness of the FSC Board of Directors

A transaction will be reviewed under the entire fairness standard "where actual self-interest is present and affects a majority of the directors approving a transaction." [FN12] That exacting standard is also applied where a minority of interested directors exercises a dominating influence over a sufficient number of board members to constitute a majority [FN13] A director is "interested" in a transaction if he or she appears on both sides of the transaction or expects to derive a "personal financial benefit from [the transaction] in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally " [FN14]

FN12 *Paramount Comm , Inc v QVC Network, Inc ,* Del.Supr , 637 A 2d 34, 42 n. 9 (1994).

FN13 *In re Frederick's of Hollywood, Inc Shareholders Litig ,* C A. No. 15944, Jacobs, V C. (Jan 31, 2000), Mem Op at 17

FN14 *Aronson v Lewis,* Del.Supr , 473 A 2d 805, 812 (1984).

These standards govern the Court's inquiry into the disinterest and independence of each of the FSC directors who approved the Merger.

*1 Directors Moffett, Adkerson and Rankin*

These three gentlemen were directors of both MOXY and FSC at the time of the Merger Defendant James R. Moffett was co-chairman of the boards of both FSC and MOXY Mr. Moffett was also the board chairman and the chief executive officer of Freeport-MOXY Copper and Gold, Inc. ("Freeport Copper"), an affiliate of FSC and MOXY Mr Moffett held 1,774,359 shares of

© 2005 Thomson/West No Claim to Orig U S. Govt Works

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

**(Cite as: 2001 WL 50203 (Del.Ch.))**

MOXY stock and 130,670 shares of FSC stock. [FN15]

    FN15. Complaint ¶ 18.

Defendant Richard C. Adkerson was vice chairman of the board of FSC and also co-chairman of the board and chief executive officer of MOXY. In addition, he was the president and chief operating officer of Freeport Copper. [FN16] Mr. Adkerson held 492,892 shares of MOXY stock and 28,186 shares of FSC. [FN17]

    FN16. *Id.* at ¶ 5.

    FN17. *Id.* at ¶ 18.

Defendant B.M. Rankin, Jr. served as a director of FSC, MOXY and Freeport Copper. [FN18] Mr. Rankin held 1,109,290 shares of MOXY stock and 37,736 shares of FSC stock. [FN19]

    FN18. *Id.* at ¶ 7.

    FN19. *Id.* at ¶ 18.

By virtue of being directors and officers of both FSC and MOXY, these three directors stood on both sides of the Merger, and accordingly, must be deemed to have had a conflicting interest in that transaction. [FN20] Being thus conflicted, these three directors could not independently and disinterestedly consider the Merger on behalf of the FSC public shareholders.

    FN20. See note 15 *supra*.

Because three of FSC's seven board members were clearly interested, it follows that if even one of the four remaining directors was either interested or not independent, then the entire fairness standard of review would apply.

*4 Of the remaining four directors, the plaintiff concedes that two were independent and disinterested. These two directors, Terrell J. Brown and Thomas D. Clark, were directors of only FSC. Neither held any MOXY stock, Brown held no FSC

stock, and Clark held only 500 FSC shares. Thus, only the disinterest and independence of the two remaining directors-Richard M. Wohleber ("Wohleber") and Rene L. Latiolais ("Latiolais")-are disputed and need be addressed.

*2. Wohleber*

Mr. Wohleber was FSC's chief executive officer, president and a director. [FN21] He was also a senior vice president of Freeport Copper. [FN22] The complaint alleges that in connection with the Merger, Mr. Wohleber was promised that he would become the executive vice president, chief financial officer and a director of MEC. [FN23] That promise allegedly was made before Wohleber voted in favor of the Merger. [FN24] In 1998, Wohleber received a bonus of $250,000 in addition to his salary of $225,000. [FN25] Finally, it is alleged that Wohleber served as senior vice president of Freeport Copper, and that Mr. Moffett served as chairman and CEO of the same entity. The plaintiffs argue that it is reasonable to assume that in those capacities; Mr. Wohleber was subordinate to Mr. Moffett and that Mr. Moffett was in a position to influence, if not determine, Mr. Wohleber's continued employment at Freeport Copper.

    FN21. Complaint ¶ 6.

    FN22. *Id.*

    FN23. *Id.*, at ¶ 17.

    FN24. *Id.*, at ¶ 22.

    FN25. *Id.*, at ¶ 19.

I conclude that the foregoing facts, even if taken as true, do not establish that Mr. Wohleber lacked independence. The plaintiffs' position appears to rest on the supposition that Wohleber's position as senior vice president of Freeport Copper made him vulnerable to pressure from Mr. Moffett to vote (as a director of FSC) in favor of the Merger. This supposition is nowhere straightforwardly pled, let alone supported by any factual allegations in the poorly drafted complaint. Moreover, the complaint

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

(Cite as: 2001 WL 50203 (Del.Ch.))

alleges no facts that shed any light on the relationship between FSC (and/or MOXY) and Freeport Copper. Nor are any facts alleged from which one might infer that Moffett had the authority either to fire Mr. Wohleber or significantly to influence a decision by others to fire him, or that Wohleber had a substantial financial stake in maintaining his job at Freeport Copper. [FN26] These woeful deficiencies in the complaint preclude any determination that Mr. Wohleber was either interested or lacked the independence to consider the Merger transaction impartially.

> FN26. *See Rales v. Blasband,* Del.Supr., 634 A.2d 927 (1993); *Benerofe v. Cha,* Del.Ch., C.A. No. 14614, Chandler, V.C., Mem. Op. (Sept. 12, 1996)

3. *Latiolais*

Mr. Latiolais was both a director of FSC and the vice chairman of the board of Freeport Copper. In addition, he provided consulting services to FSC before the Merger, and thereafter will continue to provide such services to MEC. After the Merger, the consulting fee Mr. Latiolais received for those services was increased from $230,000 to $330,000-a nearly 43% increase.

The FSC defendants argue that the increase in Latiolais' consulting fees is not material and, moreover, that there is no allegation that Latiolais knew his fees would be increased at the time he voted on the Merger. The plaintiff rejoins that (1) a $100,000 (or 43%) increase is inherently material, (2) a $230,000 consulting contract, in and of itself, is a material financial interest regardless of whether the fee was increased, (3) Latiolais had a conflicting interest in continuing to render the consulting services for a fee to MEC after the Merger.

*5 In support of their position, the defendants rely upon *In re Walt Disney Co. Derivative Litigation,* [FN27] where Chancellor Chandler, in granting a motion to dismiss the complaint, found that a director who received consulting fees could not be deemed interested where the complaint did not allege facts that would establish that those fees were

material to *that* director. [FN28] The plaintiff has failed to allege such facts in this case. Accordingly, here, as in *Disney,* the Court is unable to conclude that the current pleading sufficiently alleges that Latiolais lacked independence or had a conflicting self-interest in the Merger.

> FN27. *In re Walt Disney Co. Derivative Litig.,* Del. Ch., 731 A.2d 342 (1999) *aff'd in part, rev'd in part on other grounds sub nom Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000).

> FN28. In discussing consulting fees paid to Senator George Mitchell, the Court stated that the "plaintiffs have not alleged that the ... consulting fees [were] even material to [defendant]." *Id.* at 360.

Because neither Wohleber or Latiolais can be deemed interested or to lack independence on the facts alleged, the pled facts do not establish that entire fairness is the applicable standard of review. Because (on the current pleading) the Merger would be reviewed under the business judgment standard, and because no facts are alleged that would establish that the Merger consideration was so low as to constitute fraud or waste, the complaint fails to state a cognizable claim that the FSC directors breached any fiduciary duty owed to the corporation. [FN29]

> FN29. Because the complaint cannot survive the FSC defendants' motion to dismiss, I need not address MOXY's motion to dismiss the aiding and abetting claim against it, because an underlying breach of fiduciary duty an essential element of a claim for aiding and abetting. *See In re Santa Fe Pac. Corp. Litig.,* 669 A.2d 59, 72 (1995) (citing *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986)).

IV. CONCLUSION

For the foregoing reasons, the FSC defendants' motion to dismiss is granted, with leave to amend the complaint within 30 days of this Opinion to add

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

**(Cite as: 2001 WL 50203 (Del.Ch.))**

nonconclusory factual allegations that would establish that the Merger is not governed by the business judgment standard, either because (a) the FSC independent committee process did not merit business judgment rule protection, or (b) a majority of the FSC directors who approved the Merger were interested and were not independent. If no further amended complaint is filed within that 30 day period, the dismissal of this action shall be final.

IT IS SO ORDERED.

Not Reported in A.2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 DEL. CH. LEXIS 65

IN RE GENERAL MOTORS (HUGHES) SHAREHOLDER LITIGATION

CONSOLIDATED, C.A. No. 20269

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

2005 Del. Ch. LEXIS 65; 35 Employee Benefits Cas. (BNA) 2188

March 7, 2005, Submitted
May 4, 2005, Decided
May 4, 2005, Filed

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** In re GM (Hughes) S'holders Litig, 2003 Del. Ch. LEXIS 148 (Del. Ch., Oct. 2, 2003)

**DISPOSITION:** General Motors Corporation ("GM") and The News Corporation Limited ("News" or "News Corp.") motion to dismiss is granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a parent corporation and its directors and a buying corporation, filed motions to dismiss the suit brought by plaintiff shareholders. The shareholders asserted breaches of the duty of loyalty with regard to the parent corporation and its directors as to a restated certificate of incorporation. The shareholders asserted that the buying corporation aided and abetted the alleged breaches.

**OVERVIEW:** The shareholders were challenging a series of transactions by which the buying corporation acquired a significant interest in a subsidiary of the parent corporation. The shareholders were at all times holders of the parent corporation's Class H common stock, which was a tracking stock representing the financial performance of the subsidiary. The court granted the motions to dismiss, because the complaint failed to state a claim that the directors acted with the primary purpose of thwarting the shareholders' vote and failed to allow the court to infer that the will of the shareholders was somehow frustrated, particularly in light of the fact that the sale was successfully approved by vote. The court incorporated the consent solicitation agreement that was relied upon heavily by the shareholders in their complaint and found

that no failure to disclose claim was stated. Rather, the shareholders' allegations merely expressed dissatisfaction with the buying corporation's exchange ratio. The court agreed that it had personal jurisdiction over the buying corporation but held that the shareholders failed to state a cause of action against it by merely making conclusory statements.

**OUTCOME:** The court granted the motions to dismiss.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] When considering a motion to dismiss under Del. Ch. Ct. R. 12(b)(6), a trial court is required to assume the truthfulness of all well-pleaded allegations of the complaint. In addition, the trial court is required to extend to the plaintiffs the benefit of all reasonable inferences that can be drawn from the complaint. Conclusory statements, however, without supporting factual averments, will not be accepted as true for purposes of a motion to dismiss. A trial court cannot order a dismissal unless it is reasonably certain that the plaintiffs could not prevail under any set of facts that can be inferred from the complaint. Consistent with those requirements, a trial court accepts as true all of the plaintiffs' properly pled allegations and makes every reasonable inference in their favor.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN2] Relying on a disclosure document for purposes other than disclosure issues or perhaps to establish for-

mal, uncontested matters is not appropriate on a motion to dismiss

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN3] Delaware law holds that a director may have a disabling conflict if a particular relationship would cause that director to make a corporate decision that materially benefits the director at the expense of the corporation or shareholders. If a trial court draws an inference in favor of a plaintiff, and that inference suggests that one director is conflicted by reason of some outside business relationship, the plaintiff is not relieved of his burden of pleading domination over the remaining directors.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN4] The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences. To rebut the presumption of the business judgment rule, a plaintiff must proffer evidence that members of the board had a material self-interest suggesting disloyalty.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN5] To the extent that in a given transaction different shareholder classes have mutually exclusive interests, the ability of a board to act in all of the shareholders' best interests is seriously complicated. Nevertheless, when future conflicts of interest are anticipated and appropriate provisions to deal with them are drafted under the certificate of incorporation, that is clearly a more efficient method of coping with potential divergences of interest between shareholder groups than having courts adapt procedural mechanisms, for example, special committees, burden shifts, etc., that are unnecessary or poorly adapted to new contexts. To the extent aspects of the process may be flawed, if all shareholders are sufficiently informed about the details of the process and empowered to make an independent decision on the substantive terms of the transaction then the business judgment rule's presumptions must remain in effect.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

*Evidence > Procedural Considerations > Burdens of Proof*
[HN6] To state a claim of vote manipulation, the plaintiffs must allege well-pled facts that would allow a trial court to infer that the primary purpose of the fiduciary's conduct was to thwart the exercise of a shareholder vote. Pejorative rhetoric and conclusory allegations are insufficient to state a claim; and without a threshold showing, the defendant directors' actions are entitled to the protection of the business judgment rule. If, on the other hand the plaintiffs meet their burden, the defendants would have the opportunity to show a compelling justification, but it is unlikely, if not impossible, for a defendant to meet this burden on a motion to dismiss.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN7] Del. Code Ann. tit 8, § 141(f) authorizes board action by consent without a meeting of the board.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN8] The burden of demonstrating that omissions were material rests with the plaintiff. The parties who assert the defense of shareholder ratification have the burden to establish that they fully disclosed all material facts in their proxy disclosures.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN9] Whether shareholders are fully informed necessarily asks the question of whether the directors have complied with their fiduciary duty to disclose all material information. Information is material when there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote, and that under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholders. It is not enough that the information might render a communication to shareholders somewhat more informative. Rather, the determination of the materiality of an alleged omission or misstatement requires a careful balancing of the potential benefits of disclosure against the resultant harm. Delaware law does not require directors to bury the shareholders in an avalanche of trivial information. Otherwise, shareholder

solicitations would become so detailed and voluminous that they will no longer serve their purpose

*Business & Corporate Entities > Business Combinations > Sale of Assets*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN10] A disclosure that does not include all financial data needed to make an independent determination of fair value is not per se misleading or omitting a material fact. The fact that the financial advisors may have considered certain non-disclosed information does not alter that analysis. The disclosure obligation is said to be one that requires the disclosure of all material information within the knowledge of the corporation and thus available to the directors. That duty may extend to factors the board should have known, but that determination cannot be made absent well-pled allegations to support such an inference.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN11] Delaware law does not require directors to assume they are acting improperly and then advise shareholders of the consequences of the hypothetically wrongful conduct. Directors need not engage in self-flagellation by implicating themselves in a breach of fiduciary duty. Statements of belief are not actionable absent an allegation of fact that the belief was falsely stated.

*Business & Corporate Entities > Corporations > Formation > Corporate Purpose & Powers*
*Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws*
*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN12] A corporate charter is a contract between a corporation and its shareholders, and a trial court will apply standard rules of contract interpretation to determine the parties' intentions.

*Business & Corporate Entities > Business Combinations > Sale of Assets*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN13] Delaware law clearly provides that a corporation may dispose of property, amounting to less than all or substantially all its assets, without a shareholder vote.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN14] Because a defendant challenges whether personal jurisdiction over it is proper, the plaintiffs bear the burden of making a showing that jurisdiction is proper. A trial court will then engage in a two-step analysis, first determining whether an applicable statute permits the exercise of jurisdiction, and then whether exercising jurisdiction over a particular defendant violates the due process clause of the Fourteenth Amendment of the United States Constitution.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN15] Even if plaintiffs follow the proper procedure for service under Del. Code Ann. tit. 10, § 365, jurisdiction under that statute is only proper in certain circumstances. Del. Code Ann. tit. 10, § 3104(c) sets forth a series of acts, which if taken either personally or by an agent, constitute legal presence in Delaware, such that the actor or principal consents to submit to the jurisdiction of the Delaware courts. Section 3104(c)(1) allows personal jurisdiction when the defendant transacts any business or performs any character of work or service in the State. The provisions of § 3104(c) are to be broadly construed such that jurisdiction is permitted to the fullest extent of the due process clause of the Fourteenth Amendment. In determining the scope of § 3104(c), and which acts suffice to create jurisdiction in Delaware, it is important to understand that paragraph (c)(1) grants specific, transactional, or single-act jurisdiction, as opposed to the general jurisdiction created by paragraph (c)(4). When establishing jurisdiction under paragraph (c)(1), the plaintiff must show that the cause of action arises from the defendants' specific activities within Delaware. There must be an affiliation between the forum state and the controversy between the parties.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN16] Delaware law is clear that if the only link between the parent corporation and the alleged wrong is the parent's ownership of stock in the subsidiary, that is insufficient to establish personal jurisdiction under Del. Code Ann. tit. 10, § 3104(c)(1). If the parent corporation of the Delaware subsidiary, however, actively engages in the negotiations and consummation of the transaction, it has transacted business within the meaning of §

3104(c)(1), and may be haled into a Delaware court to defend a cause of action that arises from that transaction.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN17] Ownership of stock in a Delaware corporation is not sufficient contact with Delaware to satisfy constitutional due process standards. Del. Code Ann. tit. 8, § 169. The legal situs of stock of Delaware corporations is within Delaware.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN18] A Delaware choice of law provision is insufficient to satisfy the constitutional minimum contacts test.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN19] Under Delaware law, in order to state a valid claim for aiding and abetting a breach of fiduciary duty, the plaintiffs must allege: (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary. In most cases, the second and third prongs of the test are the most relevant in the context of a motion to dismiss. A claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred. If such facts are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an inherently wrongful manner. Even per se illegality of a fiduciary's actions may, in certain circumstances, be insufficient to infer knowing participation.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN20] In order for allegations of a diversion of money to be sufficient to infer knowing participation, the diversion must have been granted by the non-fiduciary acquirer to the fiduciary directors such that a trial court

could reasonably infer that the payments were made specifically to induce the fiduciaries to breach their duties. In other words, the diversion of money caused by the alleged aider/abetter becomes an incentive for the directors to ignore their fiduciary obligations.

*Business & Corporate Entities > Business Combinations > Sale of Assets*
*Business & Corporate Entities > Business Combinations > Transfers of Shares & Tender Offers*
[HN21] When a controlling shareholder merely sells its interest to another controlling shareholder, it is not a change of control.

COUNSEL: Attorneys for Plaintiffs: Jay W. Eisenhofer, Geoffrey C. Jarvis and P. Brad deLeeuw, of GRANT & EISENHOFER P.A., Wilmington, Delaware; Michael Hanrahan, Thomas A. Mullen, Paul A. Fioravanti, Jr. and Tanya P. Jefferis, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Marc A. Topaz, of SCHIFFRIN & BARROWAY, LLP, of Bala Cynwyd, Pennsylvania; Richard B. Brualdi and Kevin T. O'Brien, of THE BRUALDI LAW FIRM, New York, New York.

Attorneys for Defendants Percy N. Barnevik, John H. Bryan, Armando M. Codina, George M. C. Fisher, Nobuyuki Idei, Karen Katen, Alan G. Lafley, Phillip A. Laskaway, E. Stanley O'Neal, Eckhard Pfeiffer, John S. Smith, Jr., G. Richard Wagoner, Jr., Lloyd D. Ward, and General Motors Corporation: R. Franklin Balotti, Lisa A. Schmidt and Srinivas M. Raju, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; OF COUNSEL: Robert J. Kopecky and Timothy A. Duffy, of KIRKLAND & ELLIS LLP, Chicago, Illinois; Greg A. Danilow and Stephen A. Radin, of WEIL GOTSCHAL & MANGES LLP, New York, New York.

Attorneys for Defendant The News Corporation [*2] Limited: Edward P. Welch, Edward B. Micheletti, Seth M. Beausang, James A. Whitney and T. Victor Clark, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware.

OPINION:

OPINION

CHANDLER, Chancellor

Plaintiffs instituted this lawsuit against defendant General Motors Corporation ("GM") and defendant The News Corporation Limited ("News" or "News Corp."), n1 challenging a series of transactions by which News acquired a significant interest in Hughes Electronics Corporation ("Hughes"). n2 Hughes was previously a

wholly-owned subsidiary of GM. The individuals who were directors of GM at the relevant times have also been named as defendants (the "Individual" or "Director" defendants) n3 Plaintiffs were at all relevant times holders of GM's Class H Common Stock ("GMH"), which was a "tracking stock" representing the financial performance of Hughes while Hughes was wholly-owned by GM. For the reasons set forth in more detail later, I grant the motion to dismiss brought by GM and the Individual defendants. The complaint fails to state a claim upon which relief can be granted as to GM and the Individual defendants. I also grant News' motion to dismiss for the same reason. [*3]

n1 News is a South Australian corporation. Rev Am Consol Class Action Compl ("Compl") P 17 Letter of Edward P Welch, Esq to the Court of January 26, 2005

n2 Hughes was renamed The DIRECTV Group, Inc on March 16, 2004 Id P 10. I, as did plaintiffs in their Complaint, shall refer to the entity as "Hughes" for purposes of clarity

n3 The Individual or Director defendants are: G. Richard Wagoner, Jr ("Wagoner"), John F Smith, Jr ("Smith"), Percy N Barnevik ("Barnevik"), John H Bryan ("Bryan"), Armando M. Codina ("Codina"), George M C Fisher ("Fisher"), E Stanley O'Neal ("O'Neal"), Eckhard Pfeiffer ("Pfeiffer"), Alan G Lafley ("Lafley"), Karen Katen ("Katen"), Philip A Laskaway ("Laskaway"), Nobuyki Idei ("Idei"), and Lloyd D Ward ("Ward") Id PP 18-21

## I. INTRODUCTION

The operative complaint in this action is the Revised Amended Consolidated Class Action Complaint ("Complaint"), filed on May 7, 2004 It is a "door-stop" weight 97-page tome that purports [*4] to state seven claims. The Complaint contains some facts, but also offers a rich stew of conclusory allegations and legal arguments. Counts I, II, III, and IV are against GM and the Individual defendants for breaches of the duty of loyalty Counts V and VI are against GM and the Individual defendants for breach of GM's Restated Certificate of Incorporation Count VII is against News for aiding and abetting the Individual defendants' breaches of fiduciary duty It is necessary that I briefly outline the Complaint's key elements and factual allegations.

*A Director Defendants Were Not Disinterested and Independent*

Plaintiffs allege that the Director defendants are not disinterested and independent in connection with the transactions at issue in this case because their loyalties were to GM in order to preserve their directorships there, with the accompanying compensation and perquisites, and that the Director defendants were thus in conflict with the soon to be spun-off GMH shareholders. n4 Plaintiffs argue that the non-employee GM directors are excessively compensated for their services as directors, and that similar excess is present in the compensation of the Hughes directors. [*5] n5 Plaintiffs further attempt to impugn the independence of the directors by outlining professional connections that certain of the directors have that may relate to GM or Hughes. n6 Nevertheless, there are no allegations in the Complaint that any of the compensation paid to the non-employee GM directors is material to them, n7 with the exception that allegations of materiality are addressed toward defendant Smith, who was formerly the Chief Executive Officer of GM. n8

n4 Compl PP 22-27.

n5 For example, the non-employee GM directors receive an annual retainer of $ 200,000 per year, reimbursement for travel expenses, and other compensation valued by plaintiffs at $ 17,000 per year. Non-employee Hughes directors received an annual retainer of $ 140,000 per year. The Chair of GM's Audit Committee receives an annual retainer of $ 30,000 per year, and the committee's members receive an annual retainer of $ 20,000 per year. The Chairs of GM's Capital Stock Committee, Executive Compensation Committee, Investment Funds Committee, Directors and Corporate Governance Committee, and Public Policy Committee each receive annual retainers of $ 5,000 per year. Id PP 22-26.

[*6]

n6 For example, Pfeiffer was also a director of Hughes. Bryan also serves on the board of Goldman Sachs Group, Inc., which provides investment banking services for GM. O'Neal is the CEO and a board member of Merrill Lynch & Co, which also provides financial services for GM and News Bryan, Barnevik, Lafley, and Wagoner are members of The Business Council, and Lafley and Wagoner are members of The Business Round Table. Ward was CEO of the U.S. Olympic Committee, which receives substantial donations from GM. Id PP 23-26

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

n7 The Complaint does allege that Pfeiffer and Bryan are "professional directors" and that they derive "substantial income" from serving on various boards of directors, but the Complaint does not allege that the income received from GM is material to them. *Id.* PP 23-24.

n8 "Because of his many years of employment at GM and the pension and other benefits, compensation and perquisites he derives from GM, the financial health, credit rating and security of GM and GM's Pension Plans and Benefit Plans are of material significance to Smith." *Id.* P 20. Other than defendant Wagoner, who is currently GM's Chairman, CEO, and President, none of the other Individual defendants are employees of GM. *Id.* P 19.

[*7]

### B. GM's Pension Crisis

Plaintiffs further allege that GM and its directors were not independent because GM had a "pension crisis." n9 This conflict extended to the Investment Funds Committee of GM's Board of Directors, n10 which is a named fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") for certain of GM's pension plans. n11 Plaintiffs allege that because GM's pension funds were underfunded by $ 19.3 billion by the end of 2002, and GM's debt rating had been downgraded by Standard and Poor's to BBB, the directors on the Investment Funds Committee faced a direct conflict of interest between their fiduciary responsibilities over the pension plans and their fiduciary duties as directors of GM owed to the GMH shareholders. n12

n9 *Id.* PP 28-36.
n10 The Investment Funds Committee was made up of defendants Barnevik, Codina, Fisher, Idei, O'Neal, and Smith. *Id.* P 37.
n11 *Id.* PP 37-39.
n12 *Id.* PP 32, 39.

### C. The Transactions

The split-off [*8] of Hughes was accomplished via a series of transactions detailed below, and announced to the public for the first time on April 9, 2003. n13 Five days before the announcement, GM, as the 100% shareholder, caused Hughes to amend its certificate of incorporation to increase the number of authorized shares of Hughes common stock and Hughes Class B common stock from 1 million shares to 2.5 billion shares. n14 An "excess shares" provision was added to the certificate of

incorporation and Hughes' board was staggered, among other amendments. n15

n13 *Id.* P 2.
n14 *Id.* P 4.
n15 *Id.*

Just before the split-off of Hughes was accomplished, Hughes paid a special dividend to its sole shareholder, GM, of $ 275 million in cash. n16 The split-off occurred by GM's redemption of each GMH share in exchange for one share of Hughes' common stock, shares which Hughes had previously issued to GM. n17 GM sold its economic interest in Hughes to News Corp. in the form of Hughes Class B common stock. n18 GM [*9] received a combination of cash ($ 3.1 billion) and stock (28.6 million News Corp. Preferred American Depository Shares ("News ADSs")) from News. n19 The News ADSs were valued at approximately $ 1.0 billion, bringing the total compensation from News to GM to $ 4.1 billion. n20 Including the $ 275 million dividend, GM received a total of $ 4.375 billion in compensation for divesting itself of Hughes, with $ 3.375 billion of that amount in cash. n21

n16 *Id.* PP 6, 66-89.
n17 According to the Complaint, GM voted those 1.4 billion Hughes shares in favor of the merger between Hughes and the News Corp. subsidiary before distributing them to the GMH shareholders. *Id.* PP 7, 13.
n18 *Id.* P 8.
n19 *Id.*
n20 *Id.*
n21 *Id.* P 12.

Immediately following the above-described transactions, News acquired an additional interest in Hughes via the merger of a subsidiary of News into Hughes (the "Merger"), leaving News with approximately a 34% interest in Hughes. n22 [*10] The former GMH shareholders therefore received a combination of Hughes common stock and News ADSs in exchange for their GMH shares. n23 News later transferred its interest in Hughes to another subsidiary of News Corp., Fox Entertainment. n24

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

n22 Via the merger, News exchanged News ADSs for 17.5% of the Hughes common stock held by the former GMH shareholders. Id. PP 9-10
n23 Id. P 11
n24 Id. P 10

*D. Rights and Terms of (and Policies Regarding) the GMH Shares*

The rights and terms of the GMH shares were defined in Article FOURTH of GM's Restated Certificate of Incorporation. n25 Dividends paid to the GMH shareholders were paid out of the "Available Separate Consolidated Net Income of Hughes," as opposed to the dividends to GM's common shareholders, which were paid out of other available funds not including the "Available Separate Consolidated Net Income of Hughes." n26 When the GM shareholders voted, the GMH shareholders voted with the other GM common shareholders (the "GM [*11] $ 1 2/3" holders), but each GMH share was treated as 0.2 GM $ 1 2/3 shares. n27 Similarly, in the unlikely event that GM were to be liquidated, the GMH shareholders would receive distributions from the same pool as the GM $ 1 2/3 shareholders, but with each GMH share again representing 0.2 GM $ 1 2/3 shares. n28 The GMH shares, therefore, did not have a direct interest in Hughes' assets (or GM's) except through a liquidation of GM. In the event of a liquidation of Hughes, GMH shareholders would not receive the proceeds of that liquidation, but would receive GM $ 1 2/3 stock, as detailed below.

n25 Id. P 41
n26 Id.
n27 Id.
n28 Id.

GM's Restated Certificate of Incorporation provided certain protections for the GMH shareholders in the event that GM should "sell, liquidate, or otherwise dispose of 80% or more of the business of Hughes." n29 If one of those triggering events were to take place, each GMH share would be converted into GM $ 1 2/3 stock at a value [*12] equal to 120% of the value of the GMH stock on the date one of those transactions occurred. n30 Such a result could be avoided if the GM shareholders (both the GM $ 1 2/3 and the GMH) approved the transaction separately as individual classes. n31

n29 Id. P 42
n30 Id.
n31 Id.

Recognizing that the interests of the GM $ 1 2/3 and GMH shareholders may not always coincide, GM created a board committee called the Capital Stock Committee to determine the terms of any material transaction between GM and Hughes and ensure fairness to all shareholders. n32 The Capital Stock Committee was chaired by Pfeiffer, with Barnevik and Bryan as members of the committee. n33 The GM board also adopted a Board Policy Statement Regarding Certain Capital Stock Matters ("Policy Statement") setting forth procedures to be followed in the event of a material transaction between GM and Hughes. n34

n32 *See id.* P 23; *Solomon v. Armstrong*, 747 A.2d 1098, 1106-07 (Del. Ch. 1999).

[*13]

n33 Compl. PP 21, 23-24.
n34 Id. P 43. As opposed to the rights of the GMH shareholders set out in GM's Restated Certificate of Incorporation, which is binding upon the GM board, there is no information in the Complaint with respect to the extent to which the GM board was bound to protect the rights of the GMH shareholders granted by the Policy Statement. If the Policy Statement had the effect of a resolution adopted by the board, it presumably could be rescinded or amended by nothing more than another board resolution. The Complaint unreasonably implies that the Policy Statement was binding because the GM board chose to seek shareholder consent for the Hughes transactions. Id. P 45

This Policy Statement required that in the event of a transfer of material assets from Hughes to GM, GM's board would be required to declare and pay a corresponding dividend to the GMH shareholders. n35 The corresponding dividend would not be required if one of two exceptions were met: (1) Hughes receives "fair compensation" for the transfer; or (2) the transfer is approved by a majority of the [*14] GM $ 1 2/3 and GMH shareholders, voting as separate classes. n36 GM chose the second option for approving the special dividend by receiving consent for the dividend from the GM $ 1 2/3 and GMH shareholders. n37

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

n35 *Id.* P 44.
n36 *Id.*
n37 *Id.* P 45.

## E. *Allegations of Unfair Price and Process*

Plaintiffs make several allegations in an attempt to impugn the fairness of the consideration received by the GMH shareholders in the Hughes transactions as well as the process by which those transactions were negotiated and structured. At the time the Merger was announced on April 9, 2003, the approximately $ 14 per share consideration represented a twenty-two percent premium over the then-market price of the GMH share. n38 Plaintiffs allege that this premium was not as large as GM represented it to be because the merger announcement was strategically timed before two announcements that would substantially raise the market price for GMH shares. n39 Those two announcements were the announcement [*15] on April 11, 2003, that PanAm Sat Corporation ("PanAm Sat"), an eighty-one percent subsidiary of Hughes, announced higher than expected earnings, and the April 14, 2003 announcement of Hughes' 2003 first quarter financial results, which were also favorable. n40 Plaintiffs also note Hughes' announced and projected financial results for the second and third quarters of 2003, as well as the price of PanAm Sat's public shares for the remainder of 2003. n41

n38 *Id.* P 49
n39 *Id.*
n40 *Id.* PP 50-51. Plaintiffs further allege that it was unreasonable to rely on News to pay a fair price for the Hughes stock because News allegedly has a pattern of obtaining a minority, yet controlling interest in companies without paying a "control premium." *Id.* PP 63, 128-133
n41 *Id.* PP 52-53, 61-62

Plaintiffs allege that the process by which the Hughes transactions were negotiated was flawed because the GM Directors delegated to management of GM and the management and board of directors [*16] of Hughes the responsibility to negotiate both with News and between themselves. n42 The GMH shareholders were represented by Hughes' management and board. n43 Plaintiffs next speculate that an extra dollar per share was added to the special dividend paid by Hughes to GM as a result of News' agreement to reduce the amount of

Hughes stock it would acquire from 36 percent to 34 percent, and that this reduction resulted in a material reduction of compensation to be paid to the GMH shareholders. n44

n42 *Id.* P 56.
n 43 *Id.* P 57. In an example of inartful and confusing pleading, plaintiffs later allege that GMH was not represented in negotiating and structuring the Hughes transactions. *Contra id.* P 65.
n44 *Id.* PP 59-60. In addition to process and price, plaintiffs argue that the structure of the transactions was unfair to the GMH shareholders because GM wanted cash for its Hughes holdings and the GMH shareholders ended up as minority stockholders of News and Hughes. *Id.* PP 64-65.

[*17]

## F. *Fairness Opinions*

No fewer than four fairness opinions were obtained by GM and Hughes in connection with the Hughes transactions. These opinions were rendered by Merrill Lynch, Bear Stearns, Credit Suisse First Boston ("CSFB") and Goldman Sachs. n45 Reading the Complaint in the manner most favorable to the plaintiffs, it appears that Merrill Lynch and Bear Stearns gave an opinion to GM that the transactions were fair to GM. n46 Similarly, it seems that CSFB and Goldman Sachs opined that the transactions were fair to Hughes. n47 Plaintiffs complain that no financial advisor was retained to determine the fairness of the transactions specifically to the GMH shareholders. n48

n45 *Id.* P 90
n46 *Id.*
n47 *Id.*
n48 *Id.* Here is another example of inconsistencies in the Complaint: Plaintiffs later note that Merrill Lynch and Bear Stearns opined as to the fairness of the transactions "to each class," presumably the GM common and the GMH shareholders. *Id.* P 94. Along those same lines, CSFB and Goldman Sachs opined that "what the post-Split-Off holders of Hughes common stock" would receive as compensation in the Merger was fair to the Hughes common shareholders other than News, or in other words, the former GMH shareholders. *Id.*

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

[*18]

Before attacking the fairness opinions substantively, plaintiffs allege that the financial advisors were conflicted because: (1) a large portion of their compensation for the fairness opinion was contingent upon the transactions being consummated, and (2) each of the four advisors has had and continues to have a business relationship with GM, Hughes, and/or News n49 Plaintiffs also allege that the fairness opinions were inadequate because the four advisors collaborated with each other instead of working independently, purportedly in order to develop the opinion desired by GM. n50 The fairness opinions were also allegedly inadequate because Hughes' stake in its eighty-one percent subsidiary, PanAm Sat, was dramatically undervalued, and because the updated fairness opinions of August 5, 2003 did not provide a complete and accurate description of the updated analyses performed by the advisors in reaching the updated opinions. n51

n49 *Id.* PP 91-92
n50 *Id.* P 93.
n51 *Id.* PP 95-97

[*19]

*G Manipulation of the GMH Vote*

As mentioned above, the GM $ 1 2/3 and GMH shareholders voted to approve the Hughes transactions. Almost 20 percent of the outstanding GMH shares were held by pension funds associated with GM after a June 2000 contribution. n52 Later, on March 12, 2003, GM contributed another 149.2 million newly-issued GMH shares to its pension plans. n53 The Complaint then insinuates that GM had an ulterior motive in issuing these shares to its pension plans instead of selling the shares publicly and then contributing the cash to the plans. n54 The GM pension plans and other employee benefit plans held approximately 35 percent of the outstanding GMH stock at the time of the shareholder vote on the Hughes transactions. n55 The Complaint further states that GM's retained economic interest in Hughes decreased from 30.7 percent to 19.8 percent and that the pension plans' voting power was roughly doubled, and that after the Hughes transactions were consummated, the pension plans held approximately 19.8 percent of the outstanding Hughes common stock and 5.2 percent of the News ADSs. n56

n52 *Id.* P 98

[*20]

n53 *Id.* P 100
n54 *Id.*
n55 *Id.* P 104. Nevertheless, plaintiffs make no further allegations with respect to how the remaining 65% of GMH shareholders voted in order to fairly and accurately represent to the Court the effect of the pension plans on the shareholder vote totals.
n56 *Id.* PP 101, 103. I note as an aside that GM may have had perfectly valid, and even compelling tax reasons for reducing its retained interest in Hughes below 20 percent in anticipation of the Hughes transactions. In fact, this reason for the reduction was specifically contemplated by GM and discussed in the Consent Solicitation ("CS"). *See id.* P 105.

Plaintiffs then complain of certain accounting improprieties in valuing the GMH shares contributed to the pension plans which had the effect of increasing the pension plans' holdings to a greater extent and also, among other reasons, ostensibly gave the plans an incentive to vote for the Hughes transactions that was not shared by other GMH shareholders. n57 According to the Consent Solicitation, the pension and benefit plans' [*21] GMH shares were voted by the plans' trustee, the United States Trust Company ("U.S. Trust"). n58 As trustee of the plans, U.S. Trust had a fiduciary duty under ERISA to act on behalf of the plans' beneficiaries, even if the interests of the plans' beneficiaries diverged from those of the other GMH shareholders. n59

n57 *Id.* PP 106-12.
n58 *Id.* P 113.
n59 *Id.* PP 113-14.

In preparing and mailing the Consent Solicitation, GM did so before receipt of a letter ruling by the Internal Revenue Service, purportedly in order to obtain shareholder approval before the inadequacy of the consideration to be received by the GMH shareholders became clear, even though the transaction would not close for some time due to required regulatory approvals. n60 Advance copies of the Consent Solicitation were sent by GM to certain GMH shareholders before the official mailing to all GM $ 1 2/3 (and presumably GMH) shareholders. n61 The Consent Solicitation was sent to GMH shareholders of record as of August 1, 2003. n62 [*22] That decision was allegedly communicated to ADP on or

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

about July 25, 2003. n63 In addition, plaintiffs construe the Consent Solicitation to indicate that the GM board of directors did not meet between June 5, 2003 and August 5, 2003. n64 GM also communicated with GM and Hughes employees on more than one occasion with respect to the upcoming vote. n65

n60 *Id.* PP 116-19.
n61 *Id.* P 122.
n62 *Id.* P 120.
n63 *Id.* P 121. It appears that ADP was the entity chosen by GM to mail the Consent Solicitation.
n64 *Id.*
n65 *Id.* PP 123-24

The Complaint also alleges that the Consent Solicitation is materially misleading and incomplete with respect to the following four broad categories: n66 (1) the "value enhancement" to the GMH shareholders of Hughes as a stand-alone company that was used as a justification for the $ 275 million dividend; n67 (2) the bases for the updated fairness opinions were not fully and fairly disclosed; (3) the effect of shareholder [*23] ratification of the transactions; and (4) GM's contribution of GMH stock to its pension and benefit plans.

n66 *Id.* P 126.
n67 *Id.* PP 127, 134-147.

The Complaint is rounded out by allegations that the defendants did not act in good faith. Essentially, plaintiffs merely rehash each allegation in the Complaint and say that such actions evidence a lack of good faith without adding additional facts or substance. The specific allegations are that the defendants did not act in good faith because they: (1) manipulated the GMH shareholder vote; (2) did not comply with the requirements of GM's certificate of incorporation in obtaining shareholder approval of the transactions; (3) caused Hughes to pay GM the special dividend; (4) made inadequate disclosures about the proposed transactions; 5) relied upon conflicted financial advisors for fairness opinions; 6) engaged in a flawed negotiating process; 7) eliminated appraisal rights the GMH shareholders might have otherwise had in the transactions; and [*24] 8) took these actions to benefit GM and its pension and benefit plans by adopting a "we don't care" attitude toward the public GMH shareholders. n68

n68 *Id.* PP 148-49.

### H. Claims Alleged in the Complaint

As previously stated, the Complaint purports to state seven claims. All of the claims except for Count VII are alleged against GM and the Individual Defendants. Count I is for breach of the duty of loyalty and unjust enrichment in the payment of the special dividend. Count II is for breach of the duty of loyalty in failing to deal fairly with the GMH shareholders and compensate them fairly in the transactions. Count III is for breach of the duty of loyalty in manipulating the shareholder vote. Count IV is for breach of the duty of disclosure. Count V is for breach of GM's Restated Certificate of Incorporation, Article Seventh. Count VI is for breach of GM's Restated Certificate of Incorporation, Article Fourth. Count VII is alleged against News for aiding and abetting a breach of fiduciary duty.

### [*25] II. ANALYSIS

#### A. Standard on a Motion to Dismiss

[HN1] When considering a motion to dismiss under Rule 12(b)(6), I am required to assume the truthfulness of all well-pleaded allegations of the Complaint. In addition, I am required to extend to plaintiffs the benefit of all reasonable inferences that can be drawn from the Complaint. "Conclusory statements, [however], without supporting factual averments will not be accepted as true for purposes of a motion to dismiss." n69 Under this analysis, I cannot order a dismissal unless it is reasonably certain that the plaintiffs could not prevail under any set of facts that can be inferred from the Complaint. Consistent with these requirements, I accept as true all of the plaintiffs' properly pled allegations and have made every reasonable inference in their favor. n70

n69 *Grimes v. Donald*, 673 A.2d 1207, 1214 (Del. 1996).
n70 *Solomon*, 747 A.2d at 1110-11.

#### B. Does the GM Defendants' Motion to Dismiss Improperly Rely [*26] on Matters Outside the Pleadings?

As a threshold matter, I must address plaintiffs' contention that I may not consider matters outside the pleadings and that to the extent defendants base their motion on such matters to establish facts, dismissal is precluded. n71 From the outset, plaintiffs understood the possibility that a fully informed, shareholder vote may, as a matter

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

of law, preclude recovery on Counts I and II of their seven-count Complaint. Many of their allegations, therefore, attack the adequacy of the disclosures made to GM's shareholders and rest squarely on the contents of the Consent Solicitation. Therefore, the Court may consider the contents of a disclosure document and look for itself to see what the documents actually says and discloses. There would be no other way for a court to determine whether plaintiffs state a claim that the document was materially misleading or omitted a material fact. n72

n71 Pls.' Answering Br. In Opp'n To GM Defs.' Mot. To Dismiss ("Pls.' GM Br.") at 11-13.

n72 See In re Santa Fe Pac. Corp S'holders Litig., 669 A.2d 59, 69-70 (Del. 1995) (finding it appropriate on 12(b)(6) motion to consider a document plaintiffs have made integral to a claim and have incorporated the document into the complaint).

[*27]

Plaintiffs attempt to distinguish this rationale by arguing a wholly unpersuasive point that they do not challenge the Courts' ability to consider the Consent Solicitation, but rather contend that the Court cannot look behind the words and assume the matters asserted in the solicitation are true. The Court finds this distinction unpersuasive because the defendants have not attempted to submit the Consent Solicitation to prove the truth of the matter asserted. n73 Rather, defendants have referred to the omitted sections of the Consent Solicitation when doing so fairly represents the selective portions the plaintiffs have submitted into the record. Surely plaintiffs do not contend that the Court is not entitled to consider the full context of a document once the plaintiffs have relied on particular segments in their Complaint? The Court, therefore, considers the Consent Solicitation to the extent the plaintiffs have incorporated the document into their complaint, and the portions necessary for the Court to discern a complete and accurate context of what was disclosed. In this regard, the Court's consideration of the Consent Solicitation is consistent with Delaware law. n74

n73 Id. at 70 [HN2] (relying on disclosure document for purposes other than disclosure issues or perhaps to establish formal, uncontested matters is not appropriate on a motion to dismiss)

[*28]

n74 See id.

Plaintiffs also take issue with the Court's ability to consider publicly available facts that show that both classes of GM stockholders voted to approve the Hughes transactions. Because there are no allegations in the Complaint that challenge whether the conditions necessary to consummate the transaction were actually met (i.e., a majority vote of holders of each class of GM stock), those facts are not subject to reasonable dispute, and it is appropriate to take judicial notice of the voting percentages of each class of GM stock. n75

n75 See, e.g., Solomon, 747 A.2d at 1109-10 & n.20.

Finally, there is no basis to deny defendants' motion simply because of their reference to GM's Form 8-K. The defendants have cited this publicly available document to demonstrate when the IRS had issued the private letter ruling that confirmed that the redemption of GMH stock, and the subsequent [*29] distribution of Hughes stock, would be a tax-free exchange. Plaintiffs do not challenge the veracity of the letter and defendants' motion does not rely on the substance of the letter. The Court will therefore consider the date of the letter for what it is worth.

*C. Does the Complaint Contain Well-Pled Facts That Show There Was No Majority of Independent and Disinterested Directors*

Counts I and II of the Complaint allege that no majority of disinterested and independent directors approved a transaction that: (1) secured liquidity for GM's Pension and Benefit plans through a special $ 275 million dividend; and (2) unfairly allocated the transaction consideration in a manner that favored GM and the GM $ 1 2/3 holders interests over the interests of the GMH holders. The Complaint alleges that the directors breached their fiduciary duty of loyalty to the GMH holders because of their own pecuniary interests in director compensation or as beneficiaries of the GM plans, n76 or through professional relationships, n77 or because six members of the GM board were also members of the Investment Funds Committee. n78

n76 Compl. PP 22-27.

[*30]

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

n77 *Id.* P 25
n78 *Id.* PP 37-39

Notwithstanding the plaintiffs' kitchen sink approach to pleading, their allegations were distilled in paragraph 160 of the Complaint where it is stated that:

> The individual defendants were not disinterested and independent with respect to the challenged transaction [because] they would continue as directors of GM and, as a result of that relationship, their interests favored GM and its continuing shareholders and not the GMH shareholders, who would become subject to the dominion of News Corp. n79

From this, the Court surmises that the plaintiffs' theory concerning the GM directors' alleged breach is two-fold. Either the GM defendants' are conflicted due to their own self-interests, which make them beholden to the remaining GM shareholders and GM's management for their livelihood as "professional directors," n80 or absent any self-interests, the split-off necessarily favored GM, and the GM $ 1 2/3 holders at the expense of the GMH holders. I address the issues concerning the directors' self-interests below; structural challenges [*31] to the directors' interests are addressed in Section D: *The Effect of Shareholder Ratification*

n79 *Id.* P 160
n80 *Id.* P 24.

1. Allegations of Pecuniary or Professional Self-Interests

As to the allegations of pecuniary or professional interests, I conclude that the Complaint fails to make well-pled allegations sufficient to rebut the presumption that the GM directors acted loyally. First, it is well settled that plaintiffs' allegations of pecuniary self-interest must allow the Court to infer that the interest was of "a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest." n81

n81 *In re GM Class H S'holders Litig.*, 734 A.2d 611, 617-18 (Del. Ch. 1999)

[*32]

The Complaint begins with a list of directors who served on GM's board at the time the Hughes transaction was approved. Then, the Complaint merely outlines the respective salaries of each director and the annual retainers paid for service on particular committees. Absent from the Complaint, however, are any allegations that the compensation of any of these non-employee directors was in anyway contingent on the decision to approve the Hughes transaction. Similarly, nothing is alleged that suggests that the amount the directors had vested in the pension plans was material to each director. In short, there are no allegations (other than the conclusory allegations concerning Wagoner) that relate a given director's salary and benefits to that director's own economic circumstance. Without allegations to somehow link the accretion of a material benefit to the decision to approve the Hughes transactions, the allegations of pecuniary self-interest are merely conclusory and not well pled. n82

n82 *See Solomon*, 747 A.2d at 1126 ("It would be a novel result under present law to hold that the potential "self-interest" that the directors might have in ingratiating themselves to continuing GM shareholders is a proper basis to rebut the business judgment rule ")

[*33]

The Complaint is equally devoid of allegations that would allow the Court to infer that the professional relationships of four of the outside directors created a debilitating conflict for the majority. [HN3] Delaware law has held that a director may have a disabling conflict if a particular relationship would cause that director to make a corporate decision that materially benefits the director at the expense of the corporation or shareholders. n83 Still, if the Court draws an inference in favor of a plaintiff, and that inference suggests that one director is conflicted by reason of some outside business relationship, the plaintiff is not relieved of his burden of pleading domination over the remaining directors.

n83 *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) [HN4] ("The primary basis upon

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences."); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363-364 (Del. 1993) (subsequent history omitted) ("to rebut presumption of business judgment rule, plaintiff must proffer evidence that members of the board had a material self-interest suggesting disloyalty); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167-1169 (Del. 1995); *Malpiede v. Townson*, 780 A.2d 1075, 1084-85 (Del. 2001) (affirming Chancery Court's conclusion that majority of directors were disinterested when the complaint failed to allege that the one interested director dominated the other directors who approved the transaction).

[*34]

The Complaint alleges, for example, that Ward's position as CEO of the U.S. Olympic Committee made him beholden to GM's management because Ward would not oppose a transaction that was strongly supported by one of the U.S.O.C.'s major sponsors. n84 According to the Complaint, GM contributed a total of $ 23.25 million in cash and vehicles to the U.S.O.C. for the 2002 Salt Lake City Olympic Games. n85 Missing, however, is any allegation that this contribution conferred a material benefit on Ward at the expense of the Corporation or its Shareholders. In addition, there is no well-pled allegation that the donation itself was significant in relationship to the other donations the U.S.O.C. received from other sponsors, or that a similar contribution could not have been obtained from another automobile sponsor. In fact, GM's contribution to the U.S.O.C. occurred at least a year before the split-off was approved and as of June 2003, Ward no longer served on GM's board. n86 Simply stated, there is absolutely nothing in this Complaint that would suggest that this professional relationship provided GM with any leverage over Ward so that Ward's decision to approve the split-off was tainted by [*35] his desire to receive a material benefit that only GM could bestow.

n84 Compl. P 25
n85 *Id.*
n86 *Id.* P 21

The allegations concerning defendants Pfeiffer, Bryan and O'Neal are equally unremarkable and cannot rebut the business judgment rule. Pfeiffer was a board member of both Hughes and GM at the time the split-off was approved. Bryan served on the boards of both GM and Goldman Sachs -- one of Hughes' financial advisors in this transaction. O'Neal served on both GM's board and was CEO of Merrill Lynch & Co. -- one of GM's financial advisors.

Allegations concerning Pfeiffer's dual board membership are of little help to the plaintiffs' claims. As a director of Hughes (GM's wholly owned subsidiary), Pfeiffer is charged to act in the best interests of GM and GM's shareholders. n87 Clearly, being a director of Hughes did nothing to misalign the fiduciary duties Pfeiffer already owed to the GMH holders. As to Bryan and O'Neal, there is no allegation in the Complaint that either Bryan [*36] or O'Neal could have controlled or dominated the GM board even if a material conflict existed. Without such an allegation, plaintiffs cannot impugn the entire GM board with any putative conflicts Bryan and O'Neal may have had. n88

n87 *See Solomon*, 747 A.2d at 1123 (citing *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)).
n88 This is not to suggest that the Court finds these relationships conflicting or material. But, even if I extend to the plaintiffs all reasonable inferences, as I am required to do, the plaintiffs still have failed to make well-pled allegations that suggest a conflicted director dominated an otherwise independent majority of GM's board.

2. Conflicts of the Investment Fund Committee

Plaintiffs have alleged that six members of GM's board were not disinterested because they served on the Investment Fund Committee of the Board -- a named fiduciary to GM's pension plans. n89 In particular, the Complaint alleges that [*37] the payment of the $ 275 million dividend, as a means of reducing the various pension plans' underfunding, gave these directors a personal interest in the Hughes transactions. n90

n89 *See* Compl. P 37 (naming Barnevik, Codina, Fisher, Idei, O'Neal, and Smith).
n90 *Id.* P 39

These contentions fail to show a conflict of sufficiently material importance, in the context of the directors' economic circumstances, as to have made it improb-

able that the director could perform her fiduciary duties without being influenced by her overriding personal interest. First, if the proceeds from the Hughes transactions were used to fund the pension plans, then irrespective of the Special Dividend, the Investment Fund Committee, along with every other GM director, had every incentive to get the maximum value for the Hughes shares. Second, to the extent part of that consideration was allocated differently among the GM classes of Stock (*i e*, through the Special Dividend) it is often the case that directors [*38] must make difficult decisions that affect the allocation of value between various classes of stock. This fact alone does not necessarily implicate the director's good faith or loyalty. n91 Finally, as stated above, an allegation of a director's personal interest must show materiality as to that director. The Complaint alleges that by the end of 2002, the underfunding of GM's pensions approximated $ 19.3 billion. n92 In relation to this amount, the Special Dividend represented less than two percent of the total underfunding -- this amount is not material and does not suggest it was probable that an overriding personal interest was influencing the investment fund committee directors.

n91 *Solomon*, 747 A.2d at 1118 (citations omitted)
n92 Compl. P 32

The failure to set forth any well-pled allegation that would allow the Court to infer that a majority of the GM directors were self-interested is an independent reason to conclude that the Complaint has not rebutted the presumptions of [*39] the business judgment rule.

### D. The Effect of Shareholder Ratification

Aside from the plaintiffs' direct attacks on the GM directors, plaintiffs also allege that the process of splitting off Hughes was inherently conflicted. n93 In *Solomon v. Armstrong*, n94 this very same issue was addressed and resolved. There, the Court held that both the form and substance of the transaction compelled the Court to reject the notion that the Court should conceptualize the split-off transaction as akin to a minority freezeout. n95 The same considerations that were present in *Solomon* are also present here. n96 Therefore, the split-off of Hughes, alone, will not trigger an entire fairness review; plaintiffs' reliance on *Kahn v. Tremont* n97 is inapposite here n98 and because I find that the Hughes split-off does not implicate entire fairness review, I conclude that shareholder ratification will have the effect of maintaining the business judgment rule's presumptions. n99

n93 *Id.* P 168.
n94 747 A.2d 1098.
n95 *Id.* at 1123.
n96 Specifically, the Court in *Solomon* held that:

> [HN5] To the extent that in a given transaction different shareholder classes have mutually exclusive interests, the ability of the board to act in all of the shareholders' best interests is seriously complicated. . . . [Nevertheless, when future conflicts of interest are anticipated and appropriate provisions to deal with them are drafted under the certificate of incorporation] this is clearly a more efficient method of coping with potential divergences of interest between shareholder groups than having courts adapt procedural mechanisms (e.g., special committees, burden shifts, etc.) that are unnecessary or poorly adapted to new contexts.

*Id.* at 1124; *see also In re GM Class H S'holders Litig.*, 734 A.2d at 617 (finding that the structure of GM's ownership interest in Hughes did not give rise to concerns about "implied coercion" such as have been found to exist where a controlling stockholder dominates the corporation).

[*40]

n97 694 A.2d 422 (Del. 1997).
n98 *But see Lewis v. Great W. United Corp.*, 1977 Del. Ch. LEXIS 171 (recapitalization, benefiting controlling shareholders who could have forced the transaction, reviewed under entire fairness standard).
n99 *See Solomon*, 747 A.2d at 1124 (finding that to the extent aspects of the process may have been flawed, if all shareholders are sufficiently informed about the details of the process and empowered to make an independent decision on the substantive terms of the transaction then the business judgment rule's presumptions must remain in effect); *In re GM Class H S'holders Litig.*, 734 A.2d at 616 (applying business judgment rule

when shareholders were afforded the opportunity to decide for themselves on accurate disclosures and in a non-coercive atmosphere).

1. Plaintiffs' Vote Manipulation Claims

Plaintiffs' first attack on the sufficiency of the shareholder ratification is that GM "rigged" and "manipulated" the vote. n100 This allegation, according to the plaintiffs, is sufficient [*41] to rebut the business judgment rule as to Counts I and II, and is sufficient to state a separate claim under Count III. Plaintiffs' manipulation claim is predicated upon: (1) GM's contribution of 149 million shares of GMH stock to the pension plans; (2) timing the announcement a few days before Hughes had reported favorable results for the first quarter of 2003; (3) using an allegedly improper record date; and (4) making special solicitations to persons likely to support the transaction. n101 These allegations fall short of their intended mark.

n100 Compl. PP 173-77
n101 Id. P 176.

[HN6] To state a claim of vote manipulation, plaintiffs must allege well-pled facts that would allow the Court to infer that the primary purpose of the fiduciary's conduct was to thwart the exercise of a shareholder vote. n102 Pejorative rhetoric and conclusory allegations are insufficient to state a claim; and without a threshold showing, the defendant directors' actions are entitled to the protection of the business judgment [*42] rule. n103 If on the other hand plaintiffs meet their burden, defendants would have the opportunity to show a compelling justification, but it is unlikely, if not impossible, for a defendant to meet this burden on a motion to dismiss.

n102 *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 660 (Del. Ch. 1988)
n103 *Williams v. Geier*, 671 A.2d 1368, 1376 (Del. 1996); *SWIB v. Peerless Sys. Corp.*, 2000 Del. Ch. LEXIS 170, at *29

a. GM's Contribution of 149 Million Shares of GMH stock to the Pension Plans

Plaintiffs allege that an "extensive factual [record] support[s] that the issuance of the shares to the pension plans was intended to thwart a fair shareholder vote." n104 The plaintiffs also contend that the Court should

infer that the GM directors' primary purpose was to impede the shareholder franchise because the directors "knew" that the GM pension plans would vote their shares in favor of the Hughes transactions. n105 To make this existential [*43] leap, plaintiffs ask the Court to consider three facts. First, the GM directors contributed the GMH shares to the pension plans at a "steep discount from their market value." n106 Second, the pension plans would be able to sell the shares after the transaction because the stock restrictions would cease after the deal. n107 And third, GM would satisfy a portion of its underfunding by contributing to the pension plans over $ 3 billion of the transaction's proceeds. n108

n104 Pls.' GM Br. at 24 (citing Compl. PP 100, 103, 104)
n105 Id.
n106 Id. at 25.
n107 Id.
n108 Id. at 25-26

These conclusory statements fail to state a claim. U.S. Trust serves as the GM pension plans' trustees. This trust has the unilateral authority to vote all shares contributed to the pension plans. The Complaint makes no allegation that GM exerted power, or for that matter even possessed the power, to direct how U.S. Trust would vote the GMH shares. The Complaint also fails to allege [*44] that the Hughes transactions were a condition precedent to GM contributing funds to the pension plans, and by the Complaint's own assertion, GM had other means available to resolve the pension plans' underfunding. n109 At best, these allegations allow the Court to infer that the pension plans had their own, unique, economic incentive to vote for a transaction that would maximize the value of their GMH holdings, a self-interest that does not necessarily equate to approving the Hughes transactions. Moreover, this interest is totally aligned with the non-affiliated shares and, without an allegation of inequitable conduct, a shareholder is entitled to vote its shares in its own economic interests. n110

n109 The Complaint alleges that GM eliminated $ 13.5 billion in benefit underfunding, in 2003, by using its ability to borrow cash. *See* Compl. P 85
n110 *Williams v. Geier*, 671 A.2d at 1381. The Complaint does not allege that the pension plans owed any particular duty to the other GMH holders

[*45]

Even if I were to accept that the GM directors "knew" the pension plans would vote for the transaction, this does not, by itself, satisfy the *Blasius* standard. By its terms, *Blasius* set forth a conjunctive test: a plaintiff must show both a primary purpose and the thwarting of the franchise. The Complaint, however, fails to allege that there was any shareholder that the GM directors sought to oppose, or that the percentage of shares held by the pension plans was material in affecting the outcome of the vote. From all indications, it is clear that a majority of the non-affiliated shares approved this transaction. n111 In this context (*i.e.*, no management motivation), plaintiffs' allegations that the shareholder franchise was thwarted (or that there was a reason to thwart the vote) are particularly hollow.

n111 Approximately seventy-nine percent of the outstanding GMH shares voted to approve the transaction -- the non-affiliated GMH shares represented over half of the outstanding shares that voted. Of all outstanding shares that actually voted on the transaction, approximately ninety-five percent voted in favor. *See* GM SEC Form 10-Q (Nov. 13, 2003), at 35-37. Plaintiffs make no allegation that challenges the accuracy of these disclosures or that GM did not obtain the votes it required to consummate the transactions.

[*46]

b. The Timing of Announcement

The next allegation is that the defendants manipulated the vote by strategically timing the announcement of the Hughes transactions and by rushing the vote. According to the Complaint, the GM directors announced the transaction a few days before the release of PanAm Sat's (Hughes' eighty-one percent subsidiary) favorable financial results for that quarter. According to the Complaint, the timing of the announcement allowed the directors to tout a 22 percent premium over market price -- a premium that would have "evaporated" had the announcements been reversed. n112 The context in which these announcements were made, however, does not support the inference that the directors' primary purpose of announcing the transaction when they did was to thwart the franchise. The Consent Solicitation was mailed five months after the PanAm Sat results were publicly announced -- more than enough time for the public to absorb the information. Moreover, the solicitation, advised the shareholders that GM did not advocate

the transaction based on any premium and that the current market prices only reflected a 1.4 percent premium. The Complaint does not allege that the PanAm [*47] Sat results were not fully disclosed by the time the Consent Solicitation was mailed or that the defendants had ignored a viable reason to delay the announcement. Without such allegations, there is no nexus between the timing of the announcement and the effect, if any, that the announcement had on the vote. In other words, the conclusory allegations of the Complaint offer to the Court no plausible inferences of vote manipulation.

n112 Compl. P 51.

The attendant claim to the timing of PanAm Sat's announcement is plaintiffs' contention that GM rushed and, thereby, manipulated the vote by timing the vote to occur before Hughes released its third-quarter earnings. n113 Plaintiffs cite two facts that support this ostensible manipulation claim. The first is that after the third-quarter announcement, Hughes stock rose "well above $15 per share." n114 The second is that the Defendant directors caused the solicitations to be mailed before they were contractually required. n115 Plaintiffs, therefore, rest their rushing-the-vote [*48] claim on the directors' ability to foresee that a material increase in stock price was likely and a that five day difference between the date the directors chose to mail the solicitation and the date they had to mail the solicitation, made a difference in the vote outcome.

n113 *Id.* P 118.
n114 *Id.*
n115 *Id.* P 116.

The recited facts, however, cannot support a reasonable inference of conduct that violates the *Blasius* standard. According to the Complaint, the process of securing the vote began in early August. n116 There is no allegation that the Defendant directors could have known, with any degree of certainty, the results for the third-quarter at that time. Moreover, the plaintiffs want this Court to infer that the five-day head start somehow provided the defendants the edge they needed to close the transaction before the release of the third-quarter results. I cannot, however, reasonably make this inference in light of the fact that there is no allegation that suggests the [*49] directors knew or had any control over when the requisite percentage of votes would be

reached. Indeed, the transaction could have easily continued into November, a month after the Hughes third-quarter results. n117 Therefore, plaintiffs' theory is plausible only if I assume that the directors not only had the ability to predict the increase in stock price, but also the voting responses of a disaggregated public. Although the procedural posture of this case requires that I make all reasonable inferences in favor of plaintiffs, it would be unreasonable (in my opinion) to weave these allegations into a viable *Blasius* claim.

n116 *Id.* PP 120-21
n117 *See* CS at 9 (reporting that GM had 60 days to secure the vote)

c. Allegations of the Improper Record Date

Moving to the next allegation of manipulation, the plaintiffs contend that "upon information and belief" the record date "was not properly set." n118 This bald allegation seemingly arises from two facts contained in the Consent Solicitation: [*50] that the record date was August 1, 2003, and that it appears that the GM board did not meet between June 5 and August 5, 2003. n119 This allegation does not come close to stating a vote manipulation claim. There is no allegation that the actual setting of the record date had affected, in any way, the vote, or that the nondisclosure of when the record date was set had any influence. Recognizing this deficiency, plaintiffs shifted gears and have suggested that the vote was void *ab initio* under 8 *Del. C.* § 213(c). n120 This claim must also fail. The suggestion that it "appears" that the GM board did not meet between June 5 and August 5 cannot, by itself, support an inference of vote manipulation. The GM directors can avail themselves of several modes of setting a record date -- a board meeting is only one of those possibilities. n121 Without a non-conclusory allegation that the board improperly set the record date, and that the allegedly flawed process somehow met their threshold burden under *Blasius*, plaintiffs' allegations are rank speculation and will not suffice to state a claim.

n118 Compl. PP 120-21
[*51]

n119 *Id.* P 121
n120 Pls.' GM Br. at 27.

n121 *See* 8 *Del. C.* § 141(f) [HN7] (authorizing board action by consent without a meeting of the board).

d. Allegations Concerning Special Solicitations to Persons Likely to Support the Hughes Transactions

The final vote manipulation claim focuses on GM's decision to send certain shareholders and employees an advance copy of the Consent Solicitation. n122 Again, plaintiffs fail to connect a naked assertion with any facts that would support the inference that GM's primary purpose in disseminating advance copies of the solicitation was to thwart the franchise. The Complaint, for example, is devoid of any allegation that these advance copies contained information not contained in the solicitations that were already publicly available from the SEC or that the receipt of the advanced copies had any effect on the non-affiliated shareholders.

n122 Compl. PP 122-25.

[*52]

Ultimately, Count III must fail because the Complaint, despite its prolix attempts, has failed to state a claim that the GM defendants acted with the primary purpose of thwarting the shareholders' vote. This conclusion is predicated on the fact that Count III fails to put forth well-pled allegations that would allow the Court to infer that the will of the shareholders was somehow frustrated.

2. Plaintiffs' Disclosure Claims

Plaintiffs' final attack on the sufficiency of the vote focuses on the adequacy of disclosures contained in the Consent Solicitation. As with the vote manipulation claim, plaintiffs contend that they have stated a separate claim in Count IV which precludes a ratification defense as to Counts I and II. To begin, there is a dispute as to who possesses the burden on this motion. Quite simply, both parties do. To state a separate claim for failing to disclose material information, plaintiffs must bear that burden. n123 Still, the complexity of the issues here adds a familiar twist: defendants assert that ratification acts as a complete defense to Counts I and II. In this regard, the law is equally clear -- it is the defendants' burden. n124 Because plaintiffs [*53] have failed to state a claim that the defendant directors breached their duty of disclosure, I conclude that plaintiffs have not met their burden as applied to Count IV and defendants have necessarily satisfied their burden as to their ratification defense. n125

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

n123 *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140-41 (Del. 1997); *Klang v. Smith's Food & Drug Ctrs. Inc*, 1997 Del. Ch. LEXIS 73, at *18, [HN8] ("The burden of demonstrating that omissions were material rests with the plaintiff."), *affd*, 702 A.2d 150 (Del. 1997)

n124 *Solomon*, 747 A.2d at 1117 (quoting *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 502 (Del. Ch. 1990) ("The parties who assert the defense of shareholder ratification have the burden to establish that they fully disclosed all material facts in their proxy disclosures.")) *See also Yiannatsis v. Stephanis*, 653 A.2d 275, 280 (Del. 1995)

n125 *See Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 890 (Del. Ch. 1999) ("In and of itself, the fact that a defendant has proven that a Proxy Statement's disclosures are adequate to justify a Rule 12(b)(6) dismissal should ordinarily be sufficient to meet [their] burden. The substantial difficulty of winning such a motion (the plaintiff is given the benefit of every doubt), the illogic of requiring the court and defendants to identify disclosure deficiencies not complained of by experienced plaintiffs' lawyers, and the interests of judicial economy support that conclusion.")

[*54]

Plaintiffs' challenges to the Consent Solicitation are based on seven grounds: n126 (1) the incomplete and misleading disclosure concerning the value enhancement effect of the special dividend; n127 (2) the accuracy of the financial advisors' analysis; n128 (3) the lack of financial forecasts and projections prepared by Hughes management; n129 (4) the inadequacy of the PanAm Sat valuation; n130 (5) the misstatement of the legal effect of ratification; n131 (6) the incomplete and misleading disclosure concerning GM's contribution of GMH stock to the pension plans; n132 and (7) the failure to disclose material provisions of GM's Restated Certificate of Incorporation n133

n126 Because plaintiffs rely exclusively on the Consent Solicitation in making their disclosure claims, it is appropriate for the Court to incorporate the document into the Complaint and use it in deciding this 12(b)(6) motion. *See supra* discussion Section II, Part B

n127 Compl. PP 180-81

n128 *Id.* PP 182-84

n129 *Id.* P 185

n130 *Id.* PP 186-87

n131 *Id.* PP 188-89

[*55]

n132 *Id.* PP 190-91

n133 *Id.* PP 192-94

[HN9] Whether shareholders are fully informed necessarily asks the question of whether the directors have complied with their fiduciary duty to "disclose all material information." n134 Information is material when there is a "substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote," n135 and that "under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholders." n136 It is not enough that the information might render a communication to shareholders "somewhat more informative." Rather, the determination of the materiality of an alleged omission or misstatement "requires a careful balancing of the potential benefits of disclosure against the resultant harm." n137 Delaware law does not require "directors to bury the shareholders in an avalanche of trivial information. Otherwise, shareholder solicitations would become so detailed and voluminous that they will no longer serve their purpose." n138

n134 *Solomon*, 747 A.2d at 1128 (citations omitted)

[*56]

n135 *Id.*

n136 *Id.*

n137 *Id.*

n138 *Id.* at 1130

E. The Incomplete and Misleading Disclosure Concerning the Value Enhancement Effect of the Special Dividend

Plaintiffs first disclosure claim attacks the adequacy of the explanation provided to the shareholders for the $ 275 million special dividend because it "failed to disclose any analysis of, much less quantify, the value enhancement . . . that allegedly justified . . . the difference in value" n139 between Hughes as a GM subsidiary and as a stand-alone company. On pages 97 through 98, however, the Consent Solicitation begins its detailed

disclosure of how the amount of the dividend was decided.

n139 Compl. P 180(a)-(f)

In calculating the dividend, the Consent Solicitation discloses that GM's management believed a $ 400 to $ 500 million (or 3 to 5 percent of the current market price of Hughes) dividend was [*57] appropriate. GM's basis for this assumption was disclosed: (1) The 1996 EDS special dividend served as an appropriate benchmark; (2) the estimation that a one-to-one exchange of Hughes stock for GMH stock increased value to GMH holders because the derivative nature (i.e. the tracking) of the GMH stock was removed; and (3) the belief that Hughes, as a stand-alone company, would enjoy strategic benefits not currently available. n140 Hughes' management responded to GM's valuation and believed that a lower dividend was justified. The rationale disclosed was that the split-off offered GM unique benefits and that the current constraints on Hughes' financial capacity precluded the amount GM sought. The solicitation then discloses that both GM and Hughes considered the fact that they would need the concurrence of News Corp. in approving any dividend. Finally, the Consent Solicitation concedes that although the split-off to Hughes "was considered to constitute a transfer of value," to the GMH holders, n141 that value was difficult to measure. n142 Further negotiations then culminated in setting the special dividend at $ 275 million.

n140 CS at 83.

[*58]

n141 Id. at 112
n142 Id.

Importantly, the disclosures did not stop there. The reliability of this admittedly imperfect negotiation process was buttressed when the Consent Solicitation disclosed both GM's and Hughes' financial advisors' opinion letters and analyses summaries. n143 These disclosures identified a range of reasonable "differential consideration" paid in similar transactions and concluded, separate from GM's and Hughes' own assertions, that a shift from GMH tracking stock to Hughes asset-based stock generated value for the Hughes holders. n144

n143 The Court pauses to mention that the Complaint failed to allege facts that raise concerns as to the independence of the financial advisors. The fee arrangement was unremarkable in terms of the overall value of the transaction and the alleged conflicts arising from the business relations with two of the GM directors do not create a material conflict.

n144 CS at 126, 136-37.

[*59]

Thus, the Consent Solicitation informs the shareholders of the assumptions each management team brought to the table and the active process the two teams used to arrive at the size of the special dividend. It also disclosed that both GM and Hughes believed that, despite the need for a dividend, the value was going to be "difficult to measure." n145 In addition, the shareholders were not asked to rest on managements' assumptions alone; they were provided a range of values from similar transactions, and it is made clear that the financial advisors believed that the special dividend fit within those ranges. It is not clear why I should infer that the shareholders needed more information.

n145 Id. at 112

Still, plaintiffs contend that an informed decision concerning the value enhancement aspect of the exchange was obfuscated because: (1) it was not disclosed that the special dividend would be used to fund GM's pension plans, (2) it was misleading to state that the GMH stock was exchanged on a one-for-one [*60] basis with an "independent" Hughes Stock when GMH stock was already an asset-based stock, and (3) the EDS comparison was not an apples-to-apples comparison. In all respects, these allegations fail.

The Consent Solicitation clearly indicated that 149 million GMH shares were contributed to GM's pension plans. Any reasonable investor would know that any value derived from the transaction flowed to all holders of the GMH stock, including GM and the pension plans. Therefore, the solicitation is not deficient in this regard.

The details concerning the structure of the split-off are equally plain. Beginning on the first page of the solicitation, it is explained that the GMH shareholders would have their stock redeemed and exchanged for Hughes shares on a one-to-one basis, that is, each GMH holder received one Hughes share for each GMH share.

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

There is no allegation that this did not occur. Rather, plaintiffs contend that the exchange was momentary and transitory because, immediately after the exchange, seventeen percent of the Hughes stock was swapped for News ADSs and, therefore, the portion of the Hughes stock that was exchanged for News ADSs could not represent any enhanced value. n146 [*61] Clearly, the first step in splitting off Hughes required GM and Hughes to put a price tag on the entity as a stand-alone company. Then the two teams needed to negotiate what this value was in comparison to what the GMH holders already had. This produced the one-to-one exchange less the special dividend and the procedures and valuations used to arrive at this value were disclosed. It was only after this value was determined that News Corp and GM could fix the subsequent exchange ratio. Thus, the solicitation is accurate when it stated that the GMH holders would exchange their GMH stock, one-for-one, for Hughes stock and that the subsequent merger would result in the new Hughes shareholders receiving News ADSs in exchange for seventeen percent of their Hughes stock. Therefore, on this point, plaintiffs' claim is not a disclosure claim, but rather, a matter of dissatisfaction with the News ADSs exchange ratio.

n146 Pls.' GM Br. at 30 & n.49.

Plaintiffs' next contention deserves little attention. The fact that [*62] News Corp would ultimately own 34 percent of Hughes did not change the fact that Hughes was no longer GM's subsidiary. The first page of the Consent Solicitation states: "As a result of the Hughes split-off and GM/News stock sale, Hughes will become an independent public company, separate from and no longer owned by GM." Indeed, the title of the document in bold and large font states: "The Separation of Hughes from GM and the Acquisition by News Corporation of 34% of Hughes." n147

n147 Any glossary reading of the Consent Solicitation would make clear that before the Hughes transaction the GMH stock was secured by the assets of GM but with dividends payable on Hughes' performance; and that after the transaction, Hughes stock was secured by the assets of Hughes. Therefore, the solicitation is not misleading when it stated a tracking stock would be exchanged for an asset-based stock. Looking at the entire solicitation, not selective portions, cured any confusion.

Finally, the disclosures concerning the EDS transaction [*63] were not misleading. The solicitation simply disclosed that the EDS split-off produced a differential between the value of the tracking stock and the value of the stand-alone stock. This amount was determined to be worth approximately "3% to 5% of the market value of the outstanding" n148 tracking stock and served as GM's starting point in formulating the Hughes dividend. It is clear from the context of the entire solicitation that the reference to the EDS transaction was but one of several factors disclosed which justified the payment of the special dividend. In light of these other factors, including the summary of the financial analyses, and the relative weight the solicitation placed on the comparison, the GMH shareholders were not duped into blindly relying on comparisons between the EDS and Hughes split-offs; disclosures of all possible divergences between the two transactions would not have altered the total mix of information already available.

n148 CS at 9.

f. The Accuracy of the Financial Advisors' [*64] Analysis

Plaintiffs contend that the solicitation is, at worst, false or, at best, materially misleading and incomplete. n149 According to the plaintiffs, the solicitation contains "only summaries of the analyses the financial advisors performed in connection with their April 9, 2003 opinions" n150 and fails to disclose the four updated analyses the financial advisors performed in the August 5, 2003 fairness opinions. Because the April 9 opinions became stale, and because the GM board disclosed that they had relied on the updated opinions, the updated information took on vital importance. n151

n149 Compl. P 183.
n150 Id. P 182.
n151 Id. P 182.

The solicitation discloses over 35 pages of text and figures that describe the financial analyses employed, and the opinions that accompany those analyses. n152 From that it is clear the financial advisors made detailed presentations of their April 9, 2003 analyses to the board. n153 Then, the solicitation describes what the various bankers [*65] did to update their opinions n154 includ-

ing an updated presentation to the board n155 In light of all that was disclosed, plaintiffs seem to argue for the inclusion of the raw data behind the advisors' updated summaries Moreover, since the updated opinions were, in part, based upon amendments to the merger agreement and stock purchase agreements, plaintiffs would see that a list of the actual amendments considered were also included n156

n152 CS at 114-53 & App. E
n153 Id at 101-02.
n154 Id at 118, 127-30, 139-40, 142-43
n155 Id at 104-05
n156 See Pls ' GM Br at 34; Compl P 184.

[HN10] A disclosure that does not include all financial data needed to make an independent determination of fair value is not, however, per se misleading or omitting a material fact n157 The fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis. The summary of factors the advisors considered in their updated review [*66] was disclosed, along with the opinion that no material changes occurred between the April and August analyses n158 Without allegations that there was any material change in the conditions underlying the decision the board made in April, I cannot conclude that the information disclosed was materially incomplete -- there is simply no reason to think that the board had access to any information not already disclosed or that there was sufficient ground for the board to inquire into the updated opinions n159

n157 Skeen v Jo-Ann Stores, Inc , 750 A 2d 1170, 1174 (Del 2000) I extend this rationale to plaintiffs' claims for the inclusion of managements' projections
n158 See, e g , CS at 118.
n159 See Behrens v United Investors Mgmt Co , 1993 Del Ch LEXIS 217, at *42 ("The disclosure obligation        is said to be one that requires the disclosure of all material information within the knowledge of the corporation and thus available to the directors ") (citing Rosenblatt v Getty Oil Co , 493 A 2d 929 (Del 1985)) This duty may extend to factors the board should have known, but this determination cannot be made absent well-pled allegations to support such an inference. See 1993 Del. Ch LEXIS 217 at *44

[*67]

g The Inadequacy of the PanAm Sat Valuation

Like so many of the plaintiffs' claims, the allegations here move away from honest disputes concerning the adequacy of the disclosures, but instead challenge the consideration Hughes received in the deal. For example, plaintiffs allege that the PanAm Sat valuation was misleading and grossly incomplete because the financial advisors updated their April opinions without adjusting the "grossly inadequate $ 1 8 billion value ascribed to Hughes' interests in PanAm Sat." n160 This allegation seems, in large part, to be predicated upon a $ 1 40 per share increase in PanAm Sat's stock price between the date of the announcement and the updated fairness opinions n161

n160 Compl P 187.
n161 Id P 95.

The Consent Solicitation discloses that the financial advisors relied on three separate methodologies to value PanAm Sat: (1) PanAm Sat's share price; (2) discounted cash flow analyses; and (3) comparable company analyses. n162 It was also disclosed that the [*68] advisors believed no material changes had occurred between the April and August opinions. In this context, the rise in the stock price is of little consequence. First, PanAm Sat's current stock price was information publicly available -- a fact making it unlikely that additional disclosures would have altered the total mix of information already available. Second, I cannot infer that this market change was such as to impose upon the directors a duty of additional inquiry that would compel them to look beyond what the financial advisors had already provided Clearly then, the duty of disclosure did not extend beyond the information the board had (or should have had) in its possession. n163 In light of these factors, the portion of the Consent Solicitation concerning the PanAm Sat valuation is neither misleading nor grossly inadequate Plaintiffs simply think the bankers got it wrong -- this alone does not state a disclosure claim n164

n162 CS at 120-21, 132-33; 147-48
n163 Behrens, 1993 Del. Ch LEXIS at *42.
n164 See In re JCC Holding Co Inc , S'holders Litig , 843 A 2d 713, 721-22 (Del Ch 2003) (finding that disclosures are not inaccurate simply because plaintiffs subjective judgment of the advisors work is that the work is wrong)

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

[*69]

h. The Misstatement of the Legal Effect of Ratification

Plaintiffs take issue with GM's disclosed belief concerning the effect shareholder ratification would have on the deal. n165 The specific point of contention is that it was misleading to state that a majority vote of the shareholders would extinguish any claims relating to fairness. n166 A reading of what was disclosed shows that GM set forth, in general terms, and subject to qualifying language, a brief summary of the effects of shareholder ratification and their belief of how it should apply to the proposed transaction. Plaintiffs' theory of disclosure would require the directors to presuppose they were breaching their fiduciary duties, and then disclose the effect of such conduct. [HN11] Delaware law, however, does not require directors to assume they are acting improperly and then advise shareholders of the consequences of the hypothetically wrongful conduct. n167 In light of Delaware precedent, I cannot conclude that this disclosure was misleading or incomplete. n168

n165 Compl. P 188.
n166 Id. P 189.
n167 See Stroud v. Grace, 606 A.2d 75, 84 n.1 (holding that directors need not engage in self-flagellation by implicating themselves in a breach of fiduciary duty).

[*70]

n168 See, e.g., In re GM Class H, 734 A.2d at 625-26 (holding that statements of belief are not actionable absent an allegation of fact that the belief was falsely stated).

i. The Incomplete and Misleading Disclosure Concerning GM's Contribution of GMH Stock to the Pension Plans

Plaintiffs complain that the disclosures concerning the contribution to the pension plans was materially misleading and incomplete because it failed to disclose: (1) how the contribution would facilitate a tax-free split-off; (2) that the pension plan interests and the public GMH holder interests diverged and that the contribution made approval of the transaction more likely; (3) that GM would benefit from an increase in value resulting from the proposed transaction; and (4) that GM's pension expense would be reduced if the value of the contributed shares increased.

In sum, these allegations fail to meet the materiality test in light of what was actually disclosed in the Consent Solicitation. The material tax consequences of the transaction are disclosed on pages 163 to 169 of the solicitation. [*71] In that disclosure, it is clear that the shareholders are told the general tax consequences of the deal, that those consequences may not apply to each shareholder under all circumstances, and that the shareholder's own tax advisor should be consulted. It is also clear that the most important detail, in terms of tax, was disclosed - - i.e., the transaction was tax-free. The Complaint fails to allege that this information was false or that the transaction was not tax-free. Absent these allegations, I cannot infer that additional disclosures that detail the particular nuances of the Internal Revenue Code would have assumed actual significance in the deliberations of a reasonable stockholder.

The remaining disclosure allegations are nonsensical. The solicitation discloses the amount of stock contributed to the pension plans, the relative valuation of the stock by the pension plans, the terms under which the stock was held, and the fact that the contribution was designed to reduce GM's pension expense and further benefit GM's balance sheet. n169 From this information, any reasonable shareholder would be able to determine what the pension plans' interests were, and could compare those [*72] interests to their own. Moreover, it was plain that the pension plans received 149 million GMH shares in addition to the GHM shares they already held. Finally, it is disclosed that these shares represent approximately one-third of the outstanding GMH shares. n170 Any reasonable shareholder could see that this holding would make any vote subject to the GMH shareholders more or less likely to be ratified depending on how the pension plans voted and that any accretion in value that was attributable to the proposed transaction would, in part, benefit the pension plans directly and GM indirectly. n171 This observation is so obvious that any additional point not already mentioned could not possibly be material.

n169 CS at 52, 95, 265-66, 282-83.
n170 Id. at 282-83.
n171 The Consent Solicitation described the contribution as a means of decreasing GM's pension expense and strengthening its balance sheet. See id. at 95.

j. The Failure to Disclose Material Provisions of GM's Restated Certificate [*73] of Incorporation

Plaintiffs contend that the split-off was subject to GM's Article Seventh of its certificate of incorporation (requiring a two-thirds supermajority vote) and that it was a material omission not to advise the shareholders of this provision. Because I ultimately conclude that Count V fails to state a claim, I cannot find that this allegation is sufficient to state a disclosure claim

Ultimately, I have reviewed the Consent Solicitation's disclosures and the allegations plaintiffs have made concerning material misstatements or omissions. In total, I conclude that plaintiffs have not made well-pled allegations that would allow the Court to infer that the Consent Solicitation was materially deficient in any respect. I therefore conclude that Count IV of the Complaint fails to state a claim.

Reaching this conclusion, I must now address plaintiffs' contention that the effect of shareholder ratification does not extend to extinguish their unjust enrichment claim or the impropriety of the contribution to the pension plans (i e , the contribution was not part of the transaction voted on and approved by the shareholders)

As to the unjust enrichment claim, plaintiffs have [*74] failed to allege facts that show the claims arising from the payment of the special dividend were independent of the fiduciary duty claims. The Court finds plaintiffs' reliance on *Hill Stores Co v Bozic* n172 unpersuasive. *Hills Stores* held that plaintiffs' claim would survive a motion for summary judgment under two independent theories of relief -- either that the recipients of certain severance payments obtained those payments in breach of their fiduciary duties, or in violation of their employment agreements. Thus, even if the defendants successfully showed that no breach of fiduciary duty had occurred, the plaintiffs could still recover. Importantly, Vice Chancellor Strine found that recovery would be proper absent a breach of fiduciary duty because the clear and unambiguous language of the employment agreements precluded the excess payments that were at issue. Thus, the Court in *Hill Stores* found that the existing and enforceable employment contracts would permit recovery if indeed the director-employees were paid in excess of the amount due under their contracts. Here, plaintiffs have not set forth any allegation which would allow this Court to infer that plaintiffs [*75] could recover under any independent contract theory (e g , breach of GM's certificate of incorporation). Thus, plaintiffs' challenge to the special dividend cannot, unlike the severance payments in *Hills Store*, be viewed mutually exclusive from their alleged breach of fiduciary duty claims

n172 769 A 2d 88 (Del. Ch. 2000).

The claims concerning the contribution suffer from a similar defect. The Complaint contains no allegations that the actual contribution of the GMH shares to the pension plans was wrongful; rather, its effect was to "rig" the vote. This is quite different from the argument that the contribution was in violation of a statute (e g , 8 *Del C* § 160(c)). For that reason, I can find no claim concerning the contribution independent from those alleged in Count III of the Complaint. n173

n173 *Cf Aquila, Inc , v Quanta Servs , Inc* , 805 A 2d 196 (Del. Ch. 2002) (analyzing contribution to stock employee trust plan under two separate rationales when plaintiffs pled both statutory and equitable reasons for attacking the contribution). I pause to note that this is not a situation akin to what was considered in *In re Santa Fe*. There, the Court held that shareholder ratification could not extinguish claims concerning the defensive measures the directors took to fend off a bid when the defensive measures themselves were challenged under independent theories of inequitable conduct and the shareholders did not vote in favor of the precise measures under challenge in the complaint. *See In re Santa Fe*, 669 A.2d at 68. Here the contribution was not challenged separately from Count III, the vote manipulation claim, and that claim is dismissed on the grounds set forth above.

[*76]

Based on this analysis, I conclude that a valid shareholder vote has occurred and that the effect of that vote is to maintain the presumptions of the business judgment rule. Under this unfortunately lengthy analysis, I have also concluded that the complaint fails to allege conduct that would suggest the directors' decision to split-off Hughes was grossly negligent. As such, the complaint fails to state a claim for breach of the duty of care. Shareholder ratification is also sufficient to bar any claim for breach of the duty of care and serves as an independent basis to grant defendants' motion. Finally, GM's exculpatory charter provision is a third and independent basis to dismiss any duty of care claim. Plaintiffs' good faith claims are merely a rehash of their duty of loyalty claims. For all the reasons stated herein, plaintiffs fail to state a claim that the Defendant directors' actions were predicated on bad faith. Therefore, because the Complaint contains no allegations that would allow the Court to infer that the Hughes split-off was an irrational busi-