2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

ness decision or a transaction that amounted to waste, Counts I through IV are hereby dismissed in their entirety.

### E. Does [*77] Article Seventh Require a Supermajority Vote As Applied to the Hughes Transactions

Plaintiffs have failed to state a claim that the Hughes transactions violated Article Seventh of GM's Restated Certificate of Incorporation. Count VI of the Complaint alleges that the Hughes transactions required a vote of two-thirds of the outstanding stock of all classes of General Motors, n174 but in breach of Article Seventh, GM only sought a majority vote of all classes voting together and a majority vote of each class voting separately. n175

n174 Compl. P 196.
n175 Id.

[HN12] A corporate charter is a contract between a corporation and its shareholders, n176 and the Court will therefore apply standard rules of contract interpretation to determine the parties' intentions. Article Seventh is a permissive (as opposed to a mandatory) charter provision, which expressly authorizes GM's board of directors to take a variety of actions with the assent of two-thirds of all classes of GM stockholders. From the plain language [*78] of the provision, it is clear that the permissive powers conferred by Article Seventh are "in furtherance, and not in limitation of the powers conferred by law." Both parties have urged the Court to look behind the contractual language for the meaning of this Article. This task is unnecessary as I conclude that Article Seventh, by its own unambiguous terms, is not in conflict with Delaware law. [HN13] Delaware law clearly provides that a corporation may dispose of property, amounting to less than all or substantially all its assets, without a shareholder vote. n177 Because Article Seventh is to be read in furtherance and not in limitation of Delaware law, the article did not mandate a shareholder vote, much less a super-majority voting requirement.

n176 Aquila, 805 A.2d at 192 n. 13.
n177 8 Del. C. § 271(a).

### F. Did the Hughes Transactions Violate Article Fourth

Plaintiffs have failed to state a claim that the Hughes transactions violated Article Fourth [*79] of GM's Restated Certificate of Incorporation. That article ensures

that all GM $ 1 2/3 holders and all GMH holders will be, subject to the provisions set forth in Article Fourth, treated identically in all respects and enjoy equal rights and privileges. n178 Plaintiffs contend that the payment of the special dividend to some GMH holders and not others was in clear violation of this provision.

n178 Compl. P 199.

This claim fails because the contractual rights vested in corporate stockholders by a certificate of incorporation are subject to amendment by vote of those stockholders. n179 Thus, even if the special dividend ran afoul of the protections provided under Article Fourth, those protections were eliminated when the shareholders themselves voted to amend GM certificate and allowed the dividend to be paid. n180 Accordingly, Count VI is dismissed.

n179 See In re GM Class H S'holders Litig., 734 A.2d at 615-16.

[*80]

n180 It is worth noting that plaintiffs failed to address the glaring defect in their argument. Hughes paid the special dividend to its sole shareholder GM. In this circumstance, the provisions of Article Fourth were never implicated. Nevertheless, because the GMH holders voted on the amendments to GM's certificate of incorporation plaintiffs cannot recovery on Count VI under any conceivable postulation.

### III. NEWS' MOTION TO DISMISS

News has moved to dismiss the Complaint on three grounds: first, that service of process was not properly made upon News; n181 second, that this Court lacks jurisdiction over News; n182 and third, that the Complaint fails to state a claim upon which relief can be granted. n183

n181 See CT. CH. R. 12(b)(4).
n182 See CT. CH. R. 12(b)(2).
n183 See CT. CH. R. 12(b)(6).

### A. News' 12(b)(4) Argument

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

News argues that the Complaint should be dismissed [*81] as to News because News was not properly served with process in accordance with the requirements of Delaware law. After defendants filed their opening brief in support of their motion to dismiss, plaintiffs apparently became apprehensive that their personal service upon News' Australian offices would be held to be insufficient. Therefore, they served the Delaware Secretary of State with process on behalf of News Corp. on October 6, 2004, and they thereafter mailed a summons and Complaint to News' Australian offices by registered mail, return receipt requested, in accordance with the requirements of 10 *Del. C.* § 3104(d). n184 Because there is no reason why this albeit belated service should be invalidated by the prior personal service by process server, I therefore conclude that service of process was properly made in accordance with an applicable statute, and also with Court of Chancery Rule 4(d)(4). n185 News' motion to dismiss on the grounds of insufficiency of process is denied.

n184 *See* Ex. 5 to Aff. of Geoffrey C. Jarvis in Supp. Of Pls.' Memo. Of Law In Opp. To The News Corp. Ltd.'s Mot. To Dismiss ("Jarvis Aff."). It is worth nothing that the operative Complaint naming News as a defendant was filed roughly five months earlier -- a significant delay. Because the Court of Chancery Rules do not provide an express period of time in which the defendant must be served, however, I cannot conclude that this delay was unreasonable, especially given the fact that News had previously received actual notice of the suit by the personal service via process server in Australia. *See Hovde Acquisition, LLC v. Thomas*, 2002 Del. Ch. LEXIS 66, 2002 WL 1271681, at *6 (Del. Ch.) (noting that many other courts have a 120-day limit within which to serve process, but the Court of Chancery does not).

[*82]

n185 By concluding that process was properly served, I choose not to address plaintiffs' argument that News is estopped from moving to dismiss on the grounds of improper service because it negotiated a briefing schedule on the motion to dismiss pursuant to this Court's instructions.

*B. News' 12(b)(2) Argument*

[HN14] Because News has challenged whether personal jurisdiction over it is proper, plaintiffs bear the burden of making a showing that jurisdiction is proper. n186 The Court will then engage in a two-step analysis, first determining whether an applicable statute permits the exercise of jurisdiction, and then whether exercising jurisdiction over a particular defendant violates the due process clause of the Fourteenth Amendment of the United States Constitution. n187 Plaintiffs argue that this Court has personal jurisdiction over News pursuant to 10 *Del. C.* § 3104 and 10 *Del. C.* § 365 based on Delaware as the *situs* of Hughes' stock. Because plaintiffs did not comply with the service requirements set forth in § 365, personal [*83] jurisdiction thereunder is not proper, and as a result, personal jurisdiction over News will only be found if permitted by § 3104 and the requirements of due process. n188

n186 *See Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 326 (Del. Ch. 2003); *Wright v. Am. Home Prods. Corp.*, 768 A.2d 518, 526 (Del. Super. 2000); *Harmon v. Eudaily*, 407 A.2d 232, 233 (Del. Super. 1979), *aff'd*, 420 A.2d 1175, (Del. 1980).

n187 *See Hercules, Inc. v. Leu Trust and Banking (Bahamas) Ltd.*, 611 A.2d 476, 480-81 (Del. 1992), *cert. dismissed*, 507 U.S. 1025, 123 L. Ed. 2d 463, 113 S. Ct. 1836 (1993); *LaNuova D & B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986).

n188 [HN15] Even if plaintiffs had followed the proper procedure for service under § 365, jurisdiction under that statute is only proper in certain circumstances. I need not enter into a discussion of whether the circumstances here meet that standard.

Section 3104(c) sets [*84] forth a series of acts, which if taken either personally or by an agent, constitute legal presence in the state of Delaware, such that the actor or principal consents to submit to the jurisdiction of the Delaware courts. n189 Plaintiffs argue that jurisdiction is proper under three of the six paragraphs found in § 3104(c). Because jurisdiction is proper under § 3104(c)(1), I need not address plaintiffs' arguments as to (c)(3) or (4).

n189 *See* 10 *Del. C.* § 3104(b).

Section 3104(c)(1) allows personal jurisdiction when the defendant "transacts any business or performs

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

any character of work or service in the State." The provisions of § 3104(c) are to be broadly construed such that jurisdiction is permitted to the fullest extent of the due process clause of the Fourteenth Amendment. n190 In determining the scope of § 3104(c), and which acts suffice to create jurisdiction in Delaware, it is important to understand that paragraph (c)(1) grants "specific," "transactional," or "single-act" [*85] jurisdiction, as opposed to the "general" jurisdiction created by paragraph (c)(4). n191 When establishing jurisdiction under paragraph (c)(1), the plaintiff must show that the cause of action arises from the defendants' specific activities within Delaware. n192

n190 See Hercules, 611 A.2d at 480 (citing LaNuova, 513 A.2d at 768)

n191 See Computer People. Inc v. Best Int'l Group. Inc., 1999 Del. Ch. LEXIS 96, 1999 WL 288119, at *5 (Del. Ch.); Macklowe v. Planet Hollywood. Inc., 1994 Del. Ch. LEXIS 179, 1994 WL 586838, at *3 (Del. Ch.)

n192 See Computer People, 1999 Del. Ch. LEXIS 96, 1999 WL 288119, at *5; Macklowe, 1994 Del. Ch. LEXIS 179, 1994 WL 586838, at *3 (explaining that there must be an "affiliation" between the forum state and the controversy between the parties).

One of the difficulties of plaintiffs' argument with respect to § 3104(c)(1) is that the actions of various entities in which News has a controlling interest, including News Publishing Australia Limited ("NPAL."), [*86] GMH Merger Sub, and Fox Entertainment Group, Inc. ("Fox"), all three of which are Delaware corporations, are attributed to News. The Complaint is not clear as to whether News itself or one of its subsidiaries engaged in certain conduct. n193 [HN16] Delaware law is clear that if the only link between the parent corporation and the alleged wrong is the parent's ownership of stock in the subsidiary, that is insufficient to establish personal jurisdiction under § 3104(c)(1). n194 If the parent corporation of the Delaware subsidiary, however, actively engages in the negotiations and consummation of the transaction, it has transacted business within the meaning of § 3104(c)(1), and may be haled into a Delaware court to defend a cause of action that arises from that transaction. n195

n193 The lack of clarity can be excused at this stage because the Consent Solicitation speaks of

News as having engaged in the transactions and negotiations at issue. See nn. 201-206

n194 See Kahn v. Lynch Comm. Sys., Inc., 1989 Del. Ch. LEXIS 102, 1989 WL 99800, at *3 (Del. Ch.) (CGE's (the grandparent) only connection to the indirect Delaware subsidiary was its ownership of the subsidiary; there were also no allegations that the subsidiary was a mere agent, instrumentality, or alter ego of the parent to suggest that the separate corporate forms should be disregarded).

[*87]

n195 1989 Del. Ch. LEXIS 102, [WL] at *4; but cf. Ace & Co., Inc. v. Balfour Beatty PLC, 148 F. Supp. 2d 418, 424-25 (D. Del. 2001) (holding that because the Delaware subsidiary (BICC) did not negotiate or consummate the transaction involving its subsidiary within Delaware, there was no jurisdictional conduct to attribute to BICC's parent, Balfour)

NPAL was incorporated in Delaware in 1984. n196 As such, it is clear that NPAL was not created for the purpose of consummating the Hughes transactions. It then necessarily follows that the cause of action in this case does not and cannot arise from the act of filing the certificate of incorporation within Delaware that created NPAL. Therefore, this alone does not suffice to establish personal jurisdiction over NPAL's parent, News. n197 In addition, personal jurisdiction over News does not exist merely because it wholly owns NPAL. n198

n196 See Micheletti Aff., Ex. A.

n197 See Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc., 1991 Del. Ch. LEXIS 113, 1991 WL 129174, at *1-2 (Del. Ch.); IM2 Merch. & Mfg., Inc. v. Tirex Corp., 2000 Del. Ch. LEXIS 156, 2000 WL 1664168, at *4 (Del. Ch.)

[*88]

n198 See IM2, 2000 Del. Ch. LEXIS 156, 2000 WL 1664168, at *4 n.15.

Nor does personal jurisdiction arise from News' purchase of stock in Hughes (a Delaware corporation), n199 the subsequent transfer of that stock to a News subsidiary, or from merely providing that Delaware law should govern the various agreements relating to the Hughes

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

transactions n200 NPAL did not actively engage in negotiating and structuring the Hughes transactions; News negotiated the transactions on behalf of itself and its subsidiaries n201 The Consent Solicitation is replete with references to GM and Hughes' negotiations with News (not NPAL) n202 Furthermore, NPAL is not a party to the Merger Agreement n203 Hughes, News, and GMH Merger Sub are the parties to the Merger Agreement n204 It was News' board of directors that approved and adopted the Merger Agreement n205 Although Hughes did file the Certificate of Merger on behalf of itself and GMH Merger Sub, the filing of the Certificate of Merger was pursuant to the Merger Agreement, and a necessary act in Delaware to achieve the purpose of the Merger Agreement n206 [*89] As the claim asserted against News in this action stems from and relates to the Hughes transactions and the Merger Agreement, and the actions News took in negotiating and structuring those transactions, personal jurisdiction under § 3104(c)(1) is proper because News transacted business in Delaware in, furtherance of the Hughes transactions n207

n199 *Abajian v Kennedy*, 1992 Del. Ch. LEXIS 6, 1992 WL 8794, at *10 (Del Ch); *see also Shaffer v Heitner*, 433 U S 186, 53 L. Ed. 2d 683, 97 S Ct 2569 (1977) [HN17] (ownership of stock in Delaware corporation is not sufficient contact with Delaware to satisfy Constitutional due process standards); 8 *Del C* § 169 (legal situs of stock of Delaware corporations is within Delaware)

n200 *See Summit Investors II, L P v Sechrist Industries, Inc*, 2002 Del. Ch. LEXIS 117, 2002 WL 31260989, at *4 (Del Ch) (holding that [HN18] a Delaware choice of law provision is insufficient to satisfy the Constitutional minimum contacts test)

n201 *See* CS at 4

n202 *Id* at 4, 91-98, 100, 107, 110, 112

n203 The merger agreement, dated April 9, 2003, is Ex. 2.3 to Amendment No. 2 to Form F-4, SEC File No. 333-105853, included as part of Ex. 8 to the Jarvis Aff ("Merger Agreement").

[*90]

n204 Merger Agreement at 1
n205 Id at 2
n206 Id at 3
n207 *See Kahn*, 1989 Del. Ch. LEXIS 102, 1989 WL 99800 at *4; *Friedman v Alcatel Alsthom*, 752 A 2d 544, 550 (Del Ch 1999). Because the record in this case makes clear that News, not

NPAL, engaged in these activities and transactions, I need not reach the issue of whether NPAL is News' agent or an alter ego of News. *See IM2*, 2000 Del. Ch. LEXIS 156, 2000 WL 1664168 at *4; *Outokumpu Eng'g Enters, Inc v Kvaerner Enviropower. Inc*, 685 A 2d 724, 729-30 (Del Super 1996); *Mobil Oil Corp v Linear Films, Inc*, 718 F Supp 260, 265-69 (D Del 1989).

The last step in the personal jurisdiction analysis is to determine whether exercising jurisdiction over News pursuant to § 3104(c)(1) would violate Constitutional standards of due process n208 The parties' submissions contain a heated discussion *of Sternberg v O'Neil*, n209 and whether that case is dispositive on the issue of whether owning a Delaware subsidiary is a minimum contact sufficient to support an exercise [*91] of specific jurisdiction I conclude that *Sternberg* is not controlling in this case because the rationale in *Sternberg* for exercising personal jurisdiction was explicitly based on the unique nature of the suit as double derivative, and that the suit could not be brought in another jurisdiction because both the parent and the subsidiary were indispensable parties. n210

n208 *See generally Int'l Shoe Co v Washington*, 326 U S 310, 90 L. Ed 95, 66 S Ct 154 (1945).
n209 550 A 2d 1105, 1125 (Del 1988)
n210 Id at 1125-26

This, however, is not a double derivative suit, and News, for the reasons that specific jurisdiction exists under § 3104(c)(1), has sufficient minimum contacts with Delaware that it would not violate "traditional notions of fair play and substantial justice" n211 if it were forced to litigate in Delaware By negotiating and engaging in a transaction between itself, an indirect Delaware subsidiary (GMH Merger Sub), and another Delaware corporation [*92] (Hughes), in which Delaware law was to be applied, n212 and necessary acts by the parties in furtherance of that transaction were to be taken in Delaware, n213 News has "purposefully availed" itself of the laws of Delaware and should have reasonably anticipated being haled into a Delaware court for a cause of action related to that transaction n214 As such, it is neither unfair nor unreasonable to require News to defend this action here. Furthermore, Delaware has an interest in ensuring that boards of directors of Delaware corporations fulfill their fiduciary duties, an interest that would be undermined if entities that allegedly aid and abet breaches of fiduciary duties of Delaware corporations could not be held accountable in Delaware courts. For

the foregoing reasons, News has minimum contacts with Delaware, and it would not violate traditional notions of fair play and substantial justice to assert jurisdiction over News in this case.

n211 *Id.* at 1118
n212 Merger Agreement at 13.
n213 That act was the filing of the Certificate of Merger.
n214 *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).

[*93]

Because § 3104(c)(1) does provide a specific basis for this Court to exercise jurisdiction over News, and because asserting personal jurisdiction over News comports with due process, News' motion to dismiss under Court of Chancery Rule 12(b)(2) is denied.

*C. News' 12(b)(6) Argument*

News has also moved to dismiss the Complaint on the ground that it fails to state a claim against News. As previously stated, only one claim is directed against News -- Count VII for aiding and abetting a breach of fiduciary duty. n215 [HN19] Under Delaware law, in order to state a valid claim for aiding and abetting a breach of fiduciary duty, plaintiffs must allege: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." n216 In most cases, as here, the second and third prongs of the test are the most relevant in the context of a motion to dismiss. I have concluded above that the Individual Defendants did not breach any fiduciary duty and, therefore, on that ground alone, Count VII must fail [*94] as a matter of law. In the alternative, even if plaintiffs had stated a claim that the Individual Defendants breached their fiduciary duties, the aiding and abetting claim against News would still fail because the Complaint does not adequately allege in a non-conclusory fashion that News knowingly participated in a breach of fiduciary duty.

n215 Compl. PP 202-207
n216 *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 386 (Del. Ch. 1999).

*1. Plaintiffs' Allegations of Knowing Participation are Inadequate*

Even if plaintiffs had pled an adequate claim for breach of fiduciary duty by the individual defendants, Count VII would still fail as a matter of law because plaintiffs have not adequately alleged that News knowingly participated in a breach of fiduciary duty. "A claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred." n217 If such facts [*95] are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an "inherently wrongful manner." n218 This has also been stated as requiring the plaintiff to allege that the act taken by the fiduciary was *per se* illegal. n219 Conclusory statements of knowing participation will not suffice. n220 News has argued that plaintiffs have failed to adequately allege "knowing participation" for three reasons: (1) plaintiffs' allegations are conclusory; (2) News only engaged in arms-length negotiations with GM; and (3) plaintiffs have not alleged any inherently wrongful conduct that would put News on notice that GM's directors were violating their fiduciary duties.

n217 *In re Shoe-Town, Inc. S'holders Litig.,* 1990 Del. Ch. LEXIS 14, 1990 WL 13475, at *8 (Del. Ch.); *Weinberger v. RIO Grande Indus. Inc.,* 519 A.2d 116, 131 (Del. Ch. 1986).
n218 *McGowan v. Ferro,* 2002 Del. Ch. LEXIS 3, 2002 WL 77712, at *2 (Del. Ch.); *Nebenzahl v. Miller,* 1996 Del. Ch. LEXIS 113, 1996 WL 494913, at *7 (Del. Ch.)
n219 *Rand v. Western Airlines, Inc.,* 1989 Del. Ch. LEXIS 118, 1989 WL 104933, at *5 (Del. Ch.) (concluding that aiding and abetting claim failed as a matter of law because knowing participation was not adequately pled and that if "any of the actions taken by the Western directors were illegal *per se,* plaintiffs' argument *would be more compelling,"* (emphasis added) implying that even *per se* illegality of the fiduciary's actions may, in certain circumstances, be insufficient to infer knowing participation).

[*96]

n220 *In re Santa Fe,* 669 A.2d at 72

In responding to News' arguments that their allegations are conclusory, plaintiffs argue that: (1) News knowingly went along with a "diversion of money," n221 and benefited from the breach of fiduciary duty; n222 and (2) News was able to acquire Hughes without payment of a control premium. Plaintiffs' argument regarding a "diversion of money" is somewhat misleading. This Court has made clear that [HN20] in order for allegations of a diversion of money to be sufficient to infer knowing participation, the diversion must have been "granted by the non-fiduciary acquiror *to the fiduciary directors* [such] that the court could reasonably infer that the payments were made specifically to induce the fiduciaries to breach their duties." n223 In other words, the diversion of money caused by the alleged aider/abettor becomes an incentive for the directors to "ignore their fiduciary obligations." n224

n221 *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 990 (Del. Ch. 2000), *citing In re USACafes, L.P. Litig.*, 600 A.2d 43, 55-56 (Del. Ch. 1991)

[*97]

n222 *In re Summit Metals, Inc.*, 2004 U.S. Dist. LEXIS 15819, 2004 WL 1812700 (D. Del.).
n223 *McGowan*, 2002 Del. Ch. LEXIS 3, 2002 WL 77712 at *3 (emphasis added) (distinguishing *Crescent/Mach I Partners, Jackson* and *USACafes*)
n224 *USACafes*, 600 A.2d at 56; *McGowan*, 2002 Del. Ch. LEXIS 3, 2002 WL 77712 at *3

Plaintiffs argue that the diversion of money was an extra dollar per share from Hughes to GM as a special dividend, and that News agreed to this additional payment only upon GM allowing News to purchase 34 rather than 36 percent of Hughes. n225 Unfortunately for plaintiffs, this is not only a conclusory allegation, but also misstates the record to which they refer. n226 The relevant portion of the Consent Solicitation recites the history of the transaction, and states as follows:

During the days preceding News Corporation's submission of the financial terms of its offer, GM and News Corporation engaged in discussions regarding the size of the interest in Hughes that News Corporation would acquire and the value to be provided by News Corporation for such

acquisition. [*98] GM and Hughes had previously indicated to News Corporation that the maximum percentage interest in Hughes that would be available for acquisition by News Corporation would be 36%, based on certain tax-related constraints and the desire of GM and Hughes to ensure that after the completion of the transactions Hughes would have sufficient flexibility to issue a reasonable amount of equity without violating anticipated agreements with GM designed to preserve the tax-free status of the separation of Hughes from GM. Negotiations between GM and Hughes and News Corporation regarding the price to be provided for Hughes stock resulted in News Corporation's determination that it was interested in acquiring only 34% of Hughes. n227

Paragraph fifty-nine of the Complaint refers directly to this passage from the Consent Solicitation to establish its allegations. A fair reading of the Consent Solicitation, in my opinion, does not result in the same interpretation of the above language. Before the time that News allegedly "reduced" the interest in Hughes it would be interested in purchasing, there was no indication that News had made a concrete offer for a specific portion of Hughes, so [*99] therefore, there was no offer on the table for News to reduce. Instead, the Consent Solicitation indicates that the thirty-six percent figure originated not from News, but from GM and Hughes, due to GM's and Hughes' tax needs. The Consent Solicitation is clear that News was simultaneously negotiating both the price to be paid and the size of the interest purchased, and that at no time did News "reduce" the stake in Hughes that it was willing to purchase.

n225 Compl. P 59.
n226 Plaintiffs also gloss over the fact that the dividend was paid to GM, not the fiduciary directors.
n227 CS at 97.

Furthermore, even if plaintiffs' allegations did not contradict the clear language of the Consent Solicitation as to how News arrived at the decision to purchase thirty-four percent of Hughes, page ninety-eight of the Consent Solicitation also contradicts plaintiffs' allegations that the "reduction" in the size of interest in Hughes that News would purchase was related to the special

dividend In relevant [*100] part, the Consent Solicitation states:

> Hughes believed that if a special dividend were to be paid a lesser amount [than the 3 to 5 percent of market value paid in the EDS transaction] would be appropriate Taking into account these factors and the need to obtain News Corporation's concurrence with the special dividend, GM management and Hughes management [*without News*] agreed after further discussion that the transaction terms would include a special cash dividend from Hughes to GM in the amount of $ 275 million It was recognized that the payment of the special dividend by Hughes to GM could be viewed as increasing the value per notional share to GM for its retained interest in Hughes from $ 14 00 to $ 15 00 On that basis, the two managements [*GM and Hughes*] proceeded to meet with News Corporation and its advisors and, with assistance from their respective advisors, negotiated the definitive terms of the transactions as reflected in the transaction agreements described in this document These terms included News Corporation's agreement that the $ 275 million special dividend distribution would be paid by Hughes to GM n228

This portion of the Consent [*101] Solicitation makes it clear that GM and Hughes: (1) had agreed on the $ 275 million dividend *after* News had decided to acquire thirty-four percent of Hughes; and (2) GM and Hughes determined the amount of the dividend themselves *before* GM and Hughes met with News to seek approval for the dividend Because of the foregoing, I conclude that there was not a diversion of money agreed to by News upon which plaintiffs may rely for the Court to infer News' knowing participation in a breach of a fiduciary duty by the GM directors, and to the extent that plaintiffs allege otherwise, those allegations are conclusory and not well-founded in the documents upon which they purportedly rely n229 In other words, plaintiffs' allegation that the "timing and context of News' determination and the disclosure regarding it indicate that the decrease in the amount of Hughes stock News would buy was related to GM's insistence on another $ 275 million for its interest in Hughes," is wholly conclusory and an unreasonable inference to draw from the Consent Solicitation n230

n228 CS at 98.

n229 The Complaint itself is consistent with this interpretation of the Consent Solicitation, as paragraphs 70-71 refer to GM and Hughes management together, but without News, as determining the amount of the $ 275 million special dividend

[*102]

n230 Compl P 59.

Because the special dividend, in any event, did not constitute a diversion of money to a fiduciary, perhaps plaintiffs wish to rely on the alleged excessive compensation paid to the GM directors as the diversion of money. Yet, this argument is equally unavailing. There are no allegations that News altered the amounts that the GM directors were already entitled to receive or even that those amounts were material to the non-employee director defendants n231

n231 *See In re Lukens Inc S'holders Litig*, 757 A 2d 720, 735 (Del Ch 1999) (holding that acquiror's payment of golden parachutes did not constitute a diversion of money to a fiduciary because those parachutes were previously valid obligations of the target).

Plaintiffs' second argument that News knowingly participated in a breach of fiduciary duty is that News was able to acquire Hughes without payment of a control premium, [*103] and that this created a benefit to News because of the GM directors' alleged breach of fiduciary duty n232 This argument is wholly without basis in the law of Delaware, and on that basis alone, it can be inferred that News could *not* have knowingly participated in a breach of fiduciary duty by not paying, at least in plaintiffs' opinion, a "control premium " Furthermore, plaintiffs' own Complaint repeatedly argues that the GMH shareholders should have received a control premium, but they also concede, as they must, that a control premium is generally only available to a stockholder "in an independent, stand-alone company" without a controlling shareholder n233 The GMH shareholders were not in that situation Instead, they held an economic interest in a wholly-owned corporation In any event, there is *no per se* obligation under Delaware law that an entity acquiring 34 percent of the stock of a corporation must pay a control premium Furthermore, it makes no difference

that News may or may not have a "pattern" of acquiring controlling, but minority, interests in other companies, because, as outlined below, the Complaint describes that News and GM/Hughes engaged in an arms-length [*104] bargaining process.

n232 Plaintiffs' citation to two appraisal cases that awarded control premiums are completely inapposite in this context. *See Doft & Co v. Travelocity com Inc*, 2004 Del. Ch. LEXIS 75, 2004 WL. 1152338 (Del. Ch.); *Borruso v. Communications Telesystems Int'l*, 753 A.2d 451 (Del. Ch. 1999). Furthermore, there was no change of control in this case; before the transactions Hughes was wholly-owned by GM, a controlling shareholder, and after the transactions Hughes still had a controlling shareholder (if plaintiffs' arguments are taken at face value) in News. [HN21] When the controlling shareholder merely sells its interest to another controlling shareholder, it is not a change of control. *See In re Digex Inc. S'holders Litig*, 789 A.2d 1176, 1196 (Del. Ch. 2000) (holding that the sale of a controlling interest in Digex from Intermedia to WorldCom was not a change of control under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986)).
n233 Compl. P 73.

[*105]

Plaintiffs have failed to plead facts sufficient for this Court to infer knowing participation on the part of News with respect to the alleged breach of fiduciary duty by the GM directors because the allegations of the Complaint with respect to News' acquisition of its stake in Hughes without a control premium are conclusory, unsupported by the Consent Solicitation, and based on both novel and incorrect theories of law.

2. The Complaint Describes Arms-Length Negotiations

The Complaint makes clear that News engaged in arms-length negotiations with GM and Hughes. This Court has consistently held that "evidence of arm's-length negotiation with fiduciaries negated a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries." n234

n234 *In re Frederick's of Hollywood, Inc. S'holders Litig*, 1998 Del. Ch. LEXIS 111, 1998 WL. 398244, at *3 n.8 (Del. Ch.); *Shoe-Town*, 1990 Del. Ch. LEXIS 14, 1990 WL 13475 at *8 (concluding that the motion to dismiss as to the acquiror, GECC, would be granted because GECC's "involvement in the challenged transaction," was entirely consistent with "GECC as a party engaged in an arms-length negotiation of a business transaction"). *Cf. Shoe-Town*, 1990 Del. Ch. LEXIS 14, 1990 WL. 13475 at *8 (holding that claim for aiding and abetting against Shearson Lehman Hutton, Inc., the target company's financial advisor, could go forward because Shearson "was closely involved with the management group, the special committee and the Shoe-Town board," and used that involvement to influence the decisions made by the fiduciaries); *USACafes*, 600 A.2d at 56 (holding that the acquiror engaged in more than arms-length negotiations and denying the motion to dismiss because the Complaint contained factual details that the acquiror "offered financial incentives to the [fiduciaries] to induce them to ignore fiduciary obligations . . . "); *Jackson*, 741 A.2d at 393.

[*106]

Plaintiffs argue that News engaged in more than arms-length negotiations with Hughes and GM by: (1) "actively participating in the negotiations, structuring and disclosures concerning the Hughes transactions;" (2) having "offered financial incentives to GM and the Individual Defendants and induced them to ignore their fiduciary obligations," including preferring the GM $ 1 2/3 stockholders over the GMH shareholders, permitting Hughes to pay the $ 275 million dividend, and paying GM largely in cash for its interest in Hughes; and (3) mischaracterizing the Hughes transactions in the Consent Solicitation, especially "the nature and degree of News' control over Hughes resulting from the Stock Sale and Merger," which was jointly issued by Hughes, GM and News. n235

n235 Pls.' Memo. Of Law In Opp. To The News Corp. Ltd.'s Mot. To Dismiss ("Pls.' News Corp Br.") at 37-38.

As to the first point, it was clearly necessary for News to actively participate in the negotiation and structuring of the Hughes transactions, [*107] as it was a party to those transactions. But that alone does not imply knowing participation on News' part in a breach of fidu-

ciary duty by GM's directors. There are no properly pled allegations that News representatives participated in meetings of the GM board of directors or otherwise interjected themselves into the process by which the GM and Hughes boards of directors approved the Hughes transactions in any manner other than as an arms-length bidder n236. In fact, the Complaint contains the following allegations with respect to the negotiations and structuring of the Hughes transactions that indicate that those negotiations occurred at arms-length, which necessarily negates any allegations of knowing participation in a breach of fiduciary duty:

News negotiated with GM and Hughes management; n237

. News agreed to purchase thirty-four percent of Hughes even though GM was willing to permit News to purchase up to 36 percent; n238

News agreed to permit Hughes to pay the $ 275 million special dividend to GM after GM rebuffed News' initial offer at $ 14.00 per share; n239

News negotiated to have Hughes' amended certificate of incorporation contain certain [*108] anti-takeover provisions; n240

News agreed that most of the consideration for the Hughes transactions would be cash, even though News wanted to decrease the amount of cash necessary to consummate the transaction; n241

. News knew that GM and Hughes were being advised by prominent investment banks (Merrill Lynch, Bear Stearns, Credit Suisse First Boston, and Goldman Sachs) with respect to the transactions; n242

All decisions regarding the structure and timing of the GMH and GM $ 1 2/3 vote was taken unilaterally by the GM directors without involvement from News; n243

GM, Hughes, and News agreed to "extensive" concessions demanded by the Federal Communications Commission

("FCC") in order to obtain approval from the FCC for the transactions. n244

n236 Plaintiffs' brief argues that News "was closely involved with the management group of the primary Defendants, and was present and active at meetings at which it was decided to formulate the Hughes transactions offer in terms that constituted a breach of the primary defendants' fiduciary duties of loyalty and care." Pls.' News Corp. Br. at 38 n 23. Unfortunately for plaintiffs, the Complaint does not contain those allegations, nor can that conclusion be reasonably drawn from the facts pled in the Complaint. Furthermore, this argument does not specify at what kinds of meetings News was present and active. Clearly News was present and active at meetings between News and GM representatives while negotiating the Hughes transactions, but that is entirely different from being present and active at a meeting of the board of directors of Hughes or GM, unlike the situation in *Shoe-Town* to which plaintiffs cite.

[*109]

n237 Compl. P 56.
n238 *Id* P 59.
n239 *Id.* PP 59, 67, 71, 80.
n240 *Id* PP 60, 146.
n241 *Id* P 63, 67, 79.
n242 *Id* PP 71, 90.
n243 *Id* PP 116-25.
n244 *Id* P 145.

These allegations indicate, contrary to plaintiffs' assertions, that the negotiations and structuring of the Hughes transactions were made at arms-length between News and GM. Reasonable inferences cannot be made from these allegations that News was improperly involved in the negotiations of the Hughes transactions. In addition, the Consent Solicitation confirms the allegations found in the Complaint that describe arms-length negotiations between News and GM/Hughes. n245

n245 CS at 90-114 (describing negotiations with News, and how GM had also negotiated with potential acquirors other than News). The Consent Solicitation does not indicate that News negoti-

ated with GM in any way other than at arms-length.

[*110]

I have already concluded above that News did not knowingly accede to a diversion of money, negating plaintiffs' second argument. n246 Therefore, the only way that plaintiffs' argument against arms-length negotiations can prevail is if News' joint issuance of the Consent Solicitation constituted knowing participation in a breach of fiduciary duty by the GM directors. n247

n246 I also note that plaintiffs' arguments on this point continue to refer in a conclusory manner to payments from News to the GM directors, despite the lack of factual allegations on this point that would give rise to a reasonable inference that such payment had occurred. Therefore, I give no weight nor credit to this allegation.

n247 It should be further noted that it would make little sense for a plaintiff to be able to establish, by virtue of later disclosure deficiencies in a joint proxy statement or prospectus, a claim for aiding and abetting a breach of fiduciary duty when the alleged breach of duty occurred during the negotiation, structuring, and approval of a transaction but before the joint proxy was prepared. If the material terms of the transaction do not change after the transaction is approved by the necessary board(s) of directors, and if up until that point the negotiations between the parties have been at arms-length, and if a plaintiff alleges that a breach of fiduciary duty occurred by that point in time, it strikes me as unreasonable for a later disclosure violation to open up an acquiror to liability for aiding and abetting a breach of fiduciary duty that occurred while that acquiror was still acting at arms-length.

[*111]

Again, both the Complaint and the Consent Solicitation are clear in disproving plaintiffs' argument that the Consent Solicitation "repeatedly mischaracterized the transactions, including the nature and degree of News Corp.'s control over Hughes resulting from the Stock Sale and Merger." n248 The Complaint states that since "the announcement of the proposed Hughes transactions, General Motors, Hughes and News Corp. have all made it plain that Hughes and its businesses, such as DIRECTV, will be controlled by News Corp. after the consummation of the transactions." n249 The Complaint also references a roadshow made by a News executive in

support of the transaction who "confirmed that News would be running Hughes," n250 and that the anti-takeover provisions that News wanted in Hughes' certificate of incorporation were designed to "cement News' control." n251 The Consent Solicitation repeatedly states that, following the Hughes transactions, News will own thirty-four percent of Hughes and the remaining sixty-six percent of Hughes will be owned by the former GMH shareholders. n252 Also contained in the Consent Solicitation is a statement that:

> Hughes' Principal Stockholder Will [*112] Have Significant Influence Over the Management of Hughes and Over Actions Requiring Stockholder Approval Upon the completion of the transactions, News Corporation, through its subsidiary Fox Entertainment, will hold 34% of the issued and outstanding shares of Hughes common stock. Mr. Murdoch, Chairman and Chief Executive of News Corporation, will become Chairman of Hughes, and Mr. Carey, who is currently a director of, and is serving as an advisor to, News Corporation will become a director and President and Chief Executive Officer of Hughes. Additionally, two current News Corporation executives will also be directors of Hughes. As a result, News Corporation will have significant influence relating to the management of Hughes and to actions of Hughes that require stockholder approval. You should understand, however, that the interests of News Corporation may differ from the interests of other holders of Hughes common stock.

> The extent of News Corporation's stock ownership of Hughes also may have the effect of discouraging offers to acquire control of Hughes and may preclude holders of Hughes common stock from receiving any premium above market price for their shares that may be [*113] offered in connection with any attempt to acquire control of Hughes. n253

News made no attempt to conceal that it would own a significant stake in Hughes following the Hughes transactions, or that Mr. Murdoch controlled News. n254 The Consent Solicitation also contains information regarding the Hughes board of directors following the Hughes transactions, and the extent to which those directors are

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

affiliated with News. n255 Therefore, the Consent Solicitation does not "mischaracterize" the transactions that occurred, and plaintiffs' claim of knowing participation in a breach of fiduciary duty by the GM directors with respect to the disclosures contained in the Consent Solicitation must fail because News acted at arms-length. n256

n248 Compl. P 205

n249 Id. P 141. Before the Hughes transactions had closed, the FCC had also determined that News would control Hughes despite not owning a majority interest. Id. PP 127, 135-36.

n250 Id. PP 142-44.

n251 Id. P 146.

n252 CS at Introduction, 1, 4, 5, 11-13, 20-21, 27, 69, 74-75, 78.

n253 Id. at 51.

[*114]

n254 Id. at 65.

n255 Id. at 204-05.

n256 To the extent that plaintiffs argue that News was complicit in other decisions with respect to the content of the Consent Solicitation beyond the characterization of the transactions at issue, plaintiffs have failed to adequately plead facts such that this Court could reasonably infer that News was actively involved in deciding what information would be disclosed through the Consent Solicitation and how. See Weinberger, 519 A.2d at 131; Repairman's Serv. Corp. v. Nat'l Intergroup, Inc., 1985 Del. Ch. LEXIS 405, 1985 WL 11540, at *9 (Del. Ch.).

3. Nothing About the Hughes Transactions Was Inherently Wrongful

The other way for a plaintiff to establish that knowing participation in a breach of fiduciary duty occurred is if some part of the transactions at issue was inherently wrongful. n257 Plaintiffs' arguments seem to focus on the $ 275 million special dividend paid by Hughes to GM, and News' agreeing to use large amounts of cash consideration in the transaction as being inherently wrongful. In Solomon v. Armstrong [*115], this Court granted the defendants' motion to dismiss in a suit challenging the split-off of Electronic Data Systems Holding Corp. ("EDS") from GM and the large special dividend paid from EDS to GM as part of that split-off. n258 Although there are material differences between the EDS split-off and the Hughes split-off, namely the presence of

News and how it would become a controlling shareholder without a majority interest, those differences are not so great as to put News on notice that a special dividend, even of $ 275 million, was inherently wrongful in this situation.

n257 See Greenfield v. Nat'l Med. Care, Inc., 1986 Del. Ch. LEXIS 427, 1986 WL 6505, at *4 (Del. Ch.); Nebenzahl, 1996 Del. Ch. LEXIS 113, 1996 WL 494913 at *7. See also Rand, 1989 Del. Ch. LEXIS 118, 1989 WL 104933 at *5.

n258 747 A.2d 1098 (Del. Ch. 1999).

Plaintiffs also rehash their other arguments again (a knowing diversion of money to a fiduciary, misleading disclosures in the Consent Solicitation) in an attempt to convince the Court [*116] that those actions were inherently wrongful. If those allegations were borne out, certainly such actions could be considered inherently wrongful. As discussed above, however, those allegations are contradicted by other portions of the Complaint and are not consistent with the language of the portions of the Consent Solicitation referenced by the Complaint or the Consent Solicitation as a whole. n259 Therefore, at best they are merely conclusory allegations, and are entitled to no weight in my analysis. Plaintiffs have failed to allege that News participated in a transaction that was inherently wrongful, and therefore, in addition to the conclusions reached above, have failed to adequately plead a claim for aiding and abetting a breach of fiduciary duty by News. As such, Count VII of the Complaint fails to state a claim for which relief can be granted, and it is hereby dismissed with prejudice.

n259 The Complaint contains a footnote that purportedly prevents the Court from analyzing the Consent Solicitation as a whole by stating that "the references to certain portions of the August 21, 2003 Consent Solicitation . . . are not intended to incorporate by reference other portions of [that document]." Compl. P 4. It is absurd to argue that the Consent Solicitation is incomplete or misleading by quoting selected passages and then attempt to prevent the Court from considering the document in its entirety. The Consent Solicitation is integral to the Complaint, and I therefore may properly consider it in its entirety in analyzing the legal sufficiency of plaintiffs' disclosure claims on the motions to dismiss. See supra discussion Section II Part B.

2005 Del. Ch. LEXIS 65, *; 35 Employee Benefits Cas. (BNA) 2188

[*117]

## IV. CONCLUSION

Plaintiffs have failed to state claims of vote manipulation and breach of fiduciary duty of disclosure. Counts III and IV are therefore dismissed. Since the facts alleged do not overcome the presumptions of the business judgment rule and since I do not find a breach of GM certificate of incorporation, Counts I, II, V, and VI are dismissed. Finally, for the reasons stated above, the aiding and abetting claim of Count VII is dismissed.

Counsel shall confer and agree upon a form of Order to implement this decision.

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 378125 (Del.Ch.)

(Cite as: 1999 WL 378125 (Del.Ch.))

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING

Court of Chancery of Delaware
Harry LEWIS, Plaintiff,
v
K. Frank AUSTEN, M.D., et al., Defendants
**No. C.A. 12937.**

June 2, 1999

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; and A. Arnold Gershon, P.C., New York, New York; for Plaintiff

Kevin G. Abrams, Thomas A. Beck, and Srinivas M. Raju, of Richards, Layton & Finger, Wilmington, Delaware; and Alexander R. Sussman, of Fried, Frank, Harris, Shriver & Jacobson, New York, New York; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor

*1 Pending is a motion to dismiss the amended complaint ("complaint") in a stockholder derivative action brought on behalf of Humana, Inc. ("Humana") against its present, and certain of its former, directors. The complaint charges that those directors wrongfully enriched themselves by making certain adjustments to Humana's stock option plans when Humana "spun-off" its hospital subsidiary, Galen Health Care, Inc. ("Galen"), in connection with a tax-free reorganization and distribution in March 1993 (the "Distribution"). Those adjustments were made to reflect the fact that after the Distribution, Humana stockholders would own shares in two separate companies--Humana and

Galen. The plaintiff's claim is that Humana's directors adjusted the stock option plans to give themselves a larger number of options than what they would have otherwise been entitled to receive.

The defendants have moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6), and for failure to satisfy the demand requirements of Rule 23.1 For the reasons that follow, I conclude that the motion is meritorious and should be granted.

I. BACKGROUND [FN1]

FN1. The factual background, drawn from the complaint, must be accepted as true for purposes of this motion. *Weinberger v. UOP, Inc.,* Del. Ch. 409 A.2d 1262 (1979). The parties agree that the Court may consider, in addition, the specific terms of the Humana Stock Option Plans, the Humana Option Plan Amendments, the Galen Adjustment Plan, and the Galen Directors Plan, all of which are found in the Proxy Statement and in two affidavits of Kevin G. Abrams, Esquire ("Abrams Aff." and "Abrams Supp. Aff."). *Lewis v. Austin,* Del. Ch., C.A. No. 12937, Jacobs, V.C. (Jan. 26, 1997) (Transcript of January 26, 1999 Oral Argument, at 55) Because those documents form an integral part of the complaint and their contents are not disputed, they may be considered on this motion. *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996); *In re Santa Fe Pacific Corp. Shareholder Litig.,* Del.Supr., 669 A.2d 59, 68-69 (1995) ("*Santa Fe*"); *Joyce v. Cuccia,* Del. Ch., C.A. No. 14953, mem op. at 1, n. 1, 9, n. 9, and 20, Jacobs, V.C. (May 14, 1997); *Ash/Ramunno Assocs., Inc v. Branner,* Del. Ch., C.A. No. 12389,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                      Page 2

Not Reported in A 2d, 1999 WL 378125 (Del Ch.)

(Cite as: 1999 WL 378125 (Del.Ch.))

mem op at 4-5, Hartnett, V C (May 21, 1993).

## A The Parties

The plaintiff is a Humana stockholder who brings this action derivatively on behalf of Humana, which is a Delaware corporation engaged in the health care industry Humana's shares are publicly traded on the New York Stock Exchange.

Six of the individual defendants--K. Frank Austen, M D., Michael E. Gellert, John R. Hall, W. Ann Reynolds, Ph.D., David A. Jones, and Wayne T. Smith (sometimes referred to as the "post-Distribution Humana Board")--have been Humana directors since March 1, 1993, the date of the Distribution The four remaining individual defendants--J. David Grissom, John W. Landrum, William T. Young, and Carl F. Pollard (referred to as the "Galen Directors")--were Humana directors before the Distribution, and after the Distribution became directors of Galen For ease of reference, the ten-member board of directors that approved both the Distribution and the adjustments to Humana's stock option plans are referred to throughout this Opinion as the "pre-Distribution Humana Board "

## B The Distribution

Before the Distribution, Humana was engaged in two lines of business: managing acute-care hospitals, and providing and administering health plans Because the joint operation of those two businesses generated conflicts that were perceived to adversely affect Humana's overall profitability, the Humana Board decided that the company and its stockholders would be better off if the two businesses were owned and operated as separate entities

In December 1992, the Humana Board decided to separate the company's two businesses by "spinning-off" the hospital business to Galen (at that time a wholly-owned subsidiary) in a tax-free reorganization The transaction would proceed as follows: Humana would transfer to Galen the assets

of its acute-care hospital business, and in exchange would receive stock of Galen. Humana would then distribute its Galen stock to each of its (Humana's) stockholders on the basis of one Galen share for each share of Humana That transaction, as above-described, is the Distribution and would result in Humana's stockholders owning stock in both Humana and Galen, which would be two separate publicly owned companies, each having its own separate board of directors.

## C The Humana Option Plans

**\*2** The foregoing narrative is background. The critical facts--and the focus of the plaintiff's claims--concern what occurred after the Distribution particularly with respect to Humana and Galen's outstanding stock options.

At the time of the Distribution, Humana had three separate stock option plans: (i) the Humana 1981 Non-Qualified Stock Option Plan, (ii) the Humana 1989 Employees Stock Option Plan, and (iii) The Humana 1989 Stock Option Plan for Non-Employee Directors. (Collectively, these plans are referred to as the "Humana Option Plans," or the "Plans.") [FN2] Under the Plans, the options generally would expire ten years from the date of their grant, but their exercise date could be accelerated in the discretion of the Compensation Committee of the Humana Board [FN3] These option Plans all contained the identical capital adjustment provision, the critical term of which was that in the event of a "stock dividend" or "reorganization," the optioned shares "*shall* be adjusted in a manner consistent with such capital adjustment," and the purchase price of the optioned shares "*shall* be adjusted so that there will be no material change in the aggregate purchase price payable upon exercise" of the options. [FN4]

> FN2. Under the Humana Option Plans, as of January 1, 1993, two months before the Distribution, options had been granted to purchase 3,343,820 Humana shares Since 1989, options to purchase 2,921,696 shares (or approximately 87.3% of the outstanding options) had been granted

© 2005 Thomson/West No Claim to Orig U.S. Govt Works.

Not Reported in A.2d                                                                            Page 3

Not Reported in A.2d, 1999 WL 378125 (Del.Ch.)

**(Cite as: 1999 WL 378125 (Del.Ch.))**

under the 1989 Directors Plan, and the 1989 Employees Plan.

FN3. Abrams Aff. Ex. 2 at A-2-3, para. 8-9; *Id.*, Ex. 3 at B-2-3, para. 9-10; *Id.*, Ex. 4 at 2, para. 6-7.

FN4. Abrams Aff. Ex. 2 at A-3, para. 13; *Id.*, Ex. 3 at B-3, para. 14; *Id.*, Ex. 4 at 2, para. 10 (emphasis added)

**D. The December 7, 1992 Humana and Galen Board Meetings**

On December 7, 1992, the Humana and Galen boards held meetings at which three important actions were taken. First, the Humana Board amended Humana's Stock Option Plans to reflect the impact of the Distribution (the "Humana Option Plan Amendments" or "Amendments"). The effect of the Amendments was that: (a) each Humana option holder would receive one Galen option for each Humana option he or she held; (b) the exercise prices of Humana options would be reduced based upon a formula derived from the post-Distribution market prices of Humana and Galen stock; [FN5] (c) all Humana options held by Humana personnel who would be leaving Humana to work for Galen would become immediately exercisable, and the expiration date of those options would be extended to the *earlier* of the original expiration date or March 1, 1995; and (d) all Galen options issued to Humana personnel who were not departing Humana to work for Galen would expire on March 1, 1995. The Amendments and the Distribution were both made subject to shareholder approval.

FN5. The defendants offer the following example to help clarify the Distribution formula's effect: If (hypothetically) Humana stock was trading at $20 per share pre-Distribution and $8 per share post-Distribution, and if Galen stock was trading at $12 post-Distribution, each owner of one Humana share worth $20 would hold (post-Distribution) one (post-Distribution) Humana share worth $8 and one Galen share worth $12. A

pre-Distribution Humana option holder who held an option to purchase one Humana share at a pre-Distribution exercise price of $20 would receive two separate options--an option to purchase post-Distribution one Humana share at $8 per share, and an option to purchase one Galen share at $12 per share.

Second, the Galen Board adopted, and Humana as Galen's sole stockholder approved, the "Galen Adjustment Plan," whose purpose was to implement the Humana Option Plan Amendments that governed the contemplated distribution of Galen options to Humana option holders. Defendants Austen, Hall, Reynolds, Jones, Pollard, and Smith--all of whom held Humana stock options--ultimately received Galen stock options as a result of the combined Humana Option Plan Amendments and the Galen Adjustment Plan.

Third, the Galen Board approved a plan (the "Galen Directors Plan") that would automatically grant (a) 5,000 restricted Galen shares to each non-Galen employee who joined the Galen Board after the Distribution, and (b) 1,500 restricted Galen shares to each Galen director for each three years of continuous service on the Galen Board. Under the Galen Directors Plan, the Galen Board issued to defendants Grissom, Landrum, and Young (subject to the Distribution receiving shareholder approval) 5,000 shares of restricted Galen stock for $.01 per share, plus the right to receive every third year an additional 1,500 shares of Galen restricted stock at the same price, for as long as they served continuously on the Galen Board. At the time the Director Defendants took these actions, Messrs. Grissom, Landrum, and Young owned no Humana stock options.

**E. The February 18, 1993 Stockholder Meeting**

*3 The Distribution, the Amendments, the Galen Adjustment Plan, and the Galen Directors Plan were all approved at Humana's annual stockholder meeting held on February 18, 1993. The Distribution became effective on March 1, 1993. On that date the closing price of Galen stock (on a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                                    Page 4

Not Reported in A 2d, 1999 WL 378125 (Del.Ch.)

**(Cite as: 1999 WL 378125 (Del.Ch.))**

"when-issued" basis) was $12 1/4 per share, and the (pre-Distribution) closing price of Humana stock was $19 7/8, equivalent to an implied post-Distribution price of $7 5/8 for each Humana share

F The Galen-Columbia Merger

The Proxy Statement disclosed that shortly after the Distribution, Galen and Columbia Health Care ("Columbia") began engaging in merger negotiations On June 10, 1993, those companies publicly announced that Galen would be acquired by Columbia in a stock-for-stock merger On September 1, 1993, the Galen-Columbia merger was consummated. The complaint alleges that even before the Distribution became effective, the pre-Distribution Humana Board "knew or should have known" that Humana had been engaging in preliminary "discussions" with Columbia about a possible Galen-Columbia combination, and that the Board should have disclosed those discussions to Humana's shareholders in connection with seeking their approval of the Distribution

G This Lawsuit

On April 15, 1993, the plaintiff filed his original complaint, alleging that the issuance of Galen options to post-Distribution Humana personnel, and the issuance of adjusted Humana options to Galen personnel, [FN6] constituted a waste of corporate assets The defendants moved to dismiss the original complaint On September 13, 1995, this Court granted the plaintiff leave to file an amended complaint, which the plaintiff served and filed on October 3, 1995. The amended complaint alleges only Humana derivative claims. The plaintiff made no pre-suit demand on the Humana Board to redress these claims

> FN6 The original complaint did not allege any derivative claim on behalf of Humana with respect to the Humana Option Plan Amendments and the Galen Adjustment Plan Rather, the original complaint alleged solely a *Galen* derivative claim for waste, *viz* . that Galen had received no

consideration for issuing those options. Belatedly conceding that Columbia had succeeded to the Galen derivative claim as a result of its merger with Galen in 1993, the plaintiff amended his original complaint to assert a derivative claim on behalf of *Humana,* charging the continuing Humana Directors with self-dealing and waste by approving option adjustments that resulted in their receiving Galen options

In response, the defendants moved to dismiss the amended complaint This is the Court's decision on that motion

II. THE CONTENTIONS

The plaintiff concedes that the amended complaint should now be regarded as asserting only three claims. [FN7] The first claim is that the post-Distribution Humana Board breached their duty of loyalty (i) by engaging in a self-dealing transaction that involved using undisclosed "inside information" (that Galen might be merged with or sold to Columbia) at the time the Board approved the Humana option adjustments, and (ii) by illicitly profiting from that information by having received Galen options for no consideration The second claim is that the Adjustments to the Humana options that would be distributed to post-Distribution Galen employees, represented a waste of corporate assets. The third claim is that the Galen Directors Plan was itself unfair and a waste of corporate assets

> FN7 In his answering brief and at oral argument, the plaintiff unilaterally narrowed his claims to three. The Court will address those claims, and considers as abandoned any remaining claims that were not argued in the answering brief or at oral argument, including his *ultra vires* and certain waste claims against the post-Distribution Humana Board.

For the reasons next discussed, the Court concludes that all three claims are legally insufficient and must be dismissed under Rule 12(b)(6). It further concludes that the plaintiff has failed to satisfy the

© 2005 Thomson/West No Claim to Orig. U S. Govt. Works.

Not Reported in A.2d                                                              Page 5

Not Reported in A.2d, 1999 WL 378125 (Del.Ch.)

**(Cite as: 1999 WL 378125 (Del.Ch.))**

"demand futility" pleading requirement of Rule 23.1 that governs the derivative claims being asserted here.

### III. ANALYSIS
*4 To prevail on a motion to dismiss under Court of Chancery Rule 12(b)(6), a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted. [FN8] Conclusory allegations that lack specific supportive factual averments will not be accepted as true. [FN9] These standards govern the Court's evaluation of the claims at issue here.

> FN8 *Santa Fe,* 669 A.2d at 65-66; *In re Tri-Star Pictures, Inc.,* Del.Supr., 634 A.2d 319, 326 (1993).

> FN9 *Santa Fe,* 669 A.2d at 65-66; *accord Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988) ("[e]ven under the less stringent standard of a Chancery Rule 12(b)(6) motion to dismiss neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true.").

#### A. The Self-Dealing Claim
The plaintiff first claims self-dealing by the post-Distribution Humana directors, all of whom were members of the Humana Board that approved the Distribution. The logic underlying this claim runs as follows: the Galen-Columbia merger was announced six months, and closed nine months, after the Distribution became effective. Given the timing, the post-Distribution Humana directors must have known of--and therefore must have used and benefited from-- the undisclosed information that Columbia was interested in acquiring Galen's hospital assets. Therefore, those directors improperly used their position as fiduciaries by approving the Amendments and obtaining Galen options for themselves. Thus, the claim is that the Amendments enabled the post-Distribution Humana Board to unjustly enrich themselves in the Galen-Columbia merger, by permitting them to exercise options that would otherwise have expired

or remained unvested.

Because a majority of the Humana board were outside directors at the time of the Distribution, the director defendants are cloaked with a presumption that in approving the Distribution and Amendments, they acted in good faith and acted with appropriate loyalty and due care. [FN10] The plaintiff may of course rebut this presumption, but only with specific, nonconclusory factual allegations. [FN11] Because the pleaded facts fail to rebut that presumption, the self-dealing claim must fail.

> FN10. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Cede & Co. v Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 361 (1993).

> FN11 *See Aronson,* 473 A.2d at 812 (burden is on plaintiff "to establish facts rebutting the presumption" of the business judgment rule); *Santa Fe,* 669 A.2d at 65-66 ("[c]onclusory allegations will not be accepted as true without specific supporting factual allegations.").

The self-dealing claim against the post-Distribution Humana directors is legally insufficient for three reasons. First, it rests upon "fraud by hindsight" allegations of the kind which, as a legal matter, cannot support a claim for self-dealing. Second, it does not adequately allege that the defendants received an improper benefit because the so-called option "enhancements"--which neither extended the options' expiration date nor accelerated any vesting rights--created no new "benefits." Third, the complaint asserts no facts that support a claim of misuse of inside information or of disloyalty and self-dealing by the post-Distribution Humana Directors.

These reasons are now elaborated.

1 The "Fraud by Hindsight" Problem

The essence of the self-dealing claim is that in December 1992 Humana had discussions with Columbia about a possible combination, which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 1999 WL 378125 (Del.Ch.)

(Cite as: 1999 WL 378125 (Del.Ch.))

discussions were not, but should have been, disclosed to the Humana shareholders. Therefore, by approving the Distribution the Humana directors wrongfully misused and personally benefited from that undisclosed information.

This claim as pleaded is conclusory: it lacks specific supporting factual allegations that would establish that merger discussions actually took place before the Distribution, and that the Humana directors misused their knowledge of those discussions. That is not surprising, because what the complaint actually does allege is that "[s]hortly *after* the [Distribution], Galen and Columbia began discussing the possible acquisition of Galen by Columbia." [FN12] While the complaint alleges that the directors had "the benefit of undisclosed, inside information *concerning Columbia's interest in Galen,*" it does not allege that they had information concerning a possible merger of those entities at that time. [FN13]

> FN12 Amended    Complaint,    ¶    15
> (emphasis added).
>
> FN13 Amended    Complaint,    ¶    14
> (emphasis added).

*5 This claim amounts to "fraud by hindsight"--a theory this Court specifically rejected in *Noerr v. Greenwood* [FN14] In *Noerr,* the plaintiff challenged proxy disclosures relating to the market value of a corporation's stock, claiming that those values had been understated at the time of the disclosure. The sole factual basis for the claim was that the stock price had substantially increased eight months later. That "fraud by hindsight" claim was found to be legally insufficient, because it did not rest upon a contemporaneous fact from which "guilty knowledge" could be inferred.

> FN14 *See Noerr v. Greenwood,* Del. Ch., C.A. No. 14320, Jacobs, V.C. (July 16, 1997).

The claim in this case is that the post-Distribution Humana Board members had engaged in *pre-Distribution* merger discussions with Columbia.

Here, as in *Noerr,* that claim is supported by a single alleged "hindsight" fact--that the Galen-Columbia merger was announced six months, and closed nine months, after the Distribution. What the complaint does not allege, however, is any "*contemporaneous* pleaded fact from which one may infer" that pre-Distribution discussions actually took place or that the defendants had wrongfully benefited from their knowledge of those alleged discussions. [FN15] That omission is fatal to the claim.

> FN15 *Noerr, supra* note 14, at 13.

2.    The    Post-Distribution    Humana    Directors'
Alleged Benefit

The self-dealing claim is also deficient because the complaint does not adequately plead a benefit that the post-Distribution Humana directors wrongfully obtained by reason of their alleged self-dealing.

a. Expiration Date Extensions

The post-Distribution Humana Directors are said to have benefited by granting themselves Galen options that would be exercisable up to March 1, 1995. That, it is claimed, was wrongful because the pre-Distribution Humana options those directors surrendered in exchange would have expired before that time. But the record does not support the claim that the expiration date(s) of the Galen options were (wrongfully) extended beyond the date that would otherwise apply; on the contrary, the expiration dates of the Galen options were shortened. The Proxy Statement (incorporated by reference into the complaint) disclosed that the expiration date of an option to acquire stock in Galen would be the then-current expiration date, or March 1, 1995, whichever was earlier. The effect was to shorten to March 1, 1995 the expiration date of any Galen option issued in respect of a corresponding Humana option that would expire after March 1, 1995. [FN16]

> FN16. Approximately    89%    of    the
> outstanding options were granted in 1989
> and were 10 year options, meaning that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d

Not Reported in A 2d, 1999 WL 378125 (Del Ch )

(Cite as: 1999 WL 378125 (Del.Ch.))

Page 7

their expiration dates were effectively shortened The Proxy Statement pertinently states:
[F]ollowing the Distribution to the extent any [Galen option] has not earlier been exercised, each [Galen option] will automatically terminate on the date which is the earlier of (a) the date on which the Optionee's corresponding [Humana option] terminates (*i e*, upon the expiration of the original term of the [Humana Option] due to termination of the Optionee's employment; or (b) the second anniversary of the Distribution Date [*i e*, March 1, 1995]

b Accelerated Vesting

Nor has the plaintiff adequately alleged that the Humana directors voted to confer upon themselves the authority to accelerate the vesting and exercise date of the Galen options, which they then proceeded to invoke in order to enable themselves to take advantage of their knowledge of a future acquisition of Galen by Columbia The Humana Option Plans disclose that the post-Distribution Humana directors did not need to amend or adjust those Plans to be able to accelerate either the vesting or the exercise of the options Those Plans already gave the Humana Board's Compensation Committee full discretion "to determine when Options may be exercised, including the ability to accelerate [the] exercise dates of Options previously granted " [FN17] The Compensation Committee also had pre-existing authority to modify the options "to preserve for the [Employee or Optionee] the benefits of any appreciation of the underlying Stock during the term of the Option which benefits might otherwise be lost as a result of" an acquisition or merger [FN18] The Galen Adjustment Plan contained similar provisions [FN19] The purpose of accelerated exercise provisions is to assure that no one will lose the benefit of options as the result of a merger That preexisting authority undermines the claim that Humana's directors accelerated the vesting and/or the exercise date of the options to take advantage of the Galen-Columbia merger

FN17 Abrams Aff Ex 2 at A-2, ¶ 9; *Id*, Ex 3 at B-2, ¶ 10; *Id*, Ex 4 at 2, ¶ 7

FN18 Abrams Aff Ex 2 at 3-A-4, ¶ 14; *Id*, Ex 3 at B-3-B-4, ¶ 15; *Id*, Ex 4 at 3, ¶ 11

FN19 Abrams Aff Ex 1 at F-6, ¶ 15

c Wrongfully Obtained Profits

**\*6** Finally, the plaintiff attempts to infer self-dealing from the profits the post-Distribution Humana Directors allegedly made as a result of the grant of Galen options The inference would be erroneous, however, because the pleaded facts do not show that the post-Distribution Humana Directors were better off as a result of those options being granted The complaint alleges that *Galen shares* appreciated $19 04 over two years, from $12 25 per share on March 1, 1993, to an adjusted $31 29 per Galen share on March 1, 1995. [FN20] The plaintiff claims that because five of the six post-Distribution Humana Directors held 425,703 optioned Galen shares, this "suggest[s] benefits to the five board members in excess of $9 million " [FN21]

FN20 Amended Complaint, ¶ 16; Abrams Supp Aff ¶ 2

FN21 Plaintiff's Answering Brief, at 11

But this overlooks the fact that if the Humana option holders had not received Galen options in the Distribution, they could have received additional Humana options in lieu thereof As the complaint discloses, during that same two-year period, the *post-Distribution Humana shares* appreciated $16 50 per share [FN22] If the post-Distribution Humana Directors had received (in lieu of a Galen option) the economic equivalent in the form of an additional option for 1 64 new Humana shares for each of their optioned Humana shares, then the increased value of the additional optioned Humana shares would have been $27 06 per share--1 64 times $16 50. [FN23] Thus, the directors who received about $9 million of capital

Not Reported in A.2d                                                              Page 8

Not Reported in A.2d, 1999 WL 378125 (Del.Ch.)

**(Cite as: 1999 WL 378125 (Del.Ch.))**

appreciation on their 425,703 optioned Galen shares, would have realized even greater benefits of $11,519,523 under that alternative scenario.

> FN22 Amended Complaint, ¶ 16; Abrams Supp Aff ¶ 2.
>
> FN23 As explained in Abrams Supp Aff ¶ 3, one (pre-Distribution) option to purchase one Humana share would become one (post-Distribution) option to purchase 2.64 Humana shares

3. The Alleged Use of "Inside Information"

Finally, the self-dealing claim is deficient because the plaintiff has not adequately pled that the post-Distribution Humana Directors misused inside information. The claim (to reiterate) is that the Humana directors misused their knowledge of undisclosed "pre-Distribution discussions" with Columbia to obtain Galen options for themselves. But, the complaint alleges that the Galen-Columbia discussions occurred *after* the Distribution, not before. Nor does the complaint disclose that the challenged expiration and vesting features of the option Adjustments conferred upon the post-Distribution Humana directors a benefit that was not shared equally by all other shareholders who continued to hold Humana options. [FN24]

> FN24 The defendants also raise, as an alternative argument, that the Humana stockholders' approval of the Humana Option Plan Amendments constituted a ratification whose effect was to extinguish the plaintiff's duty of loyalty claim. A fully informed shareholder ratification of a transaction will normally cause the transaction to be reviewed under the business judgment review standard. *See* 8 *Del. C.* § 144(a)(2); *In re Wheelabrator Technologies, Inc. Shareholders Litig.*, Del. Ch., 663 A.2d 1194, 1203 (1995) ( *"Wheelabrator II"* ) (finding that 8 *Del. C.* § 144(a)(2) prevents "interested" transactions from being voidable if they are approved in good faith by a majority of

disinterested stockholders."). Ratification does not, however, extinguish a duty of loyalty claim. *Id.* Where a duly ratified transaction is challenged as a breach of fiduciary duty, to avoid dismissal a plaintiff must (i) "capture in its pleadings the formidable yet elusive elements of an action for corporate waste in order to pierce" the business judgment rule presumption; or (ii) provide sufficient, specific allegations that the stockholder approval was defective due to disclosure deficiencies in the proxy statement. *See In re the Walt Disney Company Derivative Litig.*, Del. Ch., C.A. No. 15452, mem. op. at 49-51, Chandler, C. (Oct. 7, 1998); *see also Solomon v. Armstrong*, Del. Ch., C.A. No. 13515, mem. op. at 55, Chandler, C. (Mar. 25, 1999) ("[S]o long as the shareholder vote to approve or disapprove the transaction was made on a fully-informed, non-coerced basis, that vote operates *ex proprio vigore* as an independent foundation for the application of the business judgment rule.").

The plaintiff has not made that showing. He has failed to state a claim that the Proxy Statement disclosures were deficient. He has also seemingly abandoned his claim that the Humana Option Adjustments for continuing Humana employees and directors amounted to waste, and (as discussed *infra* ) his other waste claims are legally insufficient as well. Because the business judgment rule presumptively protects the Humana directors' decision to make the Adjustments, and the plaintiff has not alleged facts that rebut that presumption, the duty of loyalty claim fails on ratification grounds as well.

B. The Waste Claims

The plaintiff's second and third principal claims are that the Humana Option Plan Amendments that related to the Galen employees and the Galen Directors Plan amounted to corporate waste. These claims are analyzed separately.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A 2d                                                          Page 9

Not Reported in A 2d, 1999 WL 378125 (Del Ch.)

(Cite as: 1999 WL 378125 (Del.Ch.))

1 The Adjustment of Humana Options Held by Post-Distribution Galen Employees

The analysis of these claims must begin with 8 *Del, C.* § 157, which authorizes a Delaware corporation to create and issue options to purchase its shares, and provides that "[i]n the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such ... options and the sufficiency thereof shall be conclusive." [FN25] Accordingly, a claim of waste will not succeed unless the plaintiff is able to allege facts demonstrating that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." [FN26] Expressed in somewhat different terms, the pleaded facts must show "an absolute lack of consideration, rather than inadequate consideration." [FN27] That "extreme test [is] very rarely satisfied by a shareholder plaintiff, because if under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." [FN28]

> FN25 *See also Zupnick v. Goizueta,* Del Ch., 698 A 2d 384, 387 (1997)
>
> FN26 *Grobow v. Perot,* Del Supr., 539 A 2d 180, 189 (1988) (quoting *Saxe v. Brady,* Del Ch., 184 A 2d 602, 610 (1962))
>
> FN27 *Pogostin v. Rice,* Del Supr., 480 A 2d 619, 625 (1984) (quoting *Michelson v. Duncan,* Del Supr., 407 A 2d 211, 224 (1979))
>
> FN28 *Zupnick,* 698 A 2d at 387 (quoting *Steiner v. Meyerson,* Del Ch., C A No. 13139, mem op at 2, Allen, C (July 18, 1995)

*7 The issue is whether the complaint satisfies that "extreme test." The plaintiff contends that it does, because after the Distribution became effective, the former Humana employees who stayed on with Galen had effectively been "terminated" as

employees of Humana As a consequence, the Humana Board had a duty to treat those departing employees as terminated, with the result that those employees' unvested options would have expired at the time of the Distribution Accordingly, plaintiff concludes, by accelerating the vesting of those options, the Humana Board committed waste by causing Humana to give the departing employees a benefit that the corporation was not legally obligated to give

The flaw in this reasoning is that the complaint does not adequately claim that the Humana Stock Option Plans "must be read" to require that those Humana employees who became employees of Galen after the Distribution be regarded as "terminated." No cited provision, definition, or language in the Plans mandates such a reading, and the Humana Option Plans explicitly permitted the Compensation Committee, in its discretion, to accelerate the vesting of the Options Consequently, the pleaded facts do not support the contention that the Humana employees who would continue on with Galen were "terminated" as a consequence of the Distribution

Nor does the complaint allege that no consideration flowed to Humana as a result of the Humana Option Plan Amendments. Those Amendments were necessary because Galen was to be spun-off in the Distribution The objective of the Amendments was both to retain the services of Humana (but soon-to-be Galen) employees before the Distribution became effective, and to retain their services thereafter when they would be working in their same jobs, but as Galen employees. By inducing the continued services of these employees, the Amendments resulted in consideration flowing to Humana. [FN29] Consideration also flowed for another reason. In the absence of the Amendments, the (new) Galen employees might have asserted a legal claim that they had not been terminated as Humana employees, and therefore were entitled to take advantage of the Humana Option Plan's capital adjustment provision. To the extent the Amendments eliminated that potential claim, they resulted in consideration to Humana in this form as well.

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A 2d                                                    Page 10

Not Reported in A 2d, 1999 WL 378125 (Del Ch.)

**(Cite as: 1999 WL 378125 (Del.Ch.))**

FN29 *See e.g., Zupnick,* 698 A 2d at 388-89 ("consideration for stock options is often the reasonable prospect of obtaining the employee's valued future services").

2 The Galen Directors Plan

The plaintiff's third and final claim is that the Galen Directors Plan constituted a waste of assets. It will be recalled that in connection with the Distribution, defendants Grissom, Landrum, and Young resigned from the pre-Distribution Humana Board and joined the post-Distribution Galen Board as non-employee outside directors. The Galen Directors Plan granted each of these former Humana directors 5,000 restricted Galen shares, plus an additional 1500 shares for each three year period of continuous service on the Galen Board.

The plaintiff claims that those features of the Galen Directors Plan were unfair and wasteful to Humana, but nowhere did he support that claim legally or factually in his brief or at oral argument. Because the Galen Directors Plan was approved by a majority of disinterested directors, it was entitled to the protective presumption of the business judgment rule. Any suggestion that that Plan amounts to waste is unsupported by the pleaded facts, which show that Humana received consideration for the grant of restricted Galen shares, namely, the inducement to Messrs. Grissom, Landrum, and Young to remain in Humana's service during the period from December 1992 to the effective date of the Distribution, and thereafter to perform services for Galen as post-Distribution Galen non-employee directors. [FN30]

FN30 That latter benefit would flow to Humana stockholders, albeit in their capacity as Galen stockholders.

* * *

*8 In addition to being legally deficient under Rule 12(b)(6), the complaint also fails to comply with the pleading requirements of Chancery Court Rule 23.1, because it does not allege particularized facts showing that a demand on the post-Distribution Humana Board would have been futile. Under Delaware law, the requirement of a pre-suit demand will be excused only if the plaintiff alleges particularized facts creating a reason to doubt that (i) the directors who approved the transaction were disinterested or independent, or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. [FN31] The amended complaint satisfies neither of these criteria.

FN31. *Aronson,* 473 A 2d at 814

The post-Distribution Humana directors constituted a majority of the Humana board at the time the original complaint was filed. No particularized pleaded facts suggest that those directors had any improper financial interest in, or engaged in self-dealing by approving, the Amendments or the Galen Adjustment Plan. With respect to the claims challenging the validity of the option Adjustments for Galen directors and employees and the Galen Directors Plan, the complaint shows that the post-Distribution Humana directors were disinterested and independent, and nothing in that pleading suggests otherwise. [FN32]

FN32. The cases relied on by the plaintiff to satisfy *Aronson's* first prong are inapposite, because there (unlike here) the directors were alleged to have received a personal financial benefit. *See Bergstein v Texas Int'l Co,* Del Ch., 453 A 2d 467, 471 (1982) (new stock appreciation rights); *Siegman v Tri-Star Pictures, Inc,* Del. Ch., C.A. No. 9477, Jacobs, V.C. (May 30, 1989) (substantial Coca-Cola dividends). No such personal benefit is alleged to have resulted from the economically neutral adjustment of the options in the instant case. *See Cinerama Inc v Technicolor, Inc,* Del. Ch., 663 A.2d 1134, 1151-52 (1994), *aff'd,* Del.Supr, 663 A 2d 1156 (1995) (plaintiff must show directors were "especially susceptible" to an opportunity for personal enrichment or that they would behave "differently in this instance than one would expect a reasonable person in the same or similar circumstances to act").

© 2005 Thomson/West. No Claim to Orig U.S. Govt. Works.

Not Reported in A 2d

Not Reported in A 2d, 1999 WL 378125 (Del Ch )

(Cite as: 1999 WL 378125 (Del.Ch.))

The plaintiff has not satisfied *Aronson's* second prong either As earlier discussed, the complaint states no cognizable claim of waste because it pleads no facts demonstrating a total absence of consideration flowing to Humana for adopting the Humana Option Plan Amendments and the Galen Directors Plan The complaint also alleges no particularized facts that show the various Amendments and Adjustments were not otherwise the product of a valid business judgment [FN33] Accordingly, the motion to dismiss under Rule 23 1 is also well-founded.

> FN33 *See Kahn v Tremont Corp*, Del. Ch , C.A No 12339, mem op at 16, Allen, C (Apr 22, 1994) (*Aronson's* second prong is "directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review" and the test "is thus necessarily high, similar to the legal test for waste "); *Levine v Smith,* Del Supr , 591 A 2d 194, 207 (1991) ("Plaintiffs' pleading burden under Rule 23 1 is also more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss "); *In re Chrysler Corp. Shareholder Litig ,* Del Ch , C.A No 11873, mem op at 7-8, Jacobs, V.C (July 27, 1992) ("[D]emand is not excused from the complaint if it appears that the challenged transaction could, at least as easily, serve a valid corporate purpose as an improper purpose ")

### IV CONCLUSION

For the reasons stated above, the defendants' motion to dismiss the amended complaint is granted IT IS SO ORDERED

Not Reported in A 2d, 1999 WL 378125 (Del Ch )

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3101575 (D.Del.)

(Cite as: 2004 WL 3101575 (D.Del.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(Formerly Known as Mosler, Inc.) and its
Affiliates, as Assignee of Certain Claims Pursuant
to the Second Amended Joint
Plan of Liquidation of MDIP, Inc. and its Affiliates,
Plaintiff,
v.
Michael RAPOPORT, William A. Marquard,
Thomas R. Wall, IV, Robert A. Young,
III, and Kelso & Co., Inc., Defendants.
No. C.A. 03-779(GMS).

Nov. 29, 2004.
Michael F. Bonkowski, Mark Minuti, Saul Ewing
LLP, Wilmington, DE, for Plaintiff.

Paul J. Lockwood, Eric M. Davis, Skadden, Arps,
Slate, Meagher & Flom, Wilmington, DE, for
Defendants

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On August 5, 2003, plaintiff Litigation Trust of
MDIP, Inc. ("Mosler") filed a complaint against the
above-named defendants (D.I. 1), and on February
9, 2004, filed an amended complaint (D.I.28),
which states four causes of action. The first two
causes of action are for breach of the fiduciary
duties of due care, good faith and loyalty, with
Count I against defendants Marquard, Wall and

Young (collectively, the "Kelso Directors") (id.¶¶
81-84), and Count II against defendant Rapoport (id.
¶¶ 85-88). In Count III, Mosler seeks avoidance
and recovery of constructively fraudulent transfers
under 11 U.S.C. § 548(a)(1)(B) against Kelso &
Co., Inc. ("Kelso"). (D.I. 28 ¶¶ 89-94.) Similarly,
in Count IV Mosler seeks avoidance and recovery
of constructively fraudulent transfers under 11
U.S.C. § 544(b) against Kelso (D.I. 28 ¶¶ 95-
101.) Currently before the court is the defendants'
March 10, 2004 motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6) (D.I.35.) For the following
reasons, the court will deny the defendants' motion.

II. JURISDICTION

The court's jurisdiction is pursuant to 28 U.S.C. §
1332 (2004)

III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6) should be granted when,
accepting all well-pleaded factual allegations as
true, the plaintiff is not entitled to relief as a matter
of law. *See In re Burlington Coat Factory Sec
Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997). "A
complaint should be dismissed only if, after
accepting as true all of the facts alleged in the
complaint, and drawing all reasonable inferences in
the plaintiff's favor, no relief could be granted under
any set of facts consistent with the allegations of the
complaint." *See Trump Hotels & Casino Resorts,
Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d
Cir.1998) In a motion to dismiss for failure to state
a claim, the moving party has the burden of
persuasion *See Kehr Packages, Inc. v. Fidelcor,
Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991) While the
court must accept the factual allegations in the
complaint as true, it "need not credit a complaint's
'bald assertions' or 'legal conclusions' " *See In re
Burlington Coat Factory Sec. Litig.,* 114 F.3d at
1429 (citation omitted). Therefore, "[a] complaint

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 3101575 (D.Del.)

**(Cite as: 2004 WL 3101575 (D.Del.))**

which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996)

IV BACKGROUND

In its amended complaint, Mosler alleges the detailed set of facts (totaling 80 paragraphs) on which it bases its four claims for relief. (D.I.28.) The following is a brief summary of that background. For the purpose of this motion, the court assumes all allegations of fact to be true.

"Through leveraged buyouts in 1986 and 1990, Kelso acquired control of Mosler, a manufacturer of physical security products and systems, and installed defendants Marquard, Wall and Young (collectively, the 'Kelso Directors') on Mosler's Board of Directors." (Id.¶ 2.) From 1992 to 1995, Mosler's sales increased from $203.7 million to $216.9 million. (Id.¶ 26.) Then, in 1995, defendant Rapoport was hired as President and CEO of Mosler (id.¶ 30), despite the fact that he had no prior experience as a CEO of a company of Molser's stature (id.¶ 33.) The Kelso Directors allegedly consented to his hiring on the basis of two lines in a one-page memorandum written by the outgoing CEO. (Id.¶ 30.) There was no discussion of "succession planning" at either of the two board meetings immediately preceding Rapoport's hiring (id.¶ 29), and there was no consideration of any alternative candidates (id.¶ 31.)

*2 In October 1998, Mosler acquired another security business, named LeFebure, from a company called De La Rue for $39.2 million. (Id.¶ 36.) Prior to the acquisition, Rapoport had assumed responsibility for Mosler's due diligence without formal board approval. (Id.¶ 38.) However, he failed to hire outside consultants to assist in the valuation and due diligence process, relying instead on numbers provided by De La Rue and the evaluations of his own personnel. (Id.¶ 39.) The Kelso Directors gave their approval to begin negotiations with De La Rue at a special September 1998 board meeting, but did so without the benefit

of any tangible information concerning the proposed acquisition. (Id.¶ 40.) Unfortunately, LeFebure's financial condition was not as good as was originally represented by De La Rue. (Id.¶ 42.) Thus, it turned out that Mosler had grossly overpaid for LeFebure. (Id.) This problem was compounded by the fact that Rapoport failed to retain key personnel from LeFebure (id.¶ 43) and otherwise mismanaged the integration of the two businesses (id.¶ 45), resulting in "a serious deterioration of Mosler's liquidity (id)

Subsequent to the LeFebure acquisition, mismanagement by Rapoport and the Kelso Directors continued. In 1999, Mosler attempted to convert to a new enterprise software system, which was essential to the proper functioning of its business. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house information technology ("IT") employees that this type of conversion would require them to hire outside specialists. (Id.¶ 47.) However, Rapoport ignored this advice and, with the approval of the Kelso Directors, set out to convert the new system using only the in-house IT staff. (Id.¶¶ 48-49.) As a result, the conversion was not entirely successful, and for the next several years Mosler had difficulty invoicing customers, collecting receivables, tracking inventory, etc. (Id.¶ 50.) Furthermore, Rapoport failed to address "sustained and systematic flaws" in Mosler's inventory management system, resulting in untimely deliveries to customers and a loss of goodwill. (Id.¶¶ 52-53.) Rapoport and the Kelso Directors also failed to institute standard internal control procedures for ensuring timely invoicing of customers and collection of accounts receivable. (Id.¶ 54.) As a result, Mosler's accounts receivable rose from $46 million in 1995 to nearly $100 million in 1999. (Id.¶ 55.) Yet, there was no discussion of these problems at either the February 1999 board meeting or the May 1999 board meeting. (Id.¶¶ 56-57.) Thus, Mosler contends, the Kelso Directors' failed to properly monitor Rapoport's management of the company or to investigate the sudden explosion of the accounts receivable. (Id.¶ 58.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                                                    Page 3

Not Reported in F Supp 2d, 2004 WL 3101575 (D Del )

(Cite as: 2004 WL 3101575 (D.Del.))

"Moreover, on at least ten occasions between November 1997 and January 2001, certain of the Kelso Directors were approached by veteran, senior Mosler employees about the threat that Mosler's serious business problems and Rapoport's gross mismanagement posed to the company." (Id ¶ 60.) Rapoport allegedly fired at least one of these employees in response to the complaints, and effectively forced another to resign. (Id ) Instead of investigating these reports of mismanagement and attempting to address the problems identified, the Kelso Directors ignored the reports and "actively took steps to ensure that any additional concerns of Mosler's employees would not be brought to the Board's attention " (Id ¶ 61 )

*3 Mosler's financial problems become so serious that its outside auditor and independent accountant, Deloitte, issued a letter in September 1999 to Mosler's board advising it that the matters summarized in the letter were "reportable conditions" with respect to the company's internal controls (Id ¶ 66 ) " 'Reportable conditions' are significant deficiencies in the design or operation of internal control, which could adversely affect Mosler's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements " (Id.) Accompanying Deloitte's letter was a report identifying more than forty problems with Mosler's internal controls and suggesting corrective action. (Id ) These problems included:
  1 Failure to reconcile the progress billings detail to the general ledger;
  2. Duplication of invoices for time and materials;
  3 Failure to post cash disbursements in a timely fashion, resulting in "unusual reconciling items;"
  4 Unexplained discrepancies in reported accrued vacation time between the detail and the general ledger;
  5 Lack of corporate oversight and accountability with respect to service contracts, resulting in lost contracts; and
  6 Inaccurate and untimely fulfillment of branch orders for replacement parts from headquarters.
(Id ¶ 67 ) Neither Rapoport nor the Kelso Directors took any corrective action in response to Deloitte's warning (Id ¶ 68 )

Again in November 2000, Deloitte issued another letter to the board advising it that the conditions reported in the letter were "material weaknesses " (Id ¶ 70 ) "A material weakness is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts material to Mosler's financial statements might occur and not be detected within a timely period by Mosler's employees." (Id ) This letter also included a report, this time identifying over fifty problem areas, many of which were identified in the 1999 letter and report. (Id ¶ 71 ) Again, neither Rapoport nor the Kelso Directors took any remedial action. (Id ¶ 72 ) Consequently, Mosler alleges that Rapoport and the Kelso Directors knew or were on constructive notice that the financial statements and results prepared by Mosler's management were materially misstated and misleading (Id ¶ 73 ) Specifically, the management reported a net loss in 2000 of nearly $11 million, while the net loss reported in Mosler's audited financial statements was nearly $22 million (Id ¶ 74 )

Mosler's financial problems continued in this direction until August 6, 2001, when it filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (Id ¶ 79 ) On or about October 17, 2001, Mosler's assets were sold at auction for nearly $28 million, but Mosler's unsecured creditors did not receive any distribution from the proceeds of the sale. (Id ¶¶ 79-80.) There is more than $200 million in unsecured debt (Id ¶ 4 ) Mosler now seeks to recover, on behalf of the unsecured creditors, damages for breach of fiduciary duties by Rapoport and the Kelso Directors, as well as management fees fraudulently transferred to Kelso by Mosler in the years prior to its bankruptcy. (Id ¶ 5 )

V DISCUSSION

A COUNT I--Breach of Fiduciary Duty Against the Kelso Directors

*4 Mosler alleges the Kelso Directors breached their fiduciary duties by failing to be informed

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 3101575 (D.Del.)

**(Cite as: 2004 WL 3101575 (D.Del.))**

before making business decisions, failing to employ rational business practices, failing to take action in circumstances where due attention would have prevented harm, failing to exercise good faith judgment with regard to Mosler's information and reporting systems, ignoring deficiencies in Mosler's internal control system and the account improprieties reported to them, and failing to ensure the accuracy and reliability of Mosler's financial statements. (D.I.28 ¶ 83.)

The Kelso Directors argue that this breach of fiduciary duty claim is barred by Mosler's certificate of incorporation, which limits the liability of directors to the corporation or stockholders pursuant to Del.Code Ann. tit. 8, § 102(b)(7). Specifically, the certificate of incorporation provides:

No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.

(D.I. 25 at A134.) Mosler counters by citing two non-binding cases for the proposition that such provisions are inapplicable when the action is brought for the benefit of creditors in a bankruptcy proceeding. *See Ben Franklin Retail Stores, Inc. v. Kendig*, No. 97C7934, 2000 U.S. Dist. LEXIS 276, at * 23-*24 (N.D.Ill. Jan. 12, 2000); *Pereira v. Cogan*, No. 00 Civ. 619(RWS), 2001 U.S. Dist. LEXIS 2461, at *29-*38 (S.D.N.Y. Mar. 13, 2001).

The court finds persuasive a recent (but unpublished) decision of the Court of Chancery of Delaware, in which Vice Chancellor Noble applied § 102(b)(7) in a suit brought by unsecured creditors against the directors of a company in bankruptcy. *See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, No. Civ. A. 20228-NC, 2004 WL 1949290, at *9 (Del.Ch.

Aug. 24, 2004). Although *Elkins* did not directly address the issue presented here, it is clear that application of § 102(b)(7) in cases involving creditors was not seen as problematic. Therefore, the court believes Delaware law permits defensive use of § 102(b)(7) provisions even when the suit is for the benefit of a creditor.

As a result, it would seem that the duty of care portion of Count I could be dismissed, leaving only the duty of loyalty/good faith portion to be scrutinized for the requisite factual allegations. However, "[k]nowing or deliberate indifference by a director to his or her duty to act faithfully *and with appropriate care* is conduct ... that may not have been taken honestly and in good faith to advance the best interests of the company." *In re The Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del.Ch. May 28, 2003) (emphasis added). In other words, "[w]here a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either 'not in good faith' or involve 'intentional misconduct' [of the type contemplated by § 102(b)(7) ]." *Id.* at 290. Thus, regardless of whether the claim is labeled as a breach of the duty of care, loyalty, or good faith, when a § 102(b)(7) provision is involved the underlying alleged facts must tend to show that the defendants *"knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* at 289 (emphasis in original).

*5 Viewing the totality of the allegations, the court believes Mosler has met its burden of alleging facts sufficient to show that the Kelso Directors *"knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." While it may be the case that the Kelso Directors were justified in each and every decision they made, it would be inappropriate for the court to make such a determination before adequate discovery has taken

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 5

Not Reported in F.Supp.2d, 2004 WL 3101575 (D.Del.)

(Cite as: 2004 WL 3101575 (D.Del.))

place. Thus, the defendants' motion to dismiss with regard to Count I will be denied. [FN1]

> FN1. The defendants also argue that the business judgment rule insulates them from liability. The defendants' formulation of the business judgment rule is that there can be no liability "so long as the directors' decision 'can be attributed to any rational business purpose.' " (D.I. 36 at 24.) Since the court finds that Mosler has alleged facts sufficient to show (if proven) that the defendants "*knew*" that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss," then those decisions surely could not be attributable to any rational business purpose.

B. COUNT II--Breach of Fiduciary Duty Against Rapoport

The factual basis for Count II is largely the same as for Count I. However, Mosler argues that the § 102(b)(7) provision in its charter is additionally inapplicable to Rapoport because he is both an officer *and* a director, whereas § 102(b)(7) is limited on its face to directors. Rapoport counters by arguing that "[w]here a defendant was both an officer and a director, he can only be sued for actions taken solely as an officer, and the plaintiff must 'highlight any specific actions [the defendant] undertook as an officer (as distinct from a director)' " (D.I. 50 at 2.) Here, he says, Mosler has not made any specific distinctions, so the § 102(b)(7) provision should protect him. (Id.)

To the extent that Rapoport acted in his capacity as a director, the § 102(b)(7) provision applies to him in the same way it applies to the Kelso Directors. In other words, the plaintiff must allege facts sufficient to show that Rapoport "*knew* (he was) making material decisions without adequate information and without adequate deliberation, and that (he) simply did not care if the decisions caused the

corporation and its stockholders to suffer injury or loss." To the extent that Rapoport acted solely in his capacity as an officer, he is not insulated by the § 102(b)(7) provision at all.

Therefore, the defendants' motion to dismiss Count II of the complaint will be denied.

C. COUNTS III & IV--Constructively Fraudulent Transfers

In Counts III and IV, Mosler seeks to avoid and recover for constructively fraudulent transfers from Mosler to Kelso totaling $150,000 and $800,000 in violation of 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. The defendants argue that Mosler's amended complaint merely restates the elements of constructive fraud under these sections, without asserting any facts to support its claims. (D.I. 36 at 36-38.) Admittedly, the factual allegations supporting these claims are sparse. However, Mosler does allege two specific amounts it paid to Kelso for "management fees" and that it received nothing in return. (D.I. 28 ¶¶ 89-101.) It is also true that Mosler filed for bankruptcy during the relevant time period, which tends to shore up Mosler's assertion that the transfers were completed during insolvency or that the transfers rendered the company insolvent. Therefore, the court believes it would be premature to dismiss these claims before adequate discovery. Thus, the defendants' motion to dismiss Counts III and IV will be denied.

V. CONCLUSION

*6 For the aforementioned reasons, the defendants' motion to dismiss all counts of the plaintiff's amended complaint will be denied.

*ORDER*
IT IS HEREBY ORDERED that:

The defendants' motion to dismiss all counts of the second amended complaint (D.I 35) be DENIED.

Not Reported in F.Supp.2d, 2004 WL 3101575 (D.Del.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 3101575 (D Del.)

**(Cite as: 2004 WL 3101575 (D.Del.))**

Page 6

    **Motions, Pleadings and Filings (Back to top)**

• 1:03CV00779 (Docket) (Aug  05, 2003)

END OF DOCUMENT

© 2005 Thomson/West  No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F. Supp.2d

Page 1

Not Reported in F Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

**H**

United States District Court, C.D. California
Sheila MCMICHAEL; Donald G. Kennedy; Sharell
J. Kennedy; James E. Gemmill;
1111426 Ontario, Inc ; Tom Hoh, on behalf of
themselves and all others
similarly situated, Plaintiffs,
v.
UNITED STATES FILTER CORPORATION;
Richard Heckmann; Nicholas C. Memmo; Andrew
D. Seidel; Robert S. Hillas; John L.
Diederich; Ardon E. Moore;
C. Howard Wilkens, Jr.; J. Danforth Quayle; Arthur
B. Laffer; Albert E.
Osborne, Jr.; Does, 1 through 25, inclusive,
Defendants.
**Nos. EDCV 99-182VAP (MCX), DECV
00-340VAP (MCX), EDCV 00-341VAP (MCX),
EDCV 00-
528VAP (MCX), EDCV 00-196VAP (MCX),
EDCV00-223VAP (MCX).**

Feb 23, 2001
Order Denying Reconsideration April 17, 2001

ORDER GRANTING 1) THE MOTION TO
DISMISS OF DEFENDANTS UNITED STATES
FILTER
CORPORATION, RICHARD HECKMANN,
NICHOLAS C. MEMMO, ANDREW D. SEIDEL,
JAMES E.
CLARK, ROBERT S. HILLAS, JOHN L.
DIEDERICH, ARDON E. MOORE, C. HOWARD
WILKENS,
JR., J. DANFORTH QUAYLE, ARTHUR B.
LAFFER, AND ALBERT E. OSBORNE, JR.;
AND 2)
THE MOTION TO DISMISS OF DEFENDANTS
VIVENDI S.A., EAU ACQUISITION CORP.,
AND
JEAN-MARIE MESSIER

PHILLIPS, J.

*1 The Motions to Dismiss filed by Defendants
United States Filter Corporation, Richard
Heckmann, Nicholas C. Memmo, Andrew D.
Seidel, James E. Clark, Robert S. Hillas, John L.
Diederich, Ardon E. Moore, C. Howard Wilkens,
Jr., J. Danforth Quayle, Arthur B. Laffer, Albert E.
Osborne, Vivendi S.A., Eau Acquisition Corp. and
Jean-Marie Messier came before the Court for
hearing on January 22, 2001. After reviewing and
considering all papers in support of, and in
opposition to, the Motions, and hearing the
arguments advanced by counsel, the Court orders
that the Motions to Dismiss are GRANTED.

I. Background
Vivendi S.A. and its wholly owned subsidiary, Eau
Acquisition Corp. ("Vivendi") acquired United
States Filter ("US Filter") in 1999. [Plaintiffs'
Second Amended Consolidated Class Action
Complaint ("Second Am. Compl.") at 1; Plaintiffs'
Complaint ("Compl.") at 3.]

Plaintiffs are stockholders in U.S. Filter. They filed
a class action suit [FN1] on March 23, 1999
against Richard Heckmann, Chairman of the Board
of Directors, President, and Chief Executive Officer
of U.S. Filter, as well as Nicholas C. Memmo,
Andrew Seidel, James Clark, Robert Hillas, John
Diederich, Ardon Moore, C. Howard Wilkins, J.
Danforth Quayle, Arthur B. Laffer, and Alfred
Osborne, Directors of U.S. Filter ("US Filter
Defendants"). [FN2]

> FN1 Lead Plaintiffsinclude: Donald and
> Sharell Kennedy, James Gemmill,
> 1111426 Ontaio Inc., Tom Hoh, Cam Co.,
> Sheila McMichael, all shareholders of US.
> Filter whose shares were purchased for
> $31.50. [Second Am. Cmpl. at 4-5.] The
> proposed class consists of: all common
> stockhlders in U.S. Filter who are being
> and will be harmed by Defendants'alleged
> harmful actions in connection with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.