Not Reported in F.Supp.2d                                                      Page 2

Not Reported in F.Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

Vivendi's acquisition of U.S. Filter ("the Class"), including those who tendered their shres to Vivendi pursuant to the tender offer ("tendering subclass") [Second Am Compl. at 1.] This Court gave Plaintiffs 45 days frm the date of the Court's disposition on these motions to dismiss to file for class certification [*See* October 31, 2000 Orde Continuing Deadline for Filing Motion Opposition to Motion o Dismiss.]

FN2 Nicholas Memmo s not a Director of U.S. Filter, although he is named in Plaintiff' Complaint [Carl Alan Roth Declaration, ¶ 10, Ex H (solicittion/ recommendation statement in which Mr. Memmo is not mentione as Director receiving payment) at I-4.] Mr. Memmo is an Officer o U.S. Filter and did not participate in the decision to recommend the Vivendi transaction

US Filter was a global provider of industrial, municipal, commercial, and consumer water and wastewater systems, products, and services. It announced on March 22, 1999 that its Board of Directors ("Board") had approved a tender offer by Vivendi, a French environmental services provider, to acquire all outstanding stock (180 million shares) of U.S. Filter for $31.50 a share, or approximately 5.73 billion dollars ("Vivendi transaction"). [Compl. at 4, 6; Second Am. Compl. at 1.] As part of the agreement, U.S. Filter would merge with Eau Acquisition Corp ("merger") [Second Am. Compl. at 11-12.]

Plaintiffs allege the Board, in agreeing to the merger and tender offer, breached their fiduciary duties of care and loyalty. [Second Am. Compl. at 2.] The Board, Plaintiffs claim, did not use reasonable care to maximize shareholder value by failing to ascertain U.S. Filter's true market value before agreeing to the share price [Second Am Compl. at 2.] Plaintiffs further allege three members of the Board--Messrs Seidel, Heckmann, and Spence ("Inside Directors")--accepted additional consideration of up to 11.55 million dollars from Vivendi ("additional payments"), or more than six

dollars a share beyond the price paid to shareholders, for their agreement. [FN3] [Second Am. Compl. at 2.] As further inducement, Vivendi agreed to "gross up" the payments to the Inside Directors by paying the taxes the Board was required to pay on the payments received in excess of $31.50 a share [Second Am. Compl. at 2-3.]

FN3. Although Plaintiffs allege Mr. Spence, the Chief Financial Officer of U.S. Filter, was a Director at the time of the offer, Defendants claim Mr. pence was an Officer, not a Director, and was not involved in the dcision to accept the offer. [US Filter's Notice of Motion and otion to Dismiss at 2, n. 1.] Mr. Spence, however, did receive payment from Vivendi. [Roth Decl., Ex. H.]

Plaintiffs allege: (1) Violation of Section 14(d)(7) of the Securities Exchange Act of 1934 ("the Act") and Rule 14(d)(10) promulgated thereunder by U.S. Filter Defendants; (2) Violation of Section 20(a) of the Exchange Act by Vivendi and Jean-Marie Messier, Chairman and CEO of Vivendi S.A. and the President of Eau Acquisition Corp.; and (3) breach of fiduciary duty by U.S. Filter Defendants. [FN4]

FN4. US Filter attacs Plaintiffs' third claim, and Vivendi attacks Plaintiffs' frst and second claims

II. Proceedings
**2** Defendants removed this case on May 21, 1999. On June 20, 2000, several cases arising from the Vivendi transaction were consolidated. [FN5]

FN5. The consolidate cases include: *Fagin v. Vivendi S.A. et al.*, 00-341(VAP); *CAM C. v. Eau Acquisition Corp., et al.*, 00-340(VAP); *Hack v. Vivedi S.A. et al.*, 00-528 (VAP); *Worry v. Vivendi S.A. et al.*, 00-196(VAP); and *Gothelf v. Eau Acquisition Corp., et al.*, 00-223(VAP).

Plaintiffs filed a Second Amended Consolidated Complaint on July 12, 2000. On December 4, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

Court ordered Defendants Vivendi S.A., Eau Acquisition Corp., and Jean Marie Messier to be added to the Second Amended Complaint [See December 4, 2000 Order.]

On September 25, 2000 U.S. Filter, Richard Heckmann, Nicholas Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diedrich, Ardon Moore, C. Howard Wilkens, Jr., J. Danforth Quayle, Arthur B. Laffer and Alfred E. Osborne filed a Motion to Dismiss accompanied by the Declaration of Carl Alan Roth.

On September 25, 2000 Vivendi S.A., Eau Acquisition Corp and Jean Marie Messier filed a Motion to Dismiss along with the Declaration of Andrew Houston.

Plaintiffs filed Opposition to the U.S. Filter Motion on November 8, 2000. Plaintiffs filed Opposition to the Vivendi Motion on November 8, 2000. Vivendi filed its Reply on December 8, 2000, and U.S. Filter filed its Reply on December 8, 2000.

### III. Legal Standard
#### A. Applicable Law

This case is before the Court pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

Breach of fiduciary duty is a state law claim, and as U.S. Filter is incorporated in Delaware, Delaware law applies to U.S. Filter's Motion to Dismiss. *CTS Corp v. Dynamics Corp.*, 481 U.S. 69, 90 107 S.Ct. 1637, 1650, 95 L.Ed.2d 67 (1987) ("This beneficial free market system depends at its core upon the fact that a corporation--except in the rarest situations--is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of incorporation."); *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982) (finding law of state of incorporation should govern corporation's internal affairs); Cal. Corp Code § 2116 (applying law of state of incorporation to liability for actions of directors or officers of foreign corporation);

*Batchelder v. Kawamoto,* 147 F.3d 915, 920 (9th Cir 1998).

#### B. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990). Nevertheless, "nothing in rule 12(b)(6) confines its sweep to claims which are obviously insupportable;" rather, if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations at hand, "a claim must be dismissed without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989).

*3 Although the same facts gave rise to both Motions to Dismiss, each Motion raises different issues. While one discussion of the facts suffices, the Motions are addressed separately below.

#### IV. The Vivendi Motion to Dismiss
Plaintiffs' first and second claims are directed at the Vivendi Defendants. [FN6] The Vivendi Defendants argue that Plaintiffs have failed to state a claim because: (1) The additional payments were not consideration or an integral part of the offer; (2) Rule 14(d)(10) does not regulate payments to executives for preexisting obligations; (3) without violation of Rule 14(d) of the Exchange Act, Plaintiffs have no Rule 20 violation; and (4) Plaintiffs' suit is barred by the statute of limitations. As Plaintiffs have not pled that the payments were additional consideration, they fail to make successful Rule 14(d)(10) and Rule 20 claims and their two claims against Vivendi are dismissed.

> FN6. Vivendi, S.A. i a French company. Eau Acquisition Corp. is incorporated in Delaware.

#### A. The Statute of Limitations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                    Page 4

Not Reported in F Supp 2d, 2001 WL 418981 (C D Cal ), Fed. Sec. L. Rep. P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

Vivendi claims complaints filed more than one year after the tender offer are barred by the statute of limitations. In *Lampf Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct 2773, 115 L Ed 2d 321 (1991) the Supreme Court established a uniform statute of limitations for Section 10(b) claims that "[l]itigation instituted pursuant to    10(b) and Rule 10b-5    must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf,* 111 S.Ct. at 2782; *Maki v Grenda,* 92-CV-0819E(M), 1993 WL 427456 at *2 (W.D.N.Y. Oct. 15, 1993) (applying *Lampf* to Rule 14(d)) [FN7]

> FN7  On December 20,1991, the President signed Senate Bill 543 into law, essentiallyoverruling *Lampf* The new law states that: "The limitation period for any private civil action implied under section 10(b) of thisAct that was commenced on or before June 19, 1991, shall be the litation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as suc laws existed on June 19, 1991 " 15 U.S.C § 78aa-1 *See riggs v Pace American Group, Inc ,* 170 F 3d 877 (9th Cir 1999) (annoncing rule replacing *Lampf* ) Senate Bill 543 has not yet been appled to Rule 14(d) Accordingly, the Court applies the one year tatute of limitations

Plaintiffs were put on inquiry notice by the publication of the tender offer materials on March 26, 1999 [Vivendi Mot. to Dismiss at 22.] Vivendi argues that only the first two of the six actions filed were timely--as they were filed before March 26, 2000 [Vivendi Mot to Dismiss at 22.]

Plaintiffs claim the commencement of a class action suspends the applicable statute of limitations as to all members of the class who would have been parties had the suit continued as a class action. [Opp'n to Vivendi Mot. at 20; *American Pipe and Constr Co V Utah,* 414 U.S. 538, 554, 94 S Ct 756, 38 L.Ed Ed 714 (1974) ("To hold to the contrary would frustrate the principal function of a

class suit "); *Crown, Cork & Seal Co v Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L Ed 2d 628 (1983) (holding that the filing of class action tolled the applicable statute of limitations for all asserted members of the class, not just for intervenors); *Griggs v Pace Am Group, Inc ,* 170 F.3d 877, 880 (9th Cir 1999); *but see Robbin v Fluor Corp ,* 835 F.2d 213, 214 (9th Cir.1987) (interpreting *American Pipe* not to allow tolling when the district court in the previous action had denied class certification, and when second action sought to relitigate the issue of class certification and thereby to circumvent the earlier denial).

**\*4** This Court gave Plaintiffs forty-five days from the disposition of this action to certify as a class. Moreover, Plaintiffs do not seek to relitigate the issue of class certification. The claims against Vivendi are not time barred.

B  Plaintiffs have not stated a claim that the payments to the Inside Directors were consideration for acceptance of the tender offer

Under Rule 14d-10, 17 C.F.R. § 240 14d-10, also known as the "all-holder-- best-price" rule:
  (a) No bidder shall make a tender offer unless:
  (1) The tender offer is open to all security holders of the class of securities subject to the tender offer; and
  (2) The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.
"Rule 14d-10 prohibits a bidder from making a tender offer that is made to all shareholders or that is made to shareholders at varying prices." *Epstein v MCA, Inc ,* 50 F 3d 644, 652-53 (9th Cir.1995), *rev'd on other grounds,* 516 U.S. 367, 116 S.Ct. 873, 134 L Ed 2d 6 (1996), *cert denied* 528 U.S. 1004, 120 S.Ct. 497, 145 L Ed 2d 384 (1999). The SEC, in promulgating Rule 14d-10, "emphasized the need for 'equality of treatment among all shareholders who tender their shares." ' *Epstein,* 50 F.3d at 655 (quoting S.Rep. No. 550, 90th Cong , 1st sess 10 (1967)). Rule 14d-10 ensures that all "holders of the same security are offered precisely the same consideration." *Epstein,*

© 2005 Thomson/West  No Claim to Orig. U.S Govt Works.

Not Reported in F Supp 2d    Page 5

Not Reported in F Supp.2d, 2001 WL 418981 (C.D Cal.), Fed Sec L Rep P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

50 F 3d at 657

Plaintiffs allege the payments to the three Directors were an "integral part" of Vivendi's tender offer, made to induce the Directors to tender their shares and endorse the transaction [First Am. Compl. ¶¶ 34-36 ]

Vivendi Defendants claim the payments to the three Directors had no relation to the purchase of stock, were not new consideration, and were merely "golden parachute" employment contracts [Vivendi Motion to Dismiss Second Amended Consolidated Class Action Complaint ("Vivendi Mot to Dismiss") at 9-10 ]

Much of the dispute between the parties over the payments centers on the precedential value of *Epstein v MCA, Inc*, 50 F 3d 644 (9th Cir 1995) ( *"Epstein I"* ) Even if *Epstein I* [FN8] retains precedential value and applies to this case, Plaintiffs still cannot state a claim on the subject of the payments In *Epstein I,* the Ninth Circuit held:

> FN8. In 1990, Matsusita Electric Industrial Co made a tender offer for the common stock of MCA, Inc., a Delaware corporation In a class action filed in Delaware court against MCA and its directors for breach of fiduciary duty, the Complaint alleged Matsushita's tender offer violated Rules 10b-3 and 14d-10 *See Epstein I* Plaintiffs alleged Matsushita violated Rule 14d-10 by offering preferential treatment in the tender offer to MCA principals Lew Wasserman and Sidney Sheinberg *Id* Plaintiffs alleged Matsushita offered a tax-driven stock swap arrangement to Wasserman, then MCA's chairman and chief executive officer, and a $21 million bonus to Sheinberg, then MCA's chief operating officer and owner of 1,170,00 shares of MCA common stock *Id*
> In *Epstein I,* the Ninth Circuit addressed two issues: Rule 14d-10 and the application of the full faith and credit clause to a Delaware court's settlement

procedure. The court held that Matsushita violated Rule 14d-10 by paying Wasserman consideration not offered to other shareholders, and found that plaintiffs were entitled to summary judgment on liability. *Epstein I,* 50 F.3d at 657.
The Supreme Court, in *Matsushita Elec Indus Co , Ltd v Epstein,* 516 U S. 367, 116 S.Ct 873, 134 L.Ed.2d 6 (1996), reversed and remanded *Epstein I,* ruling that the Ninth Circuit had to give full faith and credit to the Delaware court's settlement On remand in *Epstein v MCA, Inc ,* 126 F 3d 1235, *cert denied* 528 U.S. 1004, 120 S Ct 497, 145 L.Ed.2d 384 (1999) (*"Epstein II"* ), the Ninth Circuit interpreted the Supreme Court's ruling to govern only the issue of full faith and credit, noting: "None of these rulings on the merits of the Rule 14d-10 claims were disturbed by the Supreme Court in *Matsushita* ... The Court reversed our judgment and remanded for further proceedings solely on the basis of the first question ... 'Whether a federal court can withhold full faith and credit from a state court final judgment approving a class action settlement simply because the settlement released exclusively federal claims.' '

To be sure, the fact that a private purchase of stock and a public tender offer are both part of a single plan of acquisition does not ... render the purchase a part of a tender offer for purposes of Rule 14d-10. Rule 14d-10 does not prohibit transactions entered into or effected before, or after, a tender offer--provided that all material terms of the transaction stand independent of the tender offer

*Epstein I* did not address the issue of payment of preexisting obligations to executives of the target company As discussed below, because the payments in question were no more than golden parachute payments, which were disclosed to shareholders [Vivendi Mot. to Dismiss at 7;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

Houston Decl., Ex. 11 at 28], they were not additional consideration, and Defendants have not violated Rule 14d-10.

*5 First, despite Plaintiffs' argument that this is a matter for summary judgment, and should not be addressed on a motion to dismiss, Defendants' Motion is based on undisputed facts regarding the payments, not on the intent behind them. [See Plaintiffs' Opposition to Vivendi's Motion to Dismiss ("Opp'n to Vivendi Mot.") at 5; Vivendi's Reply ("Vivendi Reply") at 2.]

Second, upon examination, the substance of the 1998 employment agreements and 1999 agreements is identical. Both sets of agreements employ the same formula to determine the amount of payment. The 1998 employment agreements contained change of control provisions, entitling the executive to a payment of "base salary for the balance of the Employment Term, plus the target annual incentive bonus scheduled for each year following the Date of Termination for the balance of the Employment Term." [See Houston Decl., Exs. 8 (¶ 4(e)), 9(¶ 3.6), 10 (¶ 3.6).] The employment term of Messrs Spence and Seidel was thirty-six months, and of Mr. Heckmann, sixty-three months. [Houston Decl., Ex 9 (¶ 2), 10 (¶ 2), 8(¶ 1b).]

The 1999 employment agreements entitled the three executives to payments they were to receive under the change of control provision in the 1998 agreements [Houston Decl., Exs. 5 (¶ 3(l)), 6 (¶ 3(h)), 7(¶ 3(h)).] The agreements of Messrs Spence and Seidel provided for a payment of three times their base salary (corresponding to their thirty-six month employment terms) plus maximum bonuses of $1,950,000 to Mr. Spence and $2,100,000 to Mr. Seidel. [Exs. 6, 7 (¶ 3(h)).] Mr. Heckmann's agreement provided for a payment of five times his base salary (corresponding to his sixty-three month employment term) and a maximum bonus of $7,500,000. [Ex. 5 (¶ 3(i)).] The maximum payments were based on executive salaries and bonuses that would have been used in calculating the 1998 payments [Vivendi Mot to Dismiss at 7.] While the agreements themselves may have changed slightly in form, their substance

did not alter. Unlike Mr. Wasserman's payment in Epstein I, these payments were premised on a company's preexisting duty. 50 F.3d at 656 (noting two facts indicated the payments were integral: the redemption value of Wasserman's preferred stock incorporated the tender offer price by reference and the Capital Contribution and Loan Agreement was conditioned on the tender offer's success).

Third, the 1999 agreements were disclosed as part of Vivendi's Offer to Purchase [Ex. 11 at 28.] Although in oral argument, Plaintiffs' counsel argued that under Rule 14d-10, Defendants were obligated to disclose the "nature" of the payments in addition to disclosing their existence, Plaintiffs offer no support for this argument. The Supreme Court has indicated, to the contrary, that the Act was not intended to govern the fairness of the terms of a merger, but rather their disclosure. Santa Fe Industries, Inc v Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) ("The 'fundamental purpose' of the Act ... [is] implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern.")

*6 Fourth, the payments came not from Vivendi, but from U.S. Filter--the target corporation. Vivendi, in acknowledging the payments in the 1999 employment agreements, was doing no more than recognizing U.S. Filter's preexisting duty to pay its executives. Plaintiffs have not alleged facts sufficient to challenge Vivendi's assertion that the obligation to pay preexisted the tender offer. Plaintiffs argue that because talks between U.S. Filter and Vivendi began in 1996, predating the 1998 agreements, Vivendi cannot argue that it had not role in the agreements. [Opp'n to Vivendi Mot. at 9.] Vivendi counters that the earlier talks between the two companies were unrelated to the tender offer and instead dealt with a possible sale of certain Vivendi assets to U.S. Filter; therefore, when the tender offer was discussed, the 1998 payments were not an issue. [Vivendi Reply at 4.]

Defendants add that the payments, as part of the New Employment Agreements, were conditioned on the completion of the subsequent Merger of Eau

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7

Not Reported in F.Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

Acquisition Corp. and U.S. Filter--not the tender offer itself. [Vivendi Mot. to Dismiss at 10; Houston Decl., Exs. 5-7 (defining the effective date of the agreement as the merger date and providing the new agreement terminates should the Merger fail); Vivendi Reply at 3.] Plaintiffs' argument that the merger was contingent on the tender offer, and therefore the payments were integral [Opp'n to Vivendi Mot. to Dismiss at 13], begs the question. The payments were not integral to the tender offer because, as Defendants show, they merely recognized a preexisting duty.

Accordingly, the payments are not regulated by Rule 14(d)(10) and Plaintiffs' Rule 14(d)(10) claim against Vivendi is dismissed without leave to amend.

C. Without finding that Defendants violated Rule (14)(d) of the Exchange Act, the Court cannot find a violation of Section 20 of the Act.

As the Court has found that Vivendi did not violate Rule 14(d) of the Act, it cannot find liability under Section 20--a secondary liability provision. *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir.1999) (finding no secondary liability without primary violations).

V. The U.S. Filter Motion to Dismiss
US Filter Defendants bring their Motion on the following grounds: (1) U.S. Filter's Certificate of Incorporation bars the duty of care claim; (2) Plaintiffs' breach of fiduciary duty claim is barred by the Business Judgment Rule; and (3) Plaintiffs' fiduciary duty claim fails because the Vivendi transaction was ratified by U.S. Filter shareholders [US Filter's Notice of Motion and Motion to Dismiss ("US Filter Mot.")]. All of these attacks are directed only at Plaintiffs' third claim, the state law claim for breach of fiduciary duty. For the reasons set forth below, the Motion is granted.

A. Plaintiffs' breach of fiduciary duty claim is a direct claim.

Plaintiffs' third claim for breach of fiduciary duty targets both the alleged additional consideration and the transaction itself. Plaintiffs attack the payments

to the Inside Directors as unlawful and in violation of Rule 14(d), alleging the payments were "made pursuant to the merger, contingent on the merger and as an integral part of the merger." [Second Am. Compl. at 19; Plaintiffs' Opposition to U.S. Filter's Motion to Dismiss ("Opp'n to U.S. Filter Mot.") at 13; Second Am. Compl. at 10-12.] As both parties stipulated at the hearing on the Motion, Plaintiffs' third claim is a direct one.

B. US Filter Shareholders tendered their shares but did not ratify the Vivendi transaction.

*7 Defendants argue Plaintiffs' fiduciary duty claims fail because fully informed U.S. Filter shareholders ratified the Vivendi transaction. [US Filter Mot. at 20.]

With ratification, shareholder duty of care claims are extinguished. *Solomon v. Armstrong*, 747 A.2d 1098, 1115 (Del.1999); *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 890 (Del.Ch.1999) ("[T]he effect of untainted stockholder approval of the merger is to invoke the protection of the business judgment rule and to insulate the Merger from all attacks other than on the ground of waste"); *Van Gorkom*, 488 A.2d at 889.] Moreover, in the face of a claim of self-dealing, a fully-informed shareholder vote in favor of the challenged transaction maintains the Business Judgment Rule's presumptions. *Solomon*, 747 A.2d at 1116. The burden then shifts from Defendants to Plaintiffs to rebut the Rule and allege facts showing "no person of ordinary sound business judgment could view the benefits received as a fair exchange for the consideration paid by the corporation." *Solomon*, 742 A.2d at 1116.

Plaintiffs argue that there was never a shareholder vote, only a tendering of shares. Without such a vote, there can be no ratification. [Opp'n to U.S. Filter Mot. at 22.]

Defendants reply that the tender of shares by ninety-six percent of the shareholders *does* constitute ratification. [US Filter's Reply ("US Filter Reply") at 2 (citing *Cinerama*, 663 A.2d at 1176 (Del.1995) ("tender by an overwhelming majority

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.2d                                                                                      Page 8

Not Reported in F Supp 2d, 2001 WL 418981 (C.D Cal ), Fed. Sec. L. Rep. P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

of .. stockholders [is] .. approval and .. constitute [s] substantial evidence of fairness ")) ] Moreover, U.S. Filter disclosed the efforts of the Board to obtain the best price for U S Filter stock, the terms of the Agreement with Vivendi, and the details of the employment and voting agreements [US Filter Mot at 6-9; US Filter Reply at 3; Roth Decl at ¶ 9; Ex G at 243-384; Second Am. Compl at ¶¶ 2-4 ]

The term "ratification" is applied to several different situations, including shareholder approval of a stock option plan and a loan to or from a director or officer. *In re Wheelabrator Technologies, Inc Shareholders Litigation,* 663 A 2d 1194, 1201, n .4 (Del. Ch 1995) ( *"Wheelabrator II"* ); *Solomon,* 747 A 2d at 1115, n. 40. Moreover, ratification has a variety of effects on a board's decision, depending on the circumstances. *See id* In any event, a shareholder vote is a required component of ratification In *Wheelabrator II,* the court explained that in light of all the different methods of ratification, the term "has now acquired an expanded meaning intended to describe any approval of challenged board action by a *fully informed vote* of shareholders, irrespective of whether that shareholder vote is legally required for the transaction to attain legal existence " (emphasis added) 663 A 2d at 1201, n 4 Accordingly, Defendants' ratification defense is not a bar to Plaintiffs' breach of fiduciary duty claim

C US Filter's certificate of incorporation bars Plaintiffs' duty of care claim.

1 Judicial Notice

**\*8** Defendants argue U.S Filter's certificate of incorporation bars Plaintiffs' duty of care claims and ask the Court to take judicial notice of the certificate of incorporation. [US Filter Mot. at 23, n. 20; US Filter Request for Judicial Notice ] A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned [FN9]

Fed R Evid 201(b).

FN9. US Filter Defenants also ask the Court to take judicial notice of U.S. Filter'sQuarterly Report, the Solicitation Recommendation Statemnt, the Offer to Purchase, and U S. Filter's Current Report (exhiits G, H, I and J) The Court may take judicial notie of th contents of documents filed with an administrative agency *Lovelace v Software Spectrum, Inc,* 78 F.3d 1015, 1018, fn. (5th Cir 1996). Fed. Rule Evid. 201(b)(2); *Bryant v Avado Brads, Inc,* 187 F.3d 1271, 1283 (11th Cir.1999) (taking judicial notie of relevant public documents required to be filed with the SEC fo the purpose of determining what statements the documents containand not to prove the truth of the documents' contents); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (holding publicy filed SEC documents could be judicially noticed under at motin to dismiss stage); *Cortec Indus, Inc v Sum Holding L P,* 99 F.2d 42, 47 (2d Cir.1991) (citing *Kramer* ). Furthermore, Plaintiffs quote the documents in their Complaint. *Branch v Tunnell,* 14 F.3d 449 (9th Cir.1994), *cert. denied,* 512 U.S. 1219, 114 S.Ct 2704, 129 L Ed.2d 832. US Filter Defendants also ask te Court to take judicial notice of all five consolidated complains and four dismissals These requests are granted The Court alo takes judicial notice of the stock price in Exhibit K *Plevyv Haggerty,* 38 F Supp 2d 816, 835 (C D.Cal.1998) (finding sock price appropriate for judicial notice); *In re 3Com Securitis Litigation,* 1999 WL 1039715,\*4 (N D.Cal.1999) (taking judicia notice of closing stock price because cited by plaintiff in Complint and capable of verification) Finally, U.S. Filter asks the Cort to take judicial notice of Exhibit L, a collection of article concerning the company. As these contain facts in controversy nd are not publicly filed and easily verified, the Court dnies the Request as to Exhibit L.

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Not Reported in F Supp 2d                                                                      Page 9

Not Reported in F Supp 2d, 2001 WL 418981 (C D Cal ), Fed Sec L Rep P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

The certificate of incorporation of a Delaware corporation is a publicly filed document, and as such, can be judicially noticed *See In re Wheelabrator Technologies Inc Shareholders Litigation,* No Civ A 11495, 1992 WL 212595 at *11, 18 Del J Corp L 778, 800 (Del Ch Sept 1, 1992) (taking judicial notice of exculpatory clause in certificate of incorporation Rule as the certificate is filed with the office of the Secretary of State of Delaware, a source "whose accuracy cannot reasonably be questioned") (citing *Diceon Electronics, Inc v Calvary Partners, L P,* 772 F Supp 859 (D Del 1991) ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered ")

2 Certificate of Incorporation

Article VIII of U S Filter's certificate of incorporation provides:

> To the fullest extent permitted by the General Corporation law of Delaware .. a director of this corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director

[Declaration of Carl Roth, Ex F (U.S. Filter certification of incorporation).] Such exculpation clauses are valid under Delaware law. 8 Del. C. § 102(b)(7) (corporations are empowered to shield directors from breaches of the duty of care); *See Wheelabrator,* 1992 WL 212595 at *11.

Plaintiffs, however, argue Defendants' use of the certificate of incorporation is an affirmative defense and, as such, may not be used as a grounds for a motion to dismiss [Opp'n to U.S. Filter Mot at 23.] Plaintiffs cite *In re Fredericks of Hollywood, Inc Shareholder Litig,* 2000 Del Ch LEXIS 19 (January 21, 2000) in support of their argument The court in *Fredericks,* however, held that Defendants could use the exculpatory clause in the certificate of incorporation to shield them from duty of care claims, provided that "a dismissal on that ground does not prevent a plaintiff from pursuing well-pleaded claims that the directors breached their

fiduciary duty of loyalty " 2000 Del Ch LEXIS 19 at *19 (citing *Emerald Partners v Berlin,* 726 A 2d 1215 (Del 1999)) Here, dismissal of Plaintiffs' breach of fiduciary duty of care claims by the exculpatory clause does not preclude Plaintiffs' duty of loyalty claim.

Accordingly, U.S. Filter's certificate of incorporation bars Plaintiffs' third claim insofar as it is based on the duty of care.

D Plaintiffs fail to assert facts to overcome the presumption of the Business Judgment Rule.

1 The Business Judgment Rule

**\*9** Plaintiffs' third claim [FN10] for breach of the duties of care and loyalty fails to overcome the strong presumption of the Business Judgment Rule.

> FN10 As the certificate of incorporation bars Plaintiffs' duty of care claim, the Cort now need only address Plaintiffs' duty of loyalty claim The Cort, however, will address the merits of *both* the care and loyalty laims

The Business Judgment Rule "sets up a presumption that directors' decisions are made in good faith and are based upon sound and informed business judgment." *Unocal Corp v. Mesa Petroleum, Co.,* 493 A 2d 946, 958 (Del 1985) ("The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." ') (*citing Aronson v Lewis,* 473 A 2d 805 (Del 1984), *overruled by Brehm v Eisner,* 746 A 2d 244 (Del 1998)); *Kahn on Behalf of DeKalb Genetics Corp v Roberts,* 679 A 2d 460, 461 (Del 1996); *F D I C v Castetter,* 184 F 3d 1040 (9th Cir 1999); *Lee v Interinsurance Exch,* 50 Cal App 4th 694, 715, 57 Cal Rptr 2d 798 (1996)

The Rule reflects the principle that the business and affairs of a corporation are managed by or under the corporation's board of directors *Cede & Co v*

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

*Technicolor, Inc.* 634 A.2d 345 (Del 1993). In exercising their managerial powers, "directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." *Cede,* 634 A.2d at 360; *Smith v. Van Gorkom,* 488 A.2d 858, 872.

The Business Judgment Rule "posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be "attributed to any rational business purpose." *Cede,* 634 A.2d at 360 (Del 1993) (citing *Sinclair Oil Corp v. Levien,* 280 A.2d 717, 720 (Del 1971)); *In re J.P. Stevens & Co., Inc.,* 542 A.2d 770, 780-81 (Del.Ch 1988) (finding decision in question must be "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith"); *A.C. Acquisitions Corp. v. Anderson, Clayton & Co.,* 519 A.2d 103, 111 (Del 1986).

Thus, a shareholder plaintiff challenging a board decision has the burden at the outset to rebut the rule's presumption. *Van Gorkom,* 488 A.2d at 872 (Del 1985); *Cede,* 634 A.2d at 360. To rebut the Rule, plaintiff must "provide evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty--good faith, loyalty or due care." *Cede,* 634 A.2d at 360. If the plaintiff cannot overcome the presumption, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and courts hesitate to second-guess such decisions. *Van Gorkom,* 488 A.2d at 872; *Cede,* 634 A.2d at 360; *Aronson,* 473 A.2d at 812 (finding, on motion to dismiss, burden is on party challenging decision to establish facts rebutting presumption). Should a plaintiff rebut the Rule, the burden shifts to the defendant directors to prove the "entire fairness" of the transaction. *Cede,* 634 A.2d at 360.

2. Plaintiffs' Duty of Care Claim

*10 In the context of a merger or a sale, directors are charged with the duty of informing themselves of all material information reasonably available to

them before voting on a proposed plan. *Cede,* 634 A.2d at 368 (citing *Aronson,* 473 A.2d at 812). The duty of care, therefore, is a duty to act on an informed basis. *Id.* Under the Rule's presumption, a court will not find the directors to have breached their duty of care unless they individually "and the board collectively have failed to inform themselves fully and in a deliberate manner before voting." *Cede,* 634 A.2d at 368 (citing *Van Gorkom,* 488 A.2d at 873; *Aronson,* 473 A.2d at 812).

Plaintiffs claim Defendants, in accepting the Vivendi offer, breached their fiduciary duty of care and failed to "take all reasonable steps to assure the maximization of stockholder value." [Second Am. Compl. at 23.] Defendants failed both to implement a bidding mechanism to foster a fair auction of the company to the highest bidder, and to explore other purchasers or strategic alternatives which would return greater value to Plaintiffs [Second Am. Compl. at 23.] In addition to agreeing to an inadequate stock price, Defendants consummated agreements containing lock-up provisions (granting Vivendi, for no consideration, an option to purchase 19.9% of U.S. Filter in the event U.S. Filter terminated the agreement); termination fees (requiring U.S. Filter to pay 245 million dollars to Vivendi should it accept another offer); and no-shop clauses (prohibiting U.S. Filter from soliciting, initiating, or encouraging any other offer) [Second Am. Compl. at 24; Roth Decl ¶ 11, Ex. I at 445.]

*Provisions of the Agreement*

Regarding the lock-up provisions, termination fee and no-shop clauses, the Court's inquiry focuses on whether or not these measures would act to foreclose other offers or "merely to afford some protection to prevent disruption of the Agreement by proposals from third parties that are neither bona fide nor likely to result in a higher transaction." *Matador Capital Management Corp v. BRC Holdings, Inc.,* 729 A.2d 280, 293 (Del Ch 1998).

In *Matador,* the court was asked to enjoin a proposed merger on the basis of, among other issues, provisions similar to those challenged by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                           Page 11

Not Reported in F Supp 2d, 2001 WL 418981 (C D Cal ), Fed Sec L Rep P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

Plaintiffs In analyzing the no-shop provision, the court reasoned that it was not, in fact, a defensive measure because it did not prevent the board from responding to unsolicited inquiries 729 A 2d at 291 Instead, the measure required the board to respond to situations only where the board has made a good faith determination that the unsolicited offer was bona fide and may result in a transaction more favorable to stockholders 729 A 2d at 291

Here, Plaintiffs allege U S Filter's acceptance of the no-shop provision was a breach of its duty of care This argument overlooks a key clause in the no-shop provision, however, requiring the Board to consider any bona fide written proposal, if rejection of such would be a breach of the Directors' fiduciary duty [Roth Decl , Ex I at 444 ]

*11 Similarly, the lock-up provision and the termination fee do not foreclose other offers Rather, they provide some guarantee and stability to the offer on the table See Matador, 729 A 2d at 291, & n 15 (explaining termination fees are not unusual in merger context) (citing Kysor Indus Corp v Margaux, Inc, 674 A 2d 889, 897 (Del 1996) Moreover, Plaintiffs do not claim that any of the challenged provisions chilled other bidders See Yanow v Scientific Leasing, Inc, 1988 WL 8772 at *5, 13 Del J Corp L 1273, 1281 (Del Ch Feb 8, 1988) (noting that the restrictive provision was not a lock-up option that would operate to preclude higher bids) Finally, the existence of the provisions was disclosed to all U S Filter shareholders [US Filter Mot to Dismiss at 8 ] In sum, the challenged provisions do not support Plaintiffs' attempt to claim breach of the duty of care

### Failure to Accept Adequate Price

Second, Plaintiffs charge Defendants failed to investigate and accepted an inadequate price for the stock [First Am Compl at 23 ] Courts are hesitant to challenge a board's decision to recommend an offer where there is no evidence of a competing offer Matador, 729 A 2d at 293 (finding the failure of competitors to make a bid within a month after the transaction was evidence that directors obtained

best offer and therefore refusing to enjoin proposed merger); Barkan v Amsted Industrial, Inc, 567 A 2d 1279, 1287 (Del 1979) ( "[W]hen it is widely known that some change of control is in the offing and no rival bids are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed."); Cf Paramount Communication Inc v QVC Network, Inc, 637 A 2d 34, 46 (Del 1994) (upholding claim because directors favored one bidder over another) Plaintiffs fail to allege U S Filter ever received a competing offer

The Court is not persuaded that the Directors breached their duty of care by recommending the transaction at a time the stock was at a low point See Eisenberg v Chicago Milwaukee Corp, 537 A 2d 1051, 1061 (Del Ch 1987) ("In what sense do corporate officers behave inequitably if they cause the corporation to offer to purchase its own publicly-held shares at a premium above market, even if the market price is at an historic low?") Although the Eisenberg court enjoined the self tender offer on other grounds, it explained that if a disclosure of all material facts had been made, the fact that directors timed the offer to coincide with low preferred stock price levels still did not render the transaction involuntary and coercive 537 A 2d at 1061

### Revlon Duties

Finally, Plaintiffs cite Revlon, Inc v MacAndrews & Forbes Holdings, Inc, 506 A 2d 173, 180 (Del 1986), in which the court found that when a transaction results in a change in control of the company, the transaction is subject to enhanced scrutiny and defendants have the burden to show they were informed adequately and acted reasonably [Opp'n to U S Filter Mot at 14; Paramount, 637 A 2d at 45; Barkan, 567 A 2d at 1286 ] Assuming that Revlon duties attach here, [FN11] Plaintiffs have not alleged facts adequate to support their claim

> FN11 There is some ispute among Delaware courts as to whether or not a break-up of he company is required to

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d                                                                              Page 12

Not Reported in F.Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

trigger *Revlon* duties. *See Whelabrator,* 1992 WL 212595 at * 11

*12 In *Barkan,* the Delaware Supreme Court explained *Revlon* duties in the context of a merger with a single bidder. 567 A.2d at 1286. *Revlon* held that in the case of multiple bidders, directors cannot use defensive tactics that destroy the auction process. *Id.* (citing *Revlon,* 506 A.2d at 182-85). The *Barkan* court noted:

> *Revlon* does not demand that every change in the control of a Delaware corporation be preceded by a heated bidding contest. When the board is considering a single offer and has no reliable grounds upon which to judge its adequacy, this concern for fairness demands a canvas of the market to determine if higher bids may be elicited ... When, however, the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market.

*Barkan,* 568 A.2d at 1286. Although the court explained that a canvas of the market (as was done here), is preferable to analysis of investment banks (as was done here), the court clarified that no one method of information gathering is required by a board. *Id.* Accordingly, the court found that the advice of investment bankers, "coupled with the special circumstances surrounding the negotiation and consummation of the    [transaction] supported a finding that Amsted's directors had acted in good faith to arrange the best possible transaction for shareholders." *Id.*

Furthermore, as the court explained in *In re Wheelabrator,* Plaintiffs need to allege more than a change in control to avoid dismissal of their *Revlon* claims; they must allege specific facts of breach of duty such as ... a lack of information. *In re Wheelabrator,* 1992 WL 212595 at **8-9 ("[E]ven if there occurred a 'fundamental change of corporate control' that triggered *Revlon* duties ... plaintiffs have not alleged ... directors were so uninformed ... that they violated their *Revlon* duties ... What the plaintiffs do allege is ... directors failed to conduct a market check to assure themselves that there were

no superior alternative transactions. That, without more, is insufficient.") Alleging the board wrongly delegated the decision to its financial advisors was insufficient, according to the *Wheelabrator* court. *Id.* Plaintiffs were required to make allegations regarding how much the board knew:

> The focus of that allegation is upon the scope of the financial advisors' investigation, not upon the directors' knowledge of the company's value. While overseeing a faulty investigation might constitute a breach of other fiduciary duties owed by directors under more general principles, that conduct does not constitute a breach of Revlon duties as described in *Barkan.* Because the complaint fails to allege a breach of *Revlon* duties under the standards of either *Barkan* or *Paramount,* the plaintiffs' Revlon claims must be dismissed.

*13 *Id.*

In this case, Plaintiffs fail to allege specific facts of unreasonable behavior by the Directors. In fact, Plaintiffs admit that beginning in January, 1996, Defendants spent almost two years negotiating the transaction, conducting "due diligence", approving possible merger partners, and retaining investment banks (Salomon Smith Barney and J.P. Morgan) to conduct market checks and issue fairness opinions. [Opp'n to U.S. Filter Mot. at 5; Declaration of Leigh Parker, Ex. B. (Solicitation/Recommendation Statement) at 000054.] Plaintiffs allege nothing to suggest that under the circumstances of the transaction, the market checks and fairness opinions were inadequate. As in *Barkan,* the circumstances surrounding the Vivendi tender offer support a finding that the directors exercised the requisite due care. 567 A.2d at 1287.

Discussions between U.S. Filter and Vivendi regarding a potential merger and tender offer began in January, 1999. [US Filter Mot. to Dismiss at 6.] On March 26, 1999 Vivendi issued its tender offer statement to U.S. Filter shareholders. [First Am. Compl at 1.] From this time, shareholders had twenty-seven days to tender their shares. [US Filter Mot. to Dismiss at 9.] During this time, U.S. Filter was "in play." *Barkan,* 567 A.2d at 1287. From March 26 to April 22, 1999, however, not one

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                                    Page 13

Not Reported in F Supp 2d, 2001 WL 418981 (C.D Cal ), Fed Sec L Rep P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

bidder emerged to make a competing offer, nor did any emerge during the time Vivendi and U S Filter were discussing the transaction [US Filter Mot to Dismiss at 9 ] Moreover, the price offered to U S Filter shareholders was a twenty-five percent premium about the share price [US Filter Mot to Dismiss at 1 ]

Plaintiffs emphasize analysts' reports that U.S. Filter looked promising, was on target to meet its restructuring goals, and was moving forward to capitalize on its 1998 acquisition of Culligan. [Second Am Compl at 8 ] A director of Credit Suisse First Boston announced that despite the poor performance of the U S Filter stock, U S Filter would improve its profit margin and shareholders would, in turn, see value created and be "richly rewarded " [Second Am Compl at 9 ] Moreover, analysts termed U S Filter's management team "the best senior management team out of all the environmental companies on Wall Street " [Second Am Compl at 9 ] With such a team, U S Filter had "open-ended growth potential " [Second Am Compl at 10 ] None of this, however, alleges a breach of the duty of care US Filter may have been promising and well run, and may have begun both to capitalize on its acquisition and restructure, but Vivendi still paid a twenty-five percent premium above U S Filter's twenty-five dollar share price. [US Filter Mot at 1 ] Plaintiffs' call for a required bidding contest fails See Freedman v Restaurant Assocs , Civ A No 9212, 1990 LEXIS 142, at **16-17 (Del Ch 1990) (dismissing claim that directors had breached duty under Revlon by failing to hold auction); Barkan, 567 A 2d at 1286 (finding no one action the Board must take to analyze single offer)

*14 In light of these circumstances, Plaintiffs fail to rebut the presumption that Defendants exercised the requisite due care in approving the transaction and adequately informed themselves of the value of the company

3 Plaintiffs' Duty of Loyalty Claim

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director " Cede 634 A 2d at 361.

Plaintiffs allege Messrs Heckmann, Seidel and Spence, "US Filter Insiders," breached their duty of loyalty by accepting additional consideration. Plaintiffs claim: "Knowing that the U.S. Filter Insiders as a group controlled less than 2% of U S Filter's outstanding shares, the Vivendi Defendants realized the U.S. Filter Insiders' agreement to support, and endorse the tender offer was crucial " [Second Am Compl at 16.] In return for their endorsement, the Insiders received payment of more than 11 55 million dollars plus the gross-up payment. [Second Am Compl at 2 ] Although the payments were made "under the guise of new employment agreements" [Second Am Compl at 3], they became effective only if the offer was successful.

To prevail on their breach of loyalty claim, Plaintiffs must overcome the Business Judgment Rule presumption and show a majority of the U S Filter Directors had personal interests potentially adverse to the interests of U S Filter and its shareholders Cinerama, Inc v Technicolor Inc, 663 A 2d 1156, 1168 (Del 1995) (holding to maintain duty of loyalty claim, plaintiff must show materially self-interested board members 1) either constituted majority of or controlled and dominated the board or failed to disclose their interests in the transaction to the board and 2) a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction) (citing Cinerama, Inc v Technicolor, Inc, 663 A 2d 1134, 1153 (Del.Ch 1994)), rev'd on other grounds 758 A 2d 485 (Del 2000)).

Absent such a showing by Plaintiffs, the presence of several potentially interested or conflicted directors does not deprive the board as a whole of the Business Judgment Rule's presumption of loyalty. Cede, 634 A 2d at 363 (rejecting argument that one director's receipt of tangible benefit not shared by stockholders is sufficient to overcome the business judgment presumption); McMillan v Intercargo Corp, No Civ A 16963, 768 A 2d

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d                                                           Page 14

Not Reported in F.Supp.2d, 2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

492, 2000 WL 516265 (Del.Ch., Apr. 20, 2000) (citing *Cinerama* and finding plaintiffs had not pled facts sufficient to rebut business judgment presumption and state a claim for breach of duty of loyalty).

Plaintiffs have not alleged facts, which, if true, show that a majority of the Board had any personal interest in the alleged injurious transactions. Indeed, they allege only three of the eleven Directors stood to gain from the Vivendi transaction. *Thompson v. Enstar Corp.*, 509 A.2d 578, 581 (Del.Ch.1984) (dismissing action for failure to overcome business judgment rule presumption when ten of twelve directors were acting independently); *McMillan*, 768 A.2d 492, 2000 WL 516265 at *8 ("The independence and disinterestedness of five of the eight directors is unchallenged. The presence of an unconflicted board majority undercuts any inference that the decisions of the    board can be attributed to disloyalty.")]

*15 Moreover, Plaintiffs do not assert the three Insiders coerced or influenced the rest of the Board's decision to approve the Merger. Plaintiffs cite *Parnes* for support of their argument that one director can taint the entire merger process. [Opp'n to U.S. Filter Mot At 19.] The facts of *Parnes*, however, are distinguishable. In that case, the court found that one director, by demanding a bribe in exchange for his approval of a merger, tainted the entire process, and the board members breached their duty when they *acquiesced* to the director's demand for a bribe. *Parnes*, 722 A.2d at 1246. Moreover, the corrupt director in *Parnes* was the central decision-maker in the merger process. *Id.* at 1245. Plaintiffs here do not allege the Inside Directors tainted the entire process, do not allege that the other Directors acquiesced to the demands of the Insiders, and do not allege that the Inside Directors were the key-decision makers in the merger process.

Plaintiffs do allege that the endorsement of the Insiders "was critical to the success of the Tender Offer." [First Am. Compl. at 11.] The *Parnes* court found that it was "inexplicable that independent directors, acting in good faith, could approve" a

deal in which one director "tainted the entire process of finding an interested merger partner and negotiating the transaction by demanding a bribe." 722 A.2d at 1247. Applying that standard here, the Court must determine whether or not it was "inexplicable" for the other directors on the U.S. Filter Board, knowing of the payments totaling 11.55 million to the inside directors, to approve the deal.

If the other directors, in good faith, thought the payments were the recognition of preexisting obligations to the Insiders, their approval of the deal cannot be characterized as inexplicable. In other words, the Court must analyze whether or not the payments were additional consideration (as Plaintiffs argue) or previously owed compensation (as Defendants argue). As the Court concluded in the context of the Vivendi Motion to Dismiss, the payments are the recognition of U.S. Filter's preexisting duty to pay the directors in a change of control context. [*See* Section IV-B, supra.] The Board's decision, therefore, was not inexplicable.

Additionally, Plaintiffs' argument that the Insiders "endorsement" of the tender offer tainted the transaction is deflated by the reasoning in *Golaine v. Edwards*, No. Civ. A. 15404, 1999 WL 1271882 at *8 (Del. Ch. Dec. 2, 1999). There, the court dismissed a claim that payment by the acquiring corporation of an additional twenty million dollars in fees improperly tainted the transaction. *Id.* The court found that in the context of an 8.3 billion dollar deal, twenty million dollars was "immaterial." *Id.* Similarly, the 11.55 million dollars paid to the Inside Directors was immaterial in the scheme of this transaction, in which over five billion was at stake. [US Filter Mot. at 14.] Furthermore, the Insider Directors' stock represented only two percent of U.S. Filter's common stock, and by endorsing the tender offer to shareholders, the Board was recommending the directors "vote them out of a [director] job." [US Filter Mot. at 2, 15.] These additional factors highlight Plaintiffs' failure to state a duty of loyalty claim.

*16 Thus, Plaintiffs neither pled that a majority of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                                              Page 15

Not Reported in F Supp 2d, 2001 WL 418981 (C.D Cal.), Fed. Sec. L. Rep. P 91,406

(Cite as: 2001 WL 418981 (C.D.Cal.))

the Board had a conflict of interest nor that the three Insiders tainted the Board's decision-making process Moreover, in the context of the larger transaction, Plaintiffs fail to allege that the additional payments were material enough to represent a conflict of interest Accordingly, Plaintiffs' claim for breach of the duty of loyalty is dismissed

Defendants have shown Plaintiffs cannot state a claim for breach of fiduciary duty as the exculpatory clause in the certificate of incorporation bars the duty of care claim and as Plaintiffs are unable to overcome the presumption of the Business Judgment Rule on the duties of care and loyalty claims, and have not sought leave to amend their Complaint Accordingly, U.S. Filter's Motion is granted and the claim is dismissed without leave to amend *Schreiber Dist. v Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.")

### VI Conclusion
Accordingly, as Plaintiffs have failed to state a claim for breach of fiduciary duty and violation of Rule 14d-10 or Rule 20 of the Act, Plaintiffs' third claim against U S Filter and first and second claims against Vivendi are dismissed without leave to amend

IT IS SO ORDERED

### ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION
The Court has received and considered all papers filed in support of, and in opposition to, Plaintiffs' Motion for Reconsideration originally noticed for hearing on April 9, 2001. The Motion is appropriate for resolution without oral argument *See* Fed R Civ P. 78; Local Rule 7 11 The Motion is DENIED

### I BACKGROUND
Plaintiffs are stockholders in U S Filter

Corporation. They filed a class action suit [FN1] on March 23, 1999 against Richard Heckmann, Chairman of the Board of Directors, President, and Chief Executive Officer of U.S. Filter, Nicholas C. Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diedrich, Ardon Moore, C. Howard Wilkins, J. Danforth Quayle, Arthur B. Laffer, and Alfred Osborne, Directors of U S Filter ("US Filter Defendants").

> FN1. Lead Plaintiffs: Donald and Sharell Kennedy, James Gemmill, 1111426 Ontario Inc., Tom Hoh, Cam Co., Sheila McMichael, all shareholders of U.S. Filter whose shares were purchased for $31.50. [Second Am. Compl. at 4-5.] The class: all common stockholders in U S. Filter who are being and will be harmed by Defendants' alleged harmful actions in connection with Vivendi's acquisition of U S. Filter ("the Class"), including those who tendered their shares to Vivendi pursuant to the tender offer ("tendering subclass") [Second Am. Compl. at 1.]

US Filter is a global provider of industrial, municipal, commercial, and consumer water and wastewater systems, products, and services. On March 22, 1999 it announced that its Board of Directors ("Board") had approved a tender offer by Vivendi, S.A. a French environmental services provider, to acquire all outstanding stock (180 million shares) of U.S. Filter for $31.50 a share, or approximately 5.73 billion dollars ("Vivendi Transaction"). [Plaintiffs' Second Amended Consolidated Class Action Complaint ("Second Am. Compl.") at 1] As part of the agreement, U.S. Filter would merge with Eau Acquisition Corp. ("merger"). [Second Am. Compl. at 11-12.]

*17 Plaintiffs alleged the Board's agreement to this merger and tender offer breached its fiduciary duties of care and loyalty [Second Am. Compl. at 2.] Plaintiffs further alleged three members of the Board--Messrs Seidel, Heckmann, and Spence ("Inside Directors")--accepted additional consideration of up to 11 55 million dollars from Vivendi, or more than six dollars a share beyond the

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                    Page 16

Not Reported in F. Supp 2d, 2001 WL 418981 (C D Cal ), Fed. Sec. L. Rep. P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

price paid to all shareholders, for their agreement. [Second Am. Compl. at 2.] As further inducement, Vivendi agreed to "gross up" the payments to the Inside Directors by paying the taxes the Board was required to pay on the payments received in excess of $31 50 a share [Second Am. Compl. at 2-3.]

Among their claims, Plaintiffs alleged that Vivendi violated Rule 14(d)(10) of the Securities Exchange Act of 1934 by agreeing to pay three U.S. Filter executives additional consideration for their shares in the guise of new employment agreements. [*Id*] This claim is the subject of Plaintiffs' Motion for Reconsideration

On September 25, 2000 U S. Filter, Richard Heckmann, Nicholas Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diedrich, Ardon Moore, C. Howard Wilkens, Jr, J. Danforth Quayle, Arthur B. Laffer and Alfred E Osborne filed a Motion to Dismiss with the Declaration of Carl Alan Roth. On September 25, 2000 Vivendi SA, Eau Acquisition Corp and Jean Marie Messier filed a Motion to Dismiss with the Declaration of Andrew Houston. On February 22, 2001 the Court granted both Motions to Dismiss [*See* Feb 22, 2001 Order ]

On March 12, 2001 Plaintiffs filed a Motion for Reconsideration of the Court's Grant of the Motion to Dismiss filed by Vivendi, S A , Eau Acquisition Corp. And Jean-Marie Messier ("Vivendi") ("Mot for Recons "). Vivendi filed Opposition on March 26, 2001 ("Opp'n"). Plaintiffs filed a Reply on April 2, 2001

## II LEGAL STANDARD

Under Rule 7 16 of the Local Rules of the Central District of California,

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such

decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

Plaintiffs do not satisfy any of the requirements of Rule 7.16. They admit to offering no material difference in fact or law, or the emergence of any new material facts. [*See* Mot. for Recons ] While they contend that the Court erred in its earlier ruling, they have not made a manifest showing of the failure of the Court to consider material facts presented before it rendered its decision Accordingly, the Motion for Reconsideration is denied.

## III. ANALYSIS

*18 In its February 22, 2001 Order the Court dismissed Plaintiffs' Rule 14(d)(10) claim as Plaintiffs could not allege that the payments to the Inside Directors were additional consideration for acceptance of the tender offer. [Feb. 22, 2001 Order at 9.] As set forth in the Court's Order, the Inside Directors were paid pursuant to 1999 employment agreements. [*Id* at 12.] The terms of the 1999 employment agreements were identical in substance to preexisting 1998 employment agreements entitling the directors to severance payments. [*Id* ] Plaintiffs failed to allege any facts demonstrating that the payments were any more than U S. Filter's fulfilment of a pre-existing obligation.

In their Motion, Plaintiffs contend that the Court erred in its reasoning. [Mot. for Recons. at 2.] Such an argument cannot be countenanced on a Motion for Reconsideration. First, despite the Court's finding that the 1998 and 1999 agreements contained substantively identical formulas to calculate severance payments, Plaintiffs now claim the Court miscalculated the payments and argue that the 1999 agreement did more than honor the obligations of the 1998 agreement. [Mot for Recons. at 5.] According to their own calculations, Plaintiffs contend (as they did in the Opposition to Vivendi's Motion to Dismiss) that Mr. Heckmann was entitled to *more* under the 1999 agreement that

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Not Reported in F Supp 2d                                                                      Page 17

Not Reported in F Supp 2d, 2001 WL 418981 (C D Cal ), Fed  Sec  L  Rep  P 91,406

**(Cite as: 2001 WL 418981 (C.D.Cal.))**

under the 1998 agreement [Mot  for Recons  at 5 ]

Plaintiffs belabor other issues, contesting the purpose of the tender offer itself, claiming that although Mr Heckmann's termination was required in the 1998 agreement, it was taken out of the 1999 agreement, and challenging the Court's finding that dismissal of the claim was supported by the disclosure of the agreements to the shareholders [ *See* Plaintiffs' Reply to Defendant's Opposition ("Reply") at 1,2; Mot  for Recons  at 6 ]

None of this, however, demonstrates a failure to consider material evidence  The Court considered the evidence and arguments presented to it before ruling, including the formulas for severance payment in both agreements, Mr  Heckmann's termination, the actual purpose of the tender offer, and the disclosure of the payments to shareholders  Plaintiffs have failed to show otherwise; rather, they merely disagree with the Court's conclusions Accordingly, Plaintiffs' Motions fails to satisfy the requirements of Local Rule 7 16(c)  [FN2]

> FN2  Plaintiffs argue that Local Rule 7 16 cannot "trump" Federal Rule of Civil Procedure 59(e)  [Reply at 3 ] This argument is misplaced as the standard for reconsideration under the Federal Rules and local rule 7 16 is the same  *School Dist No 1J Multnomah County. Or v ACandS. Inc* .  5  F 3d  1255  (1993) ("Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law "), *cert denied* 512  U S.  1236,  114  S.Ct  2742, 129 L Ed 2d 861 (1994)

Finally, Plaintiffs claim that their Second Amended Complaint was tested for the first time by the Motions to Dismiss and ask leave to amend their pleading further  [Mot  for Recons  at 8 ] As Defendants point out, however, at the hearing on the Motion to Dismiss, the Court noted, and the Plaintiffs conceded, that Plaintiffs' Second

Amended Complaint was extremely detailed [Opp'n at 11 (citing 1/22/01 hearing transcript at 32-33) ] The Court, accordingly, "found it hard to fathom" how much more Plaintiffs could allege  [*Id* ] Moreover, neither at the hearing, nor in this Motion, do Plaintiffs indicate what else they seek to allege  Plaintiffs' request for leave to amend, therefore, is denied

IV  CONCLUSION
*19 Accordingly, Plaintiffs' Motion is DENIED

IT IS SO ORDERED

Not Reported in F.Supp 2d, 2001 WL  418981 (C.D Cal ), Fed  Sec  L  Rep  P 91,406

END OF DOCUMENT

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

LEXSEE 1999 U.S. DIST. LEXIS 14826

OFFICIAL COMMITTEE OF THE UNSECURED CREDITORS OF COLOR
TILE, INC., Plaintiff, -against- INVESTCORP S.A., INVESTCORP
INTERNATIONAL INC., CIP LIMITED, CORPORATE EQUITY LIMITED,
ACQUISITION EQUITY LIMITED, FUNDING EQUITY LIMITED, PLANNING
EQUITY LIMITED, ELIAS N. HALLACK, NEMIR A. KIRDAR, MICHAEL L.
MERRITT, PAUL W. SOLDATOS, JON P. HEDLEY, CHARLES J. PHILIPPIN,
E. GARRETT BEWKES, III, WALTER F. LOEB, COOPERS & LYBRAND,
L.L.P., INVESTCORP BANK, E.C., ABF ACQUISITION CORP., INVESTCORP
HOLDINGS LIMITED, WINDOW INVESTMENTS LIMITED, SHADES
INTERNATIONAL LIMITED, SHADES INVESTMENTS LIMITED, BLINDS
EQUITY LIMITED, BLINDS HOLDINGS LIMITED, AIBC INVESTCORP
FINANCE B.V., INVESTCORP INVESTMENT HOLDINGS LIMITED,
ACQUISITION CAPITAL LIMITED, CORPORATE CAPITAL LIMITED,
FUNDING CAPITAL LIMITED, and PLANNING CAPITAL LIMITED, Defen-
dants.

97 Civ. 9261 (MGC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*1999 U.S. Dist. LEXIS 14826*

September 24, 1999, Decided
September 24, 1999, Filed

**SUBSEQUENT HISTORY:** Reconsideration Denied
November 18, 1999, Reported at: *1999 U.S. Dist. LEXIS
17875* Reconsideration denied by *Official Comm. of the
Unsecured Creditors of Color Tile, Inc. v. Investcorp
S.A. 1999 U.S. Dist. LEXIS 17875* (S.D.N.Y., Nov. 18,
1999)

**DISPOSITION:** [*1] Moving defendants' motion to
dismiss Counts Eight through Twelve granted

**LexisNexis(R) Headnotes**

**COUNSEL:** Peter M. Fishbein, Esq., Juan C. Ordonez,
Esq., KAYE, SCHOLER, FIERMAN, HAYS &
HANDLER, LLP, New York, New York, for Plaintiff

Harvey Kurzweil, Esq., Joanna R. Swomley, Esq.,
DEWEY BALLANTINE LLP, New York, New York,
for Moving Defendants

Sarah L. Reid, Esq., KELLEY DRYE & WARREN LLP,
New York, New York, Co-counsel for Walter F. Loeb,
Defendant.

**JUDGES:** MIRIAM GOLDMAN CEDARBAUM,
United States District Judge

**OPINIONBY:** MIRIAM GOLDMAN CEDARBAUM

**OPINION:**

OPINION

**CEDARBAUM, J.**

The plaintiff committee of unsecured creditors of
Color Tile, Inc. ("Color Tile") sues for breach of fiduci-
ary duty, aiding and abetting breach of fiduciary duty,
negligence, and fraudulent conveyance. All the defen-
dants except Coopers & Lybrand move to dismiss all the
claims asserted against them in the Second Amended and
Consolidated Complaint (the "Complaint").

At oral argument, the motion to dismiss the claims
that relate to the 1993 transaction -- Counts One through
Seven and Count Nineteen -- was denied. (10/9/98 Tr. at
73). Decision was reserved on Counts Eight through
Twelve, which allege that the controlling shareholders
[*2] and four director defendants are liable for self-
interestedly delaying filing Color Tile's bankruptcy in

Case 1:04-cv-01268-***-MPT    Document 75-5    Filed 11/30/2005    Page 18 of 28

Page 2
1999 U.S. Dist. LEXIS 14826, *

1995. For the reasons that follow, the motion to dismiss Counts Eight through Twelve is now granted.

### BACKGROUND

The facts as set forth in the Complaint are as follows:

The plaintiff is the Official Committee of Unsecured Creditors (the "Committee") which was appointed in the 1996 bankruptcies of Color Tile and its parent, Color Tile Holdings, Inc. ("CT Holdings"). The Committee is empowered to prosecute certain claims, including the claims in this action, on behalf of the estates of Color Tile and CT Holdings, the Unsecured Creditors' Trust, and the Consumer Deposit Trust pursuant to a September 17, 1997 Order of the United States Bankruptcy Court for the District of Delaware approving the Global Settlement Agreement among Color Tile, CT Holdings, the Committee, and other entities (the "Settlement") (Compl PP 13, 15) n1

n1 The parties' earlier submissions on subject matter jurisdiction show that, under the Settlement, recoveries from this and other actions will be distributed to the Color Tile and CT Holdings estates, the Consumer Deposit Trust, and the Unsecured Creditors' Trust under the formula specified in the Settlement. In its Order approving the Settlement, the Delaware Bankruptcy Court retained jurisdiction to resolve disputes that arise with respect to distribution under the Settlement of any litigation proceeds. The Bankruptcy Court is expected to spend at least the next two to four years resolving objections to claims against the litigation proceeds.

[*3]

Before it ceased doing business, Color Tile, a Delaware corporation headquartered in Fort Worth, Texas, was the largest specialty retailer of floor covering products in North America. (Id. PP 15, 36) In 1989, the Luxembourg limited liability company Investcorp S.A. and affiliated entities and individuals referred to in the Complaint as the "Investcorp Group" acquired Color Tile. (Id. PP 16, 21, 25-27, 36) The Investcorp Group formed a holding company, CT Holdings, to hold all the common stock of Color Tile. (Id. PP 15, 37) Through control of CT Holdings, the Investcorp Group exercised control over the management and operations of Color Tile and had the power to vote all of the common stock and elect all of the directors of Color Tile. (Id. P 37) The moving defendants are all affiliated with the Investcorp Group Entities not affiliated with the Investcorp Group owned two classes of preferred stock in Color Tile. Id.

In December 1993, the Investcorp Group forced Color Tile to undertake an asset acquisition and a $ 200 million high-interest debt financing (collectively, the "1993 Transaction") The 1993 Transaction left Color Tile undercapitalized, without the [*4] ability to service its debts as they became due, and without the necessary cash resources to operate its business in a competitive fashion. (Id. P 2)

Within months after the 1993 Transaction, it became evident that Color Tile would not have sufficient cash resources to service its debt and competitively operate its floor-covering business. (Id. P 7) By September 1994, Color Tile had to borrow an additional $ 29 million to fund its operations, pay dividends on its preferred stock, and make interest payments. (Id. PP 7, 56) Despite this cash infusion, by the spring of 1995, Color Tile again faced a liquidity crisis. (Id. PP 7, 57) In May and June 1995, an affiliate of the Investcorp Group loaned $ 15 million to Color Tile to keep it afloat. (Id. PP 8, 57)

By August 1995, despite having received more than $ 44 million in unforecast borrowings during the prior year, Color Tile was again out of cash. (Id. PP 8, 58) "It was apparent that [the company] was hopelessly insolvent and could not be rescued without truly massive capital infusions." (Id. P 8) The Investcorp Group, however, determined neither to arrange for any significant cash infusions nor [*5] to take steps to immediately restructure Color Tile so as to preserve whatever value could be salvaged. (Id. PP 8, 58) Rather, from August 1995 until the end of January 1996, the Investcorp Group "dribbled in just enough cash to keep Color Tile afloat on a day-to-day basis, without taking steps that could have made Color Tile viable or could have preserved some of its existing value." (Id.)

On December 15, 1995, Color Tile defaulted on a $ 10.4 million interest payment. (Id. P 62) On January 24, 1996, it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, *11 U.S.C. § 101, et seq.* (Id. P 15) The Committee asserts that the moving defendants should have made Color Tile file for bankruptcy relief sooner.

According to the Complaint, the Investcorp Group's strategy of keeping Color Tile "limping along" for several months after it had become clear, in mid-1995, that Color Tile was in a financial crisis, furthered the Investcorp Group's own interests in two ways. (Id. P 10) First, during the summer of 1995, the Investcorp Group was in the process of trying to take the Gucci Group, N.V. public (Id. PP 10, 59). [*6] "The Investcorp Group was concerned that a Color Tile bankruptcy would taint and ultimately jeopardize the success of the Gucci [common stock] offering, from which [the Investcorp Group] stood to earn hundreds of millions of dollars." (Id.) The public

1999 U.S. Dist. LEXIS 14826, *

offering for Gucci was completed in October 1995. (Id. P 35) n2

> n2 There is no explanation in the Complaint as to why the public offering of Saks Fifth Avenue stock by the Investcorp Group in 1996, (Compl. P 35), did not cause a further delay of Color Tile's bankruptcy filing.

The second alleged self-interest that Investcorp Group had in delaying Color Tile's bankruptcy was its interest in preserving its good relationship with the bank group that had provided much of the financing for Color Tile's 1993 Transaction (Id. PP 11, 60). During the summer of 1995, it was discovered that Color Tile had not delivered the stock of American Blind and Wallpaper Factory, Inc ("ABWF") -- the Color Tile subsidiary that owned the assets acquired in the 1993 Transaction [*7] -- to the bank group (Id. P 11). Color Tile's agreement with the bank group required Color Tile to deliver the ABWF stock to the bank group as collateral (Id. PP 11, 60). Thus, in the summer of 1995, at a time when it was in dire financial straights, Color Tile had to decide between belatedly transferring the ABWF stock to the bank group and keeping the stock for itself and its creditors (Id.) The Investcorp Group chose to deliver the stock to the bank group (as it was contractually obligated to do) with the alleged objective of furthering the Investcorp Group's own interests in shoring up its long-standing relationship with the bank group, and in particular its lead lender, who had financed many of the Investcorp Group's prior investments in the United States and to whom the Investcorp Group was looking for future financings (Id.) By continuing to operate Color Tile through the end of 1995, well after Color Tile had transferred the ABWF stock to the bank group, n3 the Investcorp Group enabled the bank group to perfect its security interest in the ABWF stock and avoid the operation of the ninety-day statutory preference period, which ran out shortly before Color [*8] Tile filed for bankruptcy in January 1996 (Id.)

> n3 The date on which the ABWF stock was transferred to the bank group is not specified in the Complaint but is implied to have been in the late summer or early fall of 1995.

The defendants' alleged self-interested avoidance of bankruptcy relief for Color Tile until January 1996 is hereinafter referred to as the "1995 Avoidance."

It is alleged that the 1995 Avoidance, while beneficial for the Investcorp Group's bank group and Gucci

interests, was detrimental to the interests of Color Tile. (Id. PP 12, 61) According to the Complaint, if the Investcorp Group had not been selfishly concerned with completing the Gucci public offering and preserving its relationship with the bank group, Color Tile could have taken earlier steps to preserve its salvageable value, (id.), that is, it could have restructured or filed for bankruptcy relief in mid or late 1995 rather than waiting until January 1996. (10/9/98 Tr. at 16) ("We are alleging that if they had carried [*9] out their fiduciary duties and restructured earlier and not let the company continue for another eight or twelve months, there would have been more assets and the company could have been saved.")

DISCUSSION

A. Claim against Director Defendants

Count Twelve alleges that the four directors of Color Tile who served in the latter half of 1995, Jon P. Hedley, Charles J. Philippin, E. Garrett Bewkes, III, and Walter F. Loeb, (collectively, the "Director Defendants"), breached their duty of loyalty to Color Tile by allowing the 1995 Avoidance to occur. n4

> n4 The parties dispute whether the Committee's basic complaint in Counts Eight through Twelve, that the entities and individuals controlling Color Tile are liable because they self-interestedly delayed the timing of Color Tile's bankruptcy filing, states a cognizable breach of fiduciary duty claim. Cf. *Schacht v. Brown*, 711 F.2d 1343, 1345, 1348 (7th Cir. 1983), *McHale v. Huff (In re Huff)*, 109 B.R. 506, 508 (Bankr. S.D. Fla. 1989). For purposes of this motion, the issue need not be decided.

[*10]

According to the Complaint, the Director Defendants were self-interested in the 1995 Avoidance by virtue of their employment connections with the Investcorp Group. In 1995, Hedley and Philippin were officers of III, an affiliate of the Investcorp Group. (Compl. PP 30, 31) Bewkes "was a director and officer of III from March 1994 until he left to form his own business." (Compl. P 32) Loeb was paid as a consultant by the Investcorp Group on various Investcorp Group investments in unspecified years. (Id. P 29) The Committee argues that these allegations of self-interest of the Director Defendants in carrying out the Investcorp Group's wishes suffice to prevent application of the business judgment rule in this case.

"The business judgment rule is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Parnes v. Bally Entertainment Corp., 722 A.2d 1243, 1246 (Del. 1999)* (internal quotation marks omitted) A plaintiff bears the burden of alleging well-pleaded facts to overcome the presumption and survive a motion [*11] to dismiss Id.; *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), Nebenzahl v. Miller, 1996 Del. Ch. LEXIS 113, Civ. A. No. 13206, 1996 WL 494913,* at *2 (Del. Ch. Aug. 29, 1996).

"Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." *Pogostin v. Rice, 480 A.2d 619, 624 (Del. 1984)* In this case, viewing the allegations of interest most favorably to the Committee, despite the sparseness of the allegations of director interest, it may well be possible to draw an inference that, in 1995, the Director Defendants' decisions with respect to Color Tile were in fact or were likely to be affected by their personal financial interest in maintaining good relations with the controlling shareholder group. See *Friedman v. Beningson, 1995 Del. Ch. LEXIS 154, Civ. A. No. 12232, 1995 WL 716762,* at *5 (Del. Ch. Dec. 4, 1995) (allegation that defendant controlling shareholder had ability to affect a director's consulting fees cast doubt on that director's independence); *Kahn v. Tremont Corp., 1994 Del. Ch. LEXIS 41, Civ. A. No. 12339, 1994 WL 162613,* [*12] at *2 (Del. Ch. Apr. 22, 1994) (allegation that defendant controlling shareholder indirectly controlled the salaries of directors/officers cast doubt on their independence); see also *Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1167 (Del. 1995)* (articulating the standard for determining whether an individual director's interest in a challenged board-approved transaction is sufficiently material to conclude that he lacked independence); *Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 363-64 (Del. 1993)* (same)

In any event, the business judgment presumption remains intact because the Complaint does not allege that the Director Defendants' alleged interest was material in bringing about the 1995 Avoidance:

"Missing is any allegation regarding the composition of the Color Tile Board of Directors which allegedly acted or failed to act contrary to the best interests of Color Tile -- i.e., how many directors there were, how many acted along with the Director Defendants and/or how many failed to act along with the Director Defendants.

Plaintiff's cause of action necessarily stems from a decision that the entire board of directors made or failed [*13] to make (it is not clear which), not a decision that the Director Defendants made independently. Thus, plaintiff must plead facts supporting the conclusion that the board as a whole was tainted by the Director Defendants' alleged interest.

Moreover, plaintiff failed to allege that Messrs. Bewkes, Philippin or Hedley somehow controlled or dominated the remainder of the board."

(4/16/98 Def. Mem. at 38-39).

When an action by a board of directors of a Delaware corporation is challenged, the courts determine whether a conflict of interest of board members has deprived stockholders of a "neutral decision-making body." *Cinerama, 663 A.2d at 1170* The focus is on whether a majority of the corporation's board of directors was neutral and independent in passing on the proposed corporate action. *Id. at 1167-1170*

"[A] material interest of one or more directors less than a majority of those voting would [only] rebut the application of the business judgment rule if the plaintiff proved that the interested director controls or dominates the board as a whole or that the interested director failed to disclose his interest in the transaction [*14] to the board and a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction."

*Id. at 1168* (internal quotation marks and brackets omitted)

There is no allegation in this case that any of the Director Defendants failed to disclose to the rest of the board his alleged interest in the 1995 Avoidance. Thus, under the Cinerama formulation for determining if the interest of one or more directors was material to the independence of the entire board, the Complaint fails to rebut the business judgment rule unless it alleges facts from which one could infer that the Director Defendants, through their dominance over the other board members, "so infected or affected the deliberative process of the board as to disarm the board of its presumption of regu-

Case 1:04-cv-01268-***-MPT    Document 75-5    Filed 11/30/2005    Page 21 of 28

Page 5
1999 U.S. Dist. LEXIS 14826, *

larity and respect." *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1153 (Del. Ch. 1994), aff'd 663 A.2d 1156 (Del. 1995). see also *Nebenzahl v. Miller, 1996 Del. Ch. LEXIS 113, Civ. A. No. 13206, 1996 WL 494913,* at *3 (Del. Ch. Aug. 29, 1996) (dismissing fiduciary duty claim against directors; **[\*15]** fact that 50% of the directors who voted on proposed merger were interested and held substantial corporate positions and shareholdings was not sufficient to rebut the presumption that the disinterested directors who voted to approve the merger did so independently and in good faith).

The importance of allegations of materiality of the position of a particular interested director defendant with respect to an action or nonaction by the Color Tile board as a whole was made clear to the Committee during oral argument on the motion to dismiss the Amended and Consolidated Complaint (the "First Amended Complaint") (6/25/98 Tr at 13-36). In response to the comments made at that oral argument, and after receiving a ruling on July 31, 1998 permitting the Committee to make one more round of amendments to the First Amended Complaint, (7/31/98 Tr at 27-31), n5 in August 1998, the Committee added factual allegations about the composition and independence of the 1993 board with respect to the 1993 Transaction. Significantly, the Committee did not add similar allegations with respect to the 1995 board regarding the 1995 Avoidance. Thus, the Complaint still lacks allegations about the number of **[\*16]** directors on the 1995 board or the interestedness or independence of any of the 1995 directors other than the four Director Defendants.

> n5 In ruling from the bench, I stated, "I will grant [Coopers & Lybrand's motion to dismiss] with leave to amend the complaint, although I think this is the last time you should amend your complaint. So you should do any amending you are planning to do." (7/31/98 Tr at 31).

The Committee concedes that under Delaware law, the independence of the majority of the board must be challenged to strip the individual directors of the business judgment presumption (9/21/98 Pl. Mem. at 14). However, it argues that when the Complaint is read as a whole, under *Fed. R. Civ. P. 8(a),* it gives rise to the logical conclusion that the Director Defendants, through their connections with Color Tile's controlling shareholder group, dominated and controlled the rest of the 1995 Color Tile board. The Committee points to the following allegation: "[The Director Defendants'] breach of their fiduciary **[\*17]** duties of loyalty proximately caused damages to Color Tile in that, absent breach of their fiduciary duties of loyalty, Color Tile could have

taken steps that would have preserved whatever value of the company was salvageable." (Compl. P 156).

This allegation, unaccompanied by any factual allegations about the number of other board members and the nature of their relationship with Color Tile or the defendants, does not undermine the independence of the 1995 board as a whole. "Conclusory allegations alone cannot be the platform for launching an extensive, litigious fishing expedition in the hope of finding something to support them." *Nebenzahl, 1996 WL 494913,* at *3. The fact that the entire Color Tile board could have been replaced by the company's controlling shareholder group, while relevant, is not sufficient to support an inference that the board as a whole lacked independence, absent additional factual allegations demonstrating "that through personal or other relationships the directors are beholden to the controlling person." *Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984).* see also *Friedman v. Beningson, 1995 Del. Ch. LEXIS 154. Civ. A. No. 12232. 1995 WL 716762,* **[\*18]** at *5 (Del. Ch. Dec. 4, 1995). Because the complaint lacks the basic factual allegations that would allow an inference under *Fed. R. Civ. P. 8(a)* that the Director Defendants' alleged interest in carrying out the wishes of the controlling shareholder group infected the 1995 board as a whole, the business judgment presumption shields the Director Defendants from a breach of fiduciary duty of loyalty claim based on the 1995 Avoidance. n6

> n6 The Committee argues that the cited Delaware cases are distinguishable because they concern application of Del. Ch. Ct. Rule 23.1, which sets forth a pleading "with particularity" standard for shareholder derivative suits. The pleading standard that applies is not determinative of the outcome in this case. Even under the basic notice pleading requirement of *Fed. R. Civ. P. 8(a),* the Complaint's incomplete allegations about the identity and independence of the directors on the 1995 board are insufficient to rebut the business judgment presumption.

The Committee's argument that **[\*19]** the business judgment presumption does not regularly apply in the case of self-interested transactions with a controlling shareholder, see *Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997),* is misplaced because the 1995 Avoidance was not a "self-dealing transaction." The CT Holdings Controlling Shareholders did not stand on the other side of any 1995 "transaction" which is under attack. I decline to extend Kahn far beyond its facts. What is being attacked here is a self-interested failure to take Color Tile into bankruptcy for a period of several months.

1999 U.S. Dist. LEXIS 14826, *

Kahn does not authorize the automatic removal of the business judgment presumption from every considered decision of a company owned by a controlling shareholder. The presumption is removed only when the corporation affirmatively deals with the controlling shareholder or one of its controlled entities.

The Committee also argues that the Director Defendants may be held liable on the theory that they are joint tortfeasors or co-conspirators. However, the failure to allege that the 1995 Avoidance was the work product of a majority-tainted board precludes the imposition of such liability. Without factual allegations **[*20]** about a majority of the 1995 board, there is no actionable tort to which joint liability could attach. Accordingly, Count Twelve is dismissed for failure to state a claim upon which relief can be granted.

B. Claims against CT Holdings Controlling Shareholders

Counts Eight and Nine assert that by bringing about the 1995 Avoidance through their shareholder control over Color Tile, the "CT Holdings Controlling Shareholders" n7 breached their fiduciary duties of loyalty and care to the company. Counts Ten and Eleven are identical except that they allege breach of the duties of loyalty and care running to Color Tile's creditors rather than Color Tile itself. n8

> n7 The CT Holdings Controlling Shareholders are (1) a Luxembourg limited liability company called Investcorp SA ("SA"); (2) three of the principal officers of SA: Elias N. Hallack, Nemir A. Kirdar, and Michael L. Merritt; and (3) five Cayman Islands corporations: CIP Limited, Corporate Equity Limited, Acquisition Equity Limited, Funding Equity Limited, and Planning Equity Limited (Compl. PP 1, 16, 21, 25-27). Kirdar, Hallack, Merritt, and the five Cayman Islands corporations owned the voting stock of CT Holdings. (Id. PP 21, 25-27). Through contractual arrangements with the Cayman Islands corpora-

tions (Id. P 21) and Kirdar, Hallack, and Merritt, SA had the right to vote all the voting stock of CT Holdings. (Id. P 1).

**[*21]**

> n8 The parties have not briefed the issue of whether the claims asserted in Counts Ten and Eleven are property of Color Tile such that the Committee may properly assert them. Since the claims are dismissed on a different ground, resolution of this issue is unnecessary.

These counts fail to state a claim of breach of fiduciary duty against the controlling shareholder group because they do not allege that a majority of the board of directors that deliberated on the 1995 Avoidance was beholden to and carrying out the wishes of the CT Holdings Controlling Shareholders. Thus, there is no allegation that the shareholder control that was exerted over Color Tile's board was material to the overall independence of the board such that the business judgment rule cloaking the 1995 Avoidance may be considered rebutted.

CONCLUSION

For the foregoing reasons, the moving defendants' motion to dismiss Counts Eight through Twelve is granted. With respect to Counts One through Seven and Count Nineteen, all of which concern the 1993 Transaction, the motion to dismiss was previously denied in an oral opinion **[*22]** in open court. (10/9/98 Tr. at 73).

SO ORDERED.

Dated: New York, New York

September 24, 1999

MIRIAM GOLDMAN CEDARBAUM

United States District Judge

Westlaw.

Not Reported in F. Supp.2d                                                    Page 1

Not Reported in F. Supp 2d, 2004 WL 2151336 (N.D Cal.)

(Cite as: 2004 WL 2151336 (N.D.Cal.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

NOT FOR CITATION

United States District Court,
N.D. California
THE OFFICIAL COMMITTEE OF BOND
HOLDERS OF METRICOM, INC et al. and the
Official Committee of Unsecured Trade Creditors
of Metricom, Inc. et al.,
Plaintiffs,
v.
Ralph C. DERRICKSON et al., Defendants.
**No. C 02-04756 JF.**

Feb. 25, 2004.

Paul N. Silverstein, Law Offices of Andrews and
Kurth, New York, NY, John D. Fiero, Pachulski
Stang Ziehl Young & Jones PC, San Francisco, CA,
for Plaintiffs.

Elizabeth Walsh Walker, Lisa Hill Fenning, Dewey
Ballantine LLP, Daniel P. Lefler, David Siegel,
Richard H. Zelichov, Irell & Manella LLP, Los
Angeles, CA, Charles C. Robinson, Christian A.
Hatfield, Mark E. Friedman, Garvey Shubert &
Barer, Portland, OR, Samuel Ray Miller, Folger
Levin & Kahn LLP, Darryl P. Rains, Morrison &
Foerster LLP, San Francisco, CA, Patrick T. Nash,
Grippo & Elden, Chicago, IL, for Defendants.

Arthur S. Weissbrodt, U.S. Bankruptcy Court, San
Jose, CA, pro se.

USBC Manager, U.S. Bankruptcy Court, San Jose,
CA, pro se.

ORDER GRANTING MOTIONS TO DISMISS
SECOND AMENDED COMPLAINT

FOGEL, J.

>Docket Nos. 83, 84, & 87]
*1 Defendants move to dismiss Plaintiffs' second
amended complaint ("SAC"). Plaintiffs, creditors of
Metricom, Inc. ("Metricom"), a bankrupt
corporation, allege that Defendants, all of whom
were directors of Metricom, were influenced
inappropriately by a controlling shareholder whose
interests were adverse to the interests of the
creditors. Plaintiffs contend that this controlling
shareholder encouraged the Defendant directors to
deplete Metricom's resources in an effort to carry
out the company's business plan at a time when the
directors should have conserved cash so that
Metricom could pay its debts, thus breaching
fiduciary duties owed to the creditors. The Court
has read the moving and responding papers and has
considered the oral arguments of counsel presented
on January 29, 2004. For the reasons set forth
below, the motions will be granted.

I. BACKGROUND

Plaintiffs, who commenced this action on July 31,
2001, seek compensation in the amount of $500
million. On November 15, 2002, the Court
withdrew its reference to the bankruptcy court.
Defendants moved to dismiss Plaintiffs' first
amended complaint on February 19, 2003. The
Court granted the motion with leave to amend, and
Plaintiffs filed the operative SAC on September 26,
2003. By the instant motion, Defendants again ask
the Court to dismiss the claims against them.

Plaintiffs allege that Defendants, three outside
directors and two inside directors of Metricom, took
"reckless, wasteful, irrational and futile actions" in a
bad faith effort to prolong the life of the company
and thus breached their fiduciary duties of loyalty,
care, and good faith, as well as their duty not to
waste the company's assets. Opposition, p. 10.
Plaintiffs version of the facts is as follows: First,
Metricom continued spending to build a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 2151336 (N D Cal.)

(Cite as: 2004 WL 2151336 (N.D.Cal.))

Page 2

telecommunications infrastructure ("the Network") specified by Metricom's business plan, *see* SAC, ¶ 15, even after the directors knew that Metricom would become insolvent. Defendants "pointlessly continue[d] the expansion buildout regardless of the cost to the company." *Id* Second, because it was obvious that Metricom's business plan no longer made sense, Defendants must have had a duplicitous reason for continuing to pursue it. Third, Paul Allen, owner of the controlling shareholder, Vulcan Ventures, Inc. ("Vulcan"), wanted Metricom to spend wastefully because he "was known to have a deep personal interest in the technology and development of the Network." *Id* Fourth, Defendants personally were interested in indulging Allen They wanted "to protect [their] position[s] and preserve [their] own relationships with an influential shareholder." *Id* Finally, Defendants owed fiduciary duties to the creditors, in addition to the company and its shareholders, because the company was in a "zone of insolvency."

## II APPLICABLE LAW

A complaint may be dismissed as a matter of law for only two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory *Conley v Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L Ed 2d 80 (1957); *Robertson v Dean Witter Reynolds, Inc,* 749 F.2d 530, 533-34 (9th Cir 1984) (citing 2A J MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 12 08 at 2271 (2d ed 1982)). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v King & Spaulding.* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L Ed 2d 59 (1984); *see also Argabright v United States.* 35 F 3d 472, 474 (9th Cir 1994) Motions to dismiss generally are viewed with disfavor under this liberal standard and are granted rarely *Gilligan v Jamco Dev Corp,* 108 F 3d 246, 249 (9th Cir 1997)

*2 For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff *Jenkins v McKeithen,* 395 U.S. 411, 421, 89 S Ct 1843, 23 L Ed 2d 404

(1969); *Argabright,* 35 F.3d at 474 However, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v Cult Awareness Network,* 18 F 3d 752, 754-55 (9th Cir 1994) Indeed, pursuant to Delaware law, which the parties agree is applicable here, "conclusory statements--those unsupported by well-pled factual allegations--are not accepted as true." *Beam ex rel Martha Stewart Living Omnimedia, Inc v Stewart,* 833 A.2d 961, 970 (Del.Ch.2003). A court's review is limited to the face of the complaint, documents referenced by the complaint, and matters of which the court may take judicial notice. *Levine v Diamanthuset,* 950 F.2d 1478, 1483 (9th Cir.1991); *In re Stac Elecs Sec Litig,* 89 F 3d 1399, 1405 n 4 (9th Cir 1996)

Under Delaware law, directors owe the company and its shareholders fiduciary duties of care, loyalty, and good faith, and may not waste the company's assets. The duty of care is one of procedural due care, *Smith v Van Gorkom,* 488 A.2d 858, 872-73 (Del.1985); *In re Caremark Int'l Inc Derivative Litig.,* 698 A.2d 959 (Del.Ch 1996), not of substantive due care, which, in the decision-making context, is foreign to the business judgment rule, *Brehm v. Eisner,* 746 A.2d 244, 264 (Del 2000) The standard for finding a breach of procedural due care is gross negligence. *Van Gorkom,* 488 A.2d at 872-73. A fiduciary's decision is considered wasteful only if it egregiously served no corporate purpose: if "there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky." *Brehm,* 746 A.2d at 263 A director breaches the duty of loyalty when the director uses a position of trust and confidence to further the director's own interests to the detriment of the company *See Cede & Co. v Technicolor, Inc,* 634 A.2d 345, 361 (Del.1993); *Guth v Loft, Inc,* 5 A 2d 503 (Del 1939).

When assessing whether fiduciary duties have been

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 2151336 (N D Cal.)

(Cite as: 2004 WL 2151336 (N.D.Cal.))

Page 3

breached, the Court applies the business judgment rule, which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v Lewis*, 476 A 2d 805, 812 (Del 1984) "The burden is on the party challenging the decision to establish facts rebutting the presumption " *Id*

[W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests.

*3 *In re Caremark Int'l Inc. Derivative Litig*, 698 A 2d at 967.

Typically, directors do not owe fiduciary duties to creditors because the relationship between debtor and creditor is contractual in nature "At the moment a corporation becomes insolvent, however, the insolvency triggers fiduciary duties for directors for the benefit of creditors." *In re Hechinger Investment Co of Delaware*, 274 B R 71, 89 (D Del 2002) Such duties exist when a company becomes "insolvent in fact"; that is, when it is within the "zone" or "vicinity" or insolvency, a poorly defined state that may exist when "the corporation cannot generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time " *Pereira v Cogan*, 294 B R 449, 521 (S D N Y 2003) "[C]reditors have a right to expect that directors will not divert, dissipate or unduly risk assets necessary to satisfy their claims." *In re Ben Franklin Retail Stores, Inc*, 225 B R 646, 655 (Bankr N D Ill 1998) (amended and superseded by *In re Ben Franklin Retail Stores, Inc*, 2000 WL 28266) Notably, "in insolvency the duty runs not directly to the creditors but to the 'community of interest' " *In re Hechinger Investment Co of Delaware*, 274 B R at 89 Thus, "while this duty does not necessarily place creditor interests ahead

of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity." *Id*

### III. DISCUSSION
#### A Defendants Dilworth, Jaschke, and Johnson

"[U]nder Delaware law, conclusory assertions that directors breached their fiduciary duty of care are inadequate; rather, the complaint must contain well-pleaded allegations to overcome the presumption that the directors' decisions were informed and reached in good faith." *In re McKesson HBOC, Inc Sec Litig*, 126 F Supp 2d 1248, 1278 (N D Cal 2000) Plaintiffs's SAC does not contain well pleaded allegations demonstrating that the outside directors-- Defendants Robert P. Dilworth ("Dilworth"), Justin C. Jaschke ("Jaschke"), and Bram B. Johnson ("Johnson")--failed to act on an informed basis, in good faith, unwastefully, and in the honest belief that the action taken was in the best interests of the company In fact, Plaintiffs plead no facts at all alleging a breach of the duty of care by these individuals. At most, Plaintiffs *conclude* that

[t]hrough their actions, in irrationally and recklessly bleeding Metricom of its cash reserves at the rate of $50-70 million per month for expenses that were of no use to the company when the company was not only in the zone of insolvency but in a hopeless condition, Defendants breached their fiduciary duties to the company and its creditors,

SAC, ¶ 28, and that "[t]he acts and omissions of Defendants, which were indicative of gross mismanagement and/or motivated by bad faith and self-interest, were clearly not in the best interest of Metricom and its creditors and indeed, were to their clear detriment," SAC, ¶ 31. Viewing these allegations in the light most favorable to Plaintiffs, they suggest nothing more than that the directors followed through with the company's business plan, *see* SAC, ¶ 15--hardly a basis for overcoming the presumption of the business judgment rule

*4 Plaintiffs' claims necessarily depend upon their ability to prove that Defendants had a conflict of interest stemming from their connection to Allen

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 2151336 (N.D.Cal.)

(Cite as: 2004 WL 2151336 (N.D.Cal.))

and Vulcan. However, Plaintiffs do not plead any facts supporting their conclusion that Defendants Dilworth, Jaschke, and Johnson had such a connection or had any reason or motivation to please Allen or Vulcan. Plaintiffs allege only that Defendants William D. Savoy ("Savoy") and Ralph C. Derrickson ("Derrickson") were associated with Vulcan SAC, ¶ 24.

The present action was commenced over two years ago. The complaint has been amended twice. Plaintiffs still have not articulated a cognizable claim against the outside directors. Accordingly, Plaintiffs' claims against Defendants Dilworth, Jaschke, and Johnson will be dismissed without leave to amend.

B. Defendants Derrickson and Savoy

1. There are no well pleaded facts supporting Plaintiffs' theory of breach of fiduciary duty.

Although they do allege that Defendants Derrickson and Savoy were associated with Vulcan, Plaintiffs do not plead particularized facts that would support a finding that these Defendants breached their duty of care. There is no allegation that any Defendant failed to make an informed business judgment. Rather, Plaintiffs set forth a description of Metricom's demise and the unfortunate market conditions that existed in 2001, *see, e.g.*, SAC, ¶ 17, and claim that Defendants "refused to confront reality," SAC, ¶ 25. Plaintiffs appear to be claiming a lack of *substantive* due care, an impermissible allegation in the decision-making context. *See Brehm*, 746 A.2d at 264; *In re Caremark Int'l Inc Derivative Litig*, 698 A.2d at 967. Even if their argument were permissible, Plaintiffs provide no facts from which the Court could reach the conclusion that Derrickson and Savoy did not exercise informed business judgment.

The heart of Plaintiffs' claims appears to be the assertion that Derrickson and Savoy breached their duty of loyalty. According to Plaintiffs' theory of the case, Derrickson and Savoy were connected to Allen, who sought to promote the development of

Metricom's Network. Allegedly, Allen so desired the development of the Network that he convinced Derrickson and Savoy to continue Metricom's pursuit of the program until the company had no remaining cash, even though Derrickson and Savoy knew that there would be no money left to satisfy the creditors and that the company could not succeed.

Derrickson points to undisputed evidence that he was employed not by Vulcan itself, but by Vulcan Northwest, Inc , a Vulcan affiliate, and that such employment ended in September 1998. In their opposition brief, Plaintiffs respond that a "majority of the board had ties, to varying degrees, with Vulcan and/or Allen such that one can infer that it was their influence, and not a good faith attempt to act in the company's interest, that led them to act irrationally." Opposition, p. 13. The SAC itself merely contains a conclusory statement that Derrickson was connected to a Vulcan affiliate. SAC, ¶ 24. Plaintiffs have not pleaded specific facts supporting their theory, but instead ask the Court to infer that the inside directors' ties to Allen and Vulcan were so strong as to cause them to abandon their fiduciary duties. The Court may not do this under Delaware law.

2. Plaintiffs have not pleaded facts suggesting that the board was interested.

*5 "[T]o rebut the presumption [of the business judgment rule], a shareholder plaintiff assumes the burden of providing evidence that the *board* of directors, in reaching *its* challenged decision, breached any *one* of *its* triad of fiduciary duties: good faith, loyalty, or due care." *Cinerama, Inc v. Technicolor, Inc*, 663 A.2d 1156, 1164 (Del.1995) Thus, Plaintiffs must plead facts supporting the conclusion either that a *majority* of directors breached fiduciary duties or that an

> interested director *control[led]* or *dominate[d]* the board as a whole or [that] the interested director *fail[ed] to disclose his interest* in the transaction to the board *and* a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2004 WL 2151336 (N.D.Cal.)

(Cite as: 2004 WL 2151336 (N.D.Cal.))

*Id.* at 1168. It is undisputed that Plaintiffs have not pleaded facts suggesting that the outside directors were interested. Moreover, they have made only conclusory statements that Derrickson was interested. They have not pleaded any facts specifying the composition--whether interested or not--of the board at the time that any allegedly improper decision was made. In particular, they have not pleaded facts suggesting that the board--that is, a majority of the directors--was (1) connected to Allen or Vulcan or (2) controlled or dominated by any director connected to Allen or Vulcan when it decided to continue developing the Network. Thus, there is no factual basis for rebutting the presumption of the business judgment rule with respect to the board's decision to follow through with Metricom's business plan.

3. There are no well pleaded facts indicating when Metricom entered into a "zone of insolvency."

In *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del.Ch.1992), the defendant argued that the plaintiff had not pleaded sufficient facts suggesting that there was a "zone" of insolvency. The court disagreed, concluding that the plaintiff had pleaded specific enough facts to suggest that the court might later find such a zone. In that case, Plaintiff pleaded the following specific facts: "substantial assets [of defendant corporation] were so liquidated [for two years] that its liabilities probably were greater than the value of its assets"; a fiduciary, Ingersoll, had "caused [defendant corporation] to give up an asset worth approximately $50 million for consideration primarily paid to Mr. Ingersoll and Warburg" (another fiduciary); that "Ingersoll caused [defendant corporation] to cancel valuable management agreements with the domestic newspapers retained by Warburg in return for consideration paid to Mr. Ingersoll"; and that, "as a result of the transactions, [defendant corporation] failed to make payments due to plaintiff because it was unable." *Id.* at 791. Here, Plaintiffs allege no such specific facts, and their conclusory allegations are unsupported by the available facts. Plaintiffs simply conclude in the SAC that "upon information and belief, by mid-2000, Metricom was insolvent or had entered the "zone of insolvency." SAC, ¶ 18.

They base this conclusion on the "facts" that: (1) the financial markets, in particular those relating to telecommunications, were "deteriorating badly," (2) Metricom could not secure additional funding, and (3) Metricom did not generate significant revenues in the markets in which it had deployed the Network at that time. SAC, ¶ 17.

*6 However, Plaintiffs plead no facts suggesting that Metricom was not operating appropriately according to its business plan, *see* SAC, ¶ 15, in mid-2000. Plaintiffs also admit that Metricom did not file for bankruptcy until July 2, 2001. SAC, ¶ 22. As late as February 28, 2001, Metricom had a net cash deficit of only $19 million, which resulted from "working capital of approximately $327 million and outstanding purchase commitments for capital, equipment, network construction labor and modems of approximately $346 million." SAC, ¶ 21. While it is true that Metricom admitted in February 2001 that it was experiencing difficulties and that it was "looking at all alternatives" to remedy them, *see* Lefler Decl., Ex. C (Form 8-K, p. 2, of which the Court takes judicial notice), there nonetheless is no basis for suggesting that the board did not believe that, with adequate alterations, Metricom could generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time. In fact, prior to the February 2001 announcement, this state of affairs appears to have been typical for Metricom and, according to Defendants, "was well-stated and publicly disclosed in Metr[i]com's SEC filings." Derrickson's Reply, p. 5. For example, in the Management's Discussion and Analysis section of Metricom's June 30, 2000 Form 10-Q SEC filing, management states:

> As we deploy our high-speed network and launch our high-speed service, we expect our operating expenses to increase significantly from historical levels and to exceed revenues for the foreseeable future. We expect to generate substantial net losses to common stockholders for the foreseeable future.

Lefler Decl., Ex. B (Form 10-Q, p. 11, of which the Court takes judicial notice). In the same section,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                          Page 6

Not Reported in F.Supp.2d, 2004 WL 2151336 (N.D.Cal.)

(Cite as: 2004 WL 2151336 (N.D.Cal.))

management states: "In the future, after we launch our high-speed service, we    expect to derive substantially all of our future revenues from subscription fees paid to us by channel partners." *Id.* at 12. Metricom's business plan thus involved incurring increased operating expenses in the short term in order to build the Network, with the goal of deriving future revenues from it. Not only do Plaintiffs not dispute that this was Metricom's business plan, but they plead no facts that would tend to prove that Metricom was insolvent or had entered a zone of insolvency by mid-2000.

The only allegation in the SAC that comes close to providing tenable support for Plaintiffs' theory is that Defendants "irrationally and recklessly bl[ed] Metricom of its cash reserves at the rate of $50-70 million per month for expenses that were of no use to the company when the company was not only in the zone of insolvency but in a hopeless condition." SAC, ¶ 28. At the outset, the Court notes that this conclusory statement does not support Plaintiffs' assertion that Metricom was in a zone of insolvency in mid-2000. Instead, it simply makes the point that money should not have been spent after Metricom entered a zone of insolvency--merely a restatement of the applicable law. Additionally, while one might infer from this allegation that Defendants knew that they would never be able to raise cash in the future to offset these expenditures, no facts are pleaded that support such an inference. Plaintiffs have not pleaded any particularized facts suggesting that such expenditures were wasteful at the time that they were made. Instead, looking in hindsight from Metricom's bankruptcy filing in July 2001, Plaintiffs have concluded that expenditures *should* have ceased in mid-2000, a full year earlier, at which time Metricom had over $1.3 billion in assets, *see* Lefler Decl., Ex. B (Form 10-Q, p. 4).

*7 Because Plaintiffs have not pleaded facts supporting their conclusion that Metricom was in a zone of insolvency at the time of the alleged wasteful expenditures, they have not adequately supported their theory that Defendants owed them fiduciary duties. Moreover, even if Metricom was in a zone of insolvency beginning in mid-2000, Defendants' fiduciary duties would not have shifted

completely to Plaintiffs. Instead, fiduciary duties would be owed to the community of interests. As described above, Plaintiffs have not set forth well pleaded facts supporting their theory that Defendants breached their fiduciary duties to the company, shareholders, and creditors combined. At any level of analysis, Plaintiffs have not stated a cognizable claim for relief under Delaware corporate law. Accordingly, the claims will be dismissed without leave to amend.

IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that Defendants' motions are GRANTED. The second amended complaint is dismissed without leave to amend.

Not Reported in F.Supp.2d, 2004 WL 2151336 (N.D.Cal.)

Motions, Pleadings and Filings (Back to top)

• 5:02cv04756 (Docket) (Oct. 02, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.