LEXSEE 2002 DEL CH LEXIS 132

MARK H. STEINMAN, Plaintiff, v. ARTHUR E. LEVINE, MARK MICKELSON, ANDREW COHEN, CAROL ADESHAK, LEVINE LEICHTMAN CAPITAL PARTNERS, L.P., LEVINE LEIGHTMAN CAPITAL PARTNERS, INC., and ING (U.S.) CAPITAL, L.L.C., Defendants.

C.A. No. 19107

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

2002 Del. Ch. LEXIS 132

August 6, 2002, Submitted
November 27, 2002, Decided

SUBSEQUENT HISTORY: [*1] Counsel Corrected December 30, 2002. Affirmed by Steinman v. Levine, 2003 Del LEXIS 235 (Del., Apr. 17, 2003)

DISPOSITION: Motions to dismiss for lack of personal jurisdiction and for failure to state a claim were granted.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff, a defendant corporation's founder, but now a minority shareholder, who pledged his share's votes to secure loans (later restructured with warrants) to the corporation by defendant lenders, sued the lenders, and defendants, their controlling entity and their principles, who had become directors of the corporation, alleging that defendants defaulted loans to obtain control of the corporation. Defendants moved to dismiss.

OVERVIEW: The chancery court, in granting the motion to dismiss, noted first that it did not have jurisdiction over defendant nonresidents, the lender, and its controlling entity, under Del Ch Ct R 12(b)(2) and the long-arm statute Del Code Ann tit. 10, § 3104(c)(1), and under the Due Process Clause; those entities only did two acts in Delaware, filing a merger certificate and amending the corporation's certificate of incorporation, and those acts were insufficient for jurisdiction since they did not relate to the founder's claims. The acts complained of occurred in California so the founder could not impute other acts under a conspiracy theory of jurisdiction that required a substantial Delaware act and a conspiracy allegation as two parts of a five-part test. The founder was collaterally estopped from arguing there was no default, so that his shares could not be voted, since he won a California lawsuit after arguing there was a default.

Applying judicial estoppel did not require detrimental reliance. The corporation's fiduciaries did not breach an obligation of loyalty; they made a payment on the loan, but if they had not made the payment, the loan would have been in default sooner.

OUTCOME: The chancery court granted the motion to dismiss for lack of personal jurisdiction over some defendants and for failure to state a claim for relief against other defendants.

LexisNexis(R) Headnotes

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss
[HN1] When personal jurisdiction is challenged by a motion to dismiss pursuant to Del. Ch. Ct. R. 12(b)(2), the plaintiff bears the burden of showing a basis for a court's exercise of jurisdiction over the nonresident defendant. Generally, the court will engage in a two-step analysis: (1) determining whether service of process on the nonresident is authorized by statute; and, (2), considering whether the exercise of jurisdiction is, in the circumstances presented, consistent with due process.

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Evidence > Procedural Considerations > Burdens of Proof
[HN2] On a Del. Ch. Ct. R. 12(b)(2) motion, the burden is on the plaintiff to make a specific showing that a chancery court has jurisdiction under the long-arm statute, Del. Code Ann. tit. 10, § 3104(c).

2002 Del. Ch. LEXIS 132, *

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] When considering a motion to dismiss a complaint under Del. Ch. Ct. R. 12(b)(6) for failure to state a claim upon which relief can be granted, a chancery court is to assume the truthfulness of all well-pleaded allegations of fact in the complaint. Although all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true. That is, a chancery court need not blindly accept as true all allegations, nor must it draw all inferences from them in a plaintiff's favor unless they are reasonable inferences. Additionally, the chancery court may consider, for certain limited purposes, the content of documents that are integral to or are incorporated by reference into the complaint. Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN4] With respect to a Del. Ch. Ct. R. 12(b)(6) motion to dismiss, a chancery court is hardly bound to accept as true a demonstrable mischaracterization or the erroneous allegations that flow from it.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN5] With respect to a Del. Ch. Ct. R. 12(b)(6) motion to dismiss, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN6] A chancery court must first consider the defendants' motion to dismiss for lack of personal jurisdiction pursuant to Del. Ch. Ct. R. 12(b)(2) before reaching the merits of their motion to dismiss under Del. Ch. Ct. R. 12(b)(6).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN7] A two-step analysis is required to determine whether personal jurisdiction may be exercised over a nonresident defendant. First, a trial court must consider whether Delaware's long-arm statute for service of process on nonresident defendants, Del. Code Ann. tit. 10, § 3104(c), is applicable. Second, the trial court must determine whether subjecting nonresident defendants to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN8] See Del. Code Ann. tit. 10, § 3104(c).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN9] To validly exercise jurisdiction under a conspiracy theory a court must find that a five-part test has been satisfied. The test requires: (1) the existence of a conspiracy to defraud, (2) defendant must be a member of that conspiracy, (3) a substantial act or substantial effect in furtherance of the conspiracy occur in Delaware, (4) the defendant know or have reason to know of the act in Delaware or that acts outside Delaware would have an effect in Delaware, and (5) the act in or effect on Delaware is a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN10] Due process in the exercise of personal jurisdiction requires a "minimum contacts" analysis, which seeks to determine the fairness of subjecting a nonresident defendant to suit in a distant forum by considering all of the connections among the defendant, the forum and the litigation. The minimum contacts test protects a defendant against the burdens of litigating in a distant or inconvenient forum, and ensures that states, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system. A defendant's conduct and connection with a forum state should be such that she can reasonably anticipate being haled into court in her nonresident forum.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN11] A basic tenet of the due process analysis of a court's exercise of personal jurisdiction is whether the party purposely availed itself of the privilege of conducting activities within a forum state, thus, invoking the benefits and protections of its laws. This purposeful

availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN12] The general rule is that ownership of stock in a Delaware corporation is not enough to satisfy the "minimum contacts" test that due process requires

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN13] The State of Delaware does not have an interest in providing a forum for claims against defendant, where those claims involve events occurring out of Delaware, caused no injury in Delaware, and involve a plaintiff and defendants who are not Delaware residents.

*Civil Procedure > Preclusion & Effect of Judgments > Collateral Estoppel*
*Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel*
[HN14] The doctrine of collateral estoppel provides that a judgment in a prior suit precludes the relitigation of a factual issue which has been litigated and decided in the prior suit between the same parties or persons in privity with them. Also, the Delaware Supreme Court has stated, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. Finally, under the doctrine of judicial estoppel, a party may be precluded from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier legal proceeding.

*Civil Procedure > Preclusion & Effect of Judgments > Collateral Estoppel*
[HN15] Where defendants are sued in their capacities as directors of a corporation, they stand in privity with the corporation for collateral estoppel purposes.

*Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel*
[HN16] The proposition that judicial estoppel requires detrimental reliance is not a persuasive argument.

*Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel*
[HN17] Delaware cases cite the elements of judicial estoppel which do not require detrimental reliance.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > Class Actions > Derivative Actions*
[HN18] It cannot be said that a corporation's loan payment made in accordance with a properly executed loan agreement results in an individual stockholder injury. When the corporation repays part of its debt obligation, the result is that every stockholder in the corporation was affected in the identical manner on a stock-for-stock basis. Thus, this type of claim falls squarely within the definition of a derivative action.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN19] To maintain a derivative suit, a stockholder must allege either that the board has rejected a demand that it assert the corporation's claim or allege with particularity why the stockholder is justified in not having made the effort to obtain board action. Del. Ch. Ct. R. 23.1. Where the stockholder has done neither, and has not pled that demand is excused or that demand is wrongfully refused, his duty of loyalty claim must be dismissed.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN20] Anytime a corporation pays a legal obligation, however, it may be argued that it decreases the value of stockholders' equity. Without more, there cannot be a cause of action for such a payment

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN21] Even if the consequences of a foreclosure by creditor/stockholder are, for example to render the value of the minority stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
[HN22] The Delaware Supreme Court has held that claims for a breach of fiduciary duty of disclosure can only arise when the defendant has made statements to the corporation's stockholders in connection with a request for stockholder action. A duty of disclosure claim that is based on a cause of action that occurs without a request

2002 Del. Ch. LEXIS 132, *

for stockholder action does not properly state a claim for a breach of the fiduciary duty of disclosure. Where disclosure claims arise in the absence of a request for stockholder action, courts are willing, however, to allow a plaintiff to plead such arguments under the rubric of duty of loyalty.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN23] The duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN24] The duty of disclosure is merely a specific application of the more general fiduciary duty of loyalty that applies only in the setting of a transaction or other corporate event that is being presented to the stockholders for action.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN25] Plaintiffs, who have sufficiently pleaded the claim and supporting facts that defendant owed plaintiff a fiduciary duty of loyalty, but have failed to establish the existence of a similar fiduciary duty of disclosure as a matter of law, shall have the opportunity to replead to assert an appropriate cause of action based upon a breach of the duty of loyalty.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN26] To successfully state a duty of loyalty claim against directors for providing information in the absence of a request for stockholder action, a stockholder must allege he has received false communications from directors who are deliberately misinforming shareholders about the business of the corporation.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN27] In the absence of a request for stockholder action, a duty of loyalty claim requires well pleaded allegations that directors deliberately misinformed stockholders through the dissemination of false information.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN28] The elements that a shareholder must allege to adequately plead an aiding and abetting claim are clear.

The shareholder must plead facts that support (1) the existence of a fiduciary relationship, (2) a breach of duty by the fiduciary, (3) the alleged aider and abettor's knowing participation in the breach, and (4) damages resulting from the concerted action of the fiduciary and the aider and abettor. Specifically, where the trial court has found no breaches of fiduciary duty, this finding is fatal to the shareholder's aiding and abetting claim.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN29] To state a cause of action for common law fraud under Delaware law, a plaintiff must allege (1) a false representation made by the defendant, (2) the defendant's knowledge of the falsity of the representation or reckless disregard for the truth, (3) the defendant's intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's justifiable reliance upon the representation, and (5) damage to the plaintiff as a result of such reliance. Further, when a complaint alleges fraud, the circumstances constituting fraud must be stated with particularity. Without pleading such particularity, those claims will be dismissed.

*Torts > Business & Employment Torts > Deceit & Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN30] There are strenuous pleading requirements that must be alleged when asserting fraud as a cause of action. Specifically, a well pleaded fraud allegation must include at least the time, place, and contents of the false representations and what is obtained thereby.

**COUNSEL:** Edmond D. Lyons, Jr., Esquire, THE LYONS LAW FIRM, Wilmington, Delaware; Michael J. Maimone, Esquire, GORDON FOURNARIS & MAMMARELLA, P.C., Wilmington, Delaware, Attorneys for Plaintiff.

Josy W. Ingersoll, Esquire, Martin S. Lessner, Esquire, Sara Beth Reyburn, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael Sherman, Esquire, ALSCHULER GROSSMAN STEIN & KAHAN, LLP, Los Angeles, California, Attorneys for Defendants Arthur Levine, Levine Leichtman Capital Partners, Inc., and Levine Leichtman Capital Partners, L.P.

David L. Finger, Esquire, Wilmington, Delaware, Attorney for Defendant Mark Mickelson.

Alan J. Stone, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, Attorneys for Defendant Andrew Cohen.

2002 Del. Ch. LEXIS 132, *

Raymond J. DiCamillo, Esquire, Becky A. Hartshorn, Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware, Attorneys for Defendant ING (U.S.) Capital, L.L.C.

JUDGES: Stephen P. Lamb, Vice Chancellor.

OPINIONBY: Stephen P. Lamb

OPINION:

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

This action arises out of a series of loan and pledge agreements between a Delaware corporation, its nonresident founding stockholder, [*2] and its nonresident creditors and current controlling stockholders. The loan agreements at issue provided more than $ 32,000,000 in financing to the Delaware corporation. At the time the loan agreements were executed, the plaintiff owned one-third of the Delaware corporation's common stock. Pursuant to a pledge agreement executed contemporaneously with the loan agreements, the plaintiff agreed to secure the corporation's obligations by a pledge of all his stock in the Delaware corporation. If the corporation defaulted on the loans, the creditors could exercise certain rights under the pledge agreement, including voting the plaintiff's pledged shares.

The Delaware corporation defaulted on its loan agreements at various times and the corporation's creditors waived the defaults and restructured the loans. To induce the corporation's creditors to restructure the loans and waive the defaults, the Delaware corporation issued warrants exercisable for 50% of the corporation's voting stock, on a fully diluted basis. Finally, after the Delaware corporation's third default, its creditors chose to exercise their rights under the pledge agreement by voting the plaintiff's shares. The plaintiff [*3] thereafter filed suit alleging various causes of action.

The plaintiff's complaint contains essentially two core allegations. First, the plaintiff alleges that the Delaware corporation did not default on its most recent loan agreement. Second, the plaintiff alleges that the directors of the Delaware corporation should not have made principal payments pursuant to the most recent loan agreement, even though such amounts were legally owed. The plaintiff argues that the actions of the defendants were part of some overarching scheme to usurp the plaintiff's rights in his stock and to obtain control of the corporation.

The plaintiff's complaint must be dismissed for several reasons. First, the complaint must be dismissed against two of the corporation's creditors-controlling stockholders because this court cannot exercise personal jurisdiction over those defendants. The complaint must also be dismissed against the remaining defendants because its fails to state a claim upon which relief can be granted.

The plaintiff is estopped from arguing that the Delaware corporation was not in default on its loans because he previously obtained a judgment in California state court based on the fact [*4] that the corporation was in default. Moreover, the plaintiff's claims related to its principal payments pursuant to the loan agreements must be dismissed because these claims are derivative in nature and the complaint fails to comply with Rule 23.1. In addition, there is no valid claim because the challenged payments were admittedly made with respect to legally enforceable obligations. Finally, none of the disclosures or non-disclosures in this case rise to the level of a breach of the directors' fiduciary duty of disclosure, nor do they amount to fraudulent or negligent misrepresentations.

II.

A. The Parties

1. The Plaintiff

Mark Steinman is a California resident and was co-founder of Chorus Line Corporation ("Chorus"). From 1975 until 1996 Steinman was President and Chief Operating Officer of Chorus. From 1975 until 1997, he was a director of Chorus. At all times relevant to this litigation, Steinman was a Chorus stockholder. Chorus was originally a California corporation founded in 1975 by Steinman and Barry Sacks. In September 1987, Chorus reincorporated in Delaware. In the mid-1990s, Chorus was one of this country's largest designers and marketers of women's [*5] and junior's dresses, with sales in 1996 exceeding $ 240,000,000. By 1999, however, revenues had decreased to $ 130,000,000. Before the events alleged in Steinman's complaint, Steinman, Sacks and Jay Balaban each owned one-third of the issued and outstanding shares of Chorus stock. n1

> n1 For purposes of this motion, the following facts are taken from Steinman's well-pleaded allegations in his Amended Complaint.

2. The Defendants

Arthur E. Levine, Mark Mickelson, Andrew Cohen and Carol Adeshak (collectively the "Defendant Direc-

tors") constituted a majority of the five-person board of directors (the "Board") of Chorus during the relevant period. Cohen was Chorus's CEO from 1997 until 2000, and from 1998 until 2000 he was also its CFO.

Levine Leichtman Capital Partners, Inc ("LLCP") is a California corporation that manages hundreds of millions of dollars of institutional capital. LLCP invests capital through various entities, including Fund I (see below). LLCP (through its control of Fund I) has been a controlling [*6] stockholder of Chorus since 1998.

Levine Leichtman Capital Partners, L.P. ("Fund I") is a California limited partnership that manages over $ 100 million of institutional capital. Fund I has been a creditor of Chorus since 1996, and has been a controlling stockholder since 1998. Fund I is managed and controlled by LLCP. Mickelson, in addition to being a director of Chorus, was a general partner of Fund I during the relevant period.

Levine, in addition to being a director of Chorus, is a co-founder and general partner of Fund I. He is also a director, President, and a stockholder of LLCP. As disclosed in various public filings, Levine, Fund I, and LLCP are "affiliated" under the federal securities laws.

ING (U.S.) Capital, L.L.C ("ING") is a Delaware corporation. ING has been a creditor of Chorus since 1994. In 1999, ING entered into an agreement with LLCP (through its control of Fund I) appointing Fund I as ING's agent and permitting LLCP (through its control of Fund I) to exercise ING's rights (including voting rights) in connection with ING's investment in Chorus.

B. LLCP And ING Make Loans To Chorus

On February 1, 1994, Chorus and ING (among others) entered into an [*7] agreement where (a) ING agreed to invest in Chorus by purchasing notes of Chorus from a third-party investor, and (b) Chorus agreed to issue warrants to ING exercisable for 30% of Chorus stock on a fully diluted basis. The obligations of Chorus under the loan agreement were secured by, among other things, a pledge by Sacks, Balaban and Steinman of all their Chorus stock.

On April 30, 1996, Chorus and Steinman entered into a Separation Agreement related to the termination of Steinman's employment with Chorus. The Separation Agreement provided (among other things) that Steinman had a right to receive accurate financial information from Chorus, but only if requested by Steinman.

On November 18, 1996, Chorus, LLCP (through its control of Fund I) and ING entered into an agreement, whereby Chorus and ING agreed to amend the above described loan agreement, and LLCP (through its control of Fund I) and ING agreed to loan additional funds to Chorus (the "November 1996 Agreement"). Specifically, under the November 1996 Agreement, Chorus, LLCP (through its control of Fund I) and ING agreed that: (a) ING would purchase additional long-term notes from Chorus that would result in a loan to Chorus [*8] from ING with an aggregate value of $ 22,500,000, (b) LLCP (through its control of Fund I) would acquire from ING a portion of the long-term notes originally purchased from Chorus with an aggregate value of $ 10,500,000, and (c) LLCP (through its control of Fund I) would purchase additional long-term notes from Chorus with a value of $ 1,500,000. In addition, LLCP (through its control of Fund I) and ING agreed to provide Chorus with two short-term loans in the aggregate amount of $ 14,000,000 (a "Term A Note" in the amount of $ 8,000,000 and a "Term B Note" in the amount of $ 6,000,000). Chorus agreed to issue a "Deferred Fee Note" to ING in the amount of approximately $ 1,600,000. All of the loans made by ING to Chorus under the November 1996 Agreement were secured with a pledge by Sacks, Balaban, and Steinman of all their stock in Chorus. The warrant agreement between Chorus and ING was also amended, which resulted in Chorus issuing warrants to ING exercisable for 15% of Chorus stock on a fully diluted basis, and Chorus issuing warrants to LLCP (through its control of Fund I) exercisable for 20% of Chorus stock on a fully diluted basis.

The November 1996 Agreement provided that [*9] Chorus would repay the loans in accordance with a repayment schedule. On or about December 31, 1996, and continuing until May 29, 1997, Chorus defaulted on various provisions of the November 1996 Agreement. On May 29, 1997, as a result of such defaults, Chorus requested that: (a) LLCP (through its control of Fund I) and ING waive the events of default that occurred, (b) the maturity date of the Term A Note be extended, and (c) various financial covenants in the November 1996 Agreement be amended. LLCP (through its control of Fund I) and ING agreed to the requests of Chorus (the "May 1997 Agreement"). Again, Sacks, Balaban and Steinman pledged all their shares of Chorus stock to secure the loans. In connection with the May 1997 Agreement, the warrant agreement between Chorus, ING and LLCP was again amended, which resulted in Chorus issuing warrants to ING exercisable for 20% of Chorus stock on a fully diluted basis, and Chorus issuing warrants to LLCP (through its control of Fund I) exercisable for 25% of Chorus stock on a fully diluted basis.

On November 21, 1997, the Board approved various amendments to the May 1997 Agreement (the "November 1997 Agreement"). Under the terms of the [*10] November 1997 Agreement, LLCP (through its control of Fund I) and ING waived the events of default that occurred after May 29, 1997, and agreed to make an ad-

ditional loan to Chorus under the provisions of the Term B Note in the aggregate amount of $ 3,000,000. The November 1997 Agreement also required Chorus to repay its loans in accordance with an amended payment schedule. The November 1997 Agreement was again secured by a pledge of all Chorus stock held by Sacks, Balaban and Steinman (the "1997 Pledge Agreement").

In order to induce ING to agree to the November 1997 Agreement, the warrant agreement between Chorus, ING and LLCP (through Fund I) was further amended, which resulted in Chorus issuing warrants to ING and LLCP (through Fund I) exercisable for 25% of Chorus stock, respectively, on a fully diluted basis. Thus, after execution of the November 1997 Agreement, Chorus had issued warrants to LLCP (through its control of Fund I) and to ING exercisable for, in the aggregate, 50% of the shares of voting stock of Chorus on a fully diluted basis.

During the end of 1997 and the beginning of 1998, LLCP and Fund I (in their capacity as creditors) became involved in the day-to-day operations [*11] of Chorus. On March 19, 1998, Chorus, LLCP (through Fund I) and ING agreed to amend the payment schedule set forth in the November 1997 Agreement (the "March 1998 Agreement"). The March 1998 Agreement was not consented to by Steinman, and Steinman was never asked to execute an amendment to the 1997 Pledge Agreement. However, neither Steinman's consent nor an amendment to the 1997 Pledge Agreement was required. Instead, the 1997 Pledge Agreement refers to the "existing [Loan Agreement] as amended by the [Loan Agreement Amendment] and as it may be subsequently modified, restated or otherwise modified." n2 The 1997 Pledge Agreement goes on to state that ING and LLCP could, without notice to Steinman, "renew, extend, accelerate or otherwise change the time, place, manner or terms of payment by Chorus of the Underlying Debt." n3

n2 Amend. Comp. Ex. D at § 1.1

n3 Amend. Comp. Ex. B at § 14(a)

C. Fund I Obtains Board Representation

On July 20, 1998, LLCP (through its control of Fund I) exercised [*12] the warrants it received from Chorus in connection with the various loan agreements. After LLCP's exercise, it controlled 47% of Chorus's voting stock on a non-diluted basis. Levine then approached a Chorus representative and insisted that Fund I be allowed to appoint members to Chorus's Board. As a result, on or about October 20, 1998, Levine and Mickelson were nominated and elected as directors of Chorus during a special meeting of the Board. The Board then consisted of Levine, Mickelson, Cohen, Sacks and Balaban.

At various times before an October 20, 1998 special meeting of the Board, Levine and Mickelson allegedly contacted Cohen and stated that if Cohen agreed to side with LLCP, LLCP (a) would grant Cohen a significant increase in compensation and would provide Cohen with other employee-related benefits (including an equity interest in Chorus), (b) would support Cohen's continued employment as the Chorus CEO, (c) would support the removal of Sacks as the CFO of Chorus and the election of Cohen as the new CFO, and (d) would make Cohen responsible for the operations of all major Chorus divisions, including the divisions that Balaban had been managing. Essentially, LLCP offered [*13] to remove Sacks and Balaban from their respective positions of responsibility at Chorus and replace them with Cohen. Cohen allegedly agreed.

At a special meeting of the Board on October 20, 1998, Cohen was granted an increase in compensation and other benefits. At another special meeting of the Board on December 3, 1998, Levine moved that the Board elect Adeshak to fill a vacant seat on the Board. Cohen seconded the motion, and the Board elected Adeshak as a Chorus director. At the same meeting, the Board decided not to renew Sacks's employment agreement, and, thus, terminated Sacks as the CFO. It then elected Cohen to replace Sacks as the CFO.

As a result of the events that occurred during December 1998, LLCP essentially obtained control of the Board. However, this control was far from secure. So long as Sacks, Balaban, and Steinman voted their stock as a group, they continued to have voting control of Chorus. Thus, they had the authority to (a) expand the Board, pursuant to Chorus's Certificate of Incorporation, and elect individuals to serve in the vacant and newly-created seats on the Board, n4 and (b) replace any director at the end of the director's term or "for cause," and [*14] nominate and elect an individual to fill such vacancy on the Board. On February 5, 1999, at a special meeting, the Board demoted Balaban and promoted Cohen to manage all of Chorus's major divisions (including those divisions formerly managed by Balaban). n5

n4 Article FIFTH of Chorus's Certificate of Incorporation provides:

The business affairs of the corporation shall be managed under the direction of the Board of Directors. The number of directors con-

stituting the Board shall be seven (7); provided, however, that the Board of Directors shall be authorized to increase the number of directors to not more than ten (10)

Amend Comp at 19

n5 Specifically, the Board approved the following resolution:

> BE IT HEREBY RESOLVED, that Andrew Cohen be responsible for the running of the operations of all of the divisions of the Company, and all division heads report to him; that Jay Balaban be delegated the responsibility of (i) operating a new "private label" division of the Company, (ii) continuing to operate the Company's Jazz Sport division and (iii) continuing to deal with certain customers designated by the Company's Chief Executive Officer

*Id* at 22

[*15]

Balaban was removed from his duties as an employee of Chorus "for cause" at a February 26 Board meeting. Balaban contested the Board's decision and threatened litigation. In order to avoid litigation, on or about May 25, 1999, Chorus, LLCP and Balaban entered into a stock purchase agreement. Pursuant to the stock purchase agreement, LLCP agreed to purchase 90% of Balaban's Chorus shares. After this purchase, LLCP (through its control of Fund I) controlled approximately 65% of Chorus's voting stock, and with ING (if ING executed the warrants it received from Chorus in connection with the various loan agreements) controlled approximately 76% of the shares of Chorus's voting stock.

Balaban refused to sell the remaining 10% of his shares to LLCP because he did not want to give absolute control of the corporation, and its capital structure, to LLCP n6 Rather, Balaban sold his remaining 10% to Sacks. As a result, Steinman and Sacks, voting as a block, collectively controlled more than 20% of Chorus's voting stock. Accordingly, LLCP did not have the authority to cause Chorus to amend or alter its capitalization without the approval of either Sacks or Steinman

n6 Article TENTH of Chorus's Certificate of Incorporation contained a super-majority provision that provided, that without the "affirmative vote of the holders of at least eighty percent (80%) of the voting power of all the stock of [Chorus]," the Board did not have the authority to amend or alter the capitalization of Chorus. *Id* at 24.

[*16]

On June 21, 1999, the Board approved a merger between Chorus and S S B , Inc., a wholly owned subsidiary of Chorus. On August 8, 1999, Cohen filed with the Delaware Secretary of State a certificate of merger related to the S.S.B. transaction.

D. Chorus Pays Part Of Its Debt

On September 30, 1999, Chorus provided August 1999 financial statements to its stockholders, which disclosed that during March 1999 Chorus paid $ 3,000,000 to LLCP (through Fund I) and ING in repayment of a portion of the Term A Note. Chorus also informed its stockholders that another payment of $ 1,500,000 was made to LLCP (through Fund I) and ING on August 31, 1999, in repayment of an additional portion of the Term A Note:

> While the Company's excess cash flow allowed for repayment of approximately $ 2.6M other restraints as they applied to minimum availability giving effect to repayment allowed the Company to only repay $ 1.5M on August 31, 1999. The maturity date of the remaining $ 4.5M of short term debt ... has been extended to November 2001. The Company will continue to make annual payments against the debt remaining based on excess cash flow calculations.

Furthermore, in a "Certificate [*17] of Compliance" accompanying the August 1999 financial statements, Chorus disclosed that "no Event of Default has occurred or is continuing under any working capital or other arrangement to which the Company is a party, nor has the Company received any notice of cancellation with respect to its insurance policies."

E. LLCP And ING Declare An Event Of Default

2002 Del Ch LEXIS 132, *

On December 3, 1999, ING, LLCP and Fund I entered into an agreement appointing Fund I as ING's agent and permitting LLCP (through its control of Fund I) to exercise ING's rights (including voting rights) in connection with the 1997 Pledge Agreement Also, on December 3, 1999, Fund I (at the direction of LLCP) forwarded a notice to Steinman, informing him that Chorus was in default of the March 1998 Agreement Specifically, in a letter addressed to Chorus, Sacks and Steinman, LLCP (through Fund I) stated that "you are hereby notified that by [Chorus's] failure to observe the [various financial] covenants" set forth in the March 1998 Agreement with LLCP (through Fund I) and ING, an "Event of Default occurred and is continuing " n7 Such an "Event of Default" allowed ING to enforce its rights under the 1997 Pledge Agreement, [*18] including the right to vote the shares of Chorus stock owned by Sacks and Steinman LLCP (through Fund I) notified Chorus, Sacks and Steinman that "all rights of [Sacks and Steinman] to exercise the voting rights with respect to their respective shares of common stock of [Chorus] shall hereby cease, and such rights are hereupon vested in" ING n8

n7 *Id* at 29

n8 *Id*

In response to the notice that an Event of Default had occurred, on December 7, 1999 Steinman's attorneys forwarded a letter to Chorus's attorneys expressing surprise that an Event of Default occurred, and stated:

> We note that prior to the December 3 LLCP letter (which our client did not receive until December 4) our client had not received any notice or communication of any kind from [Chorus] or any of its lenders regarding [Chorus's] alleged financial distress We also note that the LLCP does not identify the alleged Event of Default with any particularity The lack of any prior notice or communication to our client [*19] as well as this lack of specificity leads us to question the severity of [Chorus's] financial position as claimed by LLCP If in fact [Chorus] has been in material breach of its various credit facilities for some time, then we believe that it was incumbent upon [Chorus] to have called a shareholders' meeting to address the matter. n9

n9 *Id* at 30

On December 7, 1999, Cohen responded to Steinman's letter, and notified him for the first time that Chorus was experiencing significant financial difficulties that negatively affected Chorus's business:

> [Chorus] has been in default to ... ING and LLCP since June 30, 1999 as a result of the difficult conditions that are currently present in the dress market. I also expect [Chorus] to be in default for the quarter ended December 31 As a result of these defaults, Heller Financial, [Chorus's] working capital lender, has refused to permit [Chorus] to full access of its overadvance facility This has caused a liquidity crises at [Chorus] [*20] which is so severe that [Chorus] may not be able to meet its payroll on Friday December 10, 1999. In such a circumstance [Chorus] will have no choice but to file bankruptcy in which case your shares will be worthless n10

n10 *Id* at 30-31.

Cohen also sent along with the letter, a memorandum dated December 1, 1999, which was prepared for the Board by Cohen, that stated "despite [Chorus's] ability to manage its working capital through smaller, more timely inventory, its poor sales performance in 1999 has caused violations of its financial covenants for the second and third quarter ... It is further projected that [Chorus] will be in violation of its fourth quarter 1999 financial covenants." n11 The memorandum further provided:

> In the declining sales and gross profit scenario that has been outlined above the Company was able to improve its use of working capital and reduce its long term debt through provisions of its working capital facility by $ 4.5M in 1999. This repayment represents [*21] the first debt repayment from operations to be repaid since November 1997 n12

n11 *Id* at 31.

n12 *Id*

2002 Del. Ch. LEXIS 132, *

As was stated by LLCP (through Fund I) in the December 3, 1999 notice forwarded to Steinman, Fund I, individually and as agent of ING, voted the shares of Chorus stock owned by Sacks and Steinman. Specifically, on December 4, 1999, Fund I executed a written consent of the Chorus stockholders unanimously approving an amendment to Chorus's Certificate of Incorporation. The amendment increased the number of authorized shares and created a class of preferred stock. The amendment also altered the requirements for calling a special meeting of Chorus stockholders. On December 6, 1999, Fund I executed a written consent of the Chorus stockholders unanimously amending the capitalization of Chorus by creating a Series B redeemable and convertible preferred stock.

F. Subsequent Events

On or about November 14, 2000, three unsecured creditors of Chorus forced Chorus into an involuntary liquidation [*22] under Chapter 7 of the Bankruptcy Code. The involuntary liquidation under Chapter 7 was subsequently converted into a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The bankruptcy proceeding is still pending.

Finally, and significantly, on August 19, 1999, Steinman filed a complaint in the Superior Court of the State of California alleging that Chorus breached various provisions of the Separation Agreement discussed above. It is undisputed that Steinman filed his complaint, litigated and obtained a $ 250,000 judgment against Chorus based on the occurrence of the exact same Event of Default that he now claims did not occur. n13 Due to Chorus's solvency issues the judgment remains unpaid.

n13 See Steinman v. Chorus Line Corp., Reyburn Aff. Ex. E, at p. 1 (accepting Steinman's Statement of Undisputed Facts number 7 that "An Event of Default occurred by no later than September 30, 1999").

III.

Steinman filed his complaint against the defendants on September 17, 2001. An amended [*23] complaint was filed on February 22, 2002. Steinman's amended complaint contains essentially two arguments. First, it alleges that "in connection with the manipulation of the loan and pledge agreements, the Chorus Defendants claimed a default of the March 1998 Agreement although no such Default occurred." n14 Second, the amended complaint alternatively alleges that Chorus was actually in default, but that "the Chorus Defendants engineered

such default by causing Chorus to make principal payments to Fund I and ING in the amount of $ 4,500,000 in accordance with the March 1998 Agreement." n15 According to Steinman, all the acts complained of were due to the "motivation of the Chorus Defendants to orchestrate such a scheme . . [because] LLCP (through its control of Fund I) initially wanted majority control of Chorus, and ultimately, wanted complete control of Chorus . . ." n16

n14 Amend. Comp. at 38.

n15 Id. at 39.

n16 Id.

Count I of the amended complaint alleges a breach of the fiduciary duty [*24] of loyalty against certain Chorus directors as well as against Chorus's controlling stockholders. Specifically, Count I alleges a breach of the duty of loyalty with respect to Levine, Mickelson, Cohen, and Adeshak as directors. It also alleges a breach of the duty of loyalty against Fund I and LLCP as controlling stockholders. Count II alleges a breach of the duty of disclosure against Levine, Mickelson, Cohen and Adeshak as directors. Count III alleges ING aided and abetted the alleged breaches of fiduciary duty mentioned above. Count IV alleges common law fraud by LLCP, Fund I and ING to deprive Steinman of his equity interest in Chorus. Finally, Count V alleges negligent misrepresentation by Levine, Cohen, Mickelson, Adeshak, LLCP, and Fund I for failure to disclose certain material information.

On March 8, 2002, the defendants moved to dismiss all counts in the amended complaint for lack of personal jurisdiction with respect to LLCP and Fund I, as well as for failure to state a claim upon which relief can be granted with respect to all defendants.

IV.

A. Personal Jurisdiction Standard Of Review

[HN1] When personal jurisdiction is challenged by a motion to dismiss pursuant [*25] to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. n17 Generally, the court will engage in a two-step analysis: first determining whether service of process on the nonresident is authorized by statute; and, second, considering whether the exercise of jurisdiction is, in the circumstances presented, consistent with due process. n18

n17 *See Plummer & Co Realtors v Crisafi*, 533 A 2d 1242, 1244 (Del Super 1987); *see also Finkbiner v Mullins*, 532 A 2d 609, 617 (Del Super 1987) [HN2] (on a 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute") (citing *Greenly v Davis*, 486 A 2d 669 (Del 1984))

n18 *LaNuova D & B, S.P.A v Bowe Co*, 513 A 2d 764, 768-69 (Del 1986)

B Rule 12(b)(6) Standard Of Review

[HN3] When considering a motion to dismiss a complaint [*26] under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court is to assume the truthfulness of all well-pleaded allegations of fact in the complaint n19 Although "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true " n20 That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in Plaintiffs' favor unless they are reasonable inferences " n21 Additionally, the court may consider, for certain limited purposes, the content of documents that are integral to or are incorporated by reference into the complaint n22 For example, the court will take judicial notice of the various loan agreements and the Separation Agreement in assessing the merits of the claims asserted against the defendants Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations n23

n19 *Grobow v Perot*, 539 A 2d 180, 187 & n 6 (Del 1988)

[*27]

n20 *Id*

n21 *Id*

n22 *See In re Santa Fe Pac Corp S'holders Litig*, 669 A 2d 59, 69-70 (Del 1995)

n23 *See In re Wheelabrator Tech's, Inc S'holders Litig*, 1992 Del. Ch. LEXIS 196, 1992 WL 212595 at *3 (Del. Ch. Sept. 1, 1992) [HN4] ("the court is hardly bound to accept as true a

demonstrable mischaracterization and the erroneous allegations that flow from it"); *See also Malpiede v Townson*, 780 A 2d 1075, 1083 (Del. 2001) [HN5] ("a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law")

V.

A. The Amended Complaint Must Be Dismissed Against LLCP And Fund I Because Delaware's Long-Arm Statute And Due Process Requirements Do Not Permit This Court To Exercise Jurisdiction Over These Entities

[HN6] The court must first consider the defendants' motion to dismiss for lack of personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2) before reaching the merits of their motion to dismiss under Court of Chancery Rule 12(b)(6) n24 LLCP and Fund I [*28] are both California entities, organized under the laws of the State of California, and are thus both nonresidents of Delaware [HN7] A two-step analysis is required to determine whether personal jurisdiction may be exercised over a nonresident defendant n25 First, the court must consider whether Delaware's long-arm statute for service of process on nonresident defendants is applicable n26 Second, the court must determine whether subjecting nonresident defendants to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment n27

n24 *See Branson v Exide Elecs Corp*, 625 A 2d 267, 268-69 (Del 1993)

n25 *See* note 18, *supra*

n26 *Id*

n27 *Id*

1 The Amended Complaint Fails To Provide A Statutory Basis Under Delaware's Long-Arm Statute For Asserting Personal Jurisdiction Over LLCP And Fund I

Steinmann alleges this court has personal jurisdiction over LLCP and Fund I based on an application of Section 3104(c)(1) of Delaware's long-arm statute [*29] n28 Essentially, Steinman argues that "Levine and Mickelson in their capacity as directors of Chorus were agents of LLCP and Fund I " n29 Any acts that Levine and Mickelson undertook as directors of Chorus, the argument goes, were acts that should be attributed to LLCP and Fund I for purposes of establishing personal jurisdiction Steinman claims certain events "affected Chorus and/or occurred within Delaware." n30 None of

2002 Del. Ch. LEXIS 132, *

these acts, however, are sufficient to satisfy the requirements of 10 *Del. C.* § 3104(c)(1), and only two of the acts described actually occurred in Delaware.

> n28 The relevant portion of Delaware's general long-arm statute, 10 *Del. C.* § 3104(c), provides as follows:
>
> > [HN8] As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent: * * * (1) Transacts any business or performs any character of work or service in this state .

> n29 Pl. Ans. Br. at 27.

[*30]

> n30 *Id.*

The first act that occurred in Delaware upon which Steinman relies is Cohen's filing in August 1999, a certificate of merger with the Delaware Secretary of State regarding Chorus's merger with wholly owned subsidiary S S B. The second event that occurred in Delaware is Cohen's filing in December 1999 with the Secretary of State, an amendment to Chorus's certificate of incorporation increasing the number of authorized shares, creating a class of preferred stock, and altering the requirements for calling special meetings. n31 These acts are insufficient to satisfy 10 *Del. C.* § 3104(c)(1) because neither of the acts relate to Steinman's causes of action, namely breaches of fiduciary duties, fraud and negligent misrepresentation related to loan and pledge agreements executed between Steinman and certain defendants.

> n31 Steinman claims that the December 1999 amendment was necessary for Chorus to consummate a June 2000 merger with California Fashions. This allegation, however, is irrelevant under Delaware's long-arm statute because Steinman does not challenge or assert any claims related to the June 2000 merger.

[*31]

Steinman next argues that, "under Delaware law, a party that has not acted in or caused an effect within Delaware" may nonetheless be amenable to suit in Delaware under the conspiracy theory of jurisdiction. n32 [HN9] To validly exercise jurisdiction under a conspiracy theory a court must find that a five-part test has been satisfied. n33 The test requires: (1) the existence of a conspiracy to defraud; (2) defendant must be a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occur in Delaware; (4) the defendant know or have reason to know of the act in Delaware or that acts outside Delaware would have an effect in Delaware; and (5) the act in or effect on Delaware is a direct and foreseeable result of the conduct in furtherance of the conspiracy. n34

> n32 Pl. Ans. Br. at 29.
>
> n33 *See Istituto Bancario Italiano SpA v Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).
>
> n34 See *id.*

Steinman concedes there is a question whether a substantial [*32] act or substantial effect in furtherance of the conspiracy occurred in Delaware. n35 He makes only the conclusory statement that, "upon examination of the conspiracy 'as a whole,' numerous actions occurred in furtherance of the conspiracy that affected Chorus and/or occurred in Delaware." n36 This reasoning fails for two reasons.

> n35 Pl. Ans. Br. at 30.
>
> n36 *Id.*

First, there is no allegation in the amended complaint of any "conspiracy," much less any alleged facts that support the unmentioned conspiracy theory. n37 Second, there is no allegation that a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware. The only reference in the amended complaint that has any relation to Delaware (by agent or otherwise) are two filings with the Secretary of State by Chorus, which are unrelated to Steinman's causes of action. Thus, Steinman has not satisfied the necessary elements of a jurisdiction by conspiracy argument, and this court cannot exercise personal jurisdiction over [*33] LLCP and Fund I based on such a theory.

n37 *Istituto*, 449 A.2d at 225. Steinman attempts to make some conclusory allegations that all of the actions complained of were part of some overarching attempt to wrest control of Chorus away from Steinman. These allegations are not enough to establish jurisdiction by conspiracy because none of those allegations relate to causes of action in the amended complaint. Steinman's amended complaint limits itself to actions related to the loan and pledge agreements, not an overarching plan to obtain control of Chorus.

2. The Exercise Of Personal Jurisdiction Over LLCP And Fund I Would Violate The Due Process Clause Of The United States Constitution

Fund I and LLCP do not have the requisite contacts with Delaware to allow this court to exercise personal jurisdiction consistent with due process. [HN10] Due process in the exercise of personal jurisdiction requires a "minimum contacts" analysis, which seeks to determine the fairness of subjecting a nonresident defendant [*34] to suit in a distant forum by considering all of the connections among the defendant, the forum and the litigation. n38 The "minimum contacts" test protects a defendant against the burdens of litigating in a distant or inconvenient forum, and ensures that "'the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system'" n39 A defendant's conduct and connection with the forum state should be such that she can reasonably anticipate being haled into court in her nonresident forum. n40

n38 *See International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945); *Shaffer v. Heitner*, 433 U.S. 186, 212, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977); *see also Sternberg v. O'Neil*, 550 A.2d 1105, 1116 (Del. 1988)

n39 *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 Del. Ch. LEXIS 52, 1994 WL 198721, at *5 (Del. Ch. May 10, 1994) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980))

n40 *Id.* [HN11] A basic tenet of the due process analysis of a court's exercise of personal jurisdiction is whether the party "purposely availed" itself of the privilege of conducting activities within the forum state, thus, invoking the benefits and protections of its laws. *Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (This "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person'") (citations omitted).

[*35]

LLCP and Fund I simply do not have enough contacts with Delaware to subject them to jurisdiction in this court. They have no office in Delaware. They do not conduct business in Delaware. They are not registered to do business in Delaware. Further, they have done no act in Delaware or any act outside of Delaware that has caused injury in this state. The loan agreements were signed in California. The pledge agreements were signed in California. Essentially every transaction in this lawsuit occurred in California.

The only connection to Delaware that Steinman alleges with respect to Fund I and LLCP is that they were controlling stockholders of Chorus, and that Chorus is a Delaware corporation. [HN12] The general rule, however, is that ownership of stock in a Delaware corporation is not enough to satisfy the "minimum contacts" test that due process requires. n41 This allegation, therefore, is not sufficient to establish personal jurisdiction.

n41 *Shaffer*, 433 U.S. at 207-09, 53 L. Ed. 2d 683, 97 S. Ct. 2569

[*36]

Finally, from a policy perspective, [HN13] the State of Delaware does not have an interest in providing a forum for claims against Fund I and LLCP, where those claims involve events occurring out of state, caused no injury in Delaware, and involve a plaintiff and defendants who are not Delaware residents. Therefore, the court will dismiss Steinman's complaint against LLCP and Fund I for lack of personal jurisdiction. n42

n42 It should be noted that dismissal with respect to LLCP and Fund I makes Steinman's reliance on *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 1996 Del. Ch. LEXIS 91, 1996 WL 422377 (Del. Ch. July 24, 1996), inapplicable because none of the remaining defendants in the case occupy the position of being both a creditor and a fiduciary of Chorus. 1996 Del. Ch. LEXIS 91, *Id.*, at *3-4

B. Steinman Is Estopped From Alleging That No "Event Of Default" Occurred

[HN14] The doctrine of collateral estoppel provides that a judgment in a prior suit "'precludes the relitigation of a factual issue which was litigated and decided in the prior [*37] suit between the same parties or persons in privity with them.'" n43 Also, the Delaware Supreme Court has stated, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." n44 Finally, under the doctrine of judicial estoppel, "'a party may be precluded from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier legal proceeding.'" n45

n43 *Kohls v. Kenetech Corp.*, 791 A.2d 763, 767 (Del. Ch. 2000) (quoting *Foltz v. Pullman, Inc.*, 319 A.2d 38, 40 (Del. 1974)).

n44 *Hercules, Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1278 (Del. 2000).

n45 *Seigman v. Palomar Med. Techs., Inc.*, 1998 Del. Ch. LEXIS 115, 1998 WL 409352, at *2 (Del. Ch. July 13, 1998) (quoting *Coates Int'l, Ltd. v. DeMott*, 1994 Del. Ch. LEXIS 20, 1994 WL 89018 at *5 (Del. Ch. Feb. 4, 1994)).

[*38]

Steinman obtained a $ 250,000 judgment in the California lawsuit based on his successful assertion that, as a matter of fact, an Event of Default occurred. Yet, in this court, Steinman's complaint seeks an additional recovery based on the factual assertion that the Event of Default did not occur. [HN15] Because the remaining defendants in this case are sued in their capacities as directors of Chorus, they stand in privity with it for collateral estoppel purposes. Thus Steinman should be estopped from relitigating the factual issues relating to the Event of Default. Indeed, Steinman makes no cogent argument as to why collateral estoppel does not bar his claims that depend on the contention that there was no Event of Default, apparently conceding the point.

With respect to judicial estoppel, Steinman does not dispute that he argued to the California court that an Event of Default occurred, and that the California court accepted that argument when it awarded a $ 250,000 judgment to him. n46 Steinman's only response to this argument is that "Defendants did not change their position in this action" and cites *Norman v. Paco Pharm. Servs., Inc.* n47 for [HN16] the proposition that judicial estoppel [*39] requires detrimental reliance. This argu-

ment is not persuasive. First, the defendants suffered detriment as a result of Steinman's prior argument that there was an Event of Default. This is because Steinman obtained a judgment against Chorus and Chorus now has to deal with its implication in subsequent proceedings (including bankruptcy proceedings). Second, [HN17] more recent Delaware cases cite the elements of judicial estoppel similarly to *Siegman*, which does not require detrimental reliance. n48 Finally, Steinman cites no case (and this court is aware of none) where a plaintiff obtains a judgment based on the assertion of the existence of a particular set of facts, and then is permitted by a second court to seek another judgment, against the same party and/or its privies, based on the exactly contradictory factual allegations. For all of these reasons, Steinman is estopped from arguing that no Event of Default occurred, and the court will dismiss all of his claims that depend on that factual assertion.

n46 See *Steinman v. Chorus Line Corp.*, Cal. Super., C.A. No. BC215508, Horwitz, J. (Oct. 3, 2000) (ORDER) at p. 5 of 9 ($ 250,000 judgment for Steinman under the Separation Agreement based on the holding that, "It is undisputed that LLCP voted Steinman's stock [on December 4, 1999]. This act constitutes the exercise by LLCP of 'any rights or remedies against any collateral security (including pledged stock) as a result of the occurrence of such Event of Default'")

[*40]

n47 1992 Del. Ch. LEXIS 208, 1992 WL 301362, at *4 (Del. Ch. Oct. 21, 1992).

n48 See *Woodall v. Playtex Products, Inc.*, 2002 Del. Super. LEXIS 425, 2002 WL 749188, at *3 (Del. Super. Apr. 26, 2002); *Steadfast Ins. Co. v. EON Labs Mfg., Inc.*, 1999 Del. Super. LEXIS 339, 1999 WL 743982, at *1 n.6 (Del. Super. Aug. 18, 1999).

C. Steinman's First Cause Of Action Must Be Dismissed

1. Steinman's Duty Of Loyalty Claim Is Derivative And Must Be Dismissed Pursuant To Rule 23.1

Because, Steinman is precluded from asserting his claims relating to an Event of Default, his only claim remaining related to the duty of loyalty is a $ 4,500,000 payment made to Fund I and ING by Chorus pursuant to its loan agreements. n49 The defendants contend that such a claim is derivative in nature and must be dis-

missed due to Steinman's failure to comply with the demand and/or pleading requirements of Chancery Court Rule 23.1. Steinman argues his claim is individual because he eventually lost the value of his equity interest in Chorus. This argument is not persuasive, however, because [HN18] it cannot be said that a loan payment made in accordance [*41] with a properly executed loan agreement results in an "individual" injury. Such an "individual" injury or loss is required to maintain an individual action under these circumstances. When Chorus repaid part of its debt obligation, the result was that every stockholder in the corporation was affected in the identical manner on a stock-for-stock basis. Thus, this type of claim falls squarely within the definition of a derivative action. n50

n49 To the extent Steinman alleges that the Defendant Directors breached their duty of loyalty by falsely claiming an Event of Default when no such default occurred, this allegation is precluded by the California litigation. *See* Section V:B, *supra*.

n50 *See* Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 9-2[a] p. 9-6 n.18 (2001) (claims based on acts of waste or mismanagement arising from excessive payments of corporate assets or funds are derivative).

[HN19] To maintain a derivative suit, [*42] a stockholder must allege either that the board rejected a demand that it assert the corporation's claim or allege with particularity why the stockholder was justified in not having made the effort to obtain board action. n51 Steinman has done neither. Because Steinman has not pled that demand was excused or that demand was wrongfully refused, his duty of loyalty claim must be dismissed. n52

n51 Ch. Ct. R. 23.1.

n52 *See White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (affirming dismissal of plaintiff's complaint for failure to show that demand was excused); *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) (dismissing derivative claim where demand was refused because the plaintiff failed to plead with particularity why the board's refusal to act on the derivative claims was wrongful).

**2. Steinman Fails To State A Claim For Breach Of The Duty Of Loyalty**

Even were the court to consider the substantive nature of Steinman's duty of loyalty claim, it must fail as a matter [*43] of law. Steinman claims that when, pursuant to the March 1998 Agreement, Chorus made a $4,500,000 payment to ING and Fund I in August 1999, the Defendant Directors breached their duty of loyalty. Steinman alleges that this payment amounts to a breach of the duty of loyalty because it was a "self-dealing" transaction "approved by the Defendant Directors." n53 This argument is unavailing.

n53 Amend. Comp. at 39.

Steinman's duty of loyalty claim must fail because Chorus was merely paying money legally owed to ING and Fund I. Steinman does not claim that the $4,500,000 paid was not actually owed to Fund I and ING. He makes no claim for waste. He does not even claim that the repayment of the loan was not entirely fair. n54 Rather, Steinman claims that paying money legally owed was detrimental to stockholders because it transferred capital from Chorus to ING and Fund I. n55 [HN20] Anytime a corporation pays a legal obligation, however, it may be argued that it decreases the value of stockholders' equity. Without more, there [*44] cannot be a cause of action for such a payment. n56

n54 *See Solomon v. Pathe Communications Corp*, 1995 Del. Ch. LEXIS 46, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995) ("Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair"), *aff'd*, 672 A.2d 35 (Del. 1996).

n55 *See* Amend. Comp. at 39.

n56 *See, e.g., Solomon*, 1995 Del. Ch. LEXIS 46, 1995 WL 250374, at *5 [HN21] ("Even if the consequences of that foreclosure [by creditor/stockholder] were, for example to render the value of the minority [] stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity").

Finally, Steinman alleges that the $4,500,000 loan repayment "caused Chorus to default on various provi-

2002 Del. Ch. LEXIS 132, *

sions of [*45] the loan agreement." n57 However, Steinman has not alleged any facts to support such an allegation. In fact, Steinman's amended complaint essentially negates such an argument. n58 In that complaint, he quoted documents and witnesses that stated the Event of Default was caused by "significant financial difficulties," n59 a "liquidity crisis," n60 and "significant financial difficulties that had a negative impact upon the fundamental business of Chorus," n61 and that Chorus has been in default "as a result of the difficult conditions that are currently present in the dress market." n62 In any event, there is a decided absurdity to Steinman's position because failure to make the payments would, itself, have resulted in default under the loan agreements. For all these reasons, therefore, this court will dismiss Steinman's duty of loyalty claim against the Defendant Directors.

n57 Amend. Comp at 39

n58 See Malpiede, 780 A.2d at 1083 ("a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law")

[*46]

n59 Amend. Comp at 25

n60 Id.

n61 Id. at 30

n62 Id.

D. Steinman Has Failed To State A Claim For Breach Of The Fiduciary Duty Of Disclosure

[HN22] The Delaware Supreme Court has held that claims for a breach of fiduciary duty of disclosure can only arise when the defendant has made statements to the corporation's stockholders in connection with a request for stockholder action. n63 A duty of disclosure claim that is based on a cause of action that occurs "without a request for stockholder action" does not properly state a claim for a breach of the fiduciary duty of disclosure. n64 It is undisputed that Steinman's disclosure claims arise in the absence of a request for stockholder action. Courts are willing, however, to allow a plaintiff to plead such arguments under the rubric of duty of loyalty. n65

n63 See Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998) [HN23] ("The duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action").

[*47]

n64 Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 389 (Del. Ch. 1999) [HN24] ("The duty of disclosure is merely a specific application of the more general fiduciary duty of loyalty that applies only in the setting of a transaction or other corporate event that is being presented to the stockholders for action").

n65 See id., at 390 [HN25] ("Plaintiffs, who have sufficiently pleaded the claim and supporting facts that [defendant] owed [plaintiff] a fiduciary duty of loyalty, but have failed to establish the existence of a similar fiduciary duty of disclosure as a matter of law, shall have the opportunity to replead to assert an appropriate cause of action based upon a breach of the duty of loyalty").

Even if Steinman were allowed to replead his duty of disclosure claim as a duty of loyalty claim, the allegations in his amended complaint fail to state a claim upon which relief can be granted. [HN26] To successfully state a duty of loyalty claim against directors for providing information in the absence of a request for stockholder action, a stockholder must allege [*48] he received "false communications" from directors who were "deliberately misinforming shareholders about the business of the corporation." n66 Steinman has failed to plead facts to satisfy this test.

n66 Malone, 722 A.2d at 14; see Jackson Nat'l Life Co., 741 A.2d at 389 [HN27] (in the absence of a request for stockholder action, a duty of loyalty claim requires well pleaded allegations that directors "deliberately misinformed stockholders through the dissemination of false information")

Steinman alleges officers of Chorus forwarded a Certificate of Compliance to Chorus stockholders that provided (among other things) "no Event of Default has occurred or is continuing under any working capital or other arrangement to which [Chorus] is a party ...." n67 Steinman's allegations do not satisfy the requirements of Jackson National Life Ins. Co. because they are not false

2002 Del. Ch. LEXIS 132, *

communications from directors *who were deliberately misinforming shareholders*. This is especially true [*49] because the Certificates of Compliance were not prepared as disclosure documents intended for stockholder use. The Certificates of Compliance were actually detailed *contractual* obligations that Chorus owed to certain creditors pursuant to the various loan agreements it had executed. n68. Nothing obligated Chorus to supply these Certificates to its stockholders, and it cannot be said that they were prepared to deliberately misinform stockholders, when in reality they were never meant for stockholders at all.

> n67 Steinman also alleges that certain financial statements did not accurately reflect the deteriorating financial condition of Chorus. Yet, this allegation appears wholly conclusory. Steinman fails to point to a single flaw in the financial statements, other than to say that they never disclosed that an Event of Default occurred. Steinman fails to demonstrate where such disclosure should have appeared in the financial statements. Also, Steinman claims that the August 1999 financial statements he was provided stated that Chorus had satisfied its payment obligations. In fact, Chorus had satisfied its payment obligations. It had made all required payments up to that date.

> Steinman further alleges in his complaint that a statement made by Cohen on September 27, 1999 that Chorus was a solvent and viable corporation was false and misleading because Chorus had previously warranted that it was in default of certain loan covenants. This claim was refuted in defendant's opening brief, and Steinman failed to respond. Therefore, Steinman is deemed to have waived this aspect of his complaint. In any event, it should be noted that a company can be solvent and viable, yet still be in default of certain loan covenants.

[*50]

> n68 It bears noting that nowhere in Steinman's amended complaint does he demonstrate how or why he relied on the disclosures provided in the Certificates of Compliance.

Finally, Steinman makes no allegations that he was not actually aware, or on notice, of the financial condition of Chorus. In fact, his complaint suggests that he was quite aware of what was going on or deliberately failed to avail himself of the tools at hand to find out. The Separation Agreement executed between Steinman and Chorus provided that Steinman "shall be granted access to all Company information and documentation that he may reasonably request." n69 He apparently chose not to request any such information. Furthermore, Sacks, Steinman's co-founder, friend, fellow stockholder, and fellow pledgor was an independent director on the Chorus Board during all relevant times. Also, pursuant to the Pledge Agreement Steinman executed, he warranted that he "has adequate means to obtain information" from Chorus and that it is his "responsibility for being informed of the financial condition" of Chorus. n70 For all these reasons, [*51] this court will dismiss Steinman's second cause of action.

> n69 Reyburn Aff. Ex. A.
>
> n70 Amend. Comp., Ex. B § 14(d)

**E. Steinman Has Failed To State A Claim Against ING For Aiding And Abetting Breaches Of Fiduciary Duties By The Director Defendants**

In Count III of his amended complaint, Steinman alleges that ING aided and abetted the alleged breach of the duty of loyalty by the Director Defendants. [HN28] The elements that Steinman must allege to adequately plead an aiding and abetting claim are clear. Steinman must plead facts that support (1) the existence of a fiduciary relationship, (2) a breach of duty by the fiduciary, (3) ING's knowing participation in the breach, and (4) damages resulting from the concerting action of the fiduciary and ING. n71 Steinman has not satisfied this standard. Specifically, as discussed above, this court has found no breaches of fiduciary duty. n72 This finding is fatal to Steinman's aiding and abetting claim. Therefore, the court will dismiss Count III of Steinman's amended [*52] complaint.

> n71 *Malpiede*, 780 A.2d at 1096; *Goodwin v. Live Entm't, Inc.*, 1999 Del. Ch. LEXIS 5, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999) (TABLE).
>
> n72 *See* Section V:C and V:D, *supra*.

**F. Steinman Has Failed To State A Claim For Common Law Fraud Or Negligent Representation Against The Defendant Directors Or ING**

1. Common Law Fraud

2002 Del Ch LEXIS 132, *

[HN29] To state a cause of action for common law fraud under Delaware law, a plaintiff must allege (1) a false representation made by the defendant, (2) the defendant's knowledge of the falsity of the representation or reckless disregard for the truth, (3) the defendant's intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's justifiable reliance upon the representation, and (5) damage to the plaintiff as a result of such reliance. n73 Further, when a complaint alleges fraud, "the circumstances constituting fraud . [must] be stated with particularity." n74 Without pleading [*53] such particularity, those claims will be dismissed. n75 Steinman has failed to adequately allege his claim of fraud with particularity

n73 See Parfi Holding AB v Mirror Image Internet. Inc , 794 A 2d 1211, 1234 (Del Ch 2001); see also Stephenson v Capano Dev Inc , 462 A 2d 1069, 1074 (Del 1983)

n74 Ct Ch R 9(b)

N75 See Browne v Robb, 583 A 2d 949, 955 (Del 1990) (affirming lower court dismissal of complaint that failed to allege any factual bases to support a claim for fraud)

Steinman has only asserted fraud with respect to LLCP, Fund I and ING As discussed in Section V:A, this court lacks personal jurisdiction over LLCP and Fund I to decide this claim. As to ING, Steinman only asserts:

ING intentionally disclosed misleading information and failed to disclose other material information to plaintiff, which resulted in plaintiff (in justifiable reliance upon such misleading information) failing to take reasonable action in connection [*54] with his investment in Chorus

As a result of the unlawful conduct of ING, plaintiff unlawfully was deprived of his equity interest in Chorus for no consideration Accordingly, as a result of the unlawful conduct of ING, plaintiff realized actual damages n76

n76 Amend. Comp. at 43-44.

This allegation does not satisfy the [HN30] strenuous pleading requirements that must be alleged when asserting fraud as a cause of action. Specifically, "a well pleaded fraud allegation must include at least 'the time, place and contents of the false representations and what [was] obtained thereby.'" n77 Steinman's fraud allegation has simply mirrored the language of the necessary fraud elements. Steinman's amended complaint contains no facts to support his conclusory allegations, as to the time, place or contents of the false representations. In fact he has failed to state what the false representations actually were. Therefore, the court will dismiss Count IV of Steinman's complaint against ING for failure to [*55] state a claim upon which relief can be granted.

n77 Crescent/Mach I Partners, L P v. Turner, 2000 Del Ch LEXIS 145, 2000 WL 1481002, at *18 (Del Ch Sep. 29, 2000) (quotation omitted)

2 Negligent Misrepresentation

Steinman has alleged a cause of action for negligent misrepresentation against all of the LLCP, Fund I and the Director Defendants Since this court lacks personal jurisdiction over LLCP and Fund I, the court must only analyze this cause of action with respect to the Defendant Directors. To successfully assert a claim for negligent misrepresentation Steinman must adequately plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information. n78 Steinman has failed to adequately plead facts supporting his claim of negligent misrepresentation [*56]

n78 Sanders v Devine, 1997 Del Ch LEXIS 131, 1997 WL 599539, at *6-7 (Del Ch Sept 24, 1997) (citing Wolf v. Magness Constr Co , 1995 Del Ch LEXIS 122, 1995 WL 571896 (Del Ch Sept 11, 1995), aff'd, 676 A 2d 905 (Del 1996) (TABLE)).

Steinman has failed to demonstrate that the Defendant Directors had a pecuniary duty to provide information. Such a duty would have to be found in the various loan agreements or in the Pledge Agreement, but, as discussed earlier, no affirmative duty to provide information existed. In fact, the Pledge Agreement specifically provided that Steinman was given the affirmative responsibility to keep informed of Chorus's financial condition. n79

2002 Del. Ch. LEXIS 132, *

n79 *See* Amend. Comp. Ex. B. § 14(d) (Steinman agrees that he "has adequate means to obtain information" from Chorus, that it is his "responsibility for being and keeping informed of the financial condition" of Chorus, and that he waives any duty on the part of LLCP to disclose any information regarding Chorus); *see also* Section V:D, *supra*

[*57]

Another flaw in Steinman's complaint is his failure to assert with any specificity what false documents or false statements he relied upon in connection with his alleged injury or who produced them. Rather, Steinman only references certain "financial statements and other documents that contained material misrepresentations . ." n80 Steinman does not even identify misrepresentations made by any particular individuals. He simply lumps all the Director Defendants together in this cause of action. Steinman is required to identify specific acts of individual defendants for his negligent misrepresentation claim to survive. n81 He has failed to do so. Therefore, this court will dismiss Steinman's negligent misrepresentation cause of action for failure to state a claim upon which relief can be granted.

n80 Amend. Comp. at 44.

n81 *See, e.g.*, 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1248 (1990) ("in order to state a claim for relief, actions brought against multiple defendants must clearly specify the claims with which each particular defendants is charged"); *J. Royal Parker Assocs., Inc. v. Parco Brown & Root, Inc.*, 1984 Del. Ch. LEXIS 559, 1984 WL 8255, at *5 (Del. Ch. Nov. 30, 1984) (action against defendant parent corporation dismissed because plaintiff only alleged facts related to defendant subsidiary's tortious conduct)

[*58]

**VI.**

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is **GRANTED** as to LLCP and Fund I. The motion to dismiss for failure to state a claim is **GRANTED** as to Arthur Levine, Mark Mickelson, Andrew Cohen, Carol Adeshak, and ING. **IT IS SO ORDERED.**

Stephen P. Lamb

**Vice Chancellor**

Westlaw.

Not Reported in F Supp 2d                                          Page 1

Not Reported in F Supp 2d, 2001 WL 30651 (D Kan )

(Cite as: 2001 WL 30651 (D.Kan.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.
In re STOICO RESTAURANT GROUP, INC ,
Debtor.
Cynthia GRIMES, Plaintiff,
v.
Tim JEFFREY, Cathy Martsolf, and James Ash,
Defendants.
**No. CIV. A. 00-2109-KHV.**

Jan. 8, 2001

MEMORANDUM AND ORDER

VRATIL

*1 Plaintiff Cynthia Grimes filed suit on behalf of
Stoico Restaurant Group, Inc ("SRG") alleging that
defendants breached their fiduciary duties as
directors and officers of SRG This matter comes
before the Court on Defendant James Ash's Motion
To Dismiss Plaintiff's Amended Complaint (Doc. #
27) and Defendants Martsolf and Jeffrey's Motion
To Dismiss Count 1 Of Plaintiff's First Amended
Complaint (Doc # 29), both filed August 24, 2000.
For reasons stated below, the Court finds that each
motion should be overruled

Motion to Dismiss Standards
In ruling on a motion to dismiss under Fed R Civ P.
12(b)(6), the Court must assume as true all well
pleaded facts in plaintiff's complaint and view them
in a light most favorable to plaintiff. *Zinermon v
Burch*, 494 U.S. 113, 118 (1990). The Court must
make all reasonable inferences in favor of plaintiff,
and liberally construe the pleadings. See
Fed R Civ P 8(a); *Lafoy v HMO* 988 F 2d 97, 98

(10th Cir 1993). The issue in reviewing the
sufficiency of the complaint is not whether plaintiff
will prevail, but whether she is entitled to offer
evidence to support her claims. See *Scheuer v
Rhodes*, 416 U S. 232, 236 (1974).

The Court may not dismiss a cause of action for
failure to state a claim unless it appears beyond a
doubt that plaintiff can prove no set of facts in
support of her theories of recovery that would
entitle her to relief. See *Jacobs, Visconsi & Jacobs,
Co v City of Lawrence*, 927 F 2d 1111, 1115 (10th
Cir.1991). Although plaintiff need not precisely
state each element of her claims, plaintiff must
plead minimal factual allegations on material
elements that must be proved See *Hall v Bellmon*,
935 F 2d 1106, 1110 (10th Cir 1991).

Factual Background
The allegations in plaintiff's amended complaint
may be summarized as follows: SRG is a Delaware
corporation with corporate headquarters formerly
located in Wichita, Kansas From 1996 to 1998,
Tim Jeffrey, Cathy Martsolf and James Ash were
shareholders of SRG and officers on its board of
directors Ash was also securities counsel for SRG.

In 1996, Jeffrey, Martsolf and Ash participated in
an initial public offering of SRG stock ("the IPO").
As directors, they had primary responsibility for
choosing underwriters and preparing a prospectus
for potential investors. The prospectus consisted of
a business plan to open ten to 12 restaurants,
requiring capital expenditures of $2.9 million in
1996 and $4.7 million in 1997. In mid 1996,
defendants were warned that an IPO at a market
capitalization value of less than $50 million was
questionable and that the proposed underwriter,
Primeline Securities Corporation, lacked experience
and recognition in the field. Before the IPO closed
in December 1996, it became apparent or should
have become apparent to SRG directors that the
public financing revenue would be inadequate to

© 2005 Thomson/West No Claim to Orig U.S Govt Works.

Not Reported in F Supp 2d                                                                    Page 2

Not Reported in F Supp 2d, 2001 WL 30651 (D Kan )

(Cite as: 2001 WL 30651 (D.Kan.))

fully fund and operate the restaurants according to the business plan

In December 1996, defendants disseminated false and misleading information to potential investors with respect to the marketability of the stock, the identity of the management company, the availability of IPO proceeds to fund construction of new restaurants, and the identity of the person who would become the majority shareholder of SRG. Because of the deficit created by the unsuccessful IPO, SRG began borrowing hundreds of thousands of dollars in connection with the construction and outfitting of new restaurants SRG records do not indicate that defendants disclosed to the rest of the board the funding shortages, the sales representations, the securities law implications of the shortages or the majority change in ownership

*2 By November or December 1996, defendants knew or should have known that Jeffrey had asked a creditor of SRG to convert 85% of a $4.75 million loan to stock in the IPO. In doing so, Jeffrey showed the creditor a budget that was not part of the prospectus and promised it a seat on the board of directors. The creditor agreed and as a result of the debt conversion, the IPO was able to close. Informed, disinterested board members, however, did not approve the decisions to close the IPO and proceed with the restaurant expansion program without adequate funds

Martsolf and Jeffrey had conflicts of interest with SRG because they paid themselves salaries, stock options and other forms of compensation which exceeded the financial abilities of the corporation. Their employment and compensation were in jeopardy if the IPO did not close Moreover, Jeffrey had taken "advances" that he would have to immediately repay if the IPO did not close Ash also had a conflict of interest, in that he and his law firm expected to receive thousands of dollars for legal work related to the IPO

In March 1997, Martsolf and Ash disseminated a letter to SRG shareholders which stated that the IPO had raised enough capital to fund the expansion program The IPO did not raise sufficient capital,

however, and without the knowledge or approval of other board members, Ash and Martsolf obtained loans to pay for restaurant construction By June 1997, SRG had to close six newly-opened restaurants because it lacked the capital necessary to operate them. In August, investors who had purchased stock in the IPO filed a class action suit against SRG, Jeffrey and Louie Stoico for securities law violations and misfeasance. Michael Thompson, a law partner of James Ash, represented defendants in the class action, which settled out of court. On March 6, 1998, SRG sought bankruptcy protection under Chapter 11 and the bankruptcy court appointed Grimes to represent the corporation with specified powers of a trustee.

Grimes filed the present suit against the former officers and directors of SRG, seeking damages for breach of fiduciary duties to the company and its other shareholders. The Court previously dismissed plaintiff's complaint with leave to amend because plaintiff did not expressly plead facts which were sufficient to overcome the presumption of the business judgment rule and she did not adequately plead causation. See Memorandum and Order (Doc # 24) filed July 20, 2000 On August 7, 2000, plaintiff filed her amended complaint Jeffrey, Martsolf and Ash filed motions to dismiss, arguing that plaintiff has again failed to allege facts which rebut the presumption of the business judgment rule, e g. bad faith and fraudulent intent Defendants also argue that plaintiff has failed to adequately plead causation

Analysis
Defendants' motions to dismiss will be considered jointly as they present nearly identical arguments regarding the sufficiency of plaintiff's amended complaint Once again, the parties do not address what state law governs the suit. As explained before, the Court discerns no material difference between the applicable substantive law in Kansas and Delaware and accordingly, it need not resolve the choice of law issue at this time. See Memorandum And Order (Doc. # 24) filed July 20, 2000 at 3.

*3 Plaintiff alleges that defendants breached their

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2001 WL 30651 (D Kan.)

(Cite as: 2001 WL 30651 (D.Kan.))

Page 3

fiduciary duties to SRG by failing to inform shareholders about financial decisions, disseminating misleading information to potential investors, failing to obtain board approval to ask a creditor to transfer SRG's debt to stock, and failing to disclose material matters in the Prospectus Plaintiff also alleges that "other matters alleged in this complaint constitute fraud on SRG and bad faith and self dealing with respect to pursuit of the closing of the IPO " First Amended Complaint (Doc # 26) filed August 7, 2000 ¶ 26

"The business judgment rule normally protects all lawful actions of a board of directors, provided they were taken in good faith, after a reasonable deliberative process and in the absence of conflicts of interest " *Kahn v Roberts,* 679 A 2d 460, 465 (Del 1996) Defendants argue that plaintiff has not alleged facts which are sufficient to overcome the presumption of the business judgment rule Plaintiff correctly notes, however, that an allegation of a conflict of interest by one of the board members is sufficient See *Aronson v Lewis,* 473 A 2d 805, 812 (Del Super Ct 1984) If a conflicting directorial interest exists, the business judgment rule does not apply unless the questioned transaction is approved by a majority of disinterested directors See *id,* Del Code Ann title 8, § 144(a)1 (2000) Conflicting directorial interest exists whenever a director is a party on both sides of a transaction or expects to receive a material personal financial benefit from the transaction as opposed to a financial advantage that would benefit all stockholders generally See *Cede & Co v Technicolor, Inc.* 634 A 2d 345, 363-64 (Del 1993) ; *Aronson,* 473 A 2d at 812.

In her original complaint, plaintiff included only conclusory allegations of bad faith and misfeasance In her amended complaint, however, plaintiff has set forth specifically how each defendant stood to receive a material financial benefit that would not be enjoyed by shareholders generally First, plaintiff avers that Martsolf and Jeffrey took forms of compensation in excess of the financial capabilities of SRG and that their employment and compensation were in jeopardy if the IPO did not close In addition, plaintiff alleges that "Jeffrey had

taken advances from the company that he would be called upon more immediately to repay if the IPO were not closed " First Amended Complaint (Doc # 26) ¶ 24. Plaintiff also claims that Ash, as securities and corporate legal counsel, had a conflict of interest because he "expected to bill thousands of dollars for legal work relating to the IPO " *Id* ¶ 25 Based on these allegations, a reasonable trier of fact could conclude that Martsolf, Jeffrey and Ash stood to receive a material financial benefit from closing the IPO that would not be enjoyed by the shareholders generally See, e g , *Cede,* 634 A 2d at 363 (entrenchment motive or abdication of directorial duty may be sufficient evidence of disloyalty to rebut presumption of business judgment rule)

*4 Based on the alleged conflicts of interest by Martsolf, Jeffrey and Ash, the business judgment rule does not apply unless the questioned transaction was approved by a majority of disinterested board members. See *Aronson,* 473 A 2d at 812. Plaintiff alleges that the decisions to close the IPO and to proceed with the restaurant expansion program without adequate funds were not approved by informed, disinterested board members See First Amended Complaint ¶¶ 26, 38. Assuming that this allegation is true, the business judgment rule does not protect the board's actions from judicial scrutiny

Defendants also contend that plaintiff has not adequately pled the element of causation in her claim for breach of fiduciary duty The Court disagrees In her amended complaint, plaintiff asserts that because defendants closed the IPO early, proceeded with the expansion program when SRG was short of funds, and took part in other conduct outlined in the complaint, the restaurant expansion program failed, SRG incurred millions of dollars in debts, and SRG incurred a significant liability associated with the class action suit See *id.* ¶ 40. These allegations are sufficient to establish "but for" causation. Defendants' motions to dismiss are therefore denied.

IT IS THEREFORE ORDERED that Defendant James Ash's Motion To Dismiss Plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                 Page 4

Not Reported in F Supp 2d, 2001 WL 30651 (D Kan )

(Cite as: 2001 WL 30651 (D.Kan.))


Amended Complaint (Doc. # 27) filed August 24,
2000 and Defendants Martsolf And Jeffrey's Motion
To Dismiss Count 1 Of Plaintiff's First Amended
Complaint (Doc # 29) filed August 24, 2000 be and
hereby are OVERRULED

Not Reported in F Supp 2d, 2001 WL 30651
(D Kan )

   **Motions, Pleadings and Filings (Back to top)**

• 2:00cv02109 (Docket) (Mar 06, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 503760 (S D N Y )

(Cite as: 2004 WL 503760 (S.D.N.Y.))

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S D. New York.
Angella TIMOTHY, Plaintiff,
v.
OUR LADY OF MERCY MEDICAL CENTER
and Our Lady of Mercy Healthcare System, INC ,
Defendants
No. 03 Civ. 3556(RCC).

March 12, 2004

**Background:** Employee sued health care company and medical center, asserting claims for employment discrimination, retaliation, and constructive discharge under federal, state, and local laws Company and center moved to dismiss in part

**Holdings:** The District Court, Casey, J , held that:
(1) complaint sufficiently alleged that health care company was employer and that its acts constituted discrimination, retaliation, and constructive discharge;
(2) Title VII claims based on alleged discriminatory acts which occurred more than 300 days before employee filed complaint with Equal Employment Opportunity Commission (EEOC) were time-barred;
(3) allegations supported adverse employment action element of retaliation claim; and
(4) allegations supported constructive discharge claim
Motion granted in part and denied in part

West Headnotes

**[1] Civil Rights** ⊂⊃**1532**
78k1532 Most Cited Cases

**[1] Health** ⊂⊃**266**
198Hk266 Most Cited Cases
Employee's complaint, which referred to both health care company and medical center in its introductory paragraph with single acronym, such that factual allegations throughout complaint referred to both entities, sufficiently alleged that health care company was her employer and that its acts constituted discrimination, retaliation, and constructive discharge, precluding dismissal of claims against company on grounds that it was not alleged to be employer or to have played role in alleged acts

**[2] Civil Rights** ⊂⊃**1505(7)**
78k1505(7) Most Cited Cases
Alleged discriminatory acts that occurred more than 300 days before employee filed complaint with Equal Employment Opportunity Commission (EEOC) were discrete acts, rather than part of any systematic discriminatory policy or practice by employers triggering application of continuing violation doctrine, and therefore Title VII claims based on such alleged acts were time-barred. Civil Rights Act of 1964, § 701 et seq , 42 U S C A § 2000e et seq.

**[3] Civil Rights** ⊂⊃**1532**
78k1532 Most Cited Cases

**[3] Civil Rights** ⊂⊃**1740**
78k1740 Most Cited Cases
Although employee was required only to give employers fair notice of her retaliation claims to properly plead those claims, and did not have to plead prima facie case under *McDonnell Douglas* standard, district court was required to determine whether employee's allegations stated claims upon which relief could rest in deciding motion to dismiss for failure to state claim 42 U S C A §

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                    Page 2

Not Reported in F. Supp 2d, 2004 WL 503760 (S D.N Y.)

**(Cite as: 2004 WL 503760 (S.D.N.Y.))**

1981; Fed Rules Civ Proc Rules 8(a), 12(b)(6), 28
U.S.C.A ; McKinney's Executive Law § 296 et seq ;
New York City Administrative Code, § 8-107 et seq

**[4] Civil Rights** �köm1532
78k1532 Most Cited Cases

**[4] Civil Rights** �köm1740
78k1740 Most Cited Cases
Employee provided employers with fair notice of
her retaliation claims when she alleged that her
attorney sent employers letter raising claims of
employment discrimination and that she thereafter
experienced retaliatory actions which impaired her
working conditions, limited her job responsibilities,
subjected her to hostile work comments, resulted in
her exclusion from meetings, and made it more
difficult for her to perform her duties 42 U.S.C A
§ 1981; Fed Rules Civ Proc.Rules 8(a), 28 U.S.C A
; McKinney's Executive Law § 296 et seq ; New
York City Administrative Code, § 8-107 et seq

**[5] Civil Rights** �köm1246
78k1246 Most Cited Cases

**[5] Health** �köm266
198Hk266 Most Cited Cases
Allegations supported adverse employment action
element of hospital employee's claims for retaliation
under federal, state, and local laws when employee
alleged that her attorney sent employers letter
raising claims of race and sex discrimination, and,
shortly thereafter, she experienced such retaliatory
actions as loss of office space, interference with her
computer rights, diminished job responsibilities,
and exclusion from meetings 42 U S C A § 1981;
Fed Rules Civ Proc Rule 12(b)(6), 28 U.S.C A ;
McKinney's Executive Law § 296 et seq ; New
York City Administrative Code, § 8-107 et seq

**[6] Civil Rights** �köm1123
78k1123 Most Cited Cases

**[6] Health** �köm266
198Hk266 Most Cited Cases
Complaint supported claim that hospital employee
suffered constructive discharge when employee
alleged that, after complaining of alleged race and

gender discrimination, she was passed over for
positions for which she was qualified and was
placed in inferior positions below her skill level,
that she was stripped of her substantive
responsibilities, removed from her office, and
shunted to several inadequate work locations, and
that employers generally engaged in actions which
made it more difficult for her to work.

### MEMORANDUM OPINION & ORDER

CASEY, J

*1 On March 16, 2003, Angella Timothy
("Plaintiff") commenced this suit against Our Lady
of Mercy Medical Center and Our Lady of Mercy
Healthcare System, Inc (collectively,
"Defendants") alleging employment discrimination
and retaliation, in violation of 42 U S C § 1981,
New York Executive Law § 296 et seq, and the
Administrative Code of the City of New York §
8-107 et seq [FN1] On October 7, 2003, Plaintiff
amended the complaint, adding claims of
discrimination under 42 U.S.C. § 2000e et seq
("Title VII") and allegations of constructive
discharge. Defendants now move to partially
dismiss the First Amended Complaint, asserting
that: (1) all claims against Our Lady of Mercy
Healthcare System, Inc. are subject to dismissal; (2)
all of the Title VII claims as they relate to events
occurring before June 30, 2002 are time-barred; and
(3) Plaintiff's retaliation and constructive discharge
claims fail as a matter of law. Defendants' motion
was deemed fully submitted on November 11, 2003
For the reasons that follow, Defendants' motion is
GRANTED IN PART and DENIED IN PART.

> FN1 Courts "commonly analyze the
> sufficiency of [claims under section 1981]
> in the same manner as Title VII claims,
> reaching the same result." *Pagan v New
> York State Div of Parole*, 98 Civ 5840,
> 2002 WL 398682, at *4-5 (S D N Y.
> Mar 13, 2002) (citations omitted); *see also
> Hargett v Nat'l Westminster Bank, U S.A*,
> 78 F.3d 836, 838 (2d Cir.1996). The
> standards used to analyze claims under
> Title VII, the Executive Law, and City

© 2005 Thomson/West. No Claim to Orig. U.S. Govt Works