Not Reported in F. Supp. 2d

Not Reported in F. Supp. 2d, 2004 WL 503760 (S.D.N.Y.)

(Cite as: 2004 WL 503760 (S.D.N.Y.))

Page 3

Law are identical. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *see also Kahn v. Objective Solutions, Int'l.*, 86 F.Supp.2d 377, 382 (S.D.N.Y.2000).

## I. BACKGROUND
For purposes of this motion, the complaint's factual allegations are accepted as true and all inferences are drawn in Plaintiff's favor.

Plaintiff, an African-American mother, was employed by Our Lady of Mercy Medical Center and Our Lady of Mercy Healthcare System, Inc. for approximately ten years. (Dkt. No. 10: First Am. Compl. ¶ 7.) These entities are non-profit corporations that operate a hospital in the Bronx, New York. (*Id.* ¶ 8.) In July 1993, after receiving her Masters of Public Administration in Health Policy and Management from New York University, Plaintiff began working as an Administrative Resident with Defendants. (*Id.* ¶ 9.) In this position, Plaintiff reported directly to Gary Horan, the hospital's President and Chief Executive Officer. (*Id.* ¶ 11.) In 1994, Plaintiff was promoted to the position of Administrative Fellow and continued to report to Horan. (*Id.*) In July 1996, Plaintiff was again promoted to the position of Associate Administrator, reporting to Horan and the Chief Operating Officer. (*Id.* ¶ 13.) Plaintiff had administrative responsibility for seven departments, attended Board of Trustees' meetings and served on numerous hospital committees. (*Id.*) In 1999, Plaintiff won the prestigious Young Healthcare Administrator of the Year Award. (*Id.* ¶ 14.) In November 2000, Plaintiff left the hospital's employ on maternity leave. (*Id.* ¶¶ 15-16.)

In July 2001, Plaintiff returned from leave. (*Id.* ¶ 21.) Plaintiff alleges thereafter she was subjected to a pattern and practice of racial and gender discrimination in which she was repeatedly demoted in favor of white women without young children and in favor of white men, some of whom have young children. (*Id.* ¶¶ 10, 17, 21-22, 29.) Plaintiff also contends that Defendants stripped her of departmental responsibilities, removed her from her career track in Administration, and relegated her

to an inferior nursing administration position. (*Id.* ¶¶ 17, 23, 28.) Plaintiff was also assigned to work in inadequate workspaces. (*Id.* ¶ 25.)

*2 On March 24, 2003, Defendants received a letter from Plaintiff's attorney raising claims of race and gender discrimination. (*Id.* ¶ 30.) Plaintiff contends that after Defendants received this letter she was subjected to a number of alleged retaliatory actions, namely—her job responsibilities were limited, she was excluded from meetings, her working conditions were impaired, and Defendants generally made it more difficult for her to perform her job. (*Id.* ¶ 31.) As specific examples of adverse employment action, Plaintiff alleges that she was reassigned to a cramped office, she was criticized for the actions of a nurse she had previously hired, she was not consulted as to whom would be hired for a position she once occupied, and her computer usage was monitored. (*Id.* ¶ 31(a)-(e).)

On March 16, 2003, Plaintiff commenced this suit. On July 14, 2003, the Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a right to sue letter, allowing her to file Title VII claims within ninety days. (*Id.* ¶ 4.) On October 7, 2003, with Defendants' motion to dismiss already submitted, Plaintiff amended her complaint to allege such claims. [FN2]

> FN2. For this reason, the parties were granted the opportunity to supplement their initial motion papers.

## II. DISCUSSION
### A. Motion to Dismiss Standard
A court may dismiss a complaint for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim which would warrant relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the Court must take as true all the facts stated in the complaint and "draw all reasonable inferences in the plaintiff's favor." *Jackson Nat'l Life Ins. v. Merrill Lynch & Co.*, 32 F.3d 697, 700 (2d Cir.1995). As such, "a complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Baker*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                      Page 4

Not Reported in F Supp 2d, 2004 WL 503760 (S D N Y )

**(Cite as: 2004 WL 503760 (S.D.N.Y.))**

*v Cuomo*, 58 F 3d 814, 818 (2d Cir 1995)

### B. Claims Against Our Lady of Mercy Healthcare System, Inc.

[1] Plaintiff asserts claims of discrimination, retaliation, and constructive discharge against both Our Lady of Mercy Medical Center and Our Lady of Mercy Healthcare System, Inc. (First Am. Compl. Introductory Paragraph ) Defendants move to dismiss all claims asserted against Our Lady of Mercy Healthcare System on the grounds that Plaintiff has failed to assert that it was her employer and that it played a role in the alleged discriminatory and retaliatory acts. Perhaps not artfully pled, the complaint's introductory paragraph refers to both Our Lady of Mercy Medical Center and Our Lady of Mercy Healthcare System, Inc as "OLM." Therefore, the factual allegations throughout the complaint refer to both entities.

Accepting the facts in the complaint as true, Plaintiff has sufficiently alleged that Our Lady of Mercy Healthcare System was her employer and that its acts constituted discrimination, retaliation and constructive discharge Our Lady of Mercy Healthcare System has therefore received fair notice of these claims *See Swierkiewicz v. Sorema, N A*, 534 U S 506, 514, 122 S Ct 992, 152 L Ed 2d 1 (2002) Defendants' motion to dismiss all claims asserted against Our Lady of Mercy Healthcare System, Inc is denied.

### C. Title VII Claims Based on Acts Occurring from January 2001 through November 2001

*3 [2] Plaintiff has alleged violations of Title VII based on discrete discriminatory acts that allegedly occurred from January 2001 through November 2001 (First Am Compl ¶¶ 17-25 ) The Complaint alleges that: (1) after Plaintiff took medical leave, Defendants assigned administration of the seven departments Plaintiff had previously supervised to five white employees; (2) after Plaintiff returned from leave she was relegated to performing secretarial work under the supervision of a white, childless woman; and (3) Plaintiff faced a series of significant demotions (*Id* ¶¶ 22-25 ) Defendants contend that these claims are

time-barred.

In New York, Title VII claims are time-barred if a plaintiff does not file a charge with the EEOC within three-hundred days of the alleged unlawful employment practice. *See Harris v. City of New York*, 186 F 3d 243, 247-48 (2d Cir 1999) Plaintiff alleges that she filed a charge of discrimination with the EEOC on or about April 25, 2003. (First Am Compl. ¶ 4.) The operative date for determining the timeliness of her newly added Title VII claims is therefore June 30, 2002, three-hundred days before her EEOC filing. Any claims concerning alleged discriminatory acts occurring before June 30, 2002 would be untimely.

In an attempt to circumvent this bar, Plaintiff argues that the alleged discriminatory acts that occurred from January 2001 through November 2001 are part of Defendants' systematic discrimination against minority employees and women with children. As such, Plaintiff asserts that the continuing violation doctrine allows her Title VII claims to proceed.

The continuing violation theory may be invoked if Plaintiff provides "proof of specific or ongoing policies or practices or ... specific and related instances of discrimination [which] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwall v. Robinson*, 23 F 3d 694, 704 (2d Cir 1994) If a continuing violation is established, "all claims of discrimination under [the discriminatory policy] will be timely even if they would be untimely standing alone " *Lambert v. Genesee Hosp.*, 10 F 3d 46, 53 (2d Cir 1993) As "a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor." *Curtis v. Airborne Freight Corp.*, 87 F Supp 2d 234, 244 (S D N Y 2000)

Here, Plaintiff has failed to provide any facts that the alleged discriminatory acts predating June 30, 2002 amount to a discriminatory policy or practice. Instead, in wholly conclusory fashion, she asserts that these acts are not merely discrete, but rather based upon systematic discrimination against

© 2005 Thomson/West No Claim to Orig. U S Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2004 WL 503760 (S.D.N.Y.)

(Cite as: 2004 WL 503760 (S.D.N.Y.))

minority employees and child-rearing women. Plaintiff may not, however, convert discrete acts into a pattern or practice by merely invoking those words. *See, e.g., Blake v. Bronx Lebanon Hosp.*, No. 02 Civ. 3827, 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003) ("A plaintiff does not properly allege an ongoing discriminatory policy simply by invoking the magic words 'pattern' or 'practice' "); *Gross v. NBC Inc.*, 232 F.Supp.2d 58, 68 (S.D.N.Y. 2002) ( "There is no indication that the term 'practice' as it is used in Title VII 'converts related discrete acts into a single unlawful practice for purposes of timely filing." ') (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002))

*4 Moreover, the Supreme Court in *Morgan* cautioned that courts should not readily allow plaintiffs to allege pattern or practice claims based on a series of discriminatory acts. *See* 536 U.S. at 113. The Court stated,

Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire [each constitute] a separate actionable "unlawful employment practice." Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete act starts a new clock for filing charges alleging that act.

*Id.* The actions on which Plaintiff premises her discrimination claims did not occur until October 2002, when Plaintiff was demoted. It may not be said that this event-occurring approximately a year after the discriminatory acts of January 2001 through November 2001-is part of a specific and systematic practice of discrimination. Rather, the discriminatory acts are discrete and each act started a new clock for filing charges. *See id.* Accordingly, Plaintiff's allegations concerning discrete events occurring from January 2001 through November 2001 are time-barred. Plaintiff's Title VII claims relating to acts or events occurring during this time-frame are therefore dismissed. [FN3]

> FN3. Defendants request that the factual allegations contained in paragraphs 17-25 of the First Amended Complaint should be completely struck as time-barred. This

request is denied because such factual allegations are timely to the extent that they relate to Plaintiff's claims under section 1981, the Executive Law, and the City Law. *See Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 n. 5 (2d Cir.1998) (stating statute of limitations for federal civil rights cases is three years, including § 1981 claims); *Lambert*, 10 F.3d at 59 (claims brought under § 296 of the New York State Executive Law and § 8-107 of the New York City Administrative Code are subject to a three-year statute of limitations).

D. Retaliation

For Plaintiff to ultimately prevail on her retaliation claims, she must satisfy the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, Plaintiff must present a *prima facie* case. To state a *prima facie* case, Plaintiff must prove the following four elements: (1) she was engaged in a protected activity; (2) Defendants were aware of her participation in this activity; (3) Defendants took adverse action against her; and (4) a causal connection existed between the protected activity and the adverse action. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993). If Plaintiff shoulders this initial burden, the burden of production shifts to Defendants to introduce evidence of a legitimate, non-retaliatory justification for its action. *Id.* Finally, if Defendants meet their burden, Plaintiff then has the opportunity to prove that the alleged justification is merely a pretext for retaliation.

[3] Defendants argue that the defect in Plaintiff's claim is she cannot establish the third element of a prima facie case-that she suffered an adverse employment action following her alleged protected activity. Plaintiff counters that at this stage of the case she need not demonstrate that the actions taken against her were adverse. The parties' disagreement stems from their conflicting interpretation of the Supreme Court's recent decision in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Plaintiff's central argument is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 503760 (S D N Y.)

(Cite as: 2004 WL 503760 (S.D.N.Y.))

Page 6

that, under *Swierkiewicz,* she must provide fair notice of her retaliation claim and no more; Defendants believe that Plaintiff must provide both fair notice and plead minimal facts, but has failed to do so as to the adverse employment element [FN4]

> FN4 Plaintiff does assert that the acts asserted in the complaint nevertheless constitute adverse employment actions. This aspect of the motion is discussed below.

*5 In *Swierkiewicz,* a Hungarian national challenged his termination as an underwriter with a reinsurance company based on his race, in violation of Title VII, and on his age, in violation of the Age Discrimination in Employment Act *See Swierkiewicz.* 534 U S at 508 Ruling on a motion to dismiss, the district court dismissed the case because the plaintiff had not adequately alleged a prima facie case, in that he had not adequately alleged circumstances that supported an inference of discrimination *Id* at 509 The Second Circuit affirmed the dismissal on the ground that plaintiff's allegations were insufficient as a matter of law to support an inference of discrimination under *McDonnell Douglas See Swierkiewicz v Sorema, N A,* No 00-9101, 2001 WL 246077, at *1 (2d Cir Mar.12, 2001) The Supreme Court, in order to resolve a split among the circuits, granted certiorari to determine "whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a prima facie case of discrimination" *Swierkiewicz,* 534 U S. at 508. The Supreme Court answered in the negative and reversed the Second Circuit The Court reasoned that a prima facie case under *McDonnell Douglas* is "an evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases." *Id* at 510, 512 The Court therefore held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination" so long as the complaint provides the defendant "fair notice of the basis for [the] claims." *Id* at 514-15 However, the Court did not, as Plaintiff contends, stop there The Court further stated that if a plaintiff satisfies the "fair notice" standard, a court must still determine whether "

'relief could be granted under any set of facts that could be proved consistent with the allegations." " *Id* at 514 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed 2d 59 (1984)). Defendants are therefore correct in articulating the framework that the Court should apply to its motion, but incorrect as to the outcome: Plaintiff has sufficiently pled a claim of retaliation, and Defendant has failed to show that the aggregated acts of which Plaintiff complains do not amount to an adverse employment action as a matter of law.

[4] Plaintiff has provided Defendants with "fair notice" of her claim Plaintiff alleged that her "attorney sent a letter to [defendants] by Federal Express, raising claims of race and sex (including pregnancy) discrimination" and that shortly after sending the letter, she experienced retaliation (First Am Compl ¶ 30.) Plaintiff contends that the alleged retaliatory actions impaired her working conditions, limited her job responsibilities, subjected her to hostile work comments, resulted in her exclusion from meetings, and made it more difficult for her to perform her duties (*Id* ¶¶ 30-31.) Moreover, Plaintiff also asserted five specific allegedly retaliatory acts (*Id* ¶ 31(a)-(e).) Therefore, Plaintiff has done more than offer conclusory allegations of retaliation. *See* Fed.R.Civ.P. 8(a); *see also Leeds v Meltz,* 85 F.3d 51, 53 (2d Cir.1996) ("While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice."). Plaintiff has " 'give[n] the defendant[s] fair notice of what the plaintiff's claim is and the grounds upon which it rests." ' *Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *see also Harrison v New York City Admin for Children's Servs,* No 02 Civ. 947, 2003 WL 22271219, at *5 (S.D.N.Y. Sept 30, 2003) (denying motion to dismiss because plaintiff provided fair notice of her race and gender discrimination claims under *Swierkiewicz*). Plaintiff has properly pled her retaliation claim.

*6 The Court next must determine whether Plaintiff has stated claims of retaliation upon which relief might rest As the Supreme Court reiterated in *Swierkiewicz,* " '[A] court may dismiss a complaint only if it is clear that no relief could be granted

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 503760 (S D.N.Y.)

(Cite as: 2004 WL 503760 (S.D.N.Y.))

under any set of facts that could be proved consistent with the allegations " ' *Swierkiewicz,* 534 U S. at 514 (quoting *Hishon,* 467 U S. at 73) The Supreme Court therefore held that the claims presented by the *Swierkiewicz* plaintiff could survive a motion to dismiss because the complaint provided "fair notice" *and* "state[d] claims upon which relief could be granted under Title VII " *Id* at 515

The Court declines to adopt the proposition that Plaintiff need only provide Defendants with fair notice of the retaliation claim First, such a position would require the Court to overlook the plain language of *Swierkiewicz* Second, doing so would all but eviscerate Rule 12(b) and its proviso that a complaint should be dismissed when a plaintiff fails "to state a claim upon which relief could be granted." Fed.R.Civ P. 12(b)(6). Finally, the consequences of such a position would be significant and adverse to the purpose of Title VII Its purpose is to assure equality of employment opportunities, to eliminate discriminatory employment practices, and to prohibit retaliation against employee's engaged in certain protected activities. Requiring a plaintiff to plead those facts, which if accepted as true would entitle a litigant to legal relief, furthers this purpose. There is no doubt that "discrimination is odious but a frivolous or malicious charge of such conduct ... is at least equally obnoxious " *Carrion v Yeshiva Univ,* 535 F 2d 722, 728 (2d Cir 1976) Adopting the position Plaintiff advances would allow such cases to survive, at least until the summary judgment stage Such a result, however, would be unjust to those plaintiffs who present meritorious claims, as it would strain federal dockets and would mean that years would pass before an aggrieved employee could present his claim in court. *See Cicero v Borg-Warner Automotive, Inc,* 163 F Supp 2d 743, 758 (E D.Mich 2001) ("Not only are frivolous suits wasteful, expensive and meddlesome to the immediate participants, they prevent plausible discrimination claims from being timely heard, and dissuade those who have actually been wronged from filing suit because of the inordinate length of time it would take to obtain a remedy.") Therefore, Plaintiff's contention that *Swierkiewicz* prevents a

court from analyzing the detailed factual allegations of retaliation is misplaced.

[5] The Second Circuit has stated that "no bright-line rules ... determine whether the challenged employment action reaches the level of [being] adverse." *Richardson v New York State Dep't of Corr. Serv,* 180 F 3d 426, 446 (2d Cir 1999) Moreover, "Title VII does not define adverse employment action solely in terms of job termination or reduced wages and benefits, and ... less flagrant reprisals by employers may indeed be adverse " *Id* Even if none of the actions that a plaintiff alleges could individually be characterized as adverse, a series of actions taken against a plaintiff may, in the aggregate, constitute such conduct *Fowler v New York City Transit Auth,* No. 96 Civ 6796, 2001 WL 83228, at *7 (S.D.N.Y. Jan.31, 2001) ("[T]he accumulation of small reprisals may be aggregated so as to permit consideration of their impact in their totality and to support their being deemed sufficient to constitute adverse employment action sustaining a claim for retaliation for engaging in a protected activity."); *see also Reiter v Metro Transit Auth,* No. 01 Civ. 2762, 2002 WL. 31190167, at *10 (S.D.N.Y. Sept. 30, 2002) (holding that "changes in ancillary job-related benefits and job responsibilities, when viewed as a whole rather than individually, may rise to the level of materially adverse actions.") (citations omitted)

*7 Taken in the aggregate, the series of actions that Plaintiff alleges-loss of office space, interference with computer rights, diminished job responsibilities, and exclusion from meetings-may constitute adverse employment action Accordingly, the Court concludes that Defendant has failed to show that Plaintiff cannot demonstrate any set of facts which would entitle her to relief

E. Constructive Discharge
[6] Plaintiff also alleges claims of constructive discharge against Defendants. An employee is constructively discharged when an employer "deliberately [makes] his working conditions so intolerable that he [is] forced into an involuntary resignation." *Kirsch v Fleet Street, Ltd,* 148 F 3d

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2004 WL 503760 (S D N Y )

**(Cite as: 2004 WL 503760 (S.D.N.Y.))**

149, 161 (2d Cir 1998) To prove constructive discharge, Plaintiff must show that a reasonable person subjected to the working condition which she experienced would have felt compelled to resign. *See Ongsiako v City of New York,* 199 F Supp 2d 180, 187 (S D N Y 2002) In other words, Plaintiff must show that Defendants deliberately made her working condition so intolerable that she was forced into an involuntary resignation *See, e g, Sinopoli v Regula,* No. 97-7229, 1997 WL 624987, at *2 (2d Cir. Oct 9, 1997) Whereas courts generally disfavor viewing allegedly discriminatory *practices* in an aggregated matter when claims related to such practices would otherwise be *untimely* (see Section II C), courts take a different view as to allegedly *adverse employment actions* that are *timely* The Second Circuit has stated that although "certain factors, standing alone, [may be] legally sufficient to support constructive discharge" a constructive discharge claim may nonetheless proceed given that "the effect of a number of adverse conditions in the workplace is cumulative " *Chertkova v Conn Gen Life Ins Co,* 92 F 3d 81, 90 (2d Cir 1996) Moreover, the Second Circuit has held that, "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually, it [is] error to treat the various conditions as separate and distinct rather than additive " *Id*

Plaintiff alleges that not only has she been passed over for positions for which she was qualified, but also that she has been placed in inferior positions below her skill level. (First Am Compl ¶¶ 28-29 ) Plaintiff further alleges, among others examples, that she was stripped of her substantive responsibilities, removed from her office, shunted to several inadequate work locations, and that Defendants generally engaged in actions that made it more difficult for her to work (*Id* ¶ 31 ) A reasonable person could infer from these combined facts that Plaintiff "was not wanted as an employee and that [s]he was going to be forced our of" her employment *Terry v Ashcroft,* 336 F 3d 128, 152 (2d Cir 2003); *see also Chertkova,* 92 F 3d at 90 ("Certain factors, standing alone, are legally insufficient to support constructive discharge But, the effect of a number of adverse conditions in

the workplace is cumulative ") (citations omitted) Therefore, similar to the claims of retaliation, the aggregated allegations underlying Plaintiff's constructive discharge claim allow this claim to withstand a motion to dismiss

### III CONCLUSION

*8 For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART as follows: (1) the motion to dismiss all allegations against Our Lady of Mercy Healthcare System, Inc. is denied; (2) Defendants' motion to dismiss the Title VII claims as they relate to acts that occurred from January 2001 through November 2001 is granted; (3) Defendants' motion to dismiss the retaliation claims is denied; and (4) the motion to dismiss the constructive discharge claim is denied

The parties are directed to appear for a conference before the Court on August 13, 2004 at 9:30 a m , at which time all discovery must be complete

So Ordered:

Not Reported in F Supp.2d, 2004 WL 503760 (S D N Y )

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv03556 (Docket) (May. 16, 2003)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

(Cite as: 2004 WL 2050138 (Del.Ch.))

Page 1

**H**

Only the Westlaw citation is currently available

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
In re the WALT DISNEY COMPANY Derivative Litigation
No. Civ.A. 15452.

Submitted Sept. 8, 2004.
Decided Sept. 10, 2004.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Seth D. Rigrodsky, of Milberg Weiss Bershad & Schulman LLP, Wilmington, Delaware; Steven G. Schulman, Joshua H. Vinik, Jennifer K. Hirsh and Lisa L. Cogan, of Milberg Weiss Bershad & Schulman LLP, New York, New York, for Plaintiffs, of counsel.

David C. McBride and Christian Douglas Wright, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Mark H. Epstein and Jason L. Haas, of Munger, Tolles & Olson LLP, Los Angeles, California, for Defendant Michael S. Ovitz, of counsel.

Andre G. Bouchard and Joel Friedlander, of Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware, for The Walt Disney Company.

Robert K. Payson, Stephen C. Norman and Kevin R. Shannon, of Potter Anderson & Corroon LLP, Wilmington, Delaware, for Sanford M. Litvack.

R. Franklin Balotti and Anne C. Foster, of Richards, Layton & Finger, Wilmington, Delaware, for Defendants Stephen F. Bollenbach, Reveta F. Bowers, Ignacio E. Lozano, Jr., George J. Mitchell, Thomas S. Murphy, Richard A. Nunis, Leo J. O'Donovan, S.J., Sidney Poitier, Irwin Russell, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson and Gary L. Wilson.

A. Gilchrist Sparks, III and S. Mark Hurd of Morris, Nichols, Arsht & Tunnel, Wilmington, Delaware; Stephen D. Alexander and Peggy Sasso, of Fried, Frank, Harris, Shriver & Jacobson LLP, Los Angeles, California, for Defendants Roy Disney and Stanley P. Gold, of counsel.

Lawrence C. Ashby, of Ashby & Geddes, Wilmington, Delaware; Gary P. Naftalis, of Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendant Michael Eisner, of counsel.

MEMORANDUM OPINION

CHANDLER, J.

### I. INTRODUCTION

*1 This derivative action already has developed a lengthy and well-documented history. In anticipation of the trial scheduled to begin shortly, defendant Michael S. Ovitz has moved for summary judgment on the ground that the undisputed evidence obtained by plaintiffs is legally insufficient to establish that he violated whatever fiduciary duties he may have owed to the Walt Disney Company and its shareholders. Although Ovitz's motion itself purportedly addresses all three claims pled against Ovitz in the Second Amended Consolidated Derivative Complaint ("Complaint"), the briefs filed in support of his motion only address the fiduciary duty issues and do not address the claim that Ovitz wrongfully caused Disney to engage in waste.

For reasons briefly described later, I conclude that Ovitz is entitled to summary judgment with respect to the First Claim of the Complaint, which alleges that he violated his fiduciary duties in negotiating,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                              Page 2

Not Reported in A 2d, 2004 WL 2050138 (Del Ch )

(Cite as: 2004 WL 2050138 (Del.Ch.))

arranging, and finalizing the terms of his employment contract because, at the time all material negotiations occurred and alterations were made, Ovitz was not yet a fiduciary of Disney. With respect to the claim of waste and Ovitz's termination and receipt of Non-Fault Termination ("NFT") benefits when his employment with Disney ended, there are genuine issues of material fact to be resolved at trial, and summary judgment in favor of Ovitz as to those issues is inappropriate. Accordingly, the motion for summary judgment is granted in part and denied in part.

## II. STATEMENT OF FACTS
At the outset of this section, the Court should make one thing very clear: The issues raised by Ovitz's motion for summary judgment relate to his alleged malfeasance or nonfeasance, not that of the other defendants [FN1] The undisputed facts of greatest relevance for granting, in part, Ovitz's motion for summary judgment are drawn from the voluminous documents produced in this case, especially defendant Michael D. Eisner's [FN2] August 14, 1995 letter ("OLA") [FN3] to Ovitz outlining the key points of his employment agreement, and the various drafts and final version of Ovitz's employment agreement ("OEA").

> FN1. With respect to entering into the OEA, to the extent that plaintiffs, as evidenced by the Preliminary Statement made in their brief in opposition to this motion, contend that Ovitz's motion should be denied because he aided and abetted the other directors in a breach of their fiduciary duties, that argument is made improperly, as a claim for aiding and abetting a breach of fiduciary duty has not been pled, and it is far too late to permit plaintiffs to replead again in order to include such a claim

> FN2. Eisner was the Chairman of the Walt Disney Company from 1984- 2004, and currently is Disney's Chief Executive Officer ("CEO"), a position he has held since 1984 Eisner Tr at 9, 28-42; Press Release, The Walt Disney Company,

Statement From the Board of Directors of The Walt Disney Company (Mar. 3, 2004) (available from http://disney.go.com/corporate/)

> FN3. Dep. Ex. 33.

Following the untimely death of Frank Wells, former President of Disney, and the acrimonious exit of Jeffrey Katzenberg, Disney was searching for a new President as part of a long-term succession plan. [FN4] Effective October 1, 1995, Ovitz filled that position. [FN5] As of that date, he did not have a finalized and duly executed employment agreement.

> FN4. See Dep. Ex. 266.

> FN5. See Dep. Ex. 3. The parties argue at length about Ovitz's departure from Creative Artists Agency ("CAA"), but that discussion is largely irrelevant and the Court only addresses those facts as necessary

The first draft of the OEA was made by the office of Disney's General Counsel, and was sent to Ovitz's attorneys on September 23, 1995. [FN6] This draft already included several material changes from the OLA. [FN7] The September 23 draft contained the following language regarding termination for cause: "Termination. for 'good cause' as used in this Agreement shall be limited to gross negligence or malfeasance by Executive in the performance of his duties under this Agreement..." [FN8]

> FN6. See Dep. Ex. 112.

> FN7. The most important changes were: 1) the removal of the guarantee that the three million stock options would be worth at least $50 million, 2) a reduction of the options' exercise price to market price on the day of grant, 3) the addition of a $10 million termination payment if the contract was not renewed following extension to Ovitz of a "Qualifying Offer", and 4) the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                    Page 3

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

(Cite as: 2004 WL 2050138 (Del.Ch.))

extension of the exercisability date of the three million options to their normal expiration date in the event of a NFT *Compare* Dep Ex. 33 *with* Dep Ex. 112 Ovitz had almost no control over the extension of the exercisability date because it required shareholder approval, which was received at a special shareholder meeting on January 4, 1996. *See* Disney's Form 8-K, filed with the SEC on Jan 5, 1996

> FN8 Dep. Ex 112 at WD00020

*2 Sometime between September 23, 1995 and the meeting of the Compensation Committee of Disney's Board of Directors on September 26, 1995, additional changes to the OEA were made [FN9] When the terms of the OEA were presented to the Compensation Committee on that date, it was preliminarily approved, subject to the final agreement being negotiated by Eisner and then memorialized and approved by the Compensation Committee via unanimous written consent [FN10]

> FN9. The most important change was the substitution of $7.5 million for $5 million as the base used to calculate bonuses in the event of a NFT *Compare* Dep. Ex. 112 *with* Dep. Ex. 39 Dep. Ex 39 is identical to Dep Ex 370

> FN10 Dep Ex 39 at WD01170, WD01188

Several more drafts of the OEA were exchanged after Ovitz began as President on October 1, 1995 [FN11] The final agreement was signed on or about December 16, 1995, with an effective date of October 1, 1995 [FN12] There is only one glaring difference between the pre-October 1 drafts and the final OEA--the date upon which Ovitz's options were to be priced The September 23 draft would have priced the options on October 2, 1995 (when they were to have been granted), while the final OEA priced them on October 16, 1995 (the date on which the options were actually approved by the Compensation Committee) [FN13] The final OEA

contained the following language regarding termination for cause: "Termination ... for 'good cause' as used in this Agreement shall be limited to gross negligence or malfeasance by Executive in the performance of his duties under this Agreement ..." [FN14]

> FN11 *See* Dep Ex. 114 (Oct. 3, 1995); 117 (Oct. 10, 1995); 121 (Oct. 16, 1995); 122 (Oct 22, 1995); 124 (Oct 24, 1995).

> FN12 Dep. Ex 7

> FN13 *See* Dep Exs. 41 and 43

> FN14 Dep. Ex 7 at WD00212

Both sides agree that once he was hired, Ovitz's tenure at Disney was not successful [FN15] By the close of business on December 27, 1996, Ovitz was no longer employed with Disney. [FN16] Ovitz did not resign, nor was he fired. Instead, Ovitz received what the OEA referred to as a "Non-Fault Termination." The NFT provisions of the OEA were triggered by the events of December 27, 1996, and Ovitz received almost $40 million in cash and the immediate vesting of his three million stock options at that time. [FN17]

> FN15 "Ovitz's relationship with Disney was not successful." Opening Br. In Support of Def Michael Ovitz's Mtn. for Summ J at 13 Plaintiffs' brief is rife with derogatory remarks about Ovitz's management

> FN16 Dep. Ex. 14

> FN17 *Id*

There is significant disagreement as to why Ovitz's term at Disney was not a success. Ovitz makes four arguments in this regard: 1) Disney executives resisted Ovitz's ideas; 2) Ovitz never possessed the authority appropriate for his position; 3) Ovitz was not given sufficient time for his efforts to bear fruit; and, 4) Ovitz never achieved the "partnership" with Eisner that allegedly induced Ovitz to come to

© 2005 Thomson/West. No Claim to Orig. U S Govt Works.

Not Reported in A.2d                                                      Page 4

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

(Cite as: 2004 WL 2050138 (Del.Ch.))

Disney [FN18] Plaintiffs, on the other hand, argue that it was Ovitz who alienated the other Disney executives, that he showed a lack of focus and inattentiveness to his duties, that he spent Disney funds in violation of company protocol, and that Ovitz was both a liar and untrustworthy [FN19]

> FN18 *See* Eisner Tr. at 312-13.

> FN19 Pls.' Br. in Opp. to Michael S. Ovitz's Mtn. for Summ. J. at 30-37.

Ovitz understood that his time at Disney would not last, and he pursued other opportunities for employment. In early October 1996, Ovitz wrote to Eisner requesting permission to negotiate an employment relationship with Sony. [FN20] Eisner agreed the next day by writing a note to Ovitz and also a note to be sent to Sony's Chairman, granting that permission and expressing a desire that Sony assume Disney's financial obligations under the OEA. [FN21] By November 1, 1996, the talks with Sony had ended, and Ovitz wrote to Eisner again, this time to "recommit [himself] to [Eisner] and to Disney." [FN22] Ten days later, Eisner wrote a much longer note describing Ovitz's flaws and stating that Ovitz needed to make preparations to leave Disney. Although Eisner intended to send Ovitz this letter, he never did so. [FN23]

> FN20. Dep. Ex. 18.

> FN21. Dep. Ex. 19.

> FN22. Dep. Ex. 19 at WD00404.

> FN23. Dep. Ex. 24. This note was sent in draft form to Bass, Russell and perhaps Litvack, and after conversation with them, Eisner decided not to send the note because "it was too mean." Eisner Tr. at 605-06.

*3 Once it was clear to all that Ovitz would be leaving Disney's employ, the question became how that end would be accomplished. Nevertheless, not everyone in Disney management was on the same page, as Ovitz was unanimously renominated to a

three-year term as a director at a board meeting held on November 25, 1996 [FN24] On December 3, 1996, Eisner met with Ovitz to discuss issues regarding his impending termination, and then Eisner sent Russell a short letter detailing his conversation with Ovitz. [FN25] Russell thereafter began negotiating the specific language of the letter whereby Ovitz would receive his NFT [FN26] On December 12, 1996, Litvack sent Ovitz a letter confirming their agreement that Ovitz would be terminated and receive a NFT. [FN27] About two weeks later, the above-referenced letter of December 27, 1996, was signed by both Ovitz and Litvack, ending Ovitz's employment immediately. [FN28] Disney's board did not meet to approve the termination of Ovitz or the payment of his NFT benefits. [FN29]

> FN24. Dep. Ex. 340 at WD06415. Eisner, Ovitz, Russell, Litvack, and others attended that board meeting *Id* at WD06409.

> FN25. Eisner Tr. at 628-29; Dep. Ex. 326. According to Eisner's letter to Russell, Ovitz had requested that Russell, not Litvack, handle the negotiations on behalf of Disney. Eisner implicitly concurred, and Russell did conduct those negotiations as requested Dep. Ex. 326 at DD002540.

> FN26. Dep. Exs. 326, 379-83 Russell, along with Litvack, had opined that Disney did not have grounds upon which to terminate Ovitz for cause *See* Russell Tr. at 722-23; Litvack Tr. at 550-51. There is some indication that an opinion from outside counsel was sought, but apparently no final opinion was ever rendered and delivered to Disney *See* Russell Tr. at 856-57.

> FN27. Dep. Ex. 13.

> FN28. Dep. Ex. 14.

> FN29 *See* Russell Tr. at 853 (compensation committee did not meet) In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

**(Cite as: 2004 WL 2050138 (Del.Ch.))**

addition, there are no minutes indicating that the full board ever considered Ovitz's termination

### III. STANDARD OF REVIEW

Court of Chancery Rule 56 is the basis for motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [FN30] In ruling on the motion, the Court must view the facts in the light most favorable to the non-moving party, and make all reasonable inferences in favor of the non-moving party. [FN31]

> FN30. CT. CH. R. 56(c)

> FN31. *Judah v. Del Trust Co.*, 378 A.2d 624, 632 (Del.1977)

### IV. ANALYSIS

*A. Ovitz Was Not a Fiduciary Until October 1, 1995*

To date, the fiduciary duties of officers have been assumed to be identical to those of directors. [FN32] With respect to directors, those duties include the duty of care and the duty of loyalty. There has also been much discussion regarding a duty of good faith, which may or may not be subsumed under the duty of loyalty. [FN33] Ovitz became an officer of Disney on October 1, 1995 when he became President of the corporation, [FN34] and he became a director on January 22, 1996. [FN35] Therefore, upon becoming an officer on October 1, 1995, Ovitz owed fiduciary duties to Disney and its shareholders

> FN32. "With respect to the obligation of officers to their own corporation and its stockholders, there is nothing in any Delaware case which suggests that the fiduciary duty owed is different in the slightest from that owed by directors." DAVID A. DREXLER, ET AL., DELAWARE CORPORATION LAW

AND PRACTICE § 14.02 (Rel. No. 16, 2003).

> FN33. *See In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 475-76 n.41 (Del. Ch.2000); Lyman P.Q. Johnson & Mark A. Sides, *The Sarbanes-Oxley Act and Fiduciary Duties*, 30 WM. MITCHELL L.REV. 1149 (2004); Hillary A. Sale, *Delaware's Good Faith*, 89 CORNELL L.REV. 456 (2004)

> FN34. Dep. Ex. 29 at WD01196.

> FN35. Dep. Ex. 47 at WD01210-11.

As this Court previously held, before becoming a fiduciary, "Ovitz did have the right to seek the best employment agreement possible for himself." [FN36] In fact, that prior ruling implies that it may be the law of the case that Ovitz was not a fiduciary until October 1, 1995. [FN37] Even if this is not the law of the case, it is the correct result and the Court reaches that conclusion anew

> FN36. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 290 (Del. Ch.2003) ( *"Disney"*).

> FN37. "Nevertheless, once Ovitz became a fiduciary of Disney on October 1, 1995...." *Id*

Plaintiffs claim that once the OLA was executed and Ovitz's hiring was publicly announced in mid-August 1995, his official installation as President and status as a fiduciary was a foregone conclusion. This may be so, but it does not explain why Ovitz would be bound by those fiduciary duties even though he had not yet taken office. Plaintiffs cite two cases for the proposition that Ovitz owed Disney fiduciary duties before he assumed the position of President on October 1, 1995, though neither case supports their argument. [FN38]

> FN38. First, plaintiffs cite *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939) for the proposition that "a corporate officer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 6

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

(Cite as: 2004 WL 2050138 (Del.Ch.))

assumes fiduciary duties to the corporation and the shareholders, [and] that those duties flow not from the corporate title itself but from the assumption of an equivalent role or function in relation to the company." Pls.' Br. in Opp. to Michael S. Ovitz's Mtn. for Summ. J. at 52 n.30. The Court has been unable to find this particular rule of law in the *Guth* opinion, but even if it were true, it would support Ovitz's argument instead. Although he was to be made President of Disney, Ovitz's duties did not flow from that title or the publicity stemming from his hiring, but from the assumption of his role and function in relation to the company, or in other words, his duties and authority as President, which he did not obtain until October 1, 1995. Secondly, plaintiffs' reference to Justice Jacobs' opinion in *Faraone v. Kenyon,* 2004 Del.Ch. LEXIS 26 at *26 (Del. Ch.), is taken out of context and misleading because Justice Jacobs clearly was discussing relationships that fall outside the well-recognized set of fiduciary relationships, and the fiduciary relationship that an officer or director owes to the corporation and its shareholders has long been recognized in Delaware jurisprudence.

*4 Because there is no reason to impose a fiduciary duty upon Ovitz before he obtained fiduciary authority, Ovitz was not a fiduciary before October 1, 1995, and therefore, Ovitz was free to negotiate the OLA and OEA to his greatest advantage until October 1, 1995. If this means that Ovitz took advantage of any personal relationship he might have had with Eisner or Russell during the course of those negotiations, Ovitz would be entitled to do so unless his actions amounted to aiding and abetting a breach of their (Eisner's and Russell's) fiduciary duties, a claim that plaintiffs have not asserted.

Similarly, it is not Ovitz's responsibility to ensure that Eisner had actual authority to extend the offer of employment to Ovitz or to negotiate on behalf of Disney. Ovitz knew that Eisner was Chairman and

CEO of Disney, which would be sufficient to give Eisner apparent authority to take those actions [FN39] It would be nonsensical to require Ovitz to ignore this fundamental principle of agency law, and as part of his inchoate fiduciary duties, and without any authority vis-a-vis Disney, to verify that Eisner could negotiate on behalf of Disney and that the Disney Board of Directors were complying with their fiduciary responsibilities in connection with Ovitz's hiring.

> FN39. Under Delaware law, an agent, such as a CEO, can bind the principal if the third person with whom that agent is dealing reasonably concludes that the agent is acting on behalf of the principal. *Int'l Boiler Works Co. v. Gen. Waterworks Corp.,* 372 A.2d 176, 177 (Del.1977).

Finding that Ovitz owed fiduciary duties at some time before October 1, 1995 would lead to significant uncertainty regarding when one becomes a fiduciary. [FN40] A bright-line rule whereby officers and directors become fiduciaries only when they are officially installed, and receive the formal investiture of authority that accompanies such office or directorship, is a more reasonable and desirable rule. [FN41] Therefore, because Ovitz did not have any authority at Disney before October 1, 1995, he was not a fiduciary of Disney before that time. It thus follows that any actions taken by him, or negotiations on his behalf with respect to the OEA, before October 1, 1995, cannot subject him to liability for breach of a fiduciary duty that he did not yet have.

> FN40. For example, if a director does not become a fiduciary on the day he or she is installed as a director, when would that person's fiduciary duties begin? When the final results of the directorial election are certified? When the prospective director is placed on a management slate certain to win approval? Similar problems exist in attempting to determine when an officer becomes a fiduciary if not when that person is formally installed and assumes their responsibilities and duties as an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A 2d

Not Reported in A 2d, 2004 WL 2050138 (Del Ch )

(Cite as: 2004 WL 2050138 (Del.Ch.))

Page 7

officer of the corporation.

FN41. Plaintiffs argue that Ovitz wielded some authority before October 1, 1995, perhaps in connection with the extensive remodeling of the Disney executive suite where Ovitz's office was eventually constructed. Even if Ovitz was consulted as to what he desired in an office, others in senior management with authority to approve those expenditures gave consent before work began. *See* Appendix of Exs. To Pls ' Br. in Opp. to Michael S. Ovitz's Mtn for Summ J at tabs D and E. Those documents have the Bates numbers of WD06758-72 and WD06756-57, respectively.

*B  Once a Fiduciary, Ovitz Did Not Breach His Fiduciary Duties By Executing the Previously-Negotiated OEA*

Because Ovitz was not in a fiduciary relationship until October 1, 1995, he owed no duty until that time. If material changes were made to the OEA after that date, however, Ovitz would be required to act as a fiduciary in making those changes In deciding the previous motions to dismiss, the Court noted that case law supports the proposition that "an officer may negotiate his or her own employment agreement as long as the process involves negotiations performed in an adversarial and arms-length manner " [FN42] The Court also concluded, based upon the record at the time and the precise procedural posture of a motion to dismiss, that "the final version of the [OEA] differed significantly from the draft version summarized to the board and to the compensation committee on September 26, 1995 " [FN43]

> FN42 *Disney.* 825 A 2d at 290 (emphasis removed)

> FN43 *Id*

Then, drawing all reasonable inferences in favor of the plaintiffs, the Court decided that if the allegations relating to the negotiation and execution

of the OEA were proven true, that no adversarial or arms-length process occurred and that Ovitz may have breached his fiduciary duties. [FN44] Today the Court faces the issue anew in light of the facts uncovered through the discovery process and through the lens of a summary judgment motion brought by Ovitz The facts that plaintiffs have produced simply do not support the Court's previous conclusion.

> FN44 *Id*

*5 The correspondence between Disney and Ovitz and their respective counsel in regards to the OEA clearly shows what changes were made and when. No material changes to the compensation structure, severance or NFT benefits, or the definition of "good cause" changed between September 23, 1995 and December 12, 1995 [FN45] That material changes were made between the OLA on August 14 and the final OEA is irrelevant, so long as the changes were made before Ovitz became a fiduciary on October 1, 1995.

> FN45. Plaintiffs argue that contract language was added that would grant him the $10 million termination payment between the OLA and October 10 draft of the OEA. Pls ' Br. in Opp. to Michael S. Ovitz's Mtn. for Summ. J. at 56 The provision for the $10 million severance payment was included in the September 23 draft, and the specific language referred to in plaintiffs' brief can be considered mere surplusage--it does not materially change the operation of the $10 million payment because if Ovitz were to receive an NFT the circumstances of Ovitz's imminent departure from Disney would also imply that he would not receive a "Qualifying Offer," the non-receipt of which would entitle Ovitz to the $10 million.

Plaintiffs argue vigorously that Ovitz's options were "in the money" on December 12, 1995 when the OEA was signed, and this evidences a *prima facie* case of self-dealing, quoting from the Court's previous decision, which was not made upon a full

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Not Reported in A.2d                                                      Page 8

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

**(Cite as: 2004 WL 2050138 (Del.Ch.))**

evidentiary record. [FN46] Although Ovitz's options were "in the money" on December 12, 1995, this was according to the previously agreed-upon terms of the OEA and the terms of Disney's stock option plan which required that the options be priced on the day they were approved by the Compensation Committee, in this case, October 16, 1995. [FN47]

> FN46. Pls' Br. in Opp. to Michael S. Ovitz's Mtn. for Summ. J. at 54-55; *Disney*, 825 A.2d at 282.

> FN47. *See* Dep. Ex. 7; Dep. Ex. 112. Disney's Amended and Restated 1990 Stock Incentive Plan, pursuant to which Ovitz's three million options were issued, required that the exercise price be "determined by the [Compensation] Committee at the time any option is awarded and shall not be less than 100% of the fair market value of the common stock of Disney on the date on which the option is granted." Dep. Ex. 41 at WD00133. Furthermore, the Compensation Committee minutes from October 16, 1995 make it clear that Ovitz's options were granted on that date, subject to the formalities of final execution of the OEA and execution and return of a formal stock option agreement. *Id.* at WD00121-22. Provisions similar to those in the final OEA that would possibly allow repricing based upon future amendments to the plan pursuant to the acquisition of Cap Cities/ABC existed in the September 23 draft. *Compare* Dep. Ex. 7 at WD00205 *with* Dep. Ex. 112 at WD00013-14. In addition, plaintiffs' conjecture that if Disney's stock price had dropped between October and December that Ovitz would have demanded a repricing of his options has no basis in the established record, and such "what ifs" based on events outside of Ovitz's control that did not occur cannot establish a breach of his fiduciary duties.

Plaintiffs attempt to impugn Ovitz's actions by

arguing that he was absent from the October 16, 1995 meeting of the Compensation Committee even though, according to Disney's bylaws, as President, he was an *ex officio* member of that committee. [FN48] Plaintiffs thus try to place Ovitz into a no-win situation: either he attends the meeting, possibly in breach of his duty of loyalty, or he does not attend the meeting, possibly in breach of his duty of care. Given the broad language with which the courts of Delaware have described the duty of loyalty, [FN49] Ovitz made the decision that a faithful fiduciary would make by abstaining from attendance at a meeting where a substantial part of his own compensation was to be discussed and decided upon.

> FN48. *See* Pls' Br. in Opp. to Michael S. Ovitz's Mtn. for Summ. J. at 25.

> FN49. For example, as this Court previously stated, the "duty of loyalty ... imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [a director] absolutely refrain from any conduct that would harm the corporation. This duty has been consistently defined as *'broad and encompassing,'* demanding of a director *'the most scrupulous observance.'* To that end, a director may not allow his self-interest to jeopardize his *unyielding obligations* to the corporation and its shareholders." *BelCom, Inc. v. Robb*, 1998 WL 229527 at *3 (Del. Ch.1998) (internal citations omitted and emphasis added)

Plaintiffs continue to argue that even if the OEA did not materially change after October 1, 1995, Ovitz, by signing the OEA and accepting its benefits, breached his fiduciary duties to Disney and its shareholders. [FN50] In support for this proposition, they again cite to *Guth*, the seminal case with respect to usurping a corporate opportunity. [FN51]

> FN50. Pls' Br. in Opp. to Michael S. Ovitz's Mtn. for Summ. J. at 58.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A 2d

Not Reported in A 2d, 2004 WL 2050138 (Del Ch )

(Cite as: 2004 WL 2050138 (Del.Ch.))

FN51. 5 A 2d at 510. The language that plaintiffs refer to explains that when an officer or director of a corporation usurps a corporate opportunity, a constructive trust should be established for the benefit of the corporation. This result, clearly, is predicated by a finding that the officer or director breached his fiduciary duty. No such corporate opportunity or breach of fiduciary duty has been shown to exist here.

It would make little, if any, sense for the Court to adopt plaintiffs' position, which would, in essence, articulate the following rule: If a person who will become an officer successfully negotiates a compensation package and formally executes that contract before taking office, that person is entitled to negotiate the best deal possible; but, if all the negotiations take place before taking office and the parties begin performance as if the contract was duly executed, because the contract is not formally executed until after the officer assumes his or her position and the fiduciary duties that accompany it, that officer must demonstrate the entire fairness of that contract or be held to have breached his or her fiduciary duties. There is no reasonable rationale upon which to base such a rule, which would also conflict with elementary principles of contract law [FN52]

FN52 Even though the OEA had not yet been executed, both Eisner and Ovitz had signed the OLA, both parties began performing in accordance with the basic economic terms laid out therein and approved by the Compensation Committee on September 26, 1995 (with the exception of the stock option value guarantee). This would likely be sufficient to prove or, at the very least, to make a colorable argument that some form of contract existed between Ovitz and Disney sufficient to bind both parties by no later than October 1, 1995.

*6 Plaintiffs also suggest that after Ovitz became a fiduciary and obtained authority at Disney, he breached his fiduciary duties by failing to conduct an investigation into his hiring to ensure that the proper process was used by Disney and to ensure that the other officers and directors had complied with their fiduciary duties. Although the contours of the so-called "duty to monitor" [FN53] are unclear, they certainly do not extend to the situation present here, where Ovitz negotiated terms of his employment, as a reasonable person would expect, with the CEO and at least one member of the Compensation Committee. In addition, the Compensation Committee apparently approved the terms of his hiring in a formal resolution, and the full Board of Directors formally appointed him as President of the company.

FN53. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v Stewart*, 833 A 2d 961, 970-72 (Del Ch 2003), *aff'd*, 845 A 2d 1040 (Del 2004); *In re Caremark Int'l Inc Derivative Litig*, 698 A 2d 959 (Del Ch 1996).

Because Ovitz was not a fiduciary until October 1, 1995, and because no material changes to the OEA occurred after that date, the Court concludes as a matter of law that Ovitz could not have breached a fiduciary duty he owed by performing under the OEA and by duly executing that document which conformed with the course of performance of the parties. [FN54] Because Ovitz did not breach his fiduciary duties, irrespective of whether other Disney directors and officers may have done so, Ovitz need not show the entire fairness of the OEA, and he is entitled to summary judgment with respect to the claim that he breached his fiduciary duties by entering into the OEA.

FN54. Ovitz's personal, unadvised, and lay conclusions about whether he was legally bound by a handshake or a signature are irrelevant to this conclusion. Whether or not he thought he was bound, he almost certainly was bound based on the OLA, his oral representations, and his performance, and his counsel surely would have advised him thusly had the question been presented.

*C    Genuine    Issues    of    Material    Fact    Exist*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d

Not Reported in A 2d, 2004 WL 2050138 (Del Ch )

(Cite as: 2004 WL 2050138 (Del.Ch.))

*Regarding the Claim of Waste*

The parties did not squarely address the claims regarding waste in the briefing or argument on this motion Because it is unclear whether Disney received "any substantial consideration" and whether there was a "good faith judgment" by the board "that in the circumstances the transaction [was] worthwhile," the claims for waste must remain [FN55] Having failed to present undisputed facts that would entitle him to judgment as a matter of law on this claim, Ovitz's motion for summary judgment as to the waste claims is denied

> FN55  *Brehm v Eisner*, 746 A 2d 244, 263 (Del 2000) (emphasis removed)

*D   Genuine Issues of Material Fact Exist Regarding Whether Ovitz Breached His Fiduciary Duties In Receiving A Non-Fault Termination*

It is beyond question that Ovitz was a fiduciary of Disney during the discussions and negotiations regarding his termination in the latter part of 1996. Until December 27, 1996, Ovitz was both an officer of Disney and a director of Disney As such, Ovitz owed to Disney the fiduciary duties of care and loyalty The question, therefore, is what was the extent and nature of Ovitz's duties during the termination period, and did he comply with them?

Ovitz has argued that so long as he possessed a subjective belief that Disney did not have good cause to terminate him, that he was justified in receiving the NFT, and thus did not breach his fiduciary duties Delaware law, however, has always taken an objective approach to determining fiduciary duties [FN56] Plaintiffs cite a previous decision in this case for the proposition that Ovitz, as a fiduciary, "had an obligation to ensure the process of his   termination was both impartial and fair " [FN57]

> FN56  *See Graham v Allis-Chalmers Mfg Co* , 188 A 2d 125, 130 (Del 1963)

> FN57  *Disney,* 825 A 2d at 291

*7 The situation in which Ovitz found himself was certainly undesirable. His severance from Disney was being orchestrated, and it would arguably spell the end of his career in Hollywood. Though Ovitz has attempted to characterize his termination as a unique situation in which "limited" fiduciary duties should apply, well-established principles of corporate law exist by which the Court may measure Ovitz's and the other Disney fiduciaries' actions

Section 144 of the Delaware General Corporation Law governs the validity of certain interested transactions. [FN58] Section 144 provides that interested transactions are not void or voidable solely because they are between the corporation and a director or officer thereof if one of three requirements is met: 1) after full disclosure, a majority of disinterested directors of the board or an authorized committee thereof ratifies the transaction; [FN59] 2) after full disclosure, a majority of the shareholders, in good faith, approve the transaction; or 3) the transaction is fair as to the corporation. [FN60] Of course, if the transaction constitutes waste, illegality, fraud, or an *ultra vires* act, not even ratification by disinterested directors or anything less than a unanimous shareholder vote will protect the transaction, or those participating in it [FN61]

> FN58.  For a discussion of the application of section 144(a)(2), see the earlier opinion in this case: *In re Walt Disney Co Derivative Litig* , 731 A 2d 342, 366-69 (Del Ch 1998), *aff'd in part, rev'd in part sub nom Brehm v Eisner,* 746 A 2d 244 (Del 2000)

> FN59  In fact, case law seems to indicate that not only must disinterested directors ratify the transaction, but that a disinterested party must negotiate on behalf of the company. *See Cooke v Oolie,* 1997 WL 367034 at *9 (Del Ch )

> FN60  8 *Del C* § 144(a)

> FN61  *See Cede & Co v Technicolor, Inc ,*

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A 2d                                                    Page 11

Not Reported in A 2d, 2004 WL 2050138 (Del.Ch.)

(Cite as: 2004 WL 2050138 (Del.Ch.))

634 A 2d 345 (Del.), *modified,* 636 A 2d 956 (Del 1994); *Schreiber v Bryan,* 396 A 2d 512, 518 (Del Ch 1978)

Ovitz's negotiated separation from the company was an interested transaction within the meaning of section 144 because he, as a director and officer, engaged in a transaction with the corporation for which he was a fiduciary and received a benefit greater than that of Disney's stockholders, [FN62] and this benefit was material to Ovitz [FN63] It was more than merely receiving what he was entitled to under his contract. Ovitz has argued that receiving his NFT was merely a pre-arranged contractual obligation, akin to receiving his salary. It is true that *if* Ovitz received a NFT, that he had a contractual right to receive the payout he did receive But Ovitz did not have a contractual right to receive a NFT, which distinguishes this situation from the mere receipt of salary. Instead, Ovitz's receipt of a NFT was conditioned upon a one-time determination (to be made by Disney) that was not guaranteed by his contract, and Ovitz appears to have actively engaged in negotiations and decisionmaking that affected Disney's determination to grant the NFT

FN62 *See Aronson v Lewis,* 473 A 2d 805, 812 (Del 1984)

FN63 *See Cinerama, Inc v Technicolor, Inc.,* 663 A 2d 1156, 1151, 1167 (Del 1995)

Ovitz negotiated his exit from Disney with Eisner, Russell, and others He made a conscious decision not to resign and to seek the benefits that his contract made available to him only under certain prescribed circumstances Ovitz allegedly colluded with those on the other side of the bargaining table (and it is still unclear as to who those people were at various times) in bringing about the circumstances that would entitle him to his NFT benefits In so doing, he allegedly manipulated corporate processes and thereby violated his fiduciary duties to Disney.

Furthermore, it is unclear from the record whether a majority of any group of disinterested directors

ever authorized the payment of Ovitz's severance payments. [FN64] No meetings were held, and no written consents were executed. Similarly, there was no shareholder vote on the issue Absent a demonstration that the transaction was fair to Disney, that transaction may be voidable at the discretion of the company. [FN65] Such an event would of course leave Ovitz in the position of insisting upon his various contractual rights under the OEA, as they originally existed Here plaintiffs contend that Ovitz's abuse of corporate processes amounted to a breach of duty, for which they seek money damages for the company. As there are genuine issues of material fact regarding Ovitz's receipt of the NFT, and the use of his position to obtain the NFT, summary judgment for Ovitz as to this claim is inappropriate

FN64 Though the OEA had been approved by the Compensation Committee before Ovitz's hiring, the magnitude of the NFT, even for a company of Disney's size, would indicate to a reasonable, rational director that some action would be necessary *See Brehm,* 746 A 2d at 259 ("Certainly in this case the economic exposure of the corporation to the payout scenarios of the Ovitz contract was material, particularly given its large size ")

FN65 I recognize that no party seeks to void the company's determination to grant Ovitz the NFT

V. CONCLUSION

*8 In sum, because Ovitz was not a fiduciary before October 1, 1995, prior to which the OEA was negotiated, he need not show the entire fairness of that contract Summary judgment for Ovitz is granted in part as to claims arising from his entering into the OEA

As mentioned above, the motion for summary judgment as to the claims of waste is denied.

Finally, because the record is unclear as to whether Ovitz abused his fiduciary position so as to cause

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A.2d                                                    Page 12

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

**(Cite as: 2004 WL 2050138 (Del.Ch.))**

Disney to grant the NFT, his motion for summary
judgment as to that claim must be denied.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 2050138 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A 2d

Page 1

Not Reported in A 2d, 2000 WL 710192 (Del Ch ), 26 Del J Corp L 806

(Cite as: 2000 WL 710192 (Del.Ch.))

▷
UNPUBLISHED  OPINION  CHECK  COURT
RULES BEFORE CITING

Court of Chancery of Delaware.
In re WESTERN NATIONAL CORPORATION
SHAREHOLDERS LITIGATION
No. 15927.

May 22, 2000

Joseph A. Rosenthal and Norman M Monhait, of
Rosenthal, Monhait, Gross & Goddess, P A ,
Wilmington, Delaware; and Pamela S. Tikellis, of
Chimicles & Tikellis, Wilmington, Delaware;
Sandy A Liebhard and Michael S Egan, of
Bernstein Liebhard & Lifshitz, LLP, New York,
New York; Robert I. Harwood and Matthew M.
Houston, of Wechsler Harwood Halebian & Feffer
LLP, New York, New York; and Michael Jaffe, of
Wolf Haldenstein Adler Freeman & Herz LLP, New
York, New York, for Plaintiffs, of counsel.

Steven J Rothschild and Kevin M Maloy, of
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, for Defendants American
General Corporation, Astro Corporation and
Western National Corporation

Martin P Tully, R Judson Scaggs, Jr., and S Mark
Hurd, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for the Individual
Defendants

MEMORANDUM OPINION

CHANDLER, J

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A.2d                                                                Page 2

Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806

(Cite as: 2000 WL 710192 (Del.Ch.))

II.    FACTUAL BACKGROUND ................................................ 4

III.   ANALYSIS .......................................................... 13
       A. Did American General Exercise Actual Control Over Western
       National's Business and Affairs? ................................. 13
             1. American General's Equity Stake ........................ 15
             2. Inter-Company Joint Ventures ........................... 16
             3. U.S. Life Merger ....................................... 18
             4. The Standstill Provision and Project Raven ............. 22
       B. Did American General Dominate Western National's Board of
       Directors? ...................................................... 26

             1. The Inside Directors ................................... 29
                   a. Did the merger pose an economic conflict of
       interest to Poulos? ............................................. 30
                   b. Was Poulos otherwise independent of American
       General? ........................................................ 31
                         % B5 i. American General's initial investment in
       Western National ................................................ 32
                         % B5 ii. The Poulos Provision ................. 34
                   c. Were inside directors Graf and Scott independent of
       American General and disinterested in the merger? ............... 37
             2. The Outside Directors .................................. 39
                   a. Did Poulos and Hook "handpick" certain outside
       director nominees of American General? .......................... 40
                   b. Do past relationships with American General vitiate
       the Special Committee director's independence? .................. 44
                   c. Were the remaining outside directors, Buckwalter
       and Keeble, disinterested and independent? ...................... 48
       C. Did American General Control the Special Committee And Dictate the
       Terms of the Transaction? ....................................... 55
             1. Were the Special Committee's Advisors Independent and
       Could the Committee Reasonably Rely on their Advice? ............ 55

             2. Was the Special Committee Informed? .................... 59
             3. Was the Special Committee Process Tainted by Potentially
       Interested Inside Directors? .................................... 60
             4. Did American General Control the Negotiation or Was the
       Committee Free to Negotiate at Arm's Length? .................... 62
             5. Did the Special Committee Abdicate its Responsibility to
       Poulos, a Potentially Interested Director? ...................... 64
       D. The Disclosure Claims ......................................... 72

IV.    CONCLUSION ........................................................ 77

*1 A merger between the Western National    "Company") and its 46 percent shareholder,
Corporation ("Western National" or the      American General Corporation, ("American

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                                Page 3

Not Reported in A 2d, 2000 WL 710192 (Del.Ch ), 26 Del J Corp. L  806

(Cite as: 2000 WL 710192 (Del.Ch.))

General"), gives rise to this purported class action lawsuit brought on behalf of all Western National shareholders other than the named defendants and their affiliates. Defendant Western National is a Delaware corporation with principal offices in Houston, Texas. Defendant American General is a Texas corporation with principal offices also in Houston, Texas The eight individual defendants constituted Western National's entire board of directors at the time of the merger Before the Court is defendants' motion for summary judgment.

## I CONTENTIONS OF THE PARTIES
Shareholder plaintiffs allege that because American General was the Company's controlling shareholder at the time of the merger, holding approximately 46 percent of Western National's outstanding common stock, it owed them fiduciary duties of care, loyalty and good faith Extensive discovery, plaintiffs claim, has revealed significant evidence that Western National's board of directors and American General violated "all precepts" of Delaware law designed to ensure substantive and procedural fairness to minority shareholders in transactions with controlling shareholders, including violations of disclosure duties

Defendants first challenge the very premise of plaintiffs' liability theory, arguing that the claims fail *ab initio* because American General neither owned a majority of Western National stock, exercised actual control over the business and affairs of the Company, nor dominated the Company's board of directors. Furthermore, defendants maintain that American General did not assert actual control over the Company, its board, or the special negotiating committee during the course of the merger American General, consequently, was not a controlling shareholder that owed fiduciary duties

Defendants next contend that even if certain directors labored under conflicts of interest with respect to the merger in question, the existence of a well-functioning, independent special committee coupled with the absence of a controlling shareholder brings the special committee's recommendation within the purview of the business

judgment rule Finally, defendants contend that they fully complied with their disclosure duties and, moreover, that the merger was entirely fair to the public stockholders

While plaintiffs have adduced facts that potentially cast doubt on certain Western National directors' independence from American General or, alternatively, their disinterest in the merger transaction, they have failed to demonstrate that American General, as a less than majority shareholder, exercised actual control over the Company's business and affairs. Plaintiffs also have not adduced facts or reasonable inferences to be drawn therefrom that support the notion that American General dominated the Company's board of directors generally or, specifically, that it dominated the special negotiating committee during the course of the merger.

*2 In light of plaintiffs' failure to raise triable issues of fact in support of these allegations, the infirmity of the three alleged disclosure violations, coupled with the fact that all of the Company's disinterested directors negotiated and recommended the merger in question, I review this transaction under the traditional business judgment standard. Because the special committee directors negotiated and recommended the merger to the full board in good faith and with requisite care, defendants' summary judgment motion will be granted. In addition, as noted immediately above, I grant summary judgment for defendants on all three alleged disclosure violations. Finally, it is noteworthy that fully informed, unaffiliated and disinterested Western National stockholders overwhelmingly approved the challenged merger, which was a product of arm's length negotiations between American General and Western National's special negotiating committee.

## II FACTUAL BACKGROUND
Western National was organized in 1993 as a wholly-owned, indirect subsidiary of the Conseco Investment Company ("Conseco"), a large insurance and financial services company Western National's principal line of business was the sale of single premium deferred annuities to individuals

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                         Page 4

Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806

**(Cite as: 2000 WL 710192 (Del.Ch.))**

through financial institutions, primarily banks. In February 1994, Conseco sold 60 percent of the Company through an initial public offering. In connection with Western National's emergence as a public company, Conseco hired defendant Michael J. Poulos ("Poulos"), then a senior officer of defendant American General, to become Western National's Chairman and CEO pursuant to a five-year employment contract. Like Conseco, American General is a large, diversified insurance and financial services company.

Ten months after the IPO, Conseco sold its remaining 40 percent interest in Western National to American General for $274 million, or about $11 per share. As part of the sale, American General and Western National entered into a shareholders' agreement. This agreement, among other things, contained a standstill provision (the "Standstill Provision") limiting American General's ability to acquire additional shares of Western National or to engage in an extraordinary transaction with Western National before January 1, 1999, without approval of Western National's board of directors. [FN1] The Standstill Provision also prevented American General from nominating more than two directors to Western National's board.

> FN1. The Standstill Provision prohibited American General from acquiring more than 20 percent of Western National's outstanding shares in any twelve-month period. It also prohibited American General from beneficially owning in excess of 79 percent of the total number of Western National shares outstanding without the prior approval of Western National's board of directors.

In September 1996, Western National, in need of a capital infusion to expand its annuity business while preserving its insurance ratings, sold an additional 6 percent of its equity to American General for $130 million, or $17.92 per share. Shortly thereafter, Western National again found itself under-capitalized. This time, it appeared the Company confronted a fundamental, strategic crossroads. Sales of the Company's principal

product, fixed annuities sold through banks, were increasing significantly. Western National paid commissions from annuity sales up front. Because commissions exceeded the revenue that the Company initially derived from those sales, Western National was rapidly depleting its capital. In order to maintain its impressive sales growth, while also maintaining a strong insurance rating, Western National required additional capital.

*3 The Company's capital raising ability, however, faced significant obstacles due to certain practical constraints. Debt financing was not an attractive option because additional debt would have likely caused the Company's insurance ratings to drop, which (in turn) would have made its annuity product less attractive and saleable. Because of American General's 46 percent interest, Western National's board believed that the Company could not raise equity capital from third parties on commercially reasonable terms. Finally, American General would only agree to an additional capital infusion if it could acquire absolute control of the Company.

During the latter half of 1996 and 1997, Western National and American General management devoted considerable attention to several strategic options available to Western National. Both boards undoubtedly considered whether American General should entirely subsume Western National under the American General umbrella. In case the prospect of merging the companies was not already on American General's radar, several investment banks, including Goldman Sachs, Merrill Lynch and Morgan Stanley, separately pitched the transaction to American General's senior managers and directors in 1997. In July 1997, American General's new CEO, Robert M. Devlin ("Devlin"), and Poulos discussed the possibility of a merger between American General and Western National.

Contemporaneous with these discussions, Western National management confronted several overarching operational and financial challenges. The operational challenges all seemed to center around the Company's lack of product and customer diversification. One product, single premium deferred annuities, accounted for 87 percent of

Not Reported in A 2d                                                                    Page 5

Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806

(Cite as: 2000 WL 710192 (Del.Ch.))

Company sales A single customer, First Union Bancorp, accounted for 37 percent of Company sales Finally, with 82 percent of annuity sales flowing through financial institutions, management was under the impression that the Company disproportionately relied on a single distribution channel

The Company's financial challenges, briefly described above, were senior management's chief concern Poulos summed up the impact of the Company's funding difficulties in the following manner:

> Our sales were so robust, they were consuming our capital … We were faced with the-with that almost untenable situation-if we continue to go at this robust rate, we run the risk of losing our ratings. If we lose our ratings, the banks would disqualify us as a vendor If we cut our sales, we would be sort of cutting the value of the company by virtue of the fact that the analysts would perceive this as negative So we were-our success was our very nemesis We were succeeding but so aggressively that it was essentially going to put us in a posture of having to infuse more capital in the company [FN2]

> FN2 Poulos Dep. at 74

A final challenge confronting Western National was of a decidedly long or, at least, medium-term quality, and implicated regulatory events outside of the Company's control. The banking and insurance deregulation that Congress and the financial community had for so long discussed finally seemed genuinely imminent. Western National, an essentially mono-line company selling single premium deferred annuities through banks, faced the unpleasant prospect of potentially having its primary customers and distribution channels (*i.e.*, retail banks) become its chief competitors, selling insurance and annuity products of their own [FN3]

> FN3 Sept. 2, 1997, Special Committee Minutes at 8 (Def 's Tab 3)

*4 In this context, Poulos and his senior managers resolved to recommend that the Company's board of

directors appoint a committee of outside directors to formally consider strategic alternatives, including a possible sale of the Company. In an August 21, 1997 meeting, Western National's board of directors established a special committee of three outside directors comprised of Robert M. Hermance, Donald G. Baker, and Alan Richards to explore strategic alternatives (the "Special Committee").

The fundamental strategic questions the Special Committee pondered were whether to approach American General about selling its 46 percent interest to an unrelated third party in a merger transaction or to acquire the remainder of the Company's outstanding shares. The Special Committee, with the assistance of its own financial and legal advisors, determined (or rather, confirmed, the decision presumably reached by American General's former and current chairmen, Harold Hook ("Hook") and Devlin, [FN4] and Western National's senior management) that a sale of the Company was the optimal course of action. The Company's board concurred. That is, the Committee determined that a business combination was likely superior to other solutions to Western National's operational and financial challenges.

> FN4. Devlin replaced Hook as chairman of the board for American General in April 1997. He became CEO in August 1996

The Special Committee inquired whether American General might be interested in selling its 46 percent stake. [FN5] American General indicated it was not willing to sell its interest. Essentially, American General took the position that while it would not insist upon a merger transaction whereby Western National merged into American General, it also would not sell its stake in the course of a transaction with a third party.

> FN5 It is doubtful that this was a serious query, as the Special Committee members could have hardly been unaware of American General's position in light of the "general" talks between Hook, Devlin and Poulos

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                      Page 6

Not Reported in A 2d, 2000 WL 710192 (Del Ch ), 26 Del J Corp L 806

**(Cite as: 2000 WL 710192 (Del.Ch.))**

In light of American General's unwillingness to sell its interest, the Company's need for additional funding, an increasingly inhospitable regulatory environment, lack of diversity in its customer base and distribution channels, and barriers to the capital markets, the Special Committee determined that the optimal course of action for the Company was to attempt to negotiate a fair merger price with American General The imminent expiration of the Standstill Provision in the shareholders agreement led Western National management reasonably to conclude that the optimal time to negotiate with American General was sooner rather than later.

Through a draft merger agreement submitted to American General, the Special Committee proposed $32 per share-approximately a 12% premium over Western National's then current market price of $28.19 Devlin responded that $32 was too high, noting that the Company's stock price had already recently appreciated by 46 percent on speculation of an imminent American General takeover bid and that the Company was trading at 97 percent of its 52-week high Like most buyers, American General expressed the view that Western National was already fully valued in the market and proposed a cash and stock transaction at the prevailing market price The Special Committee declined to recommend such a transaction

*5 Devlin soon moved upward to $28 75, a small increment over the prevailing market price. The Special Committee declined to recommend a transaction at that price Devlin followed up this offer with a third offer at $29 00 Again the Special Committee declined Devlin next communicated to the Special Committee that under no circumstances would American General accept a price that began with a "3" Negotiations bogged down and the Special Committee soon terminated them. Devlin likewise walked away from the table All parties concerned believed discussions had terminated When the Special Committee next convened, it resolved to ask Poulos to contact Devlin in order to find out if Devlin would return for another round of bargaining

Poulos met with Devlin and Devlin indicated that

he would return to the table but would only support a transaction fixed at $29.75 per share, subject to further negotiation of collar provisions that would adjust such value-either up or down-if the average price of American General stock were to fall outside of a given range The Committee believed that $29 75 was the highest price American General would be willing to pay and that such a merger was superior to other strategic alternatives then available. Following further negotiation of the collar provisions, the Special Committee arranged for its legal advisors to meet with American General's counsel to work out the details of a proposed form of merger agreement for consideration at a Committee meeting to be held the following day

Upon receipt of the proposed form of merger agreement, the Committee met with its financial advisor, Donaldson, Lufkin & Jenrette ("DLJ") DLJ gave a presentation regarding the value of the consideration Western National shareholders would receive under the proposed merger, followed by a financial analysis of the Western National and the American General stock to be exchanged in the merger DLJ then opined that the proposed merger transaction was fair from a financial point of view. After further discussion, the Special Committee resolved that the merger was fair and in the best interests of the Company's shareholders and recommended it for full board approval

The board adopted the Special Committee's recommendations and submitted the proposal for shareholder approval at a February 25, 1998 special meeting of the Company's shareholders Of the 79.1 percent of outstanding shares represented by proxy at the special meeting, 99.98% voted to approve the merger [FN6] By virtue of appreciation in American General's stock price during the intervening months, each Western National shareholder received cash or American General stock worth approximately $30.90 per Western National share at the closing.

FN6 Aff of James L Gleaves, ¶ 4 (Def's Tab 15).

© 2005 Thomson/West No Claim to Orig US Govt Works.

Not Reported in A.2d                                                          Page 7

Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806

(Cite as: 2000 WL 710192 (Del.Ch.))

### III. ANALYSIS

Summary judgment will be granted if the moving party demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. [FN7] On such a motion, the facts will be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that no material questions of fact exist. [FN8]

> FN7. Chancery Court Rule 56(c).

> FN8. *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1142 (1990).

*A. Did American General Exercise Actual Control Over Western National's Business and Affairs?*

\*6 A shareholder will be considered a fiduciary if it owns a majority interest in or exercises control over the business and affairs of the corporation. [FN9] In the absence of majority stock ownership, a plaintiff must demonstrate that the minority shareholder held a dominant position and actually controlled the corporation's conduct. [FN10]

> FN9. *Kahn v. Lynch Communications Sys., Inc.*, Del.Supr., 638 A.2d 1110, 1113-1114 (1994); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1344 (1987).

> FN10. *Kaplan v. Centex Corp.*, Del. Ch., 284 A.2d 119, 122 (1971); *Kahn v. Lynch* at 1114; *Solomon v. Armstrong*, Del. Ch., 747 A.2d 1098 (1999) (stating that domination requires "literal control of corporate conduct"), *aff'd*, Del.Supr., 746 A.2d 277 (2000).

Plaintiffs' briefing goes to great lengths to place every conceivable fact or event into question that might give rise to the conclusion that American General might have, in some way or in some circumstance, dominated the affairs of the Company, in order to limp past a summary judgment motion. This, of course, is entirely in keeping with summary judgment practice.

As noted above, on a summary judgment motion the defendant bears the burden of demonstrating that there is no dispute as to any issue of material fact with respect to any valid legal theory the plaintiff advances in support of its claims. The plaintiff, nevertheless, must affirmatively produce evidence demonstrating the existence of a genuine issue of fact. [FN11] In other words, if the moving party supports its summary judgment motion with sufficient undisputed evidence and points to the absence of proof corroborating the non-moving party's claims, the court properly grants the summary judgment motion. [FN12]

> FN11. *Liboff v. Allen*, Del. Ch., C.A. No. 2669, let. op. at 9, Brown, V.C. (Jan. 14, 1975).

> FN12. *See, e.g., In re Liquidation of Nat'l Heritage Life Insurance Co.*, Del. Ch., 728 A.2d 52, 57 (1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 324-25 (1986)).

Because plaintiffs bear this burden, they must affirmatively state facts-not guesses, innuendo or unreasonable inferences-establishing that American General exercised actual control over Western National. [FN13] Here, a thorough and careful reading of a well-developed discovery record and plaintiffs' briefing yields nary a fact that could give rise to a finding of domination and control.

> FN13. *Id. See also Zlotnick v. Newell Cos.*, Del. Ch., C.A. No. 7246, let. op. at 5, Walsh, V.C. (July 30, 1984) (stating that "conclusory allegation of fiduciary duty must be supported by facts from which the duty arises").

*1. American General's Equity Stake*

Plaintiffs allege that American General's 46 percent equity position coupled with its ability to purchase an additional 20 percent of Western National's common stock during any twelve month period gave it "effective control" of the Company. This argument fails for two reasons. First, and as adumbrated above, substantial non-majority stock

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.