# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| THE IT GROUP, INC., et at, ) | Case No. 02-10118 (MFW) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

| | |
|---|---|
| IT LITIGATION TRUST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. A. No. 04-CV-1268 (KAJ) |
| ) | |
| DANIEL A. D'ANIELLO, FRANCIS J. HARVEY, ) | |
| JAMES C. MCGILL, RICHARD W. POGUE, ) | |
| PHILLIP B. DOLAN, E. MARTIN GIBSON, ) | |
| ROBERT F. PUGLIESE, CHARLES W. ) | |
| SCHMIDT, JAMES DAVID WATKINS, ) | |
| ANTHONY J. DeLUCA, HARRY J. SOOSE, ) | |
| THE CARLYLE GROUP, THE CARLYLE ) | |
| GROUP L.L.C., CARLYLE PARTNERS II, L.P., ) | |
| CARLYLE SBC PARTNERS II, L.P., CARLYLE ) | |
| INTERNATIONAL PARTNERS II L.P., ) | |
| CARLYLE INTERNATIONAL PARTNERS III, ) | |
| C/S INTERNATIONAL PARTNERS, CARLYLE ) | |
| INVESTMENT GROUP, L.P., CARLYLE-IT ) | |
| INTERNATIONAL PARTNERS, LP, ) | |
| CARLYLE-IT INTERNATIONAL PARTNERS II, ) | |
| L.P., CARLYLE-IT PARTNERS L.P., ) | |
| and T.C. GROUP, L.L.C., ) | |
| ) | |
| Defendants. ) | |

## [PROPOSED] SECOND AMENDED COMPLAINT WITH
## JURY DEMAND ENDORSED HEREON

Plaintiff, the IT Litigation Trust (the "Trust"), on behalf of the Estate of The IT Group,

Inc., *et al*, ("IT Group" or the "Debtors" or the "Company"), by its undersigned counsel, as and

613736v1

for its First Amended Complaint against Daniel A. D'Aniello, Francis J. Harvey, James C. McGill, Richard W. Pogue, Philip B. Dolan, B. Martin Gibson, Robert F, Pugliese, Charles W. Schmidt, James David Watkins, Anthony J. DeLuca (the "Director Defendants"), Harry J. Soose, The Carlyle Group, The Carlyle Group L.L.C., Carlyle Partners II, L.P., Carlyle SBC Partners II, L.P., Carlyle International Partners II, Carlyle International Partners III, C/S International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, Carlyle-IT International Partners II, L.P., Carlyle-IT Partners, L.P., and T.C. Group, L.L.C. (collectively, the "Defendants"), alleges, upon information and belief, as follows:

## INTRODUCTION

1.     This is an action to, among other things, redress breaches of fiduciary duty, including breaches of loyalty and due care, by the Directors, Officers and controlling shareholders of the IT Group, who, over a period of at least three years, dissipated millions of dollars that Defendants had the duty to preserve and protect for the benefit of the Company and its creditors. Defendants, acting for the benefit, and under the control and direction, of The Carlyle Defendants (as defined below), embarked on an acquisition and debt binge, buying companies for amounts far in excess of their fair value and taking on debt the Company had no realistic prospect of servicing. Defendants failed to inform themselves of all material information readily available to them concerning the Company's financial condition and prospects, including the fact that the IT Group was insolvent or in the vicinity of insolvency from, at least, March 1998 onward. Even when Defendants recognized that their ill-advised "Roll-Up Strategy" was a failure, they failed to inform themselves of all alternatives available to the Company or take any action to reduce debt and conserve assets for the creditors and the Company, Defendants further failed to retain financial, consultants, turnaround/restructuring consultants, and bankruptcy and

restructuring legal counsel until the bankruptcy and liquidation of the Company were inevitable. Instead, Defendants wasted corporate assets, and artificially extended the life of the Company in an effort to obtain a return of the Carlyle Defendants' equity investment, which resulted in the deepening insolvency of the Company. During the three years that the Carlyle Defendants controlled the IT Group, they caused the Company to enter into lucrative consulting agreements from which the Carlyle Defendants were paid in excess of $850,000.00 and were paid dividends in excess of $8,900,000.00. As a result of Defendants' wrongdoing, the IT Group, a company with approximately $1.4 billion in sales and that had acquired multiple businesses for over $500 million, was compelled to abruptly liquidate its assets for $105 million and was not afforded any chance to reorganize its operations. Plaintiff seeks not less than $150 million in damages on these claims. Plaintiff also asserts claims to avoid and recover preferential and constructively fraudulent transfers to certain of the Defendants.

## PARTIES

2.      The Trust brings this action in its capacity as the representative of the Debtors and their estates and for the benefit of the estates' creditors. The Trust brings this action pursuant to the authority granted to it under law and the Court's (i) Order Amending Prior Order Granting Leave, Standing, and Authority to the Committee to Prosecute Avoidance Actions On Behalf of the Debtors' Estates, dated December 22, 2003; (ii) Order Granting Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to the Committee to Prosecute Avoidance Actions on Behalf of the Debtors' Estates, dated November 6, 2003, as such orders may be amended, corrected or supplemented, and any further orders of the Court; and, (iii) Stipulation and Order substituting the Trust as the Plaintiff in this action dated September 1, 2004.

613736v1

3.      Defendant Daniel A. D'Aniello ("D'Aniello") was a director of the IT Group, and a member of the Executive Committee and Compensation Committee of the board of directors of the IT Group from 1996 through 2002. D'Aniello has been a Managing Director of The Carlyle Group since at least 1987.  D'Aniello also served as the Managing Director of TCG Holdings, LLC, a Delaware Limited Liability Company and the Managing Member of TC Group, LLC, a Delaware Limited Liability Company, which, among other things, was the General Partner of Carlyle Partners II, L.P., Carlyle Partners III, L.P, Carlyle International Partners II, L.P, Carlyle International Partners III, L.P. C/S International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, L.P., Carlyle-IT International Partners II, L.P., and Carlyle IT Partners, L.P. (collectively the "Cayman Partnerships"). He has also served on the board of directors of a number of companies that are owned or controlled by The Carlyle Group.

4.      Defendant Francis J. Harvey ("Harvey") was a director of the IT Group from 1999 through 2002 and served as a member of the Executive Committee and Compensation Committee of the board of directors of the IT Group. In November 2001, Harvey was appointed acting CEO and President of the Company. At all relevant times, Harvey also served on the board of directors of other companies owned or controlled by The Carlyle Group.

5.      Defendant James C. McGill ("McGill") was a director of the IT Group and a member of the Audit Review Committee of the board of directors of the IT Group from 1998 through 2002.

6.      Defendant Richard W. Pogue ("Pogue") was a director of the IT Group and a member of the Audit Review Committee of the board of directors of the IT Group from 1998 through 2002.

7.      Defendant Philip B. Dolan ("Dolan") was a director of the IT Group and a member of the Compensation Committee of the board of directors of the IT Group from 1994 through 2002. Dolan has been employed by The Carlyle Group since at least 1989. In 1998, Dolan became a Principal of The Carlyle Group, and in February 2001, he became a Managing Director of The Carlyle Group.

8.      Defendant B. Martin Gibson ("Gibson") was a director of the IT Group and a member of the Audit Review Committee of the board of directors of the IT Group from 1994 through 2002.

9.      Defendant Robert F. Pugliese ("Pugliese") was a director of the IT Group and a member of the Audit Review Committee of the board of directors of the IT Group from 1996 through 2002.

10.      Defendant Charles W. Schmidt ("Schmidt") was a director of the IT Group and a member of the Compensation Committee of the board of directors of the IT Group from 1998 through 2002.

11.      Defendant James David Watkins ("Watkins") was a director of the IT Group and a member of the Compensation Committee of the board of directors of the IT Group from 1996 through 2002. Watkins also served as director of Duratek, Inc. of which the Carlyle Defendants are the majority shareholder.

12.      Defendant Anthony J. DeLuca ("DeLuca") was named IT Group's CEO and President on July 22, 1997, President and Acting CEO and a director as of July 1, 1996, and prior to that time had been IT Group's senior vice president and chief financial officer since March 1990. Under pressure from the board of directors, DeLuca resigned as Chief Executive Officer,

President and a director of IT Group on or about November 13, 2001. DeLuca is a resident of the State of Pennsylvania.

13.     Defendant Harry J, Soose ("Soose") is a resident of the State of Pennsylvania. Soose joined the IT Group as Controller of its Construction and Remediation Division in 1991, was appointed Vice President, Controller of the IT Group in 1995, and became Senior Vice President and Chief Financial Officer in July, 1999.

14.     Defendant the Carlyle Group is a private merchant bank headquartered in Washington, D.C. The Carlyle Group invested in the IT Group through a number of entities that it owns or controls. At all relevant times, pursuant to the agreements under which the Carlyle Defendants' stock in the IT Group was purchased in 1996, the Carlyle Defendants were entitled to and did elect a majority of the IT Group's directors. At all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group.

15.     Defendant the Carlyle Group L.L.C. is a Delaware Limited Liability Company.

16.     Defendant Carlyle Partners II, L.P. is a Delaware Limited Partnership.

17.     Defendant Carlyle SBC Partners II, L.P. is a Delaware Limited Partnership.

18.     Defendant Carlyle International Partners II, L.P. is a Cayman Islands Limited Partnership, whose General Partner is Defendant T.C. Group, LLC, a Delaware limited liability company that conducts all business on behalf of Defendant Carlyle International Partners II, L.P. Cayman Island Limited Liability Partnership law requires that all management and business transactions conducted by a Cayman Island limited partnership be conducted through a general partner—which in the case of Defendant Carlyle International Partners, II, L.P. was Defendant T.C. Group, LLC.

19.    Defendant Carlyle International Partners III, L.P. is a Cayman Islands Limited Partnership, whose General Partner is T.C. Group, LLC, a Delaware limited liability company that conducts all business on behalf of Defendant Carlyle International Partners III, L.P. Cayman Island Limited Liability Partnership law requires that all management and business transactions conducted by a Cayman Island limited partnership be conducted through a general partner—which in the case of Defendant Carlyle International Partners, III, L.P. was Defendant T.C. Group, LLC.

20.    Defendant C/S International Partners, L.P. is a Cayman Islands Limited Partnership, whose General Partner is T.C. Group, LLC, a Delaware limited liability company that conducts all business on behalf of Defendant C/S International Partners II, L.P.  Cayman Island Limited Liability Partnership law requires that all management and business transactions conducted by a Cayman Island limited partnership be conducted through a general partner—which in the case of Defendant C/S International Partners, L.P. was Defendant T.C. Group, LLC.

21.    Defendant Carlyle Investment Group, L.P. is a Delaware Limited Partnership.

22.    Defendant Carlyle-IT International Partners, L.P. is a Cayman Islands Limited Partnership, whose General Partner is T.C. Group, LLC, a Delaware limited liability company that conducts all business on behalf of Defendant Carlyle-IT International Partners, L.P. Cayman Island Limited Liability Partnership law requires that all management and business transactions conducted by a Cayman Island limited partnership be conducted through a general partner—which in the case of Defendant Carlyle-IT International Partners, L.P. was Defendant T.C. Group, LLC.

23.    Defendant Carlyle-IT International Partners II, L.P. is a Cayman Islands Limited Partnership, whose General Partner is T.C.` Group, LLC, a Delaware limited liability company

that conducts all business on behalf of Defendant Carlyle-IT International Partners II, L.P. Cayman Island Limited Liability Partnership law requires that all management and business transactions conducted by a Cayman Island limited partnership be conducted through a general partner—which in the case of Defendant Carlyle-IT International Partners, II, L.P. was Defendant T.C. Group, LLC.

24.     Defendant Carlyle-IT Partners, L.P. is a Delaware Limited Partnership.

25.     Defendant T.C. Group, L.L.C., is a Delaware Limited Liability Company, which was the General Partner of Cayman Partnerships. As the General Partner of the Cayman Partnerships, Defendant T.C. Group conducted all business transactions related to the IT Group. Defendant T.C. Group conducted all business on behalf of the Cayman Partnerships, including the election of a majority of IT Group's board of directors.

26.     The Carlyle Group, the Carlyle Group L.L.C., Carlyle Partners II, L.P., Carlyle SBC Partners II, L.P., Carlyle International Partners U, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, L.P., Carlyle-IT International Partners II, L.P., Carlyle IT-Partners, L.P. and T.C. Group, L.L.C. are collectively referred to herein as "The Carlyle Defendants."

## JURISDICTION AND VENUE

27.     Jurisdiction of this Court is founded upon Sections 157, 1331 and 1334 of title 28 of the United States Code, in that this constitutes a civil proceeding involving title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), or arising in or related to the above-captioned jointly administered chapter 11 cases under the Bankruptcy Code, which are pending in the United States Bankruptcy Court for the District of Delaware.   This Court also has supplemental jurisdiction over the Delaware State law claims pursuant to title 28 U.S.C. §1367.

28.    Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

## FACTUAL SUPPORT OF CLAIMS FOR RELIEF

### I.    The Carlyle Defendants Acquire Control of the IT Group

29.    During all relevant times, the IT Group was a provider of services in the areas of consulting, engineering, construction, environmental remediation, facilities and waste management. In 2000, IT Group had over 7,500 employees in over 80 domestic offices and 10 international offices serving more than 1,500 commercial clients on projects ranging in length from one month to many years. IT Group's range of services included the identification of contaminants in soil, air and water, as well as the subsequent design and execution of remedial solutions. IT Group also provided project and facilities management capabilities and other related services to non-environmental civil construction, watershed restoration and the outsourcing privatization markets. The IT Group was a Delaware Corporation, with its principal office in Monroeville Pennsylvania.

30.    On or about November 20, 1996, the Carlyle Defendants took control of the IT Group. The Carlyle Defendants invested $45 million in the Company (the "Carlyle Investment"). Specifically, the Cayman Partnerships, through Defendant T.C. Group, invested the following sums:

- Carlyle International Partners II, L.P. - $9,429,000.00

- Carlyle International Partners III, L.P - $508,039.00

- C/S International Partners - $2,122,999.00

- Carlyle-IT International Partners, L.P. - $14,832,625.00

- Carlyle-IT International Partners II, L.P. - $500,000.00

In return, the Carlyle Defendants received 45,000 shares of 6% Cumulative Convertible Participating Preferred Stock, par value of $100 per share and detachable warrants to purchase 1,250,000 shares of IT common stock. The Carlyle Defendants also received approximately 25% of the IT Group's voting power and obtained the right to elect a majority of IT Group's board of directors through Defendant the T.C. Group and specifically, Carlyle employees D'Aniello and Dolan. Also, the Carlyle Defendants procured a consulting agreement, despite the fact that they already controlled the Company, pursuant to which they were paid $100,000.00 per year and $10,000.00 per month.

31.    During a February 6, 2002 deposition, Defendant Harvey admitted that Carlyle controlled the IT Group Board of Directors.  Harvey testified as follows:

Q:    What is the relationship between Carlysle [sic] and the IT Group?

A    *Carlysle [sic] up until November controlled the board*. They had approximately, they had 20 plus percent ownership of the company.

Q:    That changed in November 2001?

A:    Right.   My understanding is they no longer had control of the board after November 2001.

Q:    Did that coincide at all with your appointment as acting CEO?

A:    No. The election of the next board of directors would have been the May 2002 meeting, May 2002 board meeting.  So until May 2002 they had a majority of the board of directors appointed.

32.    During the time that Carlyle controlled and dominated the board, it secured the payment of dividends and consulting fees for which the Company received no services in return.

33.    Pursuant to the Securities Purchase Agreement dated August 28, 2996, the Carlyle Defendants' were entitled to receive dividend payments on the preferred stock "when, and if declared by the Board of Directors of the Corporation, out of funds legally available for payment of dividends.

34.    During the time period during which the Company was insolvent, or in the zone of insolvency, the Carlyle Defendants used their control of the board to receive the following payments:

- A payment of $ 337,500.00 on or about February 20, 1998;

- A payment of $ 339,532.00 on or about May 20, 1998;

- A payment of $ 341,580.00 on or about August 20, 1998;

- A payment of $343,642.50 on or about November 10, 1998;

- A payment of $691,425.00 on or about February 20, 1999;

- A payment of $691,425.00 on or about May 20, 1999;

- A payment of $691,425.00 on or about August 20, 1999;

- A payment of $691,425.00 on or about November 20, 1999;

- A payment of $691,425.00 on or about February 21, 2000;

- A payment of $691,425.00 on or about May 19, 2000;

- A payment of $691,425.00 on or about August 21, 2000;

- A payment of $691,425.00 on or about November 20, 2000;

- A payment of $691,425.00 on or about February 9, 2001;

- A payment of $691,425.00 on or about May 21, 2001;

- A payment of $691,425.00 on or about August 20, 2001;

## II.     The IT Group's Acquisition Binge

[32]  35.  After assuming control of the IT Group, the Carlyle Defendants, through its control of the board of directors of the IT Group, adopted and implemented a purported "Roll-Up Strategy" to grow the company by acquiring companies engaged in the same or similar lines of business. Beginning in or about 1998, the IT Group acquired at least eleven companies (collectively, the "Acquisitions" or individually, an "Acquisition") over the next two years.

[33]  36.  In or about February and June 1998, the IT Group acquired OHM Corporation ("OHM") for approximately $303 million. The IT Group booked goodwill of approximately $346 million in connection with the acquisition of OHM.

[34]  37.  In or about December 1998, the IT Group acquired Groundwater Technology, Inc. ("GTI") for approximately $69 million. The IT Group booked goodwill of approximately $29 million in connection with its acquisition of GTI.

[35]  38.  In or about March 1999, the IT Group acquired Roche Limited Consulting Services ("Roche") for approximately $10 million. The IT Group booked goodwill of approximately $5 million in connection with its acquisition of Roche.

[36]  39.  In or about April 1999, the IT Group acquired EFM Group ("EFM") for approximately $82 million. The IT Group recorded goodwill of approximately $92 million in connection with its acquisition of EFM.

[37]  40.  In or about June 1999, the IT Group acquired EMCON, Inc. ("EMCON") for approximately $62 million. The IT Group recorded goodwill of approximately $43.5 million in connection with its purchase of EMCON.

[38] 41.  In or about May 2000, the IT Group acquired W&H Pacific, Inc. ("W&H") for approximately $1 million, and contingent consideration of up to $8 million. The IT Group recorded goodwill of approximately $5.5 million in connection with its acquisition of W&H.

[39] 42.  By or about the end of 2000, the IT Group had booked aggregate "Cost in excess of net assets of the acquired businesses" — goodwill — of approximately $539 million, representing 41 percent of the IT Group's total assets.

[40] 43.  Every single Acquisition referred to in paragraphs 33 through 38 was for a price in excess of the fair value of the assets acquired.

[41] 44.  In fact, the enormous amounts of "goodwill" recorded by the IT Group in connection with its acquisitions were of no value to the IT Group, or, at a minimum, substantially overstated the value of the acquisitions to the IT Group. Correspondingly, the value of the IT Group's assets was substantially less than the values reflected on its books.

### III.    The IT Group's Insolvency

[42] 45.  As of 1998, the IT Group had experienced consecutive fiscal years in which it had lost money.

[43] 46.  The Acquisitions, which occurred between 1998 and 2000, were funded largely by debt financing ("Debt Financing"), including approximately $500 million in secured loans and credit facilities (the "Bank Debt"), and approximately $255 million in subordinated bond debt issued in 1999.

[44] 47.  The Debt Financing increased the Company's leverage, increased its interest payments, and strained the Company's liquidity. In March 1997, the Company reported approximately $360 million in revenues and total liabilities of approximately $172 million with a leverage ratio of 51%, by December 2000, the Company reported approximately $1.4 billion in

revenues, while total liabilities had ballooned to approximately $1 billion, with a leverage ratio of 80%.

[45] 48. As a result of this lack of liquidity, the IT Group requested and obtained from the Bank Group in March 2000 an additional $100 million term loan. The Debtors' average debt outstanding during 2000 was approximately $650 million.

[46] 49. For the period ended March 28, 1997, the IT Group had a tangible net worth of approximately $160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $277 million.

[47] 50. Beginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency.

### IV.    The Carlyle Group's So-Called "Roll Up Strategy" Was A Failure

[48] 51. The "Roll-Up Strategy" did not provide the Company with the desired benefits.

[49] 52. With disappointing revenue results and significant leverage, the Company experienced liquidity problems from 1999 onward.

[50] 53. Notwithstanding the Company's declining financial condition. Defendants failed to take prompt and prudent actions to preserve and maximize the Company's assets and to restructure its debts.

[51] 54. In 1999 and 2000, Defendants failed to retain financial asset divestiture consultants, financial consultants, turnaround and restructuring consultants, or bankruptcy and legal counsel.

[52] 55. In 1999 and 2000, Defendants further failed to inform themselves of all material information available to them concerning financial restructuring, and the means available to

them to maximize the value of the Company for the benefit of its creditors and other constituents.

[53] 56. It was not until late November or early December 2001, with the Company in financial extremis, and only at the suggestion of the Company's lenders, that Defendants first retained restructuring and bankruptcy professionals to investigate the Company's options. By that time, the Company missed their cash projections by the biggest margin in their history.

[54] 57. It was not until late November or early December 2001, that Defendants considered a sale of all or substantially all the assets of the Company, or retained a financial asset divestiture consultant to advise them concerning the advisability and possibility of such a sale.

[55] 58. The failure of the "Roll-Up Strategy," and Defendants' failure to take any steps to address, remedy, correct and reverse its financial impact on the Company, caused or deepened the Company's insolvency, and sealed the Company's financial doom.

[56] 59. By the time Defendants first took any meaningful actions to inform themselves of the Company's options and to retain professionals to advise them, it was too late to do anything other than liquidate the Company for a mere $105 million -- an amount insufficient to pay off the secured debt or pay anything to unsecured creditors.

[57] 60. On January 16, 2002 (the "Petition Date"), each of the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code. Thereafter, the IT Group was liquidated.

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duties against the Directors and Officers)

[58] 61.  The Trust repeats and realleges the allegations in paragraphs [1-57] 1 – 60 as if fully set forth herein.

[59] 62.  The Directors and Officers owed fiduciary duties to the IT Group and its creditors, requiring them, among other things, to inform themselves of all material information reasonably available to them before making business decisions and to supervise corporate affairs with an appropriate level of diligence and skill.

[60] 63.  By virtue of the IT Group's insolvency or being within the vicinity of insolvency, the Directors and Officers owed fiduciary duties to the IT Group and its creditors to, among other things, preserve and maximize the value of the IT Group's assets for the benefit of such creditors.

[61] 64.  The Directors and Officers breached these fiduciary duties, including without limitation, their duties of loyalty and due care, by among other things: (a) failing to inform themselves of all material information readily available to them, (b) incurring Acquisitions for more than the fair value of such Acquisitions and increasing the Company's debts through such Acquisitions, (c) deepening the Company's insolvency, (d) failing to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors, (e) knowingly or recklessly ignoring facts of, the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized, (f) pursuing a "Roll-Up Strategy" long after they knew or should have known it was a failure, (g) making transfers for the benefits of insiders, including but not limited to discretionary dividend payments at times when the Company was insolvent (h) artificially extending the life of the insolvent Company to obtain a return on the Carlyle

Defendants' equity investment, (i) failing to timely retain restructuring advisors in order to fully inform themselves of their duties and to take the steps necessary and appropriate to maximize the value of the Company for its creditors, and (j) wasting corporate assets.

[62] 65.  As a result of the Directors' and Officers' breaches of fiduciary duties, the IT Group and its unsecured creditors have been damaged in an amount to be determined at trial, which the Trust believes to be at least $150 million.

## SECOND CLAIM FOR RELIEF
### (Breach of fiduciary duties against the Directors and Officers Under The "Trust Fund Doctrine")

[63] 66.  The Trust repeats and realleges the allegations in paragraphs [1 – 62] 1-65 as if fully set forth herein.

[64] 67. By virtue of the IT Group's insolvency or being in the vicinity of insolvency, the Directors and Officers were obligated to act as trustees of the IT Group's assets for the benefit of creditors.

[65] 68. The Directors and Officers breached these fiduciary duties, including without limitation, their duties of loyalty and due care, by among other things: (a) failing to inform themselves of all material information readily available to them, (b) incurring Acquisitions for more than the fair value of such Acquisitions and increasing the Company's debts through such Acquisitions, (c) deepening the Company's insolvency, (d) failing to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors, (e) knowingly or recklessly ignoring facts of, the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized, (f) pursuing a "Roll-Up Strategy" long after they knew or should have known it was a failure, (g) making transfers for the benefits of insiders, including but not limited to discretionary dividend payments at times when the Company was insolvent (h)

artificially extending the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment, (i) failing to timely retain restructuring advisors in order to fully inform themselves of their duties and to take the steps necessary and appropriate to maximize the value of the Company for its creditors, and (j) wasting corporate assets.

[66] 69. As a result of the Directors' and Officers' breaches of their duties as trustees, the IT Group and its unsecured creditors have been damaged in an amount to be determined at trial, which the Trust believes to be at least $150 million.

## THIRD CLAIM FOR RELIEF
### (Waste of corporate assets against the Directors and Officers)

[67] 70. The Trust repeats and realleges the allegations in paragraphs [1 – 67] 1-69 as if fully set forth herein.

[68] 71. The Directors and Officers owed a duty to the Company and its creditors not to waste the Company's assets.

[69] 72. The Directors and Officers wasted the Company's assets, by, among other things: (a) incurring Acquisitions for more than the fair value of such Acquisitions and increasing the Company's debts through such Acquisitions, (b) deepening the Company's insolvency, (c) failing to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors, (d) failing to inform themselves of all material information readily available to them concerning the Company's financial condition and prospects, including knowingly, or recklessly ignoring facts of, the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized, (e) pursuing a "Roll-Up Strategy" long after they knew or should have known it was an abject failure, (f) making transfers for the benefits of insiders, including but not limited to discretionary dividend payments at times when the Company was insolvent (g) artificially extending the life of the insolvent company to obtain a

return on the Carlyle Defendants' equity investment, and (h) failing to timely retain restructuring advisors in order to fully inform themselves of their duties and to take the steps necessary and appropriate to maximize the value of the Company for its creditors.

[70] 73. No director or officer exercising sound business judgment would have taken such actions.

[71] 74. By reason of the foregoing, the IT Group and its unsecured creditors have been damaged in an amount to be determined at trial, which the Trust believes to be at least $150 million.

## FOURTH CLAIM FOR RELIEF
### (Breach of fiduciary duties against the Carlyle Defendants)

[72] 75. The Trust repeats and realleges the allegations in paragraphs [1 – 71] 1 - 74 as if fully set forth herein.

[73] 76. By virtue of the IT Group's insolvency or being in the vicinity of insolvency, the Carlyle Defendants owed fiduciary duties to the IT Group and its unsecured creditors to, among other things: (i) preserve and maximize the value of the IT Group's assets for the benefit of such creditors and (ii) act in a manner that would not injure the Company and its creditors.

[74] 77. The Carlyle Defendants [Directors and Officers] breached these fiduciary duties, including without limitation, their duties of loyalty and due care, by among other things: (a) failing to inform themselves of all material information readily available to them, (b) incurring Acquisitions for more than the fair value of such Acquisitions and increasing the Company's debts through such Acquisitions, (c) deepening the Company's insolvency, (d) failing to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors, (e) knowingly or recklessly ignoring facts of, the Company's insolvency, that it was in the

vicinity of insolvency, and was inadequately capitalized, (f) pursuing a "Roll-Up Strategy" long after they knew or should have known it was a failure, (g) making transfers for the benefits of insiders, (h) artificially extending the life of the insolvent Company to obtain a return on their [the Carlyle Defendants'] equity investment, (i) failing to timely retain restructuring advisors in order to fully inform themselves of their duties and to take the steps necessary and appropriate to maximize the value of the Company for its creditors, and (j) wasting corporate assets.

[75] 78. As a result of the foregoing breaches by the Carlyle Defendants, the IT Group and its unsecured creditors have been damaged in an amount to be determined at trial, which the Trust believes to be at least $150 million.

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty against the Carlyle Defendants)

[76] 79. The Trust repeats and realleges the allegations in paragraphs [1- 75] 1 - 78 as if fully set forth herein.

[77] 80. The Carlyle Defendants knew or should have known that the Directors and Officers owed fiduciary duties to the IT Group and its creditors, and that the Directors and Officers breached such duties.

[78] 81. The Carlyle Defendants aided and abetted the Directors' and Officers' breaches of their fiduciary duties, by directing, supporting and assisting the Directors' breaches including as detailed in paragraph 61 hereof.

[79] 82. As a result of the Carlyle Defendants' aiding and abetting the Directors' and Officers' breaches, the IT Group and its unsecured creditors have been damaged in an amount to be determined at trial, which the Trust believes to be at least $150 million.

## SIXTH CLAIM FOR RELIEF
### (Avoidance and Recovery of Transfers Made to Gibson, Harvey, Pogue, Pugliese, Schmidt, Watkins, and the Carlyle Defendants Pursuant to Sections 547 and 550 of the Bankruptcy Code)

[80] 83. The Trust repeats and realleges the allegations in paragraphs [1 – 79] 1 – 82 as if fully set forth herein.

[81] 84. On or within one year before the Petition Date, the IT Group made one or more transfers by check, wire transfer, or its equivalent, of an interest of the IT Group in property in an aggregate amount of not less than $2,474,340 (the "Avoidable Transfers") to E. Martin Gibson, Francis J. Harvey, Richard W. Pogue, Robert F. Pugliese, Charles W. Schmidt, James David Watkins, and the Carlyle Defendants (collectively, the "Preference Defendants").

[82] 85. B. Martin Gibson received an Avoidable Transfer of $66,954.

[83] 86. Richard W. Pogue received an Avoidable Transfer of $46,256.

[84] 87. Francis J. Harvey received an Avoidable Transfer of $130,863.

[85] 88. Robert F. Pugliese received an Avoidable Transfer of $49,035.

[86] 89. Charles W. Schmidt received an Avoidable Transfer of $58,007.

[87] 90. James David Watkins received an Avoidable Transfer of $47,225.

[88] 91. The Carlyle Defendants received an Avoidable Transfer of $2,076,000.

[89] 92. The Preference Defendants were creditors of one or more of the Debtors at the time of the Avoidable Transfers within the meaning of section (10)(10)(A) of the Bankruptcy Code.

[90] 93. The Preference Defendants were insiders of one or more of the Debtors at the time of the Avoidable Transfers within the meaning of section 101(31) of the Bankruptcy Code.

[91] <u>94</u>. At the time of the Avoidable Transfers, the Preference Defendants had a right to payment on the account of an obligation owed to the Preference Defendants by one or more of the Debtors. The Avoidable Transfers were to or for the benefit of the Preference Defendants.

[92] <u>95</u>. The Avoidable Transfers were made on the account of an antecedent debt because the Avoidable Transfers were made by one or more of the Debtors upon an obligation owed by one or more of the Debtors before the Avoidable Transfers were made.

[93] <u>96</u>. The Avoidable Transfers were made while the IT Group was insolvent.

[94] <u>97</u>. The Avoidable Transfers enabled the Preference Defendants to receive more on account of their debt than they would receive if: (a) the Cases were under chapter 7 of the Bankruptcy Code; (b) the Avoidable Transfers had not been made; and (c) the Preference Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

[95] <u>98</u>. The aggregate amount of the Avoidable Transfers made by the Debtors to the Preference Defendants which are avoidable pursuant to section 547(b) of the Bankruptcy Code is $2,474,340.

[96] <u>99</u>. By reasons of the foregoing, the Avoidable Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code, and the Trust is entitled to recover the Avoidable Transfers from the Preference Defendants to the respective extent of such Transfers for the benefit of the Debtors and their estates pursuant to section 550 of the Bankruptcy Code, together with pre-and post-judgment interest thereon at the maximum legal rate from the date of the Avoidable Transfers.

## SEVENTH CLAIM FOR RELIEF
### (Avoidance and Recovery of Constructively Fraudulent Transfers Made to the Carlyle Defendants Pursuant to Sections 544, 548, 550 and 551 of the Bankruptcy Code)

[97] 100.    The Trust repeats and realleges the allegations in paragraphs [1 – 96] 1 – 99 as if fully set forth herein.

[98] 101. Pursuant to the terms of a Securities Purchase Agreement dated August 28, 1996, and by virtue of the preferred stock issued to the Carlyle Defendants on November 10, 1996, the Carlyle Defendants were entitled to receive quarterly dividend payments on account of the Carlyle Defendants' status as majority shareholder and holder of 6% percent preferred stock.

[99] 102.    The Securities Purchase Agreement Defendants' were to dividend payments on the preferred stock "when, and if declared by the Board of Directors of the Corporation, out of funds legally available for payment of dividends.

[100] 103.    The Carlyle Defendants received a payments totaling approximately $1,362,254.00 for the year ending December 31, 1998.  These payments were as follows:

- A payment of $ 337,500.00 on or about February 20, 1998;

- A payment of $ 339,532.00 on or about May 20, 1998;

- A payment of $ 341,580.00 on or about August 20, 1998;

- A payment of $343,642.50 on or about November 10, 1998;

[101]  104.  The Carrlyle Defendants received payments totaling approximately $2,765,700.00 for the year ending December 31, 1999.  These payments were as follows:

- A payment of $691,425.00 on or about February 20, 1999;

- A payment of $691,425.00 on or about May 20, 1999;

- A payment of $691,425.00 on or about August 20, 1999;

- A payment of $691,425.00 on or about November 20, 1999;

[102] 105.    The Carlyle Defendants received payments totaling approximately $2,765,700.00 for the year ending December 31, 2000.   These payments were as follows:

- A payment of $691,425.00 on or about February 21, 2000;

- A payment of $691,425.00 on or about May 19, 2000;

- A payment of $691,425.00 on or about August 21, 2000;

- A payment of $691,425.00 on or about November 20, 2000;

[103] 106.    The Carlyle Defendants received payments totaling approximately $2,074,275.00 for the nine months ending September 28, 2001. These payments were as follows:

- A payment of $691,425.00 on or about February 9, 2001;

- A payment of $691,425.00 on or about May 21, 2001;

- A payment of $691,425.00 on or about August 20, 2001;

[104] 107. The payments were transfers of an interest in the property of one or more Debtors.

[105] 108. The Debtors did not receive reasonably equivalent value or fair consideration for the payments.

[106] 109. The transfers to the Carlyle Defendants were made with the actual intent to hinder, delay or defraud the Debtors' creditors because at the time of such payments, the Debtors (i) were insolvent on the date the payments were made or became insolvent as a result of the payments; or (ii) were about to engage in business or a transaction, for which any property remaining was unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

[107] 110. At all relevant times hereto, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d)

613736v1

and 544(b) of the Bankruptcy Code. These creditors, among other things, have the right to void the foregoing transfers under applicable law.

[108] 111. By reasons of the foregoing, pursuant to sections 544, 548, 550 and 551 of the Bankruptcy Code, the Trust is entitled to avoid and recover at least $8,967,929.50.

## EIGHTH CLAIM FOR RELIEF
### (Fraudulent Conveyances Made to the Preference Defendants and Carlyle Defendants Under Del. Code § 1303)

[109] 112. The Trust repeats and realleges the allegations in paragraphs [1- 108] 1 - 111 as if fully set forth herein.

[110] 113. The Carlyle Defendants controlled IT Group through their voting power and their total control of IT Group's board of directors derived from the Carlyle Defendants' acquisition of: (i) 45,000 shares of IT Group preferred stock; and (ii) 1,250,000 warrants for IT Group common stock. Due to the control exercised by the Carlyle Defendants over the IT Group, the Carlyle Defendants were "insiders" at the time of each payment as that term is defined in § 1303(7)(b) of the Delaware Code Annotated.

[111] 114. The Preference Defendants, by virtue of the fact that they served as officers and directors of the IT Group were "insiders" at the time of each payment they received as that term is defined in § 1303(7)(b) of the Delaware Code Annotated.

[112] 115. Section 1303(12) of the Delaware Code defines a "transfer" as:

> …every mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance.

[113] 116. The payments made to the Preference Defendants and Carlyle Defendants in paragraphs 82 to 88 and 99 to 103 of the Amended Complaint constituted "transfers" as that term is defined in § 1303(12) of the Delaware Code Annotated.

[114] 117. The transfers to the Preference Defendants and Carlyle Defendants were made with actual intent to hinder, delay or defraud the Debtor's creditors because such payments were: (i) made to insiders; (ii) concealed from creditors; (iii) of substantially all of the Debtors' assets; (iii) for no consideration, or for consideration that was not reasonably equivalent to the value of the payments; (iv) made when the Debtor was insolvent or became insolvent shortly after the payments; and (v) made shortly before or shortly after a substantial debt was incurred.

[115] 118. By virtue of the fraudulent transfers made by Debtor to the Preference Defendants and Carlyle Defendants the Trust is entitled to recover at least $11,441,269.00.

## NINTH CLAIM FOR RELIEF
### (Liability of Director Defendants for Unlawful Payment of Dividends Under Del. Code § 174)

[116] 119. The Trust repeats and realleges the allegations in paragraphs [1 – 115] 1 – 118 as if fully set forth herein.

[117] 120. The dividends paid to the Carlyle Defendants were made when the Debtor was insolvent or cause the Debtor to become insolvent; and as a result, were illegal under Delaware law and in violation of 8 Del.C. § 174.

[118] 121. The Trust is entitled to recover the full amount of the dividends paid to the Carlyle Defendants pursuant to 8 Del.C. § 174, which is an amount of at least $8,967,929.00.

## RESERVATION OF RIGHTS

[119] 122.    The Trust reserves the right, to the extent permitted under law, the Bankruptcy Code or by agreement, to assert against any third party any claims relating to the subject matter of this Action or otherwise relating to the Debtors and their estates.

613736v1

-26-

**WHEREFORE**, the Trust respectfully requests that this Court enter judgment:

1.      On its First Claim for Relief, damages against the Directors and Officers, in an amount to be determined at trial, but in no event less than $150 million;

2.      On its Second Claim for Relief, damages against the Directors and Officers, in an amount to be determined at trial, but in no event less than $150 million;

3.      On its Third Claim for Relief, damages against the Directors and Officers, in an amount to be determined at trial, but in no event less than $150 million;

4.      On its Fourth Claim for Relief, damages against the Carlyle Defendants, in an amount to be determined at trial, but in no event less than $150 million;

5.      On its Fifth Claim for Relief, damages against the Carlyle Defendants, in an amount to be determined at trial, but in no event less than $150 million;

6.      On its Sixth Claim for Relief, avoiding and recovering at least $2,474,340 in transfers to the Preference Defendants for the benefit of the estates, together with pre-and post-judgment interest thereon;

7.      On its Seventh Claim for Relief, avoiding and recovering from the Carlyle Defendants at least $8,967,929.00;

8.      On its Eighth Claim for Relief, avoiding and recovering from the Preference Defendants and Carlyle Defendants at least $11,442,269.00;

9.      On its Ninth Claim for Relief, avoiding and recovering from the Director Defendants at least $8,967,929.00;

10.    Granting interest, costs, and expenses as permitted by law; and

11.    Granting such other and further relief as this Court deems just and proper.

Date: January 10, 2006                         THE BAYARD FIRM


By:_____
       Jeffrey M. Schlerf (No. 3047)
       Eric M. Sutty (No. 4007)
       222 Delaware Avenue, Suite 900
       Wilmington, Delaware 19801
       (302) 655-5000

                        - and -

       STRAUSS & TROY, LPA
       Richard S. Wayne
       Thomas P. Glass
       The Federal Reserve Building
       150 E. Fourth Street
       Cincinnati, Ohio 45202-4018
       (513) 621-2120
       Fax: (513) 629-9426

       CO-COUNSEL TO THE IT LITIGATION TRUST


## **JURY DEMAND**

The Trust demands a trial by jury on all issues.


                        _____
                        Jeffrey M. Schlerf (No. 3047)


613736v1