# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1799947 (D.Del.)
**(Cite as: 2005 WL 1799947 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Daniel L. MOORE, Plaintiff,
v.
STATE of Delaware; Department of Correction;
Stanley Taylor; Robert Snyder;
Sheresse Brewington-Carr; Raphael Williams; Perry
Phelps; Michael Costello; and
other nameless employees at MPCJF and DCCOE,
Defendants.
**No. Civ.A.04-1396 JJF.**

July 27, 2005.

Daniel L. Moore, New Castle, Delaware, Plaintiff
pro se.

Richard W. Hubbard, Deputy Attorney General,
Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

 **\*1** Presently before the Court is a Motion To
Dismiss (D.I.9) filed by Defendants, and a Motion To
Amend (D.I.17) filed by Plaintiff, Daniel L. Moore.
For the reasons discussed, the Motion To Dismiss (D
.I. 9) will be granted and the Motion To Amend
(D.I.17) will be denied.

BACKGROUND

 Mr. Moore was incarcerated in Gander Hill Prison in
the state of Delaware from 1997 until his release in
January 1999. On October 27, 2004, Mr. Moore filed
a Complaint alleging that in March 1997 the
Delaware Department of Corrections ("DDOC")
"activated" him and placed him "online", whereby he
was subjected to experimentation by way of
classified and unclassified electronic technology in
violation of his Eighth Amendment rights.
Specifically, Mr. Moore alleges that the DDOC
subjected him to behavioral modifications without
first obtaining his informed consent. The behavioral
modifications Mr. Moore complains of include:
 choking sensation, pain on bones and teeth,

bubbles moving on genitals, amplified heartbeat,
artificially induced diarrhea, artificially induced
tinnitus, unnatural gas expulsions, gritty substances
thrown on face in eyes and head, laser use (heat,
burns, cutting feelings), false dreams, hair-like
object brushing face, stings on head and body
(emphasis on genitals), wet feelings on body and
clothing, biting sensations on body, feeling of
being castrated, genitals being squeezed and
jerked, drilling sensations on head and teeth, object
forced up rectum, forced eye blinking, muscles
twitching uncontrollably, sounds (bells, chains,
voices, etc.), smells varying form sweet to
nauseous, forced erections, pressure on eye sockets
and eardrums, vibrations on head, and beams of
light

 (D.I.1, Ex. F.) Further, Mr. Moore alleges that others
can hear his thoughts, and that he is subject to "overt
and covert verbal harassment by total strangers and
others saying the same things that were said" by
guards, inmates, and other workers within the prison
where Mr. Moore was incarcerated. (D.I. 1 at 9.) Mr.
Moore alleges that such experimentation continues at
the present time, although Mr. Moore was released
from the custody of the DDOC in January 1999. Mr.
Moore seeks $1,000,000 in compensatory and
$1,500,000 in punitive damages, among other
monetary relief. [FN1]

> FN1. In 1999, Mr. **Moore** filed a similar
> Complaint against Correctional Medical
> Services and Prison Health Services, two
> medical providers that treat inmates at
> DDOC prisons. (*Daniel L. **Moore** v
> Correctional Medical Services, et al*, C.A.
> No. 99-158, **Farnan**, J. (March 12, 1999)).
> Mr. **Moore** was proceeding *in forma
> pauperis* in the 1999 action, and the Court
> dismissed Mr. **Moore's** 1999 Complaint as
> legally frivolous pursuant to 28 U.S.C. § §
> 1915(e)(2)(B) and 1915A(b)(1).

 On December 17, 2004, Defendants in the present
action filed a Motion To Dismiss (D.I.9) pursuant to
Federal Rule of Civil Procedure 12(b)(6).

 On April 15, 2005, Mr. Moore filed a Motion To
Amend (D.I.17) seeking to amend his Complaint by
adding claims for "character assassination,
defamation of character, slander, verbal harassment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 2
Not Reported in F.Supp.2d, 2005 WL 1799947 (D.Del.)
**(Cite as: 2005 WL 1799947 (D.Del.))**

and mental distress," and to recover an additional $1,000,000 in damages. (D.I.17.)

### DISCUSSION

### II. Motion To Dismiss Filed By Defendants

When a court analyzes a motion to dismiss brought pursuant to <u>Rule 12(b)(6) of the Federal Rules of Civil Procedure</u>, it must accept the factual allegations of the Complaint as true. <u>Langford v. City of Atlantic City,</u> 235 F.3d 845, 847 (3d Cir.2000). The court must draw all reasonable inferences in favor of the nonmoving party. <u>Id</u> Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' <u>Estelle v. Gamble,</u> 429 U.S. 97, 106 (1976) (quoting <u>Conley v. Gibson,</u> 355 U.S. 41, 45-46 (1957)).

*2 By its Motion, Defendants contend that, given the allegation of the Complaint, it fails to state any facts supporting a claim for relief or any legal theories supporting a claims for relief and must be dismissed pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u>. Defendants also contend that Mr. Moore has failed to show how the defendants participated in, personally directed, or acquiesced in the events that Mr. Moore claims deprived him of his constitutional rights. Further, Defendants claim that Mr. Moore's § 1983 claims are absolutely barred by the two-year limitation period set forth in the applicable statute of limitations, <u>10 Del.Code § 8119</u>.

After reviewing Mr. Moore's Complaint, the Court concludes that Mr. Moore's § 1983 claim is based on facts that provide no basis for the granting of relief by the court. <u>Cf Shane v. Fauver,</u> 213 F.3d 113, 117 (3d Cir.2000). Accordingly, the Court will dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u>.

### II. Motion To Amend Filed By Mr. Moore

Although Mr. Moore must obtain leave of the Court in order to amend his pleadings, that leave "shall be freely given when justice so requires." <u>Fed.R.Civ.P. 15(a)</u>. However, a court will deny leave to amend if such amendment would be futile. <u>Cowell v. Palmer Township,</u> 263 F.3d 286, 296 (3d Cir.2001) (<u>citing Maio v. Aetna, Inc.,</u> 221 F.3d 472 (3d Cir.2000)).

The claims Mr. Moore seeks to add depend on the

same factual bases as the original § 1983 claim. Thus, the Court concludes that Mr. Moore's amendment would be futile because it does not cure the frivolous nature of Mr. Moore's original Complaint. Accordingly, the Court will deny the Motion To Amend (D.I.17).

### CONCLUSION

For the reasons discussed, the Court will grant the Motion To Dismiss (D.I.9) filed by Defendants and deny the Motion To Amend (D.I.17) filed by Mr. Moore.

An appropriate order will be entered.

### ORDER

At Wilmington this 27 day of July 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1) The Motion To Dismiss (D.I.9) filed by Defendants is *GRANTED;*

2) The Motion To Amend (D.I.17) filed by Plaintiff Daniel L. Moore is *DENIED.*

Not Reported in F.Supp.2d, 2005 WL 1799947 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• <u>1:04CV01396</u> (Docket) (Oct. 27, 2004)

• <u>2004 WL 3543304</u> (Trial Motion, Memorandum and Affidavit) Memorandum Opinion (Jan. 01, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re WESTERN NATIONAL CORPORATION
SHAREHOLDERS LITIGATION
No. 15927.

May 22, 2000.

Joseph A. Rosenthal and Norman M. Monhait, of
Rosenthal, Monhait, Gross & Goddess, P.A.,
Wilmington, Delaware; and Pamela S. Tikellis, of
Chimicles & Tikellis, Wilmington, Delaware; Sandy
A. Liebhard and Michael S. Egan, of Bernstein
Liebhard & Lifshitz, LLP, New York, New York;

Robert I. Harwood and Matthew M. Houston, of
Wechsler Harwood Halebian & Feffer LLP, New
York, New York; and Michael Jaffe, of Wolf
Haldenstein Adler Freeman & Herz LLP, New York,
New York, for Plaintiffs, of counsel.
Steven J. Rothschild and Kevin M. Maloy, of
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, for Defendants American
General Corporation, Astro Corporation and Western
National Corporation.
Martin P. Tully, R. Judson Scaggs, Jr., and S. Mark
Hurd, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for the Individual
Defendants.

MEMORANDUM OPINION

CHANDLER, J.

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION. | 1 |
| II. | FACTUAL BACKGROUND. | 4 |
| III | ANALYSIS. | 13 |
| | A. *Did American General Exercise Actual Control Over Western National's Business and Affairs?*. | 13 |
| | 1. American General's Equity Stake. | 15 |
| | 2. Inter-Company Joint Ventures. | 16 |
| | 3. U.S. Life Merger. | 18 |
| | 4. The Standstill Provision and Project Raven. | 22 |
| | B. *Did American General Dominate Western National's Board of Directors?*. | 26 |
| | 1. The Inside Directors | 29 |
| | a. Did the merger pose an economic conflict of interest to Poulos? | 30 |
| | b. Was Poulos otherwise independent of American General?. | 31 |
| | % B5   i. American General's initial investment in Western National. | 32 |
| | % B5   ii. The Poulos Provision. | 34 |
| | c. Were inside directors Graf and Scott independent of | 37 |

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2000 WL 710192 (Del Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

American General and disinterested
in the merger?

  2. The Outside Directors.                                                   39

    a. Did Poulos and Hook                                          40
"handpick" certain outside director
nominees of American General?

    b. Do past relationships                                        44
with American General vitiate the
Special Committee director's
independence?

    c. Were the remaining                                           48
outside directors, Buckwalter and
Keeble, disinterested and
independent?

C. *Did American General Control*                                                       55
*the Special Committee And Dictate*
*the Terms of the Transaction?*

  1. Were the Special                                                        55
Committee's Advisors Independent
and Could the Committee
Reasonably Rely on their Advice?

  2. Was the Special Committee                                               59
Informed?

  3. Was the Special Committee                                               60
Process Tainted by Potentially
Interested Inside Directors?

  4. Did American General                                                    62
Control the Negotiation or Was the
Committee Free to Negotiate at
Arm's Length?

  5. Did the Special Committee                                               64
Abdicate its Responsibility to
Poulos, a Potentially Interested
Director?

D. *The Disclosure Claims*                                                              72

IV.    CONCLUSION.                                                                      77

**\*1** A merger between the Western National Corporation ("Western National" or the "Company") and its 46 percent shareholder, American General Corporation ("American General"), gives rise to this purported class action lawsuit brought on behalf of all Western National shareholders other than the named defendants and their affiliates. Defendant Western National is a Delaware corporation with principal offices in Houston, Texas. Defendant American General is a Texas corporation with principal offices also in Houston, Texas. The eight individual defendants constituted Western National's entire board of directors at the time of the merger. Before the Court is defendants' motion for summary judgment

### I. CONTENTIONS OF THE PARTIES

Shareholder plaintiffs allege that because American General was the Company's controlling shareholder at the time of the merger, holding approximately 46 percent of Western National's outstanding common stock, it owed them fiduciary duties of care, loyalty and good faith. Extensive discovery, plaintiffs claim, has revealed significant evidence that Western National's board of directors and American General violated "all precepts" of Delaware law designed to ensure substantive and procedural fairness to minority shareholders in transactions with controlling shareholders, including violations of disclosure duties.

Defendants first challenge the very premise of plaintiffs' liability theory, arguing that the claims fail *ab initio* because American General neither owned a majority of Western National stock, exercised actual control over the business and affairs of the Company, nor dominated the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 3
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

Company's board of directors. Furthermore, defendants maintain that American General did not assert actual control over the Company, its board, or the special negotiating committee during the course of the merger. American General, consequently, was not a controlling shareholder that owed fiduciary duties.

Defendants next contend that even if certain directors labored under conflicts of interest with respect to the merger in question, the existence of a well-functioning, independent special committee coupled with the absence of a controlling shareholder brings the special committee's recommendation within the purview of the business judgment rule. Finally, defendants contend that they fully complied with their disclosure duties and, moreover, that the merger was entirely fair to the public stockholders.

While plaintiffs have adduced facts that potentially cast doubt on certain Western National directors' independence from American General or, alternatively, their disinterest in the merger transaction, they have failed to demonstrate that American General, as a less than majority shareholder, exercised actual control over the Company's business and affairs. Plaintiffs also have not adduced facts or reasonable inferences to be drawn therefrom that support the notion that American General dominated the Company's board of directors generally or, specifically, that it dominated the special negotiating committee during the course of the merger.

*2 In light of plaintiffs' failure to raise triable issues of fact in support of these allegations, the infirmity of the three alleged disclosure violations, coupled with the fact that all of the Company's disinterested directors negotiated and recommended the merger in question, I review this transaction under the traditional business judgment standard. Because the special committee directors negotiated and recommended the merger to the full board in good faith and with requisite care, defendants' summary judgment motion will be granted. In addition, as noted immediately above, I grant summary judgment for defendants on all three alleged disclosure violations. Finally, it is noteworthy that fully informed, unaffiliated and disinterested Western National stockholders overwhelmingly approved the challenged merger, which was a product of arm's length negotiations between American General and Western National's special negotiating committee.

## II. FACTUAL BACKGROUND

Western National was organized in 1993 as a wholly-owned, indirect subsidiary of the Conseco Investment Company ("Conseco"), a large insurance and financial services company. Western National's principal line of business was the sale of single premium deferred annuities to individuals through financial institutions, primarily banks. In February 1994, Conseco sold 60 percent of the Company through an initial public offering. In connection with Western National's emergence as a public company, Conseco hired defendant Michael J. Poulos ("Poulos"), then a senior officer of defendant American General, to become Western National's Chairman and CEO pursuant to a five-year employment contract. Like Conseco, American General is a large, diversified insurance and financial services company.

Ten months after the IPO, Conseco sold its remaining 40 percent interest in Western National to American General for $274 million, or about $11 per share. As part of the sale, American General and Western National entered into a shareholders' agreement. This agreement, among other things, contained a standstill provision (the "Standstill Provision") limiting American General's ability to acquire additional shares of Western National or to engage in an extraordinary transaction with Western National before January 1, 1999, without approval of Western National's board of directors. [FN1] The Standstill Provision also prevented American General from nominating more than two directors to Western National's board.

> FN1. The Standstill Provision prohibited American General from acquiring more than 20 percent of Western National's outstanding shares in any twelve-month period. It also prohibited American General from beneficially owning in excess of 79 percent of the total number of Western National shares outstanding without the prior approval of Western National's board of directors.

In September 1996, Western National, in need of a capital infusion to expand its annuity business while preserving its insurance ratings, sold an additional 6 percent of its equity to American General for $130 million, or $17.92 per share. Shortly thereafter, Western National again found itself under-capitalized. This time, it appeared the Company confronted a fundamental, strategic crossroads. Sales of the Company's principal product, fixed annuities sold through banks, were increasing significantly. Western National paid commissions from annuity sales up front. Because commissions exceeded the revenue the Company initially derived from those sales, Western National was rapidly depleting its capital. In order to maintain its impressive sales growth, while also maintaining a strong insurance rating, Western National required additional capital.

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

*3 The Company's capital raising ability, however, faced significant obstacles due to certain practical constraints. Debt financing was not an attractive option because additional debt would have likely caused the Company's insurance ratings to drop, which (in turn) would have made its annuity product less attractive and saleable. Because of American General's 46 percent interest, Western National's board believed that the Company could not raise equity capital from third parties on commercially reasonable terms. Finally, American General would only agree to an additional capital infusion if it could acquire absolute control of the Company.

During the latter half of 1996 and 1997, Western National and American General management devoted considerable attention to several strategic options available to Western National. Both boards undoubtedly considered whether American General should entirely subsume Western National under the American General umbrella. In case the prospect of merging the companies was not already on American General's radar, several investment banks, including Goldman Sachs, Merrill Lynch and Morgan Stanley, separately pitched the transaction to American General's senior managers and directors in 1997. In July 1997, American General's new CEO, Robert M. Devlin ("Devlin"), and Poulos discussed the possibility of a merger between American General and Western National.

Contemporaneous with these discussions, Western National management confronted several overarching operational and financial challenges. The operational challenges all seemed to center around the Company's lack of product and customer diversification. One product, single premium deferred annuities, accounted for 87 percent of Company sales. A single customer, First Union Bancorp, accounted for 37 percent of Company sales. Finally, with 82 percent of annuity sales flowing through financial institutions, management was under the impression that the Company disproportionately relied on a single distribution channel.

The Company's financial challenges, briefly described above, were senior management's chief concern. Poulos summed up the impact of the Company's funding difficulties in the following manner:
Our sales were so robust, they were consuming our capital ... We were faced with the-with that almost untenable situation-if we continue to go at this robust rate, we run the risk of losing our ratings. If we lose our ratings, the banks would disqualify us as a vendor. If we cut our sales, we would be sort of cutting the value of the company by virtue of the fact that the analysts would perceive this as negative... So we were-our success was our very nemesis. We were succeeding but so aggressively that it was essentially going to put us in a

posture of having ... to infuse more capital in the company. [FN2]

> FN2. Poulos Dep. at 74.

A final challenge confronting Western National was of a decidedly long or, at least, medium-term quality, and implicated regulatory events outside of the Company's control. The banking and insurance deregulation that Congress and the financial community had for so long discussed finally seemed genuinely imminent. Western National, an essentially mono-line company selling single premium deferred annuities through banks, faced the unpleasant prospect of potentially having its primary customers and distribution channels (i.e., retail banks) become its chief competitors, selling insurance and annuity products of their own. [FN3]

> FN3. Sept. 2, 1997, Special Committee Minutes at 8 (Def.'s Tab 3).

*4 In this context, Poulos and his senior managers resolved to recommend that the Company's board of directors appoint a committee of outside directors to formally consider strategic alternatives, including a possible sale of the Company. In an August 21, 1997 meeting, Western National's board of directors established a special committee of three outside directors comprised of Robert M. Hermance, Donald G. Baker, and Alan Richards to explore strategic alternatives (the "Special Committee").

The fundamental strategic questions the Special Committee pondered were whether to approach American General about selling its 46 percent interest to an unrelated third party in a merger transaction or to acquire the remainder of the Company's outstanding shares. The Special Committee, with the assistance of its own financial and legal advisors, determined (or rather, confirmed, the decision presumably reached by American General's former and current chairmen, Harold Hook ("Hook") and Devlin, [FN4] and Western National's senior management) that a sale of the Company was the optimal course of action. The Company's board concurred. That is, the Committee determined that a business combination was likely superior to other solutions to Western National's operational and financial challenges.

> FN4. Devlin replaced Hook as chairman of the board for American General in April 1997. He became CEO in August 1996.

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

The Special Committee inquired whether American General might be interested in selling its 46 percent stake. [FN5] American General indicated it was not willing to sell its interest. Essentially, American General took the position that while it would not insist upon a merger transaction whereby Western National merged into American General, it also would not sell its stake in the course of a transaction with a third party.

> FN5. It is doubtful that this was a serious query, as the Special Committee members could have hardly been unaware of American General's position in light of the "general" talks between Hook, Devlin and Poulos.

In light of American General's unwillingness to sell its interest, the Company's need for additional funding, an increasingly inhospitable regulatory environment, lack of diversity in its customer base and distribution channels, and barriers to the capital markets, the Special Committee determined that the optimal course of action for the Company was to attempt to negotiate a fair merger price with American General. The imminent expiration of the Standstill Provision in the shareholders agreement led Western National management reasonably to conclude that the optimal time to negotiate with American General was sooner rather than later.

Through a draft merger agreement submitted to American General, the Special Committee proposed $32 per share-approximately a 12% premium over Western National's then current market price of $28.19. Devlin responded that $32 was too high, noting that the Company's stock price had already recently appreciated by 46 percent on speculation of an imminent American General takeover bid and that the Company was trading at 97 percent of its 52-week high. Like most buyers, American General expressed the view that Western National was already fully valued in the market and proposed a cash and stock transaction at the prevailing market price. The Special Committee declined to recommend such a transaction.

**5** Devlin soon moved upward to $28.75, a small increment over the prevailing market price. The Special Committee declined to recommend a transaction at that price. Devlin followed up this offer with a third offer at $29.00. Again the Special Committee declined. Devlin next communicated to the Special Committee that under no circumstances would American General accept a price that began with a "3". Negotiations bogged down and the Special Committee soon terminated them. Devlin likewise walked away from the table. All parties concerned believed discussions had terminated. When the Special Committee next convened, it resolved to ask Poulos to contact Devlin in order to find out if Devlin would return for another round of bargaining.

Poulos met with Devlin and Devlin indicated that he would return to the table but would only support a transaction fixed at $29.75 per share, subject to further negotiation of collar provisions that would adjust such value-either up or down-if the average price of American General stock were to fall outside of a given range. The Committee believed that $29.75 was the highest price American General would be willing to pay and that such a merger was superior to other strategic alternatives then available. Following further negotiation of the collar provisions, the Special Committee arranged for its legal advisors to meet with American General's counsel to work out the details of a proposed form of merger agreement for consideration at a Committee meeting to be held the following day.

Upon receipt of the proposed form of merger agreement, the Committee met with its financial advisor, Donaldson, Lufkin & Jenrette ("DLJ"). DLJ gave a presentation regarding the value of the consideration Western National shareholders would receive under the proposed merger, followed by a financial analysis of the Western National and the American General stock to be exchanged in the merger. DLJ then opined that the proposed merger transaction was fair from a financial point of view. After further discussion, the Special Committee resolved that the merger was fair and in the best interests of the Company's shareholders and recommended it for full board approval.

The board adopted the Special Committee's recommendations and submitted the proposal for shareholder approval at a February 25, 1998 special meeting of the Company's shareholders. Of the 79.1 percent of outstanding shares represented by proxy at the special meeting, 99.98% voted to approve the merger. [FN6] By virtue of appreciation in American General's stock price during the intervening months, each Western National shareholder received cash or American General stock worth approximately $30.90 per Western National share at the closing.

> FN6. Aff. of James L. Gleaves, ¶ 4 (Def.'s Tab 15).

### III. ANALYSIS

Summary judgment will be granted if the moving party demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

Page 6

matter of law. [FN7] On such a motion, the facts will be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that no material questions of fact exist. [FN8]

> FN7. Chancery Court Rule 56(c).

> FN8. *Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990).

A. *Did American General Exercise Actual Control Over Western National's Business and Affairs?*

*6 A shareholder will be considered a fiduciary if it owns a majority interest in or exercises control over the business and affairs of the corporation. [FN9] In the absence of majority stock ownership, a plaintiff must demonstrate that the minority shareholder held a dominant position and actually controlled the corporation's conduct. [FN10]

> FN9. *Kahn v. Lynch Communications Sys., Inc.,* Del.Supr., 638 A.2d 1110, 1113-1114 (1994); *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1344 (1987).

> FN10. *Kaplan v. Centex Corp.,* Del. Ch., 284 A.2d 119, 122 (1971); *Kahn v. Lynch* at 1114; *Solomon v. Armstrong,* Del. Ch., 747 A.2d 1098 (1999) (stating that domination requires "literal control of corporate conduct"), *aff'd,* Del.Supr., 746 A.2d 277 (2000).

Plaintiffs' briefing goes to great lengths to place every conceivable fact or event into question that might give rise to the conclusion that American General might have, in some way or in some circumstance, dominated the affairs of the Company, in order to limp past a summary judgment motion. This, of course, is entirely in keeping with summary judgment practice.

As noted above, on a summary judgment motion the defendant bears the burden of demonstrating that there is no dispute as to any issue of material fact with respect to any valid legal theory the plaintiff advances in support of its claims. The plaintiff, nevertheless, must affirmatively produce evidence demonstrating the existence of a genuine issue of fact. [FN11] In other words, if the moving party supports its summary judgment motion with sufficient undisputed evidence and points to the absence of proof corroborating the non-moving party's claims, the court properly grants the summary judgment motion. [FN12]

> FN11. *Liboff v. Allen,* Del. Ch., C.A. No. 2669, let. op. at 9, Brown, V.C. (Jan. 14, 1975).

> FN12. *See, e.g., In re Liquidation of Nat'l Heritage Life Insurance Co.,* Del. Ch., 728 A.2d 52, 57 (1998) (citing *Celotex v. Catrett,* 477 U.S. 317, 324-25 (1986))

Because plaintiffs bear this burden, they must affirmatively state facts-not guesses, innuendo or unreasonable inferences-establishing that American General exercised actual control over Western National. [FN13] Here, a thorough and careful reading of a well-developed discovery record and plaintiffs' briefing yields nary a fact that could give rise to a finding of domination and control.

> FN13. *Id. See also Zlotnick v. Newell Cos.,* Del. Ch., C.A. No. 7246, let. op. at 5, Walsh, V.C. (July 30, 1984) (stating that "conclusory allegation of fiduciary duty must be supported by facts from which the duty arises").

1. *American General's Equity Stake*

Plaintiffs allege that American General's 46 percent equity position coupled with its ability to purchase an additional 20 percent of Western National's common stock during any twelve month period gave it "effective control" of the Company. This argument fails for two reasons. First, and as adumbrated above, substantial non-majority stock ownership, without more, does not indicate control. [FN14] Second, the fact that American General *could* acquire a numerical majority stock interest in Western National in the open market is not sufficient to convert its status as a substantial minority shareholder to that of a fiduciary. [FN15]

> FN14. *Kaplan v. Centex,* 284 A.2d at 122-23.

> FN15. *See In re Sea-Land Shareholders Litig.,* Del. Ch., C.A. No. 8453, mem. op. at 10-11, Jacobs, V.C. (May 22, 1987) ("*Sea-Land I*") (holding that "[t]he potential ability to exercise control is not the equivalent to the actual exercise of that ability."); *see also Gilbert v. El Paso Co.,* Del. Ch., 490 A.2d 1050, 1056 (1984), *aff'd,* Del.Supr., 575 A.2d 1131 (1990) (holding that claims of breach of fiduciary duty "must subsist on the *actuality* of a specific relationship, not its *potential*") (emphasis added).

Not Reported in A 2d                                                                                  Page 7
Not Reported in A 2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

Finally, the Standstill Provision further militates against a finding of domination or control, as it limited to two the number of directors that American General could nominate. [FN16] Although plaintiffs deride the Standstill Provision's efficacy, nothing in the record reasonably supports a conclusion that defendants could or, in fact, did take steps to undermine its purpose or effect. [FN17]

> FN16. Cf. Di Nardo v. Renzi, Del. Ch., C.A. No. 8977, mem. op. at 9, 1987 WL 10014, 3, Berger, V.C., (Apr. 24, 1987) (concluding that a majority stockholder can lack the ability to exercise control where it has contractual limitations on its ability to vote shares).

> FN17. See Part III(A)(4), infra.

#### 2. Inter-Company Joint Ventures

As a general matter American General passively invested in Western National and was not closely involved in the day-to-day business affairs of the Company. The only indication of control with respect to operational matters plaintiffs point to are certain joint ventures between the two companies where Western National "borrowed" American General's ratings in order to offer products its own ratings could not support. In conclusory fashion, plaintiffs allege that because American General would have a significant say in the operation of the joint ventures, these business relationships are substantial evidence that American General exercised meaningful control over the Company. Plaintiffs fail to corroborate this unadorned allegation with specific facts. Moreover, they never explain how American General's participation in joint ventures, that by plaintiffs' own admission helped Western National offer new products, would somehow lead to American General dominating Western National operationally or controlling Western National's management or board.

*7 Finally, plaintiffs' claim is particularly infirm as a matter of economic principle. When two entities join together as co-venturers in a common enterprise, each brings to the table particular assets that will, hopefully, make the enterprise successful. Management of the enterprise and division of its profits (if indeed successful) should, presumably, bear some, direct relation to the contributions of each party. Here, all plaintiffs allege is that American General "loaned" its ratings to Western National so that Western National could offer certain insurance products. For American General to demand some input into the management of the joint venture and a share of its profits is quite in keeping with sound legal and economic principle. No record support exists for the

assertion that American General forced the Company into these joint ventures, exercised disproportionate control over them, or extracted a disproportionate amount of the benefits flowing from them.

#### 3. U S. Life Merger

Another alleged instance of domination and control occurred two years before the merger when American General "vetoed" a potential business combination between Western National and the U.S. Life Insurance Company ("U.S.Life") and then proceeded to acquire U.S. Life itself. Indeed, Poulos stated in deposition testimony that "[s]ince they [American General] were a forty percent owner, nothing could be done without their approval ... and [they] indicated they would not be in favor of having U.S. Life and Western National merge." [FN18] Plaintiffs analogize this testimony to the facts of Kahn v. Lynch -where the Delaware Supreme Court determined that a 43 percent shareholder's (Alcatel) veto of a proposed merger between its subsidiary, Lynch Communications, and a third party was evidence of Alcatel's control of Lynch-and likewise conclude that American General dominated and controlled Western National. [FN19]

> FN18. Poulos Dep. at 38-39.

> FN19. Kahn v. Lynch Communications Sys., Inc., Del.Supr., 638 A .2d 1110 (1994).

Defendants argue that the Supreme Court's analysis of the control issue in Kahn v. Lynch was far more contextualized than plaintiffs let on. Among other factors, defendants observe that Alcatel held five of eleven board seats, threatened to employ a tender offer if a "negotiated" agreement could not be reached and, finally, the Alcatel designees on the Lynch board rather colorfully stated that the other directors must comport with their demands: "We are a forty-three percent owner. You have to do what we tell you ... you are pushing us very much to take control of the company." [FN20]

> FN20. Id. at 1112-1114.

I consider these other factual circumstances in Kahn v. Lynch central to the Supreme Court's finding of control. In the present matter, by contrast, plaintiffs have offered not a scintilla of evidence that American General threatened Western National when the U.S. Life merger was under consideration or two years later when Western National and American General merged. Also in stark

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

contrast to *Lynch,* no American General managers, employees, agents, or even nominees sat on Western National's board of directors. [FN21]

FN21. *See* Part III(B)(1), *infra*

*8 Moreover, under the terms of the Standstill Provision, American General could not plausibly (or at least easily) "threaten" the Western National board as it was prohibited from appointing more than two directors and could not acquire more than 79% of the Company's shares through a tender offer or otherwise. Nothing in the record suggests that American General ever threatened or even contemplated a tender offer.

The mere fact that Western National management solicited the view of a 40 percent shareholder with respect to an extraordinary business transaction and ultimately agreed with the view expressed by that shareholder does not indicate a relationship of domination and control. [FN22] Indeed, in *Ivanhoe v. Newmont Mining Corp.,* the Supreme Court stated "it is well established law that nothing precludes [a 49.7 percent stockholder] as a stockholder from acting in its own self interest." [FN23] This well established legal principle, enabling a non-majority shareholder to act in its self interest, seems particularly relevant in the context of a merger. A broad examination of the Delaware corporation statute and relevant precedent governing parent-subsidiary mergers tellingly bears out this conclusion.

FN22. *See, e.g., Citron v. Steego,* Del. Ch., C.A. No. 10171, mem. op at 14, Allen, C., (Sept. 9, 1988) (finding that consultation with a 48.8 percent shareholder regarding, among other things, board representation and corporation's executive employment contracts fell "far short of establishing control that gives rise to a fiduciary duty."); *cf Sea-Land I* at 10-11 (holding that fiduciary obligation could not be imposed on corporation merely because, as 39.5 percent stockholder, it had the potential ability to "frustrate" a competing bid for the target company).

FN23. *Ivanhoe v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1344 (1987).

The fact that a large shareholder, the putative parent, takes steps to "veto" a business combination between the putative subsidiary corporation and a proposed merger partner, is not particularly probative of whether the large shareholder exercises actual control over the business and affairs of the corporation. Section 141(a) of Delaware's corporation statute provides that the *business and affairs* of a Delaware corporation fall under the direction of its board of directors. Similarly, the standard for determining whether a large, though non-majority shareholder, exercises control over the corporation requires a judicial finding of actual control over the *business and affairs* of the corporation. Notwithstanding the explicit statutory grant of authority over the business and affairs of a Delaware corporation to its board of directors, certain events in the life of the corporation, such as a merger, require the affirmative participation of the corporation's shareholders. [FN24] The shareholders' right to voice their view as to the advisability of a proposed merger, however, does not indicate that they exercise actual control over the corporation's *business and affairs*

FN24. *See* 8 *Del. C.* § 251(c).

Here, in 1995, the Western National board contemplated a merger with U.S. Life American General, as a shareholder, expressed its views with respect to the merger. The fact that American General spoke out against the merger is completely in keeping with its statutory rights and does not establish the proposition that American General exercised actual control over Western National's business and affairs. Considering the complete absence of factors akin to those found in *Kahn v. Lynch* in this case, American General's exercise of its statutory rights as a stockholder to oppose a merger with U.S. Life is of no legal consequence.

4. *The Standstill Provision and Project Raven*

*9 As I have noted, the Standstill Provision entered into between American General and Western National was intended, among other things, to protect the public shareholders by proscribing American General's ability to buy them out without the approval of Western National's board. Plaintiffs allege that American General effectuated a plan to circumvent the Standstill Provision and neutralize its protections

In support of this theory, plaintiffs rely on a document dated July 21, 1997, titled "Project Raven." Project Raven is a pitch book prepared by Morgan Stanley which, according to plaintiffs, sets forth a "plan" and "scheme" explaining how American General should go about eliminating Western National's public shareholders at a less than premium price. I have read the Project Raven pitch book. I did not discover any materials that explicitly (or otherwise) suggest that American General should or could effectuate a squeeze-out merger transaction for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 9
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

inadequate consideration.

Plaintiffs' quote selectively. The pitch book indeed notes that a "carefully orchestrated dialogue [is] critical" and that American General must "avoid [the] appearance of first striking a deal with [Western National's] CEO." [FN25] These two excerpts do not establish domination and control. Moreover, they do not indicate that the Standstill Provision was "avoided," "circumvented," or otherwise "rendered ineffectual."

FN25. Devlin Dep. Ex 4, at 7; Pls App. Tab 1.

Plaintiffs' overarching theory misapprehends the purpose of the Standstill Provision. The Standstill Provision was not intended to completely foreclose the possibility of a merger between American General and Western National. In fact, the Standstill Provision specifically carved out the possibility of a merger if Western National's board of directors believed such a transaction to be in the Company's best interest.

The Morgan Stanley document outlines the "Strategy and Tactics" American General might employ, in light of the Standstill Provision, to achieve a "Negotiated Deal" with Western National. The fact that American General contemplated, mulled over, or hypothesized potential circumstances in which it would enter into a strategic merger with a 46 percent subsidiary violates neither the letter nor the spirit of the Standstill Provision. It also does not establish domination and control of the subsidiary. Moreover, where a merger transaction is in both parties' interests, the concerns described in the Morgan Stanley document are perfectly legitimate. That is, in the event that both parties desire a merger, the Standstill Provision poses a legal obstacle that must be navigated, especially given the likelihood of litigation attendant to this type of transaction.

More specifically, plaintiffs allege that certain notes Nicholas Rasmussen, senior vice president of corporate development for American General, made in the margin of the Project Raven pitch book demonstrate incontrovertible evidence of control. The margin notation plaintiffs allude to states "they must make us an offer." [FN26] Plaintiffs' conclusion as to the significance of this language is unfounded. Rasmussen's margin notation, read in context, underscores the importance of the Standstill Provision and demonstrates American General's willingness to respect it.

FN26. Id.

**\*10** The notation expresses the simple recognition that if American General is to merge with Western National, Western National must initiate the process. Implicit in this procedure is the fact that Western National must willingly consent to, and affirmatively agree with, the desirability of the transaction. When examined as a whole, it is clear that the pitch book recognizes that American General does not control the Company. Indeed, the document identifies six of Western National's eight directors as "independent." Furthermore, it states that "all substantive deal discussions must include 'independent' directors (or their representatives)" and that any "[p]roposal will require approval by [Western National's] independent directors." [FN27]

FN27. Id. at 8.

Finally, defendants observe that the analysis contained in the pitch book, whatever that analysis may be, is largely irrelevant because Morgan Stanley independently generated the document and American General did not solicit it. Rasmussen's deposition testimony states that the Morgan Stanley pitch book was just one of many unsolicited pitches American General received from a host of investment banks seeking to provide their services should American General ever decide to merge with Western National. The testimony also demonstrates that Rasmussen did little more than listen to Morgan Stanley's presentation. [FN28]

FN28. Rasmussen Dep at 68 ("I was listening–it was not something that I've put much weight in, I don't think it was particularly well done. And like most of these, I listen and file it").

Ultimately, no evidence suggests that the allegedly sinister Project Raven played any role in the merger process. To blindly impute the Morgan Stanley document to American General when American General did not solicit it (nor retain Morgan Stanley as an advisor) is entirely unwarranted. The proposition that American General improperly circumvented the Standstill Provision, or exercised "actual control" over Western National, finds no support in the record.

B. *Did American General Dominate Western National's Board of Directors?* [FN29]

FN29. While this section of the opinion focuses on the issue of board domination, I will also discuss directors' potential or actual conflicts of

Not Reported in A.2d                                                                        Page 10
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

interest with respect to the merger transaction in question.

Plaintiffs allege that American General dominated a majority of Western National directors or that disabling conflicts of interest burdened a majority of Western National directors-with the result that they were incapable of exercising independent judgment regarding the merger. Plaintiffs make these allegations in the face of multiple, undisputed contrary facts.

As a prefatory matter, I note that none of the Company's eight directors, at the time of the merger, were employed by or directly under American General's control. This simple fact renders counterintuitive plaintiffs' several assertions of board conflict of interest and domination. The suspicions plaintiffs raise with respect to director independence and conflict of interest are of the mildest variety. In stark contrast to *Kahn v. Lynch* and *Tri-Star Pictures,* [FN30] this is not a case where a parent corporation assigned its managers to the subsidiary's board to play the part of provincial governors. I also note that six of eight Western National directors sat on the board *before* American General acquired its stake in the Company. Two board members were appointed-at a time when American General was a 40 percent shareholder-with their independence from both companies specifically in mind. [FN31]

> FN30. *In re Tri-Star Pictures, Inc.,* Del.Supr., 634 A.2d 319 (1993).

> FN31. *See* Part III(B)(2)(a), fn. 51, *infra*

**\*11** As a final preface, I note that no one from American General, as a general matter, played an active role in the conduct of Western National's board before (or during for that matter) the merger. Plaintiffs allege (wrongly) that Rasmussen, American General's Vice President for Corporate Development, regularly attended Western National board meetings. It seems that plaintiffs seized a portion of a Western National director's deposition testimony [FN32] mistakenly referring to Western National's CFO, McGimsey, who regularly attended Company board meetings, as Rasmussen, who did not, to support their allegation. Given the context of the statement, it is eminently clear to anyone with a rudimentary understanding of the facts of this case that the deponent misspoke (even without the benefit of errata sheets proffered by defendants replacing "Rasmussen" with "McGimsey"). Whether plaintiffs were excessively opportunistic in seizing the deponent's misstatement or genuinely misconstrued the testimony is unclear.

> FN32. Hermance Dep. at 45.

The Delaware Supreme Court broadly set forth the inquiry for questions regarding director disinterest and independence in *Aronson v. Lewis* [FN33] There, the Court held that a director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders or when a corporate decision will have a materially detrimental impact on a director, but not the corporation or its stockholders. [FN34] Independence, the *Aronson* Court held, means that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influences. [FN35] To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized. [FN36]

> FN33. Del.Supr., 473 A.2d 805, 812 (1984).

> FN34. *Id.* at 812.

> FN35. *Id.* at 816.

> FN36. *Id.* at 815; *see also Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991).

### 1. *The Inside Directors*

Although plaintiffs assert *ipse dixit* that American General dominated the Company's board, their key theory relies on a strained factual predicate. In light of the fact that no employees or agents of American General sat on Western National's board, plaintiffs argue that American General dominated the board through Poulos, its *de facto* agent. Essentially, this is a structural bias theory which posits that Poulos was so enamored of American General and so influenced by its corporate leaders (primarily Messrs. Devlin and Hook), that he preferred American General to his own company, even to the point that he subordinated his own economic self-interest and the interests of Western National's shareholders to those of American General. This theory labors under two burdens. First, plaintiffs must adduce some evidence demonstrating Poulos's bias. Second, they also must show that he imposed his bias on other board members such that they were beholden to him and (by extension) American General.

Somewhat more credibly, plaintiffs attack Western National's two other inside directors' disinterest in the merger on grounds that they entered into employment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 11
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

contracts with American General during the course of merger negotiations.

### a. Did the merger pose an economic conflict of interest to Poulos?

**\*12** There is slim evidence that the merger posed an economic conflict of interest to Poulos; indeed, the evidence points to the contrary. The record indicates that upon consummation of the merger, Poulos would retire his chief executive post, become a non-executive director of American General, receive a $4.5 million cash severance payment and accelerated vesting of certain options. Although plaintiffs try to color the severance payment and accelerated vesting schedule as improper incentives to accomplish the merger, I note two important facts. First, the severance payment and the accelerated vesting schedule are legitimate contractual benefits emanating from a 1994 employment agreement-negotiated *before* American General became a shareholder. Second, they were the subject of arm's length bargaining and mutual consideration. More importantly, the record also shows that at the time of the merger, Poulos owned equity in both companies, though his interest in Western National significantly outweighed his interest in American General.[FN37]

> FN37. A: By far, the interest that I had in Western National was many, many fold greater than my [interest] in American General.
> Q: By virtue of your stock interest in American General, did you have any economic incentive to favor the sale of Western National to American General at less than the highest price that could be obtained?
> A: Only if I were a fool.... Poulos Dep. at 151.

These facts cannot possibly indicate (*i.e.*, under any interpretation) that Poulos's *personal* economic and professional incentives were other than aligned with the public shareholders of Western National. That is, Poulos's significant equity interest in the Company aligned him economically with the public shareholders; his willingness to step aside from the Company's helm demonstrates, in my view, the absence of improper motivations such as a desire to maintain the perquisites and prestige attendant to the role of executive chairman. Finally, a $4.5 million cash severance payment coupled with accelerated vesting of certain options to an executive chairman of a large corporation does not strike me as so far beyond the pale that it would give rise to an improper motive to accomplish a merger.

### b. Was Poulos otherwise independent of American General?

Plaintiffs are thus left to argue that Poulos's former employment by American General coupled with his personal friendships with American General executives caused him to improperly favor that company in the merger.[FN38] It may indeed be true that Poulos enjoys fond recollections of his twenty-three year career at American General (prior to joining Western National) and it is undoubtedly true that he maintained close social and professional ties with his colleagues there. Nevertheless, such facts do not warrant the inference that Poulos favored the fortunes of American General over those of a company in which he holds substantial equity and has served as executive chairman for its entire existence as a publicly-held entity.

> FN38. Under plaintiffs' theory, Poulos "was inherently conflicted by virtue of his executive positions with the Company and long association with American General." Am. Compl. ¶ 32.

Plaintiffs' claim that Poulos's status as an executive officer at Western National also somehow undermined his independence strains credulity and logic. Perhaps if he were an officer at American General plaintiffs' allegation might facilitate a logical inference that he was beholden to American General but this fact, of course, does not prevail. Despite the inherent frailty of a liability theory predicated on an executive chairman preferring his friends' and colleagues' professional and economic interests over his own similar interests, let alone his fiduciary duty to shareholders, plaintiffs point to two facts with respect to Poulos's relationship with American General that give me some pause, particularly at summary judgment stage.

### i. American General's initial investment in Western National

**\*13** The first fact touches upon the circumstances of American General's initial 40 percent acquisition of Western National stock from Conseco. The circumstances surrounding this transaction are unorthodox. Essentially, Poulos exclusively facilitated the sale of Conseco's 40 percent stake to American General. Aware that Conseco was "rather anxious to sell" its Western National shares, Poulos solicited his former colleagues at American General. Never informing Conseco that American General was the buyer, Poulos negotiated the transaction on behalf of both parties. The parties never met and no

Not Reported in A.2d                                                                    Page 12
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

investment or legal advisors were involved.

While this transaction is certainly peculiar, I am not entirely sure what plaintiffs would have me infer from it. Does it establish that Poulos favored American General? Does it indicate some special relationship between Poulos and American General? If it does, I am at a loss as to how; and neither plaintiffs' complaint nor post-discovery briefing provides much by way of explanation. It appears that plaintiffs simply did not engage in any fact finding with respect to the Conseco-American General transaction beyond the Poulos deposition that established the facts recited above.

Defendants argue that the only reasonable, indeed plausible, understanding of Poulos's role in the Conseco-American General transaction is far less malevolent than the essentially unsupported inference plaintiffs urge. Surely Conseco, a sophisticated market participant, would not casually leave itself exposed to double-dealing and opportunism from Poulos in a significant, multi-million dollar transaction such as the sale of a 40 percent equity stake in a sizeable company. Why would Conseco allow Poulos to negotiate Western National's sale under such peculiar constraints-without professional advisors and without Conseco knowing the buyer's identity-if it did not have complete trust and confidence in him and was not completely satisfied with the consideration the undisclosed American General paid?

While that question is obviously rhetorical, the record does not conclusively establish the answer defendants rhetorically imply. In my view, however, the inference defendants urge me to make is far more compelling than plaintiffs' and, again, I note plaintiffs studied failure to develop this portion of the record. Nevertheless, acknowledging that plaintiffs have raised a factual issue, I will, for purposes of this motion, give *some* credence to plaintiff's sinister, though thinly supported hypothesis that Conseco's sale to American General evidenced a special relationship or some type of impermissible "understanding" between Poulos and American General.

### ii. *The Poulos Provision*

The second fact that I find somewhat troubling is what plaintiffs style as the "Poulos Provision." The Poulos Provision was a clause in the same shareholders' agreement giving rise to the Standstill Provision. The Poulos Provision, as plaintiffs describe it, permitted American General to acquire Western National without the consent of the Western National board if Poulos ceased to serve as its chairman. In other words, it served to suspend the protections of the Standstill Provision.

**\*14** Plaintiffs contend that "presumably" the Poulos Provision indicates that American General executives believed Poulos was, so to speak, their man at Western National. This presumption is not well developed in the extensive deposition testimony or other evidence plaintiffs proffered. Indeed, the provision is mentioned only once and, there, plaintiffs primarily inquired as to its existence.[FN39] When asked the purpose of the Provision in the scheme of the shareholders' agreement, Poulos responded that he could not specifically recollect. When asked why Hook, American General's chairman, wanted the provision, Poulos responded, "I guess he wanted the right to be able to close in if anything happened to me."[FN40]

> FN39. *See* Poulos Dep. at 30.

> FN40. *Id.*

This statement, in my view, is subject to at least two plausible interpretations. The first is that advanced by plaintiffs above: that Poulos was American General's *de facto* agent at Western National, impermissibly looking after its interest to the exclusion of all other shareholders (including himself). The second is that Hook and American General had tremendous confidence in Poulos's management skills and wanted to reevaluate their investment should Poulos leave the Company. Because I am considering a summary judgment motion, and the record is not fully developed with respect to this issue, I will give consideration to plaintiffs' more alarmist view.

In light of the peculiar circumstances surrounding American General's initial investment in Western National and the not totally implausible inferences plaintiffs ask me to draw with respect to the so-called Poulos Provision, I cannot (at this stage) conclude that Poulos was entirely independent of American General. That is, plaintiffs have adduced some evidence, although fairly tame, that Poulos *might* have considered this transaction not entirely as an advocate of Western National and its shareholders. But that is as far as it goes. Nothing in the record supports plaintiffs' allegation that Poulos dominated other members of the Western National board or that the other directors were beholden to him in any way.[FN41] The allegation that Poulos exercised undue influence or tainted the merger negotiations similarly falls short.[FN42]

> FN41. *See* Part III(B)(2)(a), *infra*

> FN42. *See* Part III(C)(4) and (5), *infra*

Not Reported in A.2d                                                                    Page 13
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

c. *Were inside directors Graf and Scott independent of*
*American General and disinterested in the merger?*

Plaintiffs seek to impeach the disinterest of inside
directors John A. Graf ("Graf"), Western National's Chief
Marketing Officer, and Richard W. Scott ("Scott"),
Western National's General Counsel and Chief Investment
Officer, on grounds that they had entered into
employment contracts with American General at the time
of the merger. These employment contracts, plaintiffs
reason, impaired Graf's and Scott's ability to honestly
weigh the merits of the merger as their interests at that
point became aligned with American General. Plaintiffs
allude to the Delaware Supreme Court's opinion in *In re*
*Tri-Star Pictures* [FN43] to support this proposition. *Tri-*
*Star,* however, is not entirely analogous to the facts here.
Importantly, *Tri-Star* involved a *de jure* parent-subsidiary
merger where the parent corporation, Coca-Cola, held a
56 percent interest in Tri-Star (measured by direct
holdings and voting agreements) and Coca-Cola
executives filled four of Tri-Star's ten director slots. In the
context of an appeal from a Rule 12(b)(6) dismissal, the
Supreme Court stated that two Tri-Star executive
directors, with ties to Coca-Cola affiliates, who would
participate in the management of the combined entity
(*i.e.,* Coca-Cola's augmented entertainment unit)
*appeared* interested.

FN43. 634 A.2d at 329.

**\*15** I do not read *Tri-Star* to stand for the proposition that
a subsidiary inside director who continues to participate in
the combined company is automatically interested in the
transaction, particularly at the summary judgment stage
after plaintiffs have had an opportunity to engage in
substantial discovery. [FN44] Here, plaintiffs chose not to
depose either Graf or Scott; nor have plaintiffs adduced
any other credible evidence to impugn their independence
and impartiality. Yet despite the dearth of evidence
sullying these inside directors' independence from
American General, I will not consider Graf and Scott
disinterested based on the stipulated facts outlined above
for purposes of this summary judgment motion.

FN44. *Cf Goodwin v. Live Entertainment, Inc.,*
Del. Ch., C.A. No. 15765, mem. op. at 53,
Strine, V.C. (Jan. 22, 1999) (stating that two
directors' continuing employment relationship
with combined entity raises triable issue of fact
at summary judgment but expressing doubt that
such relationship would constitute actual
material conflict of interest after full evidentiary

hearing), *aff'd,* Del.Supr., No. 72, 1999, Veasey,
C.J. (July 23, 1999) (Order).

Regardless of my decision not to consider Graf or Scott
disinterested in the merger transaction at issue, I note the
absence of evidence suggesting that either Graf or Scott
pressured, coerced or directed other board members into
accepting merger terms unfavorable to Western National.
Indeed, they were not actively involved in the merger
negotiations and merely concurred in the judgment of the
Special Committee. [FN45]

FN45. Plaintiffs allege that Scott participated in
the negotiation of the merger agreement's collar
provision. The significance of this fact is far
from clear as the collar provision did not cut
against Western National shareholders in terms
of dollar value received. Moreover, the Special
Committee had to cajole Devlin into accepting a
fixed price transaction (with collars) in lieu of
the fixed exchange ratio transaction that Devlin
initially wanted. That is, price collars were part
of the Special Committee's merger proposal and
Scott merely aided the Special Committee in
negotiating the collars' parameters.

In sum, the only evidence plaintiffs proffer to establish
Graf's and Scott's conflict of interest is that they retained
their jobs after the merger. While I suppose this
technically placed them on both sides of the transaction,
as conflicts of interest go, this one does not seem
particularly egregious.

2. *The Outside Directors*

Western National or American General did not employ
any of the five remaining members of the Western
National board of directors at the time of the merger. That
is, all five were outside directors-presumptively
disinterested and independent.

Plaintiffs nonetheless challenge two of the five outside
directors' independence because of circumstances
surrounding their appointment to the Western National
board. Next, plaintiffs allege that past relationships with
American General compromised the independence of the
three outside directors sitting on the Special Committee.
Finally, they contend that the two remaining outside
directors, who did not sit on the Special Committee, were
incapable of evaluating the merger in good faith because
they lacked complete independence and disinterest.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 14
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

a. *Did Poulos and Hook "handpick" certain outside
director nominees of American General?*

Previously I noted that six of eight Western National
directors were elected to the board before American
General purchased its 40 percent equity interest. Plaintiffs
attack the independence of the two directors elected to the
Company's board after the American General purchase
through unsubstantiated assertions that American General
unilaterally appointed them or, alternatively, that they
were jointly appointed (or "hand-picked," to borrow
plaintiffs' language) through the tacit cooperation of
Poulos and Hook (then chairman of American General).

As a preliminary matter, I note that even if American
General nominated some of the outside directors or if
Poulos and Hook jointly nominated them, such
nomination, without more, does not mandate a finding
that these directors were beholden to American General,
Poulos, or Hook, and incapable of exercising their
independent business judgment with respect to the merger
or otherwise. Directors must be nominated and elected to
the board in one fashion or another. The fact that a
company's executive chairman or a large shareholder
played some role in the nomination process should not,
without additional evidence, automatically foreclose a
director's potential independence. [FN46] Essentially,
plaintiffs ask that I declare these two outside directors
incapable of exercising independent, good faith business
judgment merely because they did not find their way onto
the Company's board through an independent nominating
committee. Although independent nominating committees
may indeed have a salutary effect on board efficacy and
independence, and are surely a "best practice" which the
corporate governance community endorses, they are not a
*sine qua non* for director independence under Delaware
law. [FN47]

> **FN46.** *See Aronson v. Lewis,* Del.Supr., 473
> A.2d 805, 815 (1984)(observing that a 47
> percent stockholder who personally selected *all*
> of the directors of the corporation was not
> sufficient to establish that the stockholder
> dominated and controlled the corporation's board
> of directors); *see also Andreae v. Andreae,* Del.
> Ch., C.A. No. 11905, mem. op. at 12-13,
> Hartnett, V.C. (Mar. 3, *revised,* Mar. 5,
> 1992)(noting that Delaware courts have
> consistently rejected the notion that a director
> cannot act independently of the entity that
> appointed him or her to the board).

> **FN47.** *Cf. Brehm v. Eisner,* Del.Supr., 746 A.2d
> 244 (2000) (commenting on distinction between

corporate governance "best practices" and legal
requirements).

**\*16** Plaintiffs level their attacks on director independence
based on alleged defects in the nominating process of
Donald Baker ("Baker") and Alan R. Buckwalter
("Buckwalter"). Specifically, plaintiffs allege that Baker,
a member of the Special Committee, and Buckwalter
were appointed to the Western National board only with
the approval of both Hook and Poulos, and thus are not
independent.

The record does not, however, support the contention that
American General *unilaterally* appointed any of the
Company's directors:
Q: Did American General ever indicate that they were
considering exercising their right to appoint two directors
to Western National's board?
A: I asked Mr. Hook at each, prior to each annual meeting
if in fact they wanted to advance two names to be
included on the ballot and he declined.
Q: Did the Western National board have a nominating
committee?
A: The board was so small, it served as the nominating
committee.
Q: Did American General propose any nominees?
A: No, they didn't.
Q: Did American General ever express any opinion as to
any of the nominees?
A: No, they didn't.
Q: Did American General ever ask that anyone not be
nominated?
A: No. [FN48]

> **FN48.** Poulos Dep. at 31. The deposition
> testimony of Robert Devlin, Hook's successor at
> American General, is consistent with Poulos's:
> Q: Has American General ever exercised its right
> to appoint two directors?
> A: No.
> Q: Has any Western National director or senior
> manager ever solicited your opinion on
> prospective nominees for its board?
> A: No. Devlin Dep. at 33-34.

Notwithstanding Poulos's unambiguous testimony
recounting Western National's director nominating
process, plaintiffs allude to what might be viewed as
contradictory testimony in Baker's deposition: "All that
Mike [Poulos] told me at the time was that he and Harold
[Hook] had agreed that the two board members they
added to the board would be somebody that they mutually
know and trusted. And that's the reason Alan

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

[Buckwalter] and I were chosen, because we both know both of them." [FN49]

FN49. Baker Dep. at 33.

Baker's testimony clearly corroborates that American General did not unilaterally appoint Baker and Buckwalter to the Company's board let alone impinge upon their discretion and independence. At most, it indicates that Poulos conferred with Hook before the Western National board nominated two new members. Baker's testimony also indicates that American General's and Western National's executive chairmen knew and trusted these two prospective directors. This testimony, contrary to plaintiffs' argument, does not support a conclusion that these two directors were beholden to Hook and Poulos or were incapable of making independent judgments and exercising the discretion of a fiduciary with respect to the merger. [FN50] It merely establishes that Baker and Buckwalter were "known and trusted" by the Company's executive chairman and by the executive chairman of a large shareholder.

FN50. See fn. 43, supra. See also Citron v. Steego Corp., at 14 (stating that where a board of directors was agreeable to a 48.8 percent stockholder designating two members of a nine member board "shows little more than the fact that the board recognized the interest of a large stockholder in having board representation"); Sea-Land I, at 9-11 (stating that 40 percent stock ownership and the ability to have nominees elected to board does not establish actual domination or control).

Plaintiffs cannot point to any evidence to support a reasonable inference that Baker and Buckwalter could not act independently. [FN51] Mere insinuation is unfair and improper. Plaintiffs had an opportunity to depose these directors and elicit facts that would support that they were beholden to American General. They deposed Baker and, as explained here (and in the section immediately below), failed to cast doubt on his independence. Plaintiffs did not bother to depose Buckwalter.

FN51. Plaintiffs' effort to cast Baker and Buckwalter as Poulos's and Hook's lackeys is entirely built around Baker's testimony that they were brought on the Western National board because they were "known and trusted" by Poulos and Hook. Defendants, however, note that Baker also testified that he and Buckwalter

were brought on to the board because neither "had any particularly close relationship with either company." Baker Dep. at 17.

b. *Do past relationships with American General vitiate the Special Committee directors' independence?*

*17 Plaintiffs seek to impeach the independence of all three members of Western National's Special Committee, Baker, Alan Richards ("Richards"), and Robert Hermance ("Hermance") on the basis of past relationships with American General. Before examining each director's past ties to American General, I note that under Delaware law a director's past employment with the company on whose board he sits does not alone establish that director's lack of independence. [FN52] Consequently, in my view, for a court to conclude that a director lacks independence based on a past consulting relationship is an even more dubious proposition.

FN52. *Oddyssey Partners v. Flemming Cos.,* Del. Ch., C.A. No. 14770, mem. op. at 47, Lamb, V.C. (May 13, 1999) (stating that director's status as a former officer of Fleming "is not alone, a sufficient basis for a finding that he was controlled by Fleming").

Plaintiffs first point to certain consulting work Baker performed for American General while he was a partner at Arthur Andersen. Baker retired from Arthur Andersen in 1990, seven years before he served on the Special Committee. He supervised a single project for an American General subsidiary that lasted a year or two during the late 1970s and early 80s --- over fifteen years before the merger. This work certainly does not undermine Baker's independence, standing alone or coupled with the facts surrounding his nomination to the Company's board.

Plaintiffs' challenge to Richards's independence and disinterest on similar grounds also falls short. They again invoke nebulous allegations based on past consulting work performed for American General. The undisputed record, however, indicates that Richards only performed a single, three-week consulting job for American General in the spring of 1987 and has not worked for American General since that time. I obviously cannot conclude that Richards labored under an improper preference for American General, that American General controlled him, or that he acted disloyally toward Western National as a result of a three-week consulting engagement ten years before the merger.

Plaintiffs also point to the fact that Richards performed

Not Reported in A.2d                                                                          Page 16
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

periodic consulting work for Western National from October 1993 until June 1996 and a single, two-day assignment thereafter. This relationship, however, should have no bearing on his views of the merger. Indeed, if Richards harbored any self-interested motivation as a result of past consulting work for Western National (of which there is no indication), he would, if anything, likely resist American General's overtures to merge, as a combination with the much larger entity would terminate his relationship with the Company. Once no longer in the corporate inner sanctum, the prospects for influencing future consulting arrangements are obviously diminished. In other words, plaintiffs' allegation lacks logical support.

Robert Hermance, chairman of the Special Committee, is a retired partner of the accounting firm, Ernst & Young. Plaintiffs argue that because Hermance, at one time, was Ernst & Young's engagement partner for the American General audit, his ability to function free from American General's influence was "questionable." Hermance retired from Ernst & Young in 1994 and had not been directly responsible for the American General audit since 1985. At the time of the merger, any dealings Hermance might have had with American General or Ernst & Young were twelve and three years stale respectively. Moreover, the record does not support the notion that Hermance was at all interested in rekindling contact, let alone business, with either entity. Based on these facts, as a matter of law I cannot conclude that Hermance was interested or lacked independence.

**\*18** Plaintiffs fail to impugn any of the Special Committee members' independence or disinterest based on past relationships with American General. Those relationships, in my view, could not have exercised any material effect on the Special Committee members' ability to independently evaluate the business merits of the merger. As plaintiffs have offered no other challenges to the Special Committee directors' independence (save the alleged, though unsupported, defects in Baker's nomination to the Company's board, [FN53] I conclude as a legal matter that plaintiffs have failed to point to facts, or reasonable inferences from such facts, that any of them were interested in the transaction or lacked independence from American General or its purported *de facto* agent, Michael Poulos.

> FN53. *See* Part III(B)(2)(a), *supra*

c. *Were the remaining outside directors, Buckwalter and Keeble, disinterested and independent?*

The independence and disinterest of the two remaining outside directors, Buckwalter and Sidney Keeble

("Keeble"), are not as crystal clear as that of the Special Committee members. In addition to the unsupported allegation that Buckwalter was under the control of Hook and Poulos as their "hand-picked" designee, [FN54] plaintiffs allege that because Buckwalter was President of Chase Texas Bank, one of American General's lenders, there is a material issue of fact as to whether he would consider Western National's interests without regard to his employer's interest in its client relationship with American General.

> FN54. *Id*

Defendants argue that simply because a director is an employee of a company that has a commercial relationship with the other party in a merger does not mean that the director lacks independence. [FN55] Rather, the burden is on plaintiffs to show that the relationship between the director's employer and the merger partner affected the director's decision making process. [FN56] Here, plaintiffs have not proffered any additional evidence that the banking relationship between Chase Texas and American General sterilized Buckwalter's discretion or subverted his good faith evaluation of the merger's underlying corporate merits.

> FN55. *Cf Kaplan v. Wyatt,* Del.Supr., 499 A.2d 1184, 1189 (1985) (finding a director who was an affiliate of a number of companies with which the nominal corporate defendant transacted significant business to be independent)

> FN56. *See Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993).

Plaintiffs seek to impeach Keeble's competence to evaluate the merger on its merits and in good faith (*i.e.,* as a fiduciary) because he is a retired senior vice president of an American General subsidiary and holds a substantial amount of American General stock. [FN57] Keeble's large holdings of American General stock, constituting approximately 40 percent of his total wealth at the time of the merger, are troublesome. Defendants insist, however, there is no evidence that he had a direct interest in the merger or that his American General stock ownership was in fact material to his decision to approve the recommendation of the Special Committee and put the merger to the shareholders. [FN58] In an effort to corroborate his independence, Keeble submitted an affidavit swearing to a net worth of approximately $20 million outside of his holdings in American General and stating that any speculative effect the merger might have had on the value of his American General stock played no

Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

role in his decision. [FN59]

> FN57. At the time of the merger, Keeble owned
> approximately 328,212 shares of American
> General common stock.
>
> FN58. *See Cede & Co. v. Technicolor, Inc.*,
> Del.Supr., 634 A.2d 345, 363-64 (1993).
>
> FN59. Keeble Aff. ¶ ¶ 2 and 3.

**\*19** Although I ordinarily attach little if any weight to
such inherently self-serving and non-adversarial proffers,
I note that plaintiffs made no effort to establish that
Keeble was improperly motivated as a result of his
American General holdings. Plaintiffs chose not to depose
Keeble, or Buckwalter for that matter, and failed to probe
meaningfully what potential effects (if any) Keeble's
stock ownership and Buckwalter's employment
relationship might have had on their views of the merger
transaction. Plaintiffs similarly did not bother to depose
inside directors Graf and Scott. Now, however, plaintiffs
ask me to conclude that all four of these directors, who
were never deposed, either labored under personal
conflicts of interest or were not independent of American
General.

When defendants seek a judicial finding as to director
disinterest and independence before substantial discovery
has been taken, typically in the context of a motion to
dismiss, the Court will accept plaintiffs' characterization
of all well-pleaded facts. Here, discovery has proceeded
for over two years and plaintiffs have had substantial
opportunity to establish facts supporting their allegations.
The grounds for Graf's and Scott's conflict of interest-
continued employment in the combined entity-and
Buckwalter's lack of independence-an employment
relationship with one of the parent company's lenders-are
the sort of fiduciary problems that typically require
additional evidence before the court will consider such
directors interested in the transaction or beholden to the
parent company. [FN60]

> FN60. Despite Keeble's affidavit and plaintiffs'
> failure to depose him, his substantial American
> General stock holdings, at this point, cast
> sufficient doubt as to his independence from
> American General.

In spite of these procedural and evidentiary burdens,
plaintiffs partially build their case around Graf's, Scott's,
and Buckwalter's conflicts of interest and lack of
independence *exclusively* through the facts alluded to

above. The United States Supreme Court has held that
"production of weak evidence when strong is available
can lead only to the conclusion that the strong would have
been adverse. Silence then becomes evidence of the most
convincing character." [FN61] I could plausibly conclude
that depositions of Graf, Scott, and Buckwalter would not
have yielded evidence corroborating the inferences
plaintiffs ask me to draw. That is, I might reasonably
conclude that plaintiffs strategically chose not to depose
these directors.

> FN61. *Interstate Circuit, Inc. v. United States*,
> 306 U.S. 208, 226 (1939). *See also Smith v. Van
> Gorkom*, Del.Supr., 488 A.2d 858, 878-79
> (1985) (concluding that "it is a well established
> principle that the production of weak evidence
> when strong is, or should have been, available
> can lead only to the conclusion that the strong
> would have been adverse").

In that event, plaintiffs failure to impeach these three
directors disinterest and independence, coupled with their
failure to establish that any of the Special Committee
members labored under conflicts of interest or were in
fact beholden to American General, would comfortably
result in finding a disinterested and independent majority
on the Western National board of directors. Despite this
strong possibility, I will nevertheless give some weight to
the evidence casting doubt on Graf's and Scott's
disinterest-their continued employment in the combined
entity-and Buckwalter's lack of independence-his
employment relationship with Chase Texas-and not
consider them wholly disinterested and independent,
solely for purposes of this summary judgment motion. As
noted in footnote 60, I also will not consider Keeble, on
account of his significant American General
stockholdings, independent for purposes of this motion.

**\*20** This, of course, does not end the analysis. As I have
previously noted, American General did not exercise
actual control over the Company's business and affairs.
That is, American General was generally a passive
investor, only expressing its views with respect to
extraordinary transactions such as the U.S. Life merger
and appropriately engaged in the comanagement of
Western National-American General joint ventures.

There also is no evidence to suggest that American
General directly or indirectly participated, or was in any
way involved, in the functioning of the Western National
board of directors before the merger. In other words, to
use the familiar language deployed in non-majority
shareholder control inquiries, no evidence indicates that
American General dominated the Western National board

Not Reported in A.2d                                                                                          Page 18
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

of directors. As noted in sections III(B)(1)(b)(i) and (ii) and III(B)(2)(c), plaintiffs have cast some doubt as to the ties of Poulos, Buckwalter and Keeble to American General. These doubts are, however, speculative and largely beside the point as plaintiffs have not adduced evidence indicating that any of these directors exerted pressure on other directors to favor American General.

Ultimately, focusing exclusively on each director's relationship to American General outside the context of the merger, plaintiffs have raised (if barely so) triable issues of fact with respect to the independence of three of eight directors. Plaintiffs also have established that two other board members (otherwise totally unconnected to American General) might be burdened by potential conflicts of interest exclusively with respect to the merger transaction in question-specifically, inside directors Graf and Scott, who entered into employment contracts with American General around the time of the merger negotiations.

These five potentially conflicted directors, Poulos, Buckwalter, Keeble, Graf and Scott, however, were not particularly involved in the merger process. Indeed, plaintiffs have adduced no evidence that Graf, Buckwalter, or Keeble played *any* role whatsoever (besides considering and approving the Special Committee's recommendation) while Poulos's and Scott's involvement was *de minimis.* The record, in fact, demonstrates that the Special Committee-whose disinterest and independence is above reproach-and its advisors performed the bulk of the heavy lifting during the course of merger negotiations.

Here, however, plaintiffs properly observe that a significant stockholder that does not, as a general matter, exercise actual control over the investee's business and affairs or over the investee's board of directors but does, in fact, exercise actual control over the board of directors during the course of a particular transaction, can assume fiduciary duties for purposes of that transaction. [FN62] With this in mind, I turn to the process by which the Special Committee negotiated and recommended the merger to the full board and whether American General actually controlled the Special Committee or dictated the terms of the transaction. Then, I will consider the legal effects of this process.

FN62. *Kahn v. Lynch,* 638 A.2d at 1114-15.

C  *Did American General Control the Special Committee and Dictate the Terms of the Transaction?*

**\*21** Plaintiffs attack the Special Committee process on

two grounds. They first allege that the Special Committee could not have relied on the advice of its expert advisors because the advisors were not independent of American General. The gist of their second, more general criticism is that the Special Committee was unqualified, uninformed, generally passive, and allowed American General to assert control over the transaction and dictate its terms. Neither allegation withstands scrutiny.

1. *Were the Special Committee's Advisors Independent and Could the Committee Reasonably Rely on their Advice?*

Plaintiffs' assertion that Donaldson, Lufkin & Jenrette was not independent of American General because it provided investment banking services to American General both before and after the transaction does not find support in the record. The fact of the matter is that American General had never hired DLJ directly. Rather, DLJ merely agreed to participate as one of ten or twelve co-managers in an offering of American General debt securities at the request of Goldman Sachs, the lead underwriter, two years before the merger. A one-tenth or one-twelfth participation in an underwriting syndicate two years before the merger does not undermine DLJ's independence from American General.

Plaintiffs' contention that DLJ provided services to American General after the merger, suggesting a *quid pro quo* for providing a low-ball valuation of Western National during the merger, is both false and misleading. Plaintiffs cite to Devlin's deposition testimony that DLJ provided acquisition advisory services for American General in 1999. What plaintiffs fail to point out is that the group of bankers providing these services were employed by Union Bank of Switzerland when retained by American General and transferred mid-stream to DLJ. In other words, the bankers became affiliated with DLJ *after* American General hired them. These facts do not establish that DLJ had any reason to favor American General in the merger negotiations.

Plaintiffs' effort to impeach the independence of the Special Committee's legal advisor, Sullivan & Cromwell, lacks record and logical support. Plaintiffs contend that Sullivan & Cromwell improperly advised the Special Committee because it later served as Western National's "tax counsel." The tax advice that Sullivan & Cromwell provided to Western National, however, only concerned the merger. In the course of its normal work on behalf of the Special Committee, Sullivan & Cromwell provided advice on the tax consequences of the merger. That advice was also used in drafting a Registration Statement under the Securities Act of 1933. The tax advice provided to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 19
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

Western National was consistent with, and an integral part of, Sullivan & Cromwell's work for the Special Committee. Because the Special Committee was working on behalf of Western National's shareholders (to whom Sullivan & Cromwell provided its tax advice), there was obviously no conflict of interest.

**\*22** Plaintiffs allegation that the Special Committee selected its advisors through a defective process is similarly unavailing. Here, plaintiffs allege that two inside directors, Scott and Poulos, selected the advisors as the Special Committee sat idly by. The record indeed supports plaintiffs' assertion that Western National management, including Poulos and Scott, recommended DLJ and Sullivan & Cromwell to the Special Committee. Western National's management, however, recommended these firms for the perfectly appropriate reasons that they were highly qualified and independent of American General. Hermance's deposition testimony very clearly bears this out:

Q: And do you recall who recommended DLJ to the Special Committee?
A: The management of the company.
Q: Okay. Do you specifically recall who among the management proposed DLJ?
A: It was Mr. Poulos.
Q: And do you recall what he said about DLJ?
A: He expressed confidence in them, briefly outlined some of their experience in the insurance industry, mergers and acquisitions; and indicated that finding an advisor who was not already affiliated or associated in some way with American General was important and that they fit that-that requirement. [FN63]

FN63. Hermance Dep. at 59.

Scott recommended Sullivan & Cromwell to the Special Committee for similar reasons. The Special Committee interviewed representatives of both firms and inquired as to their experience in insurance company M & A, their experience representing special committees, and their independence from American General. The Special Committee then concurred in the judgment of other members of Western National's board and management that DLJ and Sullivan & Cromwell would provide useful and independent advice during the course of merger negotiations. Based on the undisputed evidence of record, the Special Committee selected its advisors in a substantively and procedurally sound manner.

This Special Committee's selection of advisors is markedly different from the *Dairy Mart* and *Tremont* cases the plaintiffs cite. In *Dairy Mart,* the attorney for

the controlling shareholder recommended the advisors. [FN64] In *Tremont,* the corporation's general counsel recommended a law firm that had strong financial connections to the controlling shareholder. [FN65] In this case, management merely arranged for the committee to interview advisors that appeared qualified and did not have any connection to Western National or American General.

FN64. *Kahn v. Dairy Mart Convenience Stores, Inc.,* Del. Ch., C.A. No. 12489, mem. op. at 17, n. 6, Jacobs, V.C. (Mar. 29, 1996).

FN65. *Kahn v. Tremont Corp.,* Del.Supr., 694 A.2d 422, 429-30 (1997).

*2. Was the Special Committee Informed?*

Having concluded as a matter of law that the Special Committee directors and their advisors were disinterested, independent, and appropriately selected, I will now inquire whether the Special Committee was fully informed of all material information reasonably available.

The only evidence Plaintiffs offer in support of their assertion that the Special Committee was not fully informed is a sound-bite of Hermance's deposition testimony where he indicates that he did not personally request any specific information from management with respect to Western National's current financial condition. From this, plaintiffs conclude that the Special Committee members were inexperienced, uninformed and unsure how to carry out their duties. That inference is unreasonable and at odds with the record.

**\*23** The Special Committee had full access to all Company information under the terms of the board resolution setting forth its mandate. Furthermore, Richards unequivocally testified that the Special Committee indeed received full access to all Company documents. [FN66] Finally, as a legal and practical proposition, the Special Committee could and did reasonably rely on its expert advisor to obtain and analyze the specific information needed to value the Company. [FN67] And as Baker's testimony bears out, the Committee then appropriately incorporated this analysis into its overall assessment of the soundness of the merger. [FN68]

FN66. Richards Dep. at 71.

FN67. *8 Del. C. § 141(e); Cinerama Inc. v. Technicolor, Inc.,* Del. Ch., 663 A.2d 1134, 1142 (1994), *aff'd,* Del.Supr., 663 A.2d 1156 (1995)

Not Reported in A.2d                                                              Page 20
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

(reliance on experienced advisor is not only allowed, but is "evidence [of] good faith and the overall fairness of the process")

FN68. Baker Dep. at 72.

### 3. Was the Special Committee Process Tainted by Potentially Interested Inside Directors?

The next alleged defect in the Special Committee process sits somewhat awkwardly next to plaintiffs' previous allegation that the Committee did not solicit sufficient information from management. Here, plaintiffs contend that the presence of inside directors Scott and Poulos during portions of due diligence and during one of DLJ's presentations spoiled the integrity of the Special Committee process. Distilled to its core, plaintiffs' claim is that management was *too* involved with the Special Committee. Plaintiffs must decide whether management and inside directors were excessively or insufficiently involved-it cannot be both.

In any event, I am unable to find fault with some management participation or input into the Special Committee process, particularly in these circumstances where the inside directors' alleged conflicts of interest range from mild to immaterial. I also note that this case does not involve the set of concerns management buyout transactions raise where it is most vital to maintain a firewall between managers participating in the buyout group and the special committee. Nor is this a case where the record indicates interested managers attempting to influence a special committee's decision-making process.

Defendants plausibly contend that management directors were present at DLJ's presentation to comment on the accuracy and soundness of its valuation; essentially, they were there to make sure DLJ did not miss anything, so to speak. In oral argument, plaintiffs suggested that Poulos's and Scott's presence at this valuation wholly undermined the efficacy of the Special Committee, suggesting that it was equivalent to disclosing Western National's bargaining range and reservation price to American General. Again, plaintiffs ask that I draw an inference that the record does not support. There is simply no evidence to support the contention that Scott or Poulos tipped the Special Committee's hand to American General. None.

### 4. Did American General Control the Negotiation or Was the Committee Free to Negotiate at Arm's Length?

Finally, and predictably, plaintiffs allege a "quick surrender" by the Special Committee. In reality, the record not only illustrates arm's length bargaining but also demonstrates that American General never improperly forced a merger transaction, one way or another, onto the Special Committee. Indeed, to the extent that Western National felt pressured to do a deal, that pressure emanated from regulatory constraints and product and capital markets, not from American General.

**\*24** After DLJ opined that the $30-$31 per share represented the high end of Western National's value, the Special Committee offered American General (through Devlin) $32 per share pursuant to a fixed price formula. Several days later, Devlin phoned Hermance informing him that American General would only accept a fixed exchange ratio formula at the then market price of approximately $28.19. By the end of that telephone conversation Devlin had adjusted American General's price upward to $28.75 (still based on a fixed exchange ratio formula) and also agreed to accept an expense reimbursement provision in lieu of American General's earlier request for a three percent breakup fee. After discussing Devlin's offer with the Special Committee, Hermance informed Devlin that the Committee would *not* be willing to recommend a fixed exchange ratio at $28.75.

The following day, Devlin returned to the negotiating table, this time with a fixed price offer at $29.00 per share, subject to certain collars that would result in the value being adjusted up or down within a yet to be specified range, based on movements in American General's stock price. The Special Committee indicated it would *not* recommend a deal at $29.00 per share and counter-offered $31.00 per share. Devlin rejected $31.00 per share and walked away. At this point, the record indicates, all parties concerned believed the negotiations had permanently broken down.

These events, to my mind, reasonably imply two legally significant conclusions. First, the Special Committee had the power to say no. Indeed, the Special Committee said it *three* times. Second, and more importantly, the fact that American General was willing to terminate the negotiations and place Western National in a *status quo ante* posture indicates that the Special Committee had a genuine choice as to the ultimate fate of the Company. That is, American General was simply not going to force a deal on Western National if the Special Committee did not accept its terms. Plaintiffs derisively scoff at this sequence of events as a sham or faux negotiation (repeatedly placing the word negotiation between quotation marks) and argue that the entire exchange between the Special Committee and American General was merely a splendid dance meant only to charm a reviewing court. But calling something a sham over and over again does not make it a sham. Plaintiffs would have me defer to shrill invective, and ignore the undisputed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                 Page 21
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

record developed during two years of discovery into the circumstances of this merger. Ultimately, I am no more charmed by the carefully orchestrated dance of a special committee than I am by the use of baseless innuendo and unreasonable inferences to bolster a deflated legal theory. In this instance, plaintiffs have not pointed to record facts that would lead a court-even a naturally suspicious court-to question the conduct of an independent, disinterested special committee charged with negotiating a third party merger agreement.

### 5. Did the Special Committee Abdicate its Responsibility to Poulos, a Potentially Interested Director?

**\*25** It is at this point in the negotiation process that plaintiffs make a final assault on the Special Committee. After Devlin terminated negotiations, Hermance and Richards resolved to make one last effort to jump-start the talks, presumably thinking that a merger with American General was truly in Western National's interests and still potentially superior to other strategic options. They asked Poulos to contact Devlin and invite him back to the negotiating table. Poulos obliged.

In a short conversation, Devlin told Poulos that he would only come back to the table at a deal price of $29.75, based on a fixed price formula subject to collar provisions. Poulos reported the substance of this conversation to the Special Committee members. At this point, the Special Committee members, in the exercise of their good faith judgment, apparently determined that this offer represented the best option available to the Company. Upon conferring with its advisors, the Special Committee negotiated the merger's last details, including finalizing the range of the collar provisions. The Committee again met with DLJ which opined that the proposed merger transaction was fair from a financial point of view. After further discussion, the Special Committee resolved that the merger was fair and in the best interests of the Company's shareholders and recommended the transaction to the Company's full board of directors.

Based on these undisputed facts, plaintiffs allege that the Special Committee "abdicated" its duty to negotiate vigorously on behalf of the Company and its public shareholders to Poulos. Again, the facts do not come close to supporting the finding that plaintiffs urge. The Special Committee did not abdicate its responsibility; it simply used a negotiating tactic that plaintiffs thought unwise and unduly passive. Even if correct, plaintiffs cannot prevail on their abdication theory because the uncontested facts indicate that the Special Committee, which Hermance led, carried out the bulk (if not all) of the negotiation and,

more importantly, made every *decision* in the negotiating process. When shorn of all rhetoric, plaintiffs have not alleged facts that give rise to a conclusion that this merger transaction was other than the product of arm's length bargaining between a non-controlling 46 percent shareholder and a well-functioning independent special committee.

Nothing in the record indicates that American General controlled the Company's business and affairs. Nor does the record indicate that it dominated the Company's board of directors. Although the evidence does not conclusively show, at this juncture, that a majority of the Company's board was disinterested in the merger or not completely independent of American General, the doubt plaintiffs cast with respect to these issues is mild at most.

Perhaps in recognition of this eventuality, however, the Western National board prudently designated its three most clearly independent directors to serve on a special committee and charged the committee with guiding the Company at a point that genuinely appeared to be a strategic crossroads. This Special Committee appeared mindful of the fact that a merger with American General was merely one strategic option available. More importantly, American General realized the same.

**\*26** With the aid of its expert advisors, the Committee apprised itself of all reasonably available information, negotiated with American General at arm's length and, ultimately, determined that the merger transaction was in the best interests of the Company and its public shareholders. In light of these facts, I conclude that the most appropriate analytical standard to apply to this transaction is the business judgment rule.

Business judgment rule review is appropriate, it seems to me, for two broad reasons. First, Delaware law will not attach liability to decisions of independent, disinterested and informed directors. Second, Delaware law generally respects the committee process as a legitimate method to produce disinterested and independent decisions, where some directors on the board, but not on the committee, arguably have conflicting interests [FN69] The synthesis of these two principles, in my opinion, produces a general principle that liability will not attach to disinterested, independent and informed directors sitting on a special committee who recommend a merger, even if other directors on the board may have actual or potential conflicts of interest, where the board as a whole follows and accepts the committee's good faith recommendation. [FN70]

FN69. *Kahn v. Lynch,* Del.Supr., 638 A.2d 1110

Not Reported in A 2d                                                                                    Page 22
Not Reported in A 2d, 2000 WL 710192 (Del.Ch.), 26 Del J Corp L 806
**(Cite as: Not Reported in A.2d)**

(1994). *See also Weinberger v. UOP, Inc.,*
Del.Supr., 457 A.2d 701 (1983).

FN70. This maxim is by no means profound for
its novelty It is analogous to 8 *Del. C.* §
144(a)(1)

The use of an independent special committee, bargaining
at arm's length with a controlling shareholder, to shift the
burden of proving entire fairness is well noted. FN71 The
Supreme Court declined to bring such a transaction fully
within the purview of the director-protective business
judgment rule because the presence of a controlling
shareholder "has the potential to influence, however
subtly, the vote of [ratifying] minority stockholders in a
manner that is not likely to occur in a transaction with a
non-controlling party " FN72

FN71. *Kahn v Lynch,* at 1117.

FN72. *Id* at 1116 (citing *Citron v. E.I. du Pont
de Nemours & Co.,* Del. Ch., 584 A.2d 490, 502)
(1990).

The policy rationale requiring some variant of entire
fairness review, to my mind, substantially, if not entirely,
abates if the transaction in question involves a large
though not controlling shareholder. In other words,
because the absence of a controlling shareholder removes
the prospect of retaliation, the business judgment rule
should apply to an independent special committee's good
faith and fully informed recommendation FN73

FN73. It is also noteworthy, in my opinion, that
of the 79 1 percent of Western National's
outstanding shares represented by proxy at the
February 25, 1998 stockholders special meeting,
99.98 percent voted to approve the merger *See*
Affidavit of James L. Gleaves (Vice President
and Treasurer of American General), ¶ 4 (Def 's
Tab 15) Assuming that all 46 percent of
American General's shares were voted for the
merger, I can extrapolate that the roughly 33
percent remaining votes were cast by
unaffiliated, disinterested stockholders Of that
33 percent, about 32.8 percent voted in favor of
the merger-an overwhelming majority of those
actually voting and a clear majority of all
outstanding unaffiliated stockholders. Where the
unaffiliated, majority owners of a company vote
so resoundingly in favor of a transaction, and
where that vote was fully informed and
uncoerced (as it was here, for all the reasons set

forth in this decision), I think one could
reasonably ask why a corporate plebiscite on a
transaction that has no elements of fraud, waste,
or other inequitable conduct, should not be
determinative of the claims raised here This
seems all the more so, to my mind, where
potential dissenters have a full and complete
appraisal remedy. Although this question has
been raised before, *see Solomon v. Armstrong,*
Del. Ch., 747 A.2d 1098 (1999), *aff'd,* Del.Supr.,
746 A.2d 277 (2000), it has yet to be answered
definitively.

The facts of this case, in my opinion, hold out little if any
prospect for retaliation against the Company's public
shareholders. If Western National's Special Committee
refused to recommend the merger to the full board
because they believed it was not in the best interests of
the Company's public shareholders, if the board did not
approve it for similar reasons, or if the shareholders voted
down the merger at the special meeting, it is far from
clear that American General would be able to retaliate
against such refusal, even if it wished American General
did not have representatives on Western National's board,
so it is difficult to understand how it would implement
some onerous and oppressive policy upon the public
shareholders through board action. Moreover, under the
terms of the Standstill Provision, American General was
barred from nominating more than two Western National
directors-even if it chose to go into the open market and
purchase up to the Standstill's 79 percent limit of Western
National's outstanding equity. In the light of such
strictures, and the history of arm's length though amicable
course of dealing between the two companies, the sort of
retaliation the Court in *Kahn v Lynch* contemplated is
lacking here. FN74

FN74. Plaintiffs have pleaded facts that *might*
lead me to conclude that five of Western
National's directors harbored interests not
perfectly aligned with those of the public
shareholders for purposes of this transaction.
These directors, quite reasonably and
purposefully, though not required to as a matter
of law, absented themselves from the transaction,
leaving its negotiation to three clearly
disinterested and independent directors. While I
can accept plaintiffs' argument that the five
*potentially* interested directors *might* not be able
to evaluate this transaction entirely as advocates
of Western National, I cannot accept the notion
that if the transaction were to fall through, for
whatever reason, they would undertake some
action adverse to the Company's public

Not Reported in A.2d                                                                    Page 23
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
(Cite as: Not Reported in A.2d)

shareholders in retaliation-independently or at the behest of American General.

**\*27** The facts of this case are analogous to *Puma v. Marriott.* [FN75] There, a Marriott shareholder sued derivatively challenging the fairness of a transaction in which the Marriott Corporation exchanged 313,000 shares of its common stock for all the stock of six corporations primarily owned by members of the Marriott family, who also (before the transaction) collectively owned 46 percent of the Marriott Corporation's outstanding stock. The Court held that the business judgment rule and not entire fairness governed the transaction because a unanimous resolution of the corporation's five outside directors, who constituted a majority of Marriott's nine-member board, authorized the acquisition. Because there was no showing of domination of the outside directors, nor any evidence to impugn the good faith and integrity of the outside directors, and no indication that the Marriott family dictated the transaction's terms, the Court evaluated the transaction under the business judgment rule and granted defendants' summary judgment motion.

FN75. Del. Ch., 283 A.2d 693 (1971).

All those factors apply to this case. The only difference between *Puma v. Marriot* and this case is that Western National deployed a special committee of three outside, independent directors (from an eight-member board) while Marriott relied on five outside, independent directors (from a nine-member board). I do not think this variation, in the circumstances of this case, should trigger a higher review standard for the Special Committee's recommendation than the business judgment rule. The decision of the remaining five *potentially* interested directors to absent themselves from the negotiations, as noted above in footnote 74, was reasonable though not required and, in my view, made in good faith with the best interests of the Company in mind. Because the Committee's recommendation, and the full board's approval, of the merger were made in good faith and in a fully informed manner, I must conclude that the presumptions of the business judgment rule apply to these actions. Nothing in the undisputed record, moreover, indicates fraud, waste or other inequitable conduct sufficient to rebut the presumption in these circumstances. Accordingly, I now turn to plaintiffs' last gasp challenge to the merger.

### D. *The Disclosure Claims*

Directors of Delaware corporations owe a fiduciary duty "to disclose fully and fairly all material information

within the board's control when [the corporation] seeks shareholder action." [FN76] Plaintiffs allege defendants omitted material facts regarding pending litigation against certain American General subsidiaries, Special Committee directors' and their advisors' conflicts of interest, and Western National's Fourth Quarter 1997 financial results.

FN76. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 (1992).

An omitted fact is material under Delaware law if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." [FN77] For an alleged omission to be actionable, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN78]

FN77. *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1056 (1996).

FN78. *Id.*

**\*28** Plaintiffs first argue that the Proxy Statement mailed to Western National shareholders failed to disclose sufficiently that alleged victims of fraudulent sales practices have sued American General's subsidiaries in major class actions. Although plaintiffs concede that the pending litigation was disclosed "in various public filings" [FN79] they claim that because it was so disclosed, the litigation must be material to a Western National shareholder's decision whether to opt for American General stock or seek appraisal. Given its materiality, plaintiffs then argue that a full description of these claims was necessary and the Proxy Statement's "limited" disclosure was misleading. Essentially, plaintiffs claim is only that defendants failed to fully disclose the *potential* losses that *might* result from the litigation.

FN79. For example, American General's 10-Q for the Third Quarter 1997 (Def's Tab 11), which was specifically incorporated by reference in the Proxy Statement, provides: "Given the uncertain nature and the early stages of the litigation, the outcome of these actions cannot be predicted at this time. American General nonetheless believes that the ultimate outcome of all such pending litigation should not have a material adverse effect on American General's

consolidated financial position; however, it is possible that settlements or adverse determinations in one or more of these actions or other future proceedings could have a material adverse effect on American General's consolidated results of operations for a given period. No provision has been made in the consolidated financial statements related to this pending litigation because the amount of loss, if any, from these actions cannot be reasonably estimated at this time."

This argument fails for several reasons. First, disclosure duties under Delaware law arise from fiduciary relationships. [FN80] Once a fiduciary relationship is established, a fiduciary must deal honestly, openly and fairly with his beneficiary. [FN81] Under the facts of this case, I have concluded that American General did not control Western National, its board, or the Special Committee, and thus did not stand in a fiduciary relationship with Western National shareholders. Consequently, I do not see how plaintiffs can maintain this claim against American General. Furthermore, no basis exists to hold Western National and its board liable for failing to speculate as to the amount of a potential judgment against American General.

> FN80. *Turner v. Bernstein,* Del. Ch., C.A. No. 16190, mem. op. at 24-27, Jacobs, V.C. (Feb. 9, 1999)

> FN81. *See Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 778 (1993).

More generally, this claim fails to the extent that it simply ignores the long line of Delaware cases holding that there is no duty to speculate in a proxy statement. [FN82] American General's public filings, incorporated by reference into the Proxy Statement, plainly disclosed the existence of the litigation and further disclosed the fact that it did not believe that the litigation would have a material impact on its consolidated financial position. Moreover, the public filings stated that it was impossible to predict the outcome of the litigation because it was uncertain and still in the early stages. Any attempt by Western National directors or American General, for that matter, to disclose through the Proxy Statement the amounts of future settlements or judgments would have been utter speculation and, thus, need not have been disclosed.

> FN82. *See, e.g., TCG Secs., Inc. v. Southern Union Co.,* Del. Ch., C.A. No. 11282, mem. op.

at 13, Chandler, V.C. (Jan. 31, 1990) (further disclosure of pending litigation not required because of speculative nature); *Bragger v. Budacz,* Del. Ch., C.A. No. 13376, mem. op. at 14, Allen, C. (Dec. 7, 1994) (dismissing as speculative disclosure that "it is possible" that individuals' continued service as directors would result in antitrust violations).

Plaintiffs attempt to bolster this disclosure claim by pointing to the fact that on December 16, 1998-nearly eleven months after the Proxy Statement was sent to Western National shareholders-American General announced settlements of the litigation and took an allegedly material, $246 million after-tax charge to its earnings for the fourth quarter of 1998. This observation is legally irrelevant because plaintiffs cannot prove a disclosure claim by hindsight. [FN83] In other words, the fact that the litigation was settled for an allegedly material amount eleven months *after* Western National disseminated the Proxy Statement cannot give rise to an actionable nondisclosure claim at the time Western National sent the Proxy Statement when such amount was reasonably viewed as speculative.

> FN83. *See, e.g., Lewis v. Austen,* Del. Ch., C.A. No. 12937, mem. op. at 13-14, Jacobs, V.C. (June 2, 1999); *Noerr v. Greenwood,* Del. Ch., C.A. No. 14320, mem. op. at 12-13, Jacobs, V.C. (July 16, 1997).

*29 Plaintiffs next allege that Western National omitted material facts regarding Special Committee members' and Special Committee advisors' conflicts of interest. These bootstrap claims fail for reasons stated earlier in this opinion: neither the Special Committee nor its advisors labored under conflicts of interest.

Plaintiffs' final disclosure claim alleges that Western National's failure to provide its shareholders unaudited Fourth Quarter 1997 operating earnings amounted to a material omission. Plaintiffs concede that applicable SEC regulations governing when disclosures of financial statements must take place did not require the disclosure they demand. Specifically, the applicable regulation provides that if a proxy statement is mailed less than forty-five days after the close of the fiscal year, the proxy statement need only disclose the third quarter financial statements, unless an audited statement has already been prepared. [FN84]

> FN84. Regulation S-X, Rule 3-12(b); 17 C.F.R. § 210.3-12

Not Reported in A.2d                                                                                    Page 25
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806
**(Cite as: Not Reported in A.2d)**

Plaintiffs do not allege that Western National's financial statements covering the Fourth Quarter 1997 were audited at the time the Proxy Statement was disseminated. Nonetheless, they assert that Delaware law required this disclosure. This Court rejected an identical claim in *Skeen v. Jo-Ann Stores, Inc.* [FN85] Like the *Skeen* plaintiffs, plaintiffs here allege that Western National did not (but should have) disclose the most up-to-date financial statements available. The *Skeen* Court dismissed plaintiffs' disclosure claims because "plaintiffs have presented no persuasive authority or argument why this Court should expand Delaware disclosure requirements beyond those presently mandated by Federal law." [FN86] Plaintiffs claim here fails for the same reason.

FN85. Del. Ch., C.A. No. 16836, Jacobs, V.C. (Sept. 27, 1999), *aff'd,* Del.Supr., No. 448, 199 (May 3, 2000).

FN86. *Id.* at 18.

### IV. CONCLUSION

Based on the undisputed evidence as presented in the developed record of this three-year-old case, I reach the following conclusions as a matter of law. First, although American General is a large (46 percent) stockholder in Western National, it neither controlled nor dominated Western National. Second, Western National's three person Special Committee negotiated, at arm's length and in good faith, a merger transaction with American General that was in the best interests of the Company and its stockholders. The Special Committee was composed entirely of independent, disinterested directors who retained, and relied upon, qualified, independent experts regarding the merger negotiations. Third, in good faith and on a fully informed basis, the Special Committee recommended the merger agreement to Western National's board of directors. Fourth, Western National's board approved the Committee's recommendation. Fifth, the Company's board then submitted the merger agreement, pursuant to 8 *Del. C.* § 251(c), to the stockholders who approved it by an overwhelming vote with no evidence of fraud, waste, bad faith or other inequitable conduct. This corporate plebiscite was valid and is entitled to judicial deference because it was fully informed and uncoerced. As a result, I conclude as a matter of law that the business judgment rule protects the decision to approve and to recommend the merger agreement. Because plaintiffs have failed to point to evidence of fraud, waste, or other inequitable conduct that would rebut the rule's presumption, I grant summary judgment in favor of defendants.

**\*30** Plaintiffs have amended their complaint once. Full discovery has been taken regarding all issues, and no request was made at oral argument to amend the pleadings yet again. From this, I assume it is safe (to the extent one is ever safe to assume anything pre-appeal) for this Court to enter a final Order. In any event, I have entered the attached Order.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that summary judgment of dismissal is entered, pursuant to Court of Chancery Rule 56, in favor of defendants and against plaintiffs on all claims asserted in the amended complaint.

Del.Ch.,2000.
In re Western Nat. Corp. Shareholders Litigation
Not Reported in A.2d, 2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.